1  Jeffrey L. Kessler (*pro hac vice* forthcoming)
   jkessler@winston.com
2  David G. Feher (*pro hac vice* forthcoming)
   dfeher@winston.com
3  **WINSTON & STRAWN LLP**
   200 Park Avenue
4  New York, New York 10166
   Telephone: (212) 294- 6700
5  Facsimile: (212) 294-4700

6  Cardelle B. Spangler (*pro hac vice* forthcoming)
   cspangler@winston.com
7  **WINSTON & STRAWN LLP**
   35 West Wacker Drive
8  Chicago, Illinois 60601
   Telephone: (312) 558-5600
9  Facsimile: (312) 558-5700

10 Diana Hughes Leiden (SBN: 267606)
   dhleiden@winston.com
11 **WINSTON & STRAWN LLP**
   333 South Grand Avenue, 38th Floor
12 Los Angeles, California 90071-1543
   Telephone: (213) 615-1700
13 Facsimile: (213) 615-1750

14 Attorneys for Plaintiffs

15                **UNITED STATES DISTRICT COURT**
                  **CENTRAL DISTRICT OF CALIFORNIA**
16                       **WESTERN DIVISION**

17 ALEX MORGAN, MEGAN RAPINOE,           **Case No. 2:19-CV-01717**
   BECKY SAUERBRUNN, CARLI LLOYD,
18 MORGAN BRIAN, JANE CAMPBELL,
   DANIELLE COLAPRICO, ABBY             **PLAINTIFFS' COLLECTIVE**
19 DAHLKEMPER, TIERNA DAVIDSON,          **ACTION COMPLAINT FOR**
   CRYSTAL DUNN, JULIE ERTZ, ADRIANNA    **VIOLATIONS OF THE**
20 FRANCH, ASHLYN HARRIS, TOBIN          **EQUAL PAY ACT AND**
   HEATH, LINDSEY HORAN, ROSE            **CLASS ACTION**
21 LAVELLE, ALLIE LONG, MERRITT          **COMPLAINT FOR**
   MATHIAS, JESSICA MCDONALD,            **VIOLATIONS OF TITLE VII**
22 SAMANTHA MEWIS, ALYSSA NAEHER,        **OF THE CIVIL RIGHTS ACT**
   KELLEY O'HARA, CHRISTEN PRESS,        **OF 1964**
23 MALLORY PUGH, CASEY SHORT, EMILY
   SONNETT, ANDI SULLIVAN AND            **DEMAND FOR JURY TRIAL**
24 MCCALL ZERBONI,

25           Plaintiffs/Claimants,

26 vs.

27 UNITED STATES SOCCER FEDERATION,
   INC.,
28           Defendant/Respondent.

---

**COMPLAINT**

## **NATURE OF THE ACTION**

1.     The United States Soccer Federation, Inc. ("USSF") is the single, common employer of female and male professional soccer players who play on the United States Senior Women's National Soccer Team ("WNT") and the United States Senior Men's National Soccer Team ("MNT").  Despite the fact that these female and male players are called upon to perform the same job responsibilities on their teams and participate in international competitions for their single common employer, the USSF, the female players have been consistently paid less money than their male counterparts.  This is true even though their performance has been superior to that of the male players – with the female players, in contrast to male players, becoming world champions.

2.     The USSF has claimed that its mission is to "promote and govern soccer in the United States in order to make it the preeminent sport recognized for excellence in participation, spectator appeal, international competitions and **gender equality**." (Emphasis added.)  In reality, the USSF has utterly failed to promote gender equality. It has stubbornly refused to treat its female employees who are members of the WNT equally to its male employees who are members of the MNT.  The USSF, in fact, has admitted that it pays its female player employees less than its male player employees and has gone so far as to claim that "market realities are such that the women do not deserve to be paid equally to the men."  The USSF admits to such purposeful gender discrimination even during times when the WNT earned more profit, played more games, won more games, earned more championships, and/or garnered higher television audiences.

3.     During his 2017 campaign for president of the USSF, current President Carlos Cordeiro, who had been a member of the USSF's Board of Directors since 2007 and Vice President of the USSF from 2016 to February 2018, admitted, "Our women's teams should be respected and valued as much as our men's teams, but our female players have not been treated equally."  The USSF, however, has paid only lip

1  service to gender equality and continues to practice gender-based discrimination
2  against its champion female employees on the WNT in comparison to its less
3  successful male employees on the MNT.

4      4.    This collective and class action is brought by current female employees
5  of the USSF who play on the WNT for violations of the Equal Pay Act ("EPA"), 29
6  U.S.C. § 206(d) et seq., and Title VII of the Civil Rights Act of 1964, as amended, 42
7  U.S.C. § 2000e et seq. ("Title VII"), on behalf of themselves and all other similarly
8  situated current and former WNT players who the USSF has subjected to its
9  continuing policies and practices of gender discrimination.  The USSF discriminates
10 against Plaintiffs, and the class that they seek to represent, by paying them less than
11 members of the MNT for substantially equal work and by denying them at least equal
12 playing, training, and travel conditions; equal promotion of their games; equal support
13 and development for their games; and other terms and conditions of employment
14 equal to the MNT.

15     5.    This action seeks an end to the USSF's discriminatory practices, and an
16 award to make Plaintiffs and the class whole, as well as to provide for liquidated and
17 punitive damages and all other appropriate relief.

18 **PARTIES**

19     6.    Alex Morgan is a woman who resides in Maitland, Florida during the
20 National Women's Soccer League season and in Manhattan Beach, California during
21 the off-season.  During times relevant to this lawsuit, Plaintiff Morgan has been
22 employed by the USSF as a member of the WNT.

23     7.    Megan Rapinoe is a woman who resides in Seattle, Washington.  During
24 times relevant to this lawsuit, Plaintiff Rapinoe has been employed by the USSF as a
25 member of the WNT.

26     8.    Becky Sauerbrunn is a woman who resides in Portland, Oregon.  During
27 times relevant to this lawsuit, Plaintiff Sauerbrunn has been employed by the USSF as
28 a member of the WNT.

9.      Carli Lloyd is a woman who resides in Medford, New Jersey.   During times relevant to this lawsuit, Plaintiff Lloyd has been employed by the USSF as a member of the WNT.

10.      Morgan Brian is a woman who resides in Chicago, Illinois.   During times relevant to this lawsuit, Plaintiff Brian has been employed by the USSF as a member of the WNT.

11.      Jane Campbell is a woman who resides in Houston, Texas.   During times relevant to this lawsuit, Plaintiff Campbell has been employed by the USSF as a member of the WNT.

12.      Danielle Colaprico is a woman who resides in Freehold, New Jersey. During times relevant to this lawsuit, Plaintiff Colaprico has been employed by the USSF as a member of the WNT.

13.      Abby Dahlkemper is a woman who resides in Menlo Park, California. During times relevant to this lawsuit, Plaintiff Dahlkemper has been employed by the USSF as a member of the WNT.

14.      Tierna Davidson is a woman who resides in Menlo Park, California. During times relevant to this lawsuit, Plaintiff Davidson has been employed by the USSF as a member of the WNT.

15.      Crystal Dunn is a woman who resides in Rockville Centre, New York. During times relevant to this lawsuit, Plaintiff Dunn has been employed by the USSF as a member of the WNT.

16.      Julie Ertz is a woman who resides in Philadelphia, Pennsylvania.   During times relevant to this lawsuit, Plaintiff Ertz has been employed by the USSF as a member of the WNT.

17.      Adrianna Franch is a woman who resides in Beaverton, Oregon.   During times relevant to this lawsuit, Plaintiff Franch has been employed by the USSF as a member of the WNT.

18.     Ashlyn Harris is a woman who resides in Altamonte Springs, Florida. During times relevant to this lawsuit, Plaintiff Harris has been employed by the USSF as a member of the WNT.

19.     Tobin Heath is a woman who resides in Portland, Oregon.  During times relevant to this lawsuit, Plaintiff Heath has been employed by the USSF as a member of the WNT.

20.     Lindsey Horan is a woman who resides in Golden, Colorado.  During times relevant to this lawsuit, Plaintiff Horan has been employed by the USSF as a member of the WNT.

21.     Rose Lavelle is a woman who resides in Cincinnati, Ohio.  During times relevant to this lawsuit, Plaintiff Lavelle has been employed by the USSF as a member of the WNT since 2017.

22.     Allie Long is a woman who resides in Tacoma, Washington.  During times relevant to this lawsuit, Plaintiff Long has been employed by the USSF as a member of the WNT.

23.     Merritt Mathias is a woman who resides in Portland, Oregon.  During times relevant to this lawsuit, Plaintiff Mathias has been employed by the USSF as a member of the WNT.

24.     Jessica McDonald is a woman who resides in Chapel Hill, North Carolina.  During times relevant to this lawsuit, Plaintiff McDonald has been employed by the USSF as a member of the WNT.

25.     Samantha Mewis is a woman who resides in Dorchester, Massachusetts. During times relevant to this lawsuit, Plaintiff Mewis has been employed by the USSF as a member of the WNT.

26.     Alyssa Naeher is a woman who resides in Charlotte, North Carolina. During times relevant to this lawsuit, Plaintiff Naeher has been employed by the USSF as a member of the WNT.

27.    Kelley O'Hara is a woman who resides in Atlanta, Georgia.   During times relevant to this lawsuit, Plaintiff O'Hara has been employed by the USSF as a member of the WNT.

28.    Christen Press is a woman who resides in Palos Verdes, California. During times relevant to this lawsuit, Plaintiff Press has been employed by the USSF as a member of the WNT.

29.    Mallory Pugh is a woman who resides in Highlands Ranch, Colorado. During times relevant to this lawsuit, Plaintiff Pugh has been employed by the USSF as a member of the WNT.

30.    Casey Short is a woman who resides in Chicago, Illinois.   During times relevant to this lawsuit, Plaintiff Short has been employed by the USSF as a member of the WNT.

31.    Emily Sonnett is a woman who resides in Marietta, Georgia.   During times relevant to this lawsuit, Plaintiff Sonnett has been employed by the USSF as a member of the WNT.

32.    Andi Sullivan is a woman who resides in Rockville, Maryland.   During times relevant to this lawsuit, Plaintiff Sullivan has been employed by the USSF as a member of the WNT.

33.    McCall Zerboni is a woman who resides in Raleigh, North Carolina during the National Women's Soccer League season and in San Juan Capistrano, California with her family during the off-season.   During times relevant to this lawsuit, Plaintiff Zerboni has been employed by the USSF as a member of the WNT.

34.    Defendant USSF is a 501(c)(3) not-for-profit corporation domiciled in the State of New York, headquartered in Chicago, Illinois and with operations throughout the United States, including in Los Angeles County, California.   At all times relevant hereto, the USSF employed more than 500 people including, but not limited to, Plaintiffs and all current and former members of the WNT and the MNT,

all of whom performed their employment services as players in training camps and games throughout the United States, including in Los Angeles County, California.

## JURISDICTION AND VENUE

35.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs assert federal claims under the Equal Pay Act and Title VII.

36.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) because a Plaintiff resides in this district; all Plaintiffs perform work in this district, including attending training camps for extensive periods of time and playing WNT games; the USSF conducts substantial business throughout this district, including, but not limited to, maintaining the U.S. Soccer National Training Center in Carson, California where USSF, among other things, evaluates WNT players at training camps and hosts WNT games; and events giving rise to claims herein occurred in this district including, but not limited to, WNT players attending training camps and playing games.

## FACTUAL ALLEGATIONS

37.     The USSF is the common employer of the players on the WNT and the MNT. It centrally manages and controls every aspect of the senior national team program for both teams and their female and male members.  This includes, for example, selecting and hiring their members as employees; setting and providing them with their pay; hiring their coaches, trainers, nutritionists, doctors, massage therapists, administrators and other staff people; deciding the number of games the employees play, the location of games, the opponents for games, the tournaments in which they participate, and nature, timing and funding for promotion of the games; determining the surface of the fields on which their employees play; scheduling times and locations for training camps; granting access to practice fields, locker rooms and exercise equipment during camps; setting ticket prices for home games; and deciding whether to charter a flight for employees or require they travel commercially for

games.   Every aspect of the players' employment on both teams is commonly controlled by and dictated by the USSF, as the common employer.

38.   This centralized management and control has permitted the USSF to perpetuate gender-based discrimination against Plaintiffs and the class they seek to represent in nearly every aspect of their employment.

39.   This is the case even though the WNT has achieved unmatched success in international soccer leading to world championships and substantial profits for the USSF and even though Plaintiffs are required to perform the same job duties that require equal skill, effort and responsibilities performed under similar working conditions as the male MNT players.

**A.    The WNT Has Achieved Unmatched Success in International Soccer Leading to Substantial Profits for the USSF as Plaintiffs' Employer.**

40.   The WNT has enjoyed unparalleled success in international soccer.   The team has won three World Cup titles, most recently in 2015, four Olympic Gold Medals and numerous other international competitions.   It is the three-time winner of the U.S. Olympic Committee's Team of the Year Award and has been *Sports Illustrated*'s Athlete of the Year.   The WNT is currently ranked number one in the world, a position it has held ten out of the last eleven years.

41.   The July 5, 2015 World Cup title game garnered approximately 23 million viewers, making it the most watched soccer game in American TV history. The post-Cup Victory Tour drew tens of thousands of fans to soccer stadiums across the United States, a trend that continued years after that historic achievement.

42.   The WNT's success on the field has translated into substantial revenue generation and profits for the USSF.   In fact, during the period relevant to this case, the WNT earned more in profit and/or revenue than the MNT.

43.   For example, for FY2016 (April 1, 2015-March 31, 2016), the USSF budgeted a combined net loss for the national teams of $429,929.   But thanks largely to the success of the female players on the WNT, the USSF revised its projections

upward to include a $17.7 million profit.  The net profit for the WNT outstripped net profit for the MNT because the female players on the WNT were more successful in competition than the male players on the MNT – while being paid substantially less.

**B.     Plaintiffs Are Required to Perform the Same Job Duties that Require Equal Skill, Effort and Responsibilities Performed under Similar Working Conditions as MNT Players.**

44.     Notwithstanding the unbridled on-field success and financial contributions of the WNT players, the USSF has and continues to have a policy and practice of discriminating against Plaintiffs based upon their gender by treating them substantially less favorably than members of the MNT with regard to pay and other terms and conditions of employment despite the USSF requiring Plaintiffs to perform the same job duties that require equal skill, effort and responsibilities performed under similar working conditions as MNT players.

45.     As their common employer, the USSF, for example, has and continues to require that Plaintiffs and male players on the MNT be available for training and any games requested by the USSF; maintain a high level of competitive soccer skills and physical conditioning such that they can compete as elite soccer players; not use illegal or banned drugs or any other harmful substances; serve as a spokesperson for soccer and devote reasonable best efforts to promoting and developing the sport of soccer in the U.S.; grant all reasonable requests by the USSF to promote games and to participate in a reasonable number of media interviews and other media sessions; participate in autograph sessions; devote whatever time is reasonable and necessary to perform their duties as players and spokespeople; comport themselves, at all times, in a manner befitting their positions as members of the WNT and MNT and spokespersons and representatives of the USSF and the sport of soccer; and comply with the USSF's reasonable rules and regulations.

46.     As their common employer, the USSF also has and continues to require that Plaintiffs and male players on the MNT maintain competitive soccer skills,

physical conditioning and overall health by undergoing rigorous training routines (endurance running, weight training, etc.) and by adhering to certain nutrition, physical therapy and other regimens. They must attend training camps and practices, participate in skills drills and play scrimmages and other practice events.

47. As their common employer, the USSF also has and continues to require Plaintiffs and male players on the MNT to travel nationally and internationally as necessary for competitive games, which are the same in length, physical and mental demand, and playing environment and conditions throughout the United States and globally. Plaintiffs and MNT players do not work in a single location, but are required to perform and work in games throughout the United States and globally, according to the playing schedule set by the USSF.

48. Plaintiffs and similarly situated male employees of the USSF must adhere to the same rules of the game of soccer as established by the Federation Internationale de Football Association ("FIFA"). They play on the same size field; use the same size ball; have the same duration of matches and play by the same rules regarding start and restart of play, offside, fouls and misconduct, free kicks, penalty kicks, throw-ins, goals kicks, corner kicks, etc.

49. In light of the WNT's on-field success, Plaintiffs often spend more time practicing for and playing in matches, more time in training camps, more time traveling and more time participating in media sessions, among other duties and responsibilities, than similarly situated MNT players.

50. For example, from 2015 through 2018, the WNT played *nineteen* more games than the MNT played over that same period of time. As the MNT averaged approximately seventeen games per year in that time frame, the WNT played the equivalent of more than one additional MNT calendar year season from 2015 through 2018.

51. The USSF, nevertheless, has paid and continues to pay Plaintiffs less than similarly situated MNT players.

**COMPLAINT**

1
2
3

**C.**     **The USSF Has a Policy and Practice of Discriminating Against Members of the WNT, Including Plaintiffs, on the Basis of Gender by Paying Them Less Than Similarly Situated MNT Players.**

4
5
6
7
8
9

52.     Beginning as early as 2012 and at various times thereafter, members of the WNT through their union, the WNT Players' Association ("WNTPA"), have demanded that the USSF offer WNT players pay equal to pay afforded to MNT players. These demands, however, have been rejected, and the USSF has paid and continues to pay WNT players less for comparable services than the USSF pays to male players on the MNT.

10
11
12
13
14
15

53.     Under the pay structure in effect from January 1, 2001 through December 31, 2018, MNT players received a minimum amount (currently $5,000) to play in each game, regardless of the outcome. That minimum can increase to amounts currently ranging from $6,250 to $17,625 per game, depending on the level of their opponent (FIFA-ranked 1-10, FIFA-ranked 11-24, FIFA ranked above 25) and whether they win or tie the game.

16
17
18
19
20

54.     The USSF has continually rejected WNT players' requests for pay equal to the pay afforded to MNT players. In response to their demand in 2012, the USSF offered WNT players compensation only if they won games against FIFA-ranked top ten teams. The USSF would not have paid them for losing games, tying games or winning against teams ranked outside of the top ten.

21
22
23
24
25
26

55.     In response to the WNT players' demand for equal pay in 2016, a representative of the USSF admitted that the USSF has and will continue to have a practice of gender-based pay discrimination. The representative pronounced, "market realities are such that the women do not deserve to be paid equally to the men." The USSF made this statement after it already had conceded that the WNT outperformed the MNT in both revenue and profit the prior year.

27
28

**COMPLAINT**

56.    The USSF has never offered female WNT players pay at least equal to the pay afforded to male MNT players.  In fact, the USSF has admitted that WNT players have been paid less than comparable male MNT players.

57.    From March 19, 2013 through December 31, 2016, WNT players could earn a maximum salary of $72,000 plus bonuses for winning non-tournament games called "friendlies," for World Cup-related appearances and victories, and for placement at the Olympics.

58.    A comparison of the WNT and MNT pay shows that if each team played 20 friendlies in a year and each team won all twenty friendlies, female WNT players would earn a maximum of $99,000 or $4,950 per game, while similarly situated male MNT players would earn an average of $263,320 or $13,166 per game against the various levels of competition they would face.  A 20-game winning top tier WNT player would earn only 38% of the compensation of a similarly situated MNT player.

59.    The compensation afforded WNT players for World Cup competition was even more strikingly disparate than for friendlies.

60.    From March 19, 2013 through December 31, 2016, WNT players earned only $15,000 total for being asked to try out for the World Cup team and for making the team roster.  MNT players, on the other hand, earned $55,000 each for making their team's roster in 2014 and could have earned $68,750 each for making their team's roster in 2018.

61.    The pay for advancement through the rounds of the World Cup was so skewed that, in 2014, the USSF provided the MNT with performance bonuses totaling $5,375,000 for losing in the Round of 16, while, in 2015, the USSF provided the WNT with only $1,725,000 for winning the entire tournament.  The WNT earned more than three times less than the MNT while performing demonstrably better.

62.    The WNTPA entered into a new collective bargaining agreement with the USSF effective January 1, 2017 ("2017 CBA").  During collective bargaining for a

1    new contract, USSF rejected requests for compensation for the WNT players that

2    would have been at least equal to that afforded to the male MNT players.

3        63.    The WNTPA even proposed a revenue-sharing model that would test the

4    USSF's "market realities" theory.   Under this model, player compensation would

5    increase in years in which the USSF derived more revenue from WNT activities and

6    player compensation would be less if revenue from those activities decreased.   This

7    showed the players' willingness to share in the risk and reward of the economic

8    success of the WNT.   The USSF categorically rejected this model as well.

9        64.    The USSF continues its policy and practice of paying female WNT

10   players less than similarly situated male MNT players on a per game basis.

11       65.    Each Plaintiff has and continues to earn less compensation on a per game

12   basis than comparable male players on the MNT.

13       66.    The USSF has no legitimate, non-discriminatory reason for this gross

14   disparity in pay, nor can it be explained away by any bona fide seniority, merit or

15   incentive system or any other factor other than sex.

16   **D.    The USSF Has a Policy and Practice of Discriminating Against**

17       **Members of the WNT, Including Plaintiffs, on the Basis of Gender**

18       **by Providing Them with Less Favorable Terms and Conditions of**

19       **Employment Than Similarly Situated MNT Players.**

20       67.    The USSF's ongoing policies and practices of intentional gender

21   discrimination extend beyond pay and into nearly every aspect of Plaintiffs and

22   similarly situated WNT players' work conditions.   This includes playing, training and

23   travel conditions; promotion of their games; support and development for their games

24   and other terms and conditions of their employment that are less favorable than

25   provided to MNT players.

26       68.    For example, the USSF has complete control over the surfaces, i.e., grass,

27   grass overlay or artificial surfaces such as turf, on which the national teams play their

28   home matches.   Playing on inferior surfaces, including artificial turf, can lead to

1  significant, career-threatening injuries.  Such surfaces also affect fundamentals of the
2  games, including the way the ball bounces and how the ball can be struck.

3       69.    At times relevant hereto, the USSF subjected Plaintiffs and similarly
4  situated current and former WNT players to matches on inferior surfaces at a rate far
5  in excess of that required of MNT players.

6       70.    For example, from January 1, 2014 through December 31, 2017, the
7  WNT played 62 domestic matches, 13 (21%) of which were played on artificial
8  surfaces.  During that same period of time, the MNT played 49 domestic matches,
9  only 1 (2%) of which was played on an artificial surface.

10      71.    During this same time period, the USSF arranged for natural grass to be
11 installed temporarily over artificial surfaces for 8 MNT domestic matches, including 3
12 venues where the USSF did not temporarily install natural grass when the WNT
13 played in those same venues.  The USSF provided a temporary natural grass overlay
14 for the WNT only once during this same time period.

15      72.    The USSF has complete control over whether it requires WNT and MNT
16 players to take commercial flights or chooses to charter flights for the teams.  Charter
17 flights provide for more physical comfort, less risk of lost baggage or missed
18 connections and better opportunity for rest before and after games, among other
19 benefits.

20      73.    The USSF provides the MNT with the benefit of charter flights more
21 frequently than it does for the WNT.  In 2017, for example, the USSF chartered flights
22 for the MNT on at least seventeen occasions, while failing to do so even once for the
23 WNT.

24      74.    The USSF has complete control over the timing and manner of and
25 resources it devotes to promote national team games.  Among other things, the USSF
26 has allocated less resources promoting WNT games than it has allocated promoting
27 MNT games; has not announced WNT games with sufficient notice to allow for

28

maximum attendance; and has not used all available means to promote WNT games in a manner at least equal to MNT games.

75. In December 2017, the former President of Soccer United Marketing – the for-profit marketing company the USSF has used for many years to market the national teams and other soccer entities – acknowledged that the WNT has been under-marketed. She further acknowledged that the USSF has "taken the WNT for granted" and agreed that there was a need for the USSF to invest equally in the WNT and MNT.

76. Such disparate treatment in the promotion of the WNT has a direct and negative effect not only on revenue generated by the WNT but compensation in the form of ticket share revenue – an amount paid by the USSF to each national team for each ticket sold to their USSF-promoted home friendlies. When fewer people know about a game, fewer people buy tickets to the game and fewer dollars are generated from the game.

77. The USSF further continues to discriminate against Plaintiffs and similarly situated WNT players by having set ticket prices to the WNT games at a lower price than for MNT games. The USSF's unilateral decision to set such lower ticket prices, coupled with its decision to provide substantially less marketing and promotion support to the WNT, results in USSF-manufactured revenue depression for the WNT, which is then used as pretext for lower compensation for Plaintiffs.

78. The USSF has no legitimate, non-discriminatory reason for the gross disparity in the terms and conditions of employment to which it has subjected and continues to subject Plaintiffs and the class they seek to represent.

## COLLECTIVE ACTION ALLEGATIONS

**The Fair Labor Standards Act of 1938, as amended by the Equal Pay Act, 29 U.S.C. §§ 206 et seq.**

79. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

80.    The USSF has engaged in systemic gender-based pay discrimination against its female WNT employees.  The USSF has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices, and procedures, including but not limited to common compensation policies, common conduct management policies, and centralized decision-making.

81.    Plaintiffs bring collective claims alleging violations of the Equal Pay Act of 1963 ("EPA") pursuant to 29 U.S.C. § 216(b).

82.    Plaintiffs seek to be appointed as representatives of the collective.

83.    Plaintiffs and the collective are similarly situated in that they are all current or former female WNT employees of the USSF who all have been and/or are being subjected to and adversely affected by the USSF's common policies and practices of paying them less than male MNT players for substantially the same or similar work.

84.    Questions of law and fact common to each Plaintiff and the respective similarly situated current and former employees that she seeks to represent include but are not limited to the following:

a.    Whether the USSF has an unlawful common policy or practice of paying members of the collective less than similarly situated male employees for substantially equal or similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

b.    Whether the USSF unlawfully failed and continues to fail to compensate members of the collective at a level commensurate with similarly situated male employees.

c.    Whether the USSF has willfully violated the EPA by intentionally, knowingly, and/or deliberately paying female WNT employees less than its male MNT employees for substantially equal or similar work.

d.    Whether the USSF's common policy or practice of paying members of the collective less than similarly situated male employees for substantially

1   equal or similar work can be explained away by any bona fide seniority, merit or

2   incentive system or any other factor other than sex.

3       85.    Counts for violation of the EPA may be brought and maintained as an

4   "opt-in" collective action pursuant to 29 U.S.C. § 216(b) for all claims asserted by

5   Plaintiffs, because their claims are similar to the claims of the similarly situated

6   employees whom they seek to represent.

7       86.    Plaintiffs and the respective employees they seek to represent are (a)

8   similarly situated and (b) subjected to Defendant's common compensation policies,

9   practices, and procedures and centralized decision-making resulting in unequal pay

10   based on sex by failing to compensate Plaintiffs at a level commensurate with male

11   employees who perform substantially equal or similar work.

12   **CLASS ACTION ALLEGATIONS**

13   **Violation of Title VII of the Civil Rights Act of 1964, as amended,**

14   **42 U.S.C. §§ 2000e, et seq.**

15       87.    Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn each filed a charge of

16   discrimination with the Equal Employment Opportunity Commission ("EEOC") on

17   March 30, 2016 on behalf of themselves and all similarly situated WNT players

18   alleging the USSF had discriminated against them on the basis of sex.

19       88.    On February 5, 2019, the EEOC issued Plaintiffs Morgan, Lloyd,

20   Rapinoe and Sauerbrunn Notices of Right to Sue, which these Plaintiffs each received

21   on February 11, 2019.  True and accurate copies of Plaintiffs Morgan, Lloyd, Rapinoe

22   and Sauerbrunn's Notices of Right to Sue are attached to this Complaint as Exhibit A.

23       89.    Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn have exhausted their

24   administrative remedies and have brought this action in a timely manner.

25       90.    Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn bring this action as a

26   class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil

27   Procedure, on behalf of themselves and all others similarly situated.

28

91.     Specifically, the class Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn seek to represent is comprised of all current and/or former WNT players who were members of the WNT at any time from February 4, 2015 through the date of final judgment, or the date of the resolution of any appeals therefrom, whichever is later.

92.     The Class contains more than fifty (50) individuals, all of whom are readily ascertainable based on the USSF's payroll records, and is so numerous that joinder of all members is impracticable.

93.     Plaintiffs Lloyd, Morgan, Rapinoe and Sauerbrunn's claims are typical of the claims of the other members of the Class because the USSF's discriminatory acts of subjecting WNT players to terms and conditions of employment less favorable than MNT players has injured Plaintiffs Lloyd, Morgan, Rapinoe and Sauerbrunn and the members of the Class.

94.     Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn and other Class Members sustained damages arising out of the USSF's common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by the USSF's wrongful conduct in violation of laws as alleged herein.

95.     Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation.

96.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class include:

a.     Whether the USSF discriminates against the Class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender, and whether Plaintiffs and the Class have suffered disparate

impact and/or disparate treatment discrimination as a result of Defendant's wrongful conduct.

b. Whether there are legitimate, non-discriminatory reasons for this gross disparity of wages and other terms and conditions of employment and whether those reasons are pretext for unlawful gender discrimination.

c. Whether the USSF has willfully violated Title VII by intentionally, knowingly, and/or deliberately subjecting WNT players to terms and conditions of employment less favorable than MNT players.

d. Whether, as a result of the USSF's ongoing conduct, violation of Title VII, and/or willful discrimination, Plaintiff and similarly situated former and current WNT members have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

97. The USSF's policies at issue apply uniformly to all members of the Class.

98. The prosecution of separate actions by individual members of the Class would create the risk of:

a. Inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the Class; or

b. Adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their abilities to protect their interests.

99. In construing and enforcing their uniform agreements, rules, and practices, and in taking and planning to take the actions described in this Complaint, the USSF has acted or refused to act on grounds that apply generally to each of the

Plaintiffs, so that final injunctive relief or corresponding declaratory relief would be appropriate for the Class as a whole.

100.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and the USSF, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would ensure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

101.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class Members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against the USSF.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

### Equal Pay Act

### (The Fair Labor Standards Act of 1938, as amended by the Equal Pay Act, 29 U.S.C. §§ 206 et seq.)

102.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

103.   The USSF has discriminated against Plaintiffs and the collective in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206 et seq., as amended by the Equal Pay Act of 1963 ("EPA").

104.   The USSF has paid Plaintiffs and the collective less than similarly situated male employees performing equal work on jobs the performance of which require equal skill, effort and responsibility and which are performed under similar working conditions.

105.   The differential in pay between Plaintiffs and the collective on the one hand and similarly situated male employees on the other was and is not due to any bona fide seniority, merit or incentive system or any other factor other than sex, but was because of gender.

106.   The USSF did not act in good faith and created and perpetuated gender-based wage discrimination in violation of the EPA.

107.   The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).   The three-year statute of limitations applies to the USSF's EPA violations because the USSF's EPA violations were and are willful.

108.   As a result of the USSF's gender-based discriminatory policies and/or practices as described above, female WNT employees have suffered damages including, but not limited to, lost past and future income, compensation and benefits.

109.   Plaintiffs request relief as hereinafter described.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the collective, pray for relief as follows:

a.   Certify this action as a collective action under the EPA, designate Plaintiffs as the representatives of the collective, promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the collective which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and toll the statute of limitations on the claims of all members of the collective from the date the original Complaint was filed until the collective members are

provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt into the lawsuit;

      b.    Back pay (including interest and benefits) for Plaintiffs and the collective members;

      c.    Liquidated damages;

      d.    Pre-judgment and post-judgment interest;

      e.    Attorneys' fees and costs to the fullest extent allowed by law; and

      f.    Such other relief as the Court deems just, necessary and proper.

## COUNT II

### Title VII of the Civil Rights Act of 1964, as amended

### (42 U.S.C. §§ 2000e, et seq.)

110.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

111.   Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn bring this claim on behalf of themselves and the class they represent.

112.   The conduct described herein violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.

113.   The USSF has and continues to intentionally discriminate against Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn and the class they seek to represent on the basis of gender by maintaining a policy and practice of treating them less favorably than similarly situated male employees with respect to, among other things, pay; playing, training and travel conditions; promotion of games; and support and development for games.

114.   The USSF's discriminatory practices described above have denied Plaintiffs Morgan, Lloyd, Rapinoe, Sauerbrunn and the class they seek to represent of compensation and other benefits of employment to which they are entitled, which has resulted in the loss of past and future wages and other job benefits, and have caused these Plaintiffs to suffer emotional distress.

115.    The USSF acted or failed to act as herein alleged with malice or reckless indifference to the protected rights of Plaintiffs Morgan, Lloyd, Rapinoe, Sauerbrunn and the class they seek to represent.    Plaintiffs and the class are thus entitled to punitive damages.

116.    Plaintiffs request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn, on behalf of themselves and the class they seek to represent, pray for relief as follows:

a.    Certify this action as a class action under Title VII, designate Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn as the representatives of the proposed class, and their counsel of record as Class Counsel;

b.    All damages that the individual Plaintiffs and the class have sustained as a result of the USSF's unlawful conduct including, but not limited to, back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discriminatory practices of the USSF;

c.    Exemplary and punitive damages in an amount commensurate with the USSF's ability to pay and to deter future discriminatory conduct;

d.    A preliminary and permanent injunction against the USSF and its directors, officers, agents, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies and practices set forth herein;

e.    A declaratory judgment that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. § 2000e, et seq.;

f.    An adjustment of the wage rates and benefits for Plaintiffs Morgan, Lloyd, Rapinoe and Sauerbrunn and the class to the level these Plaintiffs and the class would be enjoying but for the USSF's discriminatory practices;

g.   Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

h.   Pre-judgment and post-judgment interest, as provided by law; and

i.   Such other relief as the Court deems just, necessary and proper.

Dated:  March 8, 2019                    WINSTON & STRAWN LLP

                                         By:  */s/ Diana Hughes Leiden*
                                              Jeffrey L. Kessler
                                              David G. Feher
                                              Cardelle B. Spangler
                                              Diana Hughes Leiden
                                              Jeanifer E. Parsigian

                                              Attorneys for Plaintiffs

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated:  March 8, 2019                     WINSTON & STRAWN LLP

By:  */s/ Diana Hughes Leiden*
Jeffrey L. Kessler
David G. Feher
Cardelle B. Spangler
Diana Hughes Leiden
Jeanifer E. Parsigian

Attorneys for Plaintiffs

24
**COMPLAINT**