Seyfarth Shaw LLP
Ellen E. McLaughlin *(Admitted Pro Hac Vice)*
E-mail:  emclaughlin@seyfarth.com
Noah A. Finkel *(Pro Hac Vice Admission
Anticipated)*
E-mail: nfinkel@seyfarth.com
Brian Stolzenbach *(Admitted Pro Hac Vice)*
E-mail:  bstolzenbach@seyfarth.com
Cheryl A. Luce *(Admitted Pro Hac Vice)*
E-mail:  cluce@seyfarth.com
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:   (312) 460-5000
Facsimile:    (312) 460-7000

SEYFARTH SHAW LLP
Kristen M. Peters (SBN 252296)
E-mail:  kmpeters@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:    (310) 201-5219

SEYFARTH SHAW LLP
Chantelle C. Egan (SBN 257938)
cegan@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:    (415) 397-8549

Attorneys for Defendant
UNITED STATES SOCCER FEDERATION, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX MORGAN, et al., | Case No. 2:19-cv-01717-RGK-AGR |
| Plaintiffs, | **DEFENDANT UNITED STATES SOCCER FEDERATION, INC.'S MOTION TO COMPEL PRODUCTION OF PLAINTIFFS' SOCCER-RELATED INCOME FROM SOURCES OTHER THAN U.S. SOCCER** |
| v. | |
| UNITED STATES SOCCER FEDERATION, INC., | |
| Defendant. | Judge:  Hon. Alicia G. Rosenberg |
| | Conference:  October 30, 2019 at 4 pm |

## I.   INTRODUCTION

Plaintiffs' soccer-related income from sources other than the United States Soccer Federation, Inc. ("U.S. Soccer" or "the Federation") is relevant to the issues in dispute in this litigation.  Among other things, Plaintiffs are trying to establish that they are paid less by U.S. Soccer than similarly situated male soccer players because of their sex. In fact, each Plaintiff has been compensated by U.S. Soccer as a member of the Senior Women's National Team ("WNT") pursuant to a collective bargaining agreement ("CBA") negotiated by a labor organization, the United States Women's National Team Players Association ("WNTPA"), while members of the Senior Men's National Team ("MNT") have been compensated pursuant to a different CBA negotiated by a different labor organization, the United States National Soccer Team Players Association ("MNTPA").  Each of the relevant CBAs (like most CBAs in any industry) is a complex contract that resulted from complicated negotiations.  Trade-offs were made, and there were different trades in each set of negotiations.  The income Plaintiffs earn from professional soccer clubs and from corporate sponsors: (1) may help to explain the non-discriminatory basis for many of the terms in the two WNTPA CBAs covering the relevant period in this lawsuit (a central issue in this lawsuit), (2) may help to place in proper context the pay some Plaintiffs have received from U.S. Soccer associated with their play for professional clubs in the National Women's Soccer League ("NWSL") (a contested issue in this lawsuit), and (3) may help to shed some light on the value corporate sponsors place on Plaintiffs' likenesses (another contested issue in this litigation).

## II.   FACTUAL BACKGROUND

*MNT Compensation.* The MNTPA has represented MNT players since the mid-1990s.  The most recent CBA between the MNTPA and U.S. Soccer covered the period from January 1, 2011 through December 31, 2018.  In 2019, U.S. Soccer has continued to compensate MNT players in accordance with the terms set forth in that expired CBA while the parties negotiate for a new CBA.

1

The 2011-2018 MNT CBA was finished in late 2011 (and made retroactive) and then amended in early 2012.  That CBA calls for MNT players to be paid certain amounts for participating in a team training camp, for appearing on a match-day roster, for winning or drawing a match, and/or for achieving different levels of success in particular competitive tournaments.  An MNT player is therefore paid episodically, if and when he is called into the team for a particular training camp, match, set of matches, or competition (such as the World Cup or Gold Cup).  An individual MNT player could be paid $1,875 for participating in a single ten-day training camp and then never again be paid by U.S. Soccer for the remainder of his playing career.  He could also be paid significantly more if he participates with the team significantly more often.  In any case, his compensation depends entirely on how many times he participates in MNT training camps and matches and how well the team performs in its matches and competitions.  It also does not matter *why* the individual player plays or does not play for the MNT.  If he is a superstar player but cannot play because he is injured, for example, he is not called into MNT training camp and therefore is not paid by U.S. Soccer.

In exchange for this compensation, U.S. Soccer receives the player's play on the field, the player's time and energy promoting the team and the sport of soccer, and the right to use the player's likeness in various ways.  Much of the MNT CBA is focused on the parameters of the latter—the ability to use his likeness.

Between 2014 and the end of this year, the MNT will have averaged 17 soccer matches per calendar year, with each presenting an opportunity for players to earn compensation from U.S. Soccer.  Meanwhile, almost all MNT players spend most of their time playing for a professional soccer club in the United States, Mexico, or Europe, within professional leagues that have existed continuously for decades.  Those professional clubs all play more than 30 competitive (non-exhibition) matches a year, and some play as many as 50 or 60.  Those clubs pay the players (even the most highly compensated MNT players) significantly more than U.S. Soccer does.  Some players earn

2

1   seven figures annually from their club teams.  Some of the MNT players also earn money

2   from contracts with corporate sponsors.  For example, a player may have a contract with

3   a shoe or apparel company, under which he is paid for the right to use his individual

4   likeness to market the company's brand.

5      ***WNT Compensation.*** The WNTPA has represented WNT players since

6   approximately 1999. The most recent CBA between the WNTPA and U.S. Soccer covers

7   the time period from January 1, 2017 through December 31, 2021.  The immediately

8   prior CBA covered the time period from January 1, 2013, through December 31, 2016.

9   These are the two CBAs in effect during the period relevant to this lawsuit.

10      When the parties were negotiating the 2013-2016 CBA, it was against the

11   backdrop of the top-level women's soccer league in the United States (and, indeed, the

12   world)—Women's Professional Soccer—having folded in 2012 after just three seasons

13   and the previous attempt at a top-level league, the Women's United Soccer Association,

14   having failed in 2003 after three seasons of play.  In November 2012, it was announced

15   that a third attempt at a top-tier women's professional league, the National Women's

16   Soccer League ("NWSL") would start play in 2013.  One of the main focuses for the

17   WNTPA and U.S. Soccer during negotiations for the 2013-2016 CBA negotiations was

18   the interaction between that CBA and the success of the NWSL.  That focus continued in

19   negotiations for the 2017-2021 CBA.

20      Under the WNT CBAs, a core group of players receive a guaranteed annual salary

21   from U.S. Soccer for playing on the WNT, and a larger core group of players receive a

22   separate guaranteed annual salary from U.S. Soccer for playing on a team in the NWSL.

23   The two groups largely overlap, but not always entirely.  Sometimes a player receiving a

24   salary from U.S. Soccer for playing on the WNT will play for a professional team in

25   another country, for example, and receive no salary associated with the NWSL.  On the

26   other hand, a player may receive a NWSL salary from U.S. Soccer while not receiving

27   any other salary from U.S. Soccer.  Still other players, meanwhile, receive pay from U.S.

28

Soccer only if and when called into the WNT, similar to the MNT structure described above.  The process for determining how many and which players receive which kind of salary is spelled out in complex detail in the CBA.  The CBA also contains provisions protecting a WNT player's salary(ies) following injuries and during and following pregnancy, neither of which protection is present in the MNT CBA.  The WNT CBA also contains six weeks of guaranteed time off from soccer (with either the NWSL or U.S. Soccer) from mid-November through the end of the year (something the MNT players do not have).

When the NWSL commenced play, it operated a 22-match regular season, and its most recently concluded regular season was comprised of 24 regular-season matches, with four teams making the playoffs and playing an additional one or two playoff matches.  At the same time, the WNT will have averaged 22.5 matches per calendar year from 2014 through the end of this year.  The salaries players receive from U.S. Soccer associated with their play on the WNT are higher than their salaries associated with play in the NWSL.

Further, the WNT CBA calls for certain additional payments to be made to the WNTPA in exchange for the NWSL's and U.S. Soccer's right to use WNT players' likenesses, and some or all of those funds are then disbursed by the WNTPA to the players.  The CBA also contains detailed provisions governing how those likenesses may be used.  Those terms changed materially between the 2012 and 2017 CBAs, as a result of lengthy and difficult negotiations, and they are different from the terms found in the MNT CBA.  One of the changes that occurred was the WNTPA taking back some of the likeness rights previously held by U.S. Soccer, so the WNTPA could market those rights directly to licensees in order to generate revenue for Plaintiffs and other players.  Some WNT players also have direct individual sponsorship and endorsement arrangements with corporations, similar in nature to some MNT players (e.g., with a shoe company).

4

Without U.S. Soccer's agreement to pay the salaries of its marquee players, U.S. Soccer doubts the ability of the NWSL to pay them equivalent (if any) salaries or, indeed, to survive as a league at all.[1]  U.S. Soccer has been pleased to provide this support, however, as part of its mission to grow the sport of soccer.

### III.   U.S. SOCCER'S REQUEST FOR PRODUCTION AND EFFORTS TO NARROW THE REQUEST BEFORE SEEKING COURT INTERVENTION

U.S. Soccer propounded the following request upon each Plaintiff:

> All documents reflecting, referring to, or otherwise relating to income Plaintiff has received from any source since April 19, 2014, including but not limited to Plaintiff's state and federal tax returns since 2014 and all documents showing compensation Plaintiff earned playing soccer for teams outside of the United States.

Plaintiffs objected to the request on the grounds that the request was overly broad, that producing documents relating to income from any source would be unduly burdensome, and that the request sought information neither relevant nor proportional to the needs of the case, arguing that "[t]he only compensation relevant to Plaintiffs' claims . . . is that which they received from [U.S. Soccer]."

In an effort to resolve the parties' dispute, U.S. Soccer agreed to limit its request to documents reflecting only soccer-related income, i.e., income received for playing soccer with a professional club and income earned as a result of the player's having endorsed a product or service or otherwise allowing her likeness to be used in exchange for remuneration.  Plaintiffs, however, continued to object while stating that they would *consider* complying with a request further "narrow[ed] . . . to income Plaintiffs received from playing for soccer teams outside of the United States."  As detailed below, income from all soccer-related sources is pertinent to the issues in dispute and is discoverable.

///

///

---

[1] *See, e.g.,* https://www.si.com/soccer/2019/10/24/nwsl-future-expansion-player-signings-us-soccer.

5

## IV.   PLAINTIFFS' INCOME FROM OTHER SOURCES IS DISCOVERABLE

The income Plaintiffs have been able to earn from other soccer teams (outside the NWSL) and from selling their likenesses and endorsements helps to explain the non-discriminatory basis for many of the terms in the two WNTPA CBAs covering the relevant period in this lawsuit.  It forms part of the overall context in which the parties have bargained and in which they have decided to make the various trade-offs they have made, involving compensation and other items.  It also helps demonstrate the overall value of the deal the WNTPA struck for Plaintiffs.

This other income also helps to place in proper context the pay some Plaintiffs have received for playing in the NWSL.  Plaintiffs have taken the position that the salaries some of them earn for playing in the NWSL, though paid by U.S. Soccer, is not relevant to this lawsuit at all because it is, according to them, essentially pay for a second, separate job and cannot be considered when comparing the compensation received by Plaintiffs to the compensation received by MNT players, whose pay for playing on professional clubs comes from those clubs.  Plaintiffs have also taken the position that U.S. Soccer receives certain benefits in exchange for paying the players' NWSL salaries that it would not receive if the players played overseas.  To be sure, the entire complex situation of the two teams' players must be analyzed in this lawsuit, and the NWSL salaries are part of that situation.  To the extent that U.S. Soccer is, for example, paying players significantly more (or significantly less) in the form of "NWSL salaries" than the players could earn playing for other teams in other leagues, that is part of the context U.S. Soccer should be permitted to explore in discovery.

In addition, the income players have earned from endorsement and licensing arrangements may help to shed some light on the value corporate sponsors place on Plaintiffs' likenesses.  Although U.S. Soccer believes the relevant question is what U.S. Soccer knew and believed about the history of revenue-generation and prospect for revenue-generation by WNT players, Plaintiffs have taken a more expansive view,

arguing that *actual* revenue generation—even after the parties negotiated their most recent CBA—is relevant, at least from the perspective of the standard for conducting discovery.  If that is true, then information reflecting how corporations have *actually* valued the services and likenesses of the players is something U.S. Soccer should be permitted to explore, as well.

For the reasons stated above, U.S. Soccer requests that the Court order Plaintiffs to produce documents reflecting their soccer-related income from sources other than U.S. Soccer.

DATED:  October 28, 2019                    SEYFARTH SHAW LLP


                                            By:   */s/ Chantelle C. Egan*
                                                  Ellen E. McLaughlin
                                                  Noah A. Finkel
                                                  Brian M. Stolzenbach
                                                  Chantelle Egan
                                                  Cheryl A. Luce
                                                  Kristen M. Peters
                                            Attorneys for Defendant

7

59946808v.1