# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX MORGAN, et al.,

                Plaintiffs,

     v.

UNITED STATES SOCCER
FEDERATION, INC.,

           Defendant.

Case No. 2:19-CV-01717

## EXPERT REPORT OF JUSTIN MCCRARY, PH.D.

February 4, 2020

# Table of contents

1. Introduction ...................................................................................................................................... 4

   1.1. Qualifications ............................................................................................................................ 4

   1.2. Overview of Plaintiffs' Claims ................................................................................................ 5

   1.3. Scope of Assignment and Summary of Opinions ................................................................ 7

2. The economics of performance contracts .................................................................................... 9

   2.1. Analyzing the value of a performance contract – tradeoffs between fixed pay and performance pay ...................... 9

      2.1.1. A simple example – salary and bonuses create tradeoffs between risk and reward .......................................... 10

      2.1.2. A large academic literature recognizes that performance contracts help manage risk/reward tradeoff ........ 12

   2.2. The WNT CBA and MNT CBA include different combinations of fixed components of pay and bonus components of pay ............................................ 13

      2.2.1. Fixed payments in WNT CBA ............................................................................................. 14

      2.2.2. Payments that depend on performance ............................................................................ 16

      2.2.3. The WNT and MNT CBAs are not comparable in their entirety ................................... 16

3. The WNT CBA does not systematically compensate players less than the MNT CBA .......... 18

   3.1. Scenario 1: comparing compensation from friendly matches ......................................... 18

   3.2. Scenario 2: mitigating risk for individual players who do not appear on all game rosters ......................... 23

4. Conclusion ....................................................................................................................................... 26

5. Appendix A - Curriculum vitae ..................................................................................................... 27

6. Appendix B – Documents relied upon ......................................................................................... 42

## Exhibit list

Exhibit 1    Compensation per player for friendly matches played by the WNT: Win all friendly matches 20

Exhibit 2    The WNT CBA becomes more favorable if teams do not win all matches..................................22

# 1. INTRODUCTION

## 1.1. Qualifications

1. I am an economist with expertise in labor economics, economic modeling, statistical methods, and law and economics, among other subjects. I hold an A.B. in Public Policy from Princeton University (1996) and a Ph.D. in Economics from the University of California, Berkeley ("Berkeley") (2003). I currently hold the position of Paul J. Evanson Professor at the Law School at Columbia University ("Columbia"), and previously held academic positions at the University of Michigan (2003–2008) and Berkeley (2008–2018). While at Columbia and Berkeley, I have taught courses on labor economics, antitrust, corporations, law and economics, and statistics to undergraduates, M.B.A., J.D., L.L.M., and Ph.D. students. From September 2009 until July 2014, I co-directed the Law and Economics Program at Berkeley Law. Since 2017, I have been a member of the Board of Directors of the American Law and Economics Association.

2. In addition to my position as Professor at Berkeley, I served as the Founding Director of D-Lab, the Social Sciences Data Laboratory at Berkeley, from June 2014 to June 2017. At D-Lab, I lectured on and advised graduate students and faculty regarding high performance computing, statistical software, and statistical techniques.

3. My research spans a diverse range of topics, including labor economics, antitrust, econometric and statistical methodology, crime, employment discrimination, income inequality, education, fertility, financial markets, and monetary policy. I have published papers in leading journals within economics, such as the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Economic Literature*, and the *Journal of Econometrics*. Over the years, my research has been supported by Michigan, Berkeley, Columbia, the MacArthur Foundation, the NBER, the National Institutes of Health, the National Science Foundation, the Arnold Foundation, and the Robert Wood Johnson Foundation.

4. I regularly review articles for the leading peer reviewed journals within economics, including *Econometrica*, the *American Economic Review*, the *Quarterly Journal of Economics*, the *Journal of Political Economy*, the *Review of Economic Studies*, the *Journal of Econometrics*, the *Review of Economics*

*and Statistics*, and the *American Law and Economics Review*. Peer review specifically focuses on assessing whether submitted manuscripts are employing methodologies that are consistent with academic standards.

5. My consulting experience has spanned a wide range of industries and markets, with a focus on matters involving labor, discrimination, antitrust, and statistical methods. In addition to work as a consultant for companies, I often provide consulting for state, local and federal government, frequently on a *pro bono* basis. Many of these engagements revolve around quantifying the extent of differences between racial or ethnic groups, such as differences in income, employment, or arrest rates, and the benefits of safety investments. These engagements have included clients such as the California Attorney General, the City of Chicago, the City of Oakland, the City of San Bernardino, the City of Stockton, the State of Delaware, the Pennsylvania State Troopers, the U.S. Department of Justice, the U.S. District Court of the Southern District of New York, and the U.S. Equal Employment Opportunity Commission. All of these engagements have involved the study and use of economics, econometrics, and statistics.

6. A copy of my curriculum vitae, including a list of previous testimony and depositions, is included as Appendix A. I am being compensated for my work on this matter at my standard consulting rate of $950 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### *1.2. Overview of Plaintiffs' Claims*

7. On March 8, 2019, I understand that a group of female soccer players employed by the United States Soccer Federation ("USSF") as members of the Senior Women's National Team ("WNT") filed a complaint ("the Complaint") alleging, among other things, that the USSF engages in pay discrimination against them because of their sex.[1] Specifically, I understand Plaintiffs claim that their pay under the collective bargaining agreement ("CBA") negotiated

---

[1] Complaint, *Alex Morgan, et al. v. United States Soccer Federation, Inc.*, March 8, 2019 ("Complaint"), ¶¶ 1, 4.

with the USSF by the Women's National Team Players Association ("WNTPA") is lower than it would be if Plaintiffs were instead paid pursuant to the CBA negotiated by the labor organization representing the Senior Men's National Team ("MNT") and that this disparity amounts to unlawful sex discrimination.[2]

8. In the Complaint, Plaintiffs assert that "the USSF has paid and continues to pay WNT players less for comparable services than the USSF pays to male players on the MNT" and that USSF "continues its policy and practice of paying female WNT players less than similarly situated male MNT players on a per game basis."[3]

9. I understand that Plaintiffs assert these claims as violations of the Equal Pay Act and Title VII of the Civil Rights Act of 1964.[4] I understand that the claim under the Equal Pay Act is brought as a collective action and that the claim under Title VII is brought as a class action. I understand that the collective period with respect to the Equal Pay Act begins on March 8, 2016.[5] I understand that the class period with respect to the Title VII claim begins on June 11, 2015.[6] For ease of reading, I will use "class periods" in this report when referring to the Title VII class period and Equal Pay Act collective period together.

10. There are two collective bargaining agreements governing compensation paid by the USSF to the WNT during the class periods: a CBA covering the period of 2017–2021 and a CBA covering the period from 2013–2016, which is comprised of a previous CBA, as modified by a March 19, 2013 memorandum of understanding ("MOU").[7] A single CBA has covered the entirety of both class periods for the MNT. The duration of the MNT CBA was defined as January 1, 2011 until December 31, 2018.[8] I understand that although this CBA has

---

[2] Complaint, ¶ 4.

[3] Complaint, ¶¶ 52, 64.

[4] Complaint, ¶¶ 103, 112.

[5] Order Re: Plaintiffs' Motion for Class Certification, *Alex Morgan, et al. v. United States Soccer Federation, Inc.*, November 8, 2019, p. 15.

[6] Order Granting Stipulation to Amend Title VII Class Period, *Alex Morgan, et al. v. United States Soccer Federation, Inc.*, December 6, 2019.

[7] Collective Bargaining Agreement between the United States Soccer Federation and the Women's National Team Players Association, 2005–2012, USSF_Morgan_028424 – 61 ("2005–2012 WNT CBA"); Memorandum of Understanding from the Women's National Team Players' Association to the United States Soccer Federation, March 19, 2013, WNTPA_00004575 – 83 ("2013–2016 WNT MOU"); Collective Bargaining Agreement between the United States Soccer Federation and the U.S. Women's National Team Players Association, 2017–2021, USSF_Morgan_000587 – 642 ("2017–2021 WNT CBA").

[8] 2011–2018 MNT CBA, USSF_Morgan_000530 – 78.

expired, the parties continue to operate (with respect to compensation) in accordance with the terms set forth in that CBA, along with an email regarding the newly created Concacaf Nations League, as a new agreement between the labor organization representing MNT players and the USSF has yet to be reached.[9]

### 1.3. Scope of Assignment and Summary of Opinions

11. I have been asked by counsel for the Defendant to review the terms of the 2013 MOU and the 2017 CBA for the WNT and the 2011 CBA for the MNT and to determine whether either the WNT MOU or CBA, during the relevant class periods, can be said to systematically pay WNT players a lower rate of pay than the MNT CBA pays players, on a per game basis or otherwise. I may also be asked to respond to the expert report(s) of Plaintiffs' expert(s).[10]

12. I have reached the following conclusions.

- The CBAs include many components of pay, and those differ between the WNT CBA and the MNT CBA. Components of the CBAs include fixed pay (i.e., pay that is independent of performance) and variable performance pay (i.e., pay that is dependent on performance).
- Labor economists typically refer to such contracts—which are common in many occupations—as performance (or incentive) contracts. A widely recognized feature of such contracts is that the overall value of the contract to the worker depends on not just the fixed pay and the variable performance components of pay, but also on performance and chance. This also implies that a contract that is attractive from an *ex ante* perspective (i.e., at the time of negotiation) may be disappointing in hindsight.
- Assessing whether the total compensation is higher for any given player over a given set of games under a given CBA relative to another requires (a) accounting for the tradeoffs of all relevant components of pay and (b)

---

[9] USSF_Morgan_055431; Deposition of Tom King pp.35–36. ("Q. Okay. After 2018, they [MNT players] would be compensated in 2019 going forward the same way they are compensated for under this agreement [2011 – 2018 MNT CBA] in the year 2018; is that correct? A. That is correct. There is one small nuance here that would deviate from that in terms of the verbiage. We pay a specific amount for Round 1 World Cup qualifiers. There are no Round 1 World Cup qualifiers for the men in this particular cycle. So we have – and it was replaced. Those dates were replaced by a tournament called the CONCACAF Nations League.")

[10] I have not been asked to analyze in this report whether there are non-sex based business reasons for the differences in compensation terms between the WNT CBAs and the MNT CBA. There could be, and I may be asked to analyze that issue in response to one or more expert reports furnished by Plaintiffs.

accounting for the risk (or uncertainty) in compensation that arises from performance clauses.

- The WNT CBA includes more fixed pay than the MNT CBA does, and conversely the MNT CBA includes more performance components of pay than the WNT CBA does. These features of the two teams' contracts imply that the CBAs have different levels of risk and, thus, different levels of potential value to different players depending on performance outcomes. I demonstrate below that neither contract is systematically better or worse and that there is no single rate of pay for either contract.

- In a variety of scenarios that occurred under each CBA during the class periods, the value of the fixed payments that the WNT players receive would more than offset the larger variable performance pay that the MNT players may receive. As a result, players are compensated more favorably under the WNT CBA than they would be under the MNT CBA in these scenarios, even assuming the work performed by each was comparable in the way Plaintiffs contend it is.

## 2. THE ECONOMICS OF PERFORMANCE CONTRACTS

13. The CBAs at issue in this case reflect a common form of compensation contract known as a performance (or incentive) contract. In this section, I lay out the economic framework for comparing the value of different performance contracts that include different provisions – like those at issue in this case.

14. In particular, as I explain below in Section 2.1, when workers are paid via a performance contract, it is necessary to analyze the different tradeoffs that each contract has in terms of fixed pay versus performance pay. Indeed, a central economic function of performance contracts is to incentivize workers to achieve goals that are important to the firm (typically through bonuses), while also managing the risk to the worker of volatile/uncertain pay (typically through salary).

15. In Section 2.2, I then highlight several important differences between the MNT and WNT contracts with regard to tradeoffs between risk and reward. As I detail in that section, a critical distinction between the MNT and WNT contracts is that the WNT CBA includes fixed components of pay, while the MNT does not. These differences will be important in my analysis in Section 3.

### 2.1. Analyzing the value of a performance contract – tradeoffs between fixed pay and performance pay

16. There are at least two critical concepts that need to be accounted for when assessing the value of a performance contract. First, unlike a job that has a single hourly wage, the value of a performance contract cannot be reduced to a single rate of pay because how much the worker earns depends on both fixed payments (e.g., salary or benefits) and performance payments (e.g., bonuses that depend upon games won). Performance, and therefore the effective rate of pay, can differ across workers and across time.

17. Second, how workers value a particular performance contract depends on tradeoffs related to risk and reward. As noted, performance contracts may involve a combination of fixed payments and bonus payments. The larger (smaller) the fixed component of pay, the more (less) the worker is protected when performance is poor. Different workers will value compensation pegged to performance differently and will bargain accordingly.

*2.1.1. A simple example – salary and bonuses create tradeoffs between risk and reward*

18. To understand these key economic concepts, in this section I walk through a simple example of a performance contract that has a bonus component and a salary component.

19. Consider the example of an insurance salesperson who earns a commission equal to 10% of all sales revenue she generates for the firm and a salary of $30,000. For example, if the salesperson sells $100,000 of products under this contract in a given year, her total earnings will be $40,000: $30,000 from the fixed salary and $10,000 commission. The sales commission aspect of the contract is valuable to the firm because it helps incentivize the salesperson to sell more of the company's product by tying her pay directly to the revenue of the firm. The salary aspect of the contract means the contract has less risk than would a pure commission-based contract.

20. Indeed, a well understood fact about a performance contract of the type described above is that the inclusion of both a salary and a bonus in the contract creates a risk/reward tradeoff that can differ across different contracts and that tradeoff would be expected to affect which contract a worker values most.[11] The insurance company and the salesperson are likely to have different preferences over the salary and the sales commission aspects of the contract. The contract that emerges from negotiations would be expected to reflect a balance of the preferences of the company and the salesperson. For example, suppose that the aforementioned insurance salesperson is given a choice between two different contracts:

- Contract 1 pays a lower salary of $30,000 plus a higher bonus of 10% commissions on all sales revenue she generates for the firm,
- Contract 2 pays a higher salary of $50,000 a year plus a lower bonus of 5% commissions on all sales revenue she generates for the firm.

21. Given the different tradeoffs in these contracts between risk and reward, the salesperson's choice will depend on her expectations over her success in future

---

[11] Bolton, P., and Dewatripont, M., *Contract Theory*, MIT Press, Cambridge, MA, 2005, at pp. 157–158, ("In most cases a manager's compensation package in a listed company comprises a salary, a bonus related to the firm's profits in the current year, and stock options (or other related forms of compensation based on the firm's share price). The overall package also includes various other benefits, such as pension rights and severance pay (often described as 'golden parachutes'). In other words, a manager's remuneration can broadly be divided into a "safe" transfer (the wage), a short-term incentive component (the bonus), and a long-term incentive component (the stock option).").

sales she generates for the firm. For example, if the salesperson expects to sell $100,000 of product, Contract 2 would be the more lucrative option—the $50,000 fixed salary in Contract 2 alone exceeds the $40,000 total payout under Contract 1. On the other hand, if the worker expects to sell $500,000 in sales then Contract 1 would be more lucrative—i.e., it yields $80,000 in total compensation ($30,000 salary plus 10% of $500,000), whereas Contract 2 yields only $75,000 ($50,000 salary plus 5% of $500,000). In other words, neither contract is "better" than the other contract because the amount each contract pays out depends on the scenario. Thus, the contract preferred by a given worker depends both on what they expect and on what they value.

22. Of course, given that the salesperson's future volume of sales is uncertain at the time she chooses the contract (she could have a good year, a bad year, the firm could go out of business, etc.), it is possible that the contract she chooses could end up yielding less income than the alternative contract. For example, suppose the salesperson expected to sell about $100,000 worth of product and, thus, chose Contract 2 with the bigger salary and lower commission (i.e., the less risky contract). If, however, due to an unexpected rise in popularity of the company's product, her sales ended up at $500,000, the salesperson would have made more money had she chosen the riskier contract with the lower salary, rather than the one she chose.

23. From an economics point of view, we would not say that the salesperson in this hypothetical chose the "wrong" contract. At the time she made her choice, she did not know that the company's product would become more popular. Given her expectations about how much product she would sell, she still made the right choice.[12] This is analogous to purchasing auto insurance for a rental car that would cover some of the costs associated with a car accident. Of course, often an accident does *not* occur, and even the insured may hope they do not get into an accident. Just because a given individual who purchased the insurance does not get into an accident does not mean that purchasing insurance was an economically poor decision. The insurance helped mitigate risk relative to what was known at the time of the insurance purchase.

24. The same is true in performance contracts. If a worker chooses a contract with higher fixed payments and less upside, there will be situations where the riskier contract with more upside would have paid more. However, choosing

---

[12] Besanko, D., and Braeutigam, R. R., *Microeconomics*, John Wiley & Sons, Inc., Hoboken, NJ, 2011, at p. 614. ("With diminishing marginal utility, the decision maker is thus hurt more by the downside of a lottery than he or she is helped by the upside. This tends to make the risk-averse decision maker prefer the sure thing.").

the less risky contract is a choice many workers would make; there is nothing economically irrational about that choice.

25. Indeed, as I explain more below, the MNT and WNT contracts present tradeoffs between fixed and performance pay in a manner similar to the example above. In fact, documents produced in this litigation that track the most recent CBA negotiation process show that the WNT were offered versions of the CBA with lower fixed payments and higher performance payments, but that those versions were rejected by the WNT in favor of versions with higher fixed payments and lower performance payments.

### 2.1.2. A large academic literature recognizes that performance contracts help manage risk/reward tradeoff

26. The above concepts are widely recognized in economics. Indeed, there is a large academic literature that studies why firms use bonus (or incentive) payments versus salary.

27. One of the widely recognized benefits of a salary is that it is a way for an employee to manage the risk they would face from a contract that provided only performance pay. In particular, the academic literature recognizes that workers tend to be more risk averse than their employers; thus, employers can attract workers with salary payments that guarantee a certain amount of pay independent of performance. For example, one paper notes that, "[i]n its purest form, the salary, which is totally independent of output, offers complete insurance…. The implication is that salaries are more likely to be paid when workers have a high degree of risk aversion relative to owners."[13] These concepts are also noted in textbooks,[14] and are widely used in many areas of economics, like investing (i.e., there is a fundamental risk-return tradeoff between low-risk investments such as government bonds and high-risk investments such as individual stocks, with stocks having higher expected

---

[13] Edward P. Lazear, "Salaries and Piece Rates," *Journal of Business* 59, no. 3 (1986): 421–422.

[14] See, for example, Besanko, D., et al., *Economics of Strategy*, 5th Edition, John Wiley & Sons, 2010, at p. 470 ("Consider a freshly minted MBA who is presented with two job opportunities. The jobs are identical in every way *except* the means of payment. At the first job, the employer will pay the graduate $100,000 at the end of the first year of employment. At the second job, the employer will flip a coin at the end of the first year. If the coin comes up heads…, the employer will pay $40,000. If it comes up tails, the employer will pay $160,000… Most people, when presented with such a choice, prefer the safe job – that is, most people are risk averse. A risk-averse person prefers a safe outcome to a risky outcome with the same expected value."); See also Bolton, P., and Dewatripont, M., *Contract Theory*, MIT Press, Cambridge, MA, 2005, at p. 13.

returns (but more risk) than bonds).[15] Importantly, it is widely recognized in economics that individuals have different levels of risk aversion.[16]

28. Of course, compensating workers with *only* salary payments has its own downsides. In particular, there is a large literature that analyzes the perverse incentives that fixed payments create for the worker.[17] If a worker is paid only with a fixed salary the worker will have less incentive to work hard because her pay is independent of her performance. This can be particularly problematic in particular jobs, such as high-skill positions where firm revenues are closely linked to performance by specific workers. In such situation, the use of bonuses by firms can help align incentives between workers and the firm.[18]

29. In the next section, I discuss the details specific to the WNT and the MNT CBAs, and how the economic literature applies to these contracts.

## 2.2. The WNT CBA and MNT CBA include different combinations of fixed components of pay and bonus components of pay

30. The structure of the WNT CBAs follows the structure of the standard performance contracts discussed above. Players for the WNT are paid based on a combination of fixed payments that do not vary with performance, on the one hand, and bonus payments based on performance outcomes they achieve, on

---

[15] Barron's dictionary of finance and investment terms explains the risk-return tradeoff: "the higher the return, the greater the risk, and vice versa. In practice, it means that a speculative investment, such as stock in a newly formed company, can be expected to provide a higher potential return than a more conservative investment, such as a blue chip or a bond. Conversely, if you don't want the risk, don't expect the return." Downes, J., and Goodman, J. E., *Dictionary of Finance and Investment Terms*, Barron's Educational Series, Hauppauge, NY, 2014, at p. 642.

[16] Besanko, D., et al., *Economics of Strategy,* 5th Edition, John Wiley & Sons, Inc., Hoboken, NJ, 2010, at p. 472 ("If you ask yourself what safe wage makes you indifferent between the safe job and the risky job, you may reach a different conclusion than did our hypothetical graduate. People vary in terms of their risk preferences, with some being more risk tolerant than others.").

[17] See, for example, Canice Prendergast, "The Provision of Incentives in Firms," *Journal of Economic Literature* 37, no. 1 (1999): 7 ("Since the interests of workers and their employers are not always aligned, a large theoretical literature has emphasized how firms design compensation contracts to induce employees to operate in the firm's interest. This literature has reached into many areas of compensation and has pointed to a multitude of different mechanisms that can be used to induce workers to act in the interests of their employers. These include piece rates, options, discretionary bonuses, promotions, profit sharing, efficiency wages, deferred compensation, and so on."). See also George P. Baker, "Incentive Contracts and Performance Measurement," *Journal of Political Economy* 100, no. 3 (1992); Edward P. Lazear, "Performance Pay and Productivity," *The American Economic Review* 90, no. 5 (2000).

[18] Besanko, D., et al., *Economics of Strategy,* 5th Edition, John Wiley & Sons, Inc., Hoboken, NJ, 2010, at p. 82 ("Using pay-for-performance incentives can help align the interests of the agent with those of the principal... Example of performance-based incentives are everywhere. Salespeople at departments stores like Nordstrom and Bergdorf Goodman are paid using sales commissions, where they receive a fixed percentage of the revenue their sales generate for the firm. Brand managers at consumer packaged-goods firms like Kraft or Procter & Gamble typically receive year-end bonuses that are linked to the profit generated by their brands.").

the other. As detailed above, there are two agreements governing compensation paid by the USSF to the WNT during the class periods: a CBA covering the period of 2017–2021 and a CBA covering the period from 2013–2016, which is comprised of a previous CBA, as modified by a March 19, 2013 memorandum of understanding ("MOU").[19] A single CBA covers the class periods for the MNT. The MNT CBA is also a performance contract, but there is no fixed payment component.[20]

31. Given this structure in pay, any analysis of total compensation per game under either CBA must account for the tradeoffs of different components that apply to that player based on that contract and the given performance analyzed. This is particularly important in analyzing Plaintiffs' claims because the WNT and MNT CBAs differ from each other along many dimensions.

### 2.2.1. Fixed payments in WNT CBA

32. The WNT CBAs contain several compensation and benefit provisions that are fixed—i.e., the contracted WNT players receive these regardless of whether they play for the team, outcomes of the games they do play in, or tournaments for which they qualify.[21] **These types of provisions are not included in the MNT CBA.** These provisions include, but are not limited to:

- **WNT base salary**: Under the 2013–2016 MOU, contracted WNT players were paid a salary ranging from $36,000 to $72,000 per year.[22] Currently, contracted WNT players earn a salary of $100,000 per year.[23] These salaries are paid to contracted players regardless of the number of

---

[19] 2005–2012 WNT CBA, USSF_Morgan_028424 – 61; 2013–2016 WNT MOU, WNTPA_00004575 – 83; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642.

[20] 2011–2018 MNT CBA, USSF_Morgan_000530 – 78.

[21] The WNT CBAs provide separate compensation parameters for contract and non-contract players (sometimes referred to as "Floater" players). I understand that each of the class representatives has been a contracted player throughout the class periods, so I restrict my analysis to compensation of contracted players for purposes of this report. 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 76; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

[22] From 2013–2016, WNT players' salaries depended on their Tier and the existence of a separate National Women's Soccer League ("NWSL"). Tier 1, Tier 2, and Tier 3 players earned $72,000, $51,000, or $36,000 per year, respectively, if there was a NWSL. The WNT MOU provided for higher salaries in the event there was no NWSL. See the 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 76.

[23] From 2017–2021, all WNT contract players receive an annual salary of $100,000. See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

matches played, the outcome of those matches, or whether they are selected for the roster of those matches.[24]

- **NWSL annual salary**: The USSF allocates WNT players to the NWSL. During the class period, the USSF has paid players allocated to the NWSL $44,000–75,000 per year for participating in the NWSL in addition to the WNT base salary.[25]

- **Health insurance**: WNT players are provided with health, dental and vision insurance benefits. As of 2017, the USSF also has been responsible for an annual payment to offset taxes associated with the taxable cost of health insurance.[26]

- **Injury protection**: In the event of an injury, WNT players will continue to receive 100% of their WNT salary and benefits while they are injured, for up to one year.[27] Players allocated to the NWSL may continue to receive their NWSL salaries for even longer.[28]

- **Severance pay**: If a contracted player's contract is terminated, she is eligible for up to four months of severance pay equal to her salary.[29]

- **Maternity leave**: During the class periods, contracted WNT players have been able to receive 50–75% of their salary for up to a year should they become pregnant or up to three months for an adoption.[30]

---

[24] 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 606 ("During the term of this Agreement, the Player shall, subject to her health and fitness, be available for training with, and any games of, the WNT as may be requested by the Federation unless the Player is excused by the Federation's Head Coach for good cause."); 2005–2012 WNT CBA, USSF_Morgan_028424 – 61 at 56. ("Salaried Players will participate in Women's National Team matches each year, as requested by the head coach [.]").

[25] In 2015 and 2016, the USSF paid NSWL allocated players $44,000 to $56,000 depending on the year and when the player joined the WNT. See the 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 83. Beginning in 2017, the USSF paid NWLS allocated players $62,500 or $67,500 depending on the tier they are assigned, and those figures have increased $2,500 each year. See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

[26] See the 2013–2016 MOU, WNTPA_00004575 – 83 at 78, and the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 612.

[27] See the 2013–2016 MOU, WNTPA_00004575 – 83 at 78; and the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 594.

[28] USSF_Morgan_005778 ("Upon acceptance of that [NWSL allocation] offer, the Player is entitled to that [NWSL] allocation for the entire subsequent NWSL season and the Player shall count against the minimum number of NWSL allocations. Additionally, the Federation is obligated to pay that Player's NWSL salary and afford her the other benefits of the NWSL allocation for the entire subsequent NWSL season. This entitlement and obligation applies irrespective of the Player's Injury Anniversary Date, whether the Player returns to play during that subsequent NWSL season, or whether the Federation terminates that Player's status as a WNT Contracted Player pursuant to Paragraph 1 of this LOU.").

[29] Prior to 2017, WNT players were eligible for three months' severance pay. Beginning in 2017, WNT players who had been a contracted player for at least 12 of the prior 24 months are eligible for one month's severance pay, plus an additional month's severance for each additional twelve consecutive months she was a WNT contracted player, up to a maximum severance of four months. See the 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 77, and the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 600.

[30] See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 612–613. Prior to 2017, players received 50% of their salary while on maternity leave. See the 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 78.

- **401(k)**: The USSF sponsors a 401(k) plan for the WNT players.[31]

### 2.2.2. Payments that depend on performance

33. In addition to the fixed compensation and benefits for the WNT, **both the WNT and the MNT are compensated based on performance**. Some examples include:

- **Friendly matches**: As of 2017, WNT players could earn up to $8,500 each and MNT players could earn up to $17,625 each for defeating top ranked opponents.[32]
- **Tournament incentives**: Both the WNT and the MNT receive bonuses for performing well in tournaments. Tournaments that generate bonus payments include the World Cup, the Olympic Games (WNT only), and the Gold Cup (MNT only).[33]

### 2.2.3. The WNT and MNT CBAs are not comparable in their entirety

34. The CBAs are complex, in the sense of having a wide variety of clauses covering many different scenarios. They are also hard to value, in the sense that a given clause might have more value for one player than another, and the value of any two clauses are hard to compare, even for a given player. Moreover, the components of pay differ markedly between the MNT and WNT CBAs.

35. Abstracting somewhat from that complexity, however, I do conclude that the MNT and WNT CBAs have different risk profiles. While certain performance incentives are higher for the MNT than the WNT, the fixed payments are higher for the WNT than the MNT. These differences mean that depending on performance, the WNT CBA can generate higher overall total compensation and higher total compensation per game than the MNT CBA. The reverse is also true: depending on performance, the MNT CBA can generate higher compensation than the WNT CBA. In other words, just as with the simple insurance contract example from Section 2.1.1, neither contract can be thought of as "better" than the other contract.

---

[31] See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 613.

[32] See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642, and the 2011–2018 MNT CBA, USSF_Morgan_000530 – 78 at 72.

[33] See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642, and the 2011–2018 MNT CBA, USSF_Morgan_000530 – 78 at 73.

36. Importantly, there is evidence in the record that suggests the WNT players preferred the consistency of fixed payments versus higher potential payouts for winning high profile matches. In May and again in July of 2016, the USSF proposed a CBA with a payment as large as $14,000 per player for winning a friendly match but with no fixed salary—a proposal not unlike the MNT CBA.[34] The WNT Players Association did not accept these proposals.[35] Later in the negotiation, on February 9, 2017, the USSF proposed a CBA with maximum WNT salaries of $90,000, but friendly win bonuses based on the tier of the opponent with a maximum bonus payment of $9,000 per win against a top tier team.[36] On February 14, 2017, the WNTPA then offered a proposal with a *larger* fixed salary of $125,000 but a *lower* maximum win bonus of $5,000 per win, regardless of the opponent's ranking.[37] The negotiations ended with the WNTPA and the USSF agreeing to a $100,000 salary and $8,500 maximum win bonuses.[38]

37. In the next section, I illustrate the economic value of the fixed payments by presenting several scenarios where the WNT CBA compensates players more than the MNT CBA would precisely because of the higher fixed payments included in the WNT CBA.

---

[34] USSF_SOLO_004319 – 20; USSF_SOLO_004376 – 81.

[35] WNTPA_0007563 – 64.

[36] USSF_Morgan_013186.

[37] USSF_Morgan_013236.

[38] 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

### 3. THE WNT CBA DOES NOT SYSTEMATICALLY COMPENSATE PLAYERS LESS THAN THE MNT CBA

38. In this section I detail specific scenarios under which WNT players would have been paid less per game under the MNT's contract, and vice versa. These scenarios help illustrate the economic principles detailed above.

39. Specifically, as I show below, the relative value of two different contracts with different levels of fixed payments and performance incentives depends on the performance of the team and risk preferences of each worker. Neither contract is "better" than the other contract. In fact, for a given level of performance, the rate of compensation per game can be higher for the WNT than the MNT, and vice versa.

### 3.1. Scenario 1: comparing compensation from friendly matches

40. I begin my analysis with a scenario that the Plaintiffs identified in their Complaint. Specifically, the Plaintiffs compared the total compensation that the WNT players would receive to the total compensation the MNT players would receive under a hypothetical set of 20 friendly matches played over the course of a single season. The Plaintiffs' hypothetical involves both the MNT and the WNT winning all 20 matches. Plaintiffs assert that in such a scenario the WNT players would each earn $99,000 ($72,000 salary, plus $1,350 for each win), while MNT players would each earn $263,320 ($13,166 for each win) in such a scenario.[39]

41. Plaintiff's analysis, however, does not account for several relevant factors, including but not limited to the following:

- First, the analysis considers only compensation provisions for the WNT provided by the MOU that expired at the end of 2016 and does not consider the CBA that has been in effect since January 1, 2017. The

---

[39] Complaint, ¶ 58. As of 2015, MNT players could earn different amounts for a win in a friendly match, as determined by the tier of the opponent: $17,625 for a top tier opponent ranked 1–10 plus Mexico, $12,500 for a second tier opponent ranked 11–25, or $9,375 for a third tier opponent ranked higher than 25. The average of these figures is $13,166.67. See the 2011–2018 MNT CBA, USSF_Morgan_000530 – 78 at 72. According to the 2013 WNT MOU, tier 1 contracted WNT players earned a salary of $72,000 in 2015, provided there is a NWSL, in addition to a $1,350 payment per match win. See the 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 76.

current CBA allocates a higher salary ($100,000/year) and higher win bonuses that average $6,750 for a friendly win.[40]

- Second, the hypothetical scenario considered is not consistent with actual scheduling; neither the WNT nor the MNT has played 20 friendly matches in a single calendar year dating back to at least 2014.[41] Since 2017 (the year in which the current CBA takes effect), the WNT has played an average of 16 friendly matches per year.[42] The MNT has averaged eight friendly matches per year from 2017–2019.[43]

- Third, comparing compensation assuming a team wins all 20 matches favors the contract with lower fixed compensation and higher performance based compensation—in this case the MNT CBA. In no season during the Title VII class period did the WNT win all of their friendly matches (they always tied or lost at least one game).[44]

- Fourth, the analysis ignores the value of the various contract terms provided to the WNT that the MNT do not receive—such as those outlined in Section 2.2 above—including, for example, salary continuation during periods of absence from the team.[45]

42. Exhibit 1 updates results of Plaintiffs' analysis, incorporating salary and performance pay according to the current WNT CBA rather than the expired MOU. The specific hypotheticals addressed in the exhibit involve realistic numbers of friendlies.

---

[40] As of 2017, WNT players could earn different amounts for a win in a friendly match, as determined by the tier of the opponent: $8,500 for a top tier opponent ranked 1–4 plus Canada, $6,500 for a second tier opponent ranked 5–8, or $5,250 for third tier opponent ranked higher than 8. See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

[41] USSF_Morgan_070834; USSF_Morgan_070835.

[42] See USSF_Morgan_070835. The WNT played 16 friendly matches in 2017, 15 friendly matches in 2018, and 17 friendly matches in 2019, the average of which is 16. I include SheBelieves Cup, Tournament of Nations, and the Algarve Cup as friendly matches. I understand the WNT is compensated for each match in these tournaments the same as a friendly, although there are additional incentives for winning the SheBelieves tournament. See the 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642. I note that over the entire class period, the WNT team played between 15 and 19 friendlies in each year. USSF_Morgan_070835.

[43] USSF_Morgan_070834. The MNT played 5 friendly matches in 2017, 11 friendly matches in 2018, and 8 friendly matches in 2019, the average of which is 8.

[44] USSF_Morgan_070835.

[45] Another factor that can influence the magnitude of bonus payments in a performance contract is how much revenue is generated when the worker meets relevant performance thresholds. In the analyses in this report, I abstract away from this consideration for simplicity. However, to the extent the revenue generated for USSF by MNT and WNT when each team meets their respective performance thresholds in their respective CBAs (e.g. wins friendlies, wins tournaments) differs, such differences could also explain differences in the bonus payments in the CBAs.

***EXHIBIT 1***
***Compensation per player for friendly matches played by the WNT: Win all friendly matches***

| | **16 Friendlies** | | |
| **Record** | **Compensation Component** | **WNT Player Actual Compensation** | **WNT Player Compensation Under MNT CBA** |
|---|---|---|---|
| 1. Win 16, Tie 0, Lose 0 | Base salary | $100,000 | $0 |
| 2. | Per game fee | $108,000 | $210,667 |
| 3. | Friendly Tournament Bonus | $5,000 | $0 |
| | **Total** | **$213,000** | **$210,667** |

| | **8 Friendlies** | | |
| **Record** | **Compensation Component** | **WNT Player Actual Compensation** | **WNT Player Compensation Under MNT CBA** |
|---|---|---|---|
| 4. Win 8, Tie 0, Lose 0 | Base salary | $100,000 | $0 |
| 5. | Per game fee | $54,000 | $105,333 |
| | **Total** | **$154,000** | **$105,333** |

Source: 2017–2021 WNT CBA, USSF_Morgan_000587 – 642; 2011–2018 MNT CBA, USSF_Morgan_000530 – 78; USSF_Morgan_070834; USSF_Morgan_070835

Notes: The WNT played an average of 16 friendly matches (including those in tournament format) per year from 2017–2019. The MNT played an average of eight friendly matches per year from 2017–2019. Compensation only reflects WNT salaries, WNT friendly win payments, and MNT friendly win payments. The average of the three tiers of match win payments is $6,750 according to the WNT CBA and $13,167 according to the MNT CBA.

43. The top panel in Exhibit 1 contemplates the same hypothetical scenario proposed by Plaintiffs, but each team plays and wins 16 friendly matches over the course of a single year—the average number of friendly matches the WNT has played during the first three full years of the current CBA. In every year of the current CBA, the WNT has competed in at least one tournament consisting of friendlies that provides an additional $5,000 per player if the WNT wins the tournament.[46] Because the scenario proposed by Plaintiffs assumes the WNT win all of their matches, in the top panel I assume the WNT win a friendly tournament paid each player $5,000.

44. As the top panel of the Exhibit 1 shows, in this hypothetical year the WNT players would earn *more* under the WNT CBA than under the MNT CBA. Specifically, the players would earn $213,000 under the WNT CBA and $210,667 under the MNT CBA over the course of the year.

---

[46] The current CBA provides 1st place bonuses of $5,000 per player for the SheBelieves and Four Nations tournaments. See 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642. The WNT has participated in the SheBelieves Cup in every year since 2016. USSF_Morgan_070835.

45. The bottom panel of Exhibit 1 displays results for a hypothetical involving a year with eight friendly matches—the average number of friendly matches the MNT played from 2017 through 2019. In this scenario, players would earn $154,000 from these matches according to the WNT CBA and $105,333 according to the MNT CBA. In other words, the WNT CBA pays even more per game than the MNT CBA in a scenario where the teams play a number of friendlies typical of a MNT season.

46. The analysis in Exhibit 1 overstates the value of the MNT CBA relative to the WNT CBA because Plaintiffs assume a perfect win record in friendly matches in their analysis. In Exhibit 2, I redo the same analysis, but consider how the results change if the WNT lose either one, two, or three friendly matches (three matches is the most friendly matches the WNT have lost since in a season since 2017, so I do not consider more losses than three).[47] To be conservative, in all scenarios represented in Exhibit 2 where the team does not win all of their games, I assume that the loss occurs in the friendly tournament, preventing the WNT from receiving the $5,000 bonus associated with winning the friendly tournament.

47. The top panel in Exhibit 2 considers the scenario with 16 friendlies. The analysis here shows that the MNT CBA pays more than the WNT CBA only when the WNT lose just one match *and* that match happens to be in a friendly tournament.[48] This is true even though the compensation I calculate in Exhibit 1 and Exhibit 2 omits the value of injury protection, severance pay, and other items in the WNT CBA not in the MNT CBA.

48. The bottom panel of Exhibit 2 considers scenarios with eight friendly matches (representative of a typical schedule for the MNT during the current CBA period). These results show that the WNT CBA provides about $49,000 to $53,000 more in compensation over the year than the MNT CBA depending on the team's record.

---

[47] USSF_Morgan_070835.

[48] For completeness sake, I have also calculated compensation under the WNT and MNT CBAs for all possible combination of wins, ties, and losses with at least 12 wins (the fewest wins by the WNT since 2017). There are 29 such combinations. Compensation is at least as high in the WNT CBA as in the MNT CBA in 22 of 29 scenarios. See workpaper 01.

*EXHIBIT 2*
*The WNT CBA becomes more favorable if teams do not win all matches*

| 16 Friendlies | | | |
|---|---|---|---|
| Record | WNT Player Actual Compensation | WNT Player Compensation Under MNT CBA | Compensation Higher Under WNT CBA? |
| 1. Win 16, Tie 0, Lose 0 | $213,000 | $210,667 | Yes |
| 2. Win 15, Tie 0, Lose 1 | $201,250 | $202,500 | No |
| 3. Win 14, Tie 0, Lose 2 | $194,500 | $194,333 | Yes |
| 4. Win 13, Tie 0, Lose 3 | $187,750 | $186,167 | Yes |

| 8 Friendlies | | | |
|---|---|---|---|
| Record | WNT Player Actual Compensation | WNT Player Compensation Under MNT CBA | Compensation Higher Under WNT CBA? |
| 5. Win 8, Tie 0, Lose 0 | $154,000 | $105,333 | Yes |
| 6. Win 7, Tie 0, Lose 1 | $147,250 | $97,167 | Yes |
| 7. Win 6, Tie 0, Lose 2 | $140,500 | $89,000 | Yes |
| 8. Win 5, Tie 0, Lose 3 | $133,750 | $80,833 | Yes |

Source: 2017–2021 WNT CBA, USSF_Morgan_000587 – 642; 2011–2018 MNT CBA, USSF_Morgan_000530 – 78; USSF_Morgan_070834; USSF_Morgan_070835
Note: The WNT played an average of 16 friendly matches (including those in tournament format) per year from 2017–2019. The MNT played an average of eight friendly matches per year from 2017–2019. Compensation only reflects WNT salaries, WNT friendly win payments, MNT match appearance fees (for hypothetical matches they lose), and MNT friendly win payments. The average of the three tiers of match win payments is $6,750 according to the WNT CBA and $13,167 according to the MNT CBA. When the MNT loses, the MNT players each receive a $5,000 appearance fee.

49. The economics of these results are straightforward. Because the MNT CBA is structured with higher payouts for wins and no fixed salary, a team must win the vast majority of its friendly matches for the MNT CBA to provide more compensation than the WNT CBA, and even then, the WNT CBA is often more favorable. For example, a team with only two losses out of 16 would receive higher compensation under the WNT CBA compared to the MNT CBA. This is the benefit of the fixed salary. Heading into a season, a team cannot know how many friendly matches it will win. In fact, the potential upside for the MNT CBA for friendlies is not very large—it only nets a team higher compensation than the WNT CBA when they win nearly all of their friendly games (and also fail to win the friendly tournament). Therefore, neither contract is necessarily better or worse because there is no single rate of pay, even in the simple example that only considers friendly matches and analyzes them in isolation from all other CBA terms, as Plaintiffs do in the Complaint.

### 3.2. Scenario 2: mitigating risk for individual players who do not appear on all game rosters

50. As detailed in Section 2 above, both the current WNT CBA as well as the expired MOU provide contracted players with continued salary payments even when they do not appear on match-day rosters, whether because of injury, coach's decision, or some other reason. In this sense, the WNT CBA provides a form of "insurance" for WNT players. WNT players who miss time for any of these reasons would not benefit from the various bonus payments defined in either the WNT or MNT CBAs, but such players are still assured a base level of pay. The MNT CBA does not provide this form of insurance to MNT players. As a result, players in these situations would receive higher compensation according to the WNT CBA relative to the MNT CBA during the stretches of time they do not make a match roster.

51. Below are four examples of contracted WNT players who missed games due to injuries during the class period. Pay records indicate that these players received their WNT salary during these periods, in accordance with the WNT CBA.[49] Under the MNT CBA, these players would have received zero pay from USSF during this period.

- Megan Rapinoe suffered an injury at the end of 2015, missed the Olympic qualifiers, and was unable to play with the WNT until August of 2016.[50]
- Amy Rodriguez Shilling suffered an injury in April of 2017 that prevented her from playing in a WNT match until June of 2018.[51] As a result she played in zero games during her injury period, and only 7 total games between 2017 and 2018.[52]

---

[49] USSF_Morgan_017142; USSF_Morgan_017143; USSF_Morgan_055554.

[50] Deposition of Megan Rapinoe pp. 35–36 (A: I believe the first roster I made in 2016 was the first game of the world – of the Olympics, so that would have been August 3rd. [...] Q: [...] And then I think your testimony was that you were not on the match day roster for any of the matches prior to that in 2016; is that right? A: Yes. Q: And that's because of an injury as well? A: Yes.") See also, WNT midfielder Megan Rapinoe tears ACL before final victory tour games, accessible at https:// ussoccer.com/stories/2015/12/wnt-midfielder-megan-rapinoe-tears-acl-before-final-victory-tour-games. USA's Megan Rapinoe starts vs. Colombia just months after ACL tear, accessible at https://www.usatoday.com/story/sports/olympics/rio-2016/2016/08/09/usa-megan-rapinoe-olympics-colombia-acl-tear/88492754/.

[51] Amy Rodriguez: A Long Journey Back To The Field, accessible at https://www.ussoccer.com/stories/2018/06/amy-rodriguez-a-long-journey-back-to-the-field.

[52] USSF_Morgan_063241; USSF_Morgan_063163.

- Tobin Heath suffered back injuries, underwent ankle surgery, and missed most of 2017.[53]
- Kelley O'Hara was unable to compete for the WNT from March until September of 2018 due to injuries and from October through the end of 2018 due to ankle surgery.[54]

52. The insurance value provided in the WNT CBA and absent from the MNT CBA also protects players who do not participate in matches due to coaching decisions. As an example, Meghan Klingenberg, who was a contracted WNT player at the beginning of the 2017 season and a member of both the 2015 WNT World Cup and the 2016 Olympic teams,[55] only appeared in four matches in 2017 and was not called in to the team during the final third of 2017.[56] In 2018, she appeared once as non-roster camp invitee in January, but did not play for the team and has not appeared with the WNT since then.[57] Despite playing in a small number of games, according to the current WNT CBA, Ms. Klingenberg earned $135,250 over the course of the current WNT CBA.[58] Her compensation was high primarily because of salary payments and severance pay. Under the MNT CBA, Ms. Klingenberg would have only earned $58,875.[59] Thus, Ms.

---

[53] Tobin Heath is making her way back from injuries, accessible at https://www.foxsports.com/soccer/story/tobin-heath-is-making-her-way-back-from-injuries-043018.

[54] Deposition of Kelley O'Hara p. 64. ("Q: After the qualifying tournament was over, you did not play in any other US Women's National Team matches in 2018? A: No. [...] Q: Okay. Do you recall that there was a Tournament of Nations competition in 2018? A: I do. Q: Did you participate in that? A: I did not."). See also Kelley O'Hara back from injuries, ready to take on 2019 World Cup, accessible at https://www.prosoccerusa.com/us-soccer/womens-world-cup/a-little-crazy-on-the-field-kelley-ohara-back-from-injuries-ready-to-take-on-2019-world-cup/.

[55] Ellis names U.S. roster for 2015 FIFA Women's World Cup team, accessible at https://www.ussoccer.com/stories/2015/04/ellis-names-us-roster-for-2015-fifa-womens-world-cup-team; Jill Ellis names 18 player USWNT Olympic roster, accessible at https://www.soccerwire.com/news/jill-ellis-names-18-player-uswnt-olympic-roster/.

[56] USSF_Morgan_063241.

[57] USSF_Morgan_063163.

[58] In 2017, Ms. Klingenberg earned 8 months of salary and 4 months of severance pay totaling $100,000, as well as a $10,000 signing bonus paid to members of the 2015 World Cup roster. She participated in four friendly matches in 2017: twice against a rank 25 team, once against a rank 11 team, and once against a rank 6 team. Per the WNT CBA, she was compensated three match win payments of $5,250 each and a match win bonus of $6,500. 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642; USSF_Morgan_063241; USSF_Morgan_070835; Deposition of Rebecca P. Roux, p. 147. In January 2018, Ms. Klingenberg received a $3,000 non-roster camp fee. USSF_Morgan_063163.

[59] Following Plaintiffs' methodology of applying the opponent rank to the MNT in Roux Deposition Exhibit 19, the MNT contract would have provided for three match win payments of $12,500; a match win payment of $17,625; and a non-roster comp invitee payment of $1,875 associated with the 2017 SheBelieves tournament, and a second non-roster camp fee for January 2018. See 2011–2018 MNT CBA, USSF_Morgan_000530 – 78. Ms. Klingenberg was a part of the training camp for the 2017 SheBelieves Cup, but did not make the roster. See Jill Ellis names 2017 SheBelieves Cup roster, accessible at https://www.starsandstripesfc.com/2017/2/24/14731404/jill-ellis-usa-2017-shebelieves-cup-roster.

Klingenberg was compensated far more according the WNT CBA than she would have been according to the MNT CBA in 2017.

53. As noted above, these examples capture the fact that the WNT CBA provides a form of "insurance" for players who have unexpected changes in their ability to perform in matches. The "insurance" function of the WNT CBA is absent from the MNT CBA. As detailed above in Section 2, the existence of such "insurance" creates additional economic value in the WNT CBA that offsets the lower performance-contingent payments.[60]

54. Importantly, this insurance value is provided to all players—even those who do not miss time—in the same way that rental car insurance provides value to all consumers who purchase it even when no auto accident occurs. When the CBA is negotiated, the players do not know which (if any) players will miss matches for injuries or other reasons over the relevant period, but the inclusion of insurance in the CBA provides a safeguard for all players against that risk. The basic economic idea is that financial protection from events such as injury provides value because you strike the contract *before you know whether or not it will occur* and are protected by the contract from the economic consequences of those same events.

---

[60] This is true even if one attempts to make comparisons including the payments in the MNT CBA associated with the Men's World Cup, which are higher than those in the WNT CBAs associated with the Women's World Cup. As demonstrated by just the two examples of Ms. Klingenberg and Ms. Shilling, there is no guarantee that any individual player (even a player who is a very good player at the outset of the CBA's term) is going to play in a World Cup during the term of any given CBA.

## 4. CONCLUSION

55. The MNT and the WNT are compensated according to different CBAs,
neither of which defines a single or specific amount of compensation per game.
Compensation depends on the number, type, and outcome of each match, as
well as any individual player's availability to play in a match or tournament and
the coach's decisions regarding whom to call into camp or place on a
tournament or match day roster. Furthermore, the WNT CBA includes separate
compensation and benefits that players receive regardless of matches and
outcomes. The MNT CBA does not include any of these fixed payments; MNT
player compensation is determined by performance outcomes alone.

56. Above, I presented realistic scenarios under which players, or an entire
team, would have been compensated more under the WNT CBA than the MNT
CBA. Therefore, I conclude that the CBAs are not written in a way that
systematically pays WNT players less than comparable MNT players. Instead,
compensation per game depends on performance.

_____
Justin McCrary
February 4, 2020

## 5. APPENDIX A - CURRICULUM VITAE

# Justin McCrary

Columbia University
School of Law
521 Jerome Greene Hall
New York, NY 10027

Cell Phone:  (510) 409-6418
Email:        justin.mccrary@gmail.com
Homepage:   https://www.law.columbia.edu/faculty/justin-mccrary

## Current Appointments

| | |
|---|---|
| 2018– | **Columbia University** Paul J. Evanson Professor of Law |
| 2012– | **National Bureau of Economic Research** Faculty Research Associate |

## Past Appointments

| | |
|---|---|
| Fall 2017 | **Columbia University** Samuel Rubin Visiting Professor of Law |
| 2014–17 2010–19 2008–10 | **University of California, Berkeley** Director, Social Sciences Data Laboratory (D-Lab) Professor of Law Assistant Professor of Law |
| 2013–14 | **European Central Bank (Banco de España)** Economist |
| 2003–07 2003–07 | **University of Michigan** Assistant Professor, Gerald R. Ford School of Public Policy Assistant Professor, Department of Economics (courtesy) |
| 2006–12 2008–19 | **National Bureau of Economic Research** Faculty Research Fellow Co-director, Crime Working Group |
| 1996–98 | **Federal Reserve Bank of New York** Assistant Economist |

## Education

Ph.D. Economics, University of California, Berkeley, 2003

A.B. Public Policy, Princeton University, 1996

## Testimony Experience

*County of Suffolk v. Purdue Pharma LP, et al., and County of Nassau v. Purdue Pharma LP, et al., and The People of the State of New York v. Purdue Pharma LP, et al.,*
Supreme Court of the State of New York, County of Suffolk

Prescription opioid medication litigation

Testimony regarding causation, drug use, economics of crime, regression methodology

Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

Report filed on February 3, 2020

*Government of the United States Virgin Islands v. Toyota Motor Corporation, et al.*
Superior Court of the Virgin Islands, Division of St. Thomas and St. John

    Consumer products liability case

    Testimony regarding the U.S. car market, connections between markets, statistical methodology

    Retained by Ford Motor Company

    Report filed on January 31, 2020

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
U.S. District Court for the Eastern District of New York

    Antitrust case

    Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

    Retained by Mastercard, Bank of America, Barclays, Capital One, Citibank, Fifth Third, First National Bank of Omaha, HSBC, JPMorgan Chase, PNC, SunTrust, Texas Independent Bancshares, and Wells Fargo

    Deposed on January 14, 2020

    Report filed on June 10, 2019

*Olson, Perez, Postmates, and Uber v. State of California*
U.S. District Court for the Central District of California

    U.S. constitutional objection to California adoption of Assembly Bill 5

    Testimony regarding two-sided markets and flexible work arrangements

    Retained by Postmates and Uber

    Report filed on January 8, 2020

*Rescap Liquidating Trust v. Primary Residential Mortgage, Inc.*
U.S. District Court for the District of Minnesota

    Mortgage-backed securities case (bankruptcy)

    Testimony regarding sampling, damages, and statistical concepts

    Retained by Primary Residential Mortgage, Inc.

    Deposed on October 23, 2019

    Supplemental report filed on August 23, 2019

    Report filed on August 9, 2019

*Phoenix Light SF Limited, et al. vs. Wells Fargo Bank*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case (servicing)

    Testimony regarding matching and other statistical methodologies

    Retained by Wells Fargo Bank

    Deposed on October 4, 2019

    Report filed on July 25, 2019

*Jacob Beaty and Jessica Beaty vs. Ford Motor Company*
U.S. District Court for the Western District of Washington

    Consumer products liability case

    Testimony regarding conjoint analysis and heterogeneity

    Retained by Ford Motor Company

    Deposed on June 25, 2019

    Class certification report filed on May 24, 2019

*Shamrell v. Apple Inc.*
Superior Court of the State of California, County of San Diego

> Putative class action regarding products liability, Unfair Competition Law and Consumers Legal Remedies Act

> Testimony regarding heterogeneity across putative class members, failure rate methodologies, econometrics, and data science

> Retained by Apple, Inc.

> Deposed on June 6, 2019

> Supplemental class certification report filed on October 17, 2018

> Class certification report filed on March 29, 2017

> Report filed on February 1, 2017

*Cuyahoga County v. Purdue Pharma LP, et al., and Summit County v. Purdue Pharma LP, et al.,*
U.S. District Court of the Northern District of Ohio

> Prescription opioid medication litigation

> Testimony regarding causation, drug use, economics of crime, regression methodology

> Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

> Deposed on May 31, 2019

> Report filed on May 10, 2019

*Lerman v. Apple Inc.*
U.S. District Court for the Eastern District of New York

> Putative class action regarding products liability

> Testimony regarding heterogeneity across putative class members, the nature of products, and conjoint analysis

> Retained by Apple, Inc.

> Deposed on May 29, 2019

> Report filed on April 3, 2019

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc.*
Supreme Court of the State of New York, County of New York

> Mortgage-backed securities case

> Testimony regarding sampling and statistical methods

> Retained by Morgan Stanley

> Deposed on May 15, 2019

> Report filed on October 19, 2018

*Rebuttal Testimony of Powerex Corp re: BPA Southern Intertie Hourly Rate*
U.S. Department of Energy, Bonneville Power Administration

> Administrative proceeding concerning the rates for transmission of electricity

> Testimony regarding regression methodology

> Retained by Powerex Corp.

> Testimony before the Hearing Officer on April 23, 2019

> Report filed on March 28, 2019

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*
U.S. District Court for the Southern District of New York

　　Antitrust price fixing case (Sherman Act §§ 1, 3 and Commodity Exchange Act)

　　Testimony regarding trader communications and sampling methodologies

　　Retained by Credit Suisse

　　Deposed on January 17, 2019

　　Report filed on October 25, 2018

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley & Co. LLC, as successor to Morgan Stanley & Co. Inc., Morgan Stanley, and Saxon Mortgage Services, Inc.*
Supreme Court of the State of New York, County of New York

　　Mortgage-backed securities case

　　Testimony regarding sampling and statistical methods

　　Retained by Morgan Stanley

　　Deposed on January 8, 2019

　　Report filed on August 7, 2018

*Trinidad Lopez v. Liberty Mutual Insurance Company*
U.S. District Court for the Central District of California

　　Wage and hour case after class certification

　　Testimony regarding damages and statistics

　　Retained by Liberty Mutual

　　Report filed on December 21, 2018

*Samsung Electronics Co., Ltd., v. Kuroda Electric Co., Ltd., Sakai Display Products Corporation and Sharp Corporation*
International Chamber of Commerce

　　Contractual dispute regarding supply of television panels

　　Testimony regarding economic theory, data science, statistics

　　Retained by Samsung Electronics Co.

　　Testified at arbitration hearing on December 20, 2018

　　Report filed on September 28, 2018

*In re: Part 60 RMBS Put-Back Litigation*
Supreme Court of the State of New York, County of New York

　　Mortgage-backed securities case

　　Testimony regarding sampling and statistical methods

　　Retained by Morgan Stanley Mortgage Capital Holdings LLC

　　Deposed on November 27, 2018

　　Report filed on June 22, 2018

*In Re: RFC and ResCap Liquidating Trust Litigation*
U.S. District Court for the District of Minnesota and
U.S. Bankruptcy Court for the Southern District of New York

  Mortgage-backed securities case (bankruptcy)

  Testimony regarding sampling, damages, and statistical concepts

  Retained by Advanced Financial Services, BMO Harris Bank, Cadence Bank, Colonial Savings, CTX Mortgage, Decision One, First Guaranty, Freedom Mortgage, Home Loan Center, HSBC Mortgage, Impac Funding, PNC, Provident, Standard Pacific, Synovus, and Universal American

  Testified at jury trial on November 1, 2018 (Minnesota; Home Loan Center)

  Final rebuttal report filed on June 14, 2018

  Deposed on April 24, 2018

  Rebuttal to supplemental disclosure filed on February 26, 2018

  Report filed on October 27, 2017

*Residential Funding Company v. Universal American Mortgage Co.*
U.S. District Court for the District of Minnesota

  Mortgage-backed securities case (bankruptcy)

  Testimony regarding sampling and statistical methods

  Retained by Universal American Mortgage Co.

  Report filed on August 30, 2018

*In re Gateway Plaza Residents Litigation*
Supreme Court of the State of New York, County of New York

  Putative class action regarding warranty of habitability

  Testimony regarding electricity usage, individual preferences and choices, and heterogeneity across putative class members; large scale data analysis

  Retained by Gateway Plaza

  Supplemental class certification and rebuttal report filed on August 8, 2018

  Class certification report filed on September 18, 2017

*United States of America v. SavaSeniorCare*
U.S. District Court for the Middle District of Tennessee

  False Claims Act case

  Testimony regarding sampling and statistical methods

  Retained by SavaSeniorCare

  Report filed on August 6, 2018

*Latoya Brown et al. v. Madison County, Mississippi*
U.S. District Court for the Southern District of Mississippi

  Putative class action alleging violations of Section 1983 and the Fourth and Fourteenth Amendments

  Testimony regarding regression methodologies, measurement error, and data science

  Retained by Latoya Brown et al.

  Report filed on July 2, 2018

*Martin Dulberg et al. v. Uber Technologies, Inc. and Rasier, LLC*
U.S. District Court for the Northern District of California

　Putative class action alleging breach of contract

　Testimony regarding heterogeneity in damages across putative class members

　Retained by Uber Technologies, Inc.

　Supplemental report filed on June 28, 2018

　Affirmative report filed on January 11, 2018

*Tri-City, LLC; Endor Car and Driver, LLC; Zehm-NY, LLC; Zwei-NY, LLC; Abatar, LLC; and Flatiron Transit, LLC v. New York Taxi and Limousine Commission and Meera Joshi*
Supreme Court of the State of New York, County of New York

　Article 78 proceeding challenging an administrative ruling

　Testimony regarding mismatch between accessibility regulation and accessibility demand

　Retained by plaintiffs

　Supplemental report filed on May 18, 2018

　Affirmative report filed on April 13, 2018

*Federal Home Loan Bank of Boston, v. Ally Financial, Inc., et al.*
Superior Court of the State of Massachusetts, Business Litigation Session, Suffolk County

　Mortgage-backed securities case

　Testimony regarding sampling and statistical methods

　Retained by Morgan Stanley

　Report filed on May 17, 2018

*Cheryl Phipps and Shawn Gibbons v. Wal-Mart Stores, Inc.*
U.S. District Court for the Middle District of Tennessee

　Putative class action alleging discrimination in employment

　Testimony regarding the decentralized nature of Walmart's internal labor market and concomitant heterogeneity across proposed class members in pay and promotion outcomes

　Retained by Walmart

　Deposed on April 30, 2018

　Report filed on April 20, 2018

*People of the State of California v. Morgan Stanley & Co.*
Superior Court of the State of California, County of San Francisco

　Mortgage-backed securities case

　Testimony regarding sampling and statistical methods

　Retained by Morgan Stanley & Co.

　Deposed on February 9, 2018

　Report filed on January 25, 2018

*Tony Dickey and Paul Parmer et al. v. Advanced Micro Devices, Inc.*
U.S. District Court for the Northern District of California

　Putative class action alleging false advertising

　Testimony regarding availability of information regarding and market for computer chips and heterogeneity across putative class members

　Retained by Advanced Micro Devices

　Report filed on January 26, 2018

*Federal Home Loan Bank of Chicago v. Banc of America Funding Corporation, et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

    Mortgage-backed securities case

    Testimony regarding sampling, regression, and statistical methods

    Retained by Morgan Stanley

    Deposed on December 14, 2017

    Report filed on August 21, 2017

*In re Lehman Brothers Holdings, Inc., et al., Debtors*
U.S. Bankruptcy Court for the Southern District of New York

    Mortgage-backed securities case

    Testimony regarding sampling, resampling methods for inference, and statistical methods

    Retained by Lehman Brothers Holdings, Inc.

    Deposed on October 9, 2017

    Report filed on August 28, 2017

*Deutsche Bank National Trust Company v. Morgan Stanley Mortgage Capital Holdings LLC*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on March 27, 2017

    Report filed on December 16, 2016

*Rosen v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

    Putative class action regarding false advertising

    Testimony regarding economics of safety

    Retained by Uber Technologies, Inc.

    Deposed on February 3, 2017

    Report filed on January 13, 2017

    Affirmative report filed on December 2, 2016

*Blackrock Allocation Target Shares: Series S Portfolio, et al., v. Wells Fargo Bank, N.A.; Royal Park Investments SA/NV v. Wells Fargo Bank, N.A., as Trustee; National Credit Union Administration Board, et al., v. Wells Fargo Bank, N.A.; Phoenix Light SF Limited, et al., v. Wells Fargo Bank, N.A.; and Commerzbank AG v. Wells Fargo Bank, N.A.*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Wells Fargo Bank

    Report filed on January 18, 2017

*LA Taxi Cooperative, Inc. et al. v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California
- False advertising case
- Testimony regarding economics of safety
- Retained by Uber Technologies, Inc.
- Report filed on January 13, 2017
- Affirmative report filed on November 18, 2016

*State of Illinois v. Hitachi Ltd., et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division
- Antitrust price-fixing case
- Testimony regarding liability and damages
- Retained by Hitachi Ltd.
- Report filed on November 11, 2016

*In re: City of San Bernardino, California, Debtor*
U.S. Bankruptcy Court, Central District of California, Riverside Division
- Municipal bankruptcy case
- Testimony regarding economics, econometrics, rare risks and the value of a statistical life
- Retained by the City of San Bernardino
- Report filed on October 3, 2016

*U.S. Bank National Association v. Morgan Stanley Mortgage Capital Holdings LLC*
Supreme Court of the State of New York, County of New York
- Mortgage-backed securities case
- Testimony regarding sampling and statistical methods
- Retained by Morgan Stanley Mortgage Capital Holdings LLC
- Deposed on September 10, 2016
- Report filed on June 17, 2016

*National Credit Union Administration Board v. RBS Securities, Inc.*
U.S. District Court for the Central District of California &
U.S. District Court for the District of Kansas
- Mortgage-backed securities case
- Testimony regarding sampling and statistical methods
- Retained by RBS Securities
- Deposed on January 28, 2016
- Report filed on October 16, 2015

*Temple-Inland, Inc., v. Thomas Cook, et al.*
U.S. District Court for the District of Delaware
- Escheat law case
- Testimony regarding sampling, statistical methods, and economic theory
- Retained by the State of Delaware
- Deposed on November 24, 2015
- Report filed on October 23, 2015

*National Consumer Protection Service v. Farmacias Cruz Verde S.A. et al.*
Honorable Civil Court of Santiago (Chile)

> Antitrust putative class action

> Testimony regarding appropriate methods for estimating damages

> Retained by Salcobrand

> Report filed on November 14, 2015

*Douglas O'Connor, et al., v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

> Putative class action regarding independent contractor versus employee

> Testimony regarding heterogeneity in alleged damages across putative class members, potential for class conflict

> Retained by Uber Technologies, Inc.

> Report filed on October 27, 2015

> Report filed on July 7, 2015

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*
U.S. District Court for the District of Massachusetts

> Discovery dispute in affirmative action case

> Testimony regarding necessary inputs into statistical methodologies

> Retained by Harvard College

> Report filed on July 30, 2015

*Securities and Exchange Commission v. James V. Mazzo and David L. Parker*
U.S. District Court for the Central District of California

> Civil insider trading suit

> Testimony regarding probability theory and statistics

> Retained by James V. Mazzo and David L. Parker

> Deposed on May 13, 2015

> Report filed on March 13, 2015

*In re: City of Stockton, California, Debtor*
U.S. Bankruptcy Court, Eastern District of California

> Municipal bankruptcy suit

> Testimony regarding economic theory, labor economics, and econometrics

> Retained by the City of Stockton

> Deposed on March 13, 2013

> Report filed on February 15, 2013

*In the Matter of Act 111 Interest Arbitration Between Commonwealth of Pennsylvania and Pennsylvania State Troopers Association*

> Hearings on wage setting

> Testimony regarding rare risks and the value of a statistical life

> Retained by the Pennsylvania State Troopers Association

> Testified at arbitration hearing on December 4, 2012

> Report filed on December 4, 2012

## Scholarship on Sampling, Statistics, and Econometrics

Conservative Tests Under Satisficing Models of Publication Bias (with Garret Christensen and Daniele Fanelli)
*PLOS One*, Volume 11, Number 2, February 22, 2016

New Evidence on the Finite Sample Properties of Propensity Score Matching and Reweighting Estimators (with Matias Busso and John DiNardo)
*Review of Economics and Statistics*, Volume 96, Number 5, December 2014

Incomes in South Africa Since the Fall of Apartheid (with Murray Leibbrandt and James Levinsohn)
*Journal of Globalization and Development*, Volume 1, Issue 1, January 2010

Manipulation of the Running Variable in the Regression Discontinuity Design: A Density Test
*Journal of Econometrics*, Volume 142 , Issue 2, February 2008

## Scholarship on Competition

Measuring Benchmark Damages in Antitrust Litigation (with Daniel L. Rubinfeld)
*Journal of Econometric Methods*, Volume 3, January 2014

## Scholarship on Finance

Dark Trading at the Midpoint: Pricing Rules, Order Flow, and Price Discovery (with Robert Bartlett)
Accepted, *Journal of Law, Finance, and Accounting*

How Rigged Are Stock Markets?: Evidence from Microsecond Timestamps (with Robert Bartlett)
Conditionally Accepted, *Journal of Financial Markets*

Subsidizing Liquidity with Wider Ticks: Evidence from the Tick Size Pilot Study Timestamps (with Robert Bartlett)
Conditionally Accepted, *Journal of Empirical Legal Studies*

Shall We Haggle in Pennies at the Speed of Light or in Nickels in the Dark?: How Minimum Price Variation Regulates High Frequency Trading and Dark Liquidity (working paper, 2015, with Robert Bartlett)

## Scholarship on Risk and Crime

Why We Need Police (with Deepak Premkumar)
Chapter 3 in *The Cambridge Handbook of Policing in the United States*, Tamara Rice Lave and Eric Jr. Miller, eds., Cambridge University Press, June 2019

Are U.S. Cities Underpoliced? Theory and Evidence (with Aaron Chalfin)
*Review of Economics and Statistics*, Volume 100, Issue 1, March 2018, 167–186

Criminal Deterrence: A Review of the Literature (with Aaron Chalfin)
*Journal of Economic Literature*, Volume 55, Number 1, March 2017, 5–48 (lead article)

The Deterrence Effect of Prison: Dynamic Theory and Evidence (with David S. Lee)
*Advances in Econometrics*, Volume 38, 2017, editors Matias D. Cattaneo and Juan Carlos Escanciano
2018 Emerald Literati Award, Outstanding Author Contribution

Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process: An Empirical Inquiry (with Tamara Lave)
*Brooklyn Law Review*, Volume 78, Summer 2013, Number 4, 1391–1439

General Equilibrium Effects of Prison on Crime: Evidence From International Comparisons (with Sarath Sanga)
*Cato Papers on Public Policy*, Volume 2, 2012

*Controlling Crime: Strategies and Tradeoffs* (co-edited with Phil Cook and Jens Ludwig), Chicago: University of Chicago Press, 2011.

## Scholarship on Labor Economics

Unmarked?  Criminal Record Clearing and Employment Outcomes (with Jeffrey Selbin (lead author) and Joshua Epstein)
*Journal of Criminal Law and Criminology*, Volume 108, Number 1, 2017 (lead article)

The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Laws Using Exact Date of Birth (with Heather Royer)
*American Economic Review*, Volume 101, Number 1, February 2011

Comment on "Free to Punish? The American Dream and the Harsh Treatment of Criminals", by Rafael di Tella and Juan Dubra
*Cato Papers on Public Policy*, Volume 1, 2011

Dynamic Perspectives on Crime
in *Handbook of the Economics of Crime*, Chapter 4, Edward Elgar, 2010

The Effect of Court-Ordered Hiring Quotas on the Composition and Quality of Police
*American Economic Review*, Volume 97, Number 1, March 2007

Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment
*American Economic Review*, Volume 92, Number 4, September 2002

## Scholarship on Intellectual Property

A Reconsideration of Copyright's Term (with Kristelia A. Garcia)
forthcoming, *Alabama Law Review*

## Scholarship on Monetary Policy

Following Germany's Lead: Using International Monetary Linkages to Estimate the Effect of Monetary Policy on the Economy (with Julian di Giovanni and Till von Wachter)
*Review of Economics and Statistics*, Volume 91, Number 2, May 2009

## Other Scholarship

The Ph.D. Rises in American Law Schools, 1960-2011: What Does It Mean for Legal Education?  (with Joy Milligan and James Phillips)
*Journal of Legal Education*, Volume 65, Number 543, Spring 2016

## Referee

*Econometrica*

*American Economic Review*

*Quarterly Journal of Economics*

*Journal of Political Economy*

*Review of Economic Studies*

*Journal of Econometrics*

*Journal of Economic Literature*

*Review of Economics and Statistics*

*Journal of the American Statistical Assocation*

*American Economic Journal*

*Advances in Econometrics*

*American Law and Economics Review*

*International Law and Economics Review*

*Journal of Labor Economics*

*Journal of Econometric Methods*

*Industrial and Labor Relations Review*

*Journal of Law and Economics*

*Journal of Empirical Legal Studies*

*Journal of Urban Economics*

*Journal of Quantitative Criminology*

*American Political Science Review*

*American Sociological Review*

*Stanford Law Review*

*Yale Law Journal*

*Columbia Law Review*

## Other Activities

2019–   Member, Board of Directors, Plectica, LLC

2017–   Member, Board of Directors, American Law and Economics Association

2007–19 Co-Director (with Phil Cook and Jens Ludwig), *Crime Working Group*, National Bureau of Economic Research

2009–14 Co-Director, *Law and Economics Program*, University of California, Berkeley

## Courses Taught

### Columbia

2020-21 (upcoming) L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2019-20 L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall)

2018-19 L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2017-18 L6231: Corporations (Fall)

*Berkeley*

2016-17  Law 244.4: Litigation and Statistics (Fall); Law 216: Law and Economics Workshop (Fall); Law 218.6: Law and Economics of Discrimination (Fall)

2015-16  Law 250: Business Associations (Fall); Law 244.4: Litigation and Statistics (Fall); Letters and Science 39D: Race, Policing, and Data Science (Fall)

2014-15  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer)

2013-14  Law 250S: Business Associations (Summer)

2012-13  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall)

2011-12  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall); Law 251.31: Introduction to Law, Economics, and Business (Spring); Legal Studies 145: Law and Economics I (undergraduate)

2010-11  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 216: Law and Economics Workshop (Fall and Spring); Legal Studies 145: Law and Economics I (undergraduate); Law 209.6: Topic in Quantitative Methods (JSP); Econ 250C: Labor Economics (graduate, shared course with 209.6)

2009–10  Law 216: Law and Economics Workshop (Fall and Spring); Law 209.32: Quantitative Methods II (JSP)

2008–09  Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP); Law 209.32: Quantitative Methods II (JSP)

2007–08  Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP)

*Michigan*

Introduction to Quantitative Methods (policy), First Econometrics Field Course (economics), Advanced Economic Theory (policy)

## Grants and Fellowships

2007–2010  NIH, Constructive Proposals for Dealing With Attrition (with John DiNardo)

2009    Committee on Research, Junior Faculty Research Grant, UC Berkeley

2006–2009  NIH, The Effect of Female Education on Fertility and Infant Health (with Heather Royer, Grant # R03 HD051713)

2006–2011  NSF, New Instrumental Variables Estimates of the Effects of Schooling and Military Service: Empirical Strategies Using Non-Public-Use Data (with Josh Angrist and Stacey Chen)

2005    RWJ Foundation Health and Society Scholars Program, Small Grant Program

2004    Rackham Interdisciplinary Grant, University of Michigan

2004    CLOSUP Grant, University of Michigan

2004    National Poverty Center Grant, University of Michigan

2002–2003  Chancellor's Dissertation Year Fellowship, UC Berkeley

## Presentations

2018–2019   Columbia University, School of Law; Conference on Empirical Legal Studies, University of Michigan

2017–2018   Columbia University, School of Law; Georgetown University, School of Law

2016–2017   George Mason University, School of Law; University of Michigan, Economics Department (Summer, Fall); Equities Leaders Summit; University of Zürich, Department of Economics; ETH (Swiss Federal Institute of Technology) Zürich, Law and Economics; Northwestern University, School of Law; Duke University, School of Law; Duke University, Information Initiative

2015–2016   Goldman Sachs; University of California, Berkeley, School of Law; University of Virginia, School of Law; University of California, Irvine; Equal Employment Opportunity Commission; National Bureau of Economic Research, Summer Institute

2014–2015   Duke University; Federal Reserve Bank of New York; Equal Employment Opportunity Commission (EEO-DataNet); American Law and Economics Association (discussant); New York University (NYU / Penn Law and Finance Conference); National Bureau of Economic Research, Summer Institute (discussant)

2013–2014   University of Southern California, School of Law; London School of Economics; Bank of Spain; CEMFI; Carlos III; University of Zaragoza; University of Rotterdam; University of Maastricht; University of Götenborg

2012–2013   University of California, Los Angeles, School of Law

2011–2012   University of Oregon, Department of Economics; University of British Columbia, Department of Economics; Brown University, Department of Economics; University of Rochester, Department of Economics; Cato Institute; National Bureau of Economic Research, Summer Institute; Harvard Law School

2010–2011   Northwestern, School of Law; University of Wisconsin, Department of Economics; Brookings Institution; Cato Institute

2009–2010   University of Chicago, School of Law; Cornell University, School of Law and Department of Economics; University of Michigan, School of Law and Department of Economics; University of Virginia, School of Law, Olin Conference

2008–2009   University of California, Los Angeles, School of Law; University of Arizona, School of Law and Department of Economics; Stanford University, School of Law and Department of Economics; University of Miami, Department of Economics

2007–2008   Northwestern University, School of Law; University of Michigan, Department of Economics; National Bureau of Economic Research, Summer Institute; Florida State University

*Prior to 2007–2008, presentations are at departments of economics, unless otherwise noted*

2006–2007   University of Michigan, Program in Survey Methodology; Public Policy Institute of California; Brown University

2005–2006   University of Michigan; University of California, Irvine; University of California, Santa Barbara; University of California, Santa Cruz; California State University, Long Beach; University of Western Ontario; University of Toronto; University of Illinois, Chicago; University of Chicago, Graduate School of Business; APPAM; University of Florida; University of California, Berkeley, School of Law; Princeton University; RAND; Hebrew University (conference in honor of Reuben Gronau); Stanford University, University of Wisconsin, Madison; Northwestern University; Crime and Economics Summer Workshop, University of Maryland

2004–2005   Federal Reserve Bank of Chicago; University of Illinois, Urbana-Champaign; University of Michigan, William Davidson Institute; University of Maryland; Urban Institute; American Economics Association Meetings; City University of New York Health Economics Seminar; University of Wisconsin, Madison; Stanford University; University of California, Davis; University of California, Berkeley, Labor Lunch; NBER Summer Institute, Education/Labor Studies

2003–2004   University of Michigan; APPAM; NBER Labor Studies Meeting (Fall); Massachusetts Institute of Technology; Harvard University, Kennedy School; University of California, Los Angeles; University of California, San Diego; Columbia University; University of California, Berkeley; NBER Summer Institute, Monetary Policy; NBER Summer Institute, Labor Studies

2002–2003  University of California, San Diego; University of California, Los Angeles; RAND Institute; University of Chicago, Graduate School of Business; University of Chicago, Harris School of Public Policy; University of Michigan, Ford School of Public Policy; Columbia University; Dartmouth College; Federal Reserve Bank of New York; Boston University

Last updated: February 1, 2020

## 6. APPENDIX B – DOCUMENTS RELIED UPON

| Document Title | Document Date |
|---|---|
| **Record Documents** | |
| USSF_Morgan_000530 – 78 | 2011 – 2018 |
| USSF_Morgan_000587 – 642 | 2017 – 2021 |
| USSF_Morgan_005778 | January 31, 2018 |
| USSF_Morgan_013180 – 6 | February 11, 2017 |
| USSF_Morgan_013236 | February 14, 2017 |
| USSF_Morgan_013773 | March 3, 2017 |
| USSF_Morgan_017142 | |
| USSF_Morgan_017143 | |
| USSF_Morgan_028424 – 61 | 2005 – 2012 |
| USSF_Morgan_055431 | December 20, 2019 |
| USSF_Morgan_055554 | |
| USSF_Morgan_063163 | |
| USSF_Morgan_063241 | |
| USSF_Morgan_070834 | |
| USSF_Morgan_070835 | |
| USSF_SOLO_003536 – 44 | January 4, 2016 |
| USSF_SOLO_004319 – 20 | May 13, 2016 |
| USSF_SOLO_004376 – 81 | July 7, 2016 |
| WNTPA_00000456 – 64 | February 8, 2017 |
| WNTPA_00004575 – 83 | 2013 – 2016 |
| WNTPA_00007541 – 45 | |
| WNTPA_00007563 – 4 | July 22, 2016 |
| | |
| **Legal Pleadings** | |
| Complaint, *Alex Morgan, et al. v. United States Soccer Federation, Inc.* | March 8, 2019 |
| Order Re: Plaintiffs' Motion for Class Certification, *Alex Morgan, et al. v. United States Soccer Federation, Inc.* | November 8, 2019 |
| Order Granting Stipulation to Amend Title VII Class Period, *Alex Morgan, et al. v. United States Soccer Federation, Inc.* | December 6, 2019 |
| | |
| **Depositions and Declarations** | |
| Deposition of Tom King | January 23, 2020 |
| Deposition of Kelley O'Hara | January 17, 2020 |
| Deposition of Rich Nichols | December 4, 2019 |

| Document Title | Document Date |
|---|---|
| Deposition of Megan Rapinoe | January 16, 2020 |
| Deposition of Rebecca P. Roux | December 19, 2019 |

### Academic Articles

| | |
|---|---|
| Baker, George P. "Incentive Contracts and Performance Measurement." *Journal of Political Economy* 100, no. 3: 598–614 | 1992 |
| Lazear, Edward P. "Performance Pay and Productivity. *The American Economic Review* 90, no. 5: 1346–1361 | 2000 |
| Lazear, Edward P. "Salaries and Piece Rates." *Journal of Business* 59, no. 3: 405–341 | 1986 |
| Prendergast, Canice. "The Provision of Incentives in Firms." *Journal of Economic Literature* 37, no. 1: 7–63 | 1999 |

### Books

| | |
|---|---|
| Besanko, D., and Braeutigam, R. R. *Microeconomics*. John Wiley & Sons, Inc., Hoboken, NJ | 2011 |
| Besanko, D., Dranove, D., Shanley, M., and Schaefer, S. *Economics of Strategy*. John Wiley & Sons, Inc., Hoboken, NJ | 2010 |
| Bolton, P., and Dewatripont, M. *Contract Theory*. MIT Press, Cambridge, MA | 2005 |
| Downes, J., and Goodman, J. E. *Dictionary of Finance and Investment Terms*. Barron's Educational Series, Hauppauge, NY | 2014 |

### News Articles

| | |
|---|---|
| Amy Rodriguez: A long journey back to the field, accessible at https://www.ussoccer.com/stories/2018/06/amy-rodriguez-a-long-journey-back-to-the-field | June 10, 2018 |
| Ellis names U.S. roster for 2015 FIFA Women's World Cup team, accessible at https://www.ussoccer.com/stories/2015/04/ellis-names-us-roster-for-2015-fifa-womens-world-cup-team. | April 14, 2015 |
| Jill Ellis names 18-player USWNT Olympic roster, accessible at https://www.soccerwire.com/news/jill-ellis-names-18-player-uswnt-olympic-roster/ | July 12, 2016 |
| Jill Ellis names 2017 SheBelieves Cup roster, accessible at https://www.starsandstripesfc.com/2017/2/24/14731404/jill-ellis-usa-2017-shebelieves-cup-roster | February 24, 2017 |
| Kelley O'Hara back from injuries, ready to take on 2019 World Cup, accessible at https://www.prosoccerusa.com/us-soccer/womens-world-cup/a-little-crazy-on-the-field-kelley-ohara-back-from-injuries-ready-to-take-on-2019-world-cup/ | June 11, 2019 |
| Tobin Heath is making her way back from injuries, accessible at https://www.foxsports.com/soccer/story/tobin-heath-is-making-her-way-back-from-injuries-043018 | April 30, 2018 |
| USA's Megan Rapinoe starts vs. Colombia just months after ACL tear, accessible at https://www.usatoday.com/story/sports/olympics/rio- | August 9, 2016 |

| Document Title | Document Date |
|---|---|
| 2016/2016/08/09/usa-megan-rapinoe-olympics-colombia-acl-tear/88492754/ | |
| WNT midfielder Megan Rapinoe tears ACL before final victory tour games, accessible at https://ussoccer.com/stories/2015/12/wnt-midfielder-megan-rapinoe-tears-acl-before-final-victory-tour-games | December 5, 2015 |

**Note: In addition to the documents on this list, I relied upon all documents cited in my report and my exhibits to form my opinions.**