# EXHIBIT 6

**Deiter Consulting Group, Inc.**
John C. Deiter, Ph.D.
Stephen E. Durham, Ph.D
Cynthia Stephens, Ph.D.
Finnie B. Cook, Ph.D.

**Deiter, Stephens, Durham & Cook**

Economic and Financial Consultants

100 North Tampa Street
Suite 2410
Tampa, FL 33602
Phone (813) 223-7644
Fax (813) 223-7866

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CASE NO. 2:19-cv-01717

_____

IN RE:

ALEX MORGAN, MEGAN RAPINOE, BECKY SAUERBRUNN, CARLI LLOYD, MORGAN BRIAN, JANE CAMPBELL, DANIELLE COLAPRICO, ABBY DAHLKEMPER, TIERNA DAVIDSON, CRYSTAL DUNN, JULIE ERTZ, ADRIANNA FRANCH, ASHLYN HARRIS, TOBIN HEATH, LINDSEY HORAN, ROSE LAVELLE, ALLIE LONG, MERRITT MATHIAS, JESSICA MCDONALD, SAMANTHA MEWIS, ALYSSA NAEHER, KELLEY O'HARA, CHRISTEN PRESS, MALLORY PUGH, CASEY SHORT, EMILY SONNETT, ANDI SULLIVAN AND MCCALL ZERBONI
                    PLAINTIFFS/CLAIMANTS
        V.
UNITED STATES SOCCER FEDERATION, INC.,
                    DEFENDANT/RESPONDENT

_____

EXPERT ECONOMIC DAMAGES REPORT OF FINNIE B. COOK, PH.D.

FEBRUARY 4TH, 2020

**TABLE OF CONTENTS**

Qualifications ................................................................................................................. 1

Scope of Assignment ...................................................................................................... 2

Summary of Opinions ..................................................................................................... 3

A.   Economic Damages, Count I: Equal Pay Act (The Fair Labor Standards Act of 1938, as amended by the Equal Pay Act, 29 U.S.C. §§ 206 et seq.) ..................................... 3

B.   Economic Damages, Count II: Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 2000e, et seq.) ...................................................................................... 4

Class Members and Term of Backpay Damages ............................................................. 4

A.   Count I: Equal Pay Act (The EPA Class) ................................................................. 4

B.   Count II: Title VII of the Civil Rights Act of 1964 (The Title VII Damages Class) .................... 7

Calculation of Backpay Damages to the EPA and Title VII Classes ................................. 9

A.   Calculating Compensation to Class Members at the Rate and Terms of Compensation Applicable to the USMNT Players ......................................................................... 9

1.   Compensation at USMNT Rate for USWNT Friendlies ......................................... 10

2.   Compensation at USMNT Rate for USWNT Tournaments (Other Than World Cup) .......... 11

3.   Compensation at USMNT Rate for Women's World Cup Qualifiers and Games ............... 13

4.   Summary of Calculation ..................................................................................... 14

5.   Alternative Calculation ...................................................................................... 15

B.   The USWNT Actual Compensation ...................................................................... 17

C.   Commercial Appearance Fees ............................................................................ 19

D.   Name, Image, and Likeness Rights ..................................................................... 20

E.   Per Diems ........................................................................................................ 21

F.   CBA Signing Bonuses ........................................................................................ 21

G.   NWSL Compensation ........................................................................................ 22

Backpay Damages to the Classes .................................................................................. 23

Liquidated Damages ..................................................................................................... 27

Prejudgment Interest .................................................................................................... 27

Total Backpay Damages to the Classes ......................................................................... 30

## QUALIFICATIONS

1.      My name is Finnie Bevin Cook.  I am an Economist.  I am employed as a Vice President by the firm Deiter Consulting Group, Inc. d/b/a Deiter, Stephens, Durham & Cook.  I have over fifteen years of experience preparing opinions regarding economic damages in litigation matters, including, but not limited to: employment discrimination, wrongful termination, personal injury, wrongful death, medical malpractice, marital dissolution and commercial damage claims for lost profits.  I have over ten years of testimony experience in depositions, trials, hearings and arbitration proceedings.  I have previously testified in federal court cases in Florida, Texas and Maine, and in county court matters in Florida and Nevada.

2.      Economic analysis of lost wages and benefits constitutes a significant part of my practice.  I have prepared opinions of lost wages and benefits in numerous cases for a variety of occupations.  I have prior experience preparing wage loss analyses for employees whose compensation is governed by a collective bargaining agreement.  I have also previously testified in a class action matter in federal court.

3.      I earned a Ph.D. in Business Administration with a major in Economics from the University of South Florida, a Master of Arts with a major in Economics from the University of South Florida and a Bachelor of Arts in Business Administration with a major in International Economics from the University of Florida (Summa Cum Laude).  I hold a professional certification as a Medicare Set-Aside Consultant.

4.      My research has been published in the *Journal of Forensic Economics* and I am also a reviewer for the journal.  I maintain professional memberships with the National Association of Forensic Economists, American Economic Association, Southern Economic Association, International Health Economics Association and American Academy of Economic and Financial Experts.

5.      Please refer to Attachments 1 through 3 for review of my curriculum vitae, a listing of prior testimony for the past four years, and a listing of materials reviewed and relied upon.

6.      Deiter Consulting Group, Inc. is being compensated at the rate of $325 per hour for my services, plus reimbursement of expenses.  I have been assisted by my associates and staff at Deiter Consulting Group, Inc., working under my direction and control.  The firm is being compensated at the rate of $325 per hour and $195 per hour, respectively, for their services. Neither Deiter Consulting Group, Inc. nor myself have any direct financial interest in the outcome of this matter.


## SCOPE OF ASSIGNMENT

7.      I have been asked to estimate the backpay damages suffered by the plaintiff members of the Equal Pay Act ("EPA") and Title VII classes in this action.  Specifically, in the event that claimed violations of the Equal Pay Act and Title VII are found by the jury, I have determined the backpay damages suffered by the classes by comparing what each class member would have earned if she had been compensated at the same rate as a male professional soccer player under the U.S. Men's National Team's ("USMNT") collective bargaining agreement ("CBA") in effect during the class periods against what her actual earnings as a female professional soccer player on the U.S. Women's National Team ("USWNT") were during these periods.[1]

8.      The economic damages I have estimated include lost backpay and prejudgment interest. I have also calculated liquidated damages for the EPA class.  My damages estimates do not include any damages related to working conditions under Title VII; nor do they include any value for punitive damages, which I understand are additionally being sought by the Title VII class.

---

[1] USSF_Morgan_000530 (2011-2018 MNT CBA); WNTPA_0004574 (2013-2016 WNT MOU); USSF_Morgan_000587 (2017-2021 WNT CBA).

## SUMMARY OF OPINIONS

9.      Based on the materials I have reviewed in this case, the rate of pay received by the female professional soccer players on the USWNT based on their CBA for their employment during the relevant time frame is lower than what would have been paid to male professional soccer players on the USMNT for comparable work under their CBA for their employment.  The difference between what each USWNT player would have made under the USMNT's CBA and the USWNT's CBA is that player's economic damage for backpay.

10.      It is my opinion that the total economic damages for backpay to the EPA and Title VII classes are as follows:

A.   Backpay Damages, Count I: Equal Pay Act (The Fair Labor Standards Act of 1938, as amended by the Equal Pay Act, 29 U.S.C. §§ 206 et seq.)

11.      It is my opinion that the backpay damages for the EPA class are $29,772,276 in the event of willful violation.  Prejudgment interest on these damages totals $536,926.  Thus, total economic damages for backpay inclusive of interest but exclusive of attorneys' fees and costs, as of the anticipated May 5, 2020 trial date, are $30,309,202.

12.      Backpay inclusive of liquidated damages for the EPA class totals $59,544,552 in the event of willful violation.  Total damages for backpay inclusive of liquidated damages and interest but exclusive of attorneys' fees and costs, as of the anticipated May 5, 2020 trial date, are $60,081,478.

13.      In the event that the violation is found to be non-willful, the backpay damages for the EPA class are $27,985,640.  Prejudgment interest on these damages totals $421,799.  Thus, total economic damages for backpay inclusive of interest but exclusive of attorneys' fees and costs, as of the anticipated May 5, 2020 trial date, are $28,407,439.

14.      If the violation is found to be non-willful, backpay inclusive of liquidated damages for the EPA class totals $55,971,280.  Total damages for backpay inclusive of liquidated damages and interest but exclusive of attorneys' fees and costs, as of the anticipated May 5, 2020 trial date, are $56,393,079. [2]

**B. Backpay Damages, Count II: Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 2000e, et seq.)**

15.      It is my opinion that the backpay damages for the Title VII class are $63,822,242. Prejudgment interest on these damages totals $2,899,906.  Thus, total backpay damages inclusive of interest but exclusive of attorneys' fees and costs, as of the anticipated May 5, 2020 trial date, are **$66,722,148**.

16.      Schedules 1 through 18 of this report delineate the backpay damages by individual class member.  Also attached as Appendices A through U are detailed calculations of the backpay damages for the class members.

## CLASS MEMBERS AND TERM OF BACKPAY DAMAGES

**A.  Count I: Equal Pay Act (The EPA Class)**

17.      Individual plaintiffs are required to opt-in to the EPA class.  They are able to recover damages in the form of backpay for three years prior to the date they opt-in for a willful violation, or two years prior to the date they opt-in for a non-willful violation.  The class members and their respective backpay start dates for the EPA class if the jury finds a willful violation are set forth in Table 1.  If the jury finds a non-willful violation, the class members and their respective backpay start dates for the EPA class are set forth in Table 2.

_____

[2] As of the date of submission, not all eligible plaintiffs have joined the EPA class.  In the event that one or more additional players join the action prior to trial, we reserve the right to update our opinions accordingly.

| Table 1 | | |
|---|---|---|
| **EPA Class Members and Backpay Term: Willful Violation** | | |
| **Name** | **Date of Filing** | **Backpay Start Date** |
| Brian, Morgan | 03/08/19 | 03/08/16 |
| Campbell, Jane | 03/08/19 | 03/08/16 |
| Colaprico, Danielle | 03/08/19 | 03/08/16 |
| Cook, Alana | 12/30/19 | 12/30/16 |
| Dahlkemper, Abby | 03/08/19 | 03/08/16 |
| Davidson, Tierna | 03/08/19 | 03/08/16 |
| Dunn (Soubrier), Crystal | 04/05/19 | 04/05/16 |
| Ertz (Johnston), Julie | 10/07/19 | 10/07/16 |
| Fox, Emily | 01/28/20 | 01/28/17 |
| Franch, Adrianna | 03/08/19 | 03/08/16 |
| Harris, Ashlyn | 03/08/19 | 03/08/16 |
| Hatch, Ashley | 01/21/20 | 01/21/17 |
| Heath, Tobin | 03/08/19 | 03/08/16 |
| Horan, Lindsey | 03/08/19 | 03/08/16 |
| Klingenberg, Meghan | 12/16/19 | 12/16/16 |
| Krieger, Ali | 01/22/20 | 01/22/17 |
| Lavelle, Rose | 03/08/19 | 03/08/16 |
| Lloyd (Hollins), Carli | 03/08/19 | 03/08/16 |
| Long, Allie | 03/08/19 | 03/08/16 |
| Mathias, Merritt | 03/08/19 | 03/08/16 |
| McDonald, Jessica | 04/05/19 | 04/05/16 |
| Mewis, Samantha | 03/08/19 | 03/08/16 |
| Morgan (Carrasco), Alex | 03/08/19 | 03/08/16 |
| Naeher. Alyssa | 03/08/19 | 03/08/16 |
| O'Hara, Kelley | 03/08/19 | 03/08/16 |
| Pinto, Brianna | 01/28/20 | 01/28/17 |
| Press, Christen | 03/08/19 | 03/08/16 |
| Pugh, Mallory | 03/08/19 | 03/08/16 |
| Rapinoe, Megan | 03/08/19 | 03/08/16 |
| Rodriguez (Shilling), Amy | 12/17/19 | 12/17/16 |
| Sauerbrunn, Becky | 03/08/19 | 03/08/16 |
| Short, Casey | 03/08/19 | 03/08/16 |
| Smith, Taylor | 01/24/20 | 01/24/17 |
| Sonnett, Emily | 03/08/19 | 03/08/16 |
| Sullivan, Andi | 03/08/19 | 03/08/16 |
| Ubogagu, Chioma | 01/03/20 | 01/03/17 |
| Williams, Lynn | 01/31/20 | 01/31/17 |
| Zerboni, McCall | 03/11/19 | 03/11/16 |

**Table 2**

**EPA Class Members and Backpay Term: Non-willful Violation**

| Name | Date of Filing | Backpay Start Date |
|------|----------------|--------------------|
| Brian, Morgan | 03/08/19 | 03/08/17 |
| Campbell, Jane | 03/08/19 | 03/08/17 |
| Colaprico, Danielle | 03/08/19 | 03/08/17 |
| Cook, Alana | 12/30/19 | 12/30/17 |
| Dahlkemper, Abby | 03/08/19 | 03/08/17 |
| Davidson, Tierna | 03/08/19 | 03/08/17 |
| Dunn (Soubrier), Crystal | 04/05/19 | 04/05/17 |
| Ertz (Johnston), Julie | 10/07/19 | 10/07/17 |
| Fox, Emily | 01/28/20 | 01/28/18 |
| Franch, Adrianna | 03/08/19 | 03/08/17 |
| Harris, Ashlyn | 03/08/19 | 03/08/17 |
| Hatch, Ashley | 01/21/20 | 01/21/18 |
| Heath, Tobin | 03/08/19 | 03/08/17 |
| Horan, Lindsey | 03/08/19 | 03/08/17 |
| Klingenberg, Meghan | 12/16/19 | 12/16/17 |
| Krieger, Ali | 01/22/20 | 01/22/18 |
| Lavelle, Rose | 03/08/19 | 03/08/17 |
| Lloyd (Hollins), Carli | 03/08/19 | 03/08/17 |
| Long, Allie | 03/08/19 | 03/08/17 |
| Mathias, Merritt | 03/08/19 | 03/08/17 |
| McDonald, Jessica | 04/05/19 | 04/05/17 |
| Mewis, Samantha | 03/08/19 | 03/08/17 |
| Morgan (Carrasco), Alex | 03/08/19 | 03/08/17 |
| Naeher. Alyssa | 03/08/19 | 03/08/17 |
| O'Hara, Kelley | 03/08/19 | 03/08/17 |
| Pinto, Brianna | 01/28/20 | 01/28/18 |
| Press, Christen | 03/08/19 | 03/08/17 |
| Pugh, Mallory | 03/08/19 | 03/08/17 |
| Rapinoe, Megan | 03/08/19 | 03/08/17 |
| Rodriguez (Shilling), Amy | 12/17/19 | 12/17/17 |
| Sauerbrunn, Becky | 03/08/19 | 03/08/17 |
| Short, Casey | 03/08/19 | 03/08/17 |
| Smith, Taylor | 01/24/20 | 01/24/18 |
| Sonnett, Emily | 03/08/19 | 03/08/17 |
| Sullivan, Andi | 03/08/19 | 03/08/17 |
| Ubogagu, Chioma | 01/03/20 | 01/03/18 |
| Williams, Lynn | 01/31/20 | 01/31/18 |
| Zerboni, McCall | 03/11/19 | 03/11/17 |

18.     The backpay damage term is from the backpay start date identified in Tables 1 and 2 through the May 5, 2020 trial date.  At this time, I have only been able to compute backpay damages from the backpay start dates identified in Tables 1 and 2 through December 31, 2019. I will update my damages calculations through the date of trial if I am provided with sufficient updated information.[3]

   **B.   Count II: Title VII of the Civil Rights Act of 1964 (The Title VII Damages Class)**

19.     The members of the Title VII class, determined from the records of the U.S. Soccer Federation ("USSF"), are as listed in Table 3.

---

[3] I reserve the right to update all backpay calculations pending the rosters and outcomes of additional USWNT games, including the USWNT Olympic Qualifier victories on January 28, 2020 January 31, 2020 and February 3, 2020, games in the SheBelieves Cup scheduled for March 2020, and any other games played prior to the trial date, as well as receipt of the USWNT payroll and benefit records for January 1, 2020 through May 5, 2020. I also reserve the right to calculate backpay damages for any additional players that subsequently opt in to the EPA class.

**Table 3**
**Title VII Class Members**

| | |
|---|---|
| Barnes, Lauren | Lloyd (Hollins), Carli |
| Barnhart, Nicole | Long, Allie |
| Bledsoe, Aubrey | Mace, Hailie |
| Boxx, Shannon | Mathias, Merritt |
| Brian, Morgan | McCaffrey, Stephanie |
| Campbell, Jane | McCaskill, Savannah |
| Chalupny, Lori | McDonald, Jessica |
| Colaprico, Danielle | McGrady, Tegan |
| Cook, Alana | Menges, Emily |
| Dahlkemper, Abby | Mewis, Samantha |
| Davidson, Tierna | Morgan (Carrasco), Alex |
| Dorsey, Imani | Murphy, Casey |
| Dunn (Soubrier), Crystal | Naeher, Alyssa |
| Edmonds, Kristen | Ohai, Kealia |
| Engen, Whitney | O'Hara, Kelley |
| Ertz (Johnston), Julie | O'Reilly, Heather |
| Fox, Emily | Oyster, Megan |
| Franch, Adrianna | Pinto, Brianna |
| Gilliland (Wright), Arin | Press, Christen |
| Groom, Shea | Pugh, Mallory |
| Hamilton, Kristen | Purce, Margaret |
| Hanson, Haley | Rampone, Christie |
| Harris, Ashlyn | Rapinoe, Megan |
| Hatch, Ashley | Rodriguez (Shilling), Amy |
| Heath, Tobin | Sauerbrunn, Becky |
| Hinkle, Jaelene | Short, Casey |
| Holiday, Lauren | Smith, Abby |
| Horan, Lindsey | Smith, Sophia |
| Howell, Jaelin | Smith, Taylor |
| Huerta, Sofia | Solo, Hope |
| Huster, Tori | Sonnett, Emily |
| Klingenberg, Meghan | Sullivan, Andi |
| Krieger, Ali | Ubogau, Chioma |
| Lavelle, Rose | Wambach, Abby |
| Leroux, Sydney | Williams, Lynn |
| Lewandowski, Gina | Zerboni, McCall |

20.     I have been informed by counsel that the backpay start date for all Title VII class members is April 6, 2014.  Thus, the backpay damage term for the class is from April 6, 2014 through the May 5, 2020 trial date.  At this time, I have only computed backpay damages for Count II from April 6, 2014 through December 31, 2019 based on the data currently available to me.[4]

**CALCULATION OF BACKPAY DAMAGES TO THE EPA AND TITLE VII CLASSES**

21.     The standard of comparison for determining the backpay damages to the female soccer players who comprise the EPA and Title VII classes is determining the amounts that they would have been compensated for their work playing soccer for the USWNT under the compensation terms provided to the male players for their work playing soccer for the USMNT and comparing those amounts against the amounts that they were actually paid.

22.     To calculate the economic damage of backpay due to the class members, I have computed the amounts that the USWNT class members would have been paid based on the rate of compensation set forth in the USMNT CBA.

A.   **Calculating Compensation to Class Members at the Rate and Terms of Compensation Applicable to the USMNT Players**

23.     The USMNT players' rate of compensation during the applicable class periods was governed by a collective bargaining agreement dated November 20, 2011. I understand that although the 2011 USMNT CBA expired on December 31, 2018, USSF has continued to compensate the USMNT players at the same rates as in the expired contract. The compensation terms set forth in the USMNT CBA are outlined in detail in Exhibit A to the USMNT CBA.[5]  Male players on the USMNT were paid to play soccer games and for attending camps before

---

[4] Ibid.
[5] USSF_Morgan_000530, at 000572-574.

friendlies (non-tournament games) and for playing World Cup Qualifier games.  Additionally, players on the USMNT were eligible to receive bonus payment(s) based on their performance as a team.  They were paid more for a draw (tie) or win as compared to a loss, and generally more if the win or draw was against a higher ranked opponent.  They were also eligible to receive bonuses for placing in tournaments.  Last, USMNT players were also eligible to receive bonuses for World Cup qualification, for making the World Cup roster, for points in the first round of the World Cup, and for advancement and place achievement in the World Cup.

24.     My backpay damages methodology assigns pay for USWNT friendlies based on the rate of compensation for USMNT friendlies, assigns pay for the tournaments that the USWNT participates in based on the rate of compensation for tournaments (excluding the World Cup) that the USMNT participates in, and assigns pay for the Women's World Cup based on the rate of compensation that the USMNT would have received for the Men's World Cup. The following describes the specific calculation steps I employed in my damage calculation for each class member:

### 1. Compensation at USMNT Rate for USWNT Friendlies

25.     The methodology assumes that a USWNT class member on the game roster for a friendly game should have been compensated, depending on the game outcome and Fédération Internationale de Football Association (FIFA) ranking of the opponent, for that game based on the rate of compensation paid under the USMNT pay for a friendly game with a comparable outcome and FIFA ranking. [6,7]

---

[6] Berhalter Exhibit 32, USSF_Morgan_000530 at 000572-000574.

[7] The FIFA rankings of the USWNT opponents were provided by USSF in a spreadsheet Bates numbered USSF_Morgan_055539.  We verified the FIFA rankings on FIFA's website (www.fifa.com) and noted that the rankings provided by USSF for the last two games in 2019 were outdated.  Sweden's FIFA ranking at the time of the 11/7/2019 game was 5 (not 6) and Costa Rica's ranking at the time of the 11/10/2019 game was 38 (not 37).

26.     Games the USWNT played as part of the Victory Tours after they won the World Cup in 2015 and 2019, which are compensated at a higher rate than friendlies in the USWNT CBA, were treated as friendlies for purposes of assigning compensation under the rates of the USMNT CBA.

27.     For purposes of assigning compensation, any match in which Canada was the opponent was compensated as a FIFA Ranking 1-10 regardless of Canada's actual FIFA ranking.  Although the USMNT CBA provides for compensation in games against Mexico in the same amount as a FIFA 1-10 regardless of Mexico's actual FIFA ranking, for purposes of assigning compensation to the USWNT class members, Mexico is compensated based on Mexico's actual FIFA ranking on the date of the match.  While Mexico is the USMNT's traditional North American rival, Canada is the USWNT's traditional North American rival.  This is reflected in the fact that their respective CBAs state that friendlies against Mexico and Canada will be compensated at the rate for Tier 1 friendlies regardless of actual FIFA ranking.[8]

### 2.   Compensation at USMNT Rate for USWNT Tournaments (Other Than World Cup)

28.     Both the USMNT and USWNT play in several tournaments in addition to the World Cups that occur every four years.  For the USWNT, these tournaments include the Algarve Cup, SheBelieves Cup, International Tournament of Brasilia, Tournament of Nations, CONCACAF Olympic Qualifying Tournament, and Olympic Games.  For the USMNT, these tournaments include the Gold Cup, Copa America and Confederations Cup.  The USMNT CBA specifies compensation rates for games and placement bonuses for the Gold Cup, the Copa America, and the Confederations Cup.

29.     To determine an appropriate rate of compensation for tournaments in which the USWNT participates, I have calculated averages of win/loss/tie compensation rates for each

---

[8] 2011-2018 MNT CBA, USSF_Morgan_000530 at 000565; 2017-2021 WNT CBA, USSF_Morgan_000587 at 000642.

category of FIFA opponent ranking and of the placement bonuses for the Gold Cup, Copa America and Confederations Cup tournaments in which the USMNT participates.  The methodology assumes that a USWNT class member on the game roster for an Algarve Cup, SheBelieves Cup, International Tournament of Brasilia, Tournament of Nations, CONCACAF Olympic Qualifying Tournament, and/or Olympic Games tournament game is compensated at the average win/loss/tie tournament rate for the USMNT, and that the USWNT class member receives placement bonuses at the average tournament placement bonus rate that would have been paid to members of the USMNT for tournament placement.

30.     This methodology is in keeping with the USMNT CBA's provision in Section XV of Exhibit A, that: "If the Team plays in any tournaments for which compensation is not provided in this Agreement, the Players Association and Federation shall negotiate in good faith to agree upon player compensation for the additional tournament(s) and its matches. In such event, the Players Association's and Federation's objective will be to adopt a compensation schedule for the additional tournament(s) and its matches that will pay Players at a level consistent with the compensation schedules for other games and tournaments of varying stature and importance, based on the stature and importance of the additional tournament(s)."[9]  This provision suggests that USWNT tournaments compensated under the terms of the USMNT CBA would be compensated at different rates based on their relative stature and importance in comparison to the stature and importance of the different tournaments specified in the USMNT CBA. However, rather than making judgments about the stature and importance of the various USWNT's tournaments, it is reasonable, in my expert opinion, for purposes of calculating backpay damages, to apply an average of the compensation rates the USMNT receives for tournaments to estimate what the members of the USWNT would have earned for tournaments using the USMNT CBA's higher rate of compensation.

---

[9] MNT CBA, USSF_Morgan_000530 at 00571.

31.     While there is an Olympic category for men's soccer, it is an age-restricted tournament for which the Senior USMNT is currently  ineligible to compete as a team so the USMNT CBA does not specify what the specific compensation rate would be for playing in the Olympics if the eligibility rules were changed and the age restrictions were eliminated. [10]  However, as noted previously, the UMNT CBA contains a provision which does state  that if the USMNT were to participate in any tournaments for which the rate of  compensation is not specified , the USMNT and USSF would negotiate a rate of  compensation consistent with the other tournaments, such as the Gold Cup, Copa America, and the Confederations Cup, based on the stature and importance of the additional tournament.  Tom King, USSF's 30(b)(6) designee on the application of the USMNT CBA, testified that the Olympics are a tournament and that if the USMNT became eligible to play in the Olympics, Section XV of the USMNT CBA would apply. [11]

32.     For these reasons, in my methodology, I have treated the Olympics as a tournament in calculating compensation the USWNT would receive under the USMNT's CBA.  The methodology therefore assumes that USWNT class members on the rosters for Olympic matches should have been compensated under the average tournament compensation rate that I have calculated under the USMNT CBA.

### 3.   Compensation at USMNT Rate for Women's World Cup Qualifiers and Games

33.      My backpay damages methodology assumes that USWNT class members on the roster for the first three World Cup Qualifier games should have been compensated, depending on the outcome of the game, based on the Round 1 World Cup Qualifier win/loss/tie game payment amounts under the USMNT CBA. It further assumes that USWNT class members on the roster for the World Cup Qualifier Semi-Final and/or Final games should have been compensated, depending on the outcome of the game, based on the Round 2 World Cup

---

[10] King (30(b)(6)) Dep. Tr. at 50:20-51:3; USSF_Morgan_050325.
[11] King (30(b)(6)) Dep. Tr. at 53:18-54-2.

Qualifier game win/loss/tie payment amounts specified in the USMNT CBA. My methodology also assumes that World Cup qualification bonuses should have been paid to the class members on the USWNT based on the World Cup qualification and roster bonuses for the USMNT.

34.     My methodology further assumes that USWNT class members should have been compensated for World Cup per game payments, roster bonuses, points bonuses, and round advancement bonuses based on the amounts specified under the USMNT CBA.  For backpay damages estimation  purposes, the FIFA Women's World Cup Group Stage games are considered comparable to the FIFA World Cup First Round games for the USMNT and the FIFA Women's World Cup Round of 16 is considered comparable to the  FIFA World Cup Second Round for the USMNT.[12]  Compensation for the FIFA Women's World Cup Quarterfinals, Semi-Finals and Finals are based on the compensation rates set forth  for the  FIFA World Cup Quarterfinals, Semi-Finals and Finals payable under the USMNT CBA.

35.     The methodology further assumes that USWNT Class members who attend camp for friendlies or World Cup Qualifiers who do not make the final game roster should have been compensated based on the friendly and World Cup Qualifier camp pay rates for the members of the USMNT pursuant to the terms of the USMNT CBA.

### 4.  Summary of Calculation

36.     Calculating the class' compensation utilizing the assumptions outlined above, assuming the jury finds a willful violation, the EPA class would have earned total combined wages of $48,237,328 for the backpay damage period beginning with the dates reported in Table 1 through December 31, 2019.  Of this total, $15,643,995 relates to pay for game play and $32,593,333 relates to tournament roster, qualification and placement bonuses, as well as first round World Cup and Olympics point bonuses.

---

[12] Although the USMNT CBA refers to first round and second round World Cup games, FIFA identifies these men's World Cup games as "Group Phase" and "Knockout Phase: Round of 16".

37.     Assuming the jury finds a non-willful violation, the EPA class would have earned total combined wages of $44,557,028 assuming compensation as outlined above for the backpay damage period beginning with the dates reported in Table 2 through December 31, 2019.  Of this total, $12,343,695 relates to pay for game play and $32,213,333 relates to tournament roster, qualification and placement bonuses, as well as first round World Cup and Olympics point bonuses.

38.     Had the Title VII class been compensated utilizing the assumptions outlined above, the class would have earned total combined wages of $91,782,773 from April 6, 2014 through December 31, 2019.  Of this total, $27,842,606 relates to pay for game play and $63,940,167 relates to tournament roster, qualification and placement bonuses, as well as first round World Cup and Olympics point bonuses.

39.     The compensation calculations for each class member based on the methodology outlined above are reported in the attached Schedules 1, 4 and 7.

40.     It is my opinion that the calculations of backpay damages utilizing the methodology outlined above meet the test of reasonable economic certainty.

  5.  **Alternative Calculation**

41.     Counsel has informed me that USSF has taken the position in this litigation that there is a difference between the tournaments in which the USMNT plays and the tournaments in which the USWNT plays because FIFA has not recognized them as official tournaments.[13] Therefore, as a test of reasonableness of my damage analysis assumptions, I have prepared an

---

[13] *See* Berhalter (30(b)(6)) Dep. Tr. at 254:2-257:5. Mr. Berhalter testified that the difference is that the USMNT's tournaments are "recognized by FIFA on the FIFA calendar." *Id.* at 255:4-9. He also testified that, as to the SheBelieves Cup, which USSF hosts, that he was "not sure [USSF] would need to [apply for FIFA recognition] because [it was] played on a FIFA window." *Id.* at 256:22-257:5.

alternative calculation that assigns compensation for all USWNT tournaments, except for the World Cup, based on the compensation rate for friendly games as outlined in the USMNT CBA.

42.     For this alternative calculation, the methodology for friendly games, World Cup qualifiers, and the World Cup are the same as described above.  For tournament games in the Algarve Cup, SheBelieves Cup, International Tournament of Brasilia, Tournament of Nations, CONCACAF Olympic Qualifying Tournament, and Olympic Games, the pay rate for a USMNT friendly is applied, depending on the game outcome and opponent's FIFA ranking.  No placement bonuses are applied for USWNT's performance in these tournaments.

43.     Calculating compensation utilizing the assumptions outlined above and assuming the jury finds a willful violation, the EPA class would have earned total combined wages of $46,982,750 for the backpay damage period beginning with the dates reported in Table 1 through December 31, 2019.  Of this total, $16,432,750 relates to pay for game play and $30,550,000 relates to World Cup tournament roster, qualification, and placement bonuses, as well as first round World Cup point bonuses.

44.     Assuming the jury finds a non-willful violation and based on the above compensation terms, the EPA class would have earned total combined wages of $43,483,875 for the backpay damage period beginning with the dates reported in Table 2 through December 31, 2019.  Of this total, $12,933,875 relates to pay for game play and $30,550,000 relates to World Cup tournament roster, qualification, and placement bonuses, as well as first round World Cup point bonuses.

45.     Had the Title VII class been compensated based on the assumptions outlined above, they would have earned total combined wages of $88,625,375 from April 6, 2014 through December 31, 2019.  Of this total, $28,462,875 relates to pay for game play and $60,162,500 relates to World Cup tournament roster, qualification, and placement bonuses, as well as first round World Cup point bonuses.

46.    For each class member, the compensation based on the assumptions outlined above for this alternative calculation is reported in the attached Schedules 10, 13 and 16.

**B. The USWNT Class Members' Actual Compensation**

47.    The USWNT class members' compensation during the backpay time frames has been governed by two agreements: the Memorandum of Understanding (MOA) dated March 19, 2013 and the CBA entered into on April 4, 2017.  There are two types of players for purposes of the WNT: Contracted and Non-Contracted.  Contracted players are paid a base salary which covers their participation, before bonuses, in all USWNT games they were asked to participate in each year.  Non-contracted players received $500 per week as "Floaters" based on the 2013 USWNT Memorandum of Understanding and currently receive an appearance fee per game based on the 2017 USWNT CBA.  Both contracted and non-contracted players are eligible to receive bonuses for winning friendly games and, as of the 2017 CBA, for a draw in a friendly game depending on the FIFA ranking of the opponent.  They are also eligible to receive bonuses for World Cup and Olympic qualification, for making the World Cup and/or Olympic roster, for placement in the World Cup and/or Olympics and for playing games in a World Cup and/or Olympic victory tour.  The 2013 MOA provides for no bonuses for placement in any other tournaments.  However, the 2017 USWNT CBA provides for a $5,000 bonus for placing first in the SheBelieves Tournament and the Four Nations Tournament.

48.    The terms of the 2013 USWNT MOA and 2017 USWNT CBA provide for certain benefits for contracted players in certain situations including: severance, injury protection, maternity and adoption leave, insurance (dental and vision), a $1,500 allowance to cover the taxable cost of health insurance provided by the United States Olympic Committee (USOC) and a childcare

allowance.[14,15]  For class members who received such benefits, the benefit amounts are

included in my analysis of their actual compensation received.

49.    Because the USMNT CBA does not provide for compensation to a player who does not

appear on a roster, is injured, or on parental leave, the methodology described above for

calculating their compensation under the USMNT CBA does not provide for any compensation

to the USWNT class member in these situations.  As a result, there is no need to include any

additional offset for these benefits, as they are already accounted for in the calculations using

my methodology.

50.    I have utilized the payroll records and USSF-provided employer cost of benefits

information for the class members to compute each claimant's actual wages and benefits over

the relevant damage term.[16]  The EPA class actually earned total combined wages and benefits

of $18,341,552 for the willful violation backpay damage period beginning with the dates

reported in Table 1 through December 31, 2019.  Of this total, $11,901,544 relates to salary,

float pay, game roster appearance fees, bonuses for games and benefits and $6,440,008 relates

to tournament roster, qualification and placement bonuses, as well as World Cup and Olympic

victory tour payments.

51.    The EPA class actually earned total combined wages and benefits of $16,468,139 for the

non-willful violation backpay damage period beginning with the dates reported in Table 2

---

[14] USSF also sponsors a 401(k) plan, but does not contribute nor match any employee
contributions. In my opinion, no further adjustment in the compensation analysis is required for
such a plan.
[15] For purposes of my analysis, severance, injury protection, maternity and adoption leave pay
are included in wage earnings.  Dental and vision insurances, childcare allowance and the
$1,500 allowance provided by USSF to cover the taxable cost of health insurance provided by
the USOC are included in benefits.
[16] Excluding National Women's Soccer League (NWSL) earnings, which I do not believe are
proper to include in an estimate of backpay damages for the reasons I describe elsewhere in
this report.

through December 31, 2019.  Of this total, $10,208,131 relates to salary, float pay, game roster appearance fees, bonuses for games and benefits and $6,260,008 relates to tournament roster, qualification and placement bonuses, as well as World Cup and Olympic victory tour payments.

52.     The Title VII class earned total combined wages and benefits of $27,733,531 from April 6, 2014 through December 31, 2019.  Of this total, $16,764,703 relates to salary, float pay, game roster appearance fees, bonuses for games and benefits and $10,968,828 relates to tournament roster, qualification and placement bonuses, as well as World Cup and Olympic victory tour payments.

53.     The actual wages, benefits and bonuses by class member are reported in the attached Schedules 1, 4, 7, 10, 13 and 16.[17]

### C. Commercial Appearance Fees

54.     The USMNT CBA provides for a $3,000 player appearance fee through 2014, increasing to $3,750 in 2015 and thereafter.[18]  The 2013 USWNT MOU provides for a $3,000 appearance fee.[19]  The 2017 USWNT CBA provides for a $4,000 appearance fee.[20]

55.     I have been provided information detailing CBA appearances by class member.  I have computed the difference in fees actually received as compared to what should have been paid based on the USMNT CBA.  The analyses of player commercial appearance fees, for the EPA Class (willful and non-willful damage period) and for the Title VII Class, are reported in the attached Appendices P, Q and R.  A positive value represents a loss to a class member while a negative value represents an offset to the other backpay losses.  These values are incorporated

---

[17] The values reported in paragraphs 50-52 exclude commercial appearance fees and the CBA signing bonuses which are accounted for in paragraphs 54-55 and 61-65, respectively.
[18] 2011-2018 MNT CBA, USSF_Morgan_000530 at 000573.
[19] 2013-2016 WNT MOU, WNTPA_00004575 at 00004578.
[20] 2017-2021 WNT CBA, USSF_Morgan_000587 at 000628.

in our total backpay damages calculations to the particular class member as well as the totals to each class.

**D. Name, Image, and Likeness Rights**

56.     Both the USMNT CBA and the USWNT CBA have provisions relating to the use of the players' likenesses for sponsorship and licensing purposes.  The USMNT players and USWNT players have conveyed certain intellectual property rights to their likenesses to their respective unions and then to USSF as described in the collective bargaining agreements.[21]  These provisions relate to intellectual property rights separate from the national team players' job responsibilities and the compensation received for national team play.  My methodology assumes that any USSF payments for these intellectual property rights — which are made by USSF to the union as opposed to individual players — are made pursuant to a commercial arrangement with the union independent of the athlete's compensation for his or her employment on the USMNT or USWNT and thus are not included in any calculation of backpay damages.  The USWNT CBA places no restriction on how the USWNT union can use any payment that it receives from the USSF for name, image and likeness licensing rights.

57.     According to the deposition testimony of Mr. King, who was USSF's  30 (b) (6) designee on the terms and application of the CBAs, the list of payments in Article 21.B of the USWNT CBA, "Individual Payments," are payments the players are entitled to individually either for working for the women's national team or, in the case where they're on a National Women's Soccer League ("NWSL") team, for working on an NWSL team.[22]  Article 21.B of the USWNT CBA does not include any reference to any payment to the union for the use of name, image or likeness rights.  Mr. King further testified that the USSF receives no information on how the

---

[21] See USWNT CBA, Article 15, "Use of Player Likenesses," USSF_Morgan_000587 at 000618-000624; Uniform Player Agreement Men's National Team, Paragraph 6, "Names, Pictures, Likeness," USSF_Morgan_000530 at 000550-000555.
[22] Tom King 30(b)(6) Deposition Transcript, at 20-21.

union uses any CBA payment that it receives for licensing rights.[23] Because any such payments are paid by USSF to the union and not the individual players, there is no basis for offsetting any amount from an individual class member's backpay damages.

### E. Per Diems

58.     The USMNT CBA provides for per diem payments in the amount of $50 per day for domestic venues and $60 per day for international venues for 2014, increasing to $62.50 for domestic venues and $75 for international venues for 2015 and thereafter.

59.     The USWNT 2013 MOA provides for per diem payments in the amount of $50 per day for domestic venues and $60 per day for international venues.  It also identifies per diem amounts as "Equal to MNT Per Diems."  The USWNT 2017 CBA provides for per diems of $62.50 for domestic venues and $75 for international venues for 2015 and thereafter.   According to the deposition of Rebecca Roux, although the USWNT per diem payments were not increased to $62.50 and $75, respectively, USSF has since paid the differential such that the per diem amounts over the backpay damage time frame are equal for the USMNT and USWNT.[24]

60.     Because the per diem payments were equal for both the male and female employees, there is no reason to adjust for them in the backpay damage calculations.

### F. CBA Signing Bonuses

61.     Both the USWNT's and USMNT's respective CBAs provide for payments upon execution of each agreement. The 2017-2021 USWNT CBA provides for a $230,000 signing bonus, and notes that this amount "shall be paid by the Federation directly to the Players to whom such payments are due."[25] Likewise, the 2011-2018 MNT CBA provides for a guaranteed payment of

---

[23] Tom King 30(b)(6) Deposition Transcript, at 24-25.
[24] Deposition of Rebecca Roux dated December 19, 2019 pp. 27-29.
[25] 2017-2021 WNT CBA, USSF_Morgan_000587, at 000635, 000642.

"425,000 to the Players Association Bank Account upon the signing of the Collective Bargaining Agreement" and another guaranteed payment of $531,250 on January 1, 2015.[26]

62.      We have been provided information in USSF's payroll data indicating that this signing bonus for ratification of the 2017 USWNT CBA was paid directly to 23 class members in the amounts of $10,000 each on August 15, 2017.

63.      Although the USMNT CBA provided for a higher guaranteed payment of $531,250 upon the automatic renewal of the USMNT CBA on January 1, 2015, the record indicates this payment went to the USMNT's Players' Association, not to individual players directly.[27]

64.      Therefore, we credited the $10,000 signing bonuses received by the USWNT class members against their respective individual, and total, backpay damages calculations.

65.      The CBA signing bonuses are reported by class member in the attached Appendices S, T and U.

**G. NWSL Compensation**

66.      In my opinion, no adjustment should be made in the backpay damages calculation for the compensation paid to some members of the class by USSF for playing on teams in the National Women's Soccer League ("NWSL").  A USWNT player's participation as a player for an NWSL team is a job separate and apart from her job as a member of the USWNT soccer team, as illustrated by the fact that not all USWNT members are paid by USSF to play on an NWSL team and most NWSL players are not USWNT members.  Participation on an NWSL team requires a class member to play in additional games and attend additional practices.  Other NWSL players who are not part of the USWNT receive payment for their participation on their respective teams by their respective clubs.  Some USWNT members have exercised their rights

---

[26] 2011-2018 MNT CBA, USSF_Morgan_000530, at 000569, 00572.
[27] Tom King 30(b)(6) Transcript, at 61-62.

under the CBA to play for other professional club teams during the period of the CBA in leagues other than the NWSL, further demonstrating that NWSL participation is a separate job from playing on the USWNT.

67.     So long as he fulfills his duties as outlined in the 2011-2018 Uniform Player Agreement, there is nothing in the USMNT CBA that precludes a male player from participating in other soccer employment.  In fact, USMNT players play on other club teams in other leagues including in the U.S. for Major League Soccer (MLS) as well as in leagues abroad, receiving compensation for their participation.

## BACKPAY DAMAGES TO THE CLASSES

68.     Backpay is determined by subtracting the Plaintiffs' actual compensation from their calculated compensation based on the USMNT CBA for the different backpay damage terms.

69.     Based on the methodology and assumptions outlined in this report, it is my opinion that the backpay damages for the EPA class total $29,772,276 for the willful violation damage period beginning with the dates reported in Table 1 through December 31, 2019.  The backpay damages for the EPA class total $27,985,640 for the non-willful violation damage period beginning with the dates reported in Table 2 through December 31, 2019.  Backpay damages for the Title VII class total $63,822,242 from April 6, 2014 through December 31, 2019.

70.     The conclusions regarding backpay damages reported above were determined in accordance with generally accepted methodologies for determining backpay damages and meet the test of reasonable economic certainty.  The backpay damages calculations are reported for each class member in the attached Schedules 1, 4 and 7.

71.     Based on the assumptions outlined for the alternative calculation, the backpay damages for the EPA class total $28,517,698 for the willful violation damage period beginning with the

23

dates reported in Table 1 through December 31, 2019.  The backpay damages for the EPA class total $26,912,486 for the non-willful violation damage period beginning with the dates reported in Table 2 through December 31, 2019.  Backpay damages for the Title VII class totals $60,664,844 from April 6, 2014 through December 31, 2019.  The backpay damages calculation are reported by class member in the attached Schedules 10, 13 and 16.

72.     According to my calculations, a small number of class members are not currently owed backpay damages for the relevant period either because they were NCAA eligible and chose not to be compensated during their eligibility period, because they left the team shortly after the class period for backpay damages began, because they just recently joined the team and have not yet experienced backpay damages, or because, in one case, the player chose to play for another country at the senior level.  Such class members were deprived of the opportunity to earn compensation at the same rate as members of the USMNT during the period I studied and also may have suffered other injuries if the classes prove the existence of the various forms of working conditions discrimination asserted by the classes.  These class members, for whom I do not find back pay damages under one or more of the class periods, fall into three categories described below.

    i.     First, several class members did not accept compensation for their participation in camps or games for the USWNT because they were maintaining their eligibility to play NCAA soccer for their schools.  These individuals would not have been compensated for their play regardless of which CBA applied.  I have accounted for this in calculating damages for all class members who forewent compensation for USWNT play to comply with NCAA rules.[28]  For a few class members, the decision to maintain their NCAA eligibility caused them not to have any backpay damages during the period I

---

[28] In addition to the USWNT players named above, adjustments were made in the calculations for Morgan Brian, Jane Campbell, Tierna Davidson, Ashley Hatch, Rose Lavelle, Samantha Mewis, Emily Sonnett, Andi Sullivan, and Mallory Pugh.

studied.  These include Emily Fox, Hallie Mace, Tegan McGrady, Brianna Pinto and

Sophia Smith.  Hallie Mace recently participated in the USWNT's December

Identification camp and received $2,500 from USSF for that camp.  The USMNT does not

have a similar camp.  Ms. Mace would have been owed far more than $2,500 in backpay

for her play in three friendlies and the five World Cup Qualifiers in 2018 had she been

able to receive it.  As noted above, I have reserved the right to revise damages

calculations based on play between January 1, 2020 and the trial start date of May 5,

2020, which may impact the backpay damages for some of these class members.

ii.    Second, three class members who were long-time USWNT players were very near the

end of their careers when the class periods began and would likely be owed backpay

damages but for the statutes of limitations that prevent them from seeking damages for

an earlier time period.  Two of these players, Meghan Klingenberg and Amy Rodriguez,

are owed backpay of approximately $1.5 million and $1.3 million, respectively, for their

Title VII claims for which there is a longer damages period, but do not have backpay

damages during the period for willful or non-willful EPA violations.  The third player,

Nicole Barnhart, had played for the USWNT since 2004, and was on the roster for

Olympic Games, World Cups, World Cup qualifiers, and many friendlies.  However, the

statute of limitations has run on any backpay damages owed to her for those

tournaments and games.

iii.    Third, three class members have only just recently joined the team and have not yet

incurred backpay damages, although they will do so going forward in the absence of an

adjustment of the wage rates and benefits for Plaintiffs and the class to the level these

Plaintiffs and the class would be enjoying but for the USSF's discriminatory practices.

They have participated in a few camps, but have not yet played in any games for the

USWNT.  These three players are Aubrey Bledsoe, Kristen Edmonds and Casey Murphy.

Ms. Edmonds participated in camp for two games in 2016 from November 5 until November 14.  Under the USWNT's MOU in effect at the time, she should have been compensated at a rate of $500 per week, totaling (at most) $1,000.  Under the USMNT's CBA, she would have been compensated at a rate of $1,875 per camp, totaling $3,750.  However, USSF's payroll records show that Ms. Edmonds received $785.71 in 2016, and $3,000 in retroactive pay in 2017.  It is unclear why she received these payments; but, because they are attributed to her in USSF's payroll records, I cannot determine, at this time, that she is currently owed backpay damages.  Ms. Bledsoe participated in camps for two games for the USWNT in 2019.  She received payments of $1,500 for the first camp and $2,500 for the second camp pursuant to the USWNT's CBA, totaling $4,000.  She would have received $1,875 for each camp under the USMNT's CBA, totaling $3,750.  Ms. Murphy participated in camps for two games in 2018, receiving a total payment of $4,000, and participated in the December 2019 Identification Camp for which she received $2,500.  She would have received $1,875 for each of the 2018 camps under the USMNT's CBA.  As noted above, I have reserved the right to revise damages calculations based on play between January 1, 2020 and the trial start date of May 5, 2020, which may impact the backpay damages for these class members. As noted above, if these class members play in future games and the pay disparity is not eliminated, they will likely incur backpay damages.

iv.   Fourth, Chioma Ubogagu participated in camps for two games for the USWNT in 2017.  She received payments of $1,500 for the first camp and $2,500 for the second camp pursuant to the USWNT's CBA, totaling $4,000.  She would have received $1,875 for each camp under the USMNT's CBA, totaling $3,750.  She never appeared on a game roster for the Senior USWNT and has chosen to play for England at the senior level.

The class members identified in paragraph 72 have been excluded from our backpay analyses and thus their compensation is not included in any of the values reported in this report.

## LIQUIDATED DAMAGES

73.     The Complaint identifies a claim for liquidated damages to the EPA class.  I have been provided information by counsel that liquidated damages are calculated as an amount equal to the backpay loss; thus, total liquidated damages (excluding prejudgment interest) would be double the backpay loss.

74.     Based on the methodology and assumptions outlined in this report, liquidated damages for the EPA class total $59,544,552 for the willful violation damage period beginning with the dates reported in Table 1 through December 31, 2019.  The liquidated damages for the EPA class total $55,971,280 for the non-willful violation damage period beginning with the dates reported in Table 2 through December 31, 2019.

75.     Based on the assumptions outlined for the alternative calculation, the liquidated damages for the EPA class total $57,035,397 for the willful violation damage period beginning with the dates reported in Table 1 through December 31, 2019.  The liquidated damages for the EPA class total $53,824,973 for the non-willful violation damage period beginning with the dates reported in Table 2 through December 31, 2019.

## PREJUDGMENT INTEREST

76.     Prejudgment interest on backpay damages is computed using the average 1-year constant maturity Treasury bill rates for the term of the damage.  The average rates have been computed quarterly.  Prejudgment interest on backpay losses has been computed by class

member on a by paycheck basis.  Detailed calculations of the prejudgment interest are reported in the attached Appendices F, G, H, M, N and O.  The applicable rates are reported in Table 4.

**Table 4**
**<u>Prejudgment Interest Rates</u>**

| <u>Year</u> | <u>Annual Rate</u> |
|---|---|
| 04/01/2014 - 06/30/2014 | 0.10% |
| 07/01/2014 - 09/30/2014 | 0.11% |
| 10/01/2014 - 12/31/2014 | 0.15% |
| | |
| 01/01/2015 - 12/31/2015 | 0.23% |
| 04/01/2015 - 06/30/2015 | 0.25% |
| 07/01/2015 - 09/30/2015 | 0.35% |
| 10/01/2015 - 12/31/2015 | 0.47% |
| | |
| 01/01/2016 - 03/31/2016 | 0.58% |
| 04/01/2016 - 06/30/2016 | 0.57% |
| 07/01/2016 - 09/30/2016 | 0.56% |
| 10/01/2016 - 12/31/2016 | 0.76% |
| | |
| 01/01/2017 - 03/31/2017 | 0.89% |
| 04/01/2017 - 06/30/2017 | 1.13% |
| 07/01/2017 - 09/30/2017 | 1.24% |
| 10/01/2017 - 12/31/2017 | 1.55% |
| | |
| 01/01/2018 - 03/31/2018 | 1.94% |
| 04/01/2018 - 06/30/2018 | 2.25% |
| 07/01/2018 - 09/30/2018 | 2.46% |
| 10/01/2018 - 12/31/2018 | 2.67% |
| | |
| 01/01/2019 - 03/31/2019 | 2.54% |
| 04/01/2019 - 06/30/2019 | 2.26% |
| 07/01/2019 - 09/30/2019 | 1.85% |
| 10/01/2019 - 12/31/2019 | 1.58% |
| | |
| 01/01/2020 - 05/6/2020 | 1.54% |

77.     Prejudgment interest on the backpay for the EPA class totals $536,926 for the willful violation period beginning with the dates reported in Table 1 through May 5, 2020. Prejudgment interest on the backpay for the EPA class totals $421,798 for the non-willful violation period beginning with the dates reported in Table 2 through May 5, 2020. Prejudgment interest on the backpay for the Title VII class totals $2,899,906 from April 6, 2014 through May 5, 2020.  The summary of the prejudgment interest damages is reported by class member in the attached Schedules 2, 5 and 8.

78.     For the alternative calculation, prejudgment interest on the backpay for the EPA class totals $484,609 for the willful violation period beginning with the dates reported in Table 1 through May 5, 2020.  Prejudgment interest on the backpay for the EPA class totals $381,315 for the non-willful violation period beginning with the dates reported in Table 2 through May 5, 2020.  Prejudgment interest on the backpay for the Title VII class totals $2,719,294 from April 6, 2014 through May 5, 2020.  The summary of the prejudgment interest damages is reported by class member in the attached Schedules 11, 14 and 17.

**TOTAL BACKPAY DAMAGES TO THE CLASSES**

79.     The total backpay damages inclusive of prejudgment interest for the EPA class and Title VII class are reported in Table 5.  The backpay damages and prejudgment interest by class member are reported in the attached Schedules 3, 6, 9, 12, 15 and 18.

**Table 5**
**Backpay Damages inclusive of Prejudgment Interest**

| Class / Count | Total |
|---|---|
| **EPA Class, Willful Violation** | |
| Backpay Losses | $29,772,276 |
| Prejudgment Interest | 536,926 |
| **Total** | **$30,309,202** |
| | |
| **EPA Class, Non-Willful Violation** | |
| Backpay Losses | $27,985,640 |
| Prejudgment Interest | 421,799 |
| **Total** | **$28,407,439** |
| | |
| **Title VII Class** | |
| Backpay Losses | $63,822,242 |
| Prejudgment Interest | 2,899,906 |
| **Total** | **$66,722,148** |

80.    The backpay damages inclusive of liquidated damages and prejudgment interest for the

EPA class are reported in Table 6.

**Table 6**
**Backpay Damages**
**inclusive of Liquidated Damages and Prejudgment Interest**

| Class / Count | Total |
|---|---|
| **EPA Class, Willful Violation** | |
| Backpay Losses incl. Liquidated Damages | $59,544,552 |
| Prejudgment Interest | 536,926 |
| **Total** | **$60,081,478** |
| | |
| **EPA Class, Non-Willful Violation** | |
| Backpay Losses incl. Liquidated Damages | $55,971,280 |
| Prejudgment Interest | 421,799 |
| **Total** | **$56,393,079** |

81.     The conclusions stated above were determined in accordance with generally accepted methodologies for employment disorientation damages and meet the test of reasonable economic certainty.

Executed on this 4th day of February, 2020

Finnie B. Cook, Ph.D., MSCC
DEITER, STEPHENS, DURHAM & COOK

List of Attachments

Attachment 1: Curriculum Vitae
Attachment 2: Listing of Prior Testimony
Attachment 3: Listing of Materials Reviewed and Relied Upon

List of Schedules

Schedule 1: Backpay Losses - EPA Class, Willful Violation
Schedule 2: Prejudgment Interest - EPA Class, Willful Violation
Schedule 3: Total Economic Damages (Backpay + Prejudgment Interest) – EPA Class, Willful Violation
Schedule 4: Backpay Losses - EPA Class, Non-Willful Violation
Schedule 5: Prejudgment Interest - EPA Class, Non-Willful Violation
Schedule 6: Total Economic Damages (Backpay + Prejudgment Interest) – EPA Class, Non-Willful Violation
Schedule 7: Backpay Losses – Title VII Class
Schedule 8: Prejudgment Interest - Title VII Class
Schedule 9: Total Economic Damages (Backpay + Prejudgment Interest) – Title VII Class
Schedule 10: Backpay Losses - EPA Class, Willful Violation: Alternative Analysis
Schedule 11: Prejudgment Interest - EPA Class, Willful Violation: Alternative Analysis
Schedule 12: Total Economic Damages (Backpay + Prejudgment Interest) – EPA Class, Willful Violation: Alternative Analysis
Schedule 13: Backpay Losses - EPA Class, Non-Willful Violation: Alternative Analysis
Schedule 14: Prejudgment Interest - EPA Class, Non-Willful Violation: Alternative Analysis
Schedule 15: Total Economic Damages (Backpay + Prejudgment Interest) – EPA Class, Non-Willful Violation: Alternative Analysis
Schedule 16: Backpay Losses – Title VII Class: Alternative Analysis
Schedule 17: Prejudgment Interest - Title VII Class: Alternative Analysis
Schedule 18: Total Economic Damages (Backpay + Prejudgment Interest) – Title VII Class: Alternative Analysis

List of Appendices

Appendix A: USWNT Participation by Game
Appendix B: Pay Schedule based on USMNT CBA
Appendix C: Derivation of Backpay-EPA Class, Willful Violation (By Class Member Last Name, by Year)
       Includes Code Definitions for Appendices C, D, E, I, J and K
Appendix D: Derivation of Backpay-EPA Class, Non-Willful Violation (By Class Member Last Name, by Year)
Appendix E: Derivation of Backpay-Class Title VII (By Class Member Last Name, by Year)
Appendix F: Derivation of Prejudgment Interest through May 5, 2020 Trial - Backpay-EPA Class, Willful Violation (By Class Member Last Name, by Year)
Appendix G: Derivation of Prejudgment Interest through May 5, 2020 Trial - Backpay-EPA Class, Non-Willful Violation (By Class Member Last Name, by Year)

Appendix H: Derivation of Prejudgment Interest through May 5, 2020 Trial - Backpay-Title VII Class (By Class Member Last Name, by Year)

Appendix I: Pay Schedule based on USMNT CBA: Alternative Analysis

Appendix J: Derivation of Backpay-EPA Class, Willful Violation: Alternative Analysis (By Class Member Last Name, by Year)

Appendix K: Derivation of Backpay-EPA Class, Non-Willful Violation: Alternative Analysis (By Class Member Last Name, by Year)

Appendix L: Derivation of Backpay-Class Title VII: Alternative Analysis (By Class Member Last Name, by Year)

Appendix M: Derivation of Prejudgment Interest through May 5, 2020 Trial - Backpay-EPA Class, Willful Violation: Alternative Analysis (By Class Member Last Name, by Year).

Appendix N: Derivation of Prejudgment Interest through May 5, 2020 Trial - Backpay-EPA Class, Non-Willful Violation: Alternative Analysis (By Class Member Last Name, by Year).

Appendix O: Derivation of Prejudgment Interest through May 5, 2020 Trial - Backpay-Class Title VII: Alternative Analysis (By Class Member Last Name, by Year)

Appendix P: Derivation of Backpay and Prejudgment Interest – Commercial Appearances – EPA Class, Willful Violation

Appendix Q: Derivation of Backpay and Prejudgment Interest – Commercial Appearances – EPA Class, Non-Willful Violation

Appendix R: Derivation of Backpay and Prejudgment Interest – Commercial Appearances – Title VII Class

Appendix S: Derivation of Backpay and Prejudgment Interest – CBA Signing Bonus – EPA Class, Willful Violation

Appendix T: Derivation of Backpay and Prejudgment Interest – CBA Signing Bonus – EPA Class, Non-Willful Violation

Appendix U: Derivation of Backpay and Prejudgment Interest – CBA Signing Bonus – Title VII Class