Jeffrey L. Kessler (*pro hac vice*)
jkessler@winston.com
David G. Feher (*pro hac vice*)
dfeher@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue, New York, NY 10166
Tel:   (212) 294-6700
Fax:   (212) 294-4700

Cardelle B. Spangler (*pro hac vice*)
cspangler@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive, Chicago, IL 60601
Tel:   (312) 558-5600
Fax:   (312) 558-5700

Diana Hughes Leiden (SBN: 267606)
dhleiden@winston.com
Lev Tsukerman (SBN: 319184)
ltsukerman@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, Los Angeles, CA 90071
Tel:   (213) 615-1700
Fax:   (213) 615-1750

Jeanifer E. Parsigian (SBN: 289001)
jparsigian@winston.com
**WINSTON & STRAWN LLP**
101 California St., 35th Floor, San Francisco, CA 94111
Tel:   (491) 591-1000
Fax:   (491) 591-1400

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX MORGAN ET AL., | **Case No. 2:19-CV-01717-RGK-AGR** |
| Plaintiffs/Claimants, | Assigned to: Judge R. Gary Klausner |
| vs. | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT** |
| UNITED STATES SOCCER FEDERATION, INC., | |
| Defendant/Respondent. | Date:  March 30, 2020 |
| | Time:  9:00 a.m. |
| | Courtroom: 850 |

## NOTICE OF MOTION AND MOTION

TO THE COURT, DEFENDANT, AND ITS ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on March 30, 2020 at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled court, located at 255 East Temple Street, Los Angeles, CA 90012, on the eighth floor in Courtroom 850, before the Honorable R. Gary Klausner, Plaintiffs will and hereby do move the Court for an order granting partial summary judgment for Plaintiffs.

Plaintiffs bring this motion pursuant to Fed. R. Civ. P. 56 and Local Rule 56 on the grounds that they are entitled to summary judgment on Defendant's liability under the Equal Pay Act, for compensation-based discrimination under Title VII, and Defendant's First, Fourth, Sixth, Seventh, and Eighth affirmative defenses.  In the alternative, Plaintiffs request that the Court grant this motion with respect to any of the individual elements of their EPA and Title VII claims, and with respect to any of USSF's affirmative defenses, that the Court finds appropriate for summary adjudication in order to streamline the issues to be determined by the jury at trial.

Plaintiffs' Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Statement of Uncontroverted Facts and Conclusions of Law, the Request for Judicial Notice and exhibits attached thereto, the Declaration of Diana Hughes Leiden and the exhibits attached thereto, the pleadings and papers on file herein, other records on file in this matter, and any further material and argument presented to the Court at the time of the hearing.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on February 11, 2020.

Dated:  February 20, 2020                WINSTON & STRAWN LLP


                                         By:  */s/ Jeffrey L. Kessler*
                                         Jeffrey L. Kessler

                                         Attorneys for Plaintiffs

# **TABLE OF CONTENTS**

**Page (s)**

I.  INTRODUCTION ...................................................................................... 1

II.  PROCEDURAL HISTORY .......................................................................... 3

III.  LEGAL STANDARD .................................................................................. 4

IV.  ARGUMENT .............................................................................................. 5

    A.  Plaintiffs are Entitled to Summary Judgment that USSF Violated the Equal Pay Act ............................................................................................ 5

        1.  The Undisputed Facts Show that Plaintiffs Were Paid at a Rate Less than the MNT Players ............................................................... 5

        2.  The Undisputed Facts Show that the Jobs of WNT and MNT Players Require Equal Skill, Effort, and Responsibility ................. 9

        3.  The Undisputed Facts Establish that WNT Players Perform their Jobs Under Similar Working Conditions as MNT Players for a Single Establishment ................................................................... 12

        4.  USSF Cannot Meet its Burden to Prove Any of Its Affirmative Defenses to Plaintiffs' EPA Claim ................................................. 13

            a  USSF Cannot Meet its Burden to Establish that Revenue Differences Justified the Difference in the Rate of Pay Between the MNT Players and WNT Players .................... 14

            b  USSF Cannot Justify its Discrimination on the Grounds that the WNT and MNT Have Different Unions and Bargaining Units ................................................................... 16

            c  The Ted Stevens Act and USOC Exclusive Jurisdiction Are Not Defenses in This Case ................................................. 17

            d  USSF's Other Affirmative Defenses Fail ........................... 18

    B.  Plaintiffs Are Similarly Entitled to Summary Judgment that USSF Subjected Them to Sex-Based Compensation Discrimination in Violation of Title VII ................................................................................. 19

        1.  Plaintiffs Have Produced Direct Evidence of USSF's Sex-Based Compensation Discrimination ...................................................... 20

        2.  Plaintiffs Also Have Established Indirect Evidence of USSF's Sex-Based Compensation Discrimination .......................................... 24

        3.  Plaintiffs Are Entitled to Summary Judgment on USSF's Affirmative Defenses to their Title VII Claim .............................. 24

V.  CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Gardner-Denver Co.*,
 415 U.S. 36 (1974)................................................................................24

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)................................................................................4

*Bence v. Detroit Health Corp.*,
 712 F.2d 1024 (6th Cir. 1983) ...........................................................8, 11

*Burkey v. Marshall County Bd. of Education*,
 513 F. Supp. 1084 (N.D.W.Va. 1981) ...................................................10

*City of Los Angeles, Dep't of Water & Power v. Manhart*,
 435 U.S. 702 (1978)...............................................................................22

*Coghlan v. Am. Seafoods Co.*,
 413 F.3d 1090 (9th Cir. 2005) ...............................................................20

*Corning Glass Works v. Brennan*,
 417 U.S. 188 (1974)...................................................................12, 13, 17

*Ebbert v. Nassau Cty.*,
 2009 WL 935812 (E.D.N.Y. Mar. 31, 2019) ............................................8

*EEOC v. BNSF Railway Cmpny.*,
 902 F.3d 916 (9th Cir. 2018) .................................................................18

*Enlow v. Salem–Keizer Yellow Cab Co., Inc.*,
 389 F.3d 802 (9th Cir. 2004) .................................................................20

*Gunther v. Washington Cnty.*,
 623 F.2d 1303 (9th Cir. 1979) ............................................................9, 10

*Harper v. City of San Jose*,
 2011 WL 7109218 (N.D. Cal. Mar. 7, 2011) ............................................4

*Lee v. U.S. Taekwondo Union*,
 331 F. Supp. 2d 1252 (D. Haw. 2004)....................................................18

*Lenzi v. Systemax, Inc.*,
   944 F.3d 97 (2d Cir. 2019) ...................................................................... 19

*Lewis v. Smith*,
   255 F. Supp. 2d 1054 (D. Ariz. 2003) ..................................................... 24

*Marcoux v. State of Maine* ........................................................................... 10
   797 F.2d 1100, 1102 (1st Cir. 1986) ....................................................... 10

*Maxwell v. City of Tucson*,
   1984 WL 21130 (9th Cir. July 3, 1984) ..................................................... 9

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) .................................................................................. 23

*Metoyer v. Chassman*,
   504 F.3d 919 (9th Cir. 2007) ................................................................... 23

*Mickelson v. N.Y. Life Ins. Co.*,
   460 F.3d 1304 (10th Cir. 2006) ................................................................. 5

*Mulhall v. Advance Sec, Inc.*,
   19F.3d 586, 591 (11th Cir. 1994) ........................................................... 13

*Perdue v. City University of New York*,
   13 F. Supp. 2d 326 (E.D.N.Y. 1998) ....................................................... 10

*Portis v. First Nat'l Bank of New Albany, Miss.*,
   34 F.3d 325 (1st Cir. 1994) ..................................................................... 23

*Rehwaldt v. Elec. Data Sys. Corp.*,
   1996 WL 947568 (W.D.N.Y. Mar. 28, 1996) ........................................ 13

*Rivera v. Philip Morris, Inc.*,
   395 F.3d 1142 (9th Cir. 2005) ................................................................... 4

*Samuels v. We've Only Just Begun Wedding Chapel, Inc.*,
   154 F. Supp. 3d 1087 (D. Nev. 2015) ..................................................... 23

*Shultz v. First Victoria Nat. Bank*,
   420 F.2d 648 (5th Cir. 1969) ................................................................... 11

*Sischo–Nownejad v. Merced Cmty. College Dist.*,
   934 F.2d 1104 (9th Cir. 1991) ................................................................. 23

*Trans World Airlines, Inc. v. Thurston,*
    469 U.S. 111 (1985)............................................................................... 23

*UMWA Health & Ret. Fund v. Robinson,*
    455 U.S. 562 (1982)............................................................................... 25

*Vasquez v. Cty. of L.A.,*
    349 F.3d 634 (9th Cir. 2003) ............................................................... 20

**Statutes**

29 U.S.C. § 206(d)(1) ................................................................................ 5

29 U.S.C. § 206(d)(1)(iv) ........................................................................ 13

29 U.S.C. § 255(a) .................................................................................. 18

36 U.S.C. § 220527 ................................................................................ 17

42 U.S.C. § 2000e ............................................................................ 19, 24

Ted Stevens Olympic & Amateur Sports Act ....................................... 17, 18

Civil Rights Act of 1964 title VII .......................................................*passim*

Equal Pay Act ...................................................................................*passim*

**Other Authorities**

29 C.F.R. § 1620.9(b) .............................................................................. 12

29 C.F.R. § 1620.13(c) .............................................................................. 9

29 C.F.R. § 1620.15 .................................................................................. 9

29 C.F.R. § 1620.16 .................................................................................. 9

29 C.F.R. § 1620.17 .................................................................................. 9

29 C.F.R. § 1620.18(a) ............................................................................ 12

29 C.F.R. § 1620.23 ................................................................................ 16

29 C.F.R. § 1620.27 .......................................................................... 19, 24

Fed. R. Civ. P. 56(a) ................................................................................. 4

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

This is the rare case where it is Plaintiffs who are entitled to summary judgment in a wage discrimination case because the undisputed fact of the rate of pay discrimination against the female employees is contained in written collective bargaining agreements and the common defendant employer has not come forward with evidence to meet its burden of proving that this indisputable discrimination is the result of a cause other than gender or that any other affirmative defenses apply.  By deciding these issues on summary judgment, the Court will streamline this class action for trial, so that the jury will only have to determine the amount of the damages suffered by class members as a result of the wage discrimination; whether the standards for liquidated damages (under the Equal Pay Act) or punitive damages (under Title VII) have been met, and, if so, what those damages should be; and whether USSF also has violated Title VII with respect to terms and conditions of employment other than pay.  There are no genuine issues of fact to prevent the core issues of USSF's liability for wage discrimination from being decided in Plaintiffs' favor now.

Nor is this surprising.  Plaintiffs in this case are members of the United States Senior Women's National Soccer Team ("WNT"), four-time World Cup and Olympic champions who—in the words of USSF—are the "best athletes in the world" and "one of the most dominant squads in the history of sport – men or women."[1]  Their comparators—the members of the United States Senior Men's National Soccer Team ("MNT")—do the same job, for the same employer, but have not been nearly as successful.  Despite the WNT's unbridled success on the field and the undisputed fact that these women brought in more revenue than the MNT during the class period, USSF stubbornly continues to discriminate against Plaintiffs by compensating them at a lesser rate of pay for equal work.

---

[1] *See* Request for Judicial Notice ("RJN"), Ex. 1 (https://www.ussoccer.com/teams/uswnt).

Indeed, USSF's entrenched discriminatory practice persists even in the face of a bi-partisan, unanimous Senate[2] and, more recently, the MNT itself, calling for an end to the discrimination.  The MNT has issued a statement that it does not know of any factual basis to justify this wage discrimination against the members of the WNT and has urged USSF to rectify it:

> For more than 20 years, the Federation has resisted any concept of equal pay or basic economic fairness for the USWNT players … This is systematic gender discrimination that should have never happened … What we believe should happen is simple. Pay the women significantly more than our recently expired men's deal. In our estimation, the women were due at least triple what our expired deal was worth in player compensation.[3]

And even the President of USSF, Carlos Cordeiro, has admitted, both publicly (in 2017 and 2018 when he ran for President) and at his deposition in this case, that Plaintiffs have been subjected to discriminatory treatment in comparison to the MNT, that everyone deserves equal pay for equal work, and that changes should be made immediately to rectify the discrimination that he believes exists:

> Our women's teams should be respected and valued as much as our men's teams, but our female players have not been treated equally.
>
> ***
>
> I'm a strong supporter of greater equality, diversity and inclusion throughout  U.S. Soccer, and we clearly need to work toward equal pay for the national teams.  I believe that where existing agreements are unfair, adjustments should be made immediately.  To ensure equal pay going forward, we need to be open to new paradigms while recognizing the

---

[2] *See* RJN, Ex. 2 (https://www.congress.gov/bill/114th-congress/senate-resolution/462/text).
[3] *See* RJN, Ex. 3 (https://ussoccerplayers.com/2020/02/statement-about-the-uswnt-2017-2021-cba.html).

specific needs and desires of the WNT and MNT. . . [w]e don't need to wait for CBA negotiations to make these changes; we can start now.  It's the right thing to do.  (SUF No. 20–21.)

When USSF tried to contest the fact of its wage discrimination in opposition to class certification, the best it could muster was a methodology so flawed that this Court not only rejected it, but found that it would lead to "absurd" results.  Yet, this is the same absurd methodology that USSF is now seeking to introduce at trial to once again try to dispute the existence of a rate of pay discrimination that simply cannot be denied.[4]

Nor has USSF come forward with any evidence sufficient to meet its burden of proving a justification based on revenue or profit generation, or any other non-gender-based justification, for its wage discrimination. To the contrary, USSF's records show that during the class period (June 11, 2015 forward) the WNT has generated *more* revenue and has earned a *larger* profit for USSF than the MNT.  (SUF No. 55–57.)

In sum, the undisputed facts demonstrate that the *post hoc* justifications offered by USSF for paying WNT players less than MNT players for the same work are based not on actual facts that USSF relied upon when making compensation decisions, but on gender stereotyping—such as the assertion by former USSF President Sunil Gulati that male soccer players have more "speed" and "strength"—that the EPA and Title VII were designed to eliminate as a basis for wage discrimination.  (SUF No. 66.)  This is precisely the type of indisputable fact record in which summary judgment on liability in favor of the Plaintiffs is warranted as a matter of sound judicial administration, so that the Court can narrow the remaining issues for an efficient and just trial.

## II.    PROCEDURAL HISTORY

In April 2016, the four class representatives in this case, Alex Morgan, Megan Rapinoe, Becky Sauerbrunn, and Carli Lloyd, each filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against USSF,

---

[4] *See* Plaintiffs' concurrently-filed Motion to Exclude Defendant's Expert Testimony.

alleging sex-based compensation discrimination. Dkt. No. 2.  These charges were timely brought within 300 days of the discriminatory action.  On February 5, 2019, the EEOC issued Right to Sue letters to each of the four Plaintiffs.  *Id*.  Plaintiffs timely filed the Complaint on March 8, 2019 (within the 90-day window to assert claims), alleging violations of Title VII as well as the Equal Pay Act ("EPA").  Dkt. No. 1.

On November 8, 2019, this Court certified two classes of Plaintiffs seeking relief under Title VII: (1) an injunctive relief class of "all WNT players on the team as of the date of final judgment, or the date of the resolution of any appeals therefrom, whichever is later;" and (2) a damages class of "all WNT players who were members of the WNT at any time from February 4, 2015 (later amended by stipulation to June 11, 2015) through the date of class certification."  Dkt. Nos. 98, 123.  The Court also granted conditional certification of Plaintiffs' collective action seeking relief under the EPA, made up of "all WNT players who were members of the WNT at any time from March 8, 2016 through the present."  *Id*.  The Court appointed Morgan, Rapinoe, Sauerbrunn, and Lloyd as the class representatives and Winston & Strawn LLP as class counsel.  *Id*.

## III.    LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party is entitled to summary judgment unless there is "evidence on which a jury could reasonably find for the [non-moving party]." *Id*. at 252; *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  Further, a motion for partial summary judgment is the appropriate vehicle to determine less than all of the issues in the case, Fed. R. Civ. P. 56(a), and has been found by courts in this circuit to be an efficient method to streamline the issues to be presented to the jury.  *See Harper v. City of San Jose*, No. C 09-05758 JW, 2011 WL 7109218, at *1 (N.D. Cal. Mar. 7, 2011) ("[A] party may move for summary judgment on the liability issues in a claim, leaving the issue of damages, for example, for trial.").

## IV.   ARGUMENT

### A.   Plaintiffs are Entitled to Summary Judgment that USSF Violated the Equal Pay Act

The Equal Pay Act provides that a common employer, such as USSF, cannot "discriminate … between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  In order to prevail on liability under the EPA, Plaintiffs need only show that USSF paid MNT players at a rate more than WNT players for performing substantially similar work. *See Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1310-11 (10th Cir. 2006).  There is no genuine issue of material fact that USSF has violated the Equal Pay Act by discriminating against the WNT players in their rate of pay for substantially similar work.

### 1.   The Undisputed Facts Show that Plaintiffs Were Paid at a Rate Less than the MNT Players

USSF implemented and maintains one compensation policy for the MNT and one for the WNT pursuant to each team's written collective bargaining agreements. ("CBAs"). (SUF No. 1–3); Dkt. No. 42, USSF Answer at ¶ 44.  Each of the members of the WNT and MNT is paid according to the rate of pay base compensation and bonus schedules set forth in those agreements. (SUF No. 1–3.)  The WNT's current CBA has been in effect since January 1, 2017 ("2017 WNT CBA").  (SUF No. 2.)  Prior to that, USSF paid the WNT players pursuant to a Memorandum of Understanding ("WNT MOU") that was in effect from March 19, 2013 through December 31, 2016, which itself modified a prior CBA that was in effect from 2005 through 2012 ("2005 WNT CBA"). (SUF No. 1.)  The MNT's current CBA was in effect from January 1, 2011 until December 31, 2018 ("MNT CBA").  (SUF No. 3.) The MNT players continue to be paid by USSF in accordance with the expired MNT CBA.  (SUF No. 4).

As early as 2004, it is undisputed that the members of the WNT raised concerns about pay equality in a letter from their union's counsel to the United States Olympic Committee ("USOC"), highlighting (among other things) "USSF's unwillingness to pay the women anywhere near equal compensation for successes comparable to the men's." (SUF No. 5.)    During bargaining sessions in 2016, WNT players and their representatives explicitly requested compensation that was equal to the MNT players, but were told that "market realities are such that the women do not deserve equal pay." (SUF No. 6, 67).  USSF would not agree to the players' demand for equal pay and never offered the WNT the same level of game bonuses that the MNT players have the opportunity to receive under their CBA.  (SUF No. 7.)   Indeed, although USSF offered the WNT a "pay to play" model that was similar to the one in the MNT's CBA, it is undisputed that it never offered an equal bonus model for "friendlies" or an equal rate of pay model for the World Cup or other tournament events.  (SUF No. 8.)

Furthermore, USSF's own witnesses admitted that the women are not paid equally.  First, USSF's 30(b)(6) witness on the issue of differences in the rate of pay expressly admitted that the MNT and WNT CBAs set forth lower per-game bonuses and compensation for the WNT.  (SUF No. 12–19.)  And in his race for President in late 2017 and 2018, Mr. Cordeiro unequivocally declared that "[o]ur female players have not been treated equally, that he intended, as President, to work for equal pay and equal resources for female athletes and that "immediate" changes needed to be made, without waiting for any CBA to expire, to rectify the unequal treatment of the WNT. (SUF No. 20–21.)   Further, he testified at his disposition that he still believes that unequal opportunities for the WNT exist today, and that he, and other Board members, have been complaining about this unequal treatment for years, while USSF did not redress it.  (SUF No. 23–24.)  These admissions of discrimination are dispositive.

Even if USSF's admissions were not enough, the written terms of the relevant CBAs establish as a matter of undisputed fact that USSF has paid WNT players at a rate less than MNT players throughout the class period.  (SUF No. 9–19.)  Under the WNT

CBA, WNT players currently only have the opportunity to receive lower per-game bonuses than MNT players have the opportunity to receive for "wins" and "ties" in most "friendlies." (SUF No. 12.) WNT players also only have the opportunity to receive lower bonuses than the MNT for winning World Cup qualifying games, for qualifying as a team for the World Cup, and for making the World Cup roster. (SUF No. 13–15.) And WNT players further only have the opportunity to receive lower rates of compensation for other non-World Cup tournaments. (SUF No. 17–18.) And while the terms of the WNT CBAs provide for certain benefits for contracted players in certain situations, WNT players receive a lower rate of pay than the MNT players even when all fringe benefits are taken into consideration.[5] Again, USSF's 30(b)(6) witness designated on rate of pay differences confirmed the differences in rate of pay and these facts cannot be disputed for purposes of this motion. (SUF No. 9–19.)

Moreover, while it is not necessary for EPA liability to prove that USSF intentionally discriminated against Plaintiffs on the basis of gender, the record shows that the stated reason by a USSF negotiator for paying the champion WNT players at a lower rate than the MNT was USSF's belief that "market realities are such that the women do not deserve equal pay." (SUF No. 67.) And former USSF President Gulati testified that one of the reasons he believed the pay discrimination is justified is because of gender differences in "speed" and "strength," even though he admitted that the WNT players work just as hard as the men and have been far more successful (discussed below as direct evidence of discriminatory animus under Title VII). (SUF No. 26, 66.)

Rather than dispute that WNT players have been paid at a lower rate of pay, USSF has taken the discredited legal position that there is no discrimination because various class members have earned more in *total compensation* than their male counterparts because they have won more games and been more successful during the class period. Dkt. No. 67 (USSF's Class Certification Opposition) at 3-4, 9 (asserting that "Plaintiffs'

---

[5] *See* Ex. 6 to Plaintiffs' Motion to Exclude Defendant's Expert Testimony (Expert Report of Dr. Finnie Cook).

proposed Class Representatives each made significantly more money than the highest paid MNT player" from 2015 through 2019).  But as this Court has already recognized, the controlling issue is whether an employer has discriminated on the basis of sex with respect to the *rate of pay*, not total remuneration.  Dkt. No. 98, Minute Order on Mot. for Class Certification ("Class Certification Order") at 5-6 & n.1; *Ebbert v. Nassau Cty.*, No. 05-CV-5445(FB)(AKT), 2009 WL 935812, at *2-3 (E.D.N.Y. Mar. 31, 2019) ("[T]he EPA…speak[s] in term of rate of pay, not total remuneration … As a matter of common sense, total remuneration cannot be the proper point of comparison."); *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1027 (6th Cir. 1983).  Indeed, this Court has held that "[t]o hold otherwise would yield an 'absurd result,' as this would mean … that 'an employer who pays a woman $10 per hour and a man $20 per hour would not violate the EPA … as long as the woman negated the obvious disparity by working twice as many hours."  Class Certification Order at 6 (quoting *Ebbert*, 2009 WL 935812, at *3).

There is no ground for USSF to resist summary judgment on the basis of a total compensation analysis that this Court has already rejected.  Nor can USSF stave off summary judgment by arguing that the compensation that Plaintiffs received for the separate job of playing on an NWSL team should be taken into account as offsetting the discrimination.  It is undisputed that playing for the NWSL is a separate job from being on the WNT, that not all WNT players have been employed by NWSL teams, and that it was former President Gulati and USSF—not the WNT players or their union—who came up with the proposal for USSF to subsidize the NWSL as part of USSF's—not the players'—objectives.  (SUF No. 29–31.)  Simply put, the Equal Pay Act does not require a woman to work two jobs to receive what a man can earn for working one.

It thus cannot be genuinely disputed that Plaintiffs have proven that they have been discriminated against with a lower rate of pay in comparison to the male players on the MNT—establishing the first element of Equal Pay Act liability.

**2.      The Undisputed Facts Show that the Jobs of WNT and MNT Players Require Equal Skill, Effort, and Responsibility**

There is also no genuine factual dispute that the WNT and MNT players perform "equal work," which under the EPA is defined as work that is equal in terms of skill, effort, and responsibility.  29 C.F.R. § 1620.13(c).  "Equal work" under the EPA does not mean work that is "identical."  *Gunther v. Washington Cnty*., 623 F.2d 1303, 1309 (9th Cir. 1979).  Rather, "substantially equal" is the controlling test.  *Maxwell v. City of Tucson*, 1984 WL 21130, at *3 (9th Cir. July 3, 1984).

The first element of substantial equality is skill, which is measured by the experience, ability, education, and training required to perform a job.  29 C.F.R. § 1620.15.  The undisputed evidence demonstrates that the WNT players are equally as skilled as the MNT players, as numerous USSF witnesses admitted to this fact.  WNT's former head coach testified, without contradiction, that the WNT and MNT players are equally skilled in each key area of soccer—athleticism, "tactical IQ," tactical proficiency, and mental fortitude (and Mr. Cordeiro deferred to Coach Ellis as the best judge of their skill).  (SUF No. 25.)  And, of course, there is no dispute that the WNT players have been much more successful than the MNT in recent years.  (SUF No. 35.)

The second required element of substantial equality is effort, which is defined as the amount of physical or mental exertion needed to perform a job.  29 C.F.R. § 1620.16.  The undisputed evidence demonstrates that the WNT players expend just as much effort as the MNT players in performing on the national team—USSF's President Mr. Cordeiro, its former President Mr. Gulati, and Coach Ellis all testified that the WNT players work just as hard as MNT players.  (SUF No. 26.)  USSF could not, and does not, dispute the equal work ethic of the team that they refer to on their own website as "one of the most dominant squads in the history of sport, men or women."[6]

Finally, the third required element of substantial equality is responsibility, which is defined as the degree of accountability required in performing a job. 29 C.F.R. §

---

[6] *See* RJN, Ex. 1 (https://www.ussoccer.com/teams/uswnt).

1620.17.  The undisputed evidence demonstrates that the WNT players have had substantially equal responsibilities and required accountability as MNT players. Indeed, Mr. Berhalter, testifying as the 30(b)(6) representative of USSF on this topic, attested that the MNT and WNT players' duties are laid out in their respective CBAs, which set forth substantially similar player responsibilities, such as being available for training, maintaining a high level of competitive soccer skills and physical conditioning, and not using illegal drugs or banned substances.  (SUF No. 27–28.)  Coach Ellis further testified that key player responsibilities such as attending camp in good athletic shape, acting professionally, performing at a high level, and seeking appropriate treatment for injuries are shared by WNT and MNT players alike.  (SUF No. 28.)

USSF has argued that WNT and MNT players do not perform equal work because the teams do not literally play against the same opponents and in the same tournaments given that FIFA does not permit women and men to play on the same national teams. But the argument that women have to show that their jobs were "identical" to the jobs of their male counterparts (e.g., on the same team) is not the law.  *See Gunther*, 623 F.2d at 1309.  The requirements of the EPA apply just as strongly in cases involving sex-segregated jobs.  For example, in *Marcoux v. State of Maine*, female prison guards claimed that they received lower retirement benefits than male prison guards who worked at a separate correctional facility guarding male prisoners.  797 F.2d 1100, 1102 (1st Cir. 1986).  Applying the EPA "equal work" framework to the plaintiffs' Title VII claim, the court found that the fact that the plaintiffs guarded female inmates in a separate facility did not preclude a discrimination claim and upheld the lower court's finding that the jobs were "substantially equal."  *Id*. at 1106-07; *see also Perdue v. City University of New York*, 13 F. Supp. 2d 326, 333-34 (E.D.N.Y. 1998) (upholding verdict for the coach of a college women's basketball team on her EPA claim that she was compensated less than the male coach of the men's team); *Burkey v. Marshall County Bd. of Education*, 513 F. Supp. 1084, 1092 (N.D.W.Va. 1981) (similar).

Here, the facts are undisputed that the jobs of the WNT and MNT players are substantially the same.  (SUF No. 32–34.)  They play under the same rules, on the same sized fields, and work and practice equally as hard.  (SUF No. 26, 32–33.)  For this reason, even Mr. Gulati, the 30(b)(6) witness on this subject, eventually had to admit that the fact that there are separate teams and separate competitions, "in and of itself" would not justify the pay gap.  (SUF No. 37.)

The fallacy of USSF's argument is thrown into sharp relief when considered outside the sports context.  For example, female salespersons selling the same products as male salespersons would not have to show that they travel to the same clients in the same geographic regions in order to assert an EPA claim for being paid less than the men.  Nor could an accounting firm justify a pay gap with evidence that their male and female accountants do not prepare tax returns for the exact same clients.  All that is required is proof that the two teams had the same "common core of tasks"[7], and that has clearly been demonstrated on this record for the members of the WNT and the MNT.

USSF has also argued that the teams do not perform equal work because men's soccer is purportedly more "competitive" than women's soccer.  *See* USSF Supp. Resp. to Plf.'s Rog. 1 ("[T]he international soccer environment in which the MNT players compete is far more competitive by many measures than that in which Plaintiffs compete … MNT players must achieve more and/or better results against tougher competition in order to qualify for, and succeed in, tournament competition.").  This argument is contrary to the law for the same reasons set forth above — there is no legal requirement of "identical" work.  But more fundamentally, this argument is exactly the type of pernicious and offensive gender-stereotyping that the EPA does not permit as a justification for wage discrimination.  *Shultz v. First Victoria Nat. Bank*, 420 F.2d 648, 656 (5th Cir. 1969) (the EPA's goal was "[t]he elimination of those subjective assumptions and traditional stereotyped misconceptions regarding the value of

---

[7] *See* RJN, Ex. 4 (https://www.eeoc.gov/eeoc/publications/equal_pay_day.cfm?).

1   women's work"); *see also Bence*, 712 F.2d at 1029.  Whether or not USSF believes that

2   the work of the WNT is not as worthy or as difficult as the work of the MNT, that

3   discriminatory animus is not a legally acceptable defense to an Equal Pay Act claim.

4        In any event, the undisputed facts demonstrate that the competition faced by the

5   WNT has been just as strong, if not stronger, than the competition faced by the MNT.

6   (SUF No. 39.)  Since 2014, the WNT has played, on average, teams with *higher* FIFA

7   rankings than the MNT every year except 2018.  (*Id.*)  And the only reason for the 2018

8   anomaly was, as Coach Ellis explained, because the WNT played lower-ranked

9   opponents in the run-up to winning the 2019 World Cup.  (SUF No. 40.)  Equal work

10  requires equal pay.

11       **3.    The Undisputed Facts Establish that WNT Players Perform**

12       **their Jobs Under Similar Working Conditions as MNT Players**

13       **for a Single Establishment**

14       There can further be no genuine issue of material fact that the WNT and MNT

15  players perform their jobs under similar working conditions for a single employer,

16  USSF.  In the EPA context, "similar working conditions" refers to the job's physical

17  environment and potential hazards.  29 C.F.R. § 1620.18(a); *Corning Glass Works v.*

18  *Brennan*, 417 U.S. 188, 201-03 (1974).  WNT and MNT players practice and play

19  games on the same-sized fields and by the same rules.  (SUF No. 32–33.)  Their off-

20  the-field duties are similar as well, including media appearances. (SUF No. 27–28.)

21  And the undisputed facts show that the WNT players were required to play on artificial

22  turf substantially more often than the MNT players through at least November 2017,

23  meaning that their job conditions were actually *more* hazardous than the MNT players.

24  (SUF No. 38.)

25       Furthermore, a business enterprise such as USSF is considered a "single

26  establishment" for purposes of the EPA where the employer has centralized control of

27  job descriptions, salary administration, and job assignments.  29 C.F.R. § 1620.9(b)

28  ("[A] central administrative unit may hire all employees, set wages, and assign the

location of employment."); *Brennan*, 519 F.2d 53, 58 (5th Cir. 1975) (finding a single establishment based on centralized control of hiring, wages, work assignments, scheduling and daily job duties).  And employees are considered to work for a "single establishment" even if their jobs are not performed in the same physical place.  *See*, *e.g.*, *Rehwaldt v. Elec. Data Sys. Corp.*, 1996 WL 947568, at *6 (W.D.N.Y. Mar. 28, 1996); *Mulhall v. Advance Sec, Inc.*, 19F.3d 586, 591 (11th Cir. 1994).

Here, USSF is a "single establishment" because it is undisputed that it has centralized control over WNT and MNT job descriptions, budgeting, planning, scheduling, event marketing, and decisions relating to licensing and broadcasting. (SUF No. 45–53.)  With few exceptions (such as coaches and press officers), the majority of USSF employees perform work for *both* the WNT and the MNT.  (SUF No. 41–43.) USSF's central administration also makes decisions about game venues, hotels, travel, meals and other terms of employment for both teams as part of the same process.  (SUF No. 50–52.)  And, as described in more detail below, the MNT and WNT are both promoted by Soccer United Marketing ("SUM"), the for-profit marketing arm of Major League Soccer, in a manner such that a breakdown of broadcast and sponsorship revenues between the two teams "can't be done."  (SUF No. 59–62.)

### 4.    USSF Cannot Meet its Burden to Prove Any of Its Affirmative Defenses to Plaintiffs' EPA Claim

As shown above, there is no genuine issue of material fact that Plaintiffs were paid at a rate less than their male counterparts for equal work under similar working conditions.  Accordingly, Plaintiffs should prevail on their EPA claims unless USSF can prove the pay gap is justified. 29 U.S.C. § 206(d)(1)(iv); *Brennan*, 417 U.S. at 196-97.  Because USSF cannot meet its burden, Plaintiffs are entitled to summary judgment as a matter of law on USSF's liability for their EPA claims.

USSF argues that the following "factors other than sex" justify the pay gap: (1) that USSF had a "good-faith belief" that the MNT had generated and would continue to generate more revenue and profit than the WNT; and (2) the WNT and MNT have

different unions that bargained for different terms in their respective collective bargaining agreements.   USSF also asserts the following, additional affirmative defenses: (1) that the USOC has exclusive jurisdiction over this dispute; (2) that the statute of limitations bars Plaintiffs' claims; (3) that the Central District of California is the improper venue for Plaintiffs' claims; and (4) that USSF's decisions were made "for legitimate business reasons and not for any discriminatory or other lawful purpose." Each of these defenses fails.[8]

First, there is no genuine issue of fact that USSF cannot meet its burden of proof to establish its supposed revenue justification for three separate reasons: (1) there is no evidence USSF actually did any such revenue or profit justification analysis at the time of the discriminatory compensation decisions; (2) USSF has admitted that because it jointly marketed broadcast and sponsorship rights for the MNT, WNT, and other USSF properties together, it is "impossible" for USSF to break down those key revenues between the two teams; and (3) the undisputed facts establish that from 2015 to date, and projecting into the future—the entire class period—the WNT has generated more revenues and profits than the MNT for USSF with respect to revenues that USSF does record separately for the teams (such as ticket revenues).  (SUF No. 55–61.)  Second, the text of the EPA itself, as well as Supreme Court case law, firmly establish that collective bargaining agreements do not provide a defense to EPA (or Title VII) claims. And none of USSF's remaining defenses have any merit.

### a    USSF Cannot Meet its Burden to Establish that Revenue Differences Justified the Difference in the Rate of Pay Between the MNT Players and WNT Players

USSF has asserted that the pay discrimination in favor of the MNT is justified by its "belief" that the activities of the MNT had generated and would continue to generate more game-related revenue and net profits, as well as higher broadcasting and

---

[8] USSF also asserts affirmative defenses relating to Plaintiffs' entitlement to punitive and liquidated damages, which are not relevant to this Motion.

sponsorship revenue, than the activities of the WNT.  (SUF No. 70.)  But the undisputed evidence shows that the WNT generated more game-related revenue and earned more net profits during the class period, and that it is "impossible" to allocate broadcasting and sponsorship revenue between the WNT and MNT.  (SUF No. 55–62.)  Because USSF's "belief" is not based on any facts, this defense must fail.

First, USSF did not produce any evidence that it did an analysis of any comparative revenues and profits generated by the MNT and WNT to justify its pay discrimination at the time that bargaining took place.  It is frivolous for USSF to assert "good faith" reliance on a mythical revenue analysis that never existed contemporaneous to the discrimination.   To the extent that USSF claims that it nonetheless had a "belief" that the MNT generated more revenue, such an unsupported, sexist "belief" is not a cognizable justification for wage discrimination.  Mere *post hoc* assertions that the discrimination was justified by differences in revenue without any contemporary analysis to back this up from the negotiations is not just insufficient, it shows that the entire claim is pretextual.

Second, the undisputed evidence establishes that a substantial portion of the revenue associated with the teams—sponsorship and broadcast revenue—cannot be allocated between the MNT and WNT because the teams were jointly marketed.  But without such data, USSF had no way of knowing whether its pay discrimination could somehow be related to actual revenue differences.  (SUF No. 59, 61–62.)  Indeed, USSF's Managing Director of Administration, Tom King testified that a breakdown of revenues between the two teams "can't be done," and USSF testified that it never did a study or other analysis attempting to allocate these revenues between the teams.  (SUF No. 59–62.)  Gender-based assumptions that women have less revenue potential is not a "good faith" basis for a revenue justification defense.  This is especially true where, as here, the evidence shows that, during the class period, the WNT players have been more recognized and have generated more interest from soccer fans than MNT players. (SUF No. 36.)

Third, the undisputed facts show that, not counting the broadcasting and sponsorship revenues which cannot be allocated, the MNT generated less per-game revenue and profits than the WNT during the class period. (SUF No. 55– 57.)  In fact, USSF's own verified interrogatory responses state that the WNT generated $85,022,153 in "revenue generated by MNT and WNT matches controlled by U.S. Soccer" from April 1, 2015 through September 30, 2019, while the MNT only generated $75,924,625 in such revenues during this period. (SUF No. 55–56.)  Further, the WNT *earned* over $10,000,000 in profits during this period, while the MNT *lost* over $6,000,000. (SUF No. 57.)  And the current USSF projection for the next fiscal year is that the WNT will generate more revenues again. (SUF No. 58.)  The undisputed facts thus establish that since 2015, it is the WNT that has been the more successful revenue generator and earner for USSF. (SUF No. 55– 57.)   Indeed, the MNT itself recently issued a release stating that, with the 2017 WNT CBA, "the women did not benefit from the dramatic increase in revenue associated with the USWNT."[9]

> **b      USSF Cannot Justify its Discrimination on the Grounds that the WNT and MNT Have Different Unions and Bargaining Units**

USSF makes the argument that the WNT's collective bargaining agreement absolves it of its obligations to comply with the EPA (and Title VII) because the WNT agreed to the compensation terms in its CBA and because the union for the WNT purportedly had different bargaining objectives than the union for the MNT with respect to compensation.  This is wrong as a matter of law.  All employees who are the victims of discrimination agree to the pay that they receive and it is no more a defense to argue that a union agreed to accept less money on the basis of gender (because that was all it could get the employer to agree to) than it would be to argue that a union agreed to accept a salary at less than the minimum wage.  Indeed, EPA regulations specifically

---

[9] *See* RJN, Ex. 3.

provide that a collective bargaining agreement perpetuating pay discrimination affords the employer no defense to a charge under the Act.  *See* 29 C.F.R. § 1620.23.  And to Plaintiffs' knowledge, there is not one case in which a court has ever held that, contrary to the EPA's regulations, collective bargaining agreements are a defense to an EPA claim.  *E.g.*, *Corning Glass Works v. Brennan*, 417 U.S., at 208–210 (rejecting contention that EPA violations caused by pay differential to day and night inspectors were cured when a new collective bargaining agreement went into effect).  The same is true for Title VII, as discussed below.[10]

Further, the undisputed facts show that WNT representatives (including the WNTPA and its counsel) *did* ask USSF for equal pay in collective bargaining and USSF rejected that request.  (SUF No. 6–7.)  Indeed, Mr. King, supported by his own bargaining notes, admitted that the WNT asked for equal compensation to the MNT, but USSF never agreed to propose such equal compensation terms.  (SUF No. 6–7.)  To underscore the point, the EEOC complaint was filed and served on USSF in early 2016, so USSF can hardly claim that it did not know that the WNT players have been seeking equal pay for equal work.  The fact that the CBAs had different compensation and benefit terms requires that this be accounted for in the ultimate back pay damages analysis, but it does not serve as a defense to an equal pay claim.[11]

**c**     **The Ted Stevens Act and USOC Exclusive Jurisdiction Are Not Defenses in This Case**

USSF claims that Plaintiffs' claims are barred "to the extent that they conflict with the authority granted to U.S. Soccer by the Ted Stevens Olympic and Amateur Sports Act and/or are within the exclusive jurisdiction of the United States Olympic Committee." ECF No. 42 at 17-18 (Seventh Affirmative Defense).  But USSF produced no evidence that Plaintiffs were required to present their claims to the USOC, and the law is clear that Plaintiffs were not required to do so.  The Ted Stevens Act *permits* (but

---

[10] *See also* Plaintiffs' Motion to Exclude Defendant's Expert Testimony, Section II.A.1.
[11] *See also id*.

in no way *requires*) athletes to file complaints with the USOC.  *See* 36 U.S.C. § 220527 ("[a]n amateur sports organization or person that belongs to or is eligible to belong to a national governing body ***may*** seek to compel the national governing body to comply with sections 220522, 220524, and 220525 of this title by filing a written complaint with the corporation") (emphasis added).  Courts have thus consistently held that this statute does not preclude discrimination and related claims. *See, e.g.*, *Lee v. U.S. Taekwondo Union*, 331 F. Supp. 2d 1252, 1260 (D. Haw. 2004) (holding that the statute did not preempt federal discrimination claim because the remedy sought was "not within the exclusive jurisdiction of the USOC," noting that "the Amateur Sports Act does not nullify or supersede other federal laws that provide private rights of action to ensure freedom from discrimination").

### d      USSF's Other Affirmative Defenses Fail

Plaintiffs are also entitled to summary judgment against USSF's other affirmative defenses because USSF has not (and cannot) come forward with any probative evidence to prove these defenses.  *See EEOC v. BNSF Railway Cmpny.*, 902 F.3d 916, 921 (9th Cir. 2018) (affirming summary judgment on liability where Defendants "did not offer evidence sufficient to support any affirmative defense").  While it is difficult to imagine USSF actually pursuing any of these defenses at trial, during the meet and confer prior to filing this motion, USSF refused to confirm that it was dropping these defenses.  Accordingly, in an abundance of caution, Plaintiffs submit that they timely filed their EPA claims within three years of USSF's discriminatory pay action.  29 U.S.C. § 255(a).  Further, USSF's claim that "every decision that [USSF] made with respect to the conduct alleged in the Complaint was for legitimate business reasons and not for any discriminatory or other unlawful purpose" is not a proper affirmative defense and, in any event, has not been supported with any probative evidence.[12]

---

[12] USSF has also asserted the affirmative defense of "improper venue." ECF No. 42 at 17.  But this Court already found venue to be proper.  Dkt. No. 56.

**B.    Plaintiffs Are Similarly Entitled to Summary Judgment that USSF Subjected Them to Sex-Based Compensation Discrimination in Violation of Title VII**

Title VII prohibits employers from discriminating against any employee with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  In contrast to the EPA, plaintiffs alleging sex-based compensation discrimination under Title VII need not establish that they are performing equal work for unequal pay.  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019).  Indeed, "if an employer used a transparently sex-biased system for wage determination, women holding jobs not equal to those held by men would be denied the right to prove that the system is a pretext for discrimination." *Id.* (citing *Washington County v. Gunther*, 452 U.S. 161, 179 (1981)).  In order to prevail on their Title VII sex-based compensation discrimination claim, Plaintiffs need only show that sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

As an initial matter, as set forth in Section IV.A above, Plaintiffs have established that there is no genuine issue of material fact that they were performing equal work for unequal pay during both class periods and that USSF cannot establish any of its affirmative defenses to its pay discrimination under the EPA.  Such a showing, by itself, also establishes liability, as a matter of law, under Title VII.  *See* 29 C.F.R. § 1620.27 ("[i]n situations where the jurisdictional prerequisites of both the EPA and title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., are satisfied, any violation of the Equal Pay Act is also a violation of title VII.").

Plaintiffs also are entitled to summary judgment under Title VII for the additional reasons that it has produced both direct and indirect evidence of discrimination that USSF cannot rebut with any affirmative defenses.  As shown above, USSF has admitted that it pays WNT players at a lesser rate of pay than the MNT players in accordance

with the terms of its CBAs.  *See supra*, Section IV.A.  The record also establishes that USSF has used sex-based stereotypes to try to justify the disparity, and has failed to provide equal opportunities for women players to earn as much compensation as male players.  (SUF No. 69.)  Indeed, President Cordeiro admitted at his deposition that he still believes that the WNT players do not have equal opportunities today, and that he and numerous other USSF board members have repeatedly pointed this out at Board meetings without USSF taking any action to redress this longstanding practice of gender discrimination.  (SUF No. 23.)  As Mr. Cordeiro said during his campaign, "[o]ur women's teams should be respected and valued as much as our men's teams, but our female players have not been treated equally."  (SUF No. 20.)

### 1. Plaintiffs Have Produced Direct Evidence of USSF's Sex-Based Compensation Discrimination

In the context of proving a Title VII violation, direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003) (citing *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)).  The Ninth Circuit has defined this proof as "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the fact finder to infer that that attitude was more likely than not [the cause of] the employer's decision." *Enlow v. Salem–Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir.1999)).  It "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).

Plaintiffs have come forward with precisely this category of direct evidence of USSF's discriminatory intent.  First, as noted above, Carlos Cordeiro admitted in 2017 and 2018 that the WNT players were not paid equally to MNT players and that female players were not given the same opportunities as their male peers.  (SUF No. 20–21.)

Mr. Cordeiro, in fact, campaigned for his presidency on the platform that the WNT players should be treated equally and that one of his goals as President would be "working towards equal pay." (SUF No. 20.)  More specifically, Mr. Cordeiro stated: "we clearly need to work toward equal pay for the national teams." (SUF No. 21.)  That Mr. Cordeiro—then Vice President of USSF and a member of its Board of Directors— would make such damning admissions was so alarming to then-President Sunil Gulati that he admonished Mr. Cordeiro: "Carlos, I'll bite my tongue on this document certainly publicly since it's political season; however, for a US Soccer officer to make the following statement in a public document while we have a pending EEOC charge is incredibly irresponsible." (SUF No. 22.)

In his deposition, Mr. Cordeiro attempted to backpedal by claiming that what he meant by "equal pay" was "equal opportunity."  But this change in wording is of no help to USSF in trying to defend against a Title VII claim.  Mr. Cordeiro testified:

> I had a concern—which is why I ran for president—that our women lacked
> equal opportunity. And lacking equal opportunity to play competitive
> matches and competitive tournaments that had significant payouts was a
> significant disadvantage for our women. So I believe then and I continue
> to believe now that working for quote 'equal pay and equal resources' is
> all about creating more opportunity for our women so they can play more
> competitive events that would drive more revenue and more compensation.

(SUF No. 69.)  By clearly admitting, under oath, that USSF failed to provide WNT players with equal opportunity to drive more revenue and, thus, earn more compensation, USSF admitted not only that USSF does not pay them at an equal rate of compensation (which cannot be disputed), but that it is not possible for USSF to even try to justify this discrimination based on any purported difference in revenue.[13]

---

[13] *See* EEOC Compliance Manual, Section 10: Compensation Discrimination, §10-IV(F)(2)(f) ("Commission will scrutinize this defense [of revenue production] carefully to determine whether the employer has provided reduced support for revenue

Further, Mr. Cordeiro's admission that this lack of equal opportunity has been widely recognized and discussed by board members for years, with no remedial action by USSF, provides further direct evidence of a longstanding discriminatory animus behind USSF's compensation scheme.  (SUF No. 23.)

Second, in his 30(b)(6) capacity, former USSF President Sunil Gulati testified that one of the reasons USSF used to justify setting the WNT's compensation lower than the MNT's compensation was the difference in "speed" and "strength" between men and women and the fact that organizations like FIFA separate soccer players on the basis of "genetics" and "biology."  (SUF No. 66.)  Such a sexist stereotype is precisely the type of gender-based motivation that is direct evidence of the discriminatory animus which violates Title VII.  *See, e.g.*, *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) ("In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." (internal quotation marks omitted)).

Third, one of USSF's lead negotiators, outside counsel Russ Sauer, stated during collective bargaining negotiations that the specific reason that USSF would not agree to an equal system of compensation between the WNT and MNT was that "market realities are such that the women do not deserve equal pay."  (SUF No. 67.)  This statement has been attested to by both the former Executive Director of the WNTPA and class representative Megan Rapinoe, while the USSF representative who took bargaining notes could not "remember" whether this statement was made.  (SUF No. 67–68.)  At the time Mr. Sauer made this discriminatory assertion to explain the reason why the pay disparity against the WNT was maintained, USSF knew that its own financials showed that since 2015, the WNT had generated and earned more revenue

---

production to the lower paid employee. If that is the case, then the difference in revenue will not justify the compensation disparity. [A] mere assumption that the higher paid employee will produce greater revenue will not justify the compensation disparity.").

that the MNT for USSF—so that the "market realities" could not, in fact, support the discriminatory treatment of WNT players.  (SUF No. 55–57.)

Such unabashed discriminatory statements are direct evidence of the required showing of discriminatory intent.  *See Metoyer v. Chassman*, 504 F.3d 919, 937–38 (9th Cir. 2007) (holding that remarks by members of senior management, such as "[t]here are no people of color on senior staff, and it's very unlikely that there will be," constitute such direct evidence); *Sischo–Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991) (direct evidence of sex stereotyping where employee referred to female plaintiff as "an old warhorse" and to her students as "little old ladies"), *superseded on other grounds by statute*.  The same is true in Title VII cases involving equal pay claims.  *See, e.g.*, *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 329 (1st Cir. 1994) (finding that statements like "[Plaintiff] wouldn't be worth as much as the men would be to the bank" and "[Plaintiff] would be paid less because she was a woman" "require[d] no additional inference to conclude that [Plaintiff] was wrongfully treated because of her sex").

Because Plaintiffs have come forward with direct evidence of USSF's discriminatory animus from the statements of their most senior representatives, Plaintiffs have met their burden to show discrimination under Title VII and there is no need to consider whether the WNT and MNT players are similarly situated.  Thus, the Court should move directly to the question of whether USSF has met its burden to establish that any of its affirmative defenses justified the discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (instructing that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination"); *Samuels v. We've Only Just Begun Wedding Chapel, Inc.*, 154 F. Supp. 3d 1087, 1094 (D. Nev. 2015).  As set forth in Section IV.B.1 above and in Section IV.B.3 below, USSF has failed to meet its burden of proof to establish any affirmative defense, and this is another reason summary judgment should be granted.

### 2. Plaintiffs Also Have Established Indirect Evidence of USSF's Sex-Based Compensation Discrimination

Plaintiffs have further established indirect evidence of sex-based compensation discrimination by USSF because the undisputed evidence shows that USSF paid the WNT players at a rate less than the MNT players, despite the WNT and MNT players being similarly situated. *See supra*, Section IV.A. Because Plaintiffs have demonstrated that there is no genuine issue of fact that the WNT performs "equal work" as the MNT under the EPA, they have also shown that their jobs are "similar" under the Title VII framework, and nothing more is required to prove compensation discrimination. *See Lewis v. Smith*, 255 F. Supp. 2d 1054, 1060 (D. Ariz. 2003) (because "Title VII contains a broader prohibition on discriminatory wages than that mandated by the Equal Pay Act," "Plaintiff does not need to show substantial equality to pursue a Title VII claim."); *see also* 29 CFR § 1620.27 ("[i]n situations where the jurisdictional prerequisites of both the EPA and title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq*., are satisfied, any violation of the Equal Pay Act is also a violation of title VII.").

### 3. Plaintiffs Are Entitled to Summary Judgment on USSF's Affirmative Defenses to their Title VII Claim

Under Title VII, a defendant may attempt to justify a disparity in pay using the same affirmative defenses available under the EPA. As set forth above, however, USSF has failed to raise a genuine issue of material fact in support of any of its affirmative defenses in this case. *See supra*, Section IV.A.4.

Furthermore, just as there is no authority holding that collective bargaining provides a defense to EPA claims, collective bargaining agreements or their corresponding negotiations do not provide a defense to a Title VII claim where the agreement provides for facially discriminatory pay disparities. To the contrary, for decades, the Supreme Court has held that employers cannot use collective bargaining agreements to evade the anti-discrimination laws like Title VII. *See, e.g.*, *Alexander v.*

*Gardner-Denver Co.*, 415 U.S. 36, 51–52 (1974) ("[W]e think it clear that there can be no prospective waiver of an employee's rights under Title VII … Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices.  Of necessity, the rights conferred can form no part of the collective bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII.  In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver."); *UMWA Health & Ret. Fund v. Robinson*, 455 U.S. 562, 575 (1982) ("The terms of any collective bargaining agreement must comply with federal laws that prohibit discrimination on grounds of race, color, religion, sex or national origin; that protect veterans; that regulate certain industries; and that preserve our competitive economy.") (citations omitted).[14]

Finally, there are no facts to support USSF's statute of limitations defense to Plaintiffs' Title VII claim because the EEOC charge was timely filed within 300 days of the discriminatory pay decision on April 6, 2016, and the Complaint was timely filed within 90 days of Plaintiffs' receipt of their Right to Sue letters.  *See supra*, Section II.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion for partial summary judgment on liability with respect to the classes' Equal Pay Act and Title VII claims.  In the alternative, Plaintiffs request that the Court grant this motion with respect to any of the individual elements of their EPA and Title VII claims, and with respect to USSF's affirmative defenses, that the Court finds appropriate for summary adjudication in order to streamline the issues to be determined by the jury at trial.

---

[14] USSF also has asserted that "Plaintiffs' claims arising under Title VII are barred to the extent that Plaintiffs failed to exhaust their administrative remedies."  Dkt. No. 42 at 17 (Fifth Affirmative Defense).  During the parties' meet and confer, USSF clarified that it is pursuing this affirmative defense only as to Plaintiffs' Title VII working conditions claims.  While even that defense lacks any merit, it is irrelevant to Plaintiffs' instant motion relating solely to their compensation-related Title VII claims.

Dated:  February 20, 2020                    WINSTON & STRAWN LLP

                                             By:  */s/ Jeffrey L. Kessler*
                                                  Jeffrey L. Kessler

                                                  Attorneys for Plaintiffs