Ellen E. McLaughlin (Pro Hac Vice)
E-mail: emclaughlin@seyfarth.com
Noah Finkel (Pro Hac Vice)
E-mail: nfinkel@seyfarth.com
Brian Stolzenbach (Pro Hac Vice)
E-mail: bstolzenbach@seyfarth.com
Sharilee Smentek (Pro Hac Vice)
E-mail: ssmentek@seyfarth.com
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:   (312) 460-5000
Facsimile:    (312) 460-7000

Kristen M. Peters (SBN 252296)
E-mail: kmpeters@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:    (310) 201-5219

Chantelle C. Egan (SBN 257938)
cegan@seyfarth.com
Giovanna A. Ferrari (SBN 229871)
gferrari@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:    (415) 397-8549

Kyllan Kershaw (Pro Hac Vice)
kkershaw@seyfarth.com
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309
Telephone:  (404) 885-1500
Facsimile:   (404) 892-7056

Counsel for Defendant
U.S. SOCCER FEDERATION, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX MORGAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. SOCCER FEDERATION, INC.,<br><br>Defendant. | Case No. 2:19-cv-01717-RGK-AGR<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:        Hon. R. Gary Klausner<br>Hearing:     March 30, 2020 at 9:00 a.m. |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................... 1

II.     U.S. SOCCER HAS NOT ENGAGED IN PAY DISCRIMINATION. ................... 5

        A.   Plaintiffs Have Not Been Paid Lower Wages Than MNT Players. ................ 5

        B.   Plaintiffs Do Not Work in the Same Establishment as the MNT. .................. 9

        C.   Plaintiffs and MNT Players Do Not Perform Equal Work on Jobs Requiring Equal Skill, Effort, and Responsibility Under Similar Working Conditions. ................................................................... 10

        D.   Any Pay Differential Results From Factors Other Than Sex. ...................... 14

             1.   Plaintiffs' Pay Resulted from Compromises in Bargaining. ................ 15

             2.   Revenue Differentials Are a Legitimate Factor Other than Sex............ 20

III.    PLAINTIFFS' TITLE VII CLAIMS RELATED TO ARTIFICIAL TURF AND AIR TRAVEL ALSO SHOULD BE DISMISSED. ...................................... 22

        A.   Plaintiffs Failed To Exhaust Their Administrative Remedies. ..................... 22

        B.   Plaintiffs Cannot Point To Any Evidence of Sex Discrimination. .............. 22

IV.     CONCLUSION ..................................................................................... 24

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*A.H. Phillips, Inc. v. Walling*,
324 U.S. 490 (1945) ................................................................................. 10

*AFSCME v. State of Washington*,
770 F.2d 1401 (9th Cir. 1985) ................................................................. 11

*Bartges v. UNC Charlotte*,
908 F. Supp. 1312 (W.D.N.C.), *aff'd*, 94 F.3d 641 (4th Cir. 1996) .......... 20

*Bence v. Detroit Health Corp.*,
712 F.2d 1024 (6th Cir. 1983) ................................................................... 9

*Bertotti v. Philbeck, Inc.*,
827 F. Supp. 1005 (S.D. Ga. 1993) ............................................................ 8

*Byrd v. Ronayne*,
61 F.3d 1026 (1st Cir. 1995) .................................................................... 20

*Diamond v. T. Rowe Price Assocs., Inc.*,
852 F. Supp. 372 (D. Md. 1994) ............................................................. 15

*Ebbert v. Nassau Cnty.*,
No. 05-CV-5445 (FB)(AKT), 2009 WL 935812 (E.D.N.Y. Mar. 31,
2009) ........................................................................................................... 9

*EEOC v. Kettler Bros. Inc.*,
846 F.2d 70, 1988 WL 41053 (4th Cir. 1988) (unpub.) ............................. 9

*Foster v. Arcata Assocs., Inc.*,
772 F.2d 1453 (9th Cir. 1985) ................................................................. 10

*Freeman v. Oakland Unified Sch. Dist.*,
291 F.3d 632 (9th Cir. 2002) ................................................................... 22

*Gallagher v. Kleinwort Benson Gov't Sec., Inc.*,
698 F. Supp. 1401 (N.D. Ill. 1988) ............................................................ 8

*Griffin v. Boeing Co.*,
678 F. App'x 588 (9th Cir. 2017) ............................................................... 9

*Grosz v. Boeing Co.*,
455 F. Supp. 2d 1033 (C.D. Cal. 2006) ................................................ 9, 15

*Hawn v. Exec. Jet Mgmt., Inc.*,
615 F.3d 1151 (9th Cir. 2010) ............................................................ 22, 23

*Hodgson v. Robert Hall Clothiers*,
473 F.2d 589 (3rd Cir. 1973) ................................................................... 20

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

*Huebner v. ESEC, Inc.*,
  No. CV 01-0157-PHX-PGR, 2003 U.S. Dist. LEXIS 28289 (D. Ariz.
  March 26, 2003) ....................................................................................................... 8

*Kob v. Cty. of Marin*,
  425 F. App'x 634 (9th Cir. 2011) ......................................................................... 12

*Lemons v. City & Cty. of Denver*,
  620 F.2d 228 (10th Cir. 1980) .............................................................................. 11

*Marting v. Crawford & Co.*,
  203 F. Supp. 2d 958 (N.D. Ill. 2002) ..................................................................... 8

*Maxwell v. City of Tuscon*,
  803 F.2d 444 (9th Cir. 1986) .................................................................................. 5

*Mitchell v. Developers Diversified Realty Corp.*,
  No. 4:09-CV-224, 2010 WL 3855547 (E.D. Tex. Sept. 8, 2010) ............................ 9

*Perkins v. Rock-Tenn Servs., Inc.*,
  700 F. App'x 452 (6th Cir. 2017) ......................................................................... 15

*Renstrom v. Nash Finch Co.*,
  787 F. Supp. 2d 961 (D. Minn. 2011) ................................................................... 10

*Ruffin v. Los Angeles Cty.*,
  607 F.2d 1276 (9th Cir. 1979) .............................................................................. 13

*Sims-Fingers v. City of Indianapolis*,
  493 F.3d 768 (7th Cir. 2007) ......................................................................... 11, 14

*Spaulding v. Univ. of Washington*,
  740 F.2d 686 (9th Cir. 1984) ................................................................................ 12

*Spencer v. Virginia State Univ.*,
  919 F.3d 199 (4th Cir. 2019) ................................................................................ 11

*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) ................................................................................ 13

*Vasquez v. Cty. of Los Angeles*,
  349 F.3d 634 (9th Cir. 2003), *as amended* (Jan. 2, 2004) ........................................ 24

*Weaver v. Ohio State University*,
  71 F. Supp. 2d 789 (S.D. Ohio 1998), *aff'd*, 191 F.3d 1315 (6th Cir.
  1999) ...................................................................................................................... 13

*Wheatley v. Wicomico Cty., Maryland*,
  390 F.3d 328 (4th Cir. 2004) ................................................................................ 13

**Federal Statutes**

29 U.S.C. § 158(d) .................................................................................................. 16

29 U.S.C. § 159(a) .................................................................................................. 16

iii

29 U.S.C. § 206(d) ............................................................................................... 7

29 U.S.C. § 206(d)(1) ....................................................................................... 5, 9

42 U.S.C. § 2000e-2(a)(1) .................................................................................. 22

42 U.S.C. § 2000e-2(a)(2) .................................................................................. 13

42 U.S.C. § 2000e-2(h) ........................................................................................ 5

**Regulations**

29 C.F.R. § 531.40(c) ....................................................................................... 6, 8

29 C.F.R. § 1620.10 .......................................................................................... 6, 8

29 C.F.R. § 1620.12 ............................................................................................. 7

# I.    INTRODUCTION

U.S. Soccer is aware of the public narrative surrounding this lawsuit, but the undisputed facts tell a much different story, and the Court sits to render judgment based on the actual facts in the record and the governing law. On those grounds, the Court should grant summary judgment for U.S. Soccer and dismiss this lawsuit in its entirety.

U.S. Soccer is proud to be associated with the players on its Senior Women's National Team (WNT), of the success they have achieved, and of its own role in championing women's soccer within the United States and on the world stage. As Plaintiff Megan Rapinoe acknowledges, U.S. Soccer "deserves a tremendous amount of credit" for "back[ing] the team in a very strong way" and "push[ing] the game . . . in our country [and] around the world." (Rapinoe Ex. 32.) One way U.S. Soccer supports the WNT is by providing its players with substantial compensation and other valuable benefits. This compensation and benefits package is determined through the collective bargaining process, during which the players are represented by the Women's National Team Players Association (WNTPA), a union the players organized to represent themselves (and only themselves). (King Dec. ¶ 12-14, Ex. 3-4.) During the contract negotiations relevant to this case, the WNTPA consistently demanded a very different collective bargaining agreement from the one covering players on the Senior Men's National Team (MNT) (which is negotiated by a different union representing only the MNT players). (Gulati Dec. ¶ 66, 68, 73, Ex. 14, 15; Langel Dep. 71-77, 163-64, 188-89, 201-02, Ex. 14, 21, 25; King Dec. ¶ 7-8, 17, 23-24, 33, 38-40, 43, Ex. 1, 6, 8, 10, 13-15, 17.) As a result of the collective bargaining process, the WNT players obtained many contract terms the MNT players do ***not*** enjoy in their contract. (King Dec. Ex. 1, 3-5.) Among other things, this includes six-figure salaries paid to WNT players independent of whether they actually play, including guaranteed salary continuation during periods of injury; free medical insurance; paid child care assistance; paid pregnancy and parental leave; severance benefits; access to a retirement plan; three "partnership" bonuses (tied to television ratings, sponsorship revenue, and ticket sales); more than $1 million annually

1

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

to cover players' salaries while playing in the National Women's Soccer League (NWSL); a $230,000 signing bonus paid directly to 23 players; and an annual $350,000 payment to the union in exchange for certain rights to use the players' likenesses. (King Ex. 1, Ex. 5 at 5, 14-15, 19, 23-24, 29-35.)

The end result is this: U.S. Soccer paid the WNT far more than the MNT over the past five calendar years. Between the beginning of 2015 (the year encompassing the start of the Title VII class period) and the end of 2019, U.S. Soccer paid the WNT players and their union more than **$37 million**. (Irwin Dec. Ex. 1 at 13.) The corresponding figure for the MNT is just north of **$21 million**. (*Id.*) Even setting aside (i) all the money paid to players in the form of NWSL salaries and bonuses and (ii) all the money the players have directed to their union instead of themselves, U.S. Soccer still has paid the WNT **$6 million more** than the MNT over that same period. (*Id.* at 17.) Even controlling for the number of games each team has played, U.S. Soccer still has paid the WNT more than the MNT on a per-game basis. (*Id.* at 17-21.)

Plaintiffs nevertheless claim that U.S. Soccer has engaged in sex-based pay discrimination against them. They contend that if a few provisions in their last two collective bargaining agreements had been different, and had matched certain provisions in the MNT's collective bargaining agreement, then they would have been paid even more money over the last five years. This is neither evidence of sex discrimination nor consistent with the way collective bargaining is designed by federal labor law to work. The WNTPA never asked U.S. Soccer for terms identical to those found in the MNT's contract; instead, the union asked for a very different contract containing valuable terms not found in the MNT's agreement. (Gulati Dec. ¶ 66, 68, 73, Ex. 14, 15; Langel Dep. 71-77, 163-64, 188-89, 201-02, Ex. 14, 21, 25; King Dec. ¶ 7-8, 17, 23-24, 33, 38-40, 43, Ex. 1, 6, 8, 10, 13-15, 17.) U.S. Soccer responded by bargaining with the union, the parties each made compromises, and the two sides ended up with a deal, just as the federal labor laws envision. (King Dec. Ex. 4-5, 11, 12, 14-18; Langel Ex. 15, 19-21, 23; Gulati Dec. Ex. 15; Rapinoe Dep. 223.)

2

While the two deals are different, neither is better than the other. In simplest terms, the MNT has a high-risk, high-reward agreement whereas the WNTPA negotiated for a deal more heavily focused on stability and security for the players it represents. It would contravene the law to let a jury retroactively and selectively rewrite Plaintiffs' collective bargaining agreement to give them the benefit of the high reward (while also keeping all the other unique advantages of their agreement) when they never took the higher risk.

In any case, the law does not guarantee identical pay to men and women who perform different work in different jobs. Plaintiffs would have the Court conclude that soccer is soccer, so their jobs and the MNT players' jobs must be the same, but even Plaintiffs do not believe this. As Plaintiff Kelley O'Hara admits, it is not sex discrimination for U.S. Soccer *to pay her more* than it pays men who compete in the Olympics "because it's a completely different tournament for the men and the women." (O'Hara Dep. 113-14.) Similarly, when asked if it is fair for U.S. Soccer *to pay her more* than it pays members of the men's national team that competed in the Paralympics, she simply answered that she "would encourage them to bargain differently." (*Id.* at. 177-78.)

In direct contravention of these very same principles, Plaintiffs ask the Court to conclude that U.S. Soccer is required to pay them the same amount of money for winning the Women's World Cup that the MNT would have been paid if they had won the World Cup for men. The undisputed facts, however, show that the two events are "completely different tournaments" and that U.S. Soccer legitimately "bargained differently" to determine the compensation for players competing in these two different competitions. The qualifying process for the men's tournament requires three times as many games and requires the MNT to travel to Mexico, Central America, and the Caribbean over the course of several months, whereas the WNT participates in a two-week qualifying tournament entirely on home turf. (Gulati Dec. ¶ 56-61.) Upon qualification, there are 25% more teams in the men's tournament, over a *billion* more people watch it on television, and there is a vast difference in the potential prize money the tournament organizer (FIFA) pays to participants in the two different tournaments. (Gulati Dec. ¶ 21-

3

22, Ex. 1-12.) If the MNT had won the 2018 World Cup, U.S. Soccer would have received $38 million in prize money from FIFA, from which to pay the MNT their contractually-negotiated bonuses. (Gulati Dec. ¶ 54.) In contrast, FIFA paid U.S. Soccer $6 million, combined, in total prize money for the WNT's two victories in the 2015 and 2019 Women's World Cups. (Gulati Dec.¶ 53, 55, Ex. 11-12.) Most fundamentally, these are two separate sports teams who play against entirely different sets of opponents in different competitions, (Gulati Dec. ¶ 19-20, 23-43), and no one contends that Plaintiffs would have achieved the same success had they been required to compete in the MNT's world. The law does not ensure equal pay between men and women who perform such different jobs. To hold otherwise would be to adopt the "comparable worth" theory flatly rejected by the courts, including the Ninth Circuit. Plaintiffs did not win the men's World Cup, and the law does not require U.S. Soccer to pay them as though they did.

U.S. Soccer did nothing wrong by agreeing with two different unions to two very different pay structures for the two different teams to recognize their different situations, their different demands in bargaining, and the large differential in potential revenue streams generated by the two teams' separate competitions. The law makes this clear, and to hold otherwise would interfere with U.S. Soccer's obligation to engage in the give-and-take of good-faith bargaining required by federal labor law while honoring the players' choice to organize into two separate unions representing the unique interests of each set of players. In fact, accepting Plaintiffs' legal argument essentially would require U.S. Soccer to insist on identical contracts with the two unions—a notion fundamentally inconsistent with its duty to bargain in good faith with each union independently.

U.S. Soccer also did nothing wrong by making independent decisions about the venues for the two teams' games and the means of team travel to reach those venues. The WNT has not played a game on artificial turf for more than two years, and they have consistently used charter flights for team travel since the fall of 2018, but they complain about having to play on artificial turf more often and having to fly on commercial airlines more often than the MNT during a discrete period of time in the past. These claims

1    should be dismissed because Plaintiffs failed to exhaust their administrative remedies on

2    those issues, but regardless, there is no evidence that U.S. Soccer made its decisions

3    about venues and air travel *because of Plaintiffs' sex*. Rather, the two teams are different

4    in many ways other than sex, and it is these other differences, including differences in

5    schedules and playing locations, that drove U.S. Soccer's choices in terms of venue

6    selection and method of travel; therefore, U.S. Soccer is entitled to summary judgment.

7    ## II.    U.S. SOCCER HAS NOT ENGAGED IN PAY DISCRIMINATION.

8         Plaintiffs cannot establish sex-based pay discrimination under the Equal Pay Act

9    (EPA) or Title VII. In the Complaint, Plaintiffs contend that U.S. Soccer has

10   discriminated against them in violation of both statutes by "paying them less than

11   members of the MNT for substantially equal work." (Dkt. 1 ¶ 4.) In such circumstances,

12   courts evaluate the claims under both statutes using the EPA's statutory framework.

13   *Maxwell v. City of Tuscon*, 803 F.2d 444, 446 (9th Cir. 1986) ("When a Title VII

14   claimant contends that she has been denied equal pay for substantially equal work, as

15   here, Equal Pay Act standards apply."). Specifically, Plaintiffs must prove that U.S.

16   Soccer paid them less than MNT players and also prove that they and the players on the

17   MNT perform equal work in jobs requiring equal skill, effort, and responsibility under

18   similar working conditions within the same establishment. 29 U.S.C. § 206(d)(1). Even if

19   Plaintiffs could prove all this, which they cannot, U.S. Soccer still would prevail by

20   showing that any pay differential results from a "factor other than sex." 29 U.S.C.

21   § 206(d)(1); 42 U.S.C. § 2000e-2(h). U.S. Soccer is entitled to summary judgment

22   because: (i) it did not pay the MNT more than the WNT; (ii) Plaintiffs do not work in the

23   same establishment as the MNT; (iii) Plaintiffs and the MNT do not perform equal work

24   requiring equal skill, effort, and responsibility under similar working conditions; and (iv)

25   any pay differential is based on factors other than sex.

26   ### A.    Plaintiffs Have Not Been Paid Lower Wages Than MNT Players.

27        Over the last five complete calendar years (dating back to the beginning of the

28   calendar year encompassing the Title VII class period), U.S. Soccer has paid the four

5

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

Class Representatives more than *$1 million* each.[1] (Irwin Dec. Ex. 1 at 18.) During that same five-year period, the highest-paid MNT player earned less than *$650,000*. (*Id.* at 19.) In fact, between 2015 and 2019, U.S. Soccer paid *$16 million more* to the WNT players and their union than it paid to the MNT players and their union. (*Id.* at 14.) Even setting aside all the money paid to the teams' respective unions and all the money paid to WNT players as "NWSL salary" and NWSL playoff bonuses, U.S. Soccer still paid the WNT players *$6 million more* than it has paid the MNT players. (*Id.* at 16.) These facts alone should result in the dismissal of Plaintiffs' pay discrimination claims.

Plaintiffs, however, contend that these facts should be ignored because, they allege, U.S. Soccer pays WNT players less than MNT players "on a per game basis." (Dkt. 1 ¶ 64.) Along these lines, Plaintiffs have argued that an employer may not pay a man twice as much per hour to do the same job as a woman, just because the woman earns more money overall by working twice as much, (Dkt. 70 at 2, 4), but the undisputed facts show that this is not the situation before the Court. As discussed in Section II.C., *infra*, Plaintiffs and the MNT players have very different jobs, but beyond that, the undisputed facts demonstrate that *U.S. Soccer has paid the WNT more than the MNT on a per game basis, as well*. (Irwin Dec. Ex. 1 at 16-21.)

---

[1] Each Class Representative earned more than $1 million, regardless of whether or not one includes (i) the value of benefits such as free medical insurance, (ii) the value of salaries and bonuses paid to WNT players by U.S. Soccer in connection with their play in the NWSL, or (iii) any of the money U.S. Soccer paid the WNTPA. (Irwin Dec. Ex. 1 at 18-21.) In reality, all this should be included when calculating Plaintiffs' wages under relevant law. 29 C.F.R. § 1620.10 ("'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment") (brackets in original regulation). It is undisputed that all the money U.S. Soccer pays to Plaintiffs as "NWSL salary" or NWSL playoff bonuses is paid to them as remuneration for their employment with U.S. Soccer, and the payments U.S. Soccer makes to the WNTPA are no less Plaintiffs' wages than more traditional union dues withheld from an employee's paycheck and sent directly to their union. 29 C.F.R. § 531.40(c) (union dues paid by employer directly to a union are properly considered wages under the Fair Labor Standards Act).

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Given these facts, Plaintiffs undoubtedly will shift the focus away from their "per game" theory and instead rely entirely on the argument that they would have earned more money than they actually did, if only they had been covered by the MNT's collective bargaining agreement. This argument, however, is contrary to law and should be rejected based on the undisputed facts of this case. The law addresses an employer who pays an employee of one sex "at a rate less than the rate [it] pays wages to employees of the opposite sex." 29 U.S.C. § 206(d). "The term wage 'rate' . . . refers to *the standard or measure by which an employee's wage is determined*." 29 C.F.R. § 1620.12 (emphasis added). Although Plaintiffs seek to compare themselves to a woman who earns $10 per hour while her male counterpart earns $20 per hour, (Dkt. 70 at 2), the compensation structures of the WNT and the MNT cannot be compared this way because they are fundamentally different, as a result of separate collective bargaining by each team.

U.S. Soccer pays fixed salaries to the Class Representatives and other WNT players, independent of how often they play for the team (even when they do not play at all), and it also pays the players certain bonuses for succeeding in various competitions. (King Dec. Ex. 5 at 14-15, 19, 23-24.) MNT players, in contrast, receive a series of varying flat fees and performance bonuses, if and only when they actually play soccer for the team. (King Dec. Ex. 1 at Ex. A.) This important difference exists regardless of why players on either team end up missing games (e.g., injury, coach's decision, or personal reasons). (King Dec. Ex. 1 at Ex. A, Ex. 5 at 14-15, 19, 23-24.) The WNTPA also negotiated a signing bonus that U.S. Soccer paid directly to the WNT players in 2017, something MNT players did not receive. (King Dec. ¶ 8.)

In addition, U.S. Soccer provides health insurance benefits to the Class Representatives and other WNT players and pays them salaries and playoff bonuses associated with their play in the NWSL. (King Dec. Ex. 4, 5.) The NWSL salaries and bonuses are paid to WNT players in their capacity as U.S. Soccer employees, and this is required by the same collective bargaining agreement establishing all their other compensation from U.S. Soccer. (*Id.*) Moreover, U.S. Soccer has always agreed that

7

Plaintiffs' "WNT salaries" would automatically increase (up to 50%) if the NWSL ceases to exist. (*Id.*) MNT players receive none of these things from U.S. Soccer.[2] (King Dec. ¶ 8, Ex. 1.)

Furthermore, WNT players and MNT players receive their compensation for doing different work. Even setting aside their compensation for play in the NWSL, during the class period WNT players have been compensated for playing in friendly games, the Olympics and its associated qualifying tournament, two FIFA Women's World Cups, and one World Cup qualifying tournament. (Gulati Dec. ¶ 23, 30, 33, 41-42; King Dec. Ex. 18.) During the same time, MNT players have been compensated for playing in friendly games, one FIFA World Cup qualifying tournament, three Gold Cups, the CONCACAF Cup, the Concacaf Nations League, and Copa America Centenario. (Gulati Dec. ¶ 24-28, 31-32, 34-35, 40; King Dec. Ex. 19.)

Given the two teams' fundamentally different pay structures, which apply to different competitions, the two teams do not have a parallel standard or measure of pay (i.e., "wage rate") that can be directly compared for purposes of the anti-discrimination laws, so the Court must look at their comparative total compensation. *Huebner v. ESEC, Inc.*, No. CV 01-0157-PHX-PGR, 2003 U.S. Dist. LEXIS 28289, *7-8 (D. Ariz. March 26, 2003) (plaintiff could not establish pay discrimination because "her total compensation for the relevant time period was greater than that of any male"); *Marting v. Crawford & Co.*, 203 F. Supp. 2d 958, 996 (N.D. Ill. 2002) (plaintiff could not establish pay discrimination even though her base salary was lower than her male comparator because her total compensation was higher); *Bertotti v. Philbeck, Inc.*, 827 F. Supp. 1005, 1009-10 (S.D. Ga. 1993) (comparing total compensation paid to plaintiff and male comparator and concluding: "Bertotti's actual wages received were, therefore, greater than either comparator, and her EPA claim must fail"); *Gallagher v. Kleinwort Benson Gov't Sec.,*

---

[2] Again, this is to say nothing of all the money U.S. Soccer has paid to the WNTPA oer the past five years, which also constitute Plaintiffs' "wages." 29 C.F.R. § 1620.10; 29 C.F.R. § 531.40(c).

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

*Inc.*, 698 F. Supp. 1401, 1404 (N.D. Ill. 1988) (female trader at securities firm could not sue over her lower base salary because her total compensation was higher than any male comparator); *Mitchell v. Developers Diversified Realty Corp.*, No. 4:09-CV-224, 2010 WL 3855547, *5 (E.D. Tex. Sept. 8, 2010) (the EPA "requires that Plaintiff receive total compensation at least equal to male employees with equal performance").[3]

Because Plaintiffs and their alleged comparators (the MNT) receive compensation that includes different components for different work that do not correlate to a common denominator, the law requires the Court to compare their total compensation for purposes of determining whether Plaintiffs can clear the most basic hurdle in a pay discrimination lawsuit—showing that they are paid less than male employees. U.S. Soccer has paid the WNT more than the MNT in both total compensation and on a per-game basis, (Irwin Dec. Ex. 1 at 13-21), and this fact alone is fatal to Plaintiffs' pay discrimination claims.

### B.   Plaintiffs Do Not Work in the Same Establishment as the MNT.

The EPA applies only to employees working in the same "establishment," 29 U.S.C. § 206(d)(1), and while Title VII does not contain the same language, it is well established that discrimination generally may be inferred only from disparate treatment of similarly-situated individuals. *See Griffin v. Boeing Co.*, 678 F. App'x 588, 589 (9th Cir. 2017) (a motion for summary judgment hinges on the relative treatment of similarly situated employees of different genders). In this regard, a materially distinguishing factor between Plaintiffs and MNT players for Title VII purposes, as well as EPA purposes, is the separation of their workplaces. *Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033, 1041 (C.D. Cal. 2006) (employees' locations of business are material facts when determining whether male and female employees are similarly situated). Because Plaintiffs and the MNT work in separate establishments, U.S. Soccer is entitled to summary judgment.

---

[3] On the facts presented here, cases such as *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1027-28 (6th Cir. 1983), *EEOC v. Kettler Bros. Inc.*, 846 F.2d 70, 1988 WL 41053, *3 (4th Cir. 1988) (unpub.), and *Ebbert v. Nassau Cnty.*, No. 05-CV-5445 (FB)(AKT), 2009 WL 935812, *2-3 (E.D.N.Y. Mar. 31, 2009), ultimately cannot aid Plaintiffs.

9

The term "establishment" refers to a "distinct physical place of business as opposed to an entire business or enterprise." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945). On rare occasions, courts have expanded the term to encompass multiple physical locations, but they "have consistently rejected the extension of the statutory establishment requirement to separate offices of an employer that are geographically and operationally distinct." *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1464 (9th Cir. 1985).

The undisputed facts show that the WNT and MNT are both geographically and operationally distinct. They play in different venues in different cities (and often different countries), competing in separate competitions against completely different pools of opponents. (King Dec. Ex. 18-21.) The day-to-day functions of the team are overseen by separate Head Coaches, coaching staffs, and Team Administrators. (King Dec. ¶ 3-4.) The Head Coach of each team determines who plays on the team, and (obviously) the players do not interchange between the teams or play with each other. (King Dec. ¶ 3; Gulati Dec. ¶ 62.) Plaintiffs cannot counteract all these facts merely by noting that their compensation was set by a common decision-maker. *See Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961, 965 (D. Minn. 2011) (fact that same person determined plaintiff's and alleged comparator's compensation could not overcome "the ordinary and well settled rule that physically distinct locations are different establishments for purposes of the EPA"; otherwise, "just about any corporation with a hierarchical management structure and a functioning human-resources department would find itself defined as a single establishment") (internal quotations omitted). Because Plaintiffs and MNT players work in physically separate, operationally distinct workplaces, the Court should enter summary judgment for U.S. Soccer on Plaintiffs' pay discrimination claims.

**C.      Plaintiffs and MNT Players Do Not Perform Equal Work on Jobs Requiring Equal Skill, Effort, and Responsibility Under Similar Working Conditions.**

Comparing the MNT and WNT, Plaintiff Rapinoe acknowledged: "Our pay structure is different. We play different games. We're different rankings in the world. Like, it's just

10

apples and oranges." (Rapinoe Ex. 29.) Indeed it is, and this is one reason why it is lawful to pay the two teams differently. Plaintiffs argue that the law requires U.S. Soccer to pay them the same amount of money it would have paid the MNT if the MNT had won two FIFA World Cups and 80% of its friendlies against the most elite male soccer players in the world (a feat neither the MNT nor the WNT has achieved). (King Dec. Ex. 18, 19.) At the same time, Plaintiffs do not argue that they must give up their pay for the Olympics, even though U.S. Soccer does not pay its male athletes for Olympic competition. (King Dec. ¶ 10-11.) There is no precedent for what Plaintiffs are seeking, for it is not the law. The WNT and the MNT play in fundamentally different worlds, and the WNT has been paid more than the MNT based on the results of their own contract negotiations and their own on-field play within their own separate realm of competition. Meanwhile, Plaintiffs do not contend that they would have had the same on-field success if they had played in the MNT's world instead of their own. U.S. Soccer is entitled to summary judgment because the WNT and the MNT perform substantially different work.

Title VII and the EPA are not "comparable worth" statutes. *AFSCME v. State of Washington*, 770 F.2d 1401, 1404 (9th Cir. 1985) (rejecting comparable worth theory under Title VII); *Spencer v. Virginia State Univ.*, 919 F.3d 199, 204 (4th Cir. 2019) (EPA "does not provide courts with a way of evaluating whether distinct work might have 'comparable' value to the work the plaintiff performed"); *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir. 2007) ("comparable pay" for "comparable worth" is not a cognizable theory under Title VII); *Lemons v. City & Cty. of Denver*, 620 F.2d 228, 229 (10th Cir. 1980) (rejecting "comparable worth" theory and holding that an employer may set compensation differently across genuinely different work classifications in good faith). "The comparable worth theory . . . postulates that sex-based wage discrimination exists if employees in job classifications occupied primarily by women are paid less than employees in job classifications filled primarily by men, if the jobs are of equal value to the employer, though otherwise dissimilar." *AFSCME*, 770 F.2d at 1404. Because the undisputed facts show that the MNT and WNT perform

11

1  substantially different work, Plaintiffs are effectively presenting the Court with a

2  "comparable worth" argument that has long been rejected by the Ninth Circuit and other

3  circuits as inconsistent with the governing statutes Congress has passed.

4      The Ninth Circuit instructs that courts must analyze "[a]ctual job performance and

5  content, rather than job descriptions, titles or classifications," to determine if the

6  performance requires equal skill, effort, and responsibility. *Spaulding v. Univ. of*

7  *Washington*, 740 F.2d 686, 699 (9th Cir. 1984) (female faculty members did not perform

8  work substantially equal to male faculty). Consequently, Plaintiffs' *prima facie* case

9  cannot rest on the fact that the WNT and MNT are both the senior level national teams in

10 their respective spheres of competition. *Kob v. Cty. of Marin*, 425 F. App'x 634, 635 (9th

11 Cir. 2011) ("The mere fact that the two positions may be at the same level in the

12 organizational hierarchy is not sufficient to make out an Equal Pay Act claim.")

13     The WNT and MNT play in completely separate universes of international

14 competition. During the class period, the WNT has competed in friendlies, the Olympics,

15 and the FIFA Women's World Cup against other senior women's national teams, and all

16 those matches took place in Europe, Brazil, Canada, and the United States. (King Dec.

17 Ex. 18, 20.) By contrast, the MNT has competed in the FIFA World Cup qualifying

18 process, three Gold Cups, the CONCACAF Cup, the Concacaf Nations League, Copa

19 America Centenario, and friendlies against different teams than the WNT faces, and the

20 team played those games in Mexico, Central America, and the Caribbean, in addition to

21 Europe, Canada, and the United States. (King Dec. Ex. 19, 21.) Not only do they play

22 against different opponents in different competitions in different locations, but the FIFA

23 World Cup is considered to be the most watched sporting event in the world, with over a

24 billion more people watching it than the FIFA Women's World Cup. (Gulati Dec. ¶21-

25 22, Ex. 2-7.) Meanwhile, the MNT's participation in the FIFA World Cup has the

26 potential to generate tens of millions more in prize money revenue for U.S. Soccer than

27 the WNT's participation in the FIFA Women's World Cup. (Gulati Dec. ¶ 50-55, Ex. 7-

28 11.) This alone prevents the two jobs from being compared for pay discrimination

12

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

purposes. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1321-23 (9th Cir. 1994) ("We are also of the view that the relative amount of revenue generated should be considered in determining whether responsibilities and working conditions are substantially equal."); *Weaver v. Ohio State University*, 71 F. Supp. 2d 789, 800 (S.D. Ohio 1998) (plaintiff's coaching job was not equal to male coach's job because his sport was more popular and generated more revenue), *aff'd*, 191 F.3d 1315 (6th Cir. 1999). Additionally, the qualifying process for the men's tournament requires more games over a substantially longer period of time, 50% of the men's qualifying process occurs outside the United States (compared to the entirely domestic women's qualifying tournament), and 25% more teams qualify for the men's tournament. (Gulati Dec. ¶ 56-61.) In short, as a matter of undisputed fact, the two teams play in different worlds, which is not the province of the pay discrimination laws. *Wheatley v. Wicomico Cty., Maryland*, 390 F.3d 328, 333-34 (4th Cir. 2004) (even though directors employed at defendant bear the same type of job responsibilities, "on a day-to-day basis, they work in 'different world[s]'").

It must also be acknowledged that senior men's and women's international soccer require different levels of certain fundamental physical skills central to the game (e.g., speed and strength), which is why FIFA requires separate-sex teams in the first place, (Lloyd Ex. 15; Rapinoe Ex. 29; Gulati Dec. ¶ 62 ), and no one is arguing that this sex-based separation, which is designed to ensure women a fair opportunity to play and compete, is unlawful (which it would be in almost any other circumstance). 42 U.S.C. § 2000e-2(a)(2) (making it unlawful for an employer to "segregate . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's ... sex"). The Ninth Circuit has recognized that requirements for different physical skills matter when considering allegations of sex-based pay discrimination. In *Ruffin v. Los Angeles Cty.*, 607 F.2d 1276, 1278 (9th Cir. 1979), the court held that the different physical requirements of deputy sheriff and corrections officer positions and different upper age limits were some of the "uncontroverted factual differences" between the positions precluding the EPA from

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

applying. So too, here, the substantially different physical requirements of playing soccer for the WNT versus MNT—which Plaintiffs do not dispute—defeat Plaintiffs' claims that they are engaged in equal work requiring equal skill under the law. As Plaintiff Carli Lloyd concedes, "It's a different game" because "men are bigger, stronger, faster," and "[w]e often play against U[nder] 16 boys teams and that is about as old as we can go." (Lloyd Ex. 15.) Because of these physical differences, men are *prohibited* from playing in women's international competitions. (Gulati Dec. ¶ 62.) Given the different physical skills required to compete against the MNT's opponents, Plaintiffs' pay discrimination claim must fail. To ignore these real differences between the two jobs would be to analyze whether the jobs are "proportional" in "skill level," which the law does not permit. *Sims-Fingers*, 493 F.3d at 771-72.

The fact that playing for the MNT requires a different level of speed and strength, the fact that the WNT and MNT never play against the same opponents, and the fact that they play in a completely separate set of competitions are not merely technical differences. Rather, these undisputed facts go to the core of Plaintiffs' claim. This is not a case in which the employer paid women less than men for performing the same work. Rather, U.S. Soccer paid the WNT *more* than it paid the MNT, in total compensation and on a per-game basis, pursuant to a unique compensation structure negotiated with them in good faith to fit their particular circumstances. It would be improper as a matter of law to modify the parties' collective bargaining agreement to retroactively increase certain aspects of Plaintiffs' compensation to match the money a different team hypothetically could have earned for succeeding against different opponents in different competitions that generate significantly more revenue.

### D.   Any Pay Differential Results From Factors Other Than Sex.

Even if Plaintiffs could show that they were paid less than the MNT for performing equal work under the law, it is undisputed that Plaintiffs' compensation arrangement with U.S. Soccer is driven by at least two factors other than sex: (1) the various trade-offs negotiated by Plaintiffs in the course of collective bargaining and (2) the significant

differential in revenue-generation potential between the separate games in which the two teams play. U.S. Soccer is entitled to summary judgment based on these undisputed facts.

### 1. Plaintiffs' Pay Resulted from Compromises in Bargaining.

In the course of collective bargaining between the WNTPA and U.S. Soccer, the union insisted on a different pay structure from the one found in the MNT's collective bargaining agreement, and both parties made compromises in bargaining. As a result, the union obtained multiple compensation terms and other contract provisions that (i) do not appear in the MNT's agreement, (ii) are valuable to WNT players, and (iii) represent a clear monetary cost to U.S. Soccer. This negotiation process, which led to the WNT having a different overall compensation structure from the MNT, is a legitimate "factor other than sex" requiring the dismissal of Plaintiffs' pay discrimination claims.

"There is no question that the decisions made as a result of negotiations between union and employer are made for legitimate business purposes; thus, a wage differential resulting from status as a union member constitutes an acceptable 'factor other than sex' for purposes of the Equal Pay Act." *Perkins v. Rock-Tenn Servs., Inc.*, 700 F. App'x 452, 457 (6th Cir. 2017) (affirming summary judgment for employer); *Grosz*, 455 F. Supp. 2d at 1045 (plaintiff subject to a CBA cannot be compared to non-union employees with separate pay scales); *Diamond v. T. Rowe Price Assocs., Inc.*, 852 F. Supp. 372, 396 (D. Md. 1994) (employee who separately negotiated to be paid a salary with "little or no annual bonus" did not later have a pay discrimination claim when she did not receive incentive compensation that male employees received).

The same principle applies in this case, where Plaintiffs are, by their choice, the only employees represented by their union, the MNT is represented by a different union, and Plaintiffs' unique compensation structure results from a collective bargaining process during which Plaintiffs insisted on a different compensation structure than the one contained in the MNT's collective bargaining agreement. (Gulati Ex. 14; King Dec. Ex. 6, 8, 13; Langel Dep. 73-77; King Dec. ¶ 7, 12, 29-30.) To hold otherwise would be contrary to foundational principles of labor law, which permit employees to organize into

15

a bargaining unit of their own choosing (here, a separate unit for the WNT alone) and then require their employer to bargain with that union in good faith in an effort to reach an overall agreement covering wages, hours, and terms and conditions of employment for the employees in *that* bargaining unit. 29 U.S.C. §§ 158(d), 159(a). Allowing Plaintiffs to organize into a union exclusive unto themselves, to negotiate a comprehensive employment arrangement through that union, to thereby achieve various compensation terms and other terms more favorable than those enjoyed by the MNT players, and ***then*** to claim that any provisions less favorable than the MNT's contract constitute sex discrimination would upend federal labor law.

To be clear, during negotiations for the 2013-2016 collective bargaining agreement, the WNTPA never asked for the compensation terms it now wants the Court to impose on U.S. Soccer. (Gulati Dec. ¶ 73; Langel Dep. 71-73.) The union, however, did seek various contract terms not afforded to MNT players, such as: (1) fixed WNT salaries, to be paid regardless of how often the player plays; (2) an additional salary for playing in the women's professional league; (3) salary continuation during periods of injury; (4) severance benefits; (6) insurance benefits; and (7) childcare assistance. (King Dec. Ex. 1, 8.) The union achieved each of those objectives, and those terms remained in effect during 2015 and 2016, covering the first portion of the class period in this case. (Langel Dep. 73-77; King Dec. ¶ 14, Ex. 4.) The resulting inability to compare wage "rates" between the two teams, and any pay differential between them, is indisputably the result of the collective bargaining process, not sex discrimination.

Moreover, the 2013-2016 contract included the following provision, suggested by the union's Executive Director: "If in any calendar year, the ratio of aggregate compensation of women's national team players to the aggregate revenue from all women's national team games . . . is <u>less</u> than the ratio of the aggregate revenue from all men's national team games . . . then U.S. Soccer will make a lump sum payment to the women's national team player pool to make the ratios equal." (Langel Ex. 25.) No such provision exists in the MNT agreement. (King Dec. Ex. 1.) Unlike Plaintiffs' various fiction-based legal

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

theories, **this** contract language actually provided a "wage rate" with a common denominator that could be compared between the two teams (a compensation-to-revenue ratio), it was requested by the WNTPA, and it provided that the WNT would receive **at least** equal pay by this measure. This collectively bargained contract provision, alone, should result in the dismissal of all Plaintiffs' pay discrimination claims pertaining to the period covered by the 2013-2016 collective bargaining agreement.

In contrast to the 2012-2013 negotiations, during the 2016 negotiations for a new agreement, the union's new Executive Director explicitly demanded what he termed "equal pay." (Nichols Ex. 33.) His contract proposals, however, show that this meant something much different (and far more expensive) than "the same contract terms as the MNT." His initial contract demand sought the same bonuses for friendly matches found in the MNT's agreement and the same bonus structure for the Women's World Cup that the MNT had for their World Cup, but it also sought the following additional items not found in the MNT's agreement: (1) a $4.2 million payment for certain rights to use player likenesses; (2) $150,000 annual WNT salaries and $100,000 annual NWSL salaries for 24 players, regardless of whether or how often they played; (3) contributions to a 401(k) retirement account; (4) lifetime long-term disability insurance; (5) retiree health insurance; (6) an additional $3 million payment for playing a three-game "Victory Tour" after winning the Women's World Cup; (7) another $3 million payment for a three-game post-Olympics Victory Tour; and (8) the annual salary, benefits, and travel accommodations for a full-time paid childcare professional for every player with a child. (King Dec. Ex. 6.) He later lowered his salary demand from $150,000 to $100,000 but simultaneously demanded that the number of players receiving this guaranteed salary should be 30, rather than 24. (King Dec. Ex. 8.)

U.S. Soccer countered these proposals with a "pay-to-play" proposal in the same general structure as the MNT agreement. (King Dec. ¶ 22, Ex. 7.) In other words, there would be no salary, and players would be paid only when they played for the team. (King Dec. Ex. 7.) U.S. Soccer's opening proposal included the same basic per-game

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

appearance fee for friendlies as the one found in the MNT agreement, but it contained lower bonuses for winning and drawing friendlies and lower bonuses associated with World Cup play. (King Dec. Ex. 7.) This proposal included lower bonuses for friendlies and World Cup play because (i) it was an opening offer, and U.S. Soccer anticipated needing to increase its offer over the course of negotiations to achieve compromise with the union over its demands, (ii) WNT friendlies historically generated lower per-game revenue than MNT friendlies, and (iii) FIFA pays much higher prize money for the men's World Cup. (King Dec.  21, Ex. 7; Gulati ¶ 70, 77.)

No one can say what an eventual "pay-to-play" contract may have looked like because the union refused to negotiate one; instead, it responded to U.S. Soccer's opening proposal by reiterating the demand for a completely different structure, with "at least 30 WNT Players be signed to annual Player Contracts," ensuring them at least $100,000 in base compensation per year, regardless of how much they played, along with the same bonus structure as the MNT for friendlies. (King Dec. Ex. 8; Gulati Dec. ¶ 79-80; Rapinoe Dep. 223.) At the same time, the union did not drop its other initial demands. (King Dec. ¶ 28, 30, Ex. 8.)

The WNT players replaced the union's Executive Director while these competing proposals were on the bargaining table, and with new union leadership in place, the parties promptly moved down a path of negotiations that involved a hybrid of annual salaries for some players, flat fee game appearances for others, and performance bonuses for both categories. (King Dec. ¶ 31, 33, Ex. 13-17.) In addition, U.S. Soccer proposed three new "partnership" bonuses that would pay out additional money based on achieving certain targets in sponsorship revenue, television ratings, and enhanced attendance—three items not found in the MNT agreement at all. (King Dec. ¶ 8, 37, Ex. 1, 12.) From there, the parties traded proposals and made compromises within this overall structure. (Roux Dep. 46-49, Ex. 29; Langel Ex. 14-15, 19-21, 23; Gulati Dec. ¶ 79-80, Ex. 15; Rapinoe Dep. 223; King Dec. ¶ 33-44, Ex. 11, 12, 14-18.) Notably, when the salary commitments being proposed by the parties went down, the friendly bonuses climbed. (King Dec. Ex.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

14-17.) No one can say how high they would have climbed if the union had foregone salaries altogether. (Gulati Dec. ¶ 79-80; Rapinoe Dep. 223.) Ultimately, the parties reached a final agreement within this basic structure, including annual $100,000 WNT salaries, but also including a $230,000 lump sum signing bonus paid to the players, a separate annual payment of $350,000 paid to the WNTPA in exchange for certain rights to players' likenesses, and additional annual salaries paid to players for play in the NWSL—three more financial expenditures not included in the MNT agreement. (Roux Dep. 145; King Dec. ¶ 8, 10, 11, Ex. 5, pp. 5, 14-15, 19, 23-24; 29-35.) All told, this new agreement has paid the WNT and its union **more than 2.5 times as much** as the MNT and its union during its first three years. (Irwin Dec. Ex. 1 at 14.)

It is undisputed that U.S. Soccer bargained with an eye towards the overall cost of the collective bargaining agreement. (King Dec. ¶ 42; Gulati Dec. ¶ 79.) Not only did certain line items of compensation move upward when other items moved downward, but U.S. Soccer informed the union that the cost of certain items unique to the WNT's contract (e.g., single-occupancy hotel rooms, NWSL salaries, and the annual payment for likeness rights) affected how much U.S. Soccer was willing to pay in salaries and bonuses directly tied to on-field play for the WNT. (King Dec. ¶ 44, Ex. 14-17.) Furthermore, the collective bargaining agreement states that the union may unilaterally instruct U.S. Soccer at any time to pay any or all payments owed to the union to the players instead, as direct compensation. (King Dec. Ex. 5 at Art. 21.C.) The players have the authority under the union's constitution to do this, but they have not done so. (Roux Dep. 40, 143, Ex. 5.)

Having made all these choices in contract negotiations, and having achieved a contract that paid them, their teammates, and their union **more than $25 million over the first three years of the contract**, compared to the $11 million paid to the MNT over that same time, (Irwin Dec. Ex. 1 at 14), Plaintiffs cannot plausibly contend that their compensation arrangement reflects sex discrimination rather than the result of compromises made during collective bargaining—a legitimate factor other than sex.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

### 2.   Revenue Differentials Are a Legitimate Factor Other than Sex.

Not only is the bargaining process itself a legitimate and undisputed factor other than sex that led to the different compensation arrangements at issue in this case, but U.S. Soccer repeatedly cited an independent factor other than sex during those negotiations—the difference in revenue (and potential revenue) generated by U.S. Soccer from the two teams' matches. Courts have held that revenue generation is a legitimate factor other than sex justifying pay differentials between male and female employees. *Byrd v. Ronayne*, 61 F.3d 1026, 1034 (1st Cir. 1995) (employer had defense to pay discrimination claim where male attorney generated substantially greater revenues for the employer law firm than the female plaintiff); *Hodgson v. Robert Hall Clothiers*, 473 F.2d 589, 597 (3rd Cir. 1973) (even where male and female employees performed equal work and are legitimately separated by sex owing to the nature of the work, the employer lawfully paid the male employees more because the employer derived greater economic benefit from their work); *Bartges v. UNC Charlotte*, 908 F. Supp. 1312, 1327 (W.D.N.C.), *aff'd*, 94 F.3d 641 (4th Cir. 1996) (no pay discrimination against softball coach because other sports generated more revenue for the university).

The most significant differential in this instance (and the only one that certainly would not have been overcome in collective bargaining, no matter what the WNTPA had offered as a compromise) arises from the difference in prize money potential between the World Cup for men and the Women's World Cup. In 2010, FIFA paid $8 million in prize money to every soccer federation that qualified for the men's World Cup and $30 million to the winner. (Gulati Dec. Ex. 8.) In contrast, the winner of the 2011 Women's World Cup received only $1 million from FIFA. (Gulati Dec. Ex. 9.) These facts were known to U.S. Soccer when it negotiated the collective bargaining agreement establishing performance bonuses related to the 2015 Women's World Cup. (Gulati Dec. ¶ 71.) In 2014, FIFA paid $8 million to every soccer federation that qualified for the men's World Cup and $35 million to the winner. (Gulati Dec. Ex. 10.) In contrast, U.S. Soccer received only $2 million from FIFA for winning the 2015 Women's World Cup. (Gulati

20

Dec. Ex. 11.) These facts were known to U.S. Soccer when it negotiated the collective bargaining agreement establishing performance bonuses related to the 2019 Women's World Cup. (Gulati Dec. ¶ 76.) In 2018, FIFA paid $38 million to the winner of the men's World Cup whereas the prize money for winning the 2019 Women's World Cup was only $4 million. (Gulati Dec.¶ 54, Ex. 12.) U.S. Soccer did not violate the law by agreeing to pay MNT players substantially higher bonuses if it could win a tournament that would pay U.S. Soccer exponentially more prize money, which in turn would cover the bonuses promised to the MNT players.

The revenue differentials are not limited to the two different World Cups, either. When U.S. Soccer executed the 2013 collective bargaining agreement, the WNT had just finished a four-year cycle (international soccer operates in four-year cycles) during which U.S. Soccer had generated less than $15 million, in total, from all 78 WNT games. (Irwin Dec. Ex. 1 at 13.) During that same period, it had generated almost $64 million from 69 MNT games. (Irwin Dec. Ex. 1 at 13.) Similarly, when U.S. Soccer finished negotiating the 2017 contract, it had just finished a four-year cycle during which it generated $55 million from 91 WNT games while generating $80 million from 77 MNT games. (Irwin Dec. Ex. 1 at 13.) It was not unlawful for U.S. Soccer to take these differentials into account. To be sure, the WNT's games have ended up generating more revenue during the last five years than the MNT's games, but this includes only one World Cup cycle for the MNT, compared to two for the WNT, and regardless, the WNT has been paid far more than the MNT during that time frame. (Irwin Dec. Ex. 1.) If the MNT had won two World Cups in that same time frame, U.S. Soccer would have received more than $60 million in additional FIFA prize money alone. (Gulati Dec. ¶ 54, Ex. 10.)

Fundamentally, U.S. Soccer agreed with the MNT to pay them more money if they could achieve success on the field that, in turn, would generate substantial revenues for U.S. Soccer, from which the payments to the MNT could be made. Although the WNT has achieved wonderful successes on the field, and U.S. Soccer is proud of those successes, it is undisputed that those successes have not generated the same revenue that

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

the same level of success by the MNT would have generated, and U.S. Soccer is not obligated by the anti-discrimination laws to "make up the difference" in the varying revenue streams. Accordingly, Plaintiffs' pay discrimination claims should be dismissed.

## III.   PLAINTIFFS' TITLE VII CLAIMS RELATED TO ARTIFICIAL TURF AND AIR TRAVEL ALSO SHOULD BE DISMISSED.

Aside from allegations surrounding compensation, the only concrete allegations of employment discrimination found in Plaintiffs' Complaint are allegations about playing on artificial turf instead of grass and flying commercial airplanes instead of charter aircraft. These claims should be dismissed because Plaintiffs failed to exhaust their administrative remedies, and the claims have no merit in any event.

### A.   Plaintiffs Failed To Exhaust Their Administrative Remedies.

U.S. Soccer is entitled to judgment on Plaintiffs' non-compensation claims because they failed to exhaust their administrative remedies. The EEOC charges filed by the four Class Representatives contain no allegations of discrimination in any respect other than compensation. (Egan Dec. Ex. 1.) A plaintiff does not "sufficiently exhaust[ ] . . . administrative remedies under Title VII by merely mentioning the word 'discrimination' in his or her EEOC administrative charge." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002) ("[T]he inquiry into whether a claim has been sufficiently exhausted must focus on the factual allegations made in the charge itself, describing the discriminatory conduct about which a plaintiff is grieving."). Accordingly, Plaintiffs' non-compensation claims should be dismissed. *Id.* at 636.

### B.   Plaintiffs Cannot Point To Any Evidence of Sex Discrimination.

Even setting aside Plaintiffs' failure to exhaust their administrative remedies, judgment should be entered for U.S. Soccer because Plaintiffs cannot establish that they suffered an adverse employment action ***because of their sex***. 42 U.S.C. § 2000e-2(a)(1). The mere fact that Plaintiffs flew fewer charters or played more often on artificial turf does not give rise to an inference of sex discrimination because the two teams are not similarly situated. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (a

22

*prima facie* case of sex discrimination requires "a plaintiff [to] show an inference of discrimination…through comparison to similarly situated individuals").

To begin with, the WNT has flown charter flights for all team travel, including travel to friendly matches, ever since World Cup qualifying in October 2018. (King Dec. ¶ 46.) It also flew charters for team travel during the 2015 FIFA Women's World Cup, Olympic qualifying in 2016, and the 2016 Olympic Games, with the exception of the initial flight to Brazil in 2016 because U.S. Soccer did not believe a charter flight to Brazil would have been a prudent expenditure of money at the time. (King Dec. ¶ 47.) Similarly, the MNT has taken charter flights to non-friendly games during the class period. (*Id.* ¶ 48.)

The remainder of the WNT's schedule during the class period involved playing in friendlies, for which they did not fly charters until fall 2018. (*Id.* ¶ 49.) The MNT, in contrast, did fly a grand total of six charter flights to friendly matches during the class period. (*Id.*) Two of those flights were to and from Cuba (a country with limited commercial airline routes) in October 2016 for two matches four days apart, in between World Cup qualifiers (*Id.* ¶ 50.) One was a flight in June 2017 to a friendly in Utah five days before a World Cup qualifier in Colorado. (*Id.* ¶ 51.) One was a flight from pre-Gold Cup training camp in Nashville to East Hartford for a friendly to prepare for the Gold Cup. (*Id.* ¶ 52.) One was for a friendly in France against soon-to-be world champion France, a week after a friendly in Ireland, in June 2018. (*Id.* ¶ 53.) The last was a flight to a friendly against chief rival Mexico in Nashville in September 2018, just four days after a match against Brazil in the New York area and just a month before the WNT also began flying charters consistently. (*Id.* ¶ 54.) Each of these six charters was reserved owing to competitive need (preparing for an upcoming World Cup qualifier or Gold Cup match), an unusual location with limited commercial flights (Cuba), or the high-profile nature of the opponent (France and Mexico). (*Id.* ¶ 50-54.) These factors have nothing to do with sex and are legitimate, undisputed, non-discriminatory factors explaining any difference in flight accommodations that preclude Plaintiffs from succeeding on their Title VII claim, and Plaintiffs have offered no evidence to suggest that they are mere pretext for

23

sex discrimination. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004) ("To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives.").

When it comes to playing surfaces, neither team has played on artificial turf in a venue selected by U.S. Soccer since October 2017. (King Dec. Ex. 20-21, Def. Supp. Int. Ans. 2.) Between January 1, 2016, and July 26, 2017, each team played on artificial turf one time when U.S. Soccer chose the venue for the game. (*Id.*) In addition, the WNT played on artificial turf seven times during the second half of 2015 and three times during the second half of 2017 in venues chosen by U.S. Soccer. (*Id.*) U.S. Soccer scheduled those games in venues with artificial turf fields for reasons that have nothing to do with sex, but with venue availability and the desire for the national team to play in different parts of the country. (*Id.*) To be sure, U.S. Soccer did pay to have temporary grass installed for an MNT match in one of these same stadiums in 2019, but again, neither team has played on artificial turf since 2017. (*Id.*) Furthermore, that match was the last preparatory match for the 2019 Gold Cup, which was played on grass. (*Id.*) As with their complaints about commercial flights, Plaintiffs cannot present any evidence calling into question the legitimate, non-discriminatory reasons U.S. Soccer has offered for playing on artificial turf more often with the WNT during late 2015 and 2017. *Vasquez*, 349 F.3d at 642. Plaintiffs' Title VII claims should be dismissed.

## IV.   CONCLUSION

Plaintiffs, through their self-selected and highly capable collective bargaining representatives, negotiated labor agreements that hedge against risk and provide more stability and security than the MNT's labor agreement does, while also containing various other favorable terms not found anywhere in the MNT's agreement (*e.g.*, medical insurance, a $350,000 annual payment for intellectual property rights; three separate bonuses based on television ratings, attendance, and sponsorship revenue; a guaranteed number of single-occupancy hotel rooms while on the road; and payment of the players'

salaries while playing in their professional league). Now, in hindsight, knowing that they have made it through several years of the risk of career-ending injury, falling out of favor with the coach, being passed over for a younger and better player, or simply losing more games than they had hoped, Plaintiffs want the Court to let a jury selectively turn back the clock and rewrite their contract by forcing U.S. Soccer to pay them more money without having to take the risks presented by the MNT agreement—risks the MNT took—or having to forego any of the more favorable contract terms they achieved in collective bargaining. This, even though their contractual arrangement caused them to earn far more money than the MNT players, who put their compensation on the line against these risks and earned less as a result. Ultimately, Plaintiffs want the Court to force U.S. Soccer into paying them as though they negotiated a different contract, won competitions they did not play in, defeated opponents they never faced, and generated over $60 million more in FIFA prize money for U.S. Soccer than they actually did. This is not the purpose of the anti-discrimination laws, which are designed to prevent employers from paying women less than men in exchange for virtually identical work, just because they are women. That did not happen here.

U.S. Soccer values all its athletes, including its WNT players, and it also values the collective bargaining process, during which U.S. Soccer and the players created an overall package of compensation, benefits, and other terms designed to meet the players' needs while enabling U.S. Soccer to fulfill its overall mission. Following ratification of the contract, one player (a union representative at the time and Plaintiff now) hailed the deal as "exactly what we thought was fair and what we thought should be in the CBA." (Klingenberg Ex. 7.) Plaintiffs should not be allowed to use this lawsuit as a vehicle to selectively revise portions of that agreement. The lawsuit should be dismissed.

Respectfully submitted,

U.S. SOCCER FEDERATION, INC.

By:   */s/ Brian Stolzenbach*

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT