Page 1

1                  UNITED STATES DISTRICT COURT

          FOR THE CENTRAL DISTRICT OF CALIFORNIA
2

   ALEX MORGAN, ET AL.           )
3                                )
              Plaintiff,         )
4                                )
   VS.                           )        Civil Action No.:
5                                )          2:19-cv-01717
   UNITED STATES SOCCER          )
6  FEDERATION, INC.              )
                                 )
7             Defendant          )
8                              - AND -
9
   HOPE SOLO, ET AL.             )
10                               )
              Plaintiff,         )
11                               )
   VS.                           )        Civil Action No.:
12                               )        3:18-cv-05215 JD
   UNITED STATES SOCCER          )
13 FEDERATION, INC.              )
                                 )
14            Defendant          )
15
16
17          ORAL AND VIDEOTAPED DEPOSITION OF
                     RICH NICHOLS
18               DECEMBER 4, 2019
19
20          ORAL AND VIDEOTAPED DEPOSITION OF RICH NICHOLS,
   produced as a witness at the instance of the Defendant and
21 duly sworn, was taken in the above-styled and numbered
   cause on Wednesday, December 4, 2019, from 8:13 a.m. to
22 3:05 p.m., before Kari J. Behan, CSR, RPR, CRR, in and for
   the State of Texas, reported by computerized stenotype
23 machine, at the offices of K&L Gates, 1717 Main Street,
   Suite 2800, Dallas, Texas 75201, pursuant to the
24 California Federal Rules of Civil Procedure and the
   provisions stated on the record herein.
25 JOB NO. 172862

Page 13

1   partway through the third season; is that right?

2      A.   That's correct.

3      Q.   At some point in time, were you retained to be

4   the general counsel of the Women's National Team Players

5   Association?

6      A.   Yes.

7      Q.   When was that?

8      A.   January -- I started -- I started in January of

9   2015.

10     Q.   Okay.  And were you also the executive director

11  of the Women's National Team Players Association?

12     A.   That was my title, executive director and general

13  counsel of the Women's National Team Players Association.

14     Q.   When you served in that role, were you an

15  employee of the Players Association?

16     A.   No.  I was a contractor.

17     Q.   Okay.  Were you with your -- your current firm?

18     A.   Correct.

19     Q.   Okay.  And when did you stop serving in the role

20  of general counsel and executive director?

21     A.   I was terminated on December 16th, 2016.

22             (Exhibit 1 was marked for identification.)

23  BY MR. STOLZENBACH:

24     Q.   Mr. Nichols, I have handed you an exhibit we'll

25  mark Nichols Exhibit 1.  It's also Exhibit 2 from John

Page 16

1    understanding is.

2                  THE WITNESS:  Right.  I don't agree.

3    BY MR. STOLZENBACH:

4       Q.  You don't agree?

5       A.  No.

6                  (Exhibit 4 was marked for identification.)

7    BY MR. STOLZENBACH:

8       Q.  Mr. Nichols, I have handed you something I have

9    marked Nichols Exhibit 4.  It's a Judgment from the United

10   States District Court for the North District of Illinois

11   followed by an Opinion and Order referenced in that

12   judgment.

13                  Are you familiar with the litigation that

14   resulted in this judgment?

15      A.  Yes.

16      Q.  Could you turn to page 11 of the Opinion?

17      A.  (Witness complies.)

18      Q.  And there's a highlighted sentence there from

19   Judge Sharon Johnson Coleman's Opinion in that case.

20                  Could you read it into the record?

21      A.  "Because the undisputed material facts establish

22   that the MOU incorporates the unmodified terms of the 2005

23   CBA, including the no-strike, no-lockout provision, and

24   that Langel had apparent authority to execute this MOU,

25   this Court will grant summary judgment on USSF's

Page 17

1  declaratory judgment claim."

2      Q.  So do you agree with Judge Coleman's statement

3  that the MOU, which is Nichols Exhibit 3, incorporates the

4  unmodified terms of the 2005 CBA, which is Nichols

5  Exhibit 2?

6      A.  No, I don't agree with it.

7      Q.  Okay.  Notwithstanding you're not agreeing with

8  it, the United States Women's National Soccer Team Players

9  Association stipulated to the judgment reflected on

10  Nichols Exhibit 4, page 1, correct?

11      A.  I don't recall.

12      Q.  Okay.  Notwithstanding your disagreement with the

13  federal judge who issued the decision we just looked at,

14  after she issued the decision, you and the Players

15  Association, at your direction, acted in accordance with

16  it, correct?

17          MR. CLASH-DREXLER:  Let me object to the

18  extent that it's asking him for legal advice that he

19  provided to the players.

20          So I'm not quite sure he could answer that

21  question without doing that, but maybe you want -- I don't

22  know if you want to try it a different way.

23          MR. STOLZENBACH:  Sure.  I'll ask it a

24  different way.

25  BY MR. STOLZENBACH:

Page 18

1    Q.   Notwithstanding your disagreement with Judge

2  Coleman, the Players Association acted in accordance with

3  her order that we just read from, correct?

4    A.   I'll say that we abided by her Opinion that we

5  did not have the right to strike or boycott the Olympic

6  Games.

7    Q.   Is -- are you saying that you, notwithstanding

8  her --

9            MR. STAFFORD:  I hate to interrupt, Brian.

10           Can you speak up just a little bit, Rich?

11  Can you speak up just a little bit?

12           THE WITNESS:  Okay.

13           MR. CLASH-DREXLER:  Thank you.

14  BY MR. STOLZENBACH:

15    Q.   Are you saying that the Players Association,

16  after Judge Coleman's order continued to -- well, let me

17  just ask you this:  Her Opinion, which we just read from,

18  said that the MOU incorporated the unmodified terms of the

19  2005 Collective Bargaining Agreement.  It did not limit it

20  to the no-strike clause.

21           Did you abide by her order with respect to

22  the rest of the 2005 agreement or just the no-strike

23  clause?

24           MR. BUDNER:  Objection to the extent it

25  mischaracterizes your testimony, but you -- you can answer

Page 19

1    to whatever you know, whatever you have personal knowledge

2    of.

3                    THE WITNESS:   We followed the Court's order.

4    BY MR. STOLZENBACH:

5        Q.   Were you familiar with the Collective Bargaining

6    Agreement covering the United States Soccer Men's National

7    Team Players that was in effect during your tenure as the

8    general counsel for the Women's National Team Players

9    Association?

10       A.   Was I familiar with it?

11       Q.   Yes.

12       A.   I was familiar with it.

13       Q.   Had you -- did you ever see a copy of it?

14       A.   I did.

15       Q.   You did?

16                    Do you remember when you received a copy of

17   it?

18       A.   Probably sometime early during my tenure as the

19   executive director/general counsel.

20       Q.   Sometime in early 2015?

21       A.   Correct.

22                    (Exhibit 5 was marked for identification.)

23   BY MR. STOLZENBACH:

24       Q.   Mr. Nichols, I have handed you Nichols Exhibit 5,

25   which was also Exhibit 11 in John Langel's deposition.

1        Q.  Do you recall that the second in-person

2    negotiation meeting happened on February 3rd, 2016?

3        A.  Yes.

4               (Off-record discussion.)

5               (Exhibit 17 was marked for identification.)

6    BY MR. STOLZENBACH:

7        Q.  Mr. Nichols, I have handed you Exhibit 17.

8               Before the February 3rd bargaining session,

9    you sent Exhibit 17 to Ms. Levine, correct?

10       A.  Yes.

11       Q.  And in the letter reflected on the second page of

12   that exhibit, the Union took the position that either

13   there was no Collective Bargaining Agreement in effect at

14   the time or, if there was, it was terminable and the

15   Players Association was going to terminate it?

16       A.  The letter speaks for itself.

17              (Exhibit 18 was marked for identification.)

18   BY MR. STOLZENBACH:

19       Q.  Exhibit 18 is Ms. Levine's response to your

20   letter in Exhibit 17, correct?

21       A.  It appears to be.

22              (Exhibit 19 was marked for identification.)

23   BY MR. STOLZENBACH:

24       Q.  Exhibit 19 is an e-mail from you to Ms. Levine

25   dated January 4th, 2016.  It is copied to Becky

1   Sauerbrunn, Carli Lloyd, Hope Stephens, Megan Rapinoe,

2   Alex Morgan, Arthur McAfee, Jeff Kessler, David Feher and

3   Eva Cole.

4               Ms. Sauerbrunn, Ms. Lloyd, Ms. Stephens,

5   Ms. Rapinoe and Ms. Morgan were Women's National players

6   at the time, correct?

7       A.  Yes.

8       Q.  And Hope Stephens is also known as Hope Solo,

9   right?

10      A.  Yes.

11      Q.  And this e-mail and its attachment constituted

12  the Players Association's first proposal for a new

13  Collective Bargaining Agreement, correct?

14      A.  Yes.

15      Q.  And from the Players Association's point of view,

16  the proposal was for a contract starting immediately,

17  correct?

18              MR. BUDNER:  Objection to the extent that

19  that view includes attorney-client privileged

20  communications.

21              But you can certainly testify as to what you

22  expressed to third parties.

23              THE WITNESS:  I'm -- I'm not sure that

24  that's what was communicated.

25  BY MR. STOLZENBACH:

Page 54

1     Q.   The player -- sorry.

2          The Federation took the position that it had

3     a Collective Bargaining Agreement in place that didn't

4     expire till the end of 2016, correct?

5     A.   That's the position they took, according to that

6     e-mail, yeah.

7     Q.   Your proposal, in Exhibit 19, was not submitted

8     with the idea that it wouldn't go into effect until 2017,

9     correct?

10         MR. CLASH-DREXLER:   Again, to the -- you can

11    answer that question to the extent that you communicated

12    that information to the Federation.

13         MR. BUDNER:   Same objection.

14         THE WITNESS:   I -- we never had that

15    communication with the Federation with regard to the

16    effective date of an agreement.

17    BY MR. STOLZENBACH:

18    Q.   Okay.   Can you look at page 1 of the proposal,

19    which is USSF_SOLO_3537?

20         The third bullet point says:   In exchange

21    for the WNT Players Group Licensing Rights, the USSF shall

22    pay the WNTPA $4.2 million, which equals 30 percent of the

23    $14 million "attributed" guaranteed sponsorship and

24    licensing revenue SUM pays for USSF for the exclusive

25    rights to market the WNT.

Page 55

1           You knew at the time that the Men's National

2    Team Collective Bargaining Agreement did not provide for

3    any separate payment to the men's players or the men's

4    Players Association, apart from compensation related to

5    actual play and the ticket bonus that they received,

6    correct?

7        A.  I wasn't aware of what or how the men's team was

8    compensated by U.S. Soccer.

9        Q.  Well, you had the Collective Bargaining Agreement

10   covering the men's team at the time, right?

11       A.  I did.

12       Q.  And there is nothing in it, anything like what

13   you're proposing in this bullet point I just read, is

14   there?

15           MR. BUDNER:  Objection to the extent the

16   documents speaks for themselves.

17           If you have a memory of that, you can

18   answer.

19           THE WITNESS:  Yeah, I don't recall one way

20   or the other.

21   BY MR. STOLZENBACH:

22       Q.  Now, the last bullet point on page 1 of the

23   proposal, if accepted, would have required additional

24   payments to the players actually used pursuant to the

25   first bullet point regarding the group license agreement,

Page 56

1   right?

2                   THE WITNESS:  Let me read it.

3                   (Witness reviews document.)

4                   THE WITNESS:  Can you read the question

5   again, please?

6                   (Requested material read back.)

7                   THE WITNESS:  Correct.

8   BY MR. STOLZENBACH:

9        Q.  Can you turn to page 2 of the proposal?

10       A.  (Witness complies.)

11       Q.  The second bullet point on page 2 was a proposal

12   that said:  At all times there shall be a minimum of 30

13   WNT players on contract with the USSF, referred to as

14   Contract Players.

15                   At the time, the Collective Bargaining

16   Agreement required there to be fewer contracted players

17   than 30, correct?

18       A.  Correct.

19       Q.  And the contracted players under the Collective

20   Bargaining Agreement in effect in 2016 -- those contracted

21   players received a salary from USSF, right?

22       A.  The contracted players under the MOU that was in

23   effect in 2016 received a salary.

24       Q.  And the fourth bullet point on page 2 of your

25   January 2016 proposal was designed to increase that salary

Page 57

1    to $150,000 per player, correct?

2          A.   Let me read it.

3                    (Witness reviews document.)

4                    THE WITNESS:   Repeat that question, please.

5                    (Requested material read back.)

6                    THE WITNESS:   The document speaks for

7    itself.

8    BY MR. STOLZENBACH:

9          Q.   Well, does the document say that the salary would

10   increase to 150,000 or not?

11         A.   Again, you can read it and determine what it

12   says.  It speaks for itself.

13         Q.   Are you -- can you not tell me?

14         A.   I'm not sure what you want me to tell you.

15         Q.   I want you to tell me whether it's -- that

16   proposal was designed to increase the salary of contracted

17   players to $150,000 a year.

18         A.   It was to increase the salary of the players'

19   compessession [sic] -- compensation to be no less than

20   150,000 a year.

21         Q.   Okay.  And that would be in the form of salary or

22   no?

23         A.   It would be in the form of compensation.

24         Q.   Okay.  If you'll look under No. 3 on page 2 of

25   the proposal from January 2016, the first bullet was a

Page 58

1    proposal that all Women's National Team players --

2          A.   Which -- which -- which number --

3          Q.   The first bullet under No. 3 on page 2.

4          A.   Okay.

5          Q.   It says:   All women -- sorry.

6                It says:   All WNT players (Contract &

7    Developmental Players) shall be paid no less than a

8    $100,000 salary ("NWSL Salary") for a 20 NWSL Regular

9    Season Game, 8-- 8-month season (March 1 to October 31st).

10               The reference to "Contract & Developmental

11   Players" is what I want to focus on first.   Okay?

12               What did those two terms mean in the context

13   of this proposal?

14         A.   Well, the contract players meant players who are

15   under contract with the Federation to play for the women's

16   team.   I don't recall what the developmental players'

17   designation was.

18         Q.   Can you turn to page 3 of the proposal?

19         A.   (Witness complies.)

20         Q.   Number 4 on page 3 refers to various bonuses and,

21   in particular, refers to World Cup and Olympic-related

22   bonuses.

23               Under this proposal was the Players

24   Association proposing those bonuses on top of the $150,000

25   minimum compensation referenced on the prior page?

Page 59

1          MR. BUDNER:  Objection.  Document speaks for

2    itself.

3          THE WITNESS:  Yeah, I don't recall.

4    BY MR. STOLZENBACH:

5       Q.   Okay.  On page 4 of the proposal, there's a

6    section entitled:  Travel & Per Diem.  It is No. 5.  The

7    domestic venue per diem of $65 was a proposal for a higher

8    per diem than the Men's National Team was receiving at the

9    time, right?

10      A.   I don't recall.

11      Q.   Under No. 7, there's a proposal, it says:  The

12   WNT will not play any USSF games on artificial turf.

13          Do you -- did you know at the time whether

14   the Men's National Team had that guarantee or not?

15      A.   No.

16      Q.   Turn to page 6 of the proposal.

17      A.   (Witness complies.)

18      Q.   Look at No. 13:  Victory Tour (Post World Cup &

19   Olympic Games Victories.  The first bullet point says:

20   Victory Tour compensation shall be $3 million paid by the

21   USSF to the WNTPA Player Pool.

22          Now, the MOU from 2013 called for a

23   $1.8 million victory tour payment, correct?

24      A.   Yes.

25      Q.   And the 2013 MOU called for up to ten victory

Page 60

1    tour matches in exchange for that payment, correct?

2         A.   Yes.

3         Q.   And your proposal here in Exhibit 19 called for

4    three matches in exchange for --

5         A.   Let me correct my answer to the previous

6    question.  It called -- the MOU victory tour called for

7    ten games total.

8         Q.   And your proposal on -- reflected in Exhibit 19

9    called for three victory tour games in exchange for the

10   $3 million, right?

11        A.   Yes.

12        Q.   And that $3 million was to be on top of the

13   $150,000 minimum compensation?

14        A.   The $3 million would be in addition to whatever

15   compensation the players received.

16        Q.   Number 14 in your January 2016 proposal would

17   have required the Federation to hire at least one

18   full-time team physician, right?

19        A.   That's what it says, yes.

20        Q.   And the Men's National Team had no such full-time

21   team physician at the time, did it?

22        A.   I wasn't aware whether or not they had a

23   full-time team position -- physician.

24        Q.   Number 15 in your proposal from January of 2016

25   relates to maternity and childcare, and the first bullet

Page 61

1    call -- would call for the Federation to continue paying

2    100 percent of salary for up to one year of maternity

3    leave.

4                    Seeing now that it refers to salary here,

5    does that refresh your recollection that the $150,000 that

6    was being proposed in the first page of the proposal was a

7    proposal for a $150,000 salary?

8         A.   No.

9         Q.   Then the second bullet point under maternity and

10   childcare was a proposal that the Federation provide a

11   full-time childcare professional to each player, correct?

12        A.   Let me review it.

13                   (Witness reviews document.)  The proposal

14   provided that each player who happened to be a parent

15   would be provided separate childcare professional per

16   family.

17        Q.   And it -- and that would have included the

18   Federation paying an annual salary to the childcare

19   professional, benefits and covering their travel and

20   accommodation expenses?

21        A.   That's what the proposal provides.

22        Q.   And at the time, the Federation didn't provide

23   any kind of childcare assistance to the Men's National

24   Team, did it?

25        A.   I don't -- I don't know what they provided to the

Page 62

1    Men's National Team.

2         Q.  On page 18 -- sorry.  On page 7 of your January

3    proposal reflected in Exhibit 19, No. 18 says:  Floater

4    Player Policies.

5              Do you see that?

6         A.  Yes.

7         Q.  And the PA's proposal was that floaters receive a

8    weekly salary equal to 50 percent of the top WNT player

9    weekly salary, correct?

10        A.  That's what it says.

11        Q.  And it reflects that as being $750 a week?

12        A.  At the then-current rate.

13        Q.  So you were basing that off of the salary in

14   effect under the MOU when you said "the current rate"?

15        A.  No, I don't believe we were basing it on the then

16   MOU.  We were basing it upon prospectively what the

17   compensation -- the player compensation would be at the

18   time.

19        Q.  Floaters were often players who were called into

20   training camp but didn't make a match roster, correct?

21        A.  I'm not sure.

22        Q.  Okay.  Were you aware in January of 2016 how much

23   a Men's National Team player would be paid for being

24   called into a training camp but not making a match roster?

25        A.  No.

Page 63

1    Q.  Even though you had the Collective Bargaining

2 Agreement, you weren't aware?

3    A.  Even though I had the Collective Bargaining

4 Agreement, I was not aware -- I was not aware.

5    Q.  All right.  U.S. Soccer did not respond by way of

6 rejection or counterproposal to Exhibit 19 prior to

7 meeting with you, did it?

8    A.  They did not.

9    Q.  And I think you already testified that the next

10 meeting was February 3rd, 2016?

11    A.  Yes.

12    Q.  Do you remember where that was?

13    A.  New York.

14    Q.  New York?

15    A.  New York City, uh-huh.

16    Q.  At Latham & Watkins' office?

17    A.  Yes.

18    Q.  Do you remember who was there?

19    A.  I was there, Arthur McAfee, Megan Rapinoe, David

20 Feher for the PA.  For U.S. Soccer, Donna Shalala, Kathryn

21 Ruemmler, Eric Gleason, Tom King, Russ Sauer.

22    Q.  Are you sure about Tom King?

23    A.  Yeah.

24    Q.  You are?

25    A.  Uh-huh.

1    make the deal acceptable.

2              This is not the minimum amount of money that

3    the players wanted, period.  This is the minimum annual

4    guaranteed compensation that would make the Federation's

5    Exhibit No. 27 economic proposal acceptable to the players

6    at that time.

7              (Exhibit 31 was marked for identification.)

8    BY MR. STOLZENBACH:

9        Q.  Okay.  Exhibit 31 reflects an e-mail exchange

10   between you and Ms. Levine, correct?

11       A.  It appears to be.

12       Q.  And it concludes, at the top of page 1, with an

13   e-mail from you to Ms. Levine, which itself concludes by

14   saying:  See you on the 27th.  That's because your next

15   bargaining session, after the May 16th one, was June 27th,

16   correct?

17       A.  Could you repeat that again?

18       Q.  Your next bargaining session, after the May 16th

19   bargaining session, occurred on June 27th, correct?

20       A.  You know, I don't -- I don't recall a June 27th

21   bargaining session.

22       Q.  Okay.  If you could turn to Exhibit 31, page

23   WNTPA_7555 in the lower right.  You see the -- there's a

24   e-mail from you at the top that carries over from the

25   prior page.  And your last line that you wrote is:  As per

1    on their realities?

2        A.  Yes.

3        Q.  Do you -- do you recall being -- do you recall

4    Mr. Feher saying, shortly after you said that, something

5    like:  We need a term sheet within a matter of some days,

6    a three or four-pager.  This is not what we want, but this

7    is a step forward?

8        A.  I don't recall.

9            (Exhibit 33 was marked for identification.)

10   BY MR. STOLZENBACH:

11       Q.  Mr. Nichols, Exhibit 33 is an e-mail exchange

12   between you and Ms. Levine again.

13            This was your first response to the

14   Federation's proposal reflected in Exhibit 32, correct?

15       A.  I don't know.  I need to read it.

16       Q.  Yep.

17       A.  (Witness reviews document.)  Okay.

18       Q.  Exhibit 33 was your first response to U.S.

19   Soccer's proposal reflected in Exhibit 32, correct?

20       A.  It appears to be the first written response that

21   I recall.

22       Q.  Do you recall any oral response?

23       A.  I -- I don't.

24       Q.  Okay.  In the second paragraph of your e-mail in

25   Exhibit 33, you write:  First, to be clear, we want the

Page 131

1   same pay-per-game compensation as the MNT.

2            Did that mean that you would take a male

3   player's overall pay and divide it by the number of games

4   he played in and then compare it to the same calculation

5   for a woman player?

6        A.  It means what it says.

7        Q.  Now, I see hal- -- about halfway down a proposal

8   from you using those same rankings, 1 through 4, 5 through

9   9, and 9 plus that we saw in the Federation's proposal,

10  correct?

11       A.  Repeat the question.

12       Q.  There's a proposal from you in this e-mail that

13  uses the same rankings, 1 through 4, 5 through 8, and 9

14  plus, that we saw in the Federation's first economic

15  proposal in these negotiations, correct?

16       A.  It appears to be a similar structure, yeah.

17       Q.  If you'll look at the second page in the e-mail

18  on Exhibit 33, you wrote:  Finally, with regard to your

19  lifestyle proposals, since these items are not actionable

20  until the parties reach agreement on the outstanding

21  financial issues, we shall reserve comment until that

22  time.

23            So, again, I'll ask you:  The parties did

24  not have agreement on the lifestyle issues as of

25  July 2016, did they?

Page 145

1    able to sell those?

2        A.   Soccer United Marketing.

3        Q.   Do you know that?

4        A.   Soccer United -- as I understand, Soccer United

5    Marketing holds the U.S. Soccer's domestic television

6    broadcast rights for the World Cup.  That's what I

7    understand.

8        Q.   So that would not include the final of the

9    Women's World Cup, right?

10       A.   Well, it would, the domestic television rights.

11       Q.   And your understanding of that is just based on

12   something you've read or heard?

13       A.   I've -- I've read it, uh-huh.

14       Q.   Okay.  Do you know where you read it?

15       A.   I can't recall.

16       Q.   So -- so sitting here today, do you still believe

17   it's the case that Soccer United Marketing has the right

18   to sell the broadcast rights to World Cup Final's matches?

19       A.   It's my understanding that Soccer United

20   Marketing has the right to sell U.S. Soccer's domestic

21   television rights to the World Cup broadcast.

22       Q.   Okay.  Do you recall at the October 2016

23   bargaining session Mr. Gulati offering to have a third

24   party look at the attribution of revenues?

25       A.   I vaguely recall him mentioning that.

Page 146

1    Q.  And the Players Association did not take him up

2    on the -- that offer, did it, at least while you were the

3    executive director?

4    A.  Correct.  I'm not quite sure it was an offer.  I

5    think it was a suggestion that he made.

6    Q.  During that discussion about whether to use a

7    third party to conduct this analysis, didn't you say to

8    Mr. Gulati that you believed his numbers?

9    A.  I don't recall that.

10    Q.  Do you deny it or you just don't remember?

11    A.  I don't recall that.

12    Q.  My -- my question is:  Do you deny it or do you

13    not remember one way or the other?

14    A.  I think I do not recall means I don't remember.

15    Q.  Okay.  Do you remember asking Mr. Gulati to just

16    give you the numbers directly instead of going through a

17    third-party analysis?

18    A.  Yes.

19    Q.  And didn't he say that he didn't believe you

20    would agree with the numbers if they gave them to you?

21    A.  I don't recall what he said.

22    Q.  Okay.  Do you remember, at the October 2016

23    bargaining session, Ms. Levine walking through nine items

24    in the Players Association proposal that were items that

25    the Men's National Team did not receive in its Collective