1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA

2    _____
                                     )
3    HOPE SOLO,                      )
                                     )
4               Plaintiff,           )
                                     )
5          -vs-                      )      Case No.
                                     )      C 3:18-cv-05215
6    UNITED STATES SOCCER            )
     FEDERATION,                     )
7                                    )
                Defendant.           )
8    _____)
                                     )    _____
9    ALEX MORGAN, et al.,            )
                                     )
10              Plaintiffs,          )
                                     )
11         -vs-                      )
                                     )      Case No.
12   UNITED STATES SOCCER            )      2:19-cv-01717-RGK-AGR
     FEDERATION,                     )
13                                   )
                Defendant.           )
14   _____)

15

16

                   BALLARD SPAHR LLP
17         1735 MARKET STREET - 51ST FLOOR
       PHILADELPHIA, PENNSYLVANIA  19103-7599
18               NOVEMBER 21, 2019
                   10:30 A.M.
19

20

21         VIDEOTAPED DEPOSITION OF
               JOHN B. LANGEL

22

23   REPORTED BY:

24   DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE

25   JOB NO. 172085

1          Q.   What did you do for a living

2    before you retired?

3          A.   I practice -- practiced law at

4    Ballard Spahr for 41 years.

5          Q.   And were you a litigator as part

6    of that practice?

7          A.   I was in the Litigation Department

8    from 1978 until I retired in July 2016.

9    Essentially I practiced labor employment law.

10         Q.   And so I gather that you have

11   probably both taken and defended a number of

12   depositions in your career?

13         A.   Yes, sir.

14         Q.   So I'll dispense with the usual

15   explanations about depositions.  I'm sure we

16   don't need that.

17              I will ask you, though, if there's

18   any medical reason, medication reason, or any

19   other reason why you might not be able to

20   testify truthfully or accurately today?

21         A.   None.

22         Q.   You said you had practiced with

23   Ballard Spahr for I think you -- I think you

24   said over 40 years; is that right?

25         A.   Yes.

1          Q.    And the entire time was spent

2    practicing labor and employment law, at least

3    as a majority of your practice; is that fair?

4          A.    Yes.

5          Q.    Okay.  A lot of people when they

6    say labor and employment law, they actually

7    distinguish between the two, labor versus

8    employment.

9          A.    Yes.

10         Q.    Is that something you find

11   yourself to do as well?

12         A.    Yes.

13         Q.    And how would you define the

14   distinction between the two in your own mind?

15         A.    So I practiced traditional labor

16   law, both in the private sector and the public

17   sector, state laws versus National Labor

18   Relations Act, and I practiced employment

19   law --

20         Q.    Okay.

21         A.    -- handling cases like the case

22   you're litigating here.

23         Q.    And when you refer to labor law,

24   when you're saying that, you mean dealing with

25   labor unions in some fashion or another?

1        A.    Correct.

2        Q.    And employment law would be,

3   generally speaking, dealing with employees who

4   are not represented or not trying to be

5   represented at the time you're dealing with

6   them?

7        A.    Correct.

8        Q.    Okay.

9        A.    And add both advice and counseling

10  on both sides, both the labor and employment

11  sides.

12       Q.    Roughly speaking, would you be

13  able to tell us how much time you spent doing

14  labor law, traditional labor law versus

15  employment law?

16       A.    Over the 41 years it varied, so

17  early on, till the early '80s, more employment

18  law.

19            From '83 till 2016, 50-50.  And of

20  that 50-50, I include sports law, which I

21  define as essentially labor law.

22       Q.    Okay.

23       A.    So that would be on the labor law

24  side of it.

25       Q.    Okay.  And did you primarily

1    represent employers in your practice?

2         A.   Yes.

3         Q.   At some point in time did you

4    represent the Women's National Team Players

5    Association?

6         A.   Yes.

7         Q.   Other than that representation,

8    did you ever represent any other labor

9    organizations in your practice --

10        A.   Never.

11        Q.   -- before you retired?

12             Never?

13        A.   Never.

14        Q.   Okay.

15             MS. OPPENHEIMER:  Brian, let me just

16        jump in and make a statement here that

17        obviously you're going to be asking

18        questions relating to his representation of

19        the Women's National Team, and some of

20        those matters may touch on areas covered by

21        a privilege held by the Players

22        Association, and the witness can certainly

23        testify as to communications with the

24        Federation, but I'll instruct him

25        throughout this deposition not to testify

```
 1          as to any privileged matters.

 2               And we can talk about that more if

 3          any issues arise.

 4               MR. STOLZENBACH:  Understood.

 5               MS. OPPENHEIMER:  Thanks.

 6               THE WITNESS:  I would -- I would ask

 7          that when -- that you do that, don't rely

 8          exclusively on me to identify either work

 9          product or attorney-client privilege

10          issues.

11               MS. OPPENHEIMER:  Understood.

12               THE WITNESS:  Thank you.

13               MS. OPPENHEIMER:  And I would add to

14          that collective bargaining privilege

15          issues, so I will caution you as

16          appropriate.

17               THE WITNESS:  Thank you.

18     BY MR. STOLZENBACH:

19          Q.   As part of your traditional labor

20     practice over the course of your 40 -- 40-plus

21     years of practice, did that involve

22     negotiating Collective Bargaining Agreements?

23          A.   Yes.

24          Q.   Do you have a rough ballpark of

25     how many Collective Bargaining Agreements
```

1    you've negotiated over that time?

2         A.    Lots.

3         Q.    Fair.  Dozens?

4         A.    Sure.

5         Q.    Okay.  Over a hundred?

6         A.    Certainly not a hundred different

7    clients, but multiple Collective Bargaining

8    Agreements for the same client.  Maybe a

9    hundred.

10        Q.    Okay.  Am I correct that three of

11   those Collective Bargaining Agreements were

12   negotiated on behalf of the Women's National

13   Team Players Association?

14        A.    No.

15        Q.    Okay.

16        A.    The 2000 agreement was negotiated

17   in part before the players formed a Players

18   Association.  The Players Association was

19   formed prior to the conclusion of that

20   Collective Bargaining Agreement negotiation.

21        Q.    So you negotiated an agreement

22   that ultimately, once it was executed, was

23   executed by the Players Association and

24   U.S. Soccer in around 2001; is that --

25        A.    Yeah.

 1          Q.   -- fair?

 2          A.   So prior to the conclusion of the

 3    Collective Bargaining Agreement, if my memory

 4    serves me correctly, the Players Association

 5    was formed.

 6          Q.   Okay.

 7          A.   But when we started, it was a

 8    collection of 20-something individual players.

 9          Q.   Okay.  And then subsequent to that

10    agreement, you negotiated two more Collective

11    Bargaining Agreements for the Players

12    Association with U.S. Soccer?

13          A.   Correct.

14          Q.   Okay.

15               MR. FEHER:  Objection.

16               (Pause.)

17               (Exhibit Langel-1, four-page

18          document entitled Ballard Spahr LLP, John

19          B. Langel, Partner, bearing Bates Numbers

20          USSF_MORGAN_028101 through

21          USSF_MORGAN_028104, is marked for

22          identification.)

23    BY MR. STOLZENBACH:

24          Q.   Mr. Langel, I've given you

25    something marked as Exhibit 1.  Do you

1    recognize that as your professional biography

2    from the Ballard Spahr website around about

3    2016?

4          A.   Yes.

5               MR. FEHER:  Matt, if I may, just for

6          a clear record, if you could read into the

7          record the Bates numbers whenever possible.

8          It's just a little easier for people

9          reading the transcript --

10              MR. STOLZENBACH:  And --

11              MR. FEHER:  -- if you can.

12              MR. STOLZENBACH:  And for the

13         record, various documents have been

14         produced in both the Morgan lawsuit and the

15         Solo lawsuit, and so depending on which

16         version was grabbed for these exhibits,

17         they may have one set of Bates labels on

18         them or another, but this one is

19         USSF_MORGAN_028101 through 04.

20   BY MR. STOLZENBACH:

21         Q.   And, Mr. Langel, is this a --

22   exhibit a fair and accurate summary of your

23   experience and education at the time, 2016?

24         A.   It's a snapshot.

25         Q.   How did you come to be involved in

1              MR. FEHER:  Objection.

2    BY MR. STOLZENBACH:

3         Q.   Do you recall the time period

4    covered by the first Collective Bargaining

5    Agreement you negotiated for the Players

6    Association?

7         A.   I would say it was retroactive to

8    January 1, 2000 and ran until December 31,

9    2004, but I could be wrong on the start date.

10        Q.   Okay.  Are you familiar with the

11   term "quad" as it pertains to the United

12   States Women's National Team?

13        A.   Yes.

14        Q.   Okay.  And what is a "quad"?

15        A.   It's a four-year cycle, usually

16   including an Olympics and a World Cup.

17        Q.   And did it -- does it typically

18   end, in your experience, at the end of a year

19   in which the Olympics are played?

20        A.   Yes.

21        Q.   Okay.  So the first Collective

22   Bargaining Agreement covered the quad from

23   2001 to 2004, plus an extra year on the front

24   end; right?

25        A.   Yes.

1          Q.   Now, I want to bring you forward

2    to the second Collective Bargaining Agreement

3    you negotiated for the Players Association.

4               You were the chief negotiator for

5    that?

6          A.   Yes.

7          Q.   Do you recall that it covered two

8    quads?

9          A.   The agreement that was reached

10   covered two quads?

11         Q.   Correct.

12         A.   Yes.

13         Q.   And that would have been the 2005

14   to 2008 quad and the 2009 to 2012 quad;

15   correct?

16         A.   Correct.

17              (Exhibit Langel-3, multipage

18         document entitled Preamble, bearing Bates

19         Numbers USSF_SOLO_002249 through

20         USSF_SOLO_002286, is marked for

21         identification.)

22   BY MR. STOLZENBACH:

23         Q.   I've handed you Exhibit 3, which

24   is USSF_SOLO_2249 to 2286.

25              Do you recognize that as the 2005

1          A.    Just the opposite.

2          Q.    So both parties wanted a one quad

3    contract?

4          A.    I don't recall --

5          Q.    Oh, I shouldn't -- let me rephrase

6    that.

7                Based upon what was said at the

8    table, did it appear to you that both parties

9    were aligned on how long this particular

10   contract should be?

11         A.    Across the table I don't recall

12   our ever asking for two quads; and I recall

13   U.S. Soccer saying it wanted one quad

14   particularly because of the creation of the

15   NWSL.

16         Q.    Okay.  If you look back at

17   Exhibit 3 and Article II on Page 1, it has an

18   expiration date of December 31st, 2012 and the

19   contract states that at least 60 days prior to

20   that the parties shall enter into good faith

21   negotiations for a successor or modified

22   agreement.

23                Did the parties, in fact, enter

24   into such negotiations at least 60 days prior

25   to the termination date?

1        A.   I don't know if we actually

2   started, but we each gave each other notices

3   in advance of that 60 days that we needed to

4   start having discussions.

5        Q.   Okay.  Do you recall that the

6   parties did begin negotiations before the

7   expiration date at some point?

8        A.   Yes.

9        Q.   Okay.  At that time, there was no

10  Division 1 women's professional soccer league

11  in the United States playing games; true?

12       A.   Correct.

13       Q.   Based on your recent testimony,

14  I -- well, let me ask you.

15            Is it correct that both the

16  Players Association and U.S. Soccer appeared

17  from their statements to each other to believe

18  that a league might be starting up soon when

19  they were negotiating the 2013 agreement?

20            MR. FEHER:  Objection.

21            MR. STOLZENBACH:  Here, I'll -- I'll

22       rephrase.

23            THE WITNESS:  All right.

24  BY MR. STOLZENBACH:

25       Q.   Had you been informed by anyone

1          (Exhibit Langel-4, four-page

2          document entitled "Memorandum" addressed to

3          U.S. Soccer from United States Women's

4          National Team Players Association dated

5          November 1, 2012, bearing Bates Numbers

6          USSF_SOLO_000545 through USSF_SOLO_000548,

7          is marked for identification.)

8    BY MR. STOLZENBACH:

9          Q.   Mr. Langel, I have handed you

10   something marked Exhibit 4, which bears the

11   Bates labels USSF_SOLO_545 to 548.  It is a

12   memorandum to U.S. Soccer from United States

13   Women's National Team Players Association on

14   Ballard Spahr letterhead dated November 1,

15   2012.

16          Do you recall sending this memo to

17   U.S. Soccer?

18          A.   Yes.

19          Q.   Would you consider this memorandum

20   to be the start of negotiations for a 2013

21   Collective Bargaining Agreement?

22          A.   No.

23          Q.   Okay.  They began before that --

24          A.   Yes.

25          Q.   -- or after it?

1          Q.   Fair.

2          A.   That's what I did.

3          Q.   Fair.   When was your last day as

4    Executive Director and General Counsel of the

5    Players Association?

6          A.   I think September 30th, 2014.

7               (Exhibit Langel-6, e-mail

8          correspondence bearing Bates Numbers

9          USSF_SOLO_001724 through USSF_SOLO_001725,

10         is marked for identification.)

11   BY MR. STOLZENBACH:

12         Q.   Given you Exhibit 6,

13   USSF_SOLO_1724 to 1725.

14              Do you recall sending this e-mail

15   to the people reflected in the "To" and "CC"

16   lines?

17         A.   Yes.

18         Q.   And in the e-mail, obviously

19   the beginning of it talks about the players

20   deciding to hire Rich Nichols to represent the

21   Players Association going forward.

22              Based on what you just testified,

23   am I correct in understanding that that

24   decision had been communicated to you maybe a

25   couple months before you sent this e-mail?

Page 48

1           A.   Correct.

2           Q.   After -- after you were informed

3    of that in September of 2014, did you have any

4    involvement in negotiating any future

5    Collective Bargaining Agreements on behalf of

6    the Players Association?

7           A.   No involvement.

8           Q.   As of November 24th, 2014, had

9    U.S. Soccer and the Players Association

10   completed the project of incorporating

11   Exhibit 5 and the 2005 Collective Bargaining

12   Agreement into a new integrated document?

13           MR. FEHER:   Objection.

14           THE WITNESS:   They had not.   We had

15       not.

16   BY MR. STOLZENBACH:

17           Q.   Okay.   So I gather from your

18   testimony that the collective bargaining

19   negotiations that resulted in the Memorandum

20   of Understanding in 2013 took place beginning

21   sometime in 2012 and ending in 2013; right?

22           A.   Correct.

23           Q.   So I'm going to refer to those as

24   the 2012 to 2013 negotiations and hope we'll

25   stay on the same page that way.

Page 68

1          Q.   Did -- did you, in fact, have a

2    copy of the 2011 Collective Bargaining

3    Agreement that the Men's National Team Players

4    operated under as of the time you commenced

5    the 2012-2013 negotiations with U.S. Soccer?

6          A.   Yes.

7          Q.   Okay.

8               (Exhibit Langel-11, multipage

9          document entitled Preamble, bearing Bates

10         Numbers USSF_SOLO_001776 through

11         USSF_SOLO_001824, is marked for

12         identification.)

13              (Pause.)

14   BY MR. STOLZENBACH:

15         Q.   Mr. Langel, I've handed you an

16   exhibit marked Exhibit 11, which is mark --

17   which is Bates labeled USSF_SOLO_1776 -- here

18   we are in Philadelphia anyway -- through 1824.

19              Does that appear to you to be the

20   Men's National Team Collective Bargaining

21   Agreement that was in effect when you

22   commenced the 2012 to 2013 negotiation?

23         A.   Yes.

24         Q.   At any time during the 2012 to

25   2013 negotiations for a new Collective

1          A.   I won't be able to recall

2    everything, but more pay, ranking bonuses, win

3    bonuses, World Cup bonuses, per diems,

4    travel --

5          Q.   Anything else you --

6          A.   -- other wages and terms,

7    conditions, benefits, things like that.  We

8    wanted more.  We have a lot of -- each

9    Collective Bargaining Agreement has some of

10   the same aspects with different money applying

11   to them, and we asked for more and we would at

12   times reference what the men were getting.

13        Q.   Did the Players Association ever

14   ask for in collective bargaining negotiations

15   while you were -- let me strike that.

16              During the 2012 to 2013

17   negotiations, did the Players Association

18   ever -- ever ask for the same exact World Cup

19   compensation structure that the men had?

20              MR. FEHER:  Objection.

21              MS. DE BARTOLOMEO:  Join.

22              THE WITNESS:  I don't recall that we

23        ever did that.

24   BY MR. STOLZENBACH:

25        Q.   Okay.  During the 2012 to 2013

1  negotiations, did the Players Association ever

2  ask for the same compensation structure the

3  men had for friendly match -- for friendly

4  matches?

5          MR. FEHER:  Objection.

6          MR. NICHOLS:  Objection.

7          MS. DE BARTOLOMEO:  Join.

8          THE WITNESS:  You mean the same

9      amount of money?

10  BY MR. STOLZENBACH:

11      Q.   Correct.

12      A.   I -- I don't know that we asked

13  for the same amount of money.  I know we asked

14  for more money in -- and referenced what the

15  men were getting for their per game.

16      Q.   And did the player -- Women's

17  Players Association in the 2012 to 2013

18  negotiations ever ask for the same friendly

19  win and draw bonus structure based upon

20  opponents' rankings?

21          MR. FEHER:  Objection.

22  BY MR. STOLZENBACH:

23      Q.   Setting aside the amount of money,

24  but the same structure.

25          MR. FEHER:  Objection.

1           MS. DE BARTOLOMEO:  Join.

2           THE WITNESS:  I don't recall whether

3       we did.  I know we asked for ranking

4       bonuses in every negotiation.  Whether we

5       would be tied to the ranking of a country

6       we were playing in friendly, I don't recall

7       that.

8   BY MR. STOLZENBACH:

9       Q.   During the negotiations in 2012

10  and 2013, the Players Association sought from

11  the very outset of those negotiations to

12  achieve multiple things in its Collective

13  Bargaining Agreement that you knew the men's

14  players did not have in theirs, didn't you?

15          MR. FEHER:  Objection.

16          MS. OPPENHEIMER:  And --

17          MS. DE BARTOLOMEO:  Join.

18          MS. OPPENHEIMER:  -- the same

19      caution about testifying --

20          THE WITNESS:  Yeah.

21          MS. OPPENHEIMER:  -- as to what

22      was -- what they said they sought.

23          THE WITNESS:  My demand -- the

24      demands, that November 1 exhibit that you

25      have that you showed me, include items that

1           the men do not have in their Collective

2           Bargaining Agreement.

3    BY MR. STOLZENBACH:

4           Q.   One of the things that the Women's

5    National Team Players Association proposed

6    from its very first proposal throughout the

7    negotiations in 2012 to 2013 was a guaranteed

8    minimum number of women's players receiving

9    annual salaries with U.S. Soccer; correct?

10              MR. FEHER:  Objection.

11              MS. DE BARTOLOMEO:  Objection.

12              THE WITNESS:  Correct.

13   BY MR. STOLZENBACH:

14          Q.   One of the things that the Women's

15   National Team Players Association proposed

16   from the very beginning of the negotiations in

17   2012 all the way through the end of the

18   negotiations in 2013 was severance pay if

19   their U.S. Soccer contract was terminated;

20   right?

21          A.   Correct.

22          Q.   And the Women's National Team

23   Players Association, in fact, achieved in the

24   contract in 2013 both of those things, annual

25   salaries for a certain number of players and

1  severance pay if those players' contracts were

2  terminated?

3          A.   Correct.

4          Q.   One of the things that the Players

5  Association sought from U.S. Soccer from the

6  beginning of the 2012 negotiations through the

7  end, and ultimately achieved in the contract,

8  was a continuation of a contracted player's

9  salary during the period of time the player

10  is -- was unable to play owing to injury or

11  illness; correct?

12          A.   Correct.

13          Q.   And as I recall -- who cares what

14  I recall.  Strike that.

15              One of the things that the Players

16  Association -- the Women's National Team

17  Players Association proposed from the

18  beginning of the negotiations in 2012 through

19  the end was a guarantee of a certain amount of

20  time after returning from injury or illness

21  during which a contracted player would

22  continue to receive her salary; is that right?

23          A.   Correct.

24          Q.   And -- and ultimately the Players

25  Association achieved a provision that

1    guaranteed a contracted player's salary for a

2    period of time after her return from injury or

3    illness; is that right?

4         A.   Yes.

5         Q.   One of the things the Players

6    Association, the Women's Players Association

7    proposed throughout the 2012 to 2013

8    negotiations was a promise from U.S. Soccer to

9    provide medical, dental, and vision insurance

10   benefits; is that right?

11        A.   Correct.

12        Q.   And the Players Association

13   achieved that?

14        A.   Correct.

15        Q.   Dental -- dental benefits were new

16   in the 2013 agreement; is that right?

17        A.   That's my recollection.

18        Q.   One of the things the Women's

19   National Team Players Association sought to

20   achieve in the 2002 and 2013 --

21        A.   2012-'13.

22        Q.   Thanks.  I was going to strike it

23   anyway 'cause I said "sought to achieve" and I

24   was going to get an objection.

25             Mr. Langel, one of the things that

1   the play -- Women's National Team Players

2   Association proposed in 2012 and 2013 was that

3   the -- was that U.S. Soccer would provide

4   assistance with child care during Women's

5   National Team training camps; is that right?

6           A.   Yes.

7           Q.   And the -- the form of that

8   consisted of three things:  One being pay for

9   the person providing the child care, the other

10  being airfare for the person providing the

11  child care, and the third being hotel

12  accommodations for the person providing the

13  child care.

14              Do you remember that to be

15  accurate?

16          A.   Sounds right.

17          Q.   Okay.  So you've testified already

18  about Mr. Gulati telling you and the players

19  that U.S. Soccer was working to create this

20  new league that ultimately became the NWSL.

21              Do you remember that?

22          A.   Correct.

23          Q.   That league did end up commencing

24  play in 2013; correct?

25          A.   Correct.

1   games was a part of it and he's dredging it up

2   15 years later, but so...

3           And we said Mia would not show up

4   to the announcement of the pairings for the

5   World Cup, and U.S. Soccer gave us what we

6   wanted.  And we had no commitment on the PanAm

7   games.  We got paid without a commitment.

8   Okay.

9           I find it funny.  He wasn't

10  involved, but he seemed to know lots.

11          (Exhibit Langel-14, e-mail

12      correspondence with attachment bearing

13      Bates Numbers WNTPA_00009371 through

14      WNTPA_00009375, is marked for

15      identification.)

16  BY MR. STOLZENBACH:

17      Q.   I've given you Exhibit 14, which

18  is an e-mail from you to Mr. Gulati and

19  Ms. Levine attaching a memo, and the Bates

20  labels for the exhibit are 9371 through 9375

21  from the PA's production.

22          Do you recall sending this e-mail

23  and attachment to the --

24      A.   Yes.

25      Q.   -- U.S. Soccer folks back on

1    December 6, 2012?

2         A.   Yes.

3         Q.   This memo was your attempt to

4    summarize the then current status of contract

5    negotiations?

6         A.   Yes.

7         Q.   And in particular, the Players

8    Association's position?

9         A.   Yes.

10        Q.   The first outstanding item is

11   Number 1 on the first page, "WWC/Olympic

12   Win/Tie Bonus Until Medal Rounds."

13        A.   Yes.

14        Q.   On -- in the third sentence you

15   wrote, "We asked for payments for wins and

16   ties during the World Cup/Olympic non-medal

17   rounds.  You said that, based on past quads,

18   that would amount to an additional $600,000.00

19   in guaranteed payments and you could not do

20   that."

21             Did you understand Mr. Gulati to

22   be saying that because our Women's National

23   Team always wins in those rounds, that

24   offering theoretically bonus payments for wins

25   and ties during those rounds, it was

1        Q.   Okay.

2        A.   -- of -- it's actually in the

3    meeting notes that you gave me.  I read it

4    while sitting here.  And he gave an

5    explanation of why he couldn't do it for --

6    why it didn't make sense for the women, why he

7    couldn't do it for the women.

8        Q.   Okay.

9        A.   So...

10            (Exhibit Langel-15, multipage

11        document containing letter dated December

12        10, 2012 bearing Bates Numbers

13        USSF_SOLO_001966 through USSF_SOLO_001974,

14        is marked for identification.)

15    BY MR. STOLZENBACH:

16        Q.   So, Mr. Langel, I've handed you

17    Exhibit 15, which is marked USSF_SOLO_1966 to

18    1974.

19            First page is a handwritten note

20    which appears to me to say, sent union e-mail

21    10 -- sorry -- sent union e-mail 12/10/12.

22            Is that what it looks like to you

23    as well?

24        A.   Yes.

25        Q.   Okay.  The rest of the exhibit is

1   a letter from Lisa Levine to you.

2           Do you recall receiving this

3   letter from Ms. Levine?

4           A.   No, but I have every reason to

5   believe I did.

6           Q.   Fair enough.  The first sentence

7   purports to characterize what you, Mr. Langel,

8   told us at the outset of these Collective

9   Bargaining Agreement negotiations.  Could you

10  read what it says there about what you said

11  and tell me if you agree that it's a fair

12  characterization of something you said at the

13  outset of negotiations.

14          MR. FEHER:  Objection.

15  BY MR. STOLZENBACH:

16          Q.   Just that first --

17          A.   I'm sorry.

18          Q.   -- paragraph.

19          A.   What are you asking me to look at?

20          Q.   Sure.  All right.  I'll just read

21  the whole thing here.  It says -- I'll read

22  the paragraph.

23          "Dear John, before addressing the

24  specific points raised in your memo of

25  December 6, 2012 (the Memo), we would like to

1      Q.   Okay.

2           (Exhibit Langel-19, e-mail

3      correspondence bearing Bates Numbers

4      USSF_SOLO_001104, is marked for

5      identification.)

6           (Exhibit Langel-20, letter dated

7      February 19, 2013, bearing Bates Numbers

8      USSF_SOLO_001975 through USSF_SOLO_001981

9      and USSF_SOLO_001105, is marked for

10     identification.)

11          (Pause.)

12  BY MR. STOLZENBACH:

13     Q.   Mr. Langel, I've handed you

14  Exhibits 19 and 20.  You can see that

15  Exhibit 19, which is USSF_SOLO_1104, reflects

16  that it has an attachment attached to it, and

17  I believe that Exhibit 20 is that attachment.

18          Looking at the two documents, can

19  you tell me whether that's true?

20     A.   I think that's true.

21     Q.   Okay.  And Exhibit 20 is

22  USSF_SOLO_1975 through -- well, let's say et

23  cetera because it has USSF_SOLO_1105 at the

24  back of it.

25          And to correct the record a little

1   bit, Exhibit 19 reflects two attachments to

2   the e-mail, does it not?

3          A.   I don't know.

4          Q.   Up in the attachments line, it --

5   it appears to reflect two.

6          A.   Okay.

7          Q.   Do you -- let's ask you this.

8               Do you recall sending the

9   memorandum and the -- sorry.

10              Do you recall receiving the

11  memorandum as well as the financial terms,

12  which is the last page of Exhibit 20, from

13  Ms. Levine?

14         A.   Yes.

15         Q.   Okay.  And at the bottom of

16  Exhibit 20, the first page, Ms. Levine writes,

17  "As previously discussed, we have revised our

18  financial proposal to reflect the priorities

19  as expressed by the PA, namely, to increase

20  the guaranteed compensation at the expense of

21  the non-guaranteed compensation (the bonus

22  payments)."

23              Were those priorities that you or

24  someone else representing the Players

25  Association had expressed?

1   financial data annually for purposes of the

2   Players Association being able to confirm

3   whether or not it was entitled to payment

4   under that section?

5           A.   I don't know -- remember -- recall

6   precisely what we received, but we did receive

7   an annual representation regarding this ratio

8   formula.

9           Q.   Okay.  And that Section VIX in the

10  2005 Collective Bargaining Agreement carried

11  over into the 2013 Collective Bargaining

12  Agreement as well; correct?

13              MR. FEHER:  Objection.

14              THE WITNESS:  I believe so, yes.

15              MR. STOLZENBACH:  Okay.

16              (Exhibit Langel-21, multipage

17          document entitled Memorandum bearing Bates

18          Numbers WNTPA_00009480 through

19          WNTPA_00009492, is marked for

20          identification.)

21  BY MR. STOLZENBACH:

22          Q.   Mr. Langel, Exhibit 21 is marked

23  with Bates labels WNTPA_9480 through 9492.

24          A.   Okay.

25          Q.   Do you recall sending this

1    memorandum to Ms. Levine?

2         A.   Yes.

3         Q.   This Exhibit 21, does it reflect a

4    contract proposal by the Players Association?

5         A.   Yes.

6         Q.   The first bullet point on the

7    first page says that the Players Association

8    is prepared to reduce its demand in one

9    respect and accept the U.S. Soccer proposal on

10   that same issue provided that it receives the

11   dollar twenty per ticket payment and a

12   guarantee of a minimum number of U.S. Soccer

13   promoted home games.

14             Is that a fair --

15        A.   Yes.

16        Q.   -- paraphrase of the trade?

17             MR. FEHER:  Objection.

18             MS. De BARTOLOMEO:  Objection.

19   BY MR. STOLZENBACH:

20        Q.   Why did the Players Association

21   say that it could only accept this offer with

22   a guarantee of a minimum of seven U.S. Soccer

23   promoted home games per year of the contract?

24             MR. FEHER:  Objection, and that's

25        going to be a --

1  of games and this year's schedule and

2  attendance at first two games.  Help me sell

3  it."

4           Do you recall whether you had a --

5  an expectation as to what you thought

6  Mr. Gulati would give you in response to this

7  that would help you sell it?

8       A.   Guaranteed --

9           MR. FEHER:  Objection.

10          THE WITNESS:  -- guaranteed games or

11       a representation that we were going to have

12       games.  And I was telling him look at the

13       first two games because we were getting

14       larger crowds.  It made more sense for them

15       to be having more home games.

16          So I was asking him to address that

17       issue and help me, by giving me an

18       appropriate response, help me sell that

19       back to the players who would have to

20       approve this agreement.

21          (Exhibit Langel-23, e-mail

22       correspondence with attachment bearing

23       Bates Numbers WNTPA_00009509 through

24       WNTPA_00009517, is marked for

25       identification.)

1   BY MR. STOLZENBACH:

2          Q.   Before we move on to Exhibit 23,

3   can you look back at Exhibit 20 --

4          A.   20?

5          Q.   No, I hadn't finished.  No, let's

6   look at Exhibit 23.

7          A.   Okay.

8          Q.   Exhibit 23 is labeled WNTPA_9509

9   to 9517.

10             Do you recall receiving this

11  e-mail in response from Ms. Levine on

12  March 5th, 2013 or thereabouts?

13         A.   I'm a little bit confused by the

14  cover e-mail.  One is dated 2/28, which is

15  my -- evidently my response, and one is then

16  dated 3/5th -- 5, which is her response.  So

17  I'm not sure what is attached.

18             Is that her response that's

19  attached --

20         Q.   So --

21         A.   -- with no --

22         Q.   Yeah, I'll --

23         A.   -- reference to my response?

24         Q.   Yeah, I'll represent to you that

25  the 9510 through 9516 is the attachment

1    referenced in the e-mail in the attachments

2    line that begins SKMBT pdf and that the last

3    page of the exhibit is the attachment that is

4    referred to in the first page as "WNT CBA

5    Financial Proposal."

6         A.   Okay.

7         Q.   Do -- I guess I will ask you if

8    you recall receiving Ms. Levine's March 5th,

9    2013 letter and financial proposal that's

10   reflected in the exhibit?

11        A.   I have every reason to believe

12   that that's what I would have received --

13        Q.   Okay.

14        A.   -- in -- at the time of these

15   negotiations.

16        Q.   I want, if you could, to look at

17   the last page of the exhibit, 9517.

18        A.   Yes.

19        Q.   The very bottom line says "Signing

20   Bonus" 4,025 -- sorry.

21        A.   425.

22        Q.   The very bottom line says "Signing

23   Bonus $425,000.00."

24        A.   Yes.

25        Q.   Okay.  I know this is Ms. Levine's

 1  recommend.

 2          MR. STOLZENBACH:  I'll give you

 3      Exhibit 25.

 4          (Exhibit Langel-25, e-mail

 5      correspondence bearing Bates Numbers

 6      USSF_SOLO_001321, is marked for

 7      identification.)

 8  BY MR. STOLZENBACH:

 9      Q.   Exhibit 25 reflects an e-mail from

10  you to Mr. Gulati at the bottom and then a

11  response from Mr. Gulati.

12          Do you recall having this e-mail

13  exchange with Mr. Gulati?

14      A.   No --

15      Q.   Okay.

16      A.   -- but no reason for me to believe

17  that it didn't happen.

18      Q.   The e-mail from you to Mr. Gulati

19  is titled, "Additional Potential Topics For

20  Memo of Understanding," and one of the things

21  stated in that e-mail is that "Terms from the

22  old CBA that we have not addressed remain

23  unchanged unless inconsistent with the memo we

24  will sign."

25          Do you see that sentence?

1          A.   Yes.

2          Q.   And one of those terms is

3    reflected in the first bullet point under

4    "Topics From the Old CBA" in your e-mail;

5    correct?

6          A.   Yes.

7               MR. FEHER:  Objection.

8    BY MR. STOLZENBACH:

9          Q.   And that first bullet in your

10   e-mail is a reference to Section VIX that you

11   testified about earlier; correct?

12         A.   Correct.

13         Q.   Okay.

14              MR. FEHER:  Oh, thank you very much.

15         Oh, may I?

16              (Pause.)

17              (Exhibit Langel-26, e-mail

18         correspondence bearing Bates Numbers

19         WNTPA_00009587, is marked for

20         identification.)

21   BY MR. STOLZENBACH:

22         Q.   Mr. Langel, is Exhibit 26 an

23   e-mail you sent to Mr. Gulati?

24         A.   It --

25              MR. FEHER:   Wait one second.

1                 (Exhibit Langel-31, e-mail

2          correspondence with attachment bearing

3          Bates Numbers WNTPA_00009642,

4          WNTPA_00009681 through WNTPA_00009689 and

5          WNTPA_00009643, is marked for

6          identification.)

7    BY MR. STOLZENBACH:

8          Q.   Can I see what I just gave you?

9     Do you mind?

10         A.   (Witness returns Document.)

11         Q.   Exhibit 31 is WNTPA_9642.

12    Attached to it are WNTPA9681 through 89 as

13    well as WNTPA9643.

14              Do you recognize this to be an

15    e-mail from Ms. Uselton to Sunil Gulati

16    attaching yet another version of the

17    Memorandum of Understanding and financial term

18    sheet?

19         A.   Yes.

20              MR. FEHER:  Objection.

21              MR. STOLZENBACH:  And we'll give you

22          Exhibit 32.

23              (Exhibit Langel-32, e-mail

24          correspondence bearing Bates Numbers

25          WNTPA_00009716 through WNTPA_00009717, is

1          marked for identification.)

2                    MR. FEHER:  I'm missing one.

3                    MR. STOLZENBACH:  Missing --

4                    MR. FEHER:  Two.

5                    MR. STOLZENBACH:  You only have two.

6          Maybe I kept too many.

7     BY MR. STOLZENBACH:

8          Q.   Is Exhibit 32 an e-mail from

9     Ms. Levine referencing the attachment of the

10    final Memorandum of Understanding signed by

11    U.S. Soccer.

12                   Let me do this a little

13    differently if I can -- or not.

14                   MR. SLAUGHTER:  You're referring to

15         the e-mail at the top?

16                   MR. STOLZENBACH:  I am.

17    BY MR. STOLZENBACH:

18         Q.   The e-mail at the top in which

19    Ms. Levine says, "As discussed, attached

20    please find the MOU executed and initialed on

21    behalf of U.S. Soccer."

22                   Do you understand that to be the

23    final MOU that we saw earlier that both

24    parties ultimately initialed?

25         A.   Yes.