Ellen E. McLaughlin (*Pro Hac Vice*)
E-mail:  emclaughlin@seyfarth.com
Noah Finkel (*Pro Hac Vice*)
E-mail:  nfinkel@seyfarth.com
Brian Stolzenbach (*Pro Hac Vice*)
E-mail: bstolzenbach@seyfarth.com
Sharilee Smentek (*Pro Hac Vice*)
E-mail:  ssmentek@seyfarth.com
**SEYFARTH SHAW LLP**
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:   (312) 460-5000
Facsimile:   (312) 460-7000

Kristen M. Peters (SBN 252296)
E-mail:  kmpeters@seyfarth.com
**SEYFARTH SHAW LLP**
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:   (310) 201-5219

Giovanna A. Ferrari (SBN 229871)
E-mail: gferrari@seyfarth.com
Chantelle C. Egan (SBN 257938)
E-mail: cegan@seyfarth.com
**SEYFARTH SHAW LLP**
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:  (415) 397-2823
Facsimile:   (415) 397-8549

Kyllan Kershaw (Pro Hac Vice)
E-mail: kkershaw@seyfarth.com
**SEYFARTH SHAW LLP**
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309
Telephone:  (404) 885-1500
Facsimile:   (404) 892-7056

Counsel for Defendant
U.S. SOCCER FEDERATION, INC.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALEX MORGAN, et al., | Case No. 2:19-cv-01717-RGK-AGR |
| Plaintiffs, | **DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| U.S. SOCCER FEDERATION, INC., | |
| Defendant. | Judge:      Hon. R. Gary Klausner<br>Hearing:   March 30, 2020 at 9:00 a.m.<br>Place:      Courtroom 850 |

# TABLE OF CONTENTS

**Page**

I.   Plaintiffs' Motion Must Be Denied Based on the Federal
     Policy of Judicial Nonintervention in the Collective Bargaining Process. ............... 1

II.  Plaintiffs Have Not Established an Equal Pay Act Violation. ................................. 4

    A.   Plaintiffs Have Not Established That U.S. Soccer Pays Them
     Wages at a Rate Less than It Pays Appropriate Male Comparators. .............. 4

    B.   Plaintiffs and MNT Players Do Not Work in the Same Establishment. ......... 9

    C.   WNT and MNT Players Do Not Perform Equal Work Requiring
     Equal Skill, Effort, and Responsibility Under Similar Working
     Conditions. .................................................................................................... 11

    D.   The Three Aspects of Compensation Referenced in Plaintiffs'
     Motion Serve Only To Highlight the Differences Between the Two
     Jobs. .............................................................................................................. 14

    E.   Plaintiffs Have Not Shown That U.S. Soccer Is Incapable
     of Establishing an Affirmative Defense to Their EPA Claim. ...................... 17

III. Plaintiffs Have Not Established Pay Discrimination in Violation of Title VII....... 20

    A.   Because Plaintiffs Are Not Entitled To Summary Judgment on Their
     EPA Claim, They Also Are Not Entitled to Summary Judgment on
     Their Pay Discrimination Claim Under Title VII. ........................................ 20

    B.   The Court Should Not Entertain Plaintiffs' New Legal Theory. ................... 22

    C.   Plaintiffs Have Not Established Discriminatory Intent................................. 22

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3
4

**Federal Cases**

5

*Brennan v. Goose Creek Consol. Indep. Sch. Dist.*,
    519 F.2d 53 (5th Cir. 1975) ....................................................................... 9

6
7

*Byrd v. Ronayne*,
    61 F.3d 1026 (1st Cir. 1995) .................................................................... 18

8
9

*Campbell v. City of Los Angeles*,
    903 F.3d 1090 (9th Cir. 2018) ................................................................... 4

10
11

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974) ................................................................................... 3

12
13

*Diamond v. T. Rowe Price Assocs., Inc.*,
    852 F. Supp. 372 (D. Md. 1994) .............................................................. 19

14
15

*Grosz v. Boeing Co.*,
    455 F. Supp. 2d 1033 (C.D. Cal. 2006) ..................................................... 3

16
17

*Grubic v. Los Angeles Superior Court*,
    2009 WL 10698377, No. CV 09-4729 CAS .......................................... 1, 3

18

*Hein v. Oregon Coll. of Educ.*,
    718 F.2d 910 (9th Cir. 1983) ............................................................*passim*

19
20

*Hodgson v. Robert Hall Clothiers*,
    473 F.2d 589 (3rd Cir. 1973) ............................................................. 18, 19

21
22

*Ledbetter v. Goodyear Tire & Rubber Co.*,
    550 U.S. 618 (2007) ................................................................................. 21

23
24

*Marcoux v. State of Maine*,
    797 F.2d 1100 (1st Cir. 1986) ............................................................. 6, 12

25
26

*Marshall v. Western Grain Co.*,
    838 F.2d 1165 (11th Cir. 1988) ......................................................... 1, 2, 3

27

*Maxwell v. City of Tuscon*,
    803 F.2d 444 (9th Cir. 1986) ................................................................... 20

28

ii

*Perkins v. Rock-Ten Servs., Inc.*,
  700 Fed. App'x 452 (6th Cir. 2017) ....................................................... 3, 19

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
  457 F.3d 963 (9th Cir. 2006) ...................................................................... 22

*Portis v. First National Bank of New Albany, Miss.*,
  34 F.3d 325 (5th Cir. 1994) ........................................................................ 25

*Renstrom v. Nash Finch Co.*,
  787 F. Supp. 2d 961 (D. Minn. 2011) ......................................................... 10

*Rizo v. Yovino*,
  2020 U.S. App. LEXIS 6345 (9th Cir. Feb. 27, 2020) .......................... 18, 21

*Robinson v. Entex, Inc.*,
  1990 WL 517060 (N.D. Tex. Aug. 10, 1990) ............................................ 6, 7

*Sims-Fingers v. City of Indianapolis*,
  493 F.3d 768 (7th Cir. 2007) ...................................................................... 11

*Stanley v. U.S.C.*,
  13 F.3d 1313 (9th Cir. 1994) ...................................................................... 13

*Strag v. Board of Trustees*,
  55 F.3d 943 (4th Cir. 1995) .......................................................................... 5

*Weaver v. O.S.U.*,
  71 F. Supp. 2d 789 (S.D. Ohio 1998), *aff'd*, 191 F.3d 1315 (6th Cir.
  1999) ........................................................................................................... 14

**Federal Statutes**

29 U.S.C. § 171 ................................................................................................ 1

29 U.S.C. § 206(d) ......................................................................................... 4, 9

29 U.S.C. § 255(a) ............................................................................................ 5

42 U.S.C. § 2000e-2(a)(1) ............................................................................... 21

42 U.S.C. § 2000e-2(h) ................................................................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Regulations**

29 C.F.R. § 531.40(c) ........................................................................................... 7

29 C.F.R. § 1620.9 ........................................................................................... 8, 9

29 C.F.R. § 1620.10 ......................................................................................... 6, 7

29 C.F.R. § 1620.15 ............................................................................................ 11

29 C.F.R. § 1620.18(a) ...................................................................................... 14

29 C.F.R. § 1620.27 ........................................................................................... 21

**Other Authorities**

Doraine Lambert Coleman, *Sex in Sport*, 80 LAW AND CONTEMPORARY
    PROBLEMS 63-126 (2017) ......................................................................... 11, 12

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

# I.    Plaintiffs' Motion Must Be Denied Based on the Federal Policy of Judicial Nonintervention in the Collective Bargaining Process.

Plaintiffs do not allege that their collective bargaining agreement (CBA) is being applied in a discriminatory manner among bargaining unit members or contend that the CBA includes facially discriminatory provisions; rather, Plaintiffs argue that their CBA is discriminatory only by comparing a few cherry-picked contract terms to provisions in a different CBA negotiated by a different union covering different employees who perform a different job *outside Plaintiffs' bargaining unit*. Awarding Plaintiffs summary judgment on their pay discrimination claims in these circumstances (or, indeed, denying U.S. Soccer's own motion for summary judgment) would be unprecedented in American jurisprudence and would be fundamentally inconsistent with federal labor law. 29 U.S.C. § 171 (noting that "industrial peace and . . . the best interest of employers and employees can most satisfactorily be secured by the settlement of issues between employers and employees through the processes of conference and collective bargaining").

Although unionized employees do have a remedy under anti-discrimination laws when their employers apply their CBA in a discriminatory manner or when their CBA includes facially discriminatory provisions, courts should adopt the "federal policy of judicial nonintervention in the collective bargaining process" when, as here, neither is the case. *Marshall v. Western Grain Co.*, 838 F.2d 1165, 1166-67, 1170-72 (11th Cir. 1988) (unionized plaintiffs failed to state a claim under Title VII by complaining about severance benefits that differed from those of employees outside the bargaining unit); *see also Grubic v. Los Angeles Superior Court*, 2009 WL 10698377, No. CV 09-4729 CAS (PJWx), *1, 5 (C.D. Cal. Dec. 21, 2009) (relying on *Marshall* to dismiss a Title VII complaint filed by unionized court-certified interpreters who claimed to be paid less, based on their race and national origin, than court reporters outside the bargaining unit).

In *Marshall*, the plaintiffs were unionized, and "[a]ll but one of the sixty-eight union employees were black," but "[o]ut of the total number of non-union employees, only four were black." 838 F.2d at 1167. All the non-union employees were paid severance after a

plant closure while the unionized employees were not. *Id.* at 1166-67. The court noted that a facially discriminatory CBA and discriminatory application of a CBA are both unlawful, but it held that "refusal to tamper with nondiscriminatory collective bargaining agreements is necessary to promote respect for the collective bargaining process." *Id.* at 1168-69. Accordingly, the court observed, a "collective bargaining agreement . . . should not be set aside based upon the mere allegation that minority workers were treated differently from non-minority workers," noting that "bargaining unit employees are ***never*** similarly situated with non-bargaining unit employees." *Id.* at 1169-70 (emphasis in original). The court further explained: "The unique treatment that employers give to bargaining unit members is . . . reflected best by the collective bargaining agreement. This agreement represents a culmination of often-extensive 'give-and-take' negotiations between the employer and the employees' designated representative. An employer's decision to pay severance or any other benefits cannot be understood without inquiring into the substance of such negotiations." *Id.* at 1170. Additionally, "employers' and unions' faith in the ability of the collective bargaining process to provide solutions to problems in labor relations greatly depend on [the federal policy of judicial] nonintervention [in the collective bargaining process]." *Id.* Meanwhile, "refusing to enforce collective bargaining agreements and . . . imposing contractual modifications on parties to such agreements would drastically reduce the incentive of those parties to work toward negotiated solutions. Under such a policy, parties to an agreement would face the potential of their opposition turning to the courts for assistance in accomplishing goals not achieved at the negotiating table. Such a result would be contrary to the well-established federal policy goal of fostering collective bargaining as the means of resolving employer-union disputes." *Id.* at 1171-72. For all these reasons, which are directly applicable in this case, the Court should deny Plaintiffs' motion, just as the Eleventh Circuit rejected the plaintiffs' claims in *Marshall*.

In fact, courts consistently reject attempts by unionized plaintiffs to compare themselves to employees outside the bargaining unit, under both Title VII and the EPA.

1   *Perkins v. Rock-Ten Servs., Inc.*, 700 Fed. App'x 452, 457 (6th Cir. 2017); *Marshall*, 838

2   F.2d at 1170; *Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033, 1045 (C.D. Cal. 2006); *Grubic*,

3   2009 WL 10698377 at *5.

4        *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), is not to the contrary. There,

5   the female plaintiffs held the exact same job in the exact same plant as their male

6   counterparts, but were paid a lower hourly rate for the work, dating back to the 1920s. *Id.*

7   at 191-192. The discriminatory set-up in that case started before the employees were

8   organized, but once they were organized by a union, the disparity was written into the

9   CBA, and it remained that way even after the EPA was passed. *Id.* at 192-94. The

10  Supreme Court rejected the notion that this blatant discrimination could be defended on

11  the mere basis that it had been written it into a CBA. *Id.* at 209-10. That is not the fact

12  pattern presented here. This case does not involve a single CBA negotiated by a single

13  union covering a single bargaining unit, containing pay provisions which discriminate in

14  favor of men and against women who perform identical jobs within that bargaining unit.

15       Instead, Plaintiffs contend that certain provisions in their CBA are discriminatory

16  based entirely on selective comparison to another union's CBA covering a different

17  bargaining unit. No court has ever countenanced such a claim, and doing so would permit

18  Plaintiffs to do exactly what the court warned against in *Marshall*. Plaintiffs want the

19  Court to grant them victories they could not achieve at the bargaining table by rewriting a

20  few provisions in their CBA to give them additional compensation, without any regard

21  for the give-and-take at the bargaining table that delivered the CBA (and its many

22  beneficial terms for Plaintiffs) in the first place. Plaintiffs ask the Court to do this

23  notwithstanding the indisputable fact that Plaintiffs' CBA does ***not*** systematically pay

24  them less than the MNT CBA pays MNT players. (McCrary Dec. ¶ 1, Ex. 1 at ¶ 40-49.)

25  The Court should decline Plaintiffs' invitation to intervene in the collective bargaining

26  relationship between their union and U.S. Soccer by selectively rewriting the parties'

27  CBA. Plaintiffs' motion should be denied.

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

## II.   Plaintiffs Have Not Established an Equal Pay Act Violation.

The EPA is a formulaic statute. To prove a *prima facie* case under the EPA, Plaintiffs must establish (1) that U.S. Soccer pays them "wages . . . at a rate less than the rate at which [it] pays wages to employees of the opposite sex" (2) "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions" and (3) that Plaintiffs and their male comparators work within the same "establishment." 29 U.S.C. § 206(d). Even if Plaintiffs could prove all this, U.S. Soccer still would prevail by showing that "such payment is made pursuant to . . . a differential based on [a] factor other than sex." *Id.* To prevail on summary judgment, Plaintiffs must establish their *prima facie* case even when viewing the facts in the light most favorable to U.S. Soccer while also demonstrating that U.S. Soccer is incapable of proving its affirmative defense when the facts are viewed in the same manner. Plaintiffs have not done this. They are not entitled to summary judgment.

### A.   Plaintiffs Have Not Established That U.S. Soccer Pays Them Wages at a Rate Less than It Pays Appropriate Male Comparators.

Plaintiffs do not even attempt to prove that they have been paid at a "rate less" than comparable male employees. Instead, they obfuscate and try to glide past the issue. Thirty-eight current and former WNT players have opted into this EPA collective action. A collective action is ***not*** a class action under Rule 23, in which the entire class is represented by specific plaintiffs approved by the court; rather, each plaintiff in a collective action possesses an individual claim. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1105 (9th Cir. 2018). As a result, establishing a *prima facie* case under the EPA for purposes of summary judgment requires each of the 38 Plaintiffs to show that "her wages are less than the average paid to [all] appropriate male comparator[s]." *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 917 (9th Cir. 1983). Appropriate male comparators are "all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect wage scale." *Id.* at 916 (emphasis added). "If it should turn out that [a particular Plaintiff] earns

1  *more* than males performing substantially equal work, it is axiomatic that the Equal Pay

2  Act does not afford her relief." *Id.* (emphasis in original). Notwithstanding these clear

3  instructions from the Ninth Circuit, no Plaintiff has named an allegedly comparable male

4  employee, much less explained to the Court how her "wage rate" compares to her

5  purported comparator(s). Plaintiffs' motion cannot be granted in the absence of this

6  information. *Strag v. Board of Trustees*, 55 F.3d 943, 948 (4th Cir. 1995) ("Additionally,

7  the plaintiff must identify a particular male 'comparator' for purposes of the inquiry, and

8  may not compare herself to a hypothetical or 'composite' male.").

9      Instead of actually identifying male comparators, Plaintiffs try to show they are paid a

10  lesser wage rate than male employees by making broad comparative assertions about

11  three aspects of the 2017 WNT CBA and the 2011 MNT CBA.[1] The following three

12  points constitute all of Plaintiffs' "evidence" supporting the claim that they have been

13  paid a lesser wage rate than comparable male employees: (1) "WNT players currently

14  only have the opportunity to receive lower per-game bonuses than MNT players have the

15  opportunity to receive for 'wins' and 'ties' in most 'friendlies'"; (2) "WNT players also

16  only have the opportunity to receive lower bonuses than the MNT for winning World

17  Cup qualifying games, for qualifying as a team for the World Cup, and for making the

18  World Cup roster"; and (3) "WNT players further only have the opportunity to receive

19  lower rates of compensation for other non-World Cup tournaments." (Dkt. 170 at 7.)

20      These three assertions are insufficient to show that Plaintiffs are paid a lesser wage

21  rate than comparable male employees. First, Plaintiffs' compensation arrangement is

22  complex and multi-faceted, and these cherry-picked assertions ignore all kinds of other

23

24  _____

25  [1] Plaintiffs are not seeking summary judgment on their EPA claim for pay discrimination
   under the 2013-2016 WNT CBA. This lawsuit was filed March 8, 2019, and the

26  limitations period for EPA claims is two years, so Plaintiffs' claim addresses only the
   2017 CBA unless they prove a willful violation, in which case the limitations period is

27  three years. 29 U.S.C. § 255(a). Plaintiffs disavow any notion that they are asking the
   Court to enter summary judgment finding a willful EPA violation. (Dkt. 170-42 at 4.)

28

compensation paid to them, or on their behalf, for their work as WNT players. "Under the EPA, the term 'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment." 29 C.F.R. § 1620.10 (brackets in original). Even if the foregoing isolated elements of compensation could fairly be compared between WNT and MNT players (they cannot), and even if Plaintiffs could proceed with a claim without identifying actual male comparators (they cannot), Plaintiffs still provide no legal authority suggesting that they may pick and choose among elements of their overall compensation package to claim that they are paid a lesser wage rate than male employees. On the contrary, see *Robinson v. Entex, Inc.*, 1990 WL 517060, *9 (N.D. Tex. Aug. 10, 1990), where the plaintiff alleged an EPA violation because her monthly salary was lower than a male counterpart's monthly salary but the court awarded judgment to the employer because the plaintiff's salary combined with her car allowance and insurance benefits were, in total, higher than the man's overall per-month compensation. *Cf. also Marcoux v. State of Maine*, 797 F.2d 1100, 1102 n.1 (1st Cir. 1986) (applying EPA analysis in a Title VII case involving a differential in retirement benefits, but noting that there was no other wage difference).

Plaintiffs' selective complaints about the WNT CBA ignore the fact that the CBA requires U.S. Soccer to pay a $100,000 annual salary to a minimum number of "WNT Contracted Players" each year. (1st King Dec. ¶ 15, Ex. 5 § 8.A.1 and Ex. A.) This salary is paid even when the player does not play. For example, Plaintiff Mallory Pugh was not selected for the team's Olympic qualifying roster earlier this year, yet she continued to receive her annual salary during the entire qualifying tournament. (2nd King Dec. ¶ 11, Ex. 2.) Plaintiff Alex Morgan is receiving 75% of her $100,000 annual salary even though she cannot play because she is pregnant, and Plaintiff Morgan Brian is receiving her $100,000 annual salary in the form of severance through the end of March even though her contract was terminated in December and she has not played with the team since then. (*Id.*) No MNT player receives a salary from U.S. Soccer, and they are paid only when they are called into camp to play. (1st King Dec. ¶ 8, Ex. 1 pp. 43-45.)

1   The WNT CBA also required U.S. Soccer to pay a $10,000 signing bonus to 23
2   individual players. (1st King Dec. ¶ 15, Ex 5 § 21.B., Ex. A; Roux Dep. 145.) The MNT
3   CBA did not require any such thing. (1st King Dec. ¶ 8, Ex. 1.)

4       The WNT CBA (as modified by the parties) also required U.S. Soccer to pay the
5   members of the 2019 Women's World Cup roster almost $80,000 each, as additional
6   compensation for playing in five post-tournament friendlies marketed as a "Victory
7   Tour" (which otherwise would have been paid as normal friendlies). (1st King Dec. ¶ 15,
8   Ex. 5 § 19.F., Ex. A; 2nd King Dec. ¶ 14.) No such payment is called for by the MNT
9   CBA. (1st King Dec. ¶ 8, Ex. 1.)

10      The WNT CBA also requires U.S. Soccer to pay the WNT's union: (i) $350,000
11  annually for the right to use WNT players' likenesses in certain ways, (ii) sell-out and
12  enhanced attendance bonuses based on certain levels of paid attendance at home
13  friendlies; (iii) bonuses for improved television ratings; and (iv) bonuses based on
14  achieving certain levels of revenue from sponsorships. (1st King Dec. ¶ 15, Ex. 5 §
15  15.C.1.e., 19.A, 19.B., 19.C.2., 19.C.3.) The union (whose actions are controlled by the
16  players) can direct U.S. Soccer to pay these amounts directly to the players, (*Id.* § 21.C.;
17  *see also* Roux Dep. 31-34, Roux Ex. 5 § 6), but regardless of whether it does so, such
18  payments to the union are "wages" for EPA purposes. 29 C.F.R. § 1620.10 ("all
19  payments made . . . on behalf of" an employee constitute wages under the EPA); 29
20  C.F.R. § 531.40(c) (money paid directly to union on employees' behalf properly
21  considered wages under the Fair Labor Standards Act, to which the EPA is an
22  amendment). There are no such payments in the MNT CBA. (1st King Dec. ¶ 8, Ex. 1.)

23      In sum, each Plaintiff fails to compare herself to even a single actual MNT player and
24  also fails to mention any of this other compensation that ***no*** MNT player receives.
25  Plaintiffs cannot win summary judgment on an EPA claim this way.[2] *Hein*, 718 F.2d at
26  917; *Robinson*, 1990 WL 517060 at *9; 29 C.F.R. § 1620.10.

27  _____

28  [2] Plaintiffs do sneak this sentence into their brief: "WNT players receive a lower rate of pay than the MNT players even when all fringe benefits are taken into consideration," but

Meanwhile, Dr. Justin McCrary, a labor economist at Columbia University Law School, has considered Plaintiffs' own (flawed) methodology for calculating what WNT players supposedly would have earned if they had been covered by the MNT CBA (even though Plaintiffs have not submitted the calculation in support of their motion) and has performed a reverse analysis using that same methodology. (McCrary Dec. ¶ 2, Ex. 2 at ¶ 49.) His analysis shows that MNT players would have been paid more under the WNT CBA than they received under their own. (McCrary Dec. ¶ 2, Ex. 2 ¶ 49-52.) Under Plaintiffs' own theory of the case, U.S. Soccer is somehow engaged in sex-based pay discrimination against the WNT and the MNT at the very same time! This, of course, is a logical impossibility and further demonstrates that Plaintiffs are not entitled to summary judgment. *Hein*, 718 F.2d at 916 (reversing judgment for plaintiff because plaintiff earned more than one male comparator but less than another: "Under this reasoning . . . [the employer] *prima facie* discriminates against [an alleged male comparator] on the basis of sex at the same time it discriminates against [the plaintiff] on the basis of sex. We do not believe that the Equal Pay Act is subject to such manipulation.")

Plaintiffs and the MNT players have very complex and very different compensation arrangements, and Plaintiffs cannot show that they receive a "lesser wage rate" merely by pointing to a few provisions in those overall agreements, especially without identifying any MNT players and providing the Court with a comparative analysis of their overall "wage rates." For this reason alone, Plaintiffs' motion should be denied.

---

they cite no supporting evidence for this assertion. (Dkt. 170 at 7.) Although they drop a footnote referencing an expert report filed with the Court in another context, (Dkt. 170 at 7 n.5), this cannot be considered in support of their summary judgment motion because it is not mentioned in Plaintiffs' Statement of Uncontroverted Facts (and it would be controverted if it had been). In any event, Plaintiffs never explain what this unsupported sentence is supposed to mean, what "benefits" they reference, or who their male comparators are.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**B.    Plaintiffs and MNT Players Do Not Work in the Same Establishment.**

Even if Plaintiffs could show that they were paid lesser wages than appropriate male comparators (which they cannot), they still cannot win summary judgment on their EPA claim without also proving, based on undisputed facts, that they work in the same "establishment" as those male comparators. 29 U.S.C. § 206(d). They have not done so.

Plaintiffs begin by mischaracterizing an EEOC regulation on the "establishment" issue. (Dkt. 170 at 12-13, citing 29 C.F.R. § 1620.9(b), for the proposition that the entirety of U.S. Soccer is a "single establishment" under the EPA because it is "[a] central administrative unit [that] hire[s] all employees, set[s] wages, and assign[s] the location of employment".) Plaintiffs ignore the portions of that regulation stating that an "establishment" under the EPA ordinarily "refers to a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business." 29 C.F.R. § 1620.9(a). Paragraph (b) of the regulation also says that while "unusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment[, b]arring unusual circumstances . . . the term 'establishment' will be applied as described in paragraph (a) of this section." *Id.* § 1620.9(b). The example of "unusual circumstances" described in Paragraph (b) is a situation where a central administrative unit hires all the employees, sets their wages, assigns their location of employment, ***frequently interchanges them***, and gives them daily duties that are virtually identical and performed under similar working conditions. *Id.* Similarly, Plaintiffs cite one Fifth Circuit opinion for the proposition that a single establishment exists among multiple physical locations when there is "centralized control of hiring, wages, work assignments, scheduling, and daily job duties." (Dkt. 170 at 13, citing *Brennan v. Goose Creek Consol. Indep. Sch. Dist.*, 519 F.2d 53 (5th Cir. 1975).) In reality, that case involved male and female janitors working at multiple schools in a district whose centralized administration hired all janitors, determined their wages, assigned them to the schools where they worked, ***switched them back and forth from one school to another***, and in large part controlled their schedules and daily duties, which

9

did not differ from school to school. *Id.* at 56. In short, a multi-location "establishment" occurs only in unusual situations involving far more centralized control than Plaintiffs have shown here, along with employee interchange that is not present here.

Here, each team's Head Coach decides which players make the team, players never interchange between the two teams, and the day-to-day activities of each team are overseen by the Head Coach and assistant coaching staff of that team. (1st Gulati Dec. ¶ 62; 1st King Dec. ¶ 3-4.) Meanwhile, aside from the teams' friendly matches and MNT World Cup qualifiers, the "location of employment" (i.e., where the games are played) and the identity of the opponent is not even determined by U.S. Soccer at all. (2nd King Dec. ¶ 15.) Even with respect to friendlies, each team's separate Head Coach and General Manager gives input into the selection of venue, and selection of each team's opponents for these matches is driven largely by the Head Coach. (*Id.*; Hopfinger Dec. ¶ 1.) Moreover, once the venue is determined, each team's separate Team Administrator generally chooses the team hotel, and along with the coaching staff, organizes the team's activities. (2nd King Dec. ¶ 4, 5.)

The fact that each team's separate budget is rolled up into the organization's overall budget, the fact that the organization has a single marketing department or sells its overall intellectual property rights as a bundle, and the fact that certain aspects of the two teams' employment terms are ultimately approved by the same person or group of people are insufficient facts to declare as a matter of law that the players all work in a single establishment. Plaintiffs have not cited a single authority to support this proposition, and it cannot be the case without having the exception swallow the entire rule: use of the term "establishment" in the statute would lose all meaning because nearly every business would be a single establishment. *Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961, 965 (D. Minn. 2011). A few ordinary commonalities in management and corporate oversight do not turn physically and operationally separate business units into a single establishment. For this additional reason, Plaintiffs are not entitled to summary judgment.

**C.    WNT and MNT Players Do Not Perform Equal Work Requiring Equal Skill, Effort, and Responsibility Under Similar Working Conditions.**

Even Plaintiffs acknowledge that the level of "skill" required for each job in question (WNT player and MNT player) must be "measured by the experience, ***ability***, education, and training required to perform a job." (Dkt. 170 at 15 (emphasis added), *citing* 29 C.F.R. § 1620.15.) The overall soccer-playing ***ability*** required to compete at the senior men's national team level is materially influenced by the level of certain physical attributes, such as speed and strength, required for the job. (Morgan Dep. 212-13; Ellis Dep. 291-92.) As Plaintiff Carli Lloyd's testimony admits, the WNT could not compete successfully against senior men's national teams because competing against 16- or 17-year-old boys "is about as old as [the WNT] can go." (Lloyd Dep. 103-04, 106-07; Lloyd Dep. Ex. 15.) Plaintiffs ask the Court to conclude that the ability required of an WNT player is equal to the ability required of an MNT player, ***as a relative matter***, by ignoring the materially higher level of speed and strength required to perform the job of an MNT player. The EPA does not allow this. *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir. 2007) (EPA does not ensure equal pay for jobs requiring "proportional" skill level). Nor is it a "sexist stereotype" to recognize the different levels of speed and strength required for the two jobs, as Plaintiffs' counsel contend. On the contrary, it is indisputable "science," as even Plaintiff Lloyd described it in her testimony. (Lloyd Dep. 103-05.) *See also* Doraine Lambert Coleman, *Sex in Sport*, 80 LAW AND CONTEMPORARY PROBLEMS 63-126 (2017) (available at: https://scholarship.law.duke.edu/lcp/vol80/iss4/5) (describing the scientific basis for "the average 10-12% performance gap between elite male and elite female athletes," which includes differences between males and females in "skeletal structure, muscle composition, heart and lung capacity including VO2 max, red blood cell count, body fat, and the absolute ability to process carbohydrates," and noting, by way of example, that "no matter how great the great Katie Ledecky gets . . . she will never beat Michael Phelps or his endurance counterparts in the pool").

Plaintiffs have cited no case (there is none) suggesting that two jobs requiring materially different levels of strength and speed, where those physical attributes are fundamental to the job, may constitute comparable jobs for EPA purposes. Instead, Plaintiffs cite a case involving male and female prison guards, arguing that "the requirements of the EPA apply just as strongly in cases involving sex-segregated jobs." (Dkt. 170 at 10, citing *Marcoux*, 797 F.2d at 1102.) That case is not on point. The plaintiffs in *Marcoux* were female prison guards, but their male comparators also worked side-by-side with female prison guards in the same location doing the same exact job. *Id.* There are no women on the MNT and no men on the WNT. Regardless, the point of the EPA is not to compare a plaintiff's skills to those of her alleged male comparator(s), but to compare the plaintiff's ***job requirements*** to the ***job requirements*** of her alleged male comparator(s). *Hein*, 718 F.2d at 914 ("A *prima facie* case is not made by showing that the employees of opposite sex possess equivalent skills. The statute explicitly applies to jobs that require equal skills, and not to employees that possess equal skills.") Even assuming there are WNT players who could perform the job of MNT player (contrary to Plaintiffs' own testimony), that is not the point. The point is that ***the job*** of MNT player (competing against senior men's national teams) requires a higher level of skill based on speed and strength than does ***the job*** of WNT player (competing against senior women's national teams). In *Marcoux*, by contrast, while the female plaintiffs guarded female prisoners and their male comparators, ***along with some women***, guarded only male prisoners, the two jobs nonetheless required the same skills. 797 F.2d at 1107. Neither set of guards was required to beat the world's most elite soccer players in a soccer match, nor to do anything else requiring different levels of strength or speed; the skills required for both jobs were "supervision, observation, and disciplining" prisoners. *Id.* at 1107 n.5. There is no legal authority under the EPA supporting the proposition that a job requiring employees to compete against the most elite female athletes in a sport entails equal skill to a job requiring employees to compete against the most elite male athletes in that same sport. This is not the proper domain of the statute.

All the foregoing facts about the speed and strength required for the two different jobs are undisputed (which means U.S. Soccer is entitled to summary judgment), but there is also evidence that MNT players face tougher competition, even on a relative basis. (2nd Gulati Dec. ¶ 10.) There is a significantly deeper pool of competition in men's international soccer than there is in women's international soccer, even when assessing the issue in relative terms. (*Id.*) Although Plaintiffs may dispute that, their dispute means only that this is not an additional reason to grant U.S. Soccer's own motion. It nonetheless provides an additional basis for denying Plaintiffs' motion.

Plaintiffs also fail to demonstrate, as a matter of undisputed fact, that the job of WNT player and the job of MNT player carry equal "responsibility." In this regard, Plaintiffs essentially just note that they and the MNT players are all soccer players. (Dkt. 170 at 10-11.) This is true, but it is not enough to meet the "equal responsibility" requirement under the EPA. MNT players have responsibility for competing in multiple soccer tournaments with the potential for generating a total of more than $40 million in prize money for U.S. Soccer every four years. (McCrary Dec. ¶ 2, Ex. 2 at ¶ 5.) WNT players compete in only one soccer tournament every four years that has the potential to generate any prize money at all, and most recently that amounted to one-tenth of the amount the MNT players could generate. (*Id.*) At the same time, the MNT plays in matches watched on television by many millions more people than the WNT. (Moses Dec. Ex. 1.) The average viewership for MNT matches over the first three years of the current WNT CBA was nearly five times as high as that for WNT matches, excluding matches in the Women's World Cup. (*Id.*) As for the World Cup, when the MNT last qualified, the ratings for its four World Cup matches were watched by more viewers than all the WNT matches in 2019 combined, Women's World Cup included. (*Id.*) In games for which U.S. Soccer holds the television broadcast rights (and therefore can monetize the ratings), the MNT has averaged more than three times as many viewers per game since 2017. (*Id.*) All these facts demonstrate that the job of MNT player carries more responsibility within U.S. Soccer than the job of WNT player, from an EPA standpoint. *Stanley v. U.S.C.*, 13 F.3d

13

1313, 1321-23 (9th Cir. 1994) (noting that "the relative amount of revenue generated should be considered in determining whether responsibilities and working conditions are substantially equal"); *Weaver v. O.S.U.*, 71 F. Supp. 2d 789, 800-01 (S.D. Ohio 1998) (plaintiff's coaching job not equal to male coach's job because his sport was more popular and generated more revenue), *aff'd*, 191 F.3d 1315 (6th Cir. 1999).

Finally, "working conditions" under the EPA includes the "surroundings" of the job. 29 C.F.R. § 1620.18(a). In this respect, MNT players routinely play matches (important World Cup qualifiers, in particular) throughout Mexico, Central America, and the Caribbean. (1st King Dec. ¶ 69, 77, Ex. 21.) The WNT does not. (*Id.* at ¶ 68, 77, Ex. 20.) Opposing fan hostility encountered in these MNT road environments, especially in Mexico and Central America, is unmatched by anything the WNT must face while trying to qualify for an important tournament. (2nd King Dec. ¶ 16.) Even the hostility of fans at home crowds for the MNT in some friendlies can be unlike anything the WNT faces. (*Id.*) This is all evidence of substantially different jobs under the EPA.

Plaintiffs are not entitled to summary judgment on their EPA claims because a reasonable juror could conclude that the job of MNT player requires materially different skill and more responsibility than Plaintiffs' job does, while also taking place under materially different working conditions. Simply put, they are materially different jobs that cannot be compared under the EPA.

### D.    The Three Aspects of Compensation Referenced in Plaintiffs' Motion Serve Only To Highlight the Differences Between the Two Jobs.

As noted previously, Plaintiffs seek summary judgment by pointing to three isolated aspects of their overall compensation package, rather than their total remuneration, which is not permitted under the EPA. That said, even if the Court could legitimately evaluate just those three aspects of their compensation, Plaintiffs still would not have established unequal pay for equal work as a matter of law.

To begin with, Plaintiffs point to compensation for "non-World Cup tournaments." The only "non-World Cup tournaments" addressed in the 2017 WNT CBA are the

14

Olympic Games, the SheBelieves Cup, and the Four Nations Tournament. (1st King Dec. Ex. 5 at Ex. A.) The Four Nations Tournament, however, is a misnomer; it is actually called the Tournament of Nations. (2nd King Dec. ¶ 17.)

There is no dispute that Plaintiffs "have the opportunity," in their words, to earn more from success in the Olympic Games than any MNT player can earn from any "non-World Cup tournament," and male soccer players are not paid by U.S. Soccer for playing in the Olympics at all. (1st King Dec. ¶ 10; 2nd King Dec. ¶ 11, 12.) So Plaintiffs certainly do not receive lesser pay when it comes to the Olympics, even assuming it is equal work.

Turning then to the SheBelieves Cup, it is a four-year-old, annual, four-team, three-game round-robin tournament of friendly matches created by U.S. Soccer in 2016 to enhance the profile of women's soccer in the United States and to arrange for the WNT to play three friendly matches against solid competition. (2nd Gulati Dec. ¶ 14.)

The Tournament of Nations was created by U.S. Soccer in 2017 for the same purposes, and it follows the same format. (*Id.*) Unlike the SheBelieves Cup, it is played only in years when there is no Women's World Cup or Olympic Games, so it has been played only in 2017 and 2018 so far. (*Id.*)

The MNT's non-World Cup tournaments mentioned in the 2011 CBA (the Gold Cup, Copa America, and the Confederations Cup) are not at all comparable to the SheBelieves Cup or Tournament of Nations. The Gold Cup and Copa America are official continental championships organized by Concacaf or CONMEBOL while the FIFA Confederations Cup was a tournament for which the MNT could have qualified only by first winning the Gold Cup or the World Cup. (2nd Gulati Dec. ¶ 13.) To win any of these three tournaments, the MNT would have needed to play at least two more matches than the WNT plays in the SheBelieves Cup and Tournament of Nations and would have needed to win at least two single-elimination knockout-round matches. (2nd King Dec. ¶ 18.) The Gold Cup and Copa America involve twelve to sixteen participants, and the Confederations Cup involved eight, compared to only four in the WNT competitions. (1st Gulati Dec. ¶ 27; 2nd Gulati Dec. ¶ 11, 13-14.) Each of the MNT tournaments also pays

15

seven figures in prize money to the victor whereas no team wins prize money for the SheBelieves Cup or Tournament of Nations. (2nd King Dec. ¶ 18.) Further, the MNT's tournaments weigh more heavily in FIFA rankings, and there is simply more prestige involved in winning an official continental championship or the Confederations Cup than there is in winning the SheBelieves Cup or Tournament of Nations. (2nd Gulati Dec. ¶ 15.) As Plaintiff and union representative Kelley O'Hara testified, it "makes sense" that she is paid more for the Women's World Cup than the SheBelieves Cup because: (i) the SheBelieves Cup occurs every year whereas the Women's World Cup is every four years; (ii) there are more teams in the latter; (iii) and the Women's World Cup is "the most prestigious tournament" she plays in because, according to her, it occurs only once every four years, more teams play in it, and the team must earn qualification for it. (O'Hara Dep. 173-74.) All these differentiators (and more) easily explain why playing in the SheBelieves Cup and Tournament of Nations are not "equal work" requiring the same pay received by MNT players for playing in their "non-World Cup tournaments." (2nd Gulati Dec. ¶ 15.)

In fact, no one ever suggested in collective bargaining that playing in the SheBelieves Cup or Tournament of Nations should be compensated like playing in the Gold Cup, Copa America, or FIFA Confederations Cup. (2nd King Dec. ¶ 19.) Indeed, while Plaintiffs complained about alleged pay differentials for friendlies and the Women's World Cup in the Complaint and in their EEOC charges, these documents make no mention of the idea that the SheBelieves Cup or Tournament of Nations should be compensated like one of the MNT's tournaments. (Dkt. 1; Egan Dec. Ex. 1.) Plaintiffs even filed a brief with the Court earlier in this case taking the position that games in the SheBelieves Cup and Tournament of Nations are equivalent to ordinary MNT friendlies, not the Gold Cup, Copa America, or Confederations Cup. (Roux Dep. 163-64; Roux Dep. Ex. 19 at 1-2; Dkt. 70-1.) Plaintiffs' newly concocted argument that the SheBelieves Cup and Tournament of Nations must be paid like MNT tournaments to achieve equal pay under the EPA is a lawyer's invention that should be rejected by the Court out of hand.

Turning then to other friendly matches, it is true that the MNT bonuses for beating a Top 25 opponent and for drawing any opponent in a friendly are higher than WNT bonuses for beating a Top 25 opponent or drawing a friendly, but the WNT bonus for beating an opponent ranked lower than 25th in a friendly is higher than the MNT bonus for beating an opponent ranked lower than 25th. (1st King Dec. ¶ 8, Ex. 1 at Ex. A p. 7-11, ¶ 15, Ex. 5 at Ex. A.) Plaintiffs cannot claim that lower bonuses for friendlies constitute sex-based pay discrimination when some of their friendly bonuses are actually higher than the MNT's, but more than that, when one accounts for the salaries paid to Contracted WNT players, which MNT players do not receive, the WNT CBA actually pays players more for friendlies than the MNT CBA does, using Plaintiffs' own theory. (McCrary Dec. ¶ 2, Ex. 2 ¶ 13-14.) Once again, there is no basis for Plaintiffs' claim of lesser pay for equal work, even assuming the work is equal under the law (it is not).

Finally, there is the Women's World Cup. The MNT CBA included the possibility of higher compensation for winning the 2018 World Cup than WNT players received for winning the 2019 Women's World Cup. Playing in these different tournaments, however, is not "equal work" under the law. The men's tournament is substantially more popular, the prize money available to U.S. Soccer for winning it is $34 million higher, the process for qualifying is longer and more arduous, the number of teams who participate is larger, and Plaintiffs do not contend that they could win it. (1st Gulati Dec. ¶ 21, 22, 50-61, Exs. 1-11.) Plaintiffs are simply not entitled to summary judgment.

### E.    Plaintiffs Have Not Shown That U.S. Soccer Is Incapable of Establishing an Affirmative Defense to Their EPA Claim.

As described in U.S. Soccer's own motion for summary judgment, there is substantial evidence showing that differences in historical and potential revenue generation, along with events that occurred in the course of collective bargaining negotiations, were factors "other than sex" that led to the differences in compensation terms about which Plaintiffs now complain in their own motion.

To begin with, it is undisputed that the prize money FIFA pays the federation that wins the men's World Cup is far larger than the prize money it pays the federation that wins the Women's World Cup, and it is undisputed that the compensation for MNT players associated with the World Cup was negotiated with this substantial FIFA prize money in mind. (1st Gulati Dec. ¶ 50-61, 71-72, 75-76.) It is also undisputed that when the WNT's union demanded equal bonuses for World Cup play during 2016 contract negotiations, U.S. Soccer declined, not because the WNT is comprised of women, but because paying such bonuses without receipt of concomitant prize money would "break" U.S. Soccer financially. (1st King Dec.¶ 30.) This is clear evidence that U.S. Soccer considered the vast difference in potential revenue from winning the two different tournaments when negotiating the two teams' compensation for those tournaments, and this revenue differential is a "job-related" "factor other than sex" (i.e., "a factor related to the work [Plaintiffs are] currently performing") that prevents Plaintiffs from winning summary judgment. *Rizo v. Yovino*, 2020 U.S. App. LEXIS 6345, *26-27 (9th Cir. Feb. 27, 2020). As the court noted in *Rizo*, the EPA was not designed to address broad-based societal issues, such as "fewer opportunities for training, education, skills development, and experience" (or, for example, the higher global popularity of men's soccer compared to women's soccer or the larger amount of prize money FIFA pays out as a result). *Id.* at *23-24. "Though Congress knew the cause of [the] earnings gap was multi-factorial [when it passed the EPA], it kept its solution simple. . . . The Act's limited goal was to eliminate only the purest form of sex-based wage discrimination: paying women less *because* they are women." *Id.* at *24. (emphasis in original); *see also Byrd v. Ronayne*, 61 F.3d 1026, 1034 (1st Cir. 1995) (no pay discrimination where male lawyer generated more revenue for the firm than female lawyer); *Hodgson v. Robert Hall Clothiers*, 473 F.2d 589, 597 (3rd Cir. 1973) (employer lawfully paid male employees more than female employees because it derived greater economic benefit from the male employees' work).

Further, when it comes to friendlies, U.S. Soccer actually has paid Plaintiffs more for friendlies than it has paid the MNT players, according to Plaintiffs' own flawed theory,

(McCrary Dec. Ex. 2 ¶ 13-14), but even if that were not the case, substantial evidence shows that U.S. Soccer initially proposed lower win and draw bonuses for certain WNT friendlies because it historically generated more revenue from MNT friendlies. (1st King Dec. ¶ 21, Ex. 7, 1st Gulati Dec. ¶ 70, 75, Ex. 16; 1st Irwin Dec. Ex. 1 at 10.) In fact, this trend has continued during the first three years of the current WNT CBA: MNT friendlies have generated, on average, an additional $200,000 per game more than WNT friendlies over that period. (2nd Irwin Dec. Ex. 1 at 7.) In any event, U.S. Soccer has presented evidence that no one knows whether the current WNT CBA ultimately would have contained the same friendly bonus structure as the MNT agreement if the WNT's union had been willing to forego its demands for other substantially costly items the MNT players do not enjoy. (Rapinoe Dep. 223; 1st Gulati Dec. ¶ 79, 80.) Given all the evidence showing that the differentials in friendly bonuses resulted from revenue-generation differentials and tradeoffs in bargaining, Plaintiffs cannot be granted summary judgment on U.S. Soccer's affirmative defense. *Hodgson*, 473 F.2d at 597; *Diamond v. T. Rowe Price Assocs., Inc.*, 852 F. Supp. 372, 396 (D. Md. 1994) (employee who negotiated a salary with "little or no annual bonus" had no pay discrimination claim when male employees received incentive compensation she did not).

Similarly, there is ample evidence in the record showing that the MNT's "non-World Cup tournaments" carry the potential for generating millions of dollars in prize money whereas the WNT's non-World Cup tournaments do not. (McCrary Dec. Ex. 2 ¶ 36.) It is also undisputed that the WNTPA's representatives (which included some Plaintiffs themselves) never asked U.S. Soccer during bargaining to compensate them for friendly tournaments in the same manner as the MNT players are compensated for their tournaments. (2nd King Dec. ¶ 19.) Again, these facts are sufficient to warrant denial of Plaintiffs' summary judgment motion on U.S. Soccer's affirmative defense. *Perkins*, 700 F. App'x at 457; *Diamond*, 852 F. Supp. at 396.

All told, the record evidence shows that: (1) WNT players have been paid more in relationship to the revenue generated by their matches than MNT players; (2) WNT

19

players have been paid more total compensation than MNT players; (3) some WNT players have been paid more under the WNT CBA than they would have been if they had been paid under the MNT CBA, according to Plaintiffs' own theory; and (4) MNT players generally would have been paid more under the WNT CBA than they actually were paid under their own, according to Plaintiffs' own theory. (McCrary Dec. Ex. 1 ¶ 35, Ex. 2 ¶ 31, 49-52, 54; 2nd Irwin Dec. Ex. 1 at 11-16.) These facts are sufficient to warrant granting U.S. Soccer's motion own for summary judgment, so they certainly are sufficient to deny Plaintiffs' motion.

## III.   Plaintiffs Have Not Established Pay Discrimination in Violation of Title VII.

### A.   Because Plaintiffs Are Not Entitled To Summary Judgment on Their EPA Claim, They Also Are Not Entitled to Summary Judgment on Their Pay Discrimination Claim Under Title VII.

A plaintiff alleging sex-based pay discrimination under Title VII is not obliged to show that she is performing equal work for lesser pay, *if* she alleges and proves in some other way that her pay is lower than it otherwise would be *because of her sex*. *Hein*, 718 F.2d at 916 n.5; 42 U.S.C. § 2000e-2(a)(1). Plaintiffs, however, pled in the Complaint that U.S. Soccer violated Title VII and the EPA in the same manner—by paying them "less than members of the MNT for substantially equal work." (Dkt. 1 ¶ 4.) In such cases, the Ninth Circuit instructs courts to analyze both claims using the EPA framework. *Maxwell v. City of Tuscon*, 803 F.2d 444, 446 (9th Cir. 1986). In other words, a plaintiff pursuing a pay discrimination claim based on allegedly lesser pay for purportedly equal work under both statutes cannot prevail under Title VII if she cannot prevail under the EPA. This makes sense, given the language of Title VII, which simply bars employers from engaging in pay discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Although such discrimination may take different forms, if a plaintiff contends that she is paid less because of her sex on the specific ground that male employees are paid more for performing substantially equal work, then her failure to prove these facts necessarily defeats her claim. In addition, Title VII incorporates the EPA's affirmative defenses.

42 U.S.C. § 2000e-2(h). In short, because Plaintiffs are not entitled to summary judgment on their EPA claim (as explained in Section II, *supra*), they also are not entitled to summary judgment on their Title VII claim.[3]

Even though the Title VII limitations period reaches back farther than the EPA limitations period, this matters not for purposes of Plaintiffs' motion. Not only does their motion fail to provide facts or argument about the period before the current CBA with anything close to the specificity required to justify summary judgment, but all the same arguments from Section II apply to that period, as well. None of the four Title VII class representatives identified comparable male employees, much less compared their wages to those employees under the 2013-2016 CBA, and the jobs were no more equal in skill, responsibility, or working conditions back then. Furthermore, the historical revenue disparities were even greater when the parties signed the CBA covering the 2015-2016 time period, and in bargaining for that CBA the union never (from its opening proposals onward) asked for the same compensation terms as those found in the MNT CBA. (1st Gulati Dec. ¶ 66, 68, 70-73, Ex. 14, 15; Langel Dep. 71-77, 163-64, 188-89, 201-02, Ex. 14, 21, 25; 1st King Dec. ¶ 17, 23-24, 33, 38-40, 43, Ex. 1, 6, 8, 10, 13-15, 17.) At the same time, the union asked for (and obtained) many provisions the MNT players did not enjoy. (1st Gulati Dec. ¶ 66, 68, Ex. 14, 15; Langel Dep. 71-77, 163-64, 188-89, 201-02, Ex. 14, 21, 25; 1st King Dec. ¶ 7-8, 13, 14, 15, 17, 23-24, 33, 38-40, 43, Ex. 1, 3-6, 8, 10, 13-15, 17.) Plaintiffs have not established unequal pay for equal work under either CBA in effect during the Title VII class period.

---

[3] The reverse is not true. Even a plaintiff who establishes an EPA violation may not be able to establish a Title VII violation because discriminatory intent is required under Title VII but not the EPA. *Rizo*, 2020 U.S. App. LEXIS 6345 at *13 ("Unlike Title VII, the EPA does not require proof of discriminatory intent."), quoting *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 640 (2007) ("'[T]he EPA and Title VII are not the same,' in part because 'the EPA does not require . . . proof of intentional discrimination.'"). Plaintiffs cite 29 C.F.R. § 1620.27 for the proposition that "any violation of the Equal Pay Act is also a violation of Title VII," (Dkt. 170 at 19), but this regulation is trumped by controlling Supreme Court and Ninth Circuit precedent.

### B.   The Court Should Not Entertain Plaintiffs' New Legal Theory.

In their summary judgment papers, Plaintiffs present a new claim under Title VII for the first time: "In contrast to the EPA, plaintiffs alleging sex-based compensation discrimination under Title VII need not establish that they are performing equal work for unequal pay." (Dkt. 170 at 25.) They argue that they have proven an intent to pay them less because they are women, regardless of whether they are paid a lesser wage rate for equal work. (Dkt. 170 at 19-25.) As noted, this is not the claim alleged by Plaintiffs in the Complaint, (Dkt. 1 ¶ 4), and it is not appropriate for them to raise it for the first time at the summary judgment stage. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (affirming summary judgment for defendant where the district court declined to consider alleged violations of the ADA raised for the first time in the context of summary judgment, even though the plaintiff alleged other violations of the same statute in her complaint). Plaintiffs' new claim should be rejected on that basis alone.

### C.   Plaintiffs Have Not Established Discriminatory Intent.

Even if the Court allows Plaintiffs to proceed with their newfound theory of discrimination, raised for the first time on summary judgment, they have not established that they are entitled to summary judgment on that claim. To prevail on their motion, Plaintiffs must show, based on the facts when viewed in the light most favorable to U.S. Soccer, that any reasonable juror would conclude that U.S. Soccer intentionally paid Plaintiffs less money than it otherwise would have, ***simply because they are women***. This is an impossible conclusion to reach given all the facts pointing in the opposite direction.

Under the current WNT CBA, U.S. Soccer has paid the WNT players and their union almost 2.5 times as much as the MNT players and their union. (2nd Irwin Dec. Ex. 1 at 11.) Using Plaintiffs' own methodology, multiple WNT players have been paid more under the current WNT CBA than they would have been paid under the MNT collective bargaining agreement. (McCrary Dec. ¶ Ex. 1 at ¶ 50-52.) Again, using Plaintiffs' own methodology, MNT players would have been paid more under the WNT CBA than under their own. (McCrary Dec. ¶ 2, Ex. 2 at ¶ 50-52.) WNT players are paid more for playing

22

in the Olympics than MNT players are paid for participating in any tournament other than the World Cup. (1st King Dec. ¶ 8, 15, Exs. 1, 15; 2nd King Dec. ¶ 12-13.) U.S. Soccer has rejected overtures by the MNT's union to pay male players for the Olympics at all. (1st King Dec. ¶ 11.) The WNT has been paid more as a percentage of revenue generated by the team than the MNT. (McCrary Dec. ¶ 2, Ex. 2 at ¶ 41-45.) An impeccably-credentialed labor economist has reviewed the WNT CBAs, compared them to the MNT CBA, and concluded that "the MNT CBA is not systematically better than the WNT CBAs." (McCrary Dec. ¶ 2, Ex. 2 at ¶ 61.) All four Class Representatives have been paid more than any MNT player during the class period. (2nd Irwin Dec. Ex. 1 at 17-24.)

Meanwhile, U.S. Soccer has done much to raise the profile of women's soccer in this country and globally. (2nd Gulati Dec. ¶ 14, 16; Rapinoe Dep. 297, Ex. 32.) U.S. Soccer has for years advocated to FIFA for increased prize money for the Women's World Cup and continues to do so today. (2nd Gulati Dec. ¶ 16.) U.S. Soccer also pays WNT players two different annual salaries, plus benefits, for playing in the NWSL because supporting the league in this way is a benefit to the players themselves. (2nd Gulati Dec. ¶ 5, 16 and Ex. 1; *see also* Sauerbrunn Dep. Ex. 7.)

In the face of all these facts showing that Plaintiffs do not have a less favorable CBA than the MNT players and have many contract provisions that are more favorable than those found in the MNT CBA, Plaintiffs ask the Court to conclude that U.S. Soccer has engaged in intentional sex discrimination as a matter of undisputed fact. This is absurd. Nevertheless, Plaintiffs contend that they are entitled to summary judgment on their Title VII pay discrimination claim for the following reasons, each of which has no merit.

First, Plaintiffs claim that current U.S. Soccer President Carlos Cordeiro has admitted that WNT players do not have equal opportunities or enjoy equal pay and that U.S. Soccer has done nothing about this "longstanding practice of gender discrimination." (Dkt. 170 at 20-21.) This misrepresents the content (and the relevance) of Cordeiro's statements. Cordeiro never said that U.S. Soccer denied equal opportunities to WNT players; rather, he spoke about the fact that the Women's World Cup generates less

revenue than the men's World Cup and the fact that there are no other competitive tournaments paying out substantial prize money for WNT players. (Cordeiro Dep. 52-55, 58-61.) This, too, was Cordeiro's point when he mentioned during his campaign for President a desire to work towards equal pay for the WNT—a desire to see more opportunity for the WNT to play in competitive matches that generate more revenue, which in turn could lead to higher compensation. (*Id.*) FIFA determines the prize money for the Women's World Cup, and it is FIFA and Concacaf (and, on occasion, CONMEBOL) who sponsor the tournaments that carry substantial prize money for MNT players, not U.S. Soccer. (1st Gulati Dec. ¶ 18, 21, 25, 31, 34, 45.) Meanwhile, as evidenced by things like the very existence of the SheBelieves Cup and pushing for greater prize money for the winner of the Women's World Cup, U.S. Soccer has been at the forefront of trying to create more opportunities for women's soccer in the United States and globally. (2nd Gulati Dec. ¶ 5, 14, 16; Rapinoe Dep. 297, Ex. 32.) Cordeiro's statements are not admissions that U.S. Soccer has intentionally discriminated against Plaintiffs by paying them less money because of their sex. Indeed, they could not be, when the facts actually show that the WNT CBA is ***not*** a less favorable CBA than the one covering the MNT and has actually paid them ***more***.

Second, Plaintiffs also mischaracterize former President Gulati's testimony. According to Plaintiffs, he testified that U.S. Soccer used a "sexist stereotype" (referring to scientific facts about speed and strength that are acknowledged even by Plaintiffs) to justify paying WNT players less than MNT players. (Dkt. 170 at 22.) Gulati never testified that these differences were a reason for U.S. Soccer's compensation decisions; he merely testified that they are one reason why the two jobs in question are materially different jobs for purposes of the anti-discrimination laws. (Gulati Dep. 134.) U.S. Soccer continues to advocate that point. (Section II.C., *supra*.) This is not a Title VII violation.

Finally, Plaintiffs contend that U.S. Soccer outside counsel Russell Sauer once told the WNT's union that "the specific reason" U.S. Soccer "would not agree to an equal system of compensation between the WNT and the MNT was that 'market realities are

such that women do not deserve equal pay,'" while at the time, U.S. Soccer supposedly knew the WNT had generated more revenue than the MNT over the prior year, such that "market realities" could not, in fact, support the "discriminatory treatment" of WNT players. (Dkt. 170 at 22-23.) Plaintiffs contend that Sauer's remark was an "unabashed discriminatory statement" akin to telling a female employee that "she would never be worth as much as a man to the bank because she was a woman," and telling her "she would be paid less because she was a woman," *Portis v. First National Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994). (Dkt. 170 at 29.) This is wrong as both a factual and a legal matter. Sauer and Tom King (who also was present) both deny that Sauer made the remark attributed to him by Plaintiffs (and even Plaintiff Megan Rapinoe could not say for certain that Sauer made it), so this allegedly "uncontroverted fact" is very much controverted. (Sauer Dec. ¶ 3-4; King Dep. 54-56; Rapinoe Dep. 110-15.) Regardless, when Sauer referenced "market realities" as an explanation for the friendly and World Cup bonuses contained in U.S. Soccer's mid-2016 "pay-for-play" proposal, he cited historical differences in revenue generation, attendance, and television ratings between the two teams. (Sauer Dec. ¶ 4.) This is a far cry from saying that a "woman would never be worth as much as a man . . . because she [is] a woman," as Plaintiffs' allege. It is merely pointing to undisputed factors other than sex as a basis for U.S. Soccer's contract proposals, and the existence of these factors is undisputed. (1st Gulati Dec. ¶ 70-72, 75-77, Ex. 16; Moses Dec. Ex. 1.)

Plaintiffs' argument that U.S. Soccer engaged in sex-based pay discrimination as a matter of undisputed fact is without merit. Plaintiffs' motion should be denied in its entirety.

**Dated: March 9, 2020**                     Respectfully submitted,

                                             U.S. SOCCER FEDERATION, INC.


                                             By:  */s/ Brian Stolzenbach*

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT