**Declaration of Tom King**

1. My name is Tom King. I am the Managing Director of Administration for the United States Soccer Federation, Inc. ("U.S. Soccer"). I have been employed by U.S. Soccer since 1994. I have personal knowledge of the facts set forth in this Declaration. If called upon to testify, I could and would competently testify to such facts.

2. In my role as Managing Director of Administration, I am responsible for the non-technical operations of the Senior Women's National Team ("WNT") and the Senior Men's National Team ("MNT"). This includes scheduling, budgeting, staffing, logistics, and security. Although my job title has changed at times during my tenure with U.S. Soccer, I have had these responsibilities throughout my tenure with U.S. Soccer.

3. Ever since I have worked for U.S. Soccer, the WNT and MNT have had different Head Coaches and separate coaching staffs reporting to each Head Coach. Each WNT Head Coach during that period has always been responsible for deciding which players are called in to each WNT training and which players play in each WNT match. Each MNT Head Coach during that period has always been responsible for deciding which players are called in to each MNT training and which players play in each MNT match.

4. Throughout the past 10 years (and before that, as well), the WNT and the MNT have each had a separate Team Administrator, each of whom has reported to me. Each team's Team Administrator manages all aspects of his or her team's operations and logistics, such as team travel, hotels, meals, security, training fields, and stadium requirements. They also manage team operational expenditures, including but not limited to expenditures on hotels and ground and air transportation. Each Team Administrator is also responsible for overseeing the administration of compensation to the team's players under the relevant collective bargaining agreement.

5. Since 2013, almost all MNT players have not only played for U.S. Soccer, but also have played for a club team in a professional soccer league, such as Major League Soccer in the United States, LigaMX in Mexico, the Eredivisie in the

Netherlands, the Premier League in England, the Bundesliga in Germany, or one of several others leagues in Europe. There has been only one exception: Jordan Morris still was playing for Stanford University when he was first called in to play with the team in 2014. U.S. Soccer does not pay MNT players any money for playing with their professional clubs; the clubs pay them.

6. Since 2013, most WNT players have not only played for U.S. Soccer, but also have played for a club team in a professional soccer league. A number of them, however, have been collegiate athletes like Jordan Morris was in 2014 when he was first called in to play with the MNT in 2014. The vast majority of those who were not collegiate athletes have played their club soccer between 2014 and the present in the National Women's Soccer League (NWSL), the top-tier professional women's soccer league in the United States. During that same time period, a much higher percentage of the MNT players (compared to the WNT players) have played their club soccer outside for teams in Europe.

7. In the mid-1990s, U.S. Soccer voluntarily recognized the United States National Soccer Team Players Association (USNSTPA) as the exclusive representative of all MNT players for the purposes of collective bargaining under the National Labor Relations Act. Mark Levinstein, a partner at the law firm of Williams & Connolly, has been the Executive Director and General Counsel of the USNSTPA since its creation and has represented the USNSTPA during collective bargaining negotiations for each of its collective bargaining agreements with U.S. Soccer. In the course of my job, I have had regular dealings with Mr. Levinstein in his role as USNSTPA Executive Director.

8. The USNSTPA and U.S. Soccer have executed a series of collective bargaining agreements since the 1990s covering the players on the MNT. The most recent collective bargaining agreement between the USNSTPA and U.S. Soccer was executed on November 20, 2011. It remained in effect through December 31, 2018. A true and correct copy of that agreement, including an amendment to the agreement executed in

DECLARATION OF TOM KING

early 2012, is attached to this Declaration as Exhibit 1. U.S. Soccer did not pay members of the MNT a signing bonus in conjunction with the negotiation of this agreement.

9. U.S. Soccer has continued to compensate its MNT players according to the terms of the 2011-2018 collective bargaining agreement ever since it expired, except that U.S. Soccer needed to determine, during 2019, how to compensate MNT players for playing in the 2019-2020 Concacaf Nations League. That competition did not exist when the 2011-2018 collective bargaining agreement went into effect, and the MNT did not begin playing in Concacaf Nations League matches until 2019. The manner of payment for these matches is documented in an e-mail from U.S. Soccer's outside counsel to Mr. Levinstein, and a true and correct copy of that e-mail is attached to this Declaration as Exhibit 2.

10. The MNT, as a team, is not eligible to play in the Olympic Games or in the men's Olympic soccer qualifying tournament to determine Concacaf's participants in the Olympic Games. According to the rules governing the Olympics, only Under-23 men's national teams may compete in qualifiers and the Olympic Games, with the caveat that three "over age" players may be added to the team for the Olympic Games once a team has qualified. Over the years, some individuals who have played on the MNT have also played on U.S. Soccer's Under-23 Men's National Team ("U-23 MNT") in Olympic qualifiers and the Olympic Games even after making it to the MNT, but those individuals have not been covered by the collective bargaining agreement between the USNSTPA and U.S. Soccer while playing for the U-23 MNT. Aside from per diems, U-23 MNT players were not compensated for their play in Olympic qualifiers in 2015 and 2016, even if the player had previously played for the MNT. Aside from per diems, U.S. Soccer also has no plans to compensate U-23 MNT players for playing in Olympic qualifiers in 2020 or for playing in the Olympic Games in 2020, should they qualify, even if those players have also previously played for the MNT.

11. At times in the past, Mr. Levinstein has attempted to negotiate an agreement with U.S. Soccer that would require U.S. Soccer to pay substantial additional

DECLARATION OF TOM KING

compensation to U-23 MNT players, beyond per diems, for Olympic qualifiers and Olympic play, but U.S. Soccer has not agreed.

12. In the early 2000s, U.S. Soccer voluntarily recognized the United States Women's National Soccer Team Players Association (WNTPA) as the exclusive representative of all WNT players for the purposes of collective bargaining. In the course of my job, I have had regular dealings with the three individuals who have held the position of Executive Director of the WNTPA.

13. The first collective bargaining agreement between the WNTPA and U.S. Soccer expired at the end of 2004, and the second one covered the period from 2005 through 2012. A true and correct copy of the 2005-2012 collective bargaining agreement is attached to this Declaration as Exhibit 3.

14. The collective bargaining agreement between the WNTPA and U.S. Soccer covering the period from January 1, 2013, through December 31, 2016, consisted of the 2005-2012 collective bargaining agreement (Exhibit 3), as modified by a Memorandum of Understanding (MOU) executed by the WNTPA and U.S. Soccer on March 19, 2013. A true and correct copy of that MOU is attached to this Declaration as Exhibit 4.

15. A true and correct copy of the most recent collective bargaining agreement between the WNTPA and U.S. Soccer is attached to this Declaration as Exhibit 5. It covers the period from January 1, 2017, through December 31, 2021.

16. Along with outside counsel Russ Sauer (a partner at Latham & Watkins), U.S. Soccer General Counsel Lisa Levine, and U.S. Soccer Chief Financial Officer Eric Gleason, I participated as one of four core members of U.S. Soccer's negotiating team during the collective bargaining negotiations that culminated in the 2017-2021 collective bargaining agreement. Other people joined our negotiating team from time to time during those negotiations, as well.

17. Rich Nichols, the WNTPA's Executive Director at the time, presented the WNTPA's first proposal for a new collective bargaining agreement to succeed the 2013-2016 agreement by e-mail to Ms. Levine on January 4, 2016. A true and correct copy of

DECLARATION OF TOM KING

1  that e-mail and proposal, both of which I subsequently received from Ms. Levine, is
2  attached to this Declaration as Exhibit 6.

3      18. The parties' second bargaining session after the WNTPA e-mailed U.S.
4  Soccer its proposal on January 4, 2016, took place on March 15, 2016. In addition to our
5  core negotiating team, U.S. Soccer also was represented during that session by U.S.
6  Soccer Board Member Donna Shalala and Latham & Watkins partner Kathy Ruemmler.
7  During this meeting, Mr. Nichols stated that the WNTPA wanted a new collective
8  bargaining agreement to take effect in 2016. Members of U.S. Soccer's negotiating
9  committee informed him during that meeting that U.S. Soccer was interested only in
10 negotiating a new contract to commence in 2017, after the expiration of the 2013-2016
11 agreement. At the time, U.S. Soccer and the WNTPA were engaged in litigation in
12 federal court in Illinois. The lawsuit had been filed by U.S. Soccer against the WNTPA,
13 and a question to be resolved in that litigation was whether the parties already had a
14 collective bargaining agreement in place through the end of 2016, containing a binding
15 no-strike provision. Ms. Shalala and Ms. Levine both stated during the March 15 meeting
16 that if the WNTPA wanted the lawsuit to go away, U.S. Soccer needed assurances that
17 the WNT players would not go on strike.

18     19. David Feher, a partner at Winston & Strawn and counsel to the WNTPA at
19 the time, was in attendance at the March 15 meeting. He stated during the meeting that
20 the WNTPA was not going to agree to such assurances and also explained that the WNT
21 players believed they deserved more money now (without having to wait until 2017).

22     20. During the March 15 meeting, the parties also discussed the WNTPA's
23 January 4 proposal. U.S. Soccer still had not made a counterproposal by that point. In
24 addition to other things the parties discussed, Ms. Levine asked for clarification of the
25 section of the WNTPA's January 4 proposal entitled "Various Bonuses." Mr. Nichols
26 explained that the WNTPA wanted all the same bonuses for participating in the Women's
27 World Cup and the Olympics that the MNT received for participating in the men's World
28 Cup and the Olympics. Mr. Sauer explained that the U-23 MNT does not receive bonuses

DECLARATION OF TOM KING

for the Olympics, and Ms. Levine explained that if FIFA would increase the amount it pays to soccer federations in connection with the FIFA Women's World Cup, then U.S. Soccer could look at increasing the amount paid to the WNT for participating in that event.

21. On May 9, 2016, the parties met again, and U.S. Soccer's bargaining team orally presented U.S. Soccer's first contract proposal on compensation matters. On May 13, Ms. Levine e-mailed a written summary of that oral proposal to Mr. Nichols, noting in her e-mail, however, that the written proposal added a "camp fee, which represents payment to a player who is called into camp but who does not make the roster of a game associated with the camp," and correcting the proposed bonuses for the Women's World Cup and Olympics, explaining that they had been mistakenly reversed in the oral presentation on May 9. A true and correct copy of this e-mail and attachment, which I later obtained from Ms. Levine, is attached to this Declaration as Exhibit 7.

22. The May 13 proposal was structured as a "pay-to-play" proposal. The 2013-2016 collective bargaining agreement was not a pay-to-play compensation structure because WNT players earned annual salaries that were paid to them even when they did not play. Under a "pay-to-play" compensation structure, such as the one in the MNT's 2011-2018 collective bargaining agreement, players receive a specific payment associated with a specific training camp, game, or tournament, but only if the player makes the roster for the particular camp, game, or tournament.

23. On May 16, the parties' negotiating teams met again and discussed U.S. Soccer's May 13 pay-to-play compensation proposal. During this meeting, Mr. Nichols stated that U.S. Soccer's proposal was a great start and that the players liked the structure, but he also said the WNTPA needed a minimum guaranteed payment of $100,000 per player per year. Ms. Levine responded that there are no guarantees with pay-to-play. Mr. Feher replied that the MNT players work in a different environment than the WNT players, which makes pay-to-play more difficult for the latter. The parties continued to discuss and debate whether and how the concept of a minimum guarantee would work in

DECLARATION OF TOM KING

the context of a pay-to-play compensation structure, and Mr. Feher stated more than once that the "devil is in the details."

24. On June 1, 2016, Mr. Nichols e-mailed Ms. Levine a memorandum providing, as he described it in his cover e-mail, "the 'details' with regard to the operation of the Minimum Annual Guaranteed Compensation system we discussed during our last negotiation session." A true and correct copy of that e-mail, both of which I later obtained from Ms. Levine, is attached to this Declaration as Exhibit 8.

25. The parties met again for contract negotiations on June 27. At this meeting, Ms. Levine described the WNTPA's proposal as being the MNT's collective bargaining agreement, "plus, plus, plus," and she reviewed nine broad categories of items the WNTPA had proposed that the MNT players do not receive. She also stated that U.S. Soccer could add a guarantee of 70 games per quad to its pay-to-play proposal, as well as a guaranteed minimum of 18 players in each training camp, but that the guarantees would not be player-specific. In other words, she explained that no particular player would have a guarantee of being paid anything at all, just like under the MNT's contract. Ms. Levine also observed that the expiring 2013-2016 WNT agreement contained a contract provision concerning a compensation-to-revenue ratio, and she said that U.S. Soccer would work to create a ratio with FIFA prize money, as well.

26. The compensation-to-revenue ratio provision Ms. Levine referenced is found at Exhibit A, Page 9, Section VIX [*sic*] of the 2005-2012 collective bargaining agreement (Exhibit 3 to this Declaration). That provision was not modified by the 2013 MOU.

27. After Ms. Levine referenced the compensation-to-revenue ratio, I then reviewed with the WNTPA representatives the terms in the MNT's agreement pertaining to travel and hotel accommodations and committed that U.S. Soccer would agree to the same provisions for the WNT.

28. No other new proposals were presented by either party at this meeting.

29. On July 6, Ms. Levine sent Mr. Nichols written confirmation of U.S. Soccer's proposal to guarantee a minimum number of games per quad and players per

1  camp. A true and correct copy of the e-mail and revised proposal, which I later obtained
2  from Ms. Levine, is attached to this Declaration as Exhibit 9.
3      30.    Neither party made any other new proposals in 2016, and the parties met
4  only one more time before Mr. Nichols was relieved from his position as Executive
5  Director of the WNTPA. That meeting took place on October 26, 2016. During this
6  meeting, Ms. Levine reiterated U.S. Soccer's view that the WNTPA was demanding nine
7  categories of items the MNT players did not receive and listed them as follows: (1)
8  guarantees regarding minimum annual compensation and a minimum number of games
9  per year, (2) automatic increases in WNT compensation if the MNT's compensation
10 increases, (3) continued compensation during periods of injury, (4) continued
11 compensation during periods of pregnancy, (5) severance, (6) post-termination health
12 insurance, (7) retirement benefits, (8) significant financial support of a professional
13 league and (9) a guaranteed number of players "contracted" each year. Mr. Feher
14 explained that while the WNTPA had asked for these things, it was a negotiation. U.S.
15 Soccer President Sunil Gulati was present for this meeting, and he explained that U.S.
16 Soccer was not willing to consider the WNTPA's proposals on compensation without
17 factoring in the cost of these nine items. Although the parties had some additional
18 discussion during the meeting regarding their bargaining positions, no new proposals
19 were presented by either party. During the discussion, Mr. Gulati said that there was one
20 item in the WNTPA's proposal that would "break" U.S. Soccer, and that was the
21 WNTPA's proposal related to World Cup bonuses. He explained that the amount of prize
22 money received from FIFA for the men's World Cup was vastly different from the prize
23 money received from FIFA for the Women's World Cup. He also noted that the WNT
24 players were paid more than $2 million for winning the 2015 Women's World Cup even
25 though the total prize money U.S. Soccer received was $2 million. (The winning players
26 had received bonuses totaling $1,725,000 for winning the tournament and $345,000 for
27 making the tournament roster, for a total of just over $2 million. This was in addition to
28 the $345,000 for qualifying and the $1,800,000 payment for the post-tournament Victory

DECLARATION OF TOM KING

Tour.) After some further discussion about the 2015 World Cup bonus payments to the players, Nichols said "this is a negotiation" and suggested negotiating an additional amount above $2 million. The meeting ended shortly after Mr. Feher said the meeting had been useful and Mr. Nichols asserted that Mr. Gulati's personal attendance at the meeting had fostered progress.

31. As noted, Mr. Nichols was relieved of his duties as WNTPA Executive Director after the October 26 meeting. Eventually, Mr. Nichols was replaced as WNTPA Executive Director by Becca Roux. Ms. Roux is still the Executive Director today. The WNTPA also retained the law firm of Bredhoff & Kaiser, and specifically Mady Gilson and Adam Bellotti from that firm, to represent the WNTPA in the contract negotiations for a new collective bargaining agreement.

32. The first negotiating session involving both Ms. Roux and the lawyers from Bredhoff & Kaiser took place on February 4, 2017. Although the WNTPA did not present a written proposal at this meeting, Christen Press, a WNT player and WNTPA Player Representative, did communicate that the WNTPA was focused on three guiding principles in the negotiations. The three guiding principles she identified were: (1) guaranteed compensation for being a contracted player with U.S. Soccer, (2) a fair share of the financial upside that U.S. Soccer gains from the WNT's success, and (3) respect through the players' lifestyle and working conditions.

33. At the parties' meeting on February 8, which I attended, the WNTPA presented its first written compensation proposal since Mr. Nichols' departure. A true and correct copy of that proposal (with privileged notes made by U.S. Soccer on the proposal redacted and the redactions reflected by black boxes) is attached to this Declaration as Exhibit 10. It was a proposal that would have required U.S. Soccer to pay the WNT players, as a whole, at least 35% of the combined total of certain revenue streams defined in the WNTPA's proposal. According to the proposal, the combined total revenue from which the 35% would have been calculated would have included 27% of the revenue U.S. Soccer receives from Soccer United Marketing and Nike. During the meeting, Mr.

DECLARATION OF TOM KING

Bellotti explained that the WNTPA looked at overall television viewership numbers and determined that 27% was a fair proposal based on a 3:1 ratio in favor of the MNT.

34. Mr. Sauer informed the WNTPA's representatives that U.S. Soccer was rejecting the concept of an overall revenue-sharing proposal and advised that U.S. Soccer would present a proposal based on a different structure.

35. Prior to execution of the 2011-2018 collective bargaining agreement between the USNSTPA and U.S. Soccer, the USNSTPA also had presented proposals similar to this overall revenue-sharing proposal, centered on a guarantee that the MNT players would receive at least a certain percentage of defined revenue streams, but U.S. Soccer rejected that concept when proposed by the USNSTPA, as well.

36. At a bargaining session I attended on February 9, 2017, U.S. Soccer presented its first compensation proposal since July 6, 2016. A true and correct copy of U.S. Soccer's February 9 proposal is attached to this Declaration as Exhibit 11.

37. At a bargaining session I attended on February 11, 2017, U.S. Soccer presented its first proposal for new "Partnership" Bonus Provisions in the parties' contract. A true and correct copy of this February 11 proposal is attached to this Declaration as Exhibit 12.

38. At a bargaining session I attended on February 14, 2017, the WNTPA presented a counterproposal to U.S. Soccer's February 9 proposal on compensation. A true and correct copy of this proposal is attached to this Declaration as Exhibit 13.

39. On February 15, 2017 the parties met again, where the WNTPA made another counterproposal on compensation. A true and correct copy of the WNTPA's February 15, 2017, counterproposal on compensation is attached hereto as Exhibit 14

40. At a bargaining session on March 9, 2017, the WNTPA made another counterproposal on compensation. A true and correct copy of WNTPA's March 9, 2017, counterproposal on compensation is attached hereto as Exhibit 15.

41. At a bargaining session on March 15, 2017, the WNTPA made a PowerPoint a presentation on the subject of compensation. Among other things, the presentation

explained the WNTPA's views on the "benefits of being a contracted player with the USWNT," including: (1) cachet as a player; (2) regular paycheck (financial stability); (3) health insurance; (4) vision/dental insurance; (5) downside risk protection for injury with paid injury leave; and (6) paid maternity/adoption leave.

42. At a bargaining session I attended on March 16, 2017, U.S. Soccer made a new compensation proposal. A true and correct copy of U.S. Soccer's March 16, 2017, financial proposal is attached hereto as Exhibit 16. The proposal added a signing bonus of $200,000 and a payment for group likeness rights of $350,000 per year. During this meeting, Mr. Gleason advised the WNTPA's representatives that U.S. Soccer was considering the overall cost of the collective bargaining agreement and that the annual $350,000 group likeness payment was factored into that.

43. On March 29, 2017, the WNTPA e-mailed another written proposal on compensation to U.S. Soccer. A true and correct copy of this proposal is attached to this Declaration as Exhibit 17.

44. I attended an April 1, 2017, bargaining session. Mr. Gulati was present for this session. During this session, Mr. Gulati advised the WNTPA's representatives that U.S. Soccer needed to understand what the overall cost of the deal would be and that items the players were asking for, such as single-occupancy hotel rooms and business class flights, all have costs associated with them.

45. The parties' final in-person bargaining session before the players ratified the new contract took place on April 2, 2017. During that meeting, Mr. Gulati informed the WNTPA representatives that the WNTPA's compensation proposal would cost U.S. Soccer $1.6 million more in total than U.S. Soccer's proposal and said the WNTPA would have to reduce the total cost of its proposals by $500,000 to reach a deal.

46. The WNT has flown charter flights for all team travel, including travel to friendly matches, since October 2018. Like the WNT, the MNT has used only charter flights for team travel since October 2018. U.S. Soccer has planned to take charter flights for team travel for both teams in 2020, as well.

47. The WNT flew charter flights for all team travel during the 2015 FIFA Women's World Cup, during Olympic qualifying in 2016, and during the 2016 Olympic Games. The WNT did not reserve a charter flight for its initial trip to Brazil for the 2016 Olympic Games because I did not believe the significant additional cost to take a charter flight from the United States to Brazil, rather than flying business class (which is how the team traveled there) would have been a prudent expenditure of money in light of my view that business class travel would not cost the team any competitive advantage, given that international business class travel from the United States to South America is often at least as comfortable as a charter airplane, if not more so. Also, WNT Head Coach Jill Ellis did not request a charter flight to Brazil. If she had, I would have considered the request, just as I considered (and ultimately acceded to) her request to reserve hotel accommodations for the team for the semifinals and finals of the Olympic tournament at a resort outside the Olympic Village, notwithstanding the fact that doing so cost U.S. Soccer hundreds of thousands of additional dollars. Coach Ellis told me that she believed it was important to do so for the team's competitive advantage.

48. The MNT also flew charter flights for all team travel to non-friendly matches between 2015 and 2018.

49. Between June 11, 2015, and September 2018, the WNT did not use charter flights for any team travel to friendly matches. The MNT flew a total of six charter flights for team travel to friendly matches between June 11, 2015, and September 2018.

50. Two of those MNT charter flights to friendly matches were flights to Cuba for a match against Cuba and then from Cuba to another match in Washington, D.C., in October 2016. The team flew on charter airplanes because there were very limited commercial flight options to and from Cuba at the time.

51. One of those MNT charter flights to a friendly was a flight the team took in June 2017 to a friendly in Utah, five days before a World Cup qualifier in Colorado. At the time, the team was struggling to try to qualify for the 2018 World Cup, and I agreed

DECLARATION OF TOM KING

with the Head Coach's request for a charter flight in an effort to provide the team with every competitive advantage as it attempted to qualify for the World Cup.

52. One of those MNT charter flights to a friendly was a flight the team took after arriving in Nashville for the team's pre-Gold Cup training camp in 2017. The flight took the team to East Hartford for a friendly just days before its Gold Cup opener back in Nashville. Again, the team had been struggling in World Cup qualifying, and the Gold Cup was viewed by U.S. Soccer as a significant opportunity to win a meaningful tournament (which the team did), to help provide the program with momentum and a boost for its fans. We reserved the charter flight in an effort to provide the team with every competitive advantage heading into the Gold Cup.

53. One of those MNT charter flights to a friendly was a flight from Ireland to a friendly in France against the soon-to-be world champion French team, a week after a friendly against Ireland in June 2018. By this time, the team had failed to qualify for the 2018 World Cup, and U.S. Soccer viewed the friendly against France as a meaningful opportunity for the team to compete against one of the World Cup favorites. I wanted the team to have every competitive advantage for that match because I believed a good result in that match (which the team achieved) could give the players and the program a significant boost, compared to most friendlies. In addition, charter flights within Europe can be relatively inexpensive. This one cost only €42,670 and avoided separate shipping costs because all team equipment could be on the plane. All in all, my cost-benefit analysis led me to believe a charter flight was the best option for the trip.

54. The last charter flight to a friendly before we began routinely flying charters for both teams in October 2018 was a flight to an MNT friendly against Mexico in Nashville in September 2018. The match was only four days after the team played a friendly match against Brazil in the New York area, and Mexico is the team's main rival. Even a friendly match against Mexico is seen by U.S. Soccer as an important measuring stick for the program. Accordingly, we reserved a charter flight to try to ensure every competitive advantage for the team.

DECLARATION OF TOM KING

55. The spreadsheets produced to Plaintiffs' counsel during the discovery process in the Alex Morgan, et al., lawsuit and labeled USSF_Morgan_063092-152, 063163, and 063239-42 are documents prepared by the successive WNT and MNT Team Administrators who reported to me at the time they were prepared. These documents were prepared by them in the regular course of business for purposes of submitting the document to the Finance Department shortly after the time periods covered by the submissions that so paychecks could be generated for WNT and MNT players in accordance with the instructions on the spreadsheets.

56. The spreadsheets produced to Plaintiffs' counsel during the discovery process in the Alex Morgan, et al., lawsuit and labeled USSF_Morgan_070834-35 contain information pertaining to WNT and MNT matches during the period from 2014-2019. I reviewed those spreadsheets for accuracy before they were produced, and I have personal knowledge of the facts contained in them.

57. The documents produced to Plaintiffs' counsel during the discovery process in the Alex Morgan, et al., lawsuit and labeled WNTPA_00004575 and USSF_Morgan_000530, 000587, and 028424 are all true and correct copies of collective bargaining agreements that I have described elsewhere in this Declaration and attached as exhibits to this Declaration.

58. The chart attached as Exhibit 18 to this Declaration reflects each match played by the WNT between January 1, 2014, and December 31, 2019.

59. The chart attached as Exhibit 19 to this Declaration reflects each match played by the MNT between January 1, 2014, and December 31, 2019.

60. Column A in Exhibits 18 and 19 reflect the year in which the match was played.

61. Column B in Exhibits 18 and 19 reflects the date (day and month) on which the match was played.

62. Column C in Exhibits 18 and 19 reflects the opponent for the match.

63. Column D in Exhibits 18 and 19 reflects the opponent's FIFA ranking as of the date the match was played.

64. Column E in Exhibits 18 and 19 reflects the score (WNT/MNT-opponent) of the match.

65. Column F in Exhibits 18 and 19 reflects U.S. Soccer's result (W=win, L=loss, D=draw) for the match.

66. Column G in Exhibits 18 and 19 reflects the type of match that was played. Matches in the SheBelieves Cup, Tournament of Nations, Algarve Cup, and International Tournament de Brasilia are all friendly matches that are organized into a round-robin tournament format.

67. Column H in Exhibits 18 and 19 reflects the country in which the match was played.

68. The chart attached as Exhibit 20 to this Declaration reflects each match played by the WNT between June 11, 2015, and December 31, 2019.

69. The chart attached as Exhibit 21 to this Declaration reflects each match played by the MNT between June 11, 2015, and December 31, 2019.

70. Column A in Exhibits 20 and 21 reflects the year in which the match was played.

71. Column B in Exhibits 20 and 21 reflects the date (day and month) on which the match was played.

72. Column C in Exhibits 20 and 21 reflects the opponent for the match.

73. Column D in Exhibits 20 and 21 reflects the type of match that was played. Matches in the SheBelieves Cup, Tournament of Nations, Algarve Cup, and International Tournament de Brasilia are all friendly matches that are organized into a round-robin tournament format.

74. Column E in Exhibits 20 and 21 reflects the venue in which the match was played.

DECLARATION OF TOM KING

75. Column F in Exhibits 20 and 21 reflects the city in which the match was played.

76. Column G in Exhibits 20 and 21 reflects the state in which the match was played (where applicable).

77. Column H in Exhibits 20 and 21 reflects the country in which the match was played.

78. Column I in Exhibits 20 and 21 reflects the surface upon which the match was played (permanent natural grass, artificial turf, or temporary grass installed over artificial turf or concrete). No distinction is made between a field that is completely permanent natural grass and one that is partially so (e.g., a match at a baseball stadium such as Busch Stadium, in which a portion of the field was temporary natural grass installed over infield dirt).

79. Column J in Exhibits 20 and 21 reflects the hotel or resort at which the team stayed the night before the match.

80. Column K in Exhibits 20 and 21 reflects the means by which the players traveled to the city in which the match was played.

//
//
//
//
//
//
//
//
//
//
//
//

DECLARATION OF TOM KING

1  I declare under penalty of perjury that the foregoing is true and correct.
2  Executed on February 20, 2020.
3
4  _____
5  Tom King