Ellen E. McLaughlin (Pro Hac Vice)
E-mail:  emclaughlin@seyfarth.com
Noah Finkel (Pro Hac Vice)
E-mail:  nfinkel@seyfarth.com
Brian Stolzenbach (Pro Hac Vice)
E-mail: bstolzenbach@seyfarth.com
Sharilee Smentek (Pro Hac Vice)
E-mail:  ssmentek@seyfarth.com
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:   (312) 460-5000
Facsimile:    (312) 460-7000

Kristen M. Peters (SBN 252296)
E-mail:  kmpeters@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:    (310) 201-5219

Giovanna A. Ferrari (SBN 229871)
E-mail: gferrari@seyfarth.com
Chantelle C. Egan (SBN 257938)
E-mail: cegan@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:    (415) 397-8549

Kyllan Kershaw (Pro Hac Vice)
E-mail: kkershaw@seyfarth.com
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309
Telephone:   (404) 885-1500
Facsimile:    (404) 892-7056

**SEYFARTH SHAW LLP**
Counsel for Defendant
U.S. SOCCER FEDERATION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX MORGAN, et al., | Case No. 2:19-cv-01717-RGK-AGR |
| Plaintiffs, | **DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY** |
| v. | |
| U.S. SOCCER FEDERATION, INC., | |
| Defendant. | Judge:        Hon. R. Gary Klausner<br>Hearing:     March 30, 2020 at 9:00 a.m.<br>Ctrm:        850 |

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

# **TABLE OF CONTENTS**

I.    DR. JUSTIN MCCRARY'S OPINIONS ARE RELEVANT, THEY ARE BASED ON WIDELY ACCEPTED ECONOMIC PRINCIPLES, AND THEY WOULD BE OF MATERIAL ASSISTANCE TO THE TRIER OF FACT. .................................................................................................. 1

II.   CARLYN IRWIN'S CALCULATIONS OF TOTAL COMPENSATION ARE RELEVANT AND ADMISSIBLE .................. 6

      A.    The Unions Representing the WNT and MNT Players Negotiated Very Different Compensation Structures, With No Common Denominator Enabling the Court To Directly Compare Their "Rates of Pay." ............................................................................................ 6

      B.    Absent a Common Denominator Between the MNT's and WNT's Pay Structure, an Effective Rate of Pay Must Be Calculated from Their Total Compensation, Which Ms. Irwin Has Done. ...................................... 10

      C.    If Plaintiffs Are Permitted To Pursue Their New Legal Theory Under Title VII, Ms. Irwin's Report Would Be Relevant for Additional Reasons. ........................................................................................ 15

III.  MR. MISCIMARRA'S TESTIMONY IS ADMISSIBLE—IT IS THE TYPE OF TESTIMONY REGULARLY USED TO ASSIST THE TRIER OF FACT. ................................................................................................ 16

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bence v. Detroit Health Corp.*,
    712 F.2d 1024 (6th Cir. 1983) ..................................................................11, 13, 14

*Bertotti v. Philbeck, Inc.*,
    827 F. Supp. 1005 (S.D. Ga. 1993) ...................................................... 10, 14

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993).........................................................................................5, 6

*Ebbert v. Nassau Cnty.*,
    No. 05-CV-5445, 2009 U.S. Dist. LEXIS 28032 (E.D.N.Y. 2009)...........11, 12, 13, 14

*EEOC v. Kettler Bros.*,
    Nos. 87-3069, 87-3083, 1988 U.S. App. LEXIS 20103 (4th Cir. 1988)....11, 12, 13, 14

*Fidelity Natl. Financial, Inc. v. Nat'l. Union Fire Ins. Co.*,
    No. 09–CV–140–GPC–KSC, 2014 WL 1286392 (S.D. Cal. March 28,
    2014) .................................................................................................18

*Gallagher v. Kleinwort Benson Gov't Sec., Inc.*,
    698 F. Supp. 1401 (N.D. Ill. 1988) .............................................................10

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ...................................................................18

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ....................................................................4

*Marting v. Crawford & Co.*,
    203 F. Supp. 2d 958 (N.D. Ill. 2002).........................................................10

*Marx & Co. v. Diners' Club Inc.*,
    550 F.2d 505 (2d Cir. 1977) ...................................................................17

*McDevitt v. Guenther*,
    522 F. Supp. 2d 1272 (D. Haw. 2007)........................................................18

*Pinal Creek Group v. Newmont Mining Corp.*,
    352 F. Supp. 2d 1037 (D. Ariz. 2005) ......................................................17

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

*Robinson v. Entex, Inc.*,
   No. CIV.A. CA3-87-1508-D, 1990 WL 517060 (N.D. Tex. Aug. 10,
   1990) .................................................................................................. 4, 5

*Specht v. Jensen*,
   853 F.2d 805 (10th Cir. 1988) ........................................................... 18

*Stanley v. Novartis Pharm. Corp.*,
   11 F. Supp. 3d 987 (C.D. Cal. 2014) ................................................... 5

*Treadaway v. Societe Anonyme Lous-Dreyfus*,
   894 F.2d 161 (5th Cir. 1990) ............................................................... 4

*United States v. Finley*,
   301 F.3d 1000 (9th Cir. 2002) ........................................................... 14

*United States v. Kupau*,
   781 F.2d 740 (9th Cir. 1986) ............................................................. 17

*Viveros v. Donahoe*,
   No. CV 10-08593 MMM EX, 2012 WL 6021667 (C.D. Cal. Nov. 30,
   2012) .................................................................................................... 4

*WWP, Inc. v. Wounded Warriors Family Support, Inc.*,
   628 F.3d 1032 (8th Cir. 2011) ........................................................... 15

**Federal Statutes**

29 U.S.C. § 206(d)(1) ................................................................................... 6

Title VII of the Civil Rights Act ......................................................... *passim*

Equal Pay Act (EPA) ........................................................................... *passim*

National Labor Relations Act (NLRA) ............................................... 18, 20

Pregnancy Discrimination Act ..................................................................... 4

U.S. Code § 207(e) ..................................................................................... 11

**Rules**

Fed. R. Evid. 702 ................................................................................ *passim*

iii

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

Fed. R. Evid. 702(a) .................................................................................... 1, 2

**Regulations**

29 C.F.R. § 531.40(c) ................................................................................... 7, 9

29 C.F.R. § 778.109 ......................................................................................... 10

29 C.F.R. § 1620.10 .................................................................................. 7, 9, 10

Initial Irwin Report & 2d Irwin Report ........................................................... 14

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

# I.   DR. JUSTIN MCCRARY'S OPINIONS ARE RELEVANT; THEY ARE BASED ON WIDELY ACCEPTED ECONOMIC PRINCIPLES; AND THEY WOULD BE OF MATERIAL ASSISTANCE TO THE TRIER OF FACT.

Dr. Justin McCrary is an economist with expertise in labor economics. He has reviewed the most recent collective bargaining agreement between U.S. Soccer and the union representing the Senior Men's National Team (MNT), compared it to the current and immediately preceding collective bargaining agreements covering the Senior Women's National Team (WNT), and reached certain conclusions about the agreements grounded in widely accepted economic principles. (Declaration of Chantelle Egan, ¶¶ 2-3, Ex. 1 (Initial McCrary Report), ¶¶ 7-56.) Plaintiffs seek to exclude large swaths of Dr. McCrary's testimony, on the sole contention that he is offering two "unprecedented opinions": (i) that the compensation arrangements of the WNT players and MNT players cannot be compared under Title VII of the Civil Rights Act or the Equal Pay Act (EPA), and (ii) that "when one group of employees has one mix of base compensation and bonus compensation, and another group of employees has a different mix of base compensation and bonus compensation, there is no way to determine if the compensation schemes are discriminatory." (Dkt. 167, 13:16-19, 14:1-5.) Plaintiffs assert that Dr. McCrary is using a "'junk science' use of economic theory to advocate for a new, unsupportable exemption from the wage discrimination requirements of Title VII and the EPA," which is "wrong, as a matter of law, and thus has no place as expert testimony" in this case. (*Id.* at 14:9-13.) Plaintiffs are wrong on all counts. Dr. McCrary has not offered any of the opinions falsely attributed to him by Plaintiffs, and the economic concepts he has explained in his report are firmly grounded in sound economics (and are, indeed, indisputable). His opinions are unquestionably relevant and are helpful "to understand the evidence." Fed. R. Evid. 702(a). Specifically, Dr. McCrary's testimony would assist anyone seeking to understand the differences between the collective bargaining agreements at issue in this case and to assess whether Plaintiffs' collective bargaining agreements pay them a lesser

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

wage rate than the MNT agreement or are otherwise less favorable contracts than the one covering the MNT.

Dr. McCrary's ***actual*** conclusions in his report (which Plaintiffs' motion misrepresents ) are these: (i) "neither [the MNT nor the WNT] contract is systematically better or worse" and (ii) "there is no single rate of pay for either contract." (Initial McCrary Report, ¶ 12 at Bullet 4.) These two conclusions go straight to the heart of Plaintiffs' claims of pay discrimination. Plaintiffs sued U.S. Soccer on the theory that they have been paid a lesser rate of pay than MNT players owing to sex discrimination, (Dkt. 1, ¶ 4), and they more recently (for the first time in their motion for partial summary judgment) have argued that their collective bargaining agreements reflect intentional sex-based discrimination against them, regardless of whether "they are performing equal work for unequal pay," (Dkt. 170, 19:7-9). Although Plaintiffs should not be permitted to raise the latter theory at this late stage of the litigation, (*see* Dkt. 186, 22:1-13), Dr. McCrary's economic analysis of the three complex collective bargaining agreements at issue is helpful in determining whether *both* of these assertions are, in fact, true.

Dr. McCrary demonstrates that the WNT collective bargaining agreements and the MNT collective bargaining agreement are all performance contracts containing varying and very different components of compensation and that, as a result, neither team's contract systematically compensates players more highly than the other. Among other aspects of his analysis, Dr. McCrary uses economic analysis to address specific allegations in the Complaint. (*Compare* Dkt. 1, ¶ 58 *with* Initial McCrary Report, ¶¶ 40-49.) Dr. McCrary's analysis directly contradicts Plaintiffs' specific allegations in the Complaint, which presents a hypothetical scenario designed to show that they are paid less than MNT players for friendly matches. (*Id.*) Dr. McCrary demonstrates that, in reality, the WNT collective bargaining agreement pays WNT players *more* than MNT players for friendly matches in almost every realistic scenario. (*Id.*)

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

1    Dr. McCrary also identifies specific Plaintiffs who have been paid more, overall,
2    under the WNT collective bargaining agreements for significant stretches of time than
3    they would have been paid under the MNT collective bargaining agreement under the
4    same circumstances. (Initial McCrary Report, ¶¶ 50-54.) Again, this directly contradicts
5    Plaintiffs' entire theory of the case—that their collective bargaining agreement pays them
6    less than the MNT's collective bargaining agreement would. (*Id.* ¶ 56: "Above, I
7    presented realistic scenarios under which players, or an entire team, would have been
8    compensated more under the WNT CBA than the MNT CBA. Therefore, I conclude that
9    the CBAs are not written in a way that systematically pays WNT players less than
10   comparable MNT players.") What could be more helpful in understanding the evidence
11   and assessing Plaintiffs' allegations in this case? Excluding Dr. McCrary's testimony
12   would be contrary to Rule 702 and a grievous error that would seriously prejudice U.S.
13   Soccer's ability to defend itself in this lawsuit.

14   In reality, Plaintiffs have offered no serious argument that Dr. McCrary's analysis is
15   irrelevant to this case, that it is contrary to law, or that it otherwise would be confusing to
16   anyone. Indeed, it is quite the opposite.  Dr. McCrary's analysis helps explain the
17   complex pay structures at issue and their implications. This is precisely the point of
18   expert testimony under Rule 702.

19   Instead, Plaintiffs have mischaracterized Dr. McCrary's opinions in a desperate effort
20   to exclude them because they so clearly demonstrate that Plaintiffs' claims of pay
21   discrimination are without merit. Dr. McCrary never opined that the compensation
22   arrangements of the WNT players and MNT players cannot be compared under Title VII
23   or the EPA. In fact, he did compare the structures and concluded that neither one is worse
24   than the other according to well-accepted principles of labor economics. Nor did Dr.
25   McCrary opine that "when one group of employees has one mix of base compensation
26   and bonus compensation, and another group of employees has a different mix of base
27   compensation and bonus compensation, there is no way to determine if the compensation

28

1  schemes are discriminatory." (Dkt. 167, 14:1-5.) In fact, in a supplemental report, Dr.

2  McCrary responds directly to this absurd characterization of his opinion and rejects it

3  outright. (Egan Decl., ¶¶ 2 & 4, Ex. 2 (2d McCrary Report), § 6.)

4      Meanwhile, not one of the cases cited in Plaintiffs' motion to exclude Dr. McCrary's

5  testimony stands for any proposition even remotely supportive of their argument.

6  Plaintiffs describe *Treadaway v. Societe Anonyme Lous-Dreyfus*, 894 F.2d 161 (5th Cir.

7  1990), as "finding discrimination in different compensation and benefit packages where

8  the 'economist calculated these benefits on the basis of the employer's contributions.'"

9  (Dkt. 167, 14:21-15:1.) *Treadaway* is not a discrimination case at all. It involved a

10  personal injury lawsuit by a longshoreman against his vessel, and the economist at issue

11  calculated the value of the plaintiff's lost benefits (as a result of his not being physically

12  capable of working). 894 F.2d at 162-163, 168-169. What this has to do with Plaintiffs'

13  case is beyond all understanding. In *Viveros v. Donahoe*, No. CV 10-08593 MMM EX,

14  2012 WL 6021667, *1, 5 (C.D. Cal. Nov. 30, 2012), the plaintiff was fired in violation of

15  the Pregnancy Discrimination Act, and the court considered the value of various lost

16  compensation and benefits in determining her back pay award. Again, this does not have

17  anything to do with Plaintiffs' arguments or Dr. McCrary's opinions, and the case did not

18  involve contested expert testimony at all. Similarly, in *Hemmings v. Tidyman's Inc.*, 285

19  F.3d 1174, 1178, 1191-92 (9th Cir. 2002), a Title VII case, two plaintiffs were denied

20  promotions and were awarded back pay judgments that accounted for both lost salary and

21  lost benefits. Again, this has nothing to do with the issues in this case or with Dr.

22  McCrary's opinions.

23      Finally, Plaintiffs cite *Robinson v. Entex, Inc.*, No. CIV.A. CA3-87-1508-D, 1990 WL

24  517060, *1 (N.D. Tex. Aug. 10, 1990), an Equal Pay Act case in which the plaintiff

25  alleged that her monthly compensation was lower than a male counterpart's monthly

26  compensation based on their comparative monthly salaries. The court disagreed,

27  observing that the plaintiff's monthly salary *plus her monthly car allowance and*

28

*insurance benefits* was higher than her male comparator's total monthly compensation. *Id.* at *9. In other words, the court combined different types of compensation that were provided by the employer on the same per-month basis and determined that the plaintiff received higher monthly compensation. Nowhere does Dr. McCrary opine that this would be difficult, much less impossible. Nor would Dr. McCrary's opinion even address such a situation because that is not the situation presented here. MNT players and WNT players are not both simply paid a set amount of compensation per month. One of the fundamental underpinnings of Dr. McCrary's report is the fact that MNT players and WNT players are not paid in a parallel "per month" (or "per year" or "per hour" or "per game" or "per" *anything*) manner. This is why his economic analysis is so important—to compare the two very different contracts for the trier of fact to demonstrate that the WNT's contract will often compensate a player more highly than the MNT contract, even under Plaintiffs' own theory. In fact, his more recent report demonstrates that MNT players would have been paid more if they had been covered by the WNT's most recent collective bargaining agreement, according to Plaintiffs' own legal theory. (2d McCrary Report, ¶¶ 49-51, Ex. 6.)

Dr. McCrary's analysis and opinions are grounded in well-established economic principles (whose reliability and acceptability Plaintiffs have not actually challenged in any manner, notwithstanding their aimless use of the term "junk science"), and they are unquestionably helpful in understanding the labor contracts in this case. If Plaintiffs disagree with Dr. McCrary's opinions, "vigorous cross-examination," not outright exclusion, is the appropriate vehicle for testing them. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591 (1993). Plaintiffs' attempt to exclude him is inconsistent with Rule 702, which "should be applied consistent with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barrier to "opinion testimony'." *Stanley v. Novartis Pharm. Corp.*, 11 F. Supp. 3d 987, 994-95

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

(C.D. Cal. 2014) (quoting *Daubert*, 509 U.S. at 588). Plaintiffs' motion to exclude Dr. McCrary's testimony should be denied.

## II. CARLYN IRWIN'S CALCULATIONS OF TOTAL COMPENSATION ARE RELEVANT AND ADMISSIBLE.

Forensic accountant Carlyn Irwin examined U.S. Soccer's compensation records and calculated, among other things, the total amount of money paid by U.S. Soccer from 2015 through 2019 to (i) all WNT players, (ii) all MNT players, (iii) their respective unions, (iv) the four Title VII Class Representative Plaintiffs, and (v) the four highest-paid MNT players. (Egan Decl., ¶¶ 2 & 5, Ex. 3 (Initial Irwin Report), 1-9, 13-21.) In a second report, she has updated her calculations based on new information and performed similar calculations across other time periods. (*Id.* at ¶¶ 2 & 6, Ex. 4 (2d Irwin Report).) Plaintiffs ask the Court to exclude all her testimony about "total compensation" figures on the sole ground that total compensation is, according to Plaintiffs, "irrelevant for determining discrimination under the EPA or Title VII because [her calculations] ignore differences in the rates of pay." (Dkt. 167, 12:5-9.) Plaintiffs are incorrect. Her calculations are directly relevant to Plaintiffs' claims and to U.S. Soccer's defenses.

### A. The Unions Representing the WNT and MNT Players Negotiated Very Different Compensation Structures, With No Common Denominator Enabling the Court To Directly Compare Their "Rates of Pay."

Plaintiffs are suing U.S. Soccer under the Equal Pay Act (EPA), which requires them to prove (among other things) that U.S. Soccer pays them "at a rate less than the rate at which [it] pays wages to employees of the opposite sex." 29 U.S.C. § 206(d)(1). In this regard, Plaintiffs contend that U.S. Soccer pays them at a lesser rate than MNT players. WNT players and MNT players, however, are not compensated by U.S. Soccer according to the same basic rate structure (e.g., salary per month, wage per hour, commission per sale, or fee per task). Instead, the players within each team receive compensation at all

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY
62314403v.3

sorts of different rates, and there is even greater variance when one compares the players on the two different teams to one other.

Specifically, since March 8, 2016 (the earliest possible relevant date under the EPA), MNT players have been eligible to receive the following types of compensation directly from U.S. Soccer:

- a flat fee for making a commercial appearance with a corporate sponsor;
- per diems;
- a flat fee for making the match-day roster for a friendly match, Gold Cup match, Copa America match, FIFA Confederations Cup match, Concacaf Nations League match, or FIFA World Cup qualifier;
- a flat fee for participating in training camp but not making a match-day roster;
- a bonus for winning or drawing a friendly match, Gold Cup match, Copa America match, FIFA Confederations Cup match, Concacaf Nations League match, or FIFA World Cup qualifier; and
- various bonuses for qualifying for the FIFA World Cup, making the team roster for the FIFA World Cup, and having certain levels of success in the Gold Cup, Copa America, FIFA Confederations Cup, and FIFA World Cup.

(Egan Decl., ¶ 7, Ex. 5 (King Decl. (Dkt. 171-21)), [1] ¶¶ 8-10; King Decl., Ex. 1 (Uniform Player Agreement (UPA)), Ex. A; King Decl., Ex. 2.)

In addition to the foregoing payments, U.S. Soccer also has paid the union representing MNT players a "ticket share" of $1.50 per paid attendance at home friendlies and FIFA World Cup qualifiers on home soil, (King Decl., Ex. 1 (UPA), Ex. A), which payments also constitute wages paid on behalf of the MNT players for purposes of the EPA. 29 C.F.R. § 1620.10; 29 C.F.R. § 531.40(c).

---

[1] Mr. King's declaration was filed by U.S. Soccer in support of its motion for summary judgment on February 20, 2020. (Dkt. 171-21.) For the Court's convenience, U.S. Soccer re-files it with this memorandum of points and authorities, but attaches only the declaration and exhibits thereto that are actually referenced in this document.

In stark contrast, since January 1, 2017, WNT players have been eligible to receive the following types of payments directly from U.S. Soccer:

- a flat fee for making a commercial appearance with a corporate sponsor;
- per diems;
- an annual salary of $100,000 for national team play ("Contracted" players only);
- flat fees for participating in camp or for making a match-day roster, with the amount of these fees varying based on the player's seniority ("Non-Contracted" players only);
- an annual salary for playing in the National Women's Soccer League (NWSL) and NWSL playoff bonuses ("NWSL Allocated Players" only, which includes "Contracted" and "Non-Contracted" players);
- bonuses for winning or drawing friendly matches, FIFA Women's World Cup qualifiers, and Olympic qualifiers;
- bonuses for Olympic qualification and FIFA Women's World Cup qualification;
- bonuses for placing first, second, or third at the FIFA Women's World Cup and Olympic Games;
- additional flat fee payments in connection with post-tournament friendlies (if the team places first, second, or third at the FIFA Women's World Cup or Olympic Games) that otherwise would have been compensated as normal friendly matches if they had not placed in the tournament;
- bonuses for winning the She Believes Cup and the Four Nations Tournament;
- free medical, dental, and vision insurance ("Contracted" and "NWSL Allocated" players only); and
- a contract signing bonus (23 players only).

(King Decl., ¶ 15, Ex. 5 (2017 WNT CBA), Articles 8, 9, &11, §§  12.A.1., 13.B.3 & 19.F., & Exhibit A.)

In addition to all this, U.S. Soccer makes the following payments to the union representing the WNT players, on the players' behalf:

8

- an annual $350,000 guaranteed payment;
- periodic bonus payments to the union based on television ratings;
- periodic payments to the union based on attendance levels at WNT friendlies;
- periodic payments based on U.S. Soccer revenue received from Soccer United Marketing;
- and a "ticket share" of $1.50 per paid attendance at home friendlies and FIFA World Cup qualifiers on home soil ticket sales.

(*Id.* at §§ 15.C.1.e., 19.A, 19.B, 19.C.) Again, all these payments to the women's union on the players' behalf constitute wages for EPA purposes. 29 C.F.R. § 1620.10; 29 C.F.R. § 531.40(c).

Because the WNT's compensation was controlled by a different collective bargaining agreement before 2017, the WNT players operated under a different compensation arrangement between March 8, 2016, and the end of that year. (King Decl. ¶¶ 13-14, Exs. 3 (2005 WNT CBA) & 4 (MOU).) During that period, U.S. Soccer also paid some WNT players an annual salary for national team play, some WNT players an annual salary for playing in the NWSL, and some WNT players both of these salaries. (King Decl., Ex. 4 (MOU), 1-2.) With respect to players who did not receive an annual salary for WNT play, however, U.S. Soccer paid them a weekly salary while participating in a WNT training camp and (upon reaching certain seniority) a flat fee for making a match-day roster. (*Id.* at 2-3.) All WNT players were also eligible to receive flat fees for participating in commercial appearances with corporate partners and to receive bonuses for winning friendlies. (*Id.* at 3-4.) In addition, players received a bonus for making the Olympic Games roster. (*Id.* at 3.) U.S. Soccer also made payments to the union on the players' behalf based on ticket sales, which again constituted wages for EPA purposes. 29 C.F.R. § 1620.10; 29 C.F.R. § 531.40(c).

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Absent a Common Denominator Between the MNT's and WNT's Pay Structure, It Is Necessary To Calculate Total Compensation, Which Ms. Irwin Has Done.**

Because there is no single common denominator (e.g., "per hour") running through all the foregoing compensation components (or even a uniform set of common denominators between the teams, such as "annual salary and percent commission"), it is not possible to directly and uniformly compare the WNT's actual "rate of pay" to that of MNT players. Under these circumstances, courts have held that it is necessary to look at total compensation, which, in turn, allows for a comparison between the overall ***effective rate*** of the plaintiffs and their alleged comparators by dividing that total compensation into a rational common denominator (typically, a sensible unit of time under the circumstances). *Bertotti v. Philbeck, Inc.*, 827 F. Supp. 1005, 1010 (S.D. Ga. 1993) (analyzing EPA claim by (1) annualizing female plaintiff's weekly salary and fringe benefits to compare to the men's "annual, agreed upon, wages" and (2) comparing the total actual monthly remuneration received by plaintiff and the actual annual remuneration received by the men, divided by twelve); *Marting v. Crawford & Co.*, 203 F. Supp. 2d 958, 966 (N.D. Ill. 2002) (holding that when an EPA plaintiff's total compensation is greater than her purported comparator's compensation, her EPA claim cannot survive on a base-pay theory, pursuant to the EPA regulation's definition of wages, which "includes all payments made to [or on behalf of] an employee as remuneration for employment") (quoting 29 C.F.R. § 1620.10); *Gallagher v. Kleinwort Benson Gov't Sec., Inc.*, 698 F. Supp. 1401, 1404 (N.D. Ill. 1988) (finding that any bonus received by the plaintiff and her purported comparators should be included in their respective "wages," for purposes of the EPA); *see also* 29 C.F.R. § 778.109 (calculation of the "regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment," which includes non-discretionary bonuses pursuant to 29

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

U.S. Code § 207(e), "in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid").

When arguing that total compensation can never be relevant, Plaintiffs rely on (and mischaracterize) three opinions from other circuits. (Dkt. 167, 13 n.6, citing *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1027-28 (6th Cir. 1983), *EEOC v. Kettler Bros.*, Nos. 87-3069, 87-3083, 1988 U.S. App. LEXIS 20103 (4th Cir. 1988), and *Ebbert v. Nassau Cnty.*, No. 05-CV-5445, 2009 U.S. Dist. LEXIS 28032 (E.D.N.Y. 2009).)[2] Plaintiffs misconstrue the holdings of these cases. The courts in these cases did not hold that total compensation can *never* be relevant in an EPA case. Rather, those courts rejected fact-specific arguments about total compensation in circumstances that are not present here. **In fact, as discussed below, the Sixth Circuit in *Bence* explicitly acknowledged that comparing total remuneration may be appropriate in a different circumstance, such as the one facing the Court here.**

In *Ebbert*, the female plaintiffs and their male comparators all were paid a base annual salary, with the vast majority of the women's salaries set at a pay grade lower than the men's. 2009 U.S. Dist. LEXIS at *2-3. Nevertheless, the employer argued that the plaintiffs could not establish the first element of an EPA case—that they were paid a lesser wage rate than their male comparators—because some plaintiffs earned more than the men by working more overtime and receiving certain premium holiday pay. *Id.* at *6-7. (There is no suggestion in the opinion that the men were not covered by the same overtime and holiday pay policies.) Accepting the employer's argument would have led

---

[2] U.S. Soccer understands that the Court relied on these same cases when it concluded that Plaintiffs Lloyd, Morgan, Rapinoe, and Sauerbrunn possessed *standing* to sue U.S. Soccer under Title VII, (Dkt. 98 at 5), but the Court's decision in that regard was issued before a full evidentiary record was developed and without U.S. Soccer having an opportunity to respond to those cases (which were cited by Plaintiffs for the first time in their reply brief in support of class certification). In any case, the Court's conclusion that these four Plaintiffs made allegations sufficient to establish basic standing to sue under Title VII is not dispositive of whether or how they can ultimately prove a violation of the Equal Pay Act.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

to an "absurd" result according to the court in *Ebbert* because the female plaintiffs and the male comparators were both paid the same exact way (annual base salary), and the base salaries of the plaintiffs were lower; the employer could not be allowed to escape liability by simply working the women more, such that they earned more in total. *Id.* at *7. The facts of this case, however, are nothing like that situation because Plaintiffs and the MNT are not paid in the same basic manner.

Moreover, Ms. Irwin's report expressly demonstrates that U.S. Soccer is *not* arguing for the "absurd" result rejected by the court in *Ebbert*. For example, Ms. Irwin's report shows that between 2015 and 2019, U.S. Soccer paid Plaintiff Megan Rapinoe more than $1 million for playing in 64 games while the highest-paid MNT player received less than $650,000 for playing in 60 games. (Initial Irwin Report, Exs. 13-16.) Ms. Rapinoe plainly did not earn more because she worked more. In fact, she earned *far more per game played*. Note, too, that this directly contradicts an assertion Plaintiffs make in the Complaint: "The USSF continues its policy and practice of paying female WNT players less than similarly situated male MNT players on a *per game basis*." (Dkt. 1, ¶ 64, emphasis added.) Ms. Irwin's testimony must be permitted, to allow U.S. Soccer to respond to this fundamental accusation by Plaintiffs.

*Kettler Bros.* involved sales managers who, irrespective of sex, were paid via the same structure: a guaranteed minimum salary, plus commissions, for selling "homes and town houses in metropolitan Washington, D.C." 1988 U.S. App. LEXIS 20103 at *2. The female plaintiffs, however, were paid a lower commission rate per home sale than their male counterparts. *Id.* at *6. Evidence in the record suggested that the employer had implemented higher commission rates for the men because the employer believed men "had families to support." *Id.* at *2. As in *Ebbert*, the court in *Kettler Bros.* held that it did not matter whether the plaintiffs earned more overall by selling more houses because the lower commission pay per sale reflected a lower rate for the women, when compared directly to the men. *Id.* at *7-8. Again, this situation is not present here because WNT

12

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY**

players and MNT players are not paid pursuant to parallel and simple compensation structures that can be directly compared in this way.

In *Bence*, the employer operated a chain of health spas divided into a men's and women's division, which operated on alternate days and which were staffed by male and female employees, respectively. 712 F.2d at 1025. The managers of each division were paid entirely by commission, based on gross sales of memberships, but the male managers were paid a higher commission rate than the female managers, on the grounds that there were more sales in the women's division overall, so this disparate commission rate would enable the male and female managers to earn the same amount of compensation overall. *Id.* at 1026-28. The court held, and the employer conceded, that the female plaintiffs had established a *prima facie* case under the EPA, on the grounds that their commission rate was lower, regardless of who may have earned more overall. *Id.* at 1027. Again, and unlike the situation present here, the two groups of employees were paid under identical commission structures, just using different applicable rates.

In the course of explaining why total compensation was irrelevant in that situation, however, the Sixth Circuit in *Bence* offered words that illuminate the problem with Plaintiffs' reliance on the case (and on *Ebbert* and *Kettler Bros.*) in the circumstances present here:

> Comparison of pay rates entails measuring the amount of pay against a
> **common denominator**, typically a given time period or quantity or quality
> of output. Consequently, it is necessary to identify the proper factor by
> which to measure rate of pay. This must be a practical inquiry which looks
> to the nature of the services for which an employer in fact compensates an
> employee. ***Under certain circumstances, there might be merit in [the]
> employer's "equal total remuneration" argument*** if it paid its employees
> . . . for satisfactory performance of a host of specified duties, of which
> selling memberships was merely one element. Under such a system, total

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

compensation would be based on total service to [the] employer's clientele. . . . That is not the case here. . . . [The] employees' primary function was to sell memberships. . . . Evaluation of [the] employer's compensation on a "per sale" basis makes it apparent that it paid female managerial personnel at a lower rate than their male counterparts. This is precisely what the Equal Pay Act forbids.

712 F.2d at 1027-28 (emphasis added).

The instant case presents one of the circumstances the Sixth Circuit foresaw in *Bence*, wherein the employer pays all the employees at issue for a host of different responsibilities and different competitions, using a variety of different payment components and structures, leading to the absence of a built-in common denominator by which to determine and compare rates of pay. Neither the WNT nor the MNT is paid entirely by unit of time expended (like the employees in *Ebbert*) or per output (like the employees in *Bence* and *Kettler Bros.*), based on the exact same work.

As the Sixth Circuit recognized in *Bence*, and as other courts have held, in cases like this one where the plaintiffs and their alleged comparators do not share pay rates that use a common denominator, the proper starting point under the EPA is comparative total remuneration. *See e.g.*, *Bertotti v. Philbeck, Inc.*, 827 F. Supp. 1005, 1010 (S.D. Ga. 1993). This is precisely what Ms. Irwin has presented in her report. Her calculations are not only relevant, but they are the only appropriate standard by which to begin a comparison of the compensation paid to the two teams.

Plaintiffs want to exclude Ms. Irwin's testimony simply because it is unfavorable to their case—her report shows that U.S. Soccer has paid the WNT more than the MNT during any relevant time frame Plaintiffs may suggest. (*See generally* Initial Irwin Report & 2d Irwin Report.) This is not the standard for assessing the admissibility of expert testimony; the standard under Rule 702 is that "the proposed expert testimony is relevant and will serve to aid the trier of fact." *United States v. Finley*, 301 F.3d 1000, 1008 (9th

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

Cir. 2002) (internal citation omitted); *see also WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) (holding that an expert accountant's testimony meets the "helpful requirement" of Rule 702, even when presenting "basic math using simply deductive reasoning"). Plaintiffs' motion to exclude her testimony should be denied.

### C.     If Plaintiffs Are Permitted To Pursue Their New Legal Theory Under Title VII, Ms. Irwin's Report Still Would Be Relevant for Additional Reasons.

Furthermore, as noted above in relation to Dr. McCrary, Plaintiffs have presented a new legal theory under Title VII for the first time in their motion for partial summary judgment. (*Compare* Dkt. 170, 19:7-9 *with* Dkt. 1, ¶ 4.) Plaintiffs contend, in support of their motion, that "in contrast to the EPA, plaintiffs alleging sex-based compensation discrimination under Title VII need not establish that they are performing equal work for unequal pay," so long as they can show in some other fashion that U.S. Soccer has intentionally discriminated against them in compensation because of their sex. (Dkt. 170 at 19:4-9.) Although this theory should be rejected out of hand because it was not raised by Plaintiffs before they moved for summary judgment, if Plaintiffs are permitted to proceed with the theory, then Ms. Irwin's report becomes that much more relevant. The fact that U.S. Soccer has paid its WNT players and their union (on their behalf) tens of millions of dollars more during the last five years than it has paid its MNT players and their union during that period and that every Title VII class representative was paid more than any MNT player during that period, (Initial Irwin Report, 13-21), is plainly some evidence contrary to Plaintiffs' theory that U.S. Soccer intended to discriminate against Plaintiffs based on their sex. Surely, U.S. Soccer must be allowed to demonstrate that its collective bargaining agreements with the WNT have paid the WNT players far more than the MNT's collective bargaining agreement has paid the MNT players over the Title

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

VII class period, as this is important evidence directly contradicting Plaintiffs' claim of discriminatory intent.

In addition, Dr. McCrary in his second report has offered economic analysis based in part on Ms. Irwin's total compensation calculations, in which he demonstrates that the WNT players have been compensated more than MNT players in relation to the total revenue generated by U.S. Soccer from their respective games. (2d McCrary Report, § 3.3.1.) This, too, is relevant to U.S. Soccer's defense that any alleged pay differential between the two teams is driven, not by sex, but by revenue-generation differentials. U.S. Soccer must be permitted to introduce this important expert analysis in support of its defense.

Once again, Plaintiffs are attempting to exclude expert testimony because it is harmful to their case, not because it is inadmissible under Rule 702. On the contrary, Ms. Irwin's testimony is helpful to understanding the evidence in this case. Accordingly, Plaintiffs' motion to exclude her testimony should be denied.

## III.   MR. MISCIMARRA'S TESTIMONY IS THE TYPE OF TESTIMONY REGULARLY AND PROPERLY USED TO ASSIST THE TRIER OF FACT.

Plaintiffs contend that former Chairman of the National Labor Relations Board Philip Miscimarra, an expert in the collective bargaining process, intends to "offer[] irrelevant legal argument and factual speculation in the guise of expert testimony," (Dkt. 167, 3:21-22), but his core opinion is neither. It is this: "The parties' bargaining and the 2017-2021 and the 2013-2017 [*sic*] collective bargaining agreements . . . are consistent with the types of tradeoffs, compromises and choices that are typical in collective bargaining." (Egan Decl., ¶¶ 2 & 8, Ex. 6 (Miscimarra Report), 35; *see also id.* at 17-26.) The dynamics of collective bargaining negotiations are both complex and unusual in many ways unlike any other type of contract negotiations in American law or society, and that is in part owing to the specific legal rules and parameters in which they occur. Plaintiffs

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

seek to convince a jury that U.S. Soccer's conduct in bargaining amounts to intentional sex discrimination, in part by obscuring the realities of collective bargaining. Mr. Miscimarra's testimony assists the jury in understanding how collective bargaining typically works and whether the conduct of U.S. Soccer or the union representatives representing the players during their negotiations (which included various Plaintiffs) was outside the norm. He does not purport to conclude that discrimination did or did not occur. Nor does he contend that discrimination can never occur in the context of collective bargaining. He does, however, offer an opinion solidly grounded in his deep expertise in the area, that the parties' behavior was typical of collective bargaining. Furthermore, the Ninth Circuit has recognized the need for experts in the fields of "labor law, labor management relations, and collective bargaining agreements," as such matters are outside the realm of common knowledge and involve technical terms likely to confuse a jury when presented without context. *United States v. Kupau,* 781 F.2d 740, 745 (9th Cir. 1986).

Mr. Miscimarra's vocation as an attorney does not disqualify him from testifying in this case, where his role is to educate the jury on the norms and typical course of collective bargaining, "to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice." *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 508–09 (2d Cir. 1977). In *Marx & Co.* the Second Circuit allowed the expert testimony of a lawyer on the ordinary practices of those engaged in the securities business, in order to establish a baseline by which the jury could judge the conduct of the parties. The court noted that such matters were distinguishable from inadmissible testimony, such as a lawyer's opinion as to the legal standards that should have governed the parties' conduct.

Courts in the Ninth Circuit have likewise held that expert testimony from an attorney is appropriate in certain circumstances. In *Pinal Creek Group v. Newmont Mining Corp.,* 352 F. Supp. 2d 1037, 1045 (D. Ariz. 2005), the court permitted two law professors to testify on corporate norms and whether the relationship between two entities was

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY
62314403v.3

consistent with those norms. Similarly, in *McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1293 (D. Haw. 2007), the court allowed the testimony of a law partner as an expert on the subject of the practice of family law in Hawaii.  Specifically, it permitted him "to testify about the standard of care amongst family law practitioners here in Hawaiʻi."  *Id.*at 1294.

Plaintiffs suggest that Mr. Miscimarra's testimony is improper because it references the National Labor Relations Act (NLRA). This ignores the fact that the NLRA created the structure within which collective bargaining occurs. The Ninth Circuit has held that "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Hangarter v. Provident Life & Acc. Ins. Co*., 373 F.3d 998, 1017 (9th Cir. 2004) (citation omitted) (holding expert's testimony not invalid because it relied on his understanding of the requirements of state law); *Fidelity Natl. Financial, Inc. v. Nat'l. Union Fire Ins. Co.*, No. 09–CV–140–GPC–KSC, 2014 WL 1286392 (S.D. Cal. March 28, 2014) (expert may refer to law while discussing facts). Other circuits have likewise found that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. *See Specht v. Jensen*, 853 F.2d 805, 809-10 (10th Cir. 1988).

Two of Plaintiffs' essential (if sometimes subtle and implicit, rather than explicit) arguments in this lawsuit are (1) that U.S. Soccer should have torn up its 2013-2016 collective bargaining agreement after the 2015 Women's World Cup because U.S. Soccer ended up generating more revenue than it expected from WNT games and should have shared more of that revenue with the WNT players, and (2) that U.S. Soccer should have paid the employees in one bargaining unit (the WNT) identically to those in another bargaining unit (the MNT) in certain isolated respects, without any regard for what else the employees in the first bargaining unit (the WNT) were demanding in bargaining that the employees in the second bargaining unit (the MNT) do not enjoy. In fact, one of

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3

Plaintiffs' lawyers in this very lawsuit argued at the bargaining table during 2016 negotiations, while representing the WNT's union, that it is common to renegotiate collective bargaining agreements mid-term while one of his successors in 2017 observed that she believed it was not fair for U.S. Soccer to retain all the "windfall" following the 2015 Women's World Cup, even though she also acknowledged that U.S. Soccer had no obligation to share it. (Egan Decl., ¶ 9, Ex. 7, 20:18-23:3; *Id.* at ¶ 9, Ex. 8 (Bargaining Notes), 5 (David Feher) & 70 (Mady Gilson).) At other points in negotiations, U.S. Soccer's representatives stated that the organization was focused on the "overall economic picture" of the collective bargaining agreement and that it "ha[d] to know what the overall deal will cost." (Bargaining Notes at 55 (Lisa Levine) & 134 (Sunil Gulati).)

Mr. Miscimarra's testimony about the ordinary course of collective bargaining negotiations, based on his extensive knowledge and experience in the area, would be extraordinarily helpful to a jury in placing these arguments and statements in context. If it is, in fact, not typical for employers to voluntarily grant additional benefits to unionized employees mid-contract (and lawful to decline to do so), and if it is, in fact, very typical for employers to take a holistic view to the costs of a collective bargaining agreement in negotiations (and expected that the cost of one agreed-upon provision will affect the employer's willingness to bear the cost of a different proposal), and if those approaches are also influenced by the peculiar legal framework within which these kinds of negotiations occur, then this is *precisely* the type of helpful testimony from which the trier of fact will benefit while being asked by Plaintiffs to conclude that U.S. Soccer's approach at the bargaining table was motivated by sexism, rather than legitimate bargaining objectives.

Mr. Miscimarra's testimony regarding the nature of collective bargaining and whether the bargaining in this case followed expected norms and customs must be admitted to avoid juror confusion. It is unreasonable to expect a jury to appreciate the nuances and idiosyncrasies of labor relations and the bargaining process without a baseline for what is

19

"normal" in such circumstances. The fact that Mr. Miscimarra's report references the NLRA and its legal framework to provide context to the complex and unusual nature of collective bargaining does not render his testimony inadmissible. Plaintiffs' motion to exclude his testimony should be denied.

Respectfully submitted,

U.S. SOCCER FEDERATION, INC.

By: _/s/ Brian Stolzenbach_

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

62314403v.3