Jeffrey L. Kessler (*pro hac vice*)
jkessler@winston.com
David G. Feher (*pro hac vice*)
dfeher@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue, New York, NY 10166
Tel:   (212) 294-6700
Fax:   (212) 294-4700

Cardelle B. Spangler (*pro hac vice*)
cspangler@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive, Chicago, IL 60601
Tel:   (312) 558-5600
Fax:   (312) 558-5700

Diana Hughes Leiden (SBN: 267606)
dhleiden@winston.com
Lev Tsukerman (SBN: 319184)
ltsukerman@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, Los Angeles, CA 90071
Tel:   (213) 615-1700
Fax:   (213) 615-1750

Jeanifer E. Parsigian (SBN: 289001)
jparsigian@winston.com
**WINSTON & STRAWN LLP**
101 California St., 35th Floor, San Francisco, CA 94111
Tel:   (491) 591-1000
Fax:   (491) 591-1400

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| ALEX MORGAN, et al., | **Case No. 2:19-CV-01717-RGK-AGR** |
|---|---|
| Plaintiffs, | Assigned to: Judge R. Gary Klausner |
| vs. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| UNITED STATES SOCCER FEDERATION, INC., Defendant. | Date:  March 30, 2020<br>Time: 9:00 a.m.<br>Courtroom: 850 |

# **TABLE OF CONTENTS**

**Page (s)**

I.    INTRODUCTION ...................................................................................... 1

II.   ARGUMENT.............................................................................................. 2

    A.    USSF Asks the Court to Create a Labor Exemption to the Equal
         Pay Act and Title VII ....................................................................... 2

    B.    Plaintiffs Have Established an Equal Pay Act Violation ........................ 4

        1.    It is Undisputed That USSF Pays WNT Players at a Lesser
            Pay Rate Than Their Male Comparators—the MNT Players ......... 4

        2.    USSF Does Not Controvert Admissions That It Never Was
            Willing to Pay the WNT Players Equally....................................... 6

        3.    Plaintiffs Have Met Their Burden to Show that MNT and
            WNT Players Perform their Jobs for a Single Establishment ........ 6

        4.    USSF's Argument that the WNT and MNT Players Could
            Never Perform Equal Work Because of Biological
            Differences in "Speed" and "Strength" Must Be Rejected ........... 7

        5.    USSF Cannot Establish Any Affirmative Defense to
            Plaintiffs' Equal Pay Act Claim ................................................... 10

    C.    Plaintiffs Are Also Entitled to Summary Judgment on Their Pay
         Discrimination Claim Under Title VII...................................................... 13

        1.    An EPA Violation Establishes a Title VII Violation..................... 13

        2.    Alternatively, Plaintiffs Have Proven Their Title VII Claim
            with Direct Evidence of Discriminatory Intent ............................ 13

        3.    USSF Also Has Failed to Rebut Plaintiffs' Indirect Evidence
            of USSF's Discriminatory Intent................................................... 15

        4.    USSF Has Not Established Any Affirmative Defense to
            Plaintiffs' Title VII Pay Discrimination Claim ............................ 15

III.  CONCLUSION .............................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Gardner-Denver Co.*,
  415 U.S. 36 (1974)......................................................................................2, 3

*Brennan v. Goose Creek Consol. Indep. School Dist.*,
  519 F.2d 53 (5th Cir. 1975) ............................................................................7

*Byrd v. Ronayne*,
  61 F.3d 1026 (1st Cir. 1995).........................................................................11

*Corning Glass Works v. Brennan*,
  417 U.S. 188 (1974)........................................................................................3

*Costa v. Desert Palace, Inc.*,
  299 F.3d 838 (9th Cir. 2002) ..................................................................13, 14

*Grubic v. Los Angeles Superior Court*,
  2009 WL 10698377 (C.D. Cal. Dec. 21, 2009).............................................3

*Hein v. Oregon Coll. of Educ.*,
  718 F.2d 910 (9th Cir. 1983) ...................................................................5, 8, 9

*Hodgson v. Robert Hall Clothiers*,
  473 F.2d 589 (3rd Cir. 1973) ........................................................................11

*King v. Burwell*,
  135 S. Ct. 2480 (2015)....................................................................................3

*Laffey v. Northwest Airlines Inc.*,
  567 F.2d 429 (D.C. Cir. 1976)........................................................................3

*Lewis v. Smith*,
  255 F. Supp. 2d 1054 (D. Ariz. 2003) ..........................................................15

*Littlefield v. NutriBullet, L.L.C.*,
  2017 WL 10439791 (C.D. Cal. Nov. 3, 2017) .............................................14

*Marcoux v. State of Maine*,
  797 F.2d 1100 (1st Cir. 1986).........................................................................5

*Marshall v. Dallas Indep. Sch. Dist.*,
  605 F.2d 191 (5th Cir. 1979) ........................................................................ 7

*Marshall v. W. Grain Co.*,
  838 F.2d 1165 (11th Cir. 1988) ................................................................... 3

*Maxwell v. City of Tucson*,
  803 F.2d 444 (9th Cir. 1986) ..................................................................... 13

*Metro. Life Ins. Co. v. Massachusetts*,
  471 U.S. 724 (1985) .................................................................................... 4

*Mulhall v. Advance Sec., Inc.*,
  19 F.3d 586 (11th Cir. 1994) ....................................................................... 7

*Pearce v. Wichita Cty., City of Wichita Falls, Tex., Hosp. Bd.*,
  590 F.2d 128 (5th Cir. 1979) ....................................................................... 9

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
  457 F.3d 963 (9th Cir. 2006) ..................................................................... 13

*Rizo v. Yovino*,
  2020 U.S. App. LEXIS 6345 (9th Cir. Feb. 27, 2020) .............................. 11

*Rosen v. Hosting Servs., Inc.*,
  771 F. Supp. 2d 1219 (C.D. Cal. 2010) .................................................... 10

*Shultz v. First Victoria Nat. Bank*,
  420 F.2d 648 (5th Cir. 1969) ....................................................................... 9

*Stanley v. Univ. of S. Calif.*,
  178 F.3d 1069 (9th Cir. 1999) ..................................................................... 8

*Stephens v. Union Pac. R.R. Co.*,
  935 F.3d 852 (9th Cir. 2019) ....................................................................... 6

*Wright v. Universal Mar. Serv. Corp.*,
  525 U.S. 70 (1998) ...................................................................................... 3

**Statutes**

29 U.S.C. §§ 151–169 ................................................................................. 3

29 U.S.C. § 206(d) ...................................................................................... 3

42 U.S.C. § 2000e ............................................................................................. 3

National Labor Relations Act ........................................................................... 3

Equal Pay Act .......................................................................................... *passim*

**Other Authorities**

29 C.F.R. § 1620.9 ....................................................................................... 6, 7

29 C.F.R. § 1620.13(c) ..................................................................................... 7

29 C.F.R. § 1620.18(a) ................................................................................... 10

29 C.F.R. § 1620.23 ......................................................................................... 2

29 C.F.R. § 1620.27 ....................................................................................... 13

## I.   INTRODUCTION

On page 11 of USSF's Opposition, it becomes crystal clear why the Court must grant summary judgment in favor of Plaintiffs on USSF's pay discrimination liability under both the Equal Pay Act and Title VII.  USSF brazenly argues that the Court cannot hold it accountable for paying the world champion WNT players a lesser rate of pay than the MNT players because the women have not performed, and could never perform, equal work to the men.  Why?  Because, according to USSF, women are not as biologically strong or fast as men, because women do not play in the purportedly more demanding world of male soccer (in front of supposedly more critical fans), and because the WNT players do not, according to USSF, carry the special "responsibility" of playing for higher World Cup prize money.  These assertions are based on pernicious stereotypes, are devoid of any factual support in the record, and are so imbued with discriminatory animus that then-President Carlos Cordeiro apologized for them on behalf of USSF and resigned his post.[1]  But his actions do not erase the impact of USSF's admitted motivations, which demonstrate, as a matter of law, that Plaintiffs' sex was at least "a basis" under the EPA and "a motivating factor" under Title VII for USSF's pay discrimination.  That is all that is needed for Plaintiffs to prevail.

But this is not the only reason Plaintiffs' summary judgment should be granted.  USSF has already admitted each of the following undisputed facts:  USSF has never offered equal pay to the WNT and pays them at a rate less than the MNT; Plaintiffs perform equal work to MNT players in terms of skill, effort and responsibility (and, in fact, WNT players have more responsibility because USSF expects them to win the World Cup, but has no such expectation for the MNT); USSF controls all central administrative functions for both teams, making it a single establishment; and the WNT has generated more game-related revenue and profit than the MNT throughout the class period.  The law is clear: ***women are not lesser just because they are women***.  USSF's

---

[1]  *See* Plaintiffs' Supplemental Statement of Uncontroverted Facts ("SSUF") filed concurrently herewith, Nos. 71–73.

1 | views to the contrary to justify unequal pay provide them no safe harbor.

2 | In addition, this Court should not give any weight to USSF's plea for a "collective

3 | bargaining exemption" from compliance with the EPA and Title VII. No court has

4 | accepted such an exemption to the gender discrimination laws and Congress did not

5 | create one. Apparently recognizing this, USSF shifts its emphasis to blaming much of

6 | its pay discrimination on FIFA, which awards more World Cup prize money to

7 | federations who compete in the Men's World Cup than in the Women's World Cup.

8 | But there is no third-party "FIFA" defense for gender pay discrimination. Indeed, it is

9 | undisputed that USSF decides for itself the different amounts of compensation that it

10 | provides to the MNT and WNT for competing in the World Cup and that it has never

11 | linked its higher World Cup compensation for the MNT to how much FIFA might pay

12 | in prize money. (SSUF Nos. 78, 83.) On this record, USSF cannot meet its burden to

13 | prove any non-gender based justification for its pay discrimination.

14 | II.   ARGUMENT

15 | A.   **USSF Asks the Court to Create a Labor Exemption to the Equal Pay**

16 | **Act and Title VII**

17 | One of USSF's central arguments is that granting Plaintiffs summary judgment

18 | "would be fundamentally inconsistent with federal labor law" because, according to

19 | USSF, federal courts should not "interfere" with the collective bargaining process. *See*

20 | Def.'s Opposition ("Opp."), Dkt. No. 171-1 at 1. By making this argument, USSF asks

21 | the Court to create a collective bargaining exemption from the discrimination laws that

22 | would trample on Supreme Court precedent and other applicable authority.

23 | Under the EPA, a collective bargaining agreement "does not constitute a defense

24 | available to [ ] an employer." 29 C.F.R. § 1620.23. USSF does not even mention, much

25 | less try to distinguish, this controlling regulation. And the Supreme Court and other

26 | courts have made it clear that neither Title VII nor EPA claims can be waived in

27 | collective bargaining. *See, e.g.*, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51–52

28 | (1974) ("Title VII's strictures are absolute and represent a congressional command that

2

each employee be free from discriminatory practices … an employee's rights under Title VII are not susceptible of prospective waiver."); *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 76 (1998) (reaffirming *Alexander*); *Laffey v. Northwest Airlines Inc.*, 567 F.2d 429, 446–47 (D.C. Cir. 1976) ("[r]ights established under Title VII and the Equal Pay Act are not rights which can be bargained away either by a union, by an employer, or by both acting in concert … a collective bargaining agreement perpetuating prior pay discrimination affords the employer no defense to a charge under the Equal Pay Act"); *Corning Glass Works v. Brennan*, 417 U.S. 188, 209–10 (1974). USSF makes an unavailing attempt to distinguish *Corning Glass*, but otherwise fails to mention *Alexander*, *Wright* or *Laffey* because these authorities preclude its defense.[2]

Nor do the cases cited by USSF support any different conclusion. Those cases involved Title VII claims by *unionized* plaintiffs who claimed that they were paid less than *non-unionized* employees who were found to not be "similarly situated." *See Marshall v. W. Grain Co.*, 838 F.2d 1165, 1166–67 (11th Cir. 1988); *Grubic v. Los Angeles Superior Court*, No. CV 09-4729 CAS (PJWx), 2009 WL 10698377, at *1, *5 (C.D. Cal. Dec. 21, 2009). Here, by contrast, both Plaintiffs and MNT players are unionized and there can be no genuine dispute that their equal work and responsibilities for USSF renders them "similarly situated" under Title VII. *See infra*, Section II.B.1.

Finally, there is no factual basis for USSF's claim that Plaintiffs made the decision to give up equal pay in bargaining for other benefits. *See* Opp. at 3. As an initial matter, USSF did not bargain with any Plaintiff in her individual capacity, but

---

[2] And while USSF makes frequent reference to the 1935 National Labor Relations Act ("NLRA"), both Title VII and the EPA were passed long after the enactment of the NLRA (in 1964 and 1963, respectively), so Congress could not have intended that the NLRA would override the subsequently adopted discrimination laws. *See* 42 U.S.C. § 2000e; 29 U.S.C. § 206(d); 29 U.S.C. §§ 151–169. In the absence of any statutory language creating a collective bargaining exemption from the EPA and Title VII, courts have no authority to do so. *See, e.g.*, *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) (the role of the courts is "'to say what the law is.'... [I]n every case we must respect the role of the Legislature, and take care not to undo what it has done.").

instead with the WNTPA.[3]  Nevertheless, the undisputed facts demonstrate that equal pay was not achieved at the bargaining table because USSF refused the union's bargaining demands and presented it with a "take it or leave it" offer which the union accepted rather than subjecting its members to a work stoppage while Plaintiffs continued to pursue their legal claims for equal pay.[4]  USSF cannot use its refusal to comply with the law in bargaining as a justification for illegal wage discrimination.  *See, e.g.*, *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 758 (1985).

> **B.    Plaintiffs Have Established an Equal Pay Act Violation**
>
> **1.    It is Undisputed That USSF Pays WNT Players at a Lesser Pay Rate Than Their Male Comparators—the MNT Players**

Plaintiffs have established that, under the written terms of their respective CBAs, WNT players: (1) only have the opportunity to receive lower per-game bonuses than MNT players in virtually all "friendlies;" (2) only have the opportunity to receive lesser World Cup-related bonuses than  MNT players; (3) only have the opportunity to receive lower rates of compensation for non-World Cup tournaments; and (4) receive a lower rate of pay than MNT players when all fringe benefits and both teams' entire pay packages and benefits are taken into account.[5]

USSF's response is to claim that each of the 38 Plaintiffs who are part of the EPA collective action cannot show pay discrimination because they have not met their burden to identify a specific, individual MNT player or players who are their "comparators."  Opp. at 4–5.  But Plaintiffs have shown that their comparators are all of *the individual MNT players*, as it is undisputed that each is paid by USSF under identical terms of their CBA and perform substantially equal work as the WNT players with respect to skill, effort, and responsibility.  (SUF Nos. 3–4, 25–28.)  Nothing further is required under the EPA.  Indeed, as confirmed by the authority cited by USSF, courts

---

[3] Def.'s Statement of Uncontroverted Facts No. 96, Dkt. No. 186-1.
[4] Pls.' Statement of Uncontroverted Facts ("SUF") Nos. 6–7, Dkt. No. 179-2.
[5] Pls.' Mot. for Partial Summ. J. ("Mot.") at 6–7, Dkt. No. 179-1; SUF Nos. 9–19.

*reject* attempts by plaintiffs to cherry-pick a single "similarly situated" employee out of a pool of comparators. *See, e.g.*, *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 917 (9th Cir. 1983); *see also Marcoux v. State of Maine*, 797 F.2d 1100, 1106–08 (1st Cir. 1986) (finding that all male prison guards were the appropriate comparators to the plaintiff female prison guards).

There is similarly no merit to USSF's claim that Plaintiffs' rate of pay comparison only considered three aspects of the WNT and MNT CBAs. Opp. at 5. In addition to establishing that the terms of the MNT and WNT CBAs are discriminatory on their face, (*see* SUF Nos. 9–19), Plaintiffs demonstrated from USSF's own records what each of the class members would have earned under the MNT's CBA, taking into account each team's entire CBA package of compensation and benefits.[6] This analysis shows that WNT players receive a lower rate of pay than the MNT players when all compensation and fringe benefits are considered. *Id.*

Desperate to try to create an issue of fact that does not exist, USSF cites a so-called "reverse analysis" from its proffered expert, Dr. Justin McCrary, who purports to show that "MNT players would have been paid more under the WNT CBA than they received under their own." Opp. at 8. But this "expert" opinion assumes that an MNT player, without a contract, would become a contracted player under the WNT CBA, and then further assumes an impossibly low number of games would be played by that MNT player under the WNT CBA, even though the WNT CBA has a minimum requirement of 16 friendlies per year for all contracted players. *Id.* The only plausible way to do such a "reverse analysis" would be to determine what the MNT player would have made under the WNT CBA as a non-contracted player without a minimum number of games requirement (the same status he had under the MNT CBA in which he played fewer games). Under that proper comparison, each MNT player would have made less under the WNT CBA as both the base compensation and the bonus structure was indisputably

---

[6] *See* Expert R. of Dr. Finnie Cook, Dkt. No. 167-7.

lower under the WNT agreement—a reality that has been attested to in binding admissions by USSF's 30(b)(6) witness, Tom King. (*See* SUF Nos. 12–19.) Because Dr. McCrary's analysis is divorced from the record facts, it cannot provide a basis for opposing summary judgment. *See Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019) (expert opinion must "rest on facts or data in the case").

## 2. USSF Does Not Controvert Admissions That It Never Was Willing to Pay the WNT Players Equally

Plaintiffs also established in their opening brief that it is undisputed that USSF never offered the union equal pay for its members during the collective bargaining process, despite the union's explicit demands for it. *See* Mot. at 6; (SUF Nos. 5–8, 12–21, 23–24, 67.) USSF's 30(b)(6) witness on the topic of differences in rate of pay admitted that the MNT and WNT CBAs reflect lower per-game bonuses and compensation for the WNT because USSF would not agree to an equal rate of pay. (SUF Nos. 12-19.) And former USSF President Cordeiro admitted that WNT players "have not been treated equally" and that as President he intended to make "immediate" changes and work for equal pay and resources for female athletes. (SUF Nos. 20–21); *see also infra*, Section II.C.2. These admissions conclusively establish that the MNT players were provided with a higher rate of pay than the WNT players.

## 3. Plaintiffs Have Met Their Burden to Show that MNT and WNT Players Perform their Jobs for a Single Establishment

Plaintiffs also demonstrated in their opening brief that USSF has centralized control over the key aspects of both MNT and WNT player jobs and therefore, as a matter of law, is a "single establishment" under the EPA. *See* 29 C.F.R. § 1620.9(a)-(b); Mot. at 12–13. USSF argues that it cannot be considered a "single establishment" because the WNT and MNT have different head coaches and staff and play different opponents in different venues. Opp. at 9–10. This argument has no merit.

Both EPA regulations and the case law make it clear that employees can be found to work for a "single establishment" even if their jobs are not performed in the same

6

physical place.  29 C.F.R. § 1620.9(b).  USSF does not seriously dispute this point. Opp. at 9 (acknowledging that the EPA regulations permit a business enterprise to be treated as a single establishment where it has a central administrative unit that oversees hiring, compensation, and terms of employment); *see also Brennan v. Goose Creek Consol. Indep. School Dist.*, 519 F.2d 53, 58 (5th Cir. 1975); *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir. 1994); *Marshall v. Dallas Indep. Sch. Dist.*, 605 F.2d 191, 194 (5th Cir. 1979).

USSF does not meaningfully dispute *any* of the facts establishing that USSF has centralized control over WNT and MNT job descriptions, compensation and other terms of employment in collective bargaining, budgeting, scheduling, event planning, marketing, and decisions relating to licensing and broadcasting; that the majority of USSF employees perform work for both teams; and that USSF makes decisions about game venues, hotels, travel, meals, and other terms of employment for both teams as part of the same centralized process.  (*See* SUF Nos. 41–53.)  Such undisputed facts satisfy the single establishment requirement as a matter of law.

### 4.    USSF's Argument that the WNT and MNT Players Could Never Perform Equal Work Because of Biological Differences in "Speed" and "Strength" Must Be Rejected

USSF does not deny that the governing regulations provide that employees perform "equal work" under the EPA if their jobs are "substantially equal" in terms of skill, effort, and responsibility. 29 C.F.R. § 1620.13(c).  USSF witnesses have admitted under oath that the skill, effort and responsibility of the WNT players has been at least equal to that of the MNT.  *See* Mot. at 9–12.  Rather than accept that these undisputed facts demonstrate that the jobs are "substantially equal,"[7] USSF relies on an astounding

---

[7] USSF does not factually dispute these points in their Statement of Genuine Disputes, but instead erroneously objects to straightforward statements like "WNT players are equally as skilled as MNT players" and "WNT players and MNT players expend equal amounts of effort" as "legal conclusions."  Dkt. No. 186-1 at 28-31.

argument that the championship women on the WNT could *never* perform equal work as the male members of the MNT simply because they are women, who USSF declares are not biologically weaker and slower than men. USSF asserts this is "indisputable science." Opp. at 11. But it is actually indisputable evidence of the discrimination based upon gender stereotypes that the EPA was adopted to condemn.

USSF points to biological differences between men and women like "skeletal structure, muscle composition, heart and lung capacity … red blood cell count, body fat, and the absolute ability to process carbohydrates" for its argument that WNT and MNT players cannot perform equal work. Opp. at 11. In a throwback to the worst stereotyped justifications for gender discrimination, USSF further argues that the jobs of male professional soccer players necessarily require a higher level of skill because of biology. *Id*. at 12 ("[t]he point is that the job of MNT player [sic] (competing against senior men's national teams) requires a higher level of skill based on speed and strength than does the job of WNT player [sic] (competing against senior women's national teams)."). These expressions of naked gender discrimination are so outrageous that they led to an outcry from USSF's sponsors and fans that forced the resignation of President Cordeiro and a public apology by USSF renouncing its own legal filings.[8]

What matters under the EPA is what skills are required for the job, not what skills any individual employees may have (biologically or otherwise). *Stanley v. Univ. of S. Calif.*, 178 F.3d 1069, 1074 (9th Cir. 1999) (as a matter of law, the EPA "equal work" inquiry "is limited to a comparison of the jobs in question;" it does not include a "comparison of the individuals who hold the jobs."); *Hein*, 718 F.2d at 914 ("The [EPA] explicitly applies to jobs that require equal skills, and not to employees that possess equal skill . . . [t]he only comparison that should be made in a prima facie case is a comparison of the skills required by a job."). Here, USSF does not cite a single fact in the record that a MNT player must run a particular speed or bench press a particular

---

[8] *See* SSUF Nos. 71–75.

weight in order to qualify for the team.  Nor does it cite to any facts establishing that every MNT player met those made-up requirements or that any of the WNT players did not.  These facts do not exist and USSF is simply relying on impermissible gender stereotypes as a basis for its wage discrimination.  This is not the law.[9]

Moreover, and fatal to USSF's argument that the WNT players do not perform equal work, no witness has disagreed with the testimony of former WNT Head Coach Jill Ellis, who described the set of skills required to perform at the most elite levels of professional soccer, including athleticism, "tactical IQ," tactical proficiency, and mental fortitude.  As she explained, the members of the WNT are at least equally skilled as the members of the MNT in each of these areas.  (SUF No. 25.)  And former President Cordeiro deferred to Coach Ellis on this point.  *Id*.  USSF similarly does not dispute that the WNT players work just as hard as the MNT players.  (SUF No. 26.)

Equally specious is USSF's claim that the WNT players do not have the same level of job responsibility as the MNT because certain tournaments, like the Men's World Cup, award larger amounts of prize money to federations for men's competitions than for women's competitions.  Opp. at 13.  USSF does not dispute Plaintiffs' fact-based showing that the MNT and WNT have the same job responsibilities and required accountability—both are expected to be available for training, maintain a high level of competitive soccer skills and physical conditioning, not use illegal drugs or banned substances, attend training camp in good athletic shape, act professionally, perform at a high level, and seek appropriate treatment for injuries.  (SUF Nos. 27–28.)  This is dispositive in establishing "substantially equal" work.  *See, e.g*., *Pearce v. Wichita Cty., City of Wichita Falls, Tex., Hosp. Bd.*, 590 F.2d 128, 133 (5th Cir. 1979) ("[t]he controlling factor under the Equal Pay Act is job content—the actual duties that the

---

[9] *See Shultz v. First Victoria Nat. Bank*, 420 F.2d 648, 656 (5th Cir. 1969) (the EPA's goal was "[t]he elimination of those subjective assumptions and traditional stereotyped misconceptions regarding the value of women's work").

respective employees are called upon to perform.")[10]  USSF also cannot refute its own testimony that it does not expect the MNT to win major tournaments, but *does* expect the WNT to do so, *see* Gulati Declaration ¶ 81, Dkt. No. 186-4, thereby putting greater—not lesser—job responsibility and pressure on the WNT players.

### 5.    USSF Cannot Establish Any Affirmative Defense to Plaintiffs' Equal Pay Act Claim

Plaintiffs have demonstrated that there is no genuine issue that USSF cannot prove any of its asserted affirmative defenses.  Mot. at 14–18.  USSF addresses only two of its affirmative defenses in its opposition brief—its claim that either revenue differences or collective bargaining was a non-gender justification for its pay discrimination—and therefore has conceded that Plaintiffs are entitled to summary judgment on USSF's other, now abandoned, affirmative defenses.  *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1222 (C.D. Cal. 2010).

### a.    USSF's Moving Target "Revenue" Defense Fails

Up until its most recent filing, USSF has taken the position that it was justified in compensating the WNT at a lesser rate than the MNT because of its purported good faith "belief" that the MNT had, and would continue to, generate more revenue and net profits than the WNT for USSF.  (SUF No. 70.)  In binding 30(b)(6) deposition testimony and verified interrogatory responses, USSF reiterated that it was this "belief" about actual revenue generation that formed the basis for its position that differences in revenue generation was a "factor other than sex" justifying its lower rate of pay to the WNT.  *Id.*  In their opening brief, Plaintiffs showed that, as a matter of undisputed fact,

---

[10] USSF argues that the MNT and WNT do not work in the same "surroundings" because the teams do not always play in the same geographical regions and the MNT has to face more "fan hostility."  Opp. at 14.  This is irrelevant as the teams indisputably practice and play on the same-sized fields in stadiums throughout the country and around the world by the same rules and carry out similar off-the-field duties.  (*See* SUF Nos. 27–28, 32–33. 38.)  "Similar working conditions" under the EPA is defined as the physical environment and hazards—not geographical area.  29 C.F.R. § 1620.18(a).

it was the WNT that generated more game-related revenue and earned more net profits during the class period.  (SUF Nos. 55–62.)  USSF does not dispute these facts in its opposition, and Plaintiffs are entitled to summary judgment on USSF's claimed revenue justification  defense for this reason alone.[11]

Because it cannot dispute its own financial records, USSF pivots and now claims that its revenue justification defense is based on the assertion "that the prize money FIFA pays the federation that wins the Men's World Cup is far larger than the prize money it pays the federation that wins the Women's World Cup." Opp. at 18.   But the law in the Ninth Circuit is clear that discriminatory payments by a third party are not a "factor other than sex" that can justify pay discrimination under the EPA.  *See Rizo v. Yovino*, 2020 U.S. App. LEXIS 6345, *26–27 (9th Cir. Feb. 27, 2020) ("factor other than sex" must be a "job-related" factor similar to job experience, qualifications, and performance).  In this case, it is undisputed that FIFA prize money is not paid to the players and that FIFA puts no restrictions on how USSF uses such prize money, so it has nothing to do with the jobs of the men or women as players.  (SSUF Nos. 78–80.)[12] In fact, the MNT CBA expressly provides that any FIFA prize money belongs to USSF, and that the MNT players have no claim to it.  (SSUF No. 80.)

Equally significant, there is no evidence that the possibility of higher FIFA World Cup prize money (whose amounts were unknown to the USSF at the time of bargaining) was, in fact, used by USSF to justify the MNT receiving a higher rate of bonus compensation than the WNT for World Cup related games.  (SSUF Nos. 84–86.)  For

---

[11] Rather than simply admit that Plaintiffs' revenue and profit calculations based on USSF's financials are "undisputed," USSF disagrees with the wording of some of Plaintiffs' facts but provides no evidence that the MNT earned greater revenues than the WNT during the class period.  (*See* SUF Nos. 55–62.)

[12] The two cases relied on by USSF are from other jurisdictions, and in any event, are inapposite.  *Byrd v. Ronayne*, 61 F.3d 1026, 1034 (1st Cir. 1995) (no claim by the defendant that the differences in compensation between male and female lawyers were attributed to external forces like FIFA); *Hodgson v. Robert Hall Clothiers*, 473 F.2d 589, 597 (3rd Cir. 1973) (same).

example, USSF agreed to provide bonuses to the MNT for World Cup qualifying games that are at least five times higher than the bonuses provided to the WNT for such games ($3,000 in win bonuses for the WNT players versus $15,625 in win bonuses for the MNT players), ***even though FIFA does not provide any prize money for qualifiers.*** (SSUF Nos. 76–77; 81–82.)  This undisputed fact demonstrates that FIFA prize money cannot be claimed to be the reason for USSF's World Cup-related pay discrimination.

Further, even counting World Cup prize money earned by the two teams, the undisputed facts are that the WNT generated more game-related revenue for USSF, and had greater net profits, than the MNT during the class period. (SUF Nos. 55–58.)  And USSF's largest source of revenues each year is the sponsorship and broadcasting revenue that USSF admitted it *cannot* determine how to allocate between the WNT and MNT. (SUF Nos. 54, 62.)  Accordingly, USSF cannot meet its burden of proof on its revenue justification defense when it has declared that it is  "impossible" to show how much of its sponsorship and broadcasting revenues should be attributed to the WNT, particularly because the only record evidence from USSF's sponsors is that they viewed WNT rights as significant drivers of their sponsorship interest, and wanted to devote their sponsorship dollars to support the WNT, but were prevented from doing so because MNT and WNT rights are bundled together. *See* Dkt. No. 187-5, Exs. 43 & 44.

### b.    USSF's Collective Bargaining Defense Fails

As shown above in Section II.A, USSF has no legal or factual basis for its collective bargaining justification for the pay discrimination.[13]

---

[13] USSF oddly claims that Plaintiffs are not seeking summary judgment on their EPA claim for pay discrimination under the 2013-2016 WNT CBA.  Opp. at 5 n.1.  This is false.  Plaintiffs are asking the Court to find in favor of Plaintiffs on liability under the EPA for the entire EPA damages period.  Since Plaintiffs were paid at even lower rates of compensation under the 2013-2016 CBA, while the MNT players were paid at the same higher rates, it follows that summary judgment for that part of the EPA damages period covered under the earlier WNT CBA is required if summary judgment is granted for the later portion of the EPA damages period covered by the 2017 WNT CBA.

**C.      Plaintiffs Are Also Entitled to Summary Judgment on Their Pay Discrimination Claim Under Title VII**

**1.      An EPA Violation Establishes a Title VII Violation**

Plaintiffs' entitlement to summary judgment on its EPA claim means that they have also proven a Title VII pay discrimination violation.  29 C.F.R. § 1620.27.  The Ninth Circuit has consistently recognized that EPA standards apply to Title VII claims involving equal pay.  *See, e.g.*, *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986).  And this is not surprising.  Under the EPA, once Plaintiffs have established their *prima facie* case, the burden shifts to USSF to establish that sex provided "no basis" for the pay differential.  Because USSF failed to make that showing, the result is a finding that sex did provide "a basis" for the differential.  Under Title VII, Plaintiffs only must show that sex was "a motivating factor."  It follows that if sex was "a basis" for the discrimination under the EPA, it was also "a motivating factor" under Title VII.

**2.      Alternatively, Plaintiffs Have Proven Their Title VII Claim with Direct Evidence of Discriminatory Intent**

USSF argues that the Court cannot consider Plaintiffs' direct evidence of "discriminatory intent" because it was not expressly raised in their Complaint.  Opp. at 22.  But this is not a "new claim" that would require an amendment of the pleadings. A Title VII complaint "need not contain more than the allegation that the adverse employment action was taken because of a protected characteristic." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856 & n.7 (9th Cir. 2002).  Here, Plaintiffs included one of the discriminatory comments *in the Complaint* ("market realities are such that the women do not deserve equal pay") so USSF cannot plausibly claim it was unaware of this theory of Plaintiffs' case.  Dkt. No. 1 at ¶ 55.  But Plaintiffs would still be able to support their Title VII pay claim through the direct evidence of discriminatory intent by USSF that was uncovered during discovery without a motion to amend the pleadings.[14]

---

[14] USSF's citation to *Pickern* is unavailing as that case involved new violations of the ADA that were not raised until summary judgment.  457 F.3d 963, 969 (9th Cir. 2006).

USSF next argues that Plaintiffs cannot show "that any reasonable juror would conclude that U.S. Soccer intentionally paid Plaintiffs less money than it otherwise would have, ***simply because they are women***."  Opp. at 22 (emphasis in original). Given the fact that the public and USSF's own sponsors have condemned USSF for taking the position that biological differences between men and women justify its pay discrimination, it is apparent that a reasonable jury could and likely would reach precisely this conclusion.  This discriminatory intent based on biology was admitted by Mr. Gulati, USSF's 30(b)(6) designee on USSF's rationales for its pay differential. (SUF No. 66); *Littlefield v. NutriBullet, L.L.C.*, 2017 WL 10439791, at *7 (C.D. Cal. Nov. 3, 2017) (30(b)(6) deposition admissions are binding on the corporation).

Further, USSF cannot dispute that former President Cordeiro publicly admitted, and testified, that "[o]ur women's teams should be respected and valued as much as our men's teams, but our female players have not been treated equally," "we clearly need to work toward equal pay for the national teams," that "existing agreements are unfair," and that he told members of USSF's Board of Directors that female soccer players were not treated equally on multiple occasions for many years and that other Board members expressed similar views.  (SUF. Nos. 20–23); *see also* Mot. at 20–22.  Mr. Cordeiro further admitted that despite USSF's Board being aware of this unequal treatment for many years, the lack of equal opportunity and support was never rectified and still exists today.  (SUF No. 24.)  USSF's attempt to paint these unequivocal admissions of long-standing gender-based discrimination as lamentations about the unequal World Cup prize money offered by FIFA, Opp. at 24, makes no sense, as Mr. Cordeiro made these admissions in the specific context of his statements that he believed that immediate CBA changes were needed to provide equal treatment for the WNT.  (SUF No. 21.)

Finally, USSF's submission of the declaration of its former CBA negotiator, Russ Sauer, does not advance its cause. While Mr. Sauer denies he made the specific

---

When the claims are the same but new evidence is uncovered, the complaint can be amended to conform to the proof.  *See, e.g.*, *Costa*, 299 F.3d at 856 n.7.

discriminatory statements attributed to him by two other witnesses, he admits that he told the WNT players during bargaining that they would not be offered equal pay because of "historical revenue generation." Dkt. No. 186-61, ¶ 4. At the time he made this statement (in 2016), he had to know that the WNT was already generating more game-related revenue than the MNT and was projected to continue doing so. (SUF Nos. 55–57.)[15] But this false pretext itself demonstrates USSF's intentional discrimination.

### 3. USSF Also Has Failed to Rebut Plaintiffs' Indirect Evidence of USSF's Discriminatory Intent

Even if Plaintiffs had not come forward with the undisputed direct evidence of USSF's discriminatory intent described above, they would still be entitled to summary judgment for their Title VII pay discrimination claim because the undisputed evidence shows that USSF paid the female WNT players at a lesser rate than the male MNT players, despite those players being similarly situated. *See supra* at Section II.B.1; Mot. at 24. This showing (which is parallel to Plaintiffs' EPA showing of substantially equal work) is all that is required to prove a Title VII pay discrimination claim through indirect evidence. *See Lewis v. Smith*, 255 F. Supp. 2d 1054, 1060 (D. Ariz. 2003).

### 4. USSF Has Not Established Any Affirmative Defense to Plaintiffs' Title VII Pay Discrimination Claim

For the reasons set forth above in Section II.B.5, Plaintiffs have established that they are entitled to summary judgment against USSF's affirmative defenses, which equally apply to Plaintiffs' EPA and Title VII pay discrimination claims.

## III. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant its Motion for Partial Summary Judgment in its entirety.

---

[15] USSF claims that Tom King denies that Mr. Sauer made the "market realities" statement, but he actually testified at his deposition that he could not remember. King Dep. at 55:20-24, Dkt. No. 170-10.

1    Dated:  March 16, 2020              WINSTON & STRAWN LLP

2

3                                       By:  */s/ Jeffrey L. Kessler*
                                             Jeffrey L. Kessler
4                                            David G. Feher
                                             Cardelle B. Spangler
5                                            Diana Hughes Leiden
                                             Jeanifer E. Parsigian
6                                            Lev Tsukerman

7                                            Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT