Jamie L. Wine (Bar No. 181373)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022
Phone: (212) 906-1200
jamie.wine@lw.com

Michele D. Johnson (Bar No. 198298)
**LATHAM & WATKINS LLP**
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Phone: (714) 540-1235
E-mail: michele.johnson@lw.com

*Counsel for Defendant USSF Federation, Inc.*
*(Additional counsel are listed on the signature page)*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALEX MORGAN, et al., | Case No. 2:19-cv-01717-RGK-AGR |
| Plaintiffs, | **DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| USSF FEDERATION, INC., | Judge: Hon. R. Gary Klausner |
| Defendant. | Hearing: March 30, 2020 at 9:00 a.m. |
| | Place: Courtroom 850 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ................................................................................................................3

I. PLAINTIFFS' OPPOSITION CONFIRMS THAT THE WNT HAS NOT BEEN PAID A LESSER "RATE" OF WAGES THAN THE MNT........................3

II. PLAINTIFFS AND THE MNT DO NOT WORK IN THE SAME "ESTABLISHMENT" AS DEFINED BY LAW.......................................................8

III. ANY DIFFERENCES IN BONUS PAYMENTS ARE ATTRIBUTABLE SOLELY TO NON-DISCRIMINATORY FACTORS............................................9

    A. The Bonus Differences Reflect Choices Made in Collective Bargaining. ....................................................................................................9

    B. The Bonus Differences Reflect Historical Differences in Revenue Generated by the MNT and WNT.................................................................11

IV. PLAINTIFFS HAVE NOT CREATED A GENUINE ISSUE OF FACT ON THEIR TITLE VII "WORKING CONDITIONS" CLAIM. ..................................12

    A. Plaintiffs Have Not Exhausted Their Administrative Remedies. .................12

    B. Plaintiffs' New Working Conditions Claims Independently Fail Because They Were Not in the Complaint.....................................................14

    C. Plaintiffs' Working Conditions Claim Is Not a Triable Fact Question. .......15

CONCLUSION ...........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alexander v. Gardner-Denver*,
  415 U.S. 36 (1974) ............................................................................................. 10

*Bertotti v. Philbeck, Inc.*,
  827 F. Supp. 1005 (S.D. Ga. 1993) ...................................................................... 6

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ............................................................................ 15

*Diamond v. T. Rowe Price Assocs., Inc.*,
  852 F.Supp. 372 (1994) (D. Md. 1994) ........................................................ 9, 10

*Foster v. Arcata Assocs., Inc.*,
  772 F.2d 1453 (1985), *overruled on other grounds by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991) ...................................................... 8

*Gallagher v. Kleinwort Benson Gov't Sec., Inc.*,
  698 F. Supp. 1401 (N.D. Ill. 1988) ...................................................................... 5

*Grosz v. Boeing Co.*,
  455 F. Supp. 2d 1033 (C.D. Cal. 2006) ............................................................... 9

*Hein v. Oregon Coll. of Educ.*,
  718 F.2d 910 (9th Cir. 1983) ................................................................................ 7

*Huebner v. ESEC, Inc.*,
  No. CV 01-0157-PHX-PGR, 2003 WL 21039345 (D. Ariz. Mar. 26, 2003) .................................................................................................................. 5

*Kaplan v. Int'l All. of Theatrical & Stage Emps. & Mot. Picture Mach. Operators*,
  525 F.2d 1354 (9th Cir. 1975) ...................................................................... 1, 13

*Laffey v. Nw. Airlines, Inc.*,
  567 F.2d 429 (D.C. Cir. 1976) ........................................................................... 10

*Marting v. Crawford & Co.*,
  203 F. Supp. 2d 958 (N.D. Ill. 2002) ................................................................... 5

*Mendelson v. Country Coach, Inc.*,
 No. EDCV 06-00572-SGL, 2007 WL 4811927 (C.D. Cal. Nov. 19, 2007) .................. 7

*Mitchell v. Developers Diversified Reality Corp.*,
 No. 4:09-CV-224, 2010 WL 3855547 (E.D. Tex. Sept. 8, 2010), *R. & R. adopted by* 2010 WL 3860500 (Sept. 30, 2010) .......................................................... 5

*Oliver v. Ralphs Grocery Co.*,
 654 F.3d 903 (9th Cir. 2011) .................................................................................... 14

*Ong v. Cleland*,
 642 F.2d 316 (9th Cir. 1981) .................................................................................... 14

*Renati v. Wal-Mart Stores, Inc.*,
 No. 19-0525, 2019 WL 5536206 (N.D. Cal. Oct. 25, 2019) ....................................... 13

*Sosa v. Hiraoka*,
 920 F.2d 1451 (9th Cir. 1990) .................................................................................. 13

*Thibodeaux-Woody v. Hous. Cmty. Coll.*,
 593 F. App'x 280 (5th Cir. 2014) ............................................................................. 10

*Wallis v. J.R. Simplot Co.*,
 26 F.3d 885 (9th Cir. 1994) ...................................................................................... 15

*Wright v. Universal Maritime Serv. Corp.*,
 525 U.S. 70 (1998) .................................................................................................... 10

**Statutes**

29 U.S.C. § 206(d)(1) ........................................................................................... 2, 8, 9

42 U.S.C. § 2000e-2(h) ............................................................................................ 2, 9

**Other Authorities**

29 C.F.R. § 1620.10 ...................................................................................................... 5

*Soccer: FIFA Approves Prize Money Increase For 2019 Women's World Cup*, Reuters (Oct. 26, 2018) .................................................................................. 12

**PRELIMINARY STATEMENT**

The United States Soccer Federation ("USSF") is deeply supportive of the U.S. Senior Women's National Team ("WNT")—both on and off the field. The WNT has made incredible achievements in our sport and has played an immeasurable role in increasing the popularity of soccer in the United States and across the world. USSF's commitment to the WNT and shared desire to continue advancing women's soccer is reflected in the compensation and benefits it provides to the WNT.

To USSF's knowledge, the WNT is by far the highest paid women's national soccer team in the world, and almost certainly the only senior women's national team paid *more* than its male counterpart. Over the last five years, moreover, the WNT has been paid a substantially higher percentage of the revenue that it generates than the U.S. Senior Men's National Team ("MNT"). In addition, as Plaintiffs do not contest, the WNT receives greater total compensation per game than the MNT. These undisputed facts are more than sufficient to require summary judgment on the WNT's Equal Pay Act ("EPA") claim.

The WNT's primary response is to argue that MNT players receive greater bonuses for "friendlies, tournaments and the World Cup." (Opp. 17.) But that narrow lens ignores the full picture. As the WNT's brief admits, the EPA requires a comparison of "*all* compensation, including bonuses and benefits" to "determin[e] whether a rate of pay wage differential exists." (*Id*. at 6 (emphasis added).) As the undisputed record shows, the WNT has received more total compensation over the last five years than the MNT—as well as more compensation per game. As a result, Plaintiffs cannot meet their initial burden to show that they have been denied equal pay.

That differences exist in the manner in which WNT and MNT players are compensated does not support a different result. As this case attests, the WNT's players are powerful advocates for their interests. In negotiating for their most recent collective bargaining agreement, their union purposefully chose to advocate for a compensation scheme sharply different in kind from the "pay to play" model selected by the MNT. Thus, while MNT players elected to receive the opportunity to obtain higher bonuses for their

1

performance in games in lieu of base salaries and guaranteed compensation, the WNT's union advocated for different priorities. As a result, the CBA agreed to by the WNT provides for substantial guaranteed salaries and numerous benefits that MNT players do not receive, including paid leave and salary protection when injured—in exchange for lower bonuses for individual games. USSF fully supports the WNT's right to advocate for the priorities that are best for it as a team. But in seeking all of the benefits of the MNT's deal and none of its tradeoffs, Plaintiffs are not seeking equal pay—but to be paid at a *higher* rate than the MNT. That does not support a claim under the EPA.

Even if Plaintiffs had been able to show that they received less compensation than the MNT (which they cannot), USSF would still be entitled to summary judgment. It is black letter law that differences in pay do not support an EPA claim when those differences are the product of a "factor other than sex." 29 U.S.C. § 206(d)(1); 42 U.S.C. § 2000e-2(h). Here, any differences in compensation result from the different choices made by the MNT and WNT in collective bargaining agreements and the substantially greater revenue historically generated by the MNT, due to the greater worldwide popularity of men's soccer (at least, to date)—pursuant to which the last-place team at a Men's World Cup will generate more revenue for a national federation than a first-place finish in a Women's World Cup. While USSF has been a leading voice for narrowing the gap and will continue to do so, any differences in compensation that result from such considerations are not actionable.

The WNT has long been the best women's soccer team in the world. USSF remains committed to advancing women's soccer, as well as the WNT's desire for greater financial opportunity in the years ahead. To the extent that the WNT chooses to prioritize a different compensation package in the future, USSF stands ready to support that choice. But Plaintiffs cannot show that USSF's substantial and unmatched record of financial support for the WNT violates the Equal Pay Act or supports a claim for inferior working conditions. USSF's motion for summary judgment should be granted.

# ARGUMENT

## I. PLAINTIFFS' OPPOSITION CONFIRMS THAT THE WNT HAS NOT BEEN PAID A LESSER "RATE" OF WAGES THAN THE MNT.

In their opposition to USSF's motion, Plaintiffs acknowledge that their pay discrimination claims under the Equal Pay Act hinge on their ability to prove that the "rate of pay at which" USSF paid the WNT was less than that paid to the MNT. (Opp. at 5.) Plaintiffs also acknowledge that the "rate" of wages paid to the WNT cannot be determined by focusing exclusively on "one form" of payment "without accounting for other forms" of payment to the WNT. (*See id.* at 6-7 n.4 (acknowledging that courts have rejected attempts by plaintiffs to argue that "one form of her overall wages" was "lower than the same form of wages paid to a male comparator, without accounting for other forms of wages as the EPA requires").) Instead, as Plaintiffs concede, under the EPA, "***all compensation***, including bonuses and benefits, should be considered in determining whether a rate of pay wage differential exists." (*Id.* at 6 (emphasis added).)

Under this standard, there is no evidence that suggests the "rate" of wages USSF actually paid to the WNT is less than that paid to the MNT. The reason for this is simple. As noted in its opening brief, if all of the various forms of compensation that USSF has paid to the WNT are properly taken into account "as the EPA requires" (*id.* at 6-7 n.4), the evidence overwhelmingly shows that USSF has paid the WNT more than the MNT. This is true no matter how the numbers are sliced. USSF has not only paid the WNT more than the MNT on an annual basis in four out of the five last years, it has paid WNT substantially more in the aggregate:

| Year | Payments to WNT | Payments to MNT |
|---|---|---|
| 2015 | $7,674,412 | $4,769,229 |
| 2016 | $4,115,041 | $5,332,774 |
| 2017 | $6,329,119 | $4,940,067 |
| 2018 | $7,319,961 | $1,918,468 |
| 2019 | $11,853,941 | $4,222,635 |
| **Total** | **$37,292,474** | **$21,183,172** |

(*See* Dkt. 171-44, Irwin Dec. Ex. 1 at 14.) This holds true even if certain wages paid to WNT are removed from the analysis, including payments to the WNTPA (as opposed to the WNT and MNT directly), payments to the WNT for its 2015 Victory Tour, and payments to the WNT through the NWSL. (*See id.* at 13-17.) But that is not all. USSF has also paid the WNT more on a "per game basis"—with the WNT receiving on average $220,747 per game and the MNT receiving $212,639 per game. (*Id.* at 17.) And, over that same time, USSF paid the four class representatives a total of just under $4.6 million, which is ***more than double*** what it paid the four highest-paid players on the MNT. (*Id.* at 19-21.)

These payment metrics were set forth in detail in USSF's opening brief (Mot. at 1-2), and Plaintiffs' opposition does not attempt to dispute that, when all forms of WNT's wages are taken into account, the WNT made more than the MNT both collectively and on a per game basis. (*See generally* Opp.) Nor have Plaintiffs attempted to offer their own assessment of the actual "rate" of wages paid to the WNT once all (or even most) of the forms of wages USSF pays the WNT are taken into account. (*Id.*) Instead, the ***only*** argument Plaintiffs make—and the only evidence Plaintiffs provide in support of their claim that the WNT received a lesser "rate" of pay than paid to the MNT—is that "USSF paid Plaintiffs a lesser rate of compensation than their male counterparts ***in bonuses for friendlies, tournaments and the World Cup***." (*Id.* at 7 (emphasis added).) But those bonuses make up only a portion of the negotiated compensation package that USSF pays the WNT. In addition, USSF pays the WNT (and only the WNT): (i) six-figure salaries received regardless of whether they play; (ii) medical insurance; (ii) child care assistance; (iii) pregnancy and parental leave; (iv) severance benefits; (v) retirement plans; (vi) "partnership" bonuses tied to ratings, sponsorships and ticket sales; (vii) additional salaries through the National Women's Soccer League; and (viii) individual signing bonuses. (*See* Mot. at 1-2.) The MNT receives none of the foregoing.

Plaintiffs do not deny that the WNT received these additional forms of compensation. (*See generally* Opp.) Nor do Plaintiffs deny that these forms of

compensation fall within the definition of "wages" under the EPA. (*Id.*)[1] Rather, Plaintiffs act as if such additional wages do not exist, choosing instead to focus on only one component of their wages—the purported different "rate" of bonuses the WNT and MNT were entitled to earn for friendlies, tournaments and World Cup games. (*Id.* at 7.)

This argument fails as a matter of law. Where, as here, plaintiffs receive more than one category of wages, courts have held that "higher pay in one category can offset lower pay in another category for purposes of the Equal Pay Act," and that the proper approach, therefore, is to examine the "total amount of compensation" paid to the plaintiff. *See Huebner v. ESEC, Inc.*, No. CV 01-0157-PHX-PGR, 2003 WL 21039345, at *2 n.8 (D. Ariz. Mar. 26, 2003) ("The Court concludes that the plaintiff's total amount of compensation relative to her comparators is the appropriate standard by which to measure her Equal Pay Act claim, rather than her pay in each component of her compensation structure as Huebner argues."). Faced with such circumstances, courts routinely dismiss claims where it is clear that—once the other forms of wages are taken into account—the plaintiff was paid more than her male comparators. *See, e.g.*, *id.* ("[Plaintiff]'s Equal Pay Act claim fails as a matter of law because it is undisputed that her total compensation for the relevant time period was greater than that of any male.").[2]

---

[1] Plaintiffs could hardly claim otherwise given the fact that the definition of "wages" under the Equal Pay Act broadly includes "all payments" and "all forms of compensation" made to an employee "as remuneration for employment," including "wages," "salary," "bonus[es]," and "[f]ringe benefits." *See* 29 C.F.R. § 1620.10.

[2] *See also Marting v. Crawford & Co.*, 203 F. Supp. 2d 958, 966 (N.D. Ill. 2002) (granting summary judgment to employer where employee argued only that her base salary was lower than a counterpart's, but it was clear that "she earned more than [the counterpart] when their bonuses were considered"); *Gallagher v. Kleinwort Benson Gov't Sec., Inc.*, 698 F. Supp. 1401, 1404 (N.D. Ill. 1988) ("[A]ny bonus received by a trader will be included within his or her wage. Gallagher concedes that her total compensation [once bonuses are included] exceeded that of almost every other trader."); *Mitchell v. Developers Diversified Reality Corp.*, No. 4:09-CV-224, 2010 WL 3855547, at *3 (E.D. Tex. Sept. 8, 2010) (even though two male counterparts received higher bonuses and larger percentage raises, plaintiff's total compensation was higher due to a higher base salary; accordingly, "[n]othing about this compensation scheme suggests discrimination"), *R. & R. adopted by*

In response to this long line of cases, Plaintiffs raise two arguments.  Neither is compelling.  **First**, Plaintiffs argue that the reasoning in these cases is inapplicable because plaintiffs in the cases "alleged only that one form of her overall wages (usually base salary) was lower than the same form of wages paid to a male comparator, without accounting for other forms of wages as the EPA requires."  (Opp. at 6-7 & n.4.)  While not at all clear, it appears Plaintiffs are arguing that because they view "bonuses for friendlies, tournaments and the World Cup" as more than just "one form" of wage, those wages are all that are relevant for the EPA analysis, and the many other significant forms of wages USSF paid to the WNT—which Plaintiffs do not otherwise deny were paid—should not count.  (*See id.*)  There is no reason to read such a nonsensical limitation into these cases.

**Second**, Plaintiffs spill much ink attempting to mischaracterize USSF's argument as an attempt to "re-litigate" this Court's prior ruling regarding "total compensation" at the class certification stage.  (*Id.* at 1-2, 6.)  This argument fails as well.  In the prior ruling, the Court simply recognized that it is not proper to "presuppose[] that there can be no discrimination" by simply looking to "where a female employee's total annual compensation exceeds that of similarly-situated males" before assessing any other evidence. (Dkt. 98 at 5.)  The Court did ***not*** rule that consideration of all of the wages paid to Plaintiffs was improper as a matter of law, as Plaintiffs suggest; instead, the Court ruled only that it could not conclude at the class certification stage (and absent further discovery) that no discrimination had occurred based solely on the fact that the WNT received greater total compensation than the MNT.  As the Court noted, to do so would run the risk of an "absurd result" where "an employer who pays a woman $10 per hour and a man $20 per hour would not violate the EPA" if the woman ended up making more overall by "working twice as many hours."  (*Id.* at 6 (citation omitted).)

---

2010 WL 3860500 (Sept. 30, 2010); *Bertotti v. Philbeck, Inc.*, 827 F. Supp. 1005, 1010 (S.D. Ga. 1993) (adding value of insurance payments to wages when comparing against others).

But the risk of that result has come and gone. Since that ruling, Plaintiffs have had ample time and opportunity to develop evidence showing that the fact that the WNT was paid more than the MNT was due solely, or in material part, to the WNT working more than the MNT. Now at the summary judgment stage, with discovery concluded, Plaintiffs must "show what evidence" they have on this issue. *See Mendelson v. Country Coach, Inc.*, No. EDCV 06-00572-SGL (OPx), 2007 WL 4811927, at *2 n.1 (C.D. Cal. Nov. 19, 2007) (Summary judgment is the "moment in a lawsuit, when the nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of events."). Plaintiffs' opposition presents no such evidence. The only evidence is USSF's analysis, which shows that the WNT not only made more than the MNT overall, but also made more than the MNT, on average, for each game played. (*See* Dkt. 171-44, Irwin Dec. Ex. 1 at 13-17.) This is true even without inclusion of the additional payments to the WNT for playing in the NWSL. (*Id.* at 16-17.) Without such payments (which are undoubtedly payments that USSF makes to WNT members for their employment), the WNT played 111 total games over the past five years and made $24.5 million overall and an average of $220,747 per game. (*Id.* at 16-17.) By contrast, the MNT played 87 total games and made $18.5 million overall and an average of $212,639 per game. (*Id.*) Thus, the WNT did not make more than the MNT because they simply played more games. Rather, the WNT both played more games *and* made more than the MNT per game.

Under such circumstances, it is "axiomatic that the Equal Pay Act does not afford" Plaintiffs the relief they seek. *See Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983) ("If it should turn out that Dr. Campbell earns more than males performing substantially equal work, it is axiomatic that the Equal Pay Act does not afford her relief."). The Court should grant summary judgment to USSF on Plaintiffs' pay discrimination claims under the Equal Pay Act and Title VII for this reason alone.

## II. PLAINTIFFS AND THE MNT DO NOT WORK IN THE SAME "ESTABLISHMENT" AS DEFINED BY LAW.

Plaintiffs do not dispute that the MNT and WNT are separate teams that practice and play in different groups and physical locations. (*See* Opp. at 8-10.) Plaintiffs nevertheless contend that the MNT and WNT still work in the "same establishment," as defined under 29 U.S.C. § 206(d)(1) because "there is no requirement under the EPA that employees must work in the same location or in the same work group." (*Id.* at 2.) In support, Plaintiffs cite cases from outside of the Ninth Circuit. (*Id.* at 9.) The Ninth Circuit, however, has clearly "rejected the extension of the statutory establishment requirement to separate offices of an employer[.]" *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1464 (1985), *overruled on other grounds by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991). Plaintiffs also have no basis to dispute that the WNT and MNT are "operationally" distinct. *Id.* On this front, Plaintiffs selectively quote from the declaration of Tom King, the Managing Director of Administration for USSF, to argue that the organizations are not operationally distinct. (Opp. at 10.) But Plaintiffs ignore critical aspects of Mr. King's declaration, including, in particular, his explanation that the WNT and MNT each have *a separate team administrator*, who "manages all aspects of his or her team's operations and logistics, such as team travel, hotels, meals, security, training fields, and stadium requirements. They also manage team operational expenditures[] [such as] hotels and ground and air transportation." (Dkt. No. 171-21, King Decl. ¶ 4.) The fact that the two organizations are located in different physical locations, run by different management teams with different budgets and operational needs (including game location, type of venue, qualifying process, and location of athletes) necessarily renders them different establishments, even if they are overseen by the same corporation. *See Foster*, 772 F.2d at 1464-65. There is, thus, no genuine issue of material fact as to whether the WNT and MNT work in the "same establishment" under 29 U.S.C. § 206(d)(1). They do not.

## III. ANY DIFFERENCES IN BONUS PAYMENTS ARE ATTRIBUTABLE SOLELY TO NON-DISCRIMINATORY FACTORS.

Even if Plaintiffs had developed evidence that suggested the WNT has been paid at a lesser rate than the MNT, USSF would still be entitled to summary judgment. Under the EPA, there is no violation when any differences in compensation reflect "a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); 42 U.S.C. § 2000e-2(h). Here, any differences in the compensation due to the WNT and MNT result from: (1) the WNT's choice to advocate for and accept those very differences when negotiating its recent CBA; and (2) historical differences in the revenue generated by the MNT and WNT.

### A. The Bonus Differences Reflect Choices Made in Collective Bargaining.

As detailed in USSF's opening brief, the latest CBA reflects WNT's intentional pursuit of an ***entirely different compensation structure*** than that sought by the MNT. While the MNT secured a "high-risk, high-reward" contract, which provided large bonuses tied to game performance without any guaranteed compensation, the WNT specifically opted for less risk, and less reward, in the form of set salaries, signing bonuses, and other guaranteed benefits—but lower bonuses for individual games. (*See* Mot. at 3, 15-19.) As such, to the extent the bonuses available to the WNT for individual games are lower than those available to the MNT, that is what WNT negotiated for and accepted. Where plaintiffs have sought out, negotiated, and procured a unique payment structure such as this, courts have held that EPA claims that hinge on comparing such structures with those of other employees are improper. *See Diamond v. T. Rowe Price Assocs., Inc.*, 852 F.Supp. 372, 391-92 (1994) (D. Md. 1994) (granting summary judgment where plaintiff negotiated for a unique, incentive-based compensation structure that could not be compared to the standard compensation arrangement of others); *see also Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033, 1045 (C.D. Cal. 2006) (granting summary judgment where a union member could not compare her compensation to the different structure of non-union members).

Cognizant that they negotiated for, and agreed to, the very terms they now label discriminatory, Plaintiffs argue that any wage agreement—like their CBA—cannot qualify

as a "factor other than sex" under the EPA. (Opp. at 16-17.) But none of the cases they cite stands for such a sweeping proposition.[3] At most, Plaintiffs' cases stand for the unremarkable proposition "that the mere existence of a wage agreement," standing alone, "cannot be considered a 'factor other than sex' if the contract embodies pay differentials which would themselves violate the [EPA] or Title VII." *Diamond*, 852 F. Supp. at 396. But that is a far cry from a scenario in which a plaintiff purposefully negotiates for those very differentials—which offer higher compensations in some areas in exchange for less compensation in others. Such "unique, negotiated, performance-based agreements simply cannot be compared to the contract[s]" of others for EPA purposes. *Id.* at 396 & n.117.

Plaintiffs also seek to brush aside the differentials for which they negotiated by arguing that USSF would never have agreed to give the WNT "equal pay" in any event. (Opp. at 17-18.) That is difficult to square with the facts. Indeed, under the 2013-2016 CBA that preceded the most recent CBA, USSF expressly guaranteed that, if the MNT ended up earning a higher ratio of aggregate compensation to revenue generated than the WNT, USSF would pay the WNT additional compensation to cover the difference. (Mot. at 16.) And Plaintiffs ignore that it was ***the WNTPA***—not USSF—that chose to forego that clause in exchange for a more aggressive bargaining posture in the latest CBA. (Mem. at 17.) In lieu of another provision like that, the WNTPA and WNT pushed for, and ultimately procured, a valuable suite of guaranteed payments and benefits that was, and

---

[3] Two of Plaintiffs' cases hold only that a party cannot waive his or her right to litigation through an employment contract. *See Alexander v. Gardner-Denver*, 415 U.S. 36, 49-51 (1974); *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 75-76 (1998). In *Thibodeaux-Woody v. Houston Community College*, the court expressly declined to decide whether differences in negotiation results could constitute a "factor other than sex." 593 F. App'x 280, 283-84 (5th Cir. 2014). And in *Laffey v. Northwest Airlines, Inc.*, a union agreed to two different pay amounts for similar jobs, but not to different compensation structures. 567 F.2d 429, 446-47 (D.C. Cir. 1976). The plaintiff group (who received the lower pay) did not independently negotiate; rather, the union sacrificed that group's pay in exchange for other bargaining goals. *Id.*

still is, unique among U.S. national soccer teams. Thus, far from discriminatory, Plaintiffs' compensation structure is designed as they had requested.

### B. The Bonus Differences Reflect Historical Differences in Revenue Generated by the MNT and WNT.

The WNT justifiably is proud that during the class period of 2015-2019, the WNT generated more revenue from its games than did the MNT—a testament to the WNT's success at the 2015 and 2019 Women's World Cups and the growing popularity of women's soccer. That cannot mask, however, that men's soccer historically has been more popular both worldwide and within the United States—numbers reflected in the greater revenue generated by the MNT as compared to the WNT over the course of each four-year cycle preceding the last two collecting bargaining agreements entered into by the WNT.

Thus, in 2013, USSF executed a CBA with the WNT after a four-year cycle in which the WNT generated less than $15 million in revenue from 78 WNT games, while the MNT generated nearly $64 million from 69 games. (Dkt. 171-44, Irwin Dec. Ex. 1 at 13.) Then in 2017, the WNT's next CBA followed after a four-year cycle during which the WNT generated $55 million from 91 games, growing numbers that still were dwarfed by the $80 million that the MNT generated from 77 games over the same period. *Id.*

Notwithstanding those considerations, USSF paid the WNT and the WNTPA nearly *double* that which it paid the MNT and MNTPA over 2015-2019—not even accounting for USSF's financial support for the NWSL. (*Id.* at 10, 14.) But to the extent that the MNT's CBA carries the *potential* in certain scenarios for the MNT to earn higher bonuses than the WNT if, for instance, it wins the World Cup, those differences simply reflect the different revenue opportunities associated with those competitions. Owing to the greater worldwide popularity of men's soccer (to date), and the substantially greater revenue generated by the Men's World Cup as compared to the Women's World Cup, it is a matter of public record that FIFA paid nearly $400 million in prize money to the participating federations in the 2018 Men's World Cup, while paying only $30 million in prize money to the participating

federations in the 2019 Women's World Cup.[4]  As a result, even the last place team at a Men's World Cup generates more than double the revenue to a national federation than the first place team at a Women's World Cup.  USSF has been a leading advocate for bridging that divide, but the EPA does not make those differences actionable.

Because both the MNT and WNT's collective bargaining agreements permit each team to receive a substantial share of the revenue that USSF generates from each team's participation in a World Cup, and FIFA pays far greater amounts in relation to the Men's World Cup, the MNT necessarily has a greater opportunity to generate revenue from that participation than the WNT does from its participation.  Any such differences reflect the MNT's ability to generate greater revenue—a permissible consideration under the EPA.

## IV. PLAINTIFFS HAVE NOT CREATED A GENUINE ISSUE OF FACT ON THEIR TITLE VII "WORKING CONDITIONS" CLAIM.

Plaintiffs' "working conditions" claim has now expanded from a largely moot claim about turf conditions and commercial air travel to a running list of perceived differences between the WNT and the MNT.  In the latest iteration, as articulated in Plaintiffs' opposition, the claim—for the first time—now includes differences in room and board, medical care, coaches' pay, and physical therapy. (Opp. at 23-25.)  Plaintiffs cannot raise new, untimely complaints at this stage of the proceedings.  But even if they had raised such claims in a timely manner, Plaintiffs have not come forward with sufficient admissible evidence to create a fact question as to the substance of its evolving claim.

### A. Plaintiffs Have Not Exhausted Their Administrative Remedies.

As discussed in USSF's opening brief, Plaintiffs failed to raise their working conditions concerns with the EEOC before litigating them in this proceeding.  Therefore, USSF is entitled to summary judgment.  In response, Plaintiffs contend that (1) their EEOC

---

[4] *See, e.g.*, *Soccer: FIFA Approves Prize Money Increase For 2019 Women's World Cup*, Reuters (Oct. 26, 2018), https://www.reuters.com/article/us-soccer-fifa-women/soccer-fifa-approves-prize-money-increase-for-2019-womens-world-cup-idUSKCN1N01RV; Dkt. 171-3, Gulati Dec. ¶ 54; Dkt. 171-15, Gulati Dec. Ex. 12 at 2.

charge discussed a difference in "per diems," which they insist is sufficient to open the door to the panoply of working conditions claims they have since articulated; (2) the EEOC charge is to be liberally construed, so these new claims should be deemed covered by the charge; and (3) WNT working conditions fell within the scope of the EEOC's actual investigation. (Opp. at 21-23.) These arguments are unpersuasive.

**First**, one mention of "per diems" (a form of compensation) in a multi-page EEOC charge about equal pay did not bring "working conditions" within the investigation scope. The cover page of the Charge of Discrimination expressly defines the discrimination as "*Equal Pay*," and the accompanying affidavit focuses exclusively on compensation. (*See* Dkt 171-46 at 1 (emphasis added); *id.* at Attachment at 1-3.) Indeed, the one paragraph discussing per diems is titled: "Other Compensation." (*Id.* at Attachment at 3.) In fact, it is undisputed that the two teams' collectively bargaining agreements call for identical per diems. (Dkt. 174-10, 2013 MOU at 10; Dkt. 171-26, 2017 CBA at art. 11(A)(7).)

**Second**, Plaintiffs' EEOC charge cannot be so "liberally construed" as to include working conditions that were never pled in the first place. Rather, per Plaintiffs' own authority, the charge must still, "in general terms," cover "the alleged discriminatory parties and the alleged discriminatory acts." *See Sosa v. Hiraoka*, 920 F.2d 1451, 1458 (9th Cir. 1990) (citation omitted). The flexibility is intended to protect laypersons who draft EEOC charges so that a hypertechnical compliance with pleading requirements does not unfairly exclude claims. *See Kaplan v. Int'l All. of Theatrical & Stage Emps. & Mot. Picture Mach. Operators*, 525 F.2d 1354, 1359 (9th Cir. 1975). It is not intended to provide Plaintiffs— represented by the same counsel from the outset—carte blanche to add on any other grievance after the fact, during litigation. Plaintiffs' own authority, *Renati v. Wal-Mart Stores, Inc.*, held that a plaintiff had not exhausted her remedies for precisely this reason. No. 19-0525, 2019 WL 5536206, at *10 (N.D. Cal. Oct. 25, 2019). To allow plaintiffs to assert discrimination claims in court that they failed to plead before the EEOC would undermine the purpose of providing the Commission an opportunity to first resolve such issues. *See Ong v. Cleland*, 642 F.2d 316, 319 (9th Cir. 1981) ("Allowing a … complaint to

13

proceed despite its loose 'fit' with the administrative charge and investigation, however, is precluded if it would circumvent the Title VII scheme which contemplates agency efforts to secure voluntary compliance before a civil action is instituted."). Thus, regardless of its "label," an EEOC "charge must at least describe the facts and legal theory with sufficient clarity to notify the agency that employment discrimination is claimed." *Id.* (citation omitted). The EEOC charge here contained neither the facts nor legal theory at issue.

**Third**, Plaintiffs contend that, regardless of the substance of the charge, the EEOC did, in fact, investigate working conditions. In support, Plaintiffs identify only their own self-serving letter to the EEOC. (Opp. at 22.) They conspicuously do not include the actual information requests from the EEOC or other communication from the Commission. A letter from Plaintiffs referring to some undisclosed information request it received from the EEOC is hardly sufficient to either indicate that the EEOC actively investigated any working conditions, much less these specific issues, or that USSF was on notice that the Commission was doing so.

### B. Plaintiffs' New Working Conditions Claims Independently Fail Because They Were Not in the Complaint.

Additionally, Plaintiffs raise for the first time—in response to a summary judgment motion—new purported discrimination charges. The Complaint in this matter raised only playing surfaces and charter air travel. Plaintiffs' opposition, however, layers in additional purported differences, such as room and board, coach pay, and various "personnel resources" (Opp. at 24)—none of which are to be found in the Complaint. In addition to the procedural bar for failure to exhaust their remedies, these issues independently fail because Plaintiffs did not raise them in their Complaint. They cannot do so for the first time on summary judgment. *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908-09 (9th Cir. 2011) (affirming refusal to allow plaintiff to raise new ADA violations on summary judgment that were not alleged in complaint); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) (employees cannot proceed on discrimination claim against employer at summary judgment stage that was not in complaint).

**C.  Plaintiffs' Working Conditions Claim Is Not a Triable Fact Question.**

As explained in USSF's opening brief, Plaintiffs have not demonstrated a genuine issue of material fact with respect to their claim of discrimination regarding fewer chartered flights and playing on inferior surfaces. USSF presented evidence of the legitimate, non-discriminatory reasons for these differences in years past. (Dkt. 171-2, SUF ¶¶ 192-228, (citing King Dec. ¶¶ 46-80, Ex. 18-21; Def. Supp. Int. Ans. 2).) In response, Plaintiffs simply repeat that they have played on artificial turf at a higher rate than the MNT and taken fewer charter flights. (Opp. at 24-25.) But they do not address the non-discriminatory reasons for why that is so. (Mot. at 24.) Plaintiffs "must produce specific, substantial evidence of pretext" to avoid summary judgment. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994).

Plaintiffs instead pivot to layering on new allegations of supposedly discriminatory working conditions. In addition to being procedurally improper, these new issues do not create a triable fact question. Plaintiffs have not demonstrated that any differences adversely affected them. For example, they do not allege that they were housed in inferior conditions. It is undisputed that the two teams play in different locations, at different times, and that the MNT includes more players who are based outside the U.S. (Dkt. 171-21, King Dec. ¶¶ 5-6.) Aggregate spending totals do not provide needed detail regarding how Plaintiffs may have been affected. Similarly, Plaintiffs complain that their coaches are paid less but, whether true or not (they, of course, do not have standing to bring such a claim on behalf of the coaches), they do not allege that they received inferior coaching.

## CONCLUSION

For the reasons set forth above and in USSF's opening brief, USSF respectfully requests that the Court enter summary judgment in its favor.

Dated: March 16, 2020

Respectfully submitted,

LATHAM & WATKINS LLP
By:  /s/ Jamie L. Wine
Jamie L. Wine
Michele D. Johnson

15

Ellen E. McLaughlin (*Pro Hac Vice*)
Noah Finkel (*Pro Hac Vice*)
Brian Stolzenbach (*Pro Hac Vice*)
Sharilee Smentek (*Pro Hac Vice*)
**SEYFARTH SHAW LLP**
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:   (312) 460-5000
Facsimile:    (312) 460-7000

Kristen M. Peters (SBN 252296)
E-mail:  kmpeters@seyfarth.com
**SEYFARTH SHAW LLP**
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:    (310) 201-5219

Giovanna A. Ferrari (SBN 229871)
E-mail: gferrari@seyfarth.com
Chantelle C. Egan (SBN 257938)
E-mail: cegan@seyfarth.com
**SEYFARTH SHAW LLP**
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:    (415) 397-8549

Kyllan Kershaw (Pro Hac Vice)
E-mail: kkershaw@seyfarth.com
**SEYFARTH SHAW LLP**
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309
Telephone:   (404) 885-1500
Facsimile:    (404) 892-7056

*Counsel for Defendant USSF Federation, Inc.*

DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT