# EXHIBIT 12

**Structure, Choices and Tradeoffs:**
**Federal Labor Law and Bargaining in U.S. Soccer**

Submitted In
*Morgan et al. v. U.S. Soccer Federation*, Case No. 2:19-cv-01717 (C.D. Cal.)

**Philip A. Miscimarra**
**Partner, Morgan Lewis & Bockius LLP**
**Senior Fellow, The Wharton School, University of Pennsylvania**

February 4, 2020

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................................ 1

    A.  Qualifications ................................................................................................. 1

    B.  Summary ......................................................................................................... 1

II.  DISCUSSION ................................................................................................................... 3

    A.  The Structure of U.S. Labor Law and Collective Bargaining ............................. 3

    B.  The WNTPA CBAs and Collective Bargaining in U.S. Soccer .......................... 12

        1.  The collective bargaining between the WNTPA and the Federation is consistent with the federal labor law principles described above, and is consistent with the types of tradeoffs, compromises and choices that have been typical in collective bargaining negotiations, labor contracts, and labor-management disputes in which I have been involved during my career. ................................................................................................. 12

        2.  The complex tradeoffs, compromises and choices reflected in the WNTPA labor contracts make it extremely difficult to conduct any kind of meaningful point-by-point comparison of similarities and differences between those agreements and provisions contained in the U.S. Soccer Men's National Team agreements. ......................................................... 27

        3.  Because the Women's National Team bargaining is structured around a "bargaining unit" that consists of the WNT players, this means those players and the WNTPA in bargaining necessarily focused on of their own potential leverage, and the Federation in bargaining would likewise be required to focus on its potential leverage specific to the WNT players and the WNTPA. ................................................................. 29

        4.  Substantial instability and damage to collective bargaining in U.S. Soccer, contrary to the NLRA, is likely result from a decision that effectively rewrites portions of the WNTPA labor contracts to match particular provisions contained in the Men's National Team labor contracts. .................................................................................................. 31

III. CONCLUSION ................................................................................................................. 35

**Structure, Choices and Tradeoffs:**
**Federal Labor Law and Bargaining in U.S. Soccer**

*Morgan et al. v. U.S. Soccer Federation*, Case No. 2:19-cv-01717 (C.D. Cal.)

## I.   Introduction

### A.   Qualifications

I am a partner in the law firm, Morgan, Lewis & Bockius LLP.  I served as Chairman of the National Labor Relations Board ("NLRB" or "Board") from April 24, 2017 to December 16, 2017, in addition to serving as Acting Chairman of the NLRB from January 23, 2017 to April 24, 2017, and a Board Member on the NLRB from August 7, 2013 to January 23, 2017.  I was appointed to the NLRB by President Obama and most of my tenure at the NLRB occurred during the Obama administration, and my final year at the NLRB occurred during the Trump administration.  I am also a Senior Fellow in the Wharton Center for Human Resources at the University of Pennsylvania's Wharton School, and (excluding my time at the NLRB) I have been affiliated with the Wharton Center for Human Resources or its predecessor, the Wharton Industrial Research Unit, since 1978.  I was also a member of the American Federation of Musicians, Local 60-471, for roughly 25 years from approximately 1975 to 2001.[1]

I have devoted more than 40 years to collective bargaining, labor-management relations, and employment issues.  My work has included involvement as a participant or advisor in hundreds of collective bargaining negotiations, and my service on the NLRB included participation in more than one thousand cases involving collective bargaining, union representation and related issues.

I have authored or coauthored four books and numerous other articles and publications involving labor law and collective bargaining (see Appendix 1), in addition to case opinions written during my tenure on the NLRB.

I received a J.D. from the University of Pennsylvania Law School in 1982; an MBA from the University of Pennsylvania's Wharton School in 1982, and a B.A. from Duquesne University, *summa cum laude*, in 1978.  Other disclosures specified in Rule 26(a)(2) of the Federal Rules of Civil Procedure are set forth in Appendix 2.

### B.   Summary

In the United States, collective bargaining involving private employers and employees, including sports teams, is governed by federal law – specifically, the National Labor Relations Act ("NLRA" or "Act").  The NLRA imposes important rights, obligations and an overall structure on parties in bargaining that center around four cornerstone principles:

---

[1] This report reflects my own professional judgment and opinions that should not be attributed to Morgan Lewis & Bockius LLP, The Wharton School, the University of Pennsylvania or any other person or entity.

(1) *Scope of the "Bargaining Unit."*  Parties are generally required to work within *the definition and scope of the "bargaining unit"* (i.e., the particular group of employees represented by the union);

(2) *Binding Agreements for their Entire Term.*  The objective of bargaining, under federal law, is to produce a *binding collective bargaining agreement* that will govern wages, benefits and working conditions for the agreement's entire term;

(3) *Private Decision-Making, Process, and Tradeoffs/Compromises.*  Federal law gives parties the right to *make their own decisions* about what is important versus unimportant and acceptable versus unacceptable, *and this causes most labor contracts to involve a complex assortment of tradeoffs, priorities, compromises and concessions*; and

(4) *Leverage and Economic Weapons.*  The incentive of parties to reach an agreement in bargaining, notwithstanding differences in their competing proposals, *is based on economic leverage* (i.e., the ability of parties, including employees *within* the bargaining unit, to resort to economic weapons like strikes and lockouts, and their ability to withstand the other side's potential resort to those weapons).

The above principles and my review of collective bargaining between the U.S. Soccer Women's National Team Players Association ("WNTPA" or "Union") and the United States Soccer Federation (the "Federation"), including the 2017-2021 and 2013-2016 collective bargaining agreements ("CBAs"), has prompted me to reach the following conclusions.

1.  The collective bargaining between the WNTPA and the Federation, and the resulting CBAs, have been consistent with the federal labor law principles described above, and are consistent with the types of tradeoffs, compromises and choices that have been typical in collective bargaining negotiations, labor contracts, and labor-management disputes in which I have been involved during my career.

2.  The complex tradeoffs, compromises and choices reflected in the WNTPA labor contracts make it extremely difficult to conduct any kind of meaningful point-by-point comparison of similarities and differences between those agreements and provisions contained in the U.S. Soccer Men's National Team agreements.

3.  Because the Women's National Team bargaining is structured around a "bargaining unit" that consists of the WNT players, this means those players and the WNTPA in bargaining necessarily focused on *their own* potential leverage, and the Federation in bargaining would likewise be required to focus on its potential leverage *specific to the WNT players and the WNTPA*.

4.  Substantial instability and damage to collective bargaining in U.S. Soccer, contrary to the NLRA, is likely to result from a decision that effectively rewrites portions of the WNTPA labor contracts to match particular provisions contained in the Men's National Team labor contracts.

## II.   Discussion

### A.  The Structure of U.S. Labor Law and Collective Bargaining

Collective bargaining involving most private employers and employees in the U.S., including sports teams, is governed by federal law – specifically, the National Labor Relations Act ("NLRA" or "Act").[2]  The NLRA reflects fundamental choices by Congress in the careful balancing of interests between employers, unions, employees, and the public.[3]  The NLRA was adopted in 1935 after 18 months of work by the House and Senate.  Important NLRA amendments were adopted in 1947 as part of the Labor Management Relations Act ("LMRA" or "Taft-Hartley Act").[4]  The Act was also substantially amended in 1959 as part of the Labor Management Reporting and Disclosure Act ("Landrum-Griffin Act").[5]  And in 1974 the Act was amended based on the Health Care Amendments to the National Labor Relations Act.[6]

Collective bargaining under the NLRA centers around four principles that are embedded in the structure of the law, which have been recognized and reinforced by the National Labor Relations Board ("NLRB" or "Board") and the courts over more than eight decades.

**1.  The "Bargaining Unit."**  Under federal labor law, a large number of labor-management issues rise and fall based on the scope and definition of the "bargaining unit."  This also has great importance when an employer voluntarily extends recognition to a labor organization, which occurred when the Federation voluntarily recognized the WNTPA in 2001.  The central role played by the bargaining unit's definition and scope is reflected in multiple aspects of federal labor law.

In the first instance, for example, the definition and scope of any bargaining unit is *voluntarily decided by employees and the union* that seeks to provide representation.[7]  In U.S. Soccer,

---

[2] 29 U.S.C. §§ 151 et seq.  The NLRA applies to most private sector employers and employees in the U.S., but the NLRA's definition of "employee" excludes employees of railroads and airlines, who are subject to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et seq.  *See* NLRA § 2(3), 29 U.S.C. § 152(3).  The NLRA's definition of employee also excludes, among others, individuals employed as agricultural laborers.  *Id.*

[3] The Act's central provision dealing with protected rights is Section 7, 29 U.S.C. § 157, which protects the right of employees "to bargain collectively through representatives of their own choosing . . . and to refrain from any or all of such activities," except as affected by union security agreements in states that do not prohibit such agreements.  *Cf.* NLRA § 14(b), 29 U.S.C. § 164(b) (permitting state right-to-work laws prohibiting union security agreements).

[4] 61 Stat. 136 (1947), 29 U.S.C. §§ 141 *et seq.*

[5] 73 Stat. 541 (1959), 29 U.S.C. §§ 401 *et seq.*

[6] 88 Stat. 395 (1974).

[7] The NLRB has indicated that employees should give consideration to the scope of the relevant bargaining unit when choosing whether to have union representation.  As stated in the explanation released with NLRB's election rules and regulations: "It seems obvious that it would be important for voters to know who they are voting to join in collective bargaining when they decide whether or not they want to be represented by a union for purposes of collective bargaining," and "help[ing] ensure that voters know the contours of the unit in which they are voting" results in "a more informed electorate [which] plainly promotes fair and accurate voting." 84 Fed. Reg. 69524, 69541 (2019).

-4-

the existence of a WNTPA bargaining unit – limited to female team players – was created by the WNTPA,[8] to which the Federation (the employer) agreed in 2001.[9]

There is no legal requirement that the bargaining unit be defined as a single sports team (i.e., the WNT) or any single particular grouping of employees.[10]  Federal law only requires that the desired bargaining unit be "appropriate,"[11] and it is well-established that any one of multiple possible unit configurations might be permissible in a particular case.[12]  And even if employees wish to have union representation, the union has the right to *decline* to represent employees in a particular bargaining unit; the NLRB permits a union, if it chooses, to disclaim interest in being a particular bargaining unit's representative.[13]

The NLRA's statutory language also makes the "bargaining unit" integral to union representation and to the structure of bargaining.  Section 9(a) of the Act establishes the right of unions to be the "exclusive" representative for all unit employees they represent, and defines this right *in relation to the bargaining unit*, as follows:

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees *in a unit appropriate for such purposes*, shall be the exclusive representatives of all the employees *in such unit* for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.[14]

Additional language in the NLRA further underscores the central importance of determining the "bargaining unit."  Section 9(b) states that, when the Board will conduct an election to determine whether a union has majority support, "The Board shall decide *in each case*

---

[8] *See* text accompanying notes 42-43 below (referencing the WNTPA Constitution and By-Laws).

[9] *See* text accompanying notes 45-46 below (referencing the 2000-2004 WNTPA CBA).  The NLRA permits an employer to *voluntarily* recognize a union based on a showing or claim of employee majority support, which is the manner in which the WNTPA received recognition by the Federation.  However, if the appropriateness of the bargaining unit is disputed or if the existence of employee majority support may be in doubt, the parties typically address these issues in union representation proceedings conducted by the NLRB, which culminate in an NLRB-conducted election.  The Supreme Court has held that employers have the right to refrain from voluntarily recognizing a union and to insist on an NLRB election to determine whether a union is supported by a majority of bargaining unit employees.  *Linden Lumber v. NLRB*, 419 U.S. 301 (1974).

[10] Indeed, in *Northwestern University*, 362 NLRB 1350 (2015), the NLRB declined to assert jurisdiction, in part because the union would only have represented a "single-team" bargaining unit (limited to the scholarship student-athletes on the Northwestern University football team).  *Id.* at 1354 ("in all of our past cases involving professional sports, the Board was able to regulate all, or at least most, of the teams in the relevant league or association").

[11] NLRA §§ 9(a), (b), 29 U.S.C. §§ 159(a), (b).

[12] *PCC Structurals, Inc.*, 365 NLRB No. 160, slip op. at 12 (2017) ("in a given case, multiple potential bargaining units may be appropriate").  In NLRA § 9(b), 29 U.S.C. § 159(b), the statute likewise indicates that, depending on the circumstances, an appropriate bargaining unit might be "the employer unit, craft unit, plant unit, or subdivision thereof."

[13] *Manitowoc Shipbuilding, Inc.*, 191 NLRB 786 (1971); *National By-Products Co.*, 122 NLRB 334 (1958); *WTOP, Inc.*, 114 NLRB 1236 (1955); *Ny-Lint Tool & Manufacturing Co.*, 77 NLRB 642 (1948).

[14] 29 U.S.C. § 159(a) (emphasis added).

whether, in order to assure to employees the *fullest freedom* in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining *shall be the employer unit, craft unit, plant unit, or subdivision thereof.*"[15]

Finally, under the NLRA, the obligation to bargain requires the parties to meet and confer in good faith regarding the "rates of pay, wages, hours of employment, or other conditions of employment" pertaining to employees *in the bargaining unit.*[16] Along similar lines, an employer's obligation to bargain includes the duty to provide information that is "needed by the bargaining representative for the proper performance of its duties,"[17] and this generally *excludes* information pertaining to employees who are outside the bargaining unit.[18]

**2. Binding Collective Bargaining Agreements for their Entire Term**. Another central focus of the NLRA is the statute's overriding objective which, through the requirement of good faith negotiation, is to *produce collective bargaining agreements that, if entered into, will be binding for the agreement's term*.

The NLRA defines the duty to "bargain collectively" (required under Section 8(a)(5) for employers and Section 8(b)(3) for unions) as a "mutual obligation" of the employer and union to "confer in good faith respect to wages, hours, and other terms and conditions of employment, or *the negotiation of an agreement or any question arising thereunder*."[19] Similarly, this duty to bargain in good faith is likewise defined in relevant cases as negotiating with "an open mind and a sincere desire *to reach an agreement*."[20]

---

[15] 29 U.S.C. § 159(b) (emphasis added). The NLRA's legislative history reveals that this language was itself the product of significant legislative deliberation, resulting from an initial version that appeared in 1934, which was amended in the course of the NLRA's adoption as the Wagner Act in 1935, and which was strengthened further in amendments adopted in 1947, resulting in the current formulation of this language. *See PCC Structurals, Inc.*, 365 NLRB No. 160, slip op. at 3-5 (2017); *see also Boeing Co.*, 368 NLRB No. 67, slip op. at 3-4 (2019) (indicating that, when evaluating the appropriateness of a particular bargaining unit, the Board will apply traditional "community-of-interest" factors, by evaluating whether employees in the proposed unit "share an internal community of interest," analyzing and weighing the interests of those employees and the interests of employees "excluded from [the] unit," and giving consideration to the Board's unit decisions "in the particular industry involved").

[16] NLRA § 8(d), 9(a), 29 U.S.C. §§ 158(d), 159(a).

[17] *NLRB v. ACME Industrial Co.*, 385 U.S. 432 (1967), *citing NLRB v. Truitt Mfg. Co.*, 351 U.S. 149 (1956).

[18] The Board and the courts have held that requests for information pertaining to employees within the bargaining unit are presumptively relevant to collective bargaining. *CVS Albany, LLC*, 364 NLRB No. 122 (2016). This contrasts with requests for information relating to employees outside of the bargaining unit. Such requests, to the extent they deal with matters pertaining to non-unit employees, are not presumptively relevant, and the employer has no obligation to provide this type of information unless the union satisfies the burden of establishing relevance and provides an explanation indicating why the information is relevant. *Disneyland Park*, 350 NLRB 1256, 1258 (2007).

[19] NLRA § 8(d), 29 U.S.C. § 158(d) (emphasis added).

[20] *NLRB v. Montgomery Ward & Co.*, 133 F.2d 676, 686 (9th Cir. 1943) (emphasis added). In line with the NLRA's objective of producing binding agreements, Section 8(d) defines the duty to bargain collectively as including, among other things, "the execution of a written contract incorporating any agreement reached if requested by either party." 29 U.S.C. § 158(d).

The objective of producing agreements that are binding on both parties has been emphasized throughout the NLRA's 84-year history.  In 1939, when the Act was four years old, the Supreme Court stated that "the purpose of the statute was to compel employers to bargain collectively with their employe[e]s to the end that *employment contracts binding on both parties should be made*."[21]  To the same effect, as the Supreme Court stated more than 20 years later, "Collective bargaining . . . is not simply an occasion for purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it'; *it presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract*."[22]

Congress made the binding nature of collective bargaining agreements for their entire term *explicit* in NLRA Section 8(d), based on language added to the Act in 1947 as part of the Taft-Hartley amendments.[23]  Accordingly, NLRA Section 8(d) constructs an *absolute* prohibition of any mid-term contract modifications without the mutual agreement of the opposite side, in the following language:

> [W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that *no party to such contract shall terminate or modify such contract*, unless the party desiring such termination or modification--
>
> (1)  serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;
>
> (2)  offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

---

[21] *NLRB v. Sands Mfg. Co.*, 306 U.S. 332, 342 (1939) (emphasis added).

[22] *NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 485 (1960) (emphasis added).  *See also NLRB v. Highland Park Manufacturing Co.*, 110 F.2d 632, 637 (4th Cir. 1940) ("The requirement to bargain collectively is not satisfied by mere discussion of grievances with employees' representatives.  *It contemplates the making of agreements* between employer and employee *which will serve as a working basis for the carrying on of the relationship*.") (emphasis added); *Horsehead Residential Development Co. v. NLRB*, 154 F.3d 328, 339 (6th Cir. 1998) ("A company's good faith is judged by whether, in the totality of the circumstances, the company 'desired to reach ultimate agreement, *to enter into a collective bargaining contract*.'") (emphasis added).

The converse is also true: based on the importance of producing binding agreements, under the NLRA, it violates the Act's duty of good faith whenever an employer or union engages in bargaining *without* a sincere desire to reach an agreement.  *See, e.g., General Elec. Co.*, 150 NLRB 192, 193 (1964), *enforced*, 418 F.2d 736 (2d Cir. 1969), *cert. denied*, 397 U.S. 965 (1970) ("[i]t is true that an employer does violate Section 8(a)(5) where it enters into bargaining negotiations with a desire not to reach an agreement with a union");  *NLRB v. Griswold Mfg. Co.*, 106 F.2d 713, 723 (3d Cir. 1939) ("an employer who enters into negotiations . . . with his mind hermetically sealed against even the thought of entering into an agreement with the union, is guilty of refusing to bargain . . . in good faith").

[23] The NLRA was amended and restated in Title I of the LMRA, 61 Stat. 136 (1947), *codified at* 29 U.S.C. §§ 141 et seq.

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) *continues in full force and effect*, without resorting to strike or lockout, *all the terms and conditions of the existing contract* for a period of sixty days after such notice is given *or until the expiration date of such contract, whichever occurs later*:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2), (3), and (4) . . . shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, *if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract*. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, *shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of this Act*.[24]

Section 8(d)'s prohibition against midterm contract modifications is directly linked to the importance of stable bargaining relationships, which is another of the primary policies underlying federal labor law.[25]  Thus, in *Kellogg Co. v. NLRB*, 840 F.3d 322 (6th Cir. 2016), the court stated: "Prohibiting forced bargaining on mid-term modifications *furthers the NLRA's policy of reducing 'industrial strife' and helps maintain stability in the terms and conditions of employment agreed upon by the parties*. . . .  A party's insistence on a mid-term modification to the point of impasse . . . violates the NLRA."[26]  In *Chesapeake Plywood*, 294 NLRB 201 (1989), the NLRB similarly stated that "the Act's policy of minimizing industrial strife by encouraging stability in agreements on terms and conditions of employment *is undermined by a party's making unilateral changes in such matters during a period in which both parties have agreed that changes can be made only by mutual agreement*."[27]

Significantly, just like unilateral wage or benefit cuts during a CBA's term, the NLRA makes it equally unlawful for any employer to give unilateral *wage or benefit increases*.  *NLRB v. Katz*, 369 U.S. 736, 745 (1962) (unlawful "automatic wage increase system"); *NLRB v. Crompton-*

---

[24] 29 U.S.C. § 158(d) (emphasis added).

[25] *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362-63 (1949) ("To achieve stability of labor relations was the primary objective of Congress in enacting the National Labor Relations Act. . . ."); *NLRB v. Appleton Elec. Co.*, 296 F.2d 202, 206 (7th Cir. 1961) (a "basic policy of the Act [is] to achieve stability of labor relations").

[26] 840 F.3d at 328 (emphasis added; citations omitted).

[27] *Id.* at 201 (emphasis added); *see also Smurfit-Stone Container Enterprises*, 357 NLRB 1732, 1733 (2011) ("If . . . the employer and union are parties to a collective-bargaining agreement, either party may propose to modify a provision of that agreement – such as its duration clause – and the other party is free to consent. But absent a reopener provision covering the proposal, under Section 8(d) of the Act the other party is under no obligation to consent to the modification or even to discuss it."); *San Juan Bautista Medical Center*, 356 NLRB 736, 738 (2011) ("Absent the union's consent, a mid-term contract modification of a term governing a mandatory subject of bargaining violates Section 8(a)(5)").

*Highland Mills, Inc.*, 337 U.S. 217, 219 (1949) (unlawful unilateral "general and substantial increase in the rates of pay"); *NLRB v. Herman Sausage Co.*, 275 F.2d 229, 230 (5th Cir. 1960) (unlawful "unilateral increases in wages").[28]

      **3.  Freedom of Contract: Tradeoffs, Priorities, Compromises and Process.**  A third cornerstone principle underlying the NLRA is *freedom of contract*, which means (a) parties themselves define what they regard as important versus unimportant, and acceptable versus unacceptable, and (b) NLRA Section 8(d) affirmatively states that the duty to bargain, as defined in the Act, "*does not compel* either party *to agree to a proposal or require the making of a concession*."[29] Therefore, when evaluating the parties' conduct in bargaining, Congress intended that the NLRB and the courts would focus on "process," while giving parties substantial discretion when choosing what terms to accept and incorporate into a resulting agreement.

      Therefore, the central element in collective bargaining – which drives nearly all agreements reached – consists of the conscious choices, tradeoffs, priorities and compromises, some short-term and others long-term, that are often reflected in each side's proposals and counterproposals, and it is also recognized that bargaining may make some employees better off than others.  As the Supreme Court held in *Ford Motor Co. v. Huffman*, 345 U.S. 330 (1956):

> Any authority to negotiate derives its principal strength from a delegation to the negotiators of a *discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented*.  A major responsibility of negotiators is to weigh the *relative advantages and disadvantages of differing proposals*. . . .  Compromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables.[30]

      Unions have great latitude when picking and choosing among proposals that may be agreed upon and incorporated into the resulting contract.  Nothing in the law requires a union or represented employees to accept or ratify contract terms they believe are unacceptable.  And unions do not violate their duty to fairly represent employees – nor are negotiated contracts rendered unenforceable – merely because some employees are treated less favorably than other employees.[31]

---

[28] Although unions are required to comply with negotiated contracts throughout their entire term, they are rewarded with a significant benefit – during each CBA's term – which is known as the "contract bar rule."  Under this rule, the execution of any contract reached in collective bargaining protects the union's representative status by barring (i) any employee petition to decertify the union, or (ii) any competing representation petition filed by a rival union or an employer, for the entire term of the contract (up to a maximum of three years).  *General Cable Corp.*, 139 NLRB 1123 (1962); *Hexton Furniture Co.*, 111 NLRB 342 (1955).

[29] NLRA § 8(d), 29 U.S.C. § 158(d) (emphasis added).

[30] *Id.* at 337-38 (emphasis added)

[31] *Id.*

In *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7th Cir. 1992) (arising under the Railway Labor Act), the court described the give-and-take reflected in collective bargaining as follows:

> Negotiation means compromise. *Neither employees as a whole nor particular groups of employees emerge from bargaining with all their wants satisfied.* Often unions can achieve more for some of their constituents only by accepting less for others. "*Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. . . .*[32]

The court in *Rakestraw* elaborated:

> *Bargaining has winners and losers.* . . . A better retirement plan and other deferred compensation helps older workers at the expense of younger ones, who prefer cash to cover current expenses. Accepting lower fringe benefits (less health insurance, fewer days off) in exchange for higher cash wages helps the majority at the expense of the sick and those whose religious faith requires them to take extra days off. Higher wages assist those who remain with the firm at the expense of workers who may be laid off when the employer loses business to its competitors. Reducing the difference between the wages of skilled and unskilled workers assists the less skilled, who also tend to be more numerous. Unless its leaders are unfathomably dense, the union knows who wins and who loses. The losers always may say that the union "intended" them to lose. *As all of society is an assembly of minorities, the losers can point to some respect (age, sex, religion, politics, skill, health, membership in the union, status during the most recent strike) in which they are in a minority, and insist that the distinction must have been part of a "bad faith" plot to "penalize" them on account of that status.* Taken to its limits, the approach prevents the union from resolving differences internally and representing the interests of workers as a group.[33]

Congress included safeguards in the NLRA to protect the parties' freedom to make their own decisions regarding acceptable contract terms. As noted previously, NLRA Section 8(d) contains an express limitation on the authority of the Board and the courts to remedy unfair labor practices by forcing the employer or union to accept particular contract terms.[34] Section 8(d)'s limitation on this authority was reinforced by the Supreme Court in *H.K. Porter Co. v. NLRB*,[35] where the Court stated:

> It is implicit in the entire structure of the [NLRA] that the Board acts to oversee and referee the process of collective bargaining, *leaving the results of the contest to the*

---

[32] *Id*. at 1529-1530 (emphasis added).

[33] *Id*. at 1530-31 (emphasis added; citations omitted). *See also Ohio Valley Hosp.*, 324 NLRB 23, 25 (1997) (disputed seniority proposal held not to be evidence of bad faith bargaining where "it is not hard to imagine circumstances where acceptance of the seniority proposal would be quite acceptable, such as a *quid pro quo* for obtaining or retaining certain benefits for unit employees, or as part of a plan to serve 'the interests of [the unit] as a whole.'").

[34] *See* text accompanying note 29 above.

[35] 397 U.S. 99 (1970).

*bargaining strengths of the parties.* . . . The Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself. *One of these fundamental policies is freedom of contract.* While the parties' freedom of contract is not absolute under the Act, allowing the Board to compel agreement when the parties themselves are unable to agree would violate *the fundamental premise on which the Act is based -- private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.*[36]

Because the NLRA affirmatively protects the right of parties to reject particular contract terms (see NLRA § 8(d) and *H.K. Porter Co. v. NLRB*, *supra*), the NLRB evaluates the sufficiency of the parties' bargaining conduct by focusing primarily on "process" issues – specifically, whether the process followed was indicative that parties had a sincere desire to reach an agreement that govern the resulting labor contract's term. These factors include, among other things, the number of bargaining sessions or exchanges, whether there were proposals and counterproposals, the identity of the negotiators and whether they were vested with authority to enter into binding agreements, and other factors.[37]

**4.  Economic Weapons and Leverage**.  An additional fundamental element that forms the basis for collective bargaining – and which underlies every negotiation and drives nearly every agreement – involves the role played by leverage, based on each side's actual or threatened resort to economic weapons (i.e., strikes, lockouts, protests and other forms of pressure, and actions taken by each party to withstand the potential economic weapons wielded by the other side).  The role played by leverage in labor negotiations was recognized in *H.K. Porter Co.*, where the Supreme Court held it is "implicit in the entire structure of the [NLRA] that the Board acts to oversee and referee the process of collective bargaining, *leaving the results of the contest to the bargaining strengths of the parties.*"[38]

Every negotiation requires a means by which the parties are motivated to reconcile their competing proposals and make compromises necessary to achieve an agreement.  Under the NLRA, the engine devised by Congress to drive parties towards an agreement is leverage, defined as each party's threatened or actual resort to economic weapons.  As the Supreme Court stated in *NLRB v. Insurance Agents' International Union*, 361 U.S. 477 (1960), employers and unions in collective bargaining "proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest. . . . *The presence of economic weapons in reserve, and their actual exercise on*

---

[36] *Id.* at 107-108 (emphasis added); *see also Suffield Academy*, 336 NLRB 659, 660 (2001), *enforced*, 322 F.3d 196 (2d Cir. 2003) ("The Board has no authority to order the parties to agree to any particular [] proposal.  Neither does the Board have the authority to govern the "give and take" of proposals at the bargaining table, except to the extent that such conduct demonstrates a lack of good faith.").

[37] *See, e.g., Audio Visual Services Group, Inc.*, 367 NLRB No. 103 (Mar. 12, 2019); *Management & Training Corp.*, 366 NLRB No. 134, slip op. at 4 (2018); *Mid-Continent Concrete*, 336 NLRB 258, 259-60 (2001), *enfd. sub nom. NLRB v. Hardesty Co.*, 308 F.3d 859 (8th Cir. 2002).

[38] 397 U.S. at 108 (emphasis added).

*occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized.*"[39]

The stakes in collective bargaining are substantial, which is especially true when parties face the prospect of losing the protection afforded by the expired contract's no-strike and no-lockout commitments.  This was described as follows in *NLRB v. Wire Products Mfg. Corp.*, 484 F.2d 760 (7th Cir. 1973):

> The strike is a potent economic weapon which may, and often is, wielded with disastrous effect on its employer target. Recognition was given to the lockout as a legitimate economic weapon on the part of the employer in *American Ship Building. . . .*
>
> * * *
>
> The implicit recognition of some degree of equivalency between the respective weapons of economic leverage should not be thwarted via an artificially contrived but substantially unsupported factual basis. Feelings are intense and deeply held by both parties when a lack of employment occurs, whether as the result of a strike or a lockout. The employees are denied their pay checks. The employer is denied the normal processes of production.  Statements and conduct which could be the basis for inferring animus, which the parties each entertain toward the other, are not difficult to detect.  The standard here, however, is not the existence of an inchoate animus but rather whether that feeling did in fact motivate.  In the legislative scheme, the courts serve some more worthwhile purpose than that of automatically rubberstamping approval of Board determinations. In the consideration of this particular issue, "[a]n unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one."[40]

Every party in collective bargaining has the right to expect good faith negotiation. However, the requirement of good faith does not insulate parties from the potential negative consequences associated with labor negotiations.  *See American Ship Building Co. v. NLRB*, 380 U.S. 300, 309 (1965) ("The lockout may well dissuade employees from adhering to the position which they initially adopted in the bargaining, but the right to bargain collectively does not entail any 'right' to insist on one's position free from economic disadvantage.").[41]

---

[39] *Id.* at 487–489 (emphasis added).

[40] *Id.* at 765 (emphasis added), *citing American Ship Building Co. v. NLRB*, 380 U.S. 300, 316 (1965).

[41] *See also Local 702, International Brotherhood of Elec. Workers, AFL-CIO v. NLRB*, 215 F.3d 11, 17 (D.C. Cir. 2000) ("the lockout was a legitimate defense against the Unions' 'inside game weapon' deployed as part of 'economic warfare in the midst of bargaining negotiations with the hope of securing agreement on their terms for new contracts.'") (citation omitted).  *Cf.* Gabe Feldman, *Collective Bargaining in Professional Sports: The Duel Between Players and Owners and Labor Law and Antitrust Law* (Oxford Handbook of American Sports Law, Oxford University Press, 2018) ("[i]n many ways, collective bargaining in professional sports is a mirror image of collective bargaining in traditional, non-sports industries—management and labor exercise their economic weapons, including strikes and lockouts, to gain leverage at the bargaining table."); Harry C. Katz, T.A. Kochan & A.J.S. Colvin, *The role of the economic, technological, and demographic environments*, Labor relations in a globalizing world, p. 79 (ILR Press 2015) ("Bargaining power is a central concept in labor relations because it is the key determinant of bargaining outcomes related to wages and other work conditions.").

**B.  The WNTPA CBAs and Collective Bargaining in U.S. Soccer**

As noted above, I have reached several conclusions based on the above legal principles, my experience with collective bargaining, union representation and labor-management relations, and my review of collective bargaining between the WNTPA and the Federation, including the 2017-2021 and 2013-2016 CBAs.

> 1.  The collective bargaining between the WNTPA and the Federation is consistent with the federal labor law principles described above, and is consistent with the types of tradeoffs, compromises and choices that have been typical in collective bargaining negotiations, labor contracts, and labor-management disputes in which I have been involved during my career.

Collective bargaining between the WNTPA and the Federation has been in line with the fundamental labor law principles described above, and the resulting CBAs reflect the types of priorities, tradeoffs, compromises and concessions that are typical in collective bargaining.

(a) *Bargaining Unit*.  One of the most important elements in WNTPA collective bargaining is the scope and definition of *the bargaining unit*.  Specifically, the WNTPA bargaining unit consists entirely of players on the Women's National Team.  This choice of bargaining unit was reflected in the WNTPA's 2001 Constitution and By-Laws, which defined eligible WNTPA members as "[a]ny person who is a player or has been a player, or who has been called into any training session *for the United States Women's Soccer Team* . . . since June 1, 1999."[42]

The Constitution and By-Laws also provided for ratification "by a majority vote of those members who have been on the roster for a [WNT] game against the national 'A' team of another country since June 1, 1999," and the written Constitution and By-Laws indicate that ratification occurred on March 23, 2001.[43]

As indicated previously, federal law permits an employer to voluntarily recognize a union that has majority support among employees in the bargaining unit.  The Federation and the WNTPA entered into their first CBA in March 2001 (which was effective retroactively to February 1, 2000).[44]  The 2000-2004 CBA's recognition clause indicates that the Federation recognized the WNTPA on behalf of a bargaining unit consisting of "all persons who are or may become employees of the Federation by having been selected to play as soccer players on the United

---

[42] Constitution and By-Laws of United States Women's National Soccer Team Players Association, Deposition of John B. Langel ("Langel Dep."), Exh. 2, p. 2.

[43] *Id.* at 11-12.

[44] 2000-2004 WNT CBA, Preamble, p. 1.  *See also* Langel Dep. at 12-13.

States *Women's National Soccer Team*."[45]  The same bargaining unit recognition language appears in the 2005-2012 CBA, the 2013-2016 CBA, and the 2017-2021 CBA.[46]

The parties' intent for their relationship to focus *on the relevant bargaining unit* – i.e., employees *within* a unit consisting entirely of female players – is reflected in the 2000-2004 CBA's non-discrimination clause.  That provision is captioned "No Discrimination," and like identical language contained in later CBAs, this provisions *makes no mention of prohibited sex discrimination*.  The 2000-2004 CBA's non-discrimination provision, in its entirety, states:

> Neither the Federation nor the Players Association shall discriminate against or in favor of any player *because of religion, race, color, national origin, age, marital status, or membership or non-membership in or support of or non-support of any labor organization*.[47]

The 2005-2012 CBA, the 2013-2016 CBA, and the 2017-2021 CBA contain identical language, except for the addition (starting with the 2017-2021 CBA) of prohibited "sexual orientation" discrimination.[48]

The absence of a contractual prohibition against "sex discrimination" in the WNTPA CBAs obviously does not mean that the WNTPA or the Federation believed it would be acceptable for either party to engage in discrimination against or in favor of any WNT player on the basis of sex.  However, the conspicuous omission of sex discrimination from the "No Discrimination" clause in successive CBAs reinforces a conclusion that, in WNTPA collective bargaining, in their agreements and in the administration of each CBA, both sides focused on the treatment of employees *within* the bargaining unit.

The existence of two limited-scope "me-too"[49] provisions in the 2017-2021 CBA regarding the Men's National Team[50] supports three related conclusions: (i) in WNTPA bargaining and resulting CBAs, the parties negotiated with an awareness of the Men's National Team contracts

---

[45] 2000-2004 WNT CBA, Art. II, p. 1 (emphasis added).

[46] 2005-2012 WNT CBA, Art. I, p. 1; 2017-2021 CBA, Art. 1, p. 1.  The 2013-2016 CBA consists of the 2013 MOU and the unmodified terms of the 2005 CBA.  *U.S. Soccer Federation, Inc. v. U.S. WNTPA*, 190 F. Supp. 3d 777, 785 (N.D. Ill. 2016) (hereinafter "*Soccer Federation*"); *see also* Langel Dep. Exh. 31 (email exchange indicating that unchanged 2005-2012 CBA provisions would remain in effect).

[47] 2000-2004 WNT CBA, Art. VI, Sec. 6.2, p. 7.

[48] 2005-2012 WNT CBA, Art. VI, Sec. 6.2; 2013 MOU (no provision modifying 2005 CBA's non-discrimination provision); 2017-2021 WNT CBA, Art. 25, p. 50.

[49] In the context of collective bargaining, the term "me-too" is often used to describe a contract provision that adopts or incorporates by reference all or part of a different agreement.

[50] Art. 11, Sec. 6 in the 2017-2021 CBA (p. 22) specifies "per diem" payments (of $62.50/day and $75/day, depending on whether the venue in or outside the U.S.) for WNT players; and Art. 11, Sec. 7 (p. 22) (captioned "Per-diem me-too") provides that, if the Men's National Team per diem rates increase before the end of 2021, the WNT per diem rates shall increase to the same amount(s).  *Id.*  Art. 19, Sec. C-1 (captioned "Ticket Share") provides for a $1.50/paid ticket payment to the WNTPA for each Federation home game in which the WNT participates, and provides that this "base per-paid ticket rate" shall increase to the same amount of any increase in Men's National Team base per-paid ticket rates before the end of 2021.  *Id.*, p. 42.

and working conditions;[51] (ii) in the WNTPA negotiations and resulting CBAs, the WNTPA and the Federation had the ability to make express reference to the Men's National Team agreement and could propose or agree to similar or identical contract terms; and (iii) in the absence of doing so, the wages, benefits and other employment terms applicable to the female WNT bargaining unit would be governed exclusively by the WNTPA labor contract, without regard to contract provisions in the Men's National Team agreement.[52]

(b) *The Binding Nature of WNTPA Contracts for Their Entire Term*.  The original 2000-2004 CBA, similar to subsequent contracts, stated it was "the product of bona fide, arm's length collective bargaining."[53]  It also had a fixed duration, which the 2000-2004 CBA stated was "retroactive to and shall be effective from February 1, 2000 and shall remain in full force and effect through December 31, 2004."[54]  In 2005, the WNTPA and the Federation reached agreement on a successor agreement, the 2005-2012 CBA, which stated it was "retroactive to and shall be effective from January 1, 2005 and shall remain in full force and effect through December 31, 2012."[55]

In 2013, the WNTPA and the Federation reached agreement on a 2013-2016 CBA, which was memorialized in a signed 8-page Memorandum of Understanding ("2013 MOU") and a one-page "Financial Terms" sheet.[56]  The 2013 MOU provided for a four-year CBA retroactive to January 2013, which ran through 2016, and the parties agreed that "items . . . not specifically

---

[51] There is no question that the WNTPA and WNT players had an awareness of the Men's National Team contracts and similarities and differences that exist between Women's and Men's professional soccer.  Not only could this be presumed from the media attention given to women's and men's soccer, and from interaction between the Women's and Men's National Team members (and their respective union representatives), the 2017-2021 CBA contains the two "me-too" provisions (described in note 50 above) which make express reference to potential changes that might be agreed upon in future Men's National Team collective bargaining.  The record also indicates that WNTPA representatives and female WNT players were familiar with compensation arrangements and other practices in Men's professional soccer.  *See* text accompanying notes 99-105, below.

[52] A standard principle of contract construction is the rule that "the expression of one thing is the exclusion of another," which was explained as follows in Kenneth May, ed., ELKOURI & ELKOURI, HOW ARBITRATION WORKS (8th ed. 2016): "Thus, contracts that specify certain exceptions *imply that there are no other exceptions*, and those that expressly include some guarantees in an agreement *are thought to exclude other guarantees*."  *Id.* § 9.3.A.xi (emphasis added; footnotes omitted).

It is not a startling proposition to suggest that the WNTPA, the WNT players and the Federation intended that their wages, benefits and other employment terms would be governed exclusively by the WNTPA labor contract, because this is exactly what the 2017-2021 CBA expressly states.  Article 27 in the 2017-2021 CBA reads: "The Federation and the Players Association acknowledge and agree that this Agreement and the Exhibit attached to this Agreement represent *the entire agreement and understanding between the parties* and supersede any prior agreement, prior understanding or prior negotiations respecting any matters covered by this Agreement and the Exhibit." 2017-2021 CBA, Art. 27, p. 50 (emphasis added).  Similar "complete agreement" provisions were contained in the prior WNTPA contracts.

[53] 2000-2004 WNT CBA, Preamble, p. 1; 2005-2012 WNT CBA, Preamble, p. 1; 2013 MOU (no provision modifying 2005 CBA's Preamble); 2017-2021 WNT CBA, Preamble, p. 1.

[54] 2000-2004 WNT CBA, Art. II, p. 1.

[55] 2005-2012 WNT CBA, Art. II, p. 1.

[56] 2013 MOU.

covered in the [MOU] would remain the same as under the prior CBA, but with appropriate increases/adjustments/changes."[57]  The terms of the "2013-2016 CBA" were agreed upon, signed and confirmed in writing, and the parties never subsequently prepared a more formal 2013-2016 CBA document.[58]

In July 2015, the U.S. Women's National Team won the World Cup.[59]  Subsequently, in December 2015 – 7 months before the Olympics and 12 months before the 2013-2016 CBA's expiration – the WNTPA gave written notice to "terminate and or modify, if applicable" the 2013-2016 CBA and/or the 2013 MOU.[60]  The WNTPA notice described the 2013 MOU as a "guide" and suggested there was "the absence of a collective bargaining agreement."[61]  These events were later described by the U.S. District Court for the Northern District of Illinois as follows:

> The Players Association represented that it believed that there was no CBA in place and that the MOU was terminable at will. . . .  *It also refused to agree that it would not engage in a strike or other job action prior to December 2016, and during the pendency of this action represented to the media that it was possible that the players "will have to strike."*[62]

In January and February 2016, the WNTPA attempted to renegotiate better terms than those set forth in the 2013-2016 CBA.[63]

On February 3, 2016, after the WNTPA indicated that it did not believe it was bound by the 2013-2016 CBA (including any no-strike commitment), with suggestions that a strike by WNT players could affect the Olympics,[64] the Federation filed a lawsuit against the WNTPA in federal court.[65]

On April 6, 2016, five WNT players filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that the Federation had engaged in sex discrimination in connection with their compensation in violation of Title VII of the Civil Rights Act of 1964 and the Equal Pay Act ("EPA").[66]

---

[57] Langel Dep., Exh. 31 (email dated March 19, 2013 from Ruth Uselton to Sunil Gulati).

[58] Langel Dep. at 48.

[59] FIFA, Women's World Cup Canada 2015 (available at https://www.fifa.com/womensworldcup/matches/round=268012/match=300269506/index.html).

[60] Deposition of Rich Nichols ("Nichols Dep."), Exh. 17 (email dated Dec. 24, 2015 from Richard M. Nichols, WNTPA Executive Director/General Counsel, to Lisa Levine, Federation General Counsel, attaching letter dated Dec. 23, 2015).

[61] *Id.*

[62] *Soccer Federation*, 190 F. Supp. 3d at 783.

[63] *Soccer Federation* Complaint, Exhs. J-O.

[64] *Id.*

[65] *Soccer Federation* Complaint.

[66] 42 U.S.C. §§ 2000e et seq.; 29 U.S.C. § 206(d).

On June 3, 2016, in the Federation's lawsuit seeking to enforce the 2013-2016 CBA, the U.S. District Court for the Northern District of Illinois entered judgment in favor of the Federation, and found that the 2013-2016 CBA (including its no-strike clause) remained in effect through December 2016.[67]  The court took judicial notice of the EEOC charges filed by the WNT players without considering the merits of the players' discrimination claims, although the Court observed that "this action and the EEOC complaint likely share a common impetus."[68]

In July 2017, the WNTPA and the Federation entered into the 2017-2021 CBA, which states its duration "shall be from January 1, 2017 through December 31, 2021."[69]  There is no substantive change in the bargaining unit described in the 2017-2021 CBA's recognition clause.[70]  Like prior CBAs dating back to 2001, the Preamble states the agreement "is the product of bona fide, arm's length collective bargaining,"[71] and the 2017-2021 CBA contains an "Integration, Entire Agreement" provision, which states in relevant part:

> The Federation and the Players Association acknowledge and agree that *this Agreement and the Exhibit attached to this Agreement represent the entire agreement and understanding between the parties and supersede any prior agreement, prior understanding or prior negotiations respecting any matters covered by this Agreement and the Exhibit*. No term of this Agreement or of the Exhibit to this Agreement shall be modified, altered, or amended except in a writing signed by both the Federation and the Players Association.[72]

The "Exhibit" referenced in the above-quoted language is the one-page "Exhibit A" appended to the 2017-2021 CBA, which is captioned "WNT CBA Financial Terms," and sets forth the compensation amounts applicable to WNT players for the CBA's term.

The course of bargaining described above, and the successive CBAs that have resulted from bargaining, establish that the 2013-2016 and the 2017-2021 CBAs reflected a mutual understanding that the parties' contractual rights and obligations would be unchanged for the entire term of each agreement.  Indeed, as noted above, this was the subject of litigation in relation to the 2013-2016 CBA, after the WNTPA's unsuccessful attempt to repudiate that contract and renegotiate more favorable terms roughly one year prior to the 2013-2016 CBA's expiration. Moreover, the litigated resolution of this controversy occurred within a short period of time before the parties negotiated and entered into the 2017-2021 CBA.  Therefore, it is reasonable to believe that the parties understood it was important to avoid a misunderstanding about whether any new contract would be binding for its entire stated term; and there is no indication in the 2017-2021 CBA that one party or the other reserved a right to reopen or renegotiate all or part of the agreement prior to its expiration.  Accordingly, I believe the 2017-2021 CBA reflects a mutual

---

[67] *Soccer Federation*, 190 F. Supp. 3d at 783, 787.

[68] *Id.* at 783 n.1.

[69] 2017-2021 WNT CBA Art. 2, p. 1.

[70] *Id.*, Art. 1, p. 1.

[71] *Id.*, Preamble, p. 1.

[72] *Id.*, Art. 27, p. 50 (emphasis added).

understanding that the agreed upon terms would remain applicable throughout the contract's term.[73]

(c) *Tradeoffs, Priorities, Compromises and the Bargaining Process*.  The WNTPA bargaining and the resulting CBA, including the 2017-2021 CBA and the 2013-2016 CBA, reveal the existence of complex tradeoffs, priorities, compromises and concessions.

For example, Exhibit A to the 2017-2021 CBA establishes a player signing bonus ($230,000, distributed to 23 players at $10,000 each); annual base compensation for WNT contract players ($100,000); two tiers of "camp fees" for non-roster players (which vary further depending on whether the camp lasts more than 10 days); two tiers of "game appearance fees" for non-contract players (which increase in successive seasons and are highest in World Cup matches); an array of incentive payments for "Friendly" games (in which the amounts vary depending on whether the WNT wins or ties and depending on the opposing team's FIFA ranking); bonuses for winning the She Believes and Four Nations Tournaments; World Cup games (which involve different incentives for wins or ties in Qualifying games, separate qualification and roster bonuses, and additional bonus incentives for 1st, 2nd and 3rd place, among other things), and Olympic games (involving a breakdown similar to World Cup games but different amounts); payments tied to post-World Cup and/or post-Olympics tour games (if the WNT wins a gold, silver, or bronze medal at the World Cup and/or Olympics, with different payments depending on the medal); and two tiers of "per diem" amounts (applicable within and outside the U.S., respectively).  The 2017-2021 CBA also provides for payments to the WNT players based on increases in prize money the Federation receives from FIFA (the Fédération Internationale de Football Association).[74]

Other provisions in the 2017-2021 CBA address additional payments by the Federation to the WNTPA, including "viewership" bonuses (if specified networks exceed the prior year's viewership by 10 percent or more), "enhanced attendance" bonuses (involving increased ticket price sharing if attendance at certain Federation WNT games exceeds 17,000), "sell-out" bonuses (in games where 98.5% of available tickets are sold), and additional "partnership" payments payable to the WNTPA if SUM (Soccer United Marketing) revenues exceed specified targets.  The CBA also contains important provisions addressing the use of individual and group player likenesses (which includes a $350,000 annual payment to the WNTPA for the use of such

---

[73] My observations relate to the parties' contractual obligations, and I do not discount the fact that, during the term of the 2013-2016 CBA, WNT players filed EEOC charges alleging Equal Pay Act and Title VII violations by the Federation, and after the 2017-2021 CBA went into effect, WNT players have continued to pursue these claims in federal court.  Nonetheless, the 2017-2021 CBA unequivocally states it shall remain in effect through December 31, 2021; the CBA addresses certain potential contingencies relating to other subjects (e.g., the limited-scope "me-too" provisions described in note 50 above); the CBA makes no reference to pending legal claims or to potential changes that might be required based on the resolution of such claims; nor is there any type of contractual "reopener" provision reflecting an understanding that one party or the other can request or make midterm changes.  These considerations support a conclusion that, as a contractual matter, the mutual understanding reflected in the 2017-2021 CBA was that the agreed-upon obligations would be binding for the CBA's entire term.

[74] 2017-2021 WNT CBA, Art. 19, Sec. D, p. 43.

likenesses), in addition to provisions dealing with endorsements, marketing, licenses, memorabilia, player appearances, and other types of promotion.

The WNTPA compensation structure is complicated further by contract provisions which reveal that the U.S. Soccer Federation heavily subsidizes the National Women's Soccer League ("NWSL"). Under the 2017-2021 CBA, not only does the Federation pay WNT "contract" players their WNT compensation and benefits (in addition to paying "non-contract" WNT players their appearance fees), the Federation also "allocates" a required minimum number of players to the NWSL, and the Federation also pays these "allocated" players their NWSL salaries. The 2017-2021 CBA's Exhibit A also establishes two tiers of annual compensation for 22 NWSL players (with 11 players in the upper tier, and 11 players in the lower tier); and the CBA provides for the Federation to pay any post-season NWSL bonuses that end up being payable to NWSL players who have been "allocated" by the Federation.

The 2017-2021 CBA sets minimum numbers of WNT "contracted" players who must be selected each year; and as indicated above, the CBA sets minimum numbers of WNT players who must be offered "allocation" to NWSL teams (i.e., the WNT players who accept such "allocations" play for the particular NWSL teams during the NWSL season). As noted above, the Federation is responsible for paying the compensation and benefits payable to WNT "contracted" players *and* the compensation payable to the NWSL "allocated" players. Under the 2017-2021 CBA, WNT players may decline NWSL "allocation" offers, although there are limits on the number of WNT players who may decline these offers, and the contract prescribes the time period over which such offers can be declined.

The CBAs resulting from WNTPA bargaining reveal that the parties attached significant weight to contract provisions giving WNT and NWSL players various types of economic security, including the following examples:

- The dual compensation scheme established in the WNT CBAs produces a matrix of players – all afforded different types of protection – depending on whether or not they are under "contract" with the WNT (a WNT "contracted" player) and whether or not they are "allocated" to the NWSL.

- Thus, the 2017-2021 CBA applies to four different types of players: (1) WNT Contracted/NWSL Allocated Players, (2) WNT Contracted/ NWSL Non-Allocated Players, (3) WNT Non-Contracted/NWSL Allocated Players, and (4) Non-Contracted/ NWSL Non-Allocated Players.

- The 2017-2021 CBA requires a minimum number of "WNT Contracted Player" positions (20 players in 2017, and decreasing by 1 each year, resulting in a 16-player minimum in 2021). These WNT "contracted" players receive the annual base compensation and benefits.

- The 2017-2021 CBA also requires a minimum number of "NWSL Allocated Player" positions. These positions also receive an annual salary (Tier 1 or Tier 2). The U.S. Soccer Federation pays for these salaries.

- The 2017-2021 CBA provides additional compensation security if the NWSL ceases to exist, in which case the WNT Contracted Player annual base compensation will increase by 50%, with amounts earned playing for a club team outside the U.S. offset against that increase.

- Similar provisions were contained (in a slightly more simplified fashion) in the 2013-2016 CBA, which required a minimum of 24 WNT "contract" players (with three salary tiers) and benefits; it specified the salary amount for NWSL players, including an increase in WNT salaries if the NWSL ceased to exist; and the parties agreed (in the 2013 MOU) that the WNT CBA would cover players who participate in the WNT and the NWSL "so WNT Players will not need to enter into a contract with the NWSL."[75]

The WNT CBAs also reflect the importance that the parties placed on compensation and benefit protection in situations when players could not play based on injuries or other medical conditions, including pregnancy, or when the coach decides not to put a player on the team:

- The 2017-2021 CBA provides that, if a WNT "contracted" player is injured, the Federation must continue to pay the player 100 percent of her salary and benefits for 1 year or the length of the injury (whichever is shorter), and if the same player is "allocated" to the NWSL, the Federation must also pay 100 percent of the player's NWSL salary for the same amount of time and perhaps longer.[76]

- If a WNT "non-contracted" player who is "allocated" to the NWSL is injured during NWSL play, the CBA provides that she will continue to receive her NWSL salary for one season or the duration of the injury.[77]

- If a WNT "contracted" player is injured during non-NWSL club play, the CBA provides for a shorter compensation and benefits continuation period (three months or the duration of the injury, whichever is shorter).[78]

- For WNT "contracted" players who become pregnant and are medically unable to work, the Federation pays the player 75 percent of her WNT salary, plus benefits, and, if she is "allocated" to the NWSL, 75 percent of her NWSL allocated salary, for one year or the period of disability (whichever is shorter).[79]  In the event of pregnancy, a

---

[75] 2013 MOU, p.1.

[76] 2017-2021 WNT CBA, Art. 6.D.1, p. 5; Roux Dep., Exh. 6 (Jan. 31, 2018 Letter of Understanding re WNT Contract and NWSL Allocation Rights of Injured WNT Contracted Players).

[77] *Id.*, Art. 9.E.3, p. 16.

[78] *Id.*, Art. 9.E.4, pp. 16-17.

[79] *Id.*, Art. 12.C.1, pp. 23-24.

WNT Non-Contracted/NWSL Allocated Player receives 75 percent of her allocated NWSL salary for the season of the period of disability (whichever is shorter).[80]

- The 2017-2021 CBA divests the Federation of any right to terminate any player's status as a WNT Contracted Player while the player is unable to render services due to pregnancy, injury, or illness.[81]

- The 2017-2021 CBA also provides for eligible WNT Contracted Players to receive severance pay in the amount of one month plus an additional month's severance for each additional 12 consecutive months she was a WNT Contracted Player (up to a maximum of 4 months' severance).[82]

- The 2013-2016 CBA also provided various types of protection to WNT and NWSL players in the event of injury, pregnancy or severance.[83]  The 2017-2021 CBA and the 2013-2016 CBA reveal that the parties have progressively attached importance to increased security and protection, in comparison to the 2000-2004 and 2005-2012 CBAs.[84]

Process-related issues associated with the WNTPA negotiations, and available information regarding the parties' conduct, views and proposals exchanged in negotiations, reveal that the content of the resulting CBAs resulted from choices made by the WNTPA and the Federation among many different priorities, tradeoffs, compromises and concessions.

As an initial matter, it is significant that the 2012-2013 and 2016-2017 negotiations between the WNTPA and the Federation both resulted in an agreement, even though negotiations persisted beyond the prior contract's expiration.  In each round of bargaining, therefore, the WNTPA and the Federation made conscious decisions that entering into the resulting CBA was a better option than continuing negotiations and/or resorting to a strike, lockout or other economic weapons in the hope that this might produce more advantageous contract terms.

Several other aspects of the bargaining between the WNTPA and the Federation reveal that the two sides had substantial differences based on their respective competing concerns, and both sides made compromises and concessions in different areas that permitted the parties to reach their successive CBAs.  This is illustrated by the following examples:

---

[80] *Id.*, Art. 12.D.3.c, pp. 14-15.

[81] *Id.*, Art. 10.J, p. 20.

[82] *Id.*, Art. 8.A.2, pp. 11-12.

[83] 2013 MOU, pp. 3-4.

[84] The 2000-2004 and 2005-2012 WNT CBAs provided no continuation of compensation and benefits in the event of an injury that prevented players from working.  The 2005-2012 CBA provided compensation and benefits continuation of 50 percent of salary in the event of pregnancy-related disability, and severance ranging up to a maximum of 3 months.  2005-2012 WNT CBA, Exh. A, Sec. II.F; *id.*, Exh. A, Sec. I.O. The 2000-2004 CBA provided no compensation and benefits continuation in the event of pregnancy-related disability, and more onerous eligibility requirements in relation to severance pay.  2000-2004 WNT CBA, Exh. A, Sec. I.A.1.c.

(1) *Federation/NWSL "Allocation" Arrangement*.  Again, a major factor in the WNTPA bargaining since 2012 involved the "newly-formed" NWSL.[85]  In the 2012-2013 bargaining, the Federation initially proposed the existence of separate contracts governing WNT players and NWSL players, respectively, but the WNTPA insisted on a single contract governing WNT and NWSL compensation, or at least that the Federation be a signatory or guarantor to both contracts.[86]  Some WNT players reportedly favored having a new league, but they "did not want to be employees of the new league and wanted to be employees only of U.S. Soccer, . . . and they wanted to have all the same injury protections, pregnancy protections, severance protections, all of that."[87]  The Federation initially proposed only to fund two players per NWSL team, but the 2013 MOU (memorializing changes to be made in the 2013-2016 CBA) ultimately provided that the Federation would fund the NWSL salaries of all WNT players, whose compensation for WNT games *and* NWSL games would be governed by the 2013-2016 CBA.[88]

(2) In the 2016-2017 bargaining, some WNT players reportedly considered the possibility of having separate WNT and NWSL contracts (as an alternative to the single-contract "allocation" arrangement which made the Federation responsible for WNT compensation/benefits and for the separate compensation/benefits paid to "allocated" NWSL players), but the WNTPA was concerned that separate contracts would create too much player risk if the Federation stopped providing financial support to the NWSL.[89]

(3) *"Pay-to-Play" versus More Wage/Benefits Guarantees*.  In the 2016-2017 bargaining, the Federation proposed a "pay-to-play" compensation structure that more closely resembled the arrangement applicable to the Men's National Team (which had no "contract" players, and with compensation more heavily focused on paying players who participated in particular games and tournaments).[90]  The WNTPA opposed a pay-to-play structure because it was a "different environment" and there were doubts about the stability of the NWSL.[91]  In contrast with the Men's National Team, the WNTPA expressed the view that its members "need[ed] minimum annual guarantees because we do not have a strong [National Womens Soccer] league,"[92] and that "the success of the Women's National Team comes from the security provided by US Soccer, that allocated contracts and Women's National Team contracts allow players to

---

[85] *Soccer Federation*, supra note 46, 190 F. Supp. 3d at 782.

[86] Deposition of Sunil Gulati ("Gulati Dep.") at 69.

[87] Langel Dep. at 83.

[88] *Id.* at 118; Langel Dep. Exh. 7, p. 2 (WNTPA Nov. 5, 2012 bargaining notes).

[89] Nichols Dep. at 81, 150; Oct. 26, 2016 bargaining notes, p. 24, USSF_Morgan__005661.

[90] Nichols Dep. at 101.  In general, the Federation expressed that it favored having fewer contract players. *See* Deposition of Kelley O'Hara ("O'Hara Dep.") at 131-33; March 10, 2017 bargaining notes, p. 111, USSF_Morgan_005748.

[91] Nichols Dep. at 112; May 16, 2016 bargaining notes, p. 14, USSF_Morgan_005651.

[92] Nichols Dep. at 148.

focus solely on soccer."[93]  The WNTPA insisted on a minimum compensation guarantee of $100,000 per year (either a minimum guarantee of 20 games per year with a $5,000 roster appearance fee per game, or a $100,000 minimum annual salary).[94]  The WNTPA then made an even higher $125,000 annual base compensation proposal, which the Federation successfully opposed.[95]  Ultimately, the 2017-2021 CBA incorporated the $100,000 minimum annual salary (for WNT Contracted Players), with the CBA only making an indirect (hypothetical) reference to the potential adoption of a "pay-to-play system beginning in 2022" (i.e., if adopted by the parties as part of a successor agreement to the 2017-2021 CBA).[96]

The 2013-2016 CBA reflected a similar emphasis on employment security, with provisions that required 24 WNT "contract" players, each receiving guaranteed annual WNT compensation (three different tiers), plus Federation–provided compensation to players allocated to the NWSL, but with a single contract encompassing both arrangements.[97]  During the 2012-2013 bargaining, Federation representative Lisa Levine indicated that the Federation's proposal was revised "to reflect the priorities as expressed by the [WNTPA], namely to increase the guaranteed compensation at the expense of non-guaranteed compensation (the bonus payments)."[98]

(4)  *Comparisons to the Men's National Soccer Team Contract.*  In the 2016-2017 bargaining, the WNTPA insisted on an annual $100,000 base compensation guarantee, rather than a "pay-to-play" structure that more closely resembled the arrangement applicable to the Men's National Team, because "[t]he men's primary source of income was the international teams they play for," which meant they "did not see their participation on the U.S. National Team as their primary source of revenue and income," and the WNT players did not have the same option of a reliable, primary source of income from a professional league.[99]  The WNTPA never proposed a pay-to-play structure, as an alternative to full-time contracts.[100]  Although the WNTPA was interested in "a deal that as a baseline would allow [the WNT players] to earn the same amount or have the same opportunity to earn the same amount as the men," the WNTPA also sought "obviously different" provisions addressing "injury protection and maternity leave

---

[93] O'Hara Dep. at 139-140.

[94] Nichols Dep. at 111-113 and Exh. 33.

[95] Deposition of Rebecca P. Roux ("Roux Dep."), Exh. 36; Deposition of Megan Rapinoe ("Rapinoe Dep.") at 222-223.

[96] 2017-2021 CBA, Art. 8.A.2, p. 11 ("At the end of 2021, if the Parties were to adopt a straight pay-to-play system beginning in 2022, no WNT Contracted Players would be entitled to severance."); *id.,*  Exh. A, p. 53 (referencing annual minimum $100,000 base compensation for WNT Contract Players).

[97] 2013 MOU, pp. 1-2, 7.

[98] Langel Dep. at 185-86, and Exh. 20.

[99] Nichols Dep. at 117-118.

[100] O'Hara Dep. at 133 ("We understand . . . [the Federation] ultimately do[es] not want full-time contracts, but it's too soon to go there completely.  That would need to be something that evolves."); March 10, 2017 bargaining notes, p. 111, USSF_Morgan_005748; see also O'Hara Dep. at 142-143.

and things that we found important to put in the deal or ask for, so we asked for
them."[101]   WNTPA representative David Feher expressed that the WNT players
wanted "pay equal to the men but we haven't made any bones that certain instances
would be different between the WNT and the MNT."[102]   To the same effect, WNTPA
member Megan Rapinoe (who served on the WNTPA CBA committee during the 2017
bargaining) stated in a 2019 interview: "Our pay structure is different.  We play
different games.  We're different rankings in the world, like it's just apples to
oranges."[103]

In the 2012-2013 bargaining, the WNTPA opposed having a "hybrid" model regarding
the rights to "group likenesses" (under which the Federation owned the rights, but
individual players could negotiate their own sponsorship deals).[104]   The WNTPA
opposed this model based on the risk that sponsors would refrain from entering into
player sponsorship arrangements, in favor of substituting the use of "group
likenesses" controlled by the Federation.[105]

(5)   *Other Differences, Tradeoffs, and Compromises*.  In the 2016-2017 bargaining, the WNTPA
– in addition to proposing $100,000 guaranteed base annual compensation – also
proposed to eliminate the tiered compensation structure that existed in prior CBAs.[106]
The 2017-2021 CBA incorporated the $100,000 guaranteed base annual compensation
for WNT Contracted Players, but retained the tiered compensation structure
applicable to NWSL annual compensation and non-contract player appearance fees
(with higher compensation paid after a player's seventh roster appearance).[107]
Rapinoe acknowledged the potential tradeoffs by which lower annual base
compensation could result in higher "win" or "tie" bonuses.[108]   Representatives for
both sides indicated that the 2016-2017 bargaining focused on "the overall deal" in
terms of the total costs to the Federation and the benefits provided to the players.[109]
For example, the Federation agreed to the WNTPA's demand for a guaranteed
minimum number of single-occupancy hotel rooms, but stated (i) this would add
additional cost to the collective bargaining agreement, (ii) there was still a $1.6 million
gap, and (iii) the WNTPA needed to find $500,000 to reduce the overall cost of the

---

[101] Rapinoe Dep. at 192; *see also id.* at 252-54.

[102] Nichols Dep. at 147.

[103] Rapinoe Dep. at 284-288.

[104] Langel Dep. at 135-37, 150-52.

[105] *Id.*

[106] Nichols Dep. at 84, 92-93; Rapinoe Dep. at 148.

[107] 2017-2021 CBA, p. 53, Exh. A.

[108] Rapinoe Dep. at 223 (agreeing that "you don't know what kind of win or tie bonus you could have achieved
if you had reduced the annual-based [sic.] compensation even further" and stating "I suppose if it went down or up,
the other numbers would change as well.").

[109] O'Hara Dep. at 138-139; Gulati Dep. at 195-196; Nichols Dep. at 148; Oct. 26, 2016 bargaining notes, p. 23,
USSF_Morgan_005660.

contract.[110]  The length of season was an additional significant issue in the 2016-2017
bargaining, and the WNTPA successfully negotiated a reduction in the number of
post-World Cup/Olympic victory tour games (if the WNT finished first, second or
third).[111]  Representatives for both sides in bargaining expressed a willingness to
consider spending more money in some areas if the other side accepted less money in
other areas.[112]  For example, a Federation compensation proposal exchanged on March
16, 2017 contained higher bonus amounts in several areas than had been requested by
the WNTPA in its earlier proposal presented to the Federation on February 14, 2017.[113]

Similar tradeoffs and compromises emerged in the 2012-2013 bargaining, which
included the WNTPA's opposition to the focus in prior contracts on "replication"
(which tied compensation increases to WNT players on "replicating" their on-field
success rate during the preceding contract).[114]  The WNTPA opposed the "replication"
concept, the continuation of which had been proposed by the Federation,[115] because it
penalized the players for their past success, which prompted the WNTPA to demand
and reach agreement on "some things that were new."[116]  The WNTPA wished to
narrow the gap between gold medal and silver/bronze medal bonuses in World Cup
and Olympic tournaments (based in large part on the WNT players' experience in the
2011 World Cup, where they placed second based on a shootout, resulting in
significantly smaller bonuses), which the parties discussed addressing with an
"appropriate increase" in the silver/bronze bonuses even though "the gold [medal
bonus] might be less."[117]  Like the 2016-2017 bargaining, the 2012-2013 bargaining
included certain trade-offs.  For example, the Federation agreed to the WNTPA's
demand for ticket revenue-sharing in exchange for the WNTPA's abandonment of
demanded win/tie bonus payments during non-medal rounds of the World Cup and
Olympics.[118]

As a final matter, the "process" issues that are relevant when examining collective
bargaining conduct under the NLRA reinforce a conclusion that, in negotiations between the
WNTPA and the Federation, both sides were ably represented in bargaining that was regular and
even-handed.  In other words, as stated in the successive WNTPA CBAs, the contracts resulted

---

[110] April 2, 2017 bargaining notes, USSF_Morgan_005777, p. 140.

[111] Rapinoe Dep. at 156-157 ("It's a massive grind. . . . Too many games to earn the bonus for the victory
tour.").  *See also* Nichols Dep. at 81.  Under the 2013-2016 CBA, a minimum of 10 "Victory Tour" games followed a gold
medal win, which was reduced in the 2017-2021 CBA to 4 games.  *See* 2013 MOU, p. 3; 2017-2021 WNT CBA, Art. 19, p.
43 and Exh. A, p. 53.

[112] O'Hara Dep. at 145-146.

[113] Roux Dep., Exhs. 32 and 36; Rapinoe Dep. at 218-223; O'Hara Dep. at 144-145.

[114] Langel Dep. at 139.

[115] *Id.* at 139, 169-170.

[116] *Id.* at 170.

[117] *Id.*  at 146-147.

[118] Langel Dep. at 166.

from "bona fide, arm's length collective bargaining."[119]  The 2016-2017 bargaining, which produced the 2017-2021 CBA, resulted from approximately 25 meetings,[120] WNT players attended the majority of the meetings,[121] the WNTPA's representatives included its Executive Director/General Counsel Rich Nichols (in 2016), who was succeeded by experienced lawyers from Bredhoff & Kaiser, one of the most well-known union-side law firms in the country that focuses on labor relations issues; the Federation was represented in meetings by senior executives (Tom King, Managing Director of Administration; Lisa Levine, General Counsel; Dan Flynn, CEO; Sunil Gulati, President; and/or outside counsel Russell Sauer); the parties exchanged numerous proposals and counterproposals, with meaningful exchanges of information and movement on both sides, resulting in an agreement (memorialized in the 2017-2021 CBA), which was ratified unanimously by the WNT players.[122] These factors are consistent with responsible bargaining by capable representatives who negotiated with the intention of entering into a binding agreement.

The parties' 2012-2013 bargaining, which produced the 2013-2016 CBA, involved fewer meetings and less formality.[123]  However, there were approximately six face-to-face discussions;[124] both parties had representatives who were vested with authority to enter into agreements, including WNTPA representative John Langel (a Ballard Spahr attorney experienced in labor relations who represented the WNTPA dating back to its creation)[125] and at least one WNT player representative who attended almost every meeting.[126]  It appears to be true that "congenial relations between [Federation] and the Players Association were the rule of the day while Langel was general counsel."[127]  However, the 2012-2013 bargaining required the parties to address complex issues that had profound importance for both sides, including challenges associated with "integration of the [WNT] into the newly-formed [NWSL]."[128]  The Federation's participants also included senior officers (Sunil Gulati, President; Tom King, Managing Director of Administration; Lisa Levine, General Counsel; and Dan Flynn, CEO); both sides made proposals and counterproposals and engaged in movement, resulting in the 2013-2016 CBA.  As noted previously, the WNTPA challenged the existence and enforceability of the 2013-2016 CBA, which

---

[119] 2017-2021 WNT CBA, Preamble, p. 1; 2013 MOU (no provision modifying 2005-2012 WNT CBA Preamble); 2005-2012 WNT CBA, Preamble, p. 1; 2000-2004 WNT CBA, Preamble, p. 1.

[120] Gulati Dep. at 192.

[121] Nichols Dep. at 47.

[122] Roux Dep." at 48-49.

[123] In the 2016 litigation, the court observed that "congenial relations between [the Federation] and the Players Association were the rule of the day while Langel was general counsel." *Soccer Federation*, 190 F. Supp. 3d at 785.

[124] Langel Dep. at 49, 51-52.

[125] *Soccer Federation*, 190 F. Supp. 3d at 781; *see also* Langel Dep. at 7-13.

[126] Langel Dep. at 63.

[127] *Soccer Federation*, 190 F. Supp. 3d at 785.

[128] *Soccer Federation*, 190 F. Supp. 3d at 781-782; *see also* note 75 and accompanying text, *supra*.

was the subject of court litigation in 2016, resulting in a decision upholding and reaffirming the 2013-2016 CBA.[129]

These considerations support a conclusion that the parties' conduct and resulting CBAs have involved arm's-length negotiations, reasonable bargaining conduct, and conscious choices that are typical in collective bargaining.[130]

(d) *Economic Weapons and Leverage*.  Bargaining between the WNTPA and the Federation indicates that both sides have endeavored to negotiate terms most favorable to themselves, and after significant compromises, the parties have entered into multi-year contracts stating they "shall remain in full force and effect" for terms ranging up to eight years.[131]

Consistent with the structure of federal labor laws, as noted above, each party's retreat from its most aggressive demands necessarily involved some consideration of leverage.  Again, this requires parties to focus on the relevant bargaining unit (in this case, WNT players, many of whom are also allocated to NWSL teams).  And in each round of bargaining, there was a risk that one party or the other would resort to a strike, lockout, or other forms of pressure if either party chose not to enter into an agreement.

The role played by leverage and potential resort to economic weapons was most clearly evident in the WNTPA's unsuccessful efforts in December 2015 to terminate the 2013-2016 CBA and negotiate more favorable contract terms.  As noted previously, this occurred roughly six months after the WNT won the World Cup (in July 2015), it occurred roughly seven months before many WNT players would be participating in the Olympics, and it occurred roughly one year before the 2013-2016 CBA's scheduled expiration.

The court ruling upholding enforceability of the 2013-2016 CBA – and the no-strike clause that was part of that agreement – prevented the WNTPA and its members from engaging in a work stoppage until the end of 2016.  However, when the WNTPA and the Federation engaged in their next round of bargaining, either side could have *refrained* from entering into the 2017-2021 CBA based on a judgment that its terms were unacceptable.  Each side's decision to enter into the 2017-2021 CBA – including tradeoffs, compromises and concessions rather than more advantageous provisions that the parties may have desired – reflected a judgment that the party's interests were better served by entering into the agreement, rather than being exposed to potentially greater risks associated with the absence of an agreement.

---

[129] *See* text accompanying notes 60-68 above.

[130] *See, e.g., Management & Training Corp.*, 366 NLRB No. 134, slip op. at 4 (2018) (considering "the totality of an employer's conduct and the circumstances, including factors such as the substance and timing of bargaining proposals, the parties' bargaining history, whether and how the employer explains its proposals, and other evidence of its intent"); *Mid-Continent Concrete*, 336 NLRB 258, 259-60 (2001), *enforced sub nom. NLRB v. Hardesty Co.*, 308 F.3d 859 (8th Cir. 2002) (considering the totality of the conduct, including bargaining demands, tactics, efforts to bypass the bargaining representative, and other factors); *Audio Visual Services Group, Inc.*, 367 NLRB No. 103 (Mar. 12, 2019) (same).

[131] The 2000-2004 WNT CBA had a five-year term; the 2005-2012 WNT CBA had an eight-year term; the 2013-2016 WNT CBA had a four-year term; and the 2017-2021 WNT CBA has a five-year term.

Taking all of the above considerations into account, I believe the bargaining history between the WNTPA and the Federation and the resulting CBAs are consistent with the federal labor law principles described above, and they are consistent with the types of tradeoffs, compromises and choices that have been typical in collective bargaining negotiations, labor contracts, and labor-management disputes generally.

2.   The complex tradeoffs, compromises and choices reflected in the WNTPA labor contracts make it extremely difficult to conduct any kind of meaningful point-by-point comparison of similarities and differences between those agreements and provisions contained in the U.S. Soccer Men's National Team agreements.

For several reasons, the tradeoffs, compromises and choices reflected in the WNTPA labor contracts – many of which are unique and specific to the Women's National Team – make it extremely difficult to engage in a meaningful point-by-point comparison of similarities and differences between WNT agreements, on the one hand, and provisions contained in the U.S. Soccer Men's National Team agreements, on the other.

First, the WNT labor contracts reveal that the agreements are inextricably connected to the unique structure and complex interrelationship between the WNT (which competes against other national teams *outside* of the U.S.) and the NWSL (which sponsors multiple teams *within* the U.S.). The NWSL's creation provided important opportunities for WNT players, because – unlike Men's National Team players – the WNT players had more limited opportunities to play professional soccer in the United States on a year-round basis.  At the same time, WNT players – when faced with the prospect of working out separate arrangements with the NWSL and/or local NWSL teams throughout the country – had significant concerns about whether the NWSL would be financially viable.  Therefore, as noted above, the WNTPA successfully negotiated contract provisions requiring the Federation to heavily subsidize the NWSL's compensation costs, which is an integral part of the 2013-2016 and 2017-2021 CBAs.  Again, these CBAs make the Federation responsible for selecting and paying wages and benefits for WNT players (including "contract" players who have guaranteed annual salaries, and "non-contract" players who are paid appearance fees when they are on the roster); and the same contracts make the Federation responsible for "allocating" a requisite number of WNT contract players and non-contract players to the NWSL, while also making the Federation responsible for paying the NWSL compensation for those players.

Second, the relationship between the Federation and WNT players, on the one hand, and NWSL teams, on the other, create a patchwork of four different player classifications in the 2017-2021 CBA, and each classification is treated differently.  These classifications include WNT Contracted/NWSL Allocated Players, WNT Contracted/NWSL Non-Allocated Players, WNT Non-Contracted/NWSL Allocated Players, and Non-Contracted/ NWSL Non-Allocated Players. These different player classifications exist, in part, because some WNT contract players accept (and desire) the opportunity to be "allocated" to NWSL teams, which provide the opportunity for those players to play professional soccer in the United States on a full-time year-round basis.  Yet, other WNT contract players decline NWSL "allocations," especially when they have the

opportunity to play on non-U.S. club soccer teams during the NWSL season.  Further confusion results from the fact that some WNT "non-contract" players may nonetheless be "allocated" to the NWSL (in which case the Federation pays the prescribed NWSL wages, but the players only receive WNT compensation on a "per game" basis (when they are on the WNT game roster for a particular training camp or match); and as indicated above, some WNT "non-contract" players are also NWSL "non-allocated" players, which means those players (when they are on the WNT game roster) receive WNT compensation on a "per game" basis, for which the Federation is responsible, and those players (when they are on the NWSL game roster) receive NWSL compensation on a "per game" basis, for which the NWSL (or one of its clubs) is responsible.

Third, bargaining between the WNTPA and the Federation has reflected very different priorities and choices by WNT players, and these priorities have significantly affected the CBAs entered into by the WNTPA.  For example, unlike the focus on pay-to-play arrangements applicable to the Men's National Team, the WNTPA has consistently opposed such arrangements in favor of (i) guaranteed annual base salaries for specified numbers of WNT "contracted" players; (ii) guaranteed annual base salaries for specified numbers of NWSL "allocated" players; (iii) compensation increases if the NWSL ceases to exist; and (iv) player protection provisions which, if players are injured, for example, continue wages and benefits in varying amounts ranging up to a year.

Fourth, record testimony reinforces the notion that material differences exist between the preferences and priorities expressed by the WNTPA and WNT players, which are reflected in the 2017-2021 and 2013-2016 CBAS, versus the very different compensation arrangements applicable to the Men's National Team.  For example, the annual $100,000 base compensation guarantee set forth in the 2017-2021 CBA was demanded – as an alternative to a pay-to-play structure that more closely resembled the arrangement applicable to the Men's National Team – because, unlike WNT players, "[t]he men's primary source of income was the international teams they play for," which meant they "did not see their participation on the U.S. National Team as their primary source of revenue and income."[132]  There have been other indications, for example, that the WNT players demanded "pay equal to the men," but at the same time  "haven't made any bones that certain instances would be different between the WNT and the MNT,"[133] or believed: "Our pay structure is different.  We play different games.  We're different rankings in the world, like it's just apples to oranges."[134]

Finally, one cannot disregard the fact that the successive CBAs applicable to women and men, respectively, were *each* the product of complex, separate sets of labor negotiations, and each distinct set negotiations involved (i) different *unions*, and (ii) different *union chief spokespersons*, (iii) different *bargaining units* (meaning *different groups of employees* being represented), (iv)  different *contracts* and different *negotiating histories*, and (v) different *soccer team won-loss records*, resulting in different *expectations* about whether certain levels of success are likely to be

---

[132] Nichols Dep. at 117-118.

[133] *Id.* at 147.

[134] Rapinoe Dep. at 284-288.

realized.[135]  Collective bargaining is inherently unpredictable, there are "countless variables," *Ford Motor Co.*, 345 U.S. at 337-38, and negotiations produce "winners and losers." *Rakestraw*, 981 F.2d at 1530-31.  Especially when successive contracts covering different employees are negotiated by different people affecting different bargaining units, it is predictable that dramatic differences may emerge for legitimate reasons that cannot be reasonably attributed to a single causal factor.

3.  Because the Women's National Team bargaining is structured around a "bargaining unit" that consists of the WNT players, this means those players and the WNTPA in bargaining necessarily focused on of *their own* potential leverage, and the Federation in bargaining would likewise be required to focus on its potential leverage *specific to the WNT players and the WNTPA.*

The labor law principles described above, combined with the WNT contracts and their negotiation history, provide support for several additional observations.

One observation is self-evident: the creation of the WNTPA as an organization consisting entirely of WNT players, and the original CBA's recognition of the WNTPA as the exclusive representative of WNT players, made the interests of WNT players the central focus in bargaining.  This is consistent with the structural importance that the NLRA places on the definition and scope of the "bargaining unit."[136]

The decision by the WNTPA and WNT players to engage in collective bargaining, as a distinct group, had additional practical and legal significance: as a practical matter, this meant that the WNTPA and WNT players could expect bargaining to deal *entirely* with matters that were specific to the Women's National Team.  As a legal matter, the creation of a WNT bargaining unit means that bargaining – and resulting labor contracts – must address wages, hours and working conditions for the WNT players as a distinct group.

The WNTPA's bargaining history also reveals this structure, in many ways, has benefited the parties.  As indicated above, the successive CBAs reveal that the WNT players had unique concerns, interests and priorities that differ materially from arrangements that apply to Men's National Team players.  The WNT players have strongly favored greater protection, and more guarantees, in contrast with pay-to-play arrangements that have been favored by the Men's National Team.  The focus on WNT players has perhaps been most important in the negotiated arrangements by which the Federation heavily subsidizes the NWSL, which is accomplished by the Federation's payment of WNT wages and benefits, in addition to paying NWSL wages to WNT contracted players and non-contracted players who are "allocated" to the NWSL.

---

[135]For example, the U.S. Soccer Men's National Team has *never* placed first in the World Cup (the Team's best performance was a third place finish in 1930) (https://www.fifa.com/mm/document/fifafacts/mencompwc/51/97/30/ip-301_01a_fwc-stats.pdf) so one might reasonably conclude that no cost will be associated with agreeing to an extremely high World Cup win bonus in the Men's National Team agreement.

[136] *See* the text accompanying notes 7-18 above.

The NLRA principles described above also mean that *both sides* were required to evaluate leverage issues specific to the WNTPA bargaining unit when engaging in bargaining over wages, hours and working conditions.  This focus on leverage *relevant to the bargaining unit* is integral to the structure and operation of the NLRA, where the NLRB (subject to review in the courts) only acts to oversee and referee the process of collective bargaining, *"leaving the results of the contest to the bargaining strengths of the parties."*[137]

Again, it is significant that the relevant bargaining unit in WNTPA negotiations consists of the female players who are represented by the WNTPA.  This means the primary determinant of contract terms in every WNTPA agreement is the comparative leverage of the "parties."[138]  This also leads to two other conclusions that have relevance in the present case.

- Based on the operation of federal labor law, *every* single set of negotiations and the resulting collective bargaining agreement results from complex requirements, enforced by the NLRB, which center around good faith in negotiations, the definition and scope of the bargaining unit, "antagonistic viewpoints and concepts of self-interest"[139] which, obviously, are extremely subjective, relevant economic conditions affecting the employer and employees, the availability and potential resort to "economic weapons"[140] *and*, as noted above, the respective "bargaining strengths of the parties."[141]  Therefore, any single set of negotiations has an extremely large number of unpredictable, causal factors.

- The multiplicity of variables associated with collective bargaining increases further if one compares recent collective bargaining agreements negotiated and agreed upon by one union (the WNTPA) to the contracts separately negotiated and agreed upon by a different union (the Men's U.S. National Soccer Team Players Association).  In such a comparison, *both sets* of agreements have each resulted from multiple rounds of bargaining and the factors described above, in addition to other significant differences involving who participated in negotiations, their experience in negotiations, different levels of team success, and additional variables.

In summary, the compensation, benefits and other provisions contained in contracts agreed upon by the WNTPA and the Federation resulted from a wide array of causal factors associated with collective bargaining that has occurred between the WNTPA and the Federation.  Likewise, the compensation, benefits and other provisions contained in contracts applicable to the Men's National Team resulted from a wide array of causal factors associated with separate collective bargaining that has occurred between the Men's U.S. National Soccer Team Players Association and the Federation.  I do not express any opinion on the merits of the Plaintiffs'

---

[137] *H.K. Porter Co.*, 397 U.S. at 108 (emphasis added).

[138] *Id.*

[139] *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 488 (1960).

[140] *Id.* at 489.

[141] *H.K. Porter Co.*, 397 U.S. at 108.

discrimination claims,[142] but the above conclusions are consistent with court decisions that have found disparities resulting from collective bargaining involve a "factor other than sex."[143] Although negotiations between the WNTPA and the Federation necessarily focused on the WNT's female players (in line with the definition and scope of the WNTPA bargaining unit), the WNTPA bargaining and CBAs involve the same types of conduct and the same types of tradeoffs, compromises and choices that have been typical in other negotiations, labor contracts, and labor-management disputes in which I have been involved during my career

4.  Substantial instability and damage to collective bargaining in U.S. Soccer, contrary to the NLRA, is likely result from a decision that effectively rewrites portions of the WNTPA labor contracts to match particular provisions contained in the Men's National Team labor contracts.

The pending litigation involves female WNT player claims arising under *one set of federal statutes*, the Equal Pay Act and Title VII, alleging wage discrimination on the basis of sex, where the challenged wages have been established in labor contracts negotiated and agreed upon pursuant to *another federal statute*, the NLRA, which made the WNTPA the "exclusive" representative of the female WNT players "in respect to rates of pay [and] wages."[144]  As noted above, the NLRA imposed complex obligations on the WNTPA and the Federation supported by an entire regulatory scheme vesting the NLRB with primary jurisdiction to enforce those obligations.[145]

When evaluating two or more federal statutes that address the same subject matter, the courts strongly favor interpretations that avoid any conflict between them.  In *Epic Systems Corp. v. Lewis*,[146] the Supreme Court explained this principle as follows:

---

[142] The merits of Plaintiffs' discrimination claims will be made by the Court and/or a jury based on the entirety of the record and evidence that may be presented in any trial.

[143] *See, e.g., Perkins v. Rock-Tenn Services, Inc.*, 700 Fed. Appx. 452, 457 (6th Cir. 2017) ("There is no question that the decisions made as a result of negotiations between union and employer are made for legitimate business purposes; thus, a wage differential resulting from status as a union member constitutes an acceptable 'factor other than sex' for purposes of the Equal Pay Act."); *Weinand v. Department of Veteran's Affairs of Illinois*, No. 05-3232, 2007 WL 1830840, **5-6 (C.D. Ill. June 22, 2007) (pay disparity caused by collective bargaining and hiring practice "driven by market forces" constitutes a "factor other than sex" under the Equal Pay Act).

[144] NLRA § 9(a), 29 U.S.C. § 159(a).

[145] Under the NLRA, disputes regarding whether an employer or union has violated the duty to bargain in good faith or violated other NLRA provisions (such violations are referred to as "unfair labor practices") are addressed in charges filed with the NLRB, which if found to have probable merit, result in the issuance of a complaint, a hearing before an administrative law judge whose decision can be the subject of exceptions filed with the NLRB; and the Board's decisions are subject to potential appeal to the federal courts of appeals and the U.S. Supreme Court.  *See* NLRA §§ 8, 10, 11, 29 U.S.C. §§ 158, 160, 161.

The Supreme Court has held that, in relation to rights and obligations under the NLRA, "courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board."  *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244-45 (1959).

[146] 138 S. Ct. 1612 (2018).

When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at "liberty to pick and choose among congressional enactments" and *must instead strive "'to give effect to both.'"* . . . A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing "'a clearly expressed congressional intention'" that such a result should follow. . . . The intention must be "'clear and manifest.'" . . . And in approaching a claimed conflict, we come armed with the "stron[g] presum[ption]" that repeals by implication are "disfavored" and that "Congress will specifically address" preexisting law when it wishes to suspend its normal operations in a later statute.

These rules exist for good reasons. *Respect for Congress as drafter counsels against too easily finding irreconcilable conflicts in its work.* More than that, respect for the separation of powers counsels restraint. Allowing judges to pick and choose between statutes risks transforming them from expounders of what the law is into policymakers choosing what the law should be. *Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them.*[147]

For several reasons, substantial instability and damage to collective bargaining within U.S. Soccer, contrary to the NLRA, is likely to result from a decision that effectively rewrites portions of the WNTPA labor contracts to match particular provisions contained in the Men's National Team labor contracts.

First, to state the obvious, the compensation and other provisions in the WNTPA contracts – including the 2017-2021 and 2013-2016 CBAs – were voluntarily entered into by the WNTPA (and the 2017-2021 CBA was unanimously ratified by WNT players) after extensive negotiations ostensibly resolved all issues reflected in each resulting agreement. In this context, a court decision that selectively rewrites portions of the WNTPA CBAs to match current or past Men's National Team agreements would do violence to two cornerstone principles that have great importance under the NLRA: (i) "the fundamental premise on which the [NLRA] is based," which is "private bargaining under governmental supervision *of the procedure alone*, without any official compulsion *over the actual terms of the contract*";[148] and (ii) the right of both sides to enforce and rely upon contracts for their entire term.[149]

Second, the negotiations and agreements between the WNTPA and the Federation address complex issues involving significant tradeoffs, compromises and choices among wage and non-wage provisions, many of which were agreed upon to resolve issues *specific* to female soccer players competing on the WNT and/or the NWSL. Selective midterm modifications to provisions

---

[147] *Id.* at 1624 (emphasis added), *quoting Morton v. Mancari*, 417 U.S. 535, 551 (1974); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995); *United States v. Fausto*, 484 U.S. 439, 452-53 (1988).

[148] *H.K. Porter Co.*, 397 U.S. at 108 (emphasis added). *See also* NLRA § 8(d), 29 U.S.C. § 158(d), stating that the duty to bargain collectively under the NLRA "does not compel either party to agree to a proposal or require the making of a concession."

[149] *See* text accompanying notes 19-28 above.

in the WNTPA contracts – to make them match other portions of the Men's National Team contracts – are likely disrupt the delicate balance reflected in many of these interrelated provisions.  For example, in the 2017-2021 CBA, there is a balance between two competing player objectives, involving higher compensation versus player security, and the latter is clearly reflected in provisions requiring the Federation to maintain a minimum number of WNT "contracted" players in various years (e.g., 17 players in 2020, and 16 players in 2021)[150] who each receive $100,000 in annual base compensation,[151] which the Federation must continue (with benefits) for up to one year even if the player is unavailable for work based on injury.[152]  The 2017-2021 CBA also specifies a complex array of other payments and bonuses (e.g., signing bonuses, two tiers of "camp fees" and "game appearance fees" for non-contract players), including enumerated incentive bonuses for different games and tournaments ("Friendly" games, including the She Believes and Four Nations Tournaments, World Cup games, Olympic games), among other things.[153]

There is little question that the negotiation of these provisions involved the weighing of "relative advantages and disadvantages of differing proposals" and "countless variables,"[154] including the Federation's commitment to continue the guaranteed base salary and benefits for up to one year even when WNT contracted players are unavailable due to injury.  If mid-contract increases were imposed on the Federation to match selected provisions in the Men's contract – creating higher WNTPA incentive bonuses for winning the World Cup or certain Friendlies, for example – it is likely that such modifications would disrupt the bargained-for exchange that prompted the Federation to accept the WNTPA contract's extensive employment security provisions.  These types of mid-contract changes could adversely affect interests of U.S. female professional soccer players on the whole if, for example, the Federation no longer subsidized the NWSL (which benefited greatly from contract provisions making the Federation responsible paying the NWSL wages of WNT players who are allocated to the NWSL).  Not only would selective, after-the-fact affect the parties for the remaining term of the 2017-2021 CBA, the same parties would predictably would face substantially greater challenges when attempting to reach agreement on mutually acceptable contract terms in future negotiations.[155]

---

[150] 2017-2021 CBA, Art. 8.A.1.

[151] *Id.*, Exh. A.

[152] *Id.*, Art. 6.D.1.

[153] *Id.*, Exh. A.

[154] *Ford Motor Co.*, 345 U.S. at 38.

[155] As one example, the 2017-2021 CBA already commits the Federation to a $100,000 annual base salary for WNT contracted players, it requires the Federation to have a minimum of 17 contract players in 2020 and 16 contract players in 2021, it requires the Federation to continue compensation and benefits for up to one year if the players are unavailable because of injury, and it requires the Federation to pay the separate NWSL salaries for WNT players who are "allocated" to the NWSL.  If the Federation were ordered to substantially increase WNT game-related bonuses and other payments without taking these substantial commitments into account, the Federation – when negotiating for new contract terms to be effective in 2022 and later years – would have a significant incentive to dramatically reduce the number of WNT contract players, to shorten or discontinue wage protection for injured players, and/or to reduce or discontinue the payment of any NWSL wages for WNT players who participate in the NWSL.  These changes would all be appropriate subjects to address in bargaining, and it is likely that mid-contract changes modifying previously

Third, a decision rewriting parts of the 2017-2021 and 2013-2016 CBAs would effectively constitute midterm contract modifications, which Congress prohibited in NLRA Section 8(d) based on the importance of fostering "stability in the terms and conditions of employment agreed upon by the parties."[156]  For example, the imposition of such changes would almost certainly produce uncertainty as to whether future contracts, if agreed to and ratified, would be subjected to similar midterm challenges regarding any other wage-based differences that developed in new WNTPA contracts when compared to Men's National Team agreements.

Fourth, selectively rewriting portions of the WNTPA CBAs to match current or past Men's National Team agreements would have the effect of eradicating and/or combining two distinct bargaining units: the WNTPA unit covering female WNT players, and the Men's National Team unit represented by the Men's U.S. National Soccer Team Players Association.  As noted above, the scope and definition of the relevant bargaining unit plays a central role in the NLRA's regulation of union representation and collective bargaining.[157]  It takes little imagination to see that, after any court-imposed mid-contract increases in WNTPA wage provisions to match certain wage provisions applicable to the Men's National Team, there would be multiple layers of cascading consequences: (i) everyone would regard the future negotiation of Men's National Team wage rates as dictating the rates applicable to WNT players; (ii) in WNTPA bargaining, the Men's National Team rates would become *de facto* minimums, which the WNTPA would endeavor to increase; (iii) the Men's National Team Players Association would insist that the Federation match any higher rates agreed upon in WNTPA contracts; and so on.  In these scenarios, the separate identities of each bargaining unit would be obscured, if not eliminated, based on uncertainty regarding which union was really negotiating for what group of employees. This would do violence to the core concept underlying union representation under the NLRA, which protects the right of employees in each bargaining unit to negotiate "through representatives *of their own* choosing."[158]

Finally, if after-the-fact mid-contract changes were made to WNTPA contracts, this would create a significant risk of undermining the NLRA's regulatory scheme, which requires both sides to negotiate in good faith[159] and confers "exclusive" authority in the union to negotiate wages on behalf of all unit employees,[160] with the overall objective of producing binding agreements.[161]  The NLRA gives the NLRB primary responsibility for regulating collective bargaining conduct, and in

---

agreed-upon wage provisions set forth in the 2017-2021 CBA would substantially increase the obstacles facing the WNTPA and the Federation in future bargaining.

[156] *Kellogg Co.*, 840 F.3d at 328; *see also Chesapeake Plywood*, 294 NLRB at 201.

[157] *See* text accompanying notes 7-18 above.

[158] NLRA § 7, 9(a), 29 U.S.C. § 157, 159(a) (emphasis added).

[159] *See* note 145, *supra*.  The NLRA imposes on unionized employers and unions alike the obligation to engage in good faith bargaining: an employer's failure to "bargain collectively" violates NLRA § 8(a)(5), 29 U.S.C. § 158(a)(5); and a union's failure to "bargain collectively" violates NLRA § 8(b)(3), 29 U.S.C. § 158(b)(3).  The duty to "bargain collectively" is defined in NLRA § 8(d), 29 U.S.C. § 158(d), which defines that duty as requiring parties to "meet at reasonable times and confer in good faith."

[160] NLRA § 9(a), 29 U.S.C. § 159(a).

[161] *See* text accompanying notes 19-22 above.

*San Diego Building Trades Council v. Garmon*, the Supreme Court observed that the "courts are not primary tribunals to adjudicate [NLRA] issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board."[162]  If wage provisions in the 2017-2021 and 2013-2016 CBAs were subjected to mid-contract changes, notwithstanding the fact that the WNTPA negotiated and entered into these CBAs, this would not only cause uncertainty about whether subsequent WNTPA-negotiated wages would be binding, this would arguably make the courts responsible, in the first instance, for overseeing future bargaining over wages.  In short, this would impose substantial limits on the parties' ability to rely on their own collective bargaining agreements, in addition to departing from primary responsibility that Congress vested in the NLRB to regulate collective bargaining conduct.

## III.  Conclusion

The United States Soccer Federation and the Women National Team Players Association have a bargaining relationship that spans almost 20 years.  That relationship centers around a bargaining unit that consists exclusively of WNT players, and consistent with the requirements of federal law (specifically, the National Labor Relations Act), the parties' bargaining has never failed to result in an agreement.

The parties' bargaining and the 2017-2021 and the 2013-2017 collective bargaining agreements are consistent with the federal labor law principles described above, and are consistent with the types of tradeoffs, compromises and choices that are typical in collective bargaining.  Those tradeoffs, compromises and choices make it extremely difficult to conduct any kind of meaningful point-by-point comparison of similarities and differences between WNTPA labor contracts and the provisions contained in the U.S. Soccer Men's National Team Agreements. The definition and scope of the WNTPA bargaining unit necessarily means that parties in WNT bargaining would focus on potential leverage specific to the WNT players and the WNTPA. Finally, substantial instability and damage to collective bargaining in U.S. Soccer, contrary to the NLRA, is likely to result from a decision that effectively rewrites portions of the WNTPA contracts to match particular provisions contained in the Men's National Team labor contracts.

Respectfully submitted,

*Philip A. Miscimarra*

Philip A. Miscimarra

DATED:  February 4, 2020

---

[162] 359 U.S. at 244-45.

## APPENDIX 1

### Philip A. Miscimarra

*Selected Books, Articles, and Other Publications*

**A.  Books**

THE NLRB AND MANAGERIAL DISCRETION: SUBCONTRACTING, RELOCATIONS, CLOSINGS, SALES, LAYOFFS, AND TECHNOLOGICAL CHANGE (2d ed. 2010) (by Miscimarra, Turner, Friedman, Callahan, Conrad, Lignowski and Scroggins)

THE NLRB AND SECONDARY BOYCOTTS (3d ed. 2002) (by Miscimarra, Berkowitz, Wiener and Ditelberg)

GOVERNMENT PROTECTION OF EMPLOYEES INVOLVED IN MERGERS AND ACQUISITIONS (1989 and 1997 supp.) (by Northrup and Miscimarra)

MULTINATIONAL UNION ORGANIZATIONS IN THE WHITE-COLLAR, SERVICE AND TELECOMMUNICATIONS INDUSTRIES (1983) (by Rowan, Pitterle and Miscimarra)

**B.  Selected Articles, Papers and Testimony**

*Doing Good and Doing No Harm: Protecting U.S. Employees, Employers, Unions and the Public Interest in a Changing World* (Testimony before the Committee on Education and Labor, Subcommittee on Health, Education, Labor and Pensions, May 8, 2019)

*Construction Industry Collective Bargaining Agreements: The Impact of Contract Language on Section 8(f) versus Section 9(a) Status* (ABA Section of Labor and Employment Law, Committee on Development of the Law Under the NLRA, Feb. 25, 2019) (by Griffin, Miscimarra and Gonzalez)

*NLRB Recusal Issues – The Importance of Fairness, Transparency, and Stability* (ABA Section of Labor and Employment Law, Committee on Practice and Procedure Under the NLRA, March 1, 2019) (by Miscimarra and Emery)

*The NLRB and Supervisor Status: A Board Member's Perspective on the Self-Driving Workplace*, 31 ABA J. LAB. & EMPL. LAW 411 (2016)

*Who's in Charge: The NLRB's Take on Arbitration and Deferral*, ANNUAL PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS (2015)

*Guns, Firms, and Zeal: Deconstructing Labor-Management Relations and U.S. Employment Policy*, 98 MINN. L. REV. 1728 (2014)

*Angels, Demons and the NLRB – Perspectives on Congressional Insight* (ABA Section of Labor and Employment Law, Committee on Practice and Procedure Under the NLRA, Feb. 29-March 3, 2012)

-2-

*Capital Investment, Relocations, and Major Business Changes Under the NLRA* (Testimony before the Committee on Oversight and Government Reform, United States House of Representatives, June 17, 2011)

*Outer Limits at the NLRB: Legislative Choices in the National Labor Relations Act* (Testimony before the Committee on Education and the Workforce, Subcommittee on Health, Education, Labor and Pensions, February 11, 2011)

*The Ghosts Of Arbitration Past, Present And Yet To Come: Insights About The Arbitration Fairness Act*, by Philip A. Miscimarra and John R. Richards, ANNUAL PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 52-98 (2009)

*The Arbitrator as Judge and Jury: Another Look at Statutory Law in Arbitration*, 40 ARB. J. 55 (1985) (by Scheinholtz and Miscimarra)

*Frozen in Time: The NLRB Outsourcing and Management Rights*, 18 J. LAB. RES. 561-580 (1997) (by Miscimarra and Schwartz)

*The Town & Country Case: Legal Issues and Implications*, 18 J. LAB. RES. 73-90 (1997) (by Miscimarra and Altschul); *Inability to Pay: The Problem of Contract Enforcement in Public Sector Collective Bargaining*, 43 U. PITT. L. REV. 703-730 (1982)

*The Entertainment Industry: Inroads in Multinational Collective Bargaining*, 19 BRIT. J. IND. RELS. 49-65 (1981)

## APPENDIX 2

### Philip A. Miscimarra
*Other FRCP Rule 26(a)(2) Disclosures*

## A.  Facts and Data Relied Upon

In addition to the other statutes, cases and legal authorities cited in this report, I relied upon the following facts, documents and data in forming the opinions expressed in this report:

Complaint, including exhibits, *U.S. Soccer Federation, Inc. v. U.S. Women's National Soccer Team Players Ass'n*, Case No. 16-cv-1923 (N.D. Ill.)

*U.S. Soccer Federation, Inc. v. U.S. WNTPA*, 190 F. Supp. 3d 777 (N.D. Ill. 2016).

Complaint, including exhibits, *Morgan et al. v. U.S. Soccer Federation*, Case No. 2:19-cv-01717 (C.D. Cal.)

2017-2021 Collective Bargaining Agreement between the United States Soccer Federation and the U.S. Women's National Team Players Association

2013 Memorandum of Understanding between the United States Soccer Federation and the Women's National Team Players' Association

2005-2012 Collective Bargaining Agreement between the United States Soccer Federation and The Women's National Team Players Association

2000-2004 Collective Bargaining Agreement between the United States Soccer Federation and The Women's National Team Players Association

2011-2018 Collective Bargaining Agreement between the United States Soccer Federation and The United States National Soccer Team Players Association

2003-2010 Collective Bargaining Agreement between the United States Soccer Federation and The United States National Soccer Team Players Association

1999-2002 Collective Bargaining Agreement between the United States Soccer Federation and The United States National Soccer Team Players Association

Deposition of Sunil Gulati, December 17, 2019 and December 18, 2019, including all exhibits.

Deposition of John B. Langel, November 21, 2019, including all exhibits.

Deposition of Rich Nichols, December 4, 2019, including all exhibits.

Deposition of Kelley O'Hara, January 17, 2020, including all exhibits.

Deposition of Christen Press, December 12, 2019, including all exhibits.

Deposition of Megan Rapinoe, January 16, 2020, including all exhibits.

Deposition of Rebecca P. Roux, December 19, 2019, including all exhibits.

Deposition of Rebecca Sauerbrunn, December 10, 2019, including all exhibits.

Bargaining Notes, Doc. ID # USSF_Morgan_005638-005777

Gabe Feldman, *Collective Bargaining in Professional Sports: The Duel Between Players and Owners and Labor Law and Antitrust Law* (Oxford Handbook of American Sports Law, Oxford University Press, 2018).

Harry C. Katz, T.A. Kochan & A.J.S. Colvin, *The role of the economic, technological, and demographic environments*, Labor relations in a globalizing world (ILR Press 2015).

Kenneth May, ed., ELKOURI & ELKOURI, HOW ARBITRATION WORKS (8th ed. 2016).

Dave Berndtson, PBS NewsHour, *U.S. Women's Soccer Scores Higher Pay, Better Conditions in New Labor Agreement* (Apr. 5, 2017).

FIFA, Women's World Cup Canada 2015 (available at https://www.fifa.com/womensworldcup/matches/round=268012/match=300269506/index.html).

FIFA, FIFA World Cup: Statistics (available at https://www.fifa.com/mm/document/fifafacts/mencompwc/51/97/30/ip-301_01a_fwc-stats.pdf)

Grant Wahl, Sports Illustrated, *As CBA Talks Progress, Sauerbrunn Eyes Healing Process Between U.S. Women, Men* (Apr. 4, 2017).

Grant Wahl, Sports Illustrated, *American Voices: Meghan Klingenberg* (Apr. 17, 2017).

## B. Exhibits To Be Used to Summarize or Support this Report

None

## C. Other Cases in Which I Testified as an Expert at Trial or by Deposition

None

## D. Statement of Compensation to be Paid

Compensation to be paid for my time devoted to this report and to any testimony is to be based on the standard hourly billing rates established by my law firm for my time and the time of two associate attorneys who assisted me, as follows:

Philip A. Miscimarra – $1,150/hour
Lauren M. Emery – $550/hour
Richard J. Marks – $495/hour