# EXHIBIT 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX MORGAN, et al.,

                Plaintiffs,

     v.

UNITED STATES SOCCER
FEDERATION, INC.,

          Defendant.

Case No. 2:19-CV-01717

## EXPERT REPORT OF JUSTIN MCCRARY, PH.D.

March 6, 2020

# Table of contents

**1. Assignment and summary of opinions**................................................................................................**4**

1.1. Assignment ..........................................................................................................................................4

1.2. Summary of opinions..........................................................................................................................4

**2. Methodology and overview of Dr. Cook's calculation** ....................................................................**9**

2.1. Methodology for assessing gap in pay caused by gender.............................................................9

2.2. Overview of Dr. Cook's damages calculation ...............................................................................11

**3. Differences in WNT and MNT CBA provisions are due to revenue** ..........................................**14**

3.1. Performance bonuses and revenue generation ............................................................................15

3.2. Dr. Cook ignores differences in revenue generation in her damages calculation....................18

    3.2.1. Differences in World Cup bonuses reflect differences in prize revenue generated............18

    3.2.2. Non-World Cup tournament performance bonuses also reflect differences in prize money........................21

    3.2.3. Compensation for friendly matches, salary, and other benefits ........................................22

3.3. Actual pay per unit of revenue is also higher for the WNT ......................................................23

    3.3.1. Actual pay as a fraction of revenue ......................................................................................23

    3.3.2. Other sources of revenue for the USSF generated by national teams ...............................25

**4. Dr. Cook also ignores different tradeoffs of risk versus reward between the two teams' CBAs** .....................**26**

**5. Conclusion** .........................................................................................................................................**29**

**6. Response to Plaintiffs' motion to exclude portions of my initial report**...................................**30**

**7. Appendix A – Curriculum vitae** .....................................................................................................**33**

**8. Appendix B – Documents relied upon** ..........................................................................................**48**

## Exhibit list

Exhibit 1   Dr. Cook's damages calculation broken down by game type: April 6, 2014 – December 31, 2019 12

Exhibit 2   Performance bonuses are higher for tournaments with higher prize money ............................16

Exhibit 3   Revenue and payments associated with World Cup victories .....................................................19

Exhibit 4   The WNT receives more compensation than the MNT for tournaments that generate similar revenue .................................................................................................................................................. 20

Exhibit 5   Total payments to and revenue generated by MNT and WNT: June 11, 2015 – December 31, 2019 24

Exhibit 6   A MNT player would have earned more under the current WNT CBA: 2017–2019.................. 27

# 1. ASSIGNMENT AND SUMMARY OF OPINIONS

## 1.1. Assignment

1. I have been asked by counsel for Defendant to review the damage calculation of Dr. Finnie Cook, and assess the following questions:

- Does Dr. Cook's damage analysis reliably isolate differences in relevant compensation terms in the WNT and MNT CBAs that can be attributed to the alleged discrimination separately from differences attributed to other non-discriminatory, economic factors?

- What economic factors that differ between the WNT CBAs and the MNT CBA does Dr. Cook's damage calculation not account for?

- Once relevant economic factors are accounted for, is there an unexplained difference in relevant compensation terms between the WNT CBAs and the MNT CBA, for a given level of performance?

## 1.2. Summary of opinions

2. As I explained in my initial report, the WNT and MNT CBAs are qualitatively different from one another. Compared to the MNT CBA, the CBAs for the WNT have a variety of different terms and provide more guaranteed compensation and less performance compensation on some dimensions. The two teams' CBAs are thus not directly comparable without accounting for those differences.

3. In this report, I turn to the question of damages. As I detail herein, any damages analysis seeking to isolate any effect of the alleged discrimination on pay, like Dr. Cook's, must account for differences in the CBAs that are driven by non-discriminatory, economic factors. A feature of Dr. Cook's analysis is that there is a clear articulation of but-for compensation—she assumes that each WNT player is paid under the terms of the MNT CBA. Unfortunately, her approach neglects to consider non-discriminatory factors that can explain differences in terms between the CBAs. Quantitatively, the leading factor that is neglected in Dr. Cook's analysis is the higher prize money the USSF receives if the MNT wins relevant tournaments. While this is not the only difference in the CBAs Dr. Cook ignores, as I detail in this report, Dr. Cook's failure to account for prize money differences by itself renders her damages calculation unreliable.

4. I begin my analysis in **Section 2,** when I explain that Dr. Cook calculates damages by assuming that *any* differences between the terms in the WNT CBAs and MNT CBA are due to discrimination.[1] Dr. Cook does not provide any analysis of whether other economic factors can explain the differences in terms between the WNT and MNT CBAs. As I explain in **Section 2**, accounting for non-discriminatory differences is a methodological requirement. This point is widely recognized in the academic literature that analyzes gender pay gaps. In this report, I highlight several non-discriminatory economic factors that Dr. Cook ignores, including revenue as noted above. Revenue is sufficiently important that accounting for it shows that the WNT is paid *more* than the MNT for a given level of performance, rather than less.

5. In **Section 3**, I substantiate my assertion above that, at a given level of performance, the WNT generates less revenue for the USSF than does the MNT. For the World Cup, a win by the MNT would generate almost 10 times more prize revenue than a win by the WNT. The World Cup is a quantitatively important example because over 90% of Dr. Cook's damages come from the differences in World Cup compensation terms across the teams' CBAs.

- As I explain in **Section 3.1**, a fundamental principle in labor economics is that compensation for workers is affected by the incremental revenue that the worker generates for their firm. As I show in Section 3.1, this concept applies to the CBAs at issue in this case.

- Revenue and compensation are tied, not just in theory, but also in practice. To substantiate this point, we can compare across men's tournaments. Such comparisons are not about gender, by construction, but they are instructive about the effect on compensation of USSF revenue, since some tournaments pay more than others. If the MNT wins the World Cup, the USSF receives prize revenue of $38 million, and if the MNT wins the Confederations Cup, the USSF receives $4.1 million. This corresponds to performance bonuses for the MNT of $31.7 million and $3.2 million, respectively. This simple example underscores that differences in performance bonuses ought not to be immediately attributed to discrimination. They may relate to non-discriminatory

---

[1] Expert Report of Finnie B. Cook, Ph.D., February 4, 2020 ("Cook Report"), ¶ 7 ("In the event that claimed violations of the Equal Pay Act and Title VII are found by the jury, I have determined the backpay damages suffered by the classes by comparing what each class member would have earned if she had been compensated at the same rate as a male professional soccer player under the U.S. Men's' National Team's ('USMNT') collective bargaining agreement ('CBA') in effect during the class periods against what her actual earnings as a female professional soccer player on the U.S. Women's National Team ('USWNT') were during these periods.").

factors that differ between men and women. I described this concept in my initial report.[2]

6. In **Section 3.2**, I return to comparisons between the WNT and the MNT. I show that differences in performance bonuses *between* the MNT and WNT CBAs for the key tournaments that drive all of Dr. Cook "damages" can be explained by differences in the prize money and, thus, the revenue generated for USSF. When one looks at performance bonuses as a fraction of the prize money paid to USSF for a given level of performance, the WNT performance bonuses actually pay out a *higher* fraction of the incremental prize revenue generated.

- As I discuss above, Dr. Cook assumes that gender differences in World Cup bonus payments are a result of discrimination. **This single assumption applied to both the 2015 and 2019 Women's World Cup generates $58 million (or 91%) of her total claimed backpay damages of $64 million.** However, as I explain in **Section 3.2.1**, Dr. Cook's analyses ignore a clear, non-discriminatory economic reason for the difference in bonus payments: FIFA sets different bonus payments for the different World Cup tournaments. Specifically, in 2018, FIFA would have paid $38 million to the USSF had the MNT won the Men's World Cup and, in 2019, did pay $4 million to the USSF for the WNT victory.[3]

- To account for differences in revenue generated for a given level of World Cup performance, I examine the WNT and MNT bonuses for each World Cup in the relevant period *as a fraction* of the prize money USSF receives from FIFA (**Section 3.2.1**). I find that the WNT CBAs actually pay out *a higher* fraction of the prize money than the MNT CBA does. For example, the 2017–2021 WNT CBA provides a higher payment relative to the FIFA prize for the 2019 Women's World Cup (104%) than

---

[2] Expert Report of Justin McCrary, Ph.D., February 4, 2020 ("McCrary Report"), fn. 45 ("Another factor that can influence the magnitude of bonus payments in a performance contract is how much revenue is generated when the worker meets relevant performance thresholds. In the analyses in this report, I abstract away from this consideration for simplicity. However, to the extent that revenue generated for USSF by MNT and WNT when each team meets their respective performance thresholds in their respective CBAs (e.g. wins friendlies, wins tournaments) differs, such differences could also explain differences in the bonus payments in the CBAs.").

[3] FIFA Council confirms contributions for FIFA World Cup participants, accessible at https://www.fifa.com/who-we-are/news/fifa-council-confirms-contributions-for-fifa-world-cup-participants-2917806; USSF_Morgan_007841 – 2.

the MNT CBA would have provided if the MNT had won the 2018 Men's World Cup (83%).[4]

- The Confederations Cup provides another illustration of the idea that USSF revenue drives performance bonuses in the teams' CBAs. The 2017 Confederations Cup (a men's tournament) has prize money that is comparable to the 2019 Women's World Cup—$4.1 million for the MNT versus $4 million for the WNT. For the Confederations Cup, the MNT CBA provides for a maximum performance bonus that is *smaller* than the bonus in the WNT CBA ($3.2 million versus $4.1 million, or 78% for the men and 104% for the women). This is, of course, the opposite of what would hold, were the USSF to be engaged in discrimination against women.

- In **Section 3.2.2** I show that a similar pattern holds when I analyze prize money for non-World Cup tournaments. For example, Dr. Cook assumes the WNT should get the same bonuses for winning non-World Cup tournaments that the MNT would get. However, as I show below there are large differences between these tournaments in prize money paid to USSF ($3.9 million on average for MNT and $0 for WNT).

- In **Section 3.2.3**, I then discuss how, on all other payment terms besides the World Cup and non-World Cup tournament performance bonuses, Dr. Cook's analysis finds *negative* damages. Specifically, Dr. Cook's analysis finds that the WNT CBAs paid the women *more* ($18.8 million) across all components of non-tournament pay than the MNT CBA would have paid them ($14.8 million) for the same level of performance. This finding confirms the finding in my initial report that the fixed payments in the WNT CBAs absent from the MNT CBA (e.g., salary) more than offset the higher game bonuses for friendlies.

- Finally, in **Section 3.3**, I show that the same pattern holds for actual pay. That is, the WNT received a higher ratio of the revenue their games generated as compensation (27%) than the MNT did (24%) during the class period. I also find that including sources of revenue not directly attributable to a specific team or game does not change this finding.

7. In **Section 4,** I highlight another important difference between the two teams' CBAs that Dr. Cook does not account for. As explained in my initial report, the CBAs for the WNT and MNT have fundamentally different terms

---

[4] 2011–2018 MNT CBA, USSF_Morgan_000530 – 78 at 72 – 73; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

pertaining to risk-reward tradeoffs. The WNT CBAs include fixed payments that provide insurance value to players who do not perform as expected, whereas the MNT CBA does not. Dr. Cook does not in any way account for this additional value of the WNT CBAs.

- As I show in Section 4, one way to see the insurance value provided by the WNT contract is to examine how MNT players would have been compensated under the current WNT CBA since its inception. ***As I show below, using Dr. Cook's own methodology, a player who performed as the MNT did since 2017 would have made more money under the WNT CBA than under the MNT contract.*** This result occurs because the MNT did not achieve certain performance thresholds in recent years (e.g., did not qualify for the 2018 World Cup) and, thus, the insurance aspect of the WNT CBA (e.g., salary) would have provided them protection from lower bonuses.

- This result shows that a CBA with higher bonuses does not always generate higher total compensation than a CBA that has lower bonuses plus a fixed salary. The relative value of the CBAs depends on performance, and the salary (and other benefits) in the WNT CBAs provide insurance value not present in the MNT CBA.

- This analysis also highlights the fundamental inability of Dr. Cook's methodology to isolate the causal effect of alleged discrimination. Under Dr. Cook's method, any differences in pay between the two teams' CBAs reflect "discrimination." Applying Dr. Cook's logic to my calculation, one would conclude that the USSF discriminates against the MNT and the WNT *at the same time*.

## 2. METHODOLOGY AND OVERVIEW OF DR. COOK'S CALCULATION

### 2.1. Methodology for assessing gap in pay caused by gender

8. There is a large body of academic literature that analyzes differences in pay between men and women across a variety of different occupations and industries. A central question in that literature is whether differences in pay between men and women can be explained by differences in observable, non-discriminatory, economic factors (hours worked, different choices in occupations, different levels of experience, etc.) or whether they potentially reflect factors like discrimination. Indeed, in my first report, I highlighted a variety of differences between the two teams' CBAs at issue in this case that need to be accounted for to assess whether the WNT CBAs systematically pay players less than the MNT CBA does for a given level of performance.

9. In the academic literature, this question is referred to frequently as the "causation" question. When one observes average differences in pay between two groups of people (e.g., men and women), it is important to analyze whether that difference is *caused* by gender or if it instead is caused by other factors. As one textbook in labor economics describes, comparing differences in pay between men and women without accounting for other factors is "unappealing because it is comparing apples and oranges. Many factors, other than discrimination, generate wage differentials between men and women."[5] In other words, assessing discrimination requires measuring differences in pay between workers who are comparable along all other dimensions that affect their earnings. A widely-cited paper in the academic literature on gender wage gaps summarizes this methodological concept as follows:

> In U.S. labor markets women earn substantially less than men do. Hundreds of studies investigate this phenomenon, seeking to infer the extent to which the gender wage gap is the consequence of disparate treatment by employers. The statistical exercise is one of comparison; at issue is the difference between the wages women receive and those earned by males who are otherwise *comparable* in terms of relevant characteristics (that is, men with similar levels of human capital). The standard means of drawing such comparisons, used in nearly every paper on the topic, is linear regression; the idea is to "control" for factors that reflect differences in preferences and human capital between men

---

[5] Borjas, G., *Labor Economics*, 7th Edition, McGraw-Hill Education, New York, NY, 2016, at p. 382.

and women. Gender wage differentials that remain after such adjustments are often taken as evidence of labor market discrimination.[6]

10.  This concept is also widely recognized by courts when analyzing questions of discrimination in litigation. The mere existence of average differences in pay between two groups is not sufficient to infer the existence of discrimination because the difference in pay may reflect legitimate differences between the two groups. The Federal Judicial Center's *Reference Manual on Scientific Evidence* (a document designed to aid Federal Judges in assessing scientific evidence) lays out these principles as follows, using age discrimination as an example.

> A correlation between two variables does not imply that one event causes the second. Therefore, in making causal inferences, it is important to avoid spurious correlation. Spurious correlation arises when two variables are closely related but bear no causal relationship because they are both caused by a third, unexamined variable. For example, there might be a negative correlation between the age of certain skilled employees of a computer company and their salaries. One should not conclude from this correlation that the employer has necessarily discriminated against the employees because of their age. A third, unexamined variable, such as the level of the employees' technological skills, could explain differences in productivity and, consequently, differences in salary.[7]

11. More generally, it is recognized that when attempting to measure economic damages, one must isolate the effect of the challenged conduct separately from other factors unrelated to the challenged conduct. For example, the *Reference Manual on Scientific Evidence* notes the following:

> [A] proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only the loss *caused* by the harmful act.[8] [emphasis added]

---

[6] Dan A. Black, Amelia M. Haviland, Seth G. Sanders, and Lowell J. Taylor, "Gender Wage Disparities among the Highly Educated," *The Journal of Human Resources* 43, no. 3 (2008): 630–659.

[7] Rubinfeld, D. L., "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, 3rd Edition, The National Academies Press, Washington, DC, 2011, at p. 309.

[8] Allen, M. et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence,* 3rd Edition, The National Academies Press, Washington, DC, 2011, at p. 432.

## 2.2. Overview of Dr. Cook's damages calculation

12. As I detail in the remainder of this report, Dr. Cook's analysis does not consider this fundamental methodological question of causality. Dr. Cook's damages analysis simply *assumes* that *any differences* in pay between the MNT CBA and the WNT CBAs for a given level of performance reflect discrimination. Indeed, the way that she arrives at her damages estimate is (1) to take the *actual* performance of each WNT player in the class, (2) calculate the pay of that performance under the *MNT CBA* to generate each player's pay "but-for" the alleged discrimination (i.e., "but-for" pay), and (3) then compare that but-for pay to what the player *actually* earned under the WNT CBAs. She then assumes any differences between but-for and actual pay reflect damages.

13. Exhibit 1 displays a breakdown of Dr. Cook's calculation of alleged damages for the Title VII class period by the different types of games and payment terms she analyzes. I group games based on Dr. Cook's own categorization of each game in the but-for world (i.e., if Dr. Cook assumes a WNT game is paid as a tournament game or a friendly in the but-for world, I categorize the game in the same way). **As is clear, over 90% of the damages that Dr. Cook calculates is associated with the World Cup** ($58.2 million of the total $63.8 million of alleged damages). An additional $9.5 million of Dr. Cook's damage calculation is related to differences in performance bonuses between the MNT CBA and the WNT CBAs for other, non-World Cup tournament pay.[9] Wages and benefits paid to WNT players more than offsets the alleged damages that Dr. Cook associated with the remaining friendly matches by $4 million, which Dr. Cook nets out of her damage calculation to arrive at her final calculation of $63.8 million.

---

[9] In an alternative calculation, Dr. Cook assigns friendly pay terms from the MNT CBA to the WNT non-World Cup tournament games. In this calculation, the World Cup is responsible for $58.2 million of the $60.7 million (96%) of alleged backpay damages over the Title VII class period. Cook Report, Schedule 16.

**EXHIBIT 1**
**Dr. Cook's damages calculation broken down by game type: April 6, 2014 – December 31, 2019**

| Tournament Pay | Number of Games | Pay based on MNT CBA[1] | Actual pay | Backpay |
|---|---|---|---|---|
| 1. World Cup and qualifiers[2] | 24 | $ 65,169,875 | $ 6,945,008 | $ 58,224,867 |
| 2. Other tournaments[3] | 35 | $ 11,804,110 | $ 2,247,100 | $ 9,557,010 |
| 3. Subtotal | 59 | $ 76,973,985 | $ 9,192,108 | $ 67,781,877 |
| **All other pay** | | | | |
| 4. Friendly games[4] | 69 | $ 14,808,788 | $ 6,864,470 | $ 7,944,318 |
| 5. Wages and benefits[5] | | - | $ 11,903,953 | $ (11,903,953) |
| 6. Subtotal | 69 | $ 14,808,788 | $ 18,768,423 | $ (3,959,635) |
| 7. Total | 128 | $ 91,782,773 | $ 27,960,531 | $ 63,822,242 |

Source: Cook Report, Appendix A, Appendix B, Appendix E, Schedule 7; USSF_Morgan_070835
Note:
[1] "Wages Game Play" (code A) and "Wages Tournament Bonus" (code B) from Appendix E were added according to Dr. Cook's game categorization in Appendix B to calculate "Pay based on MNT CBA."
[2] "Game Play Bonus" (code F1) and "Tournament Bonus" (code F2) from Appendix E were added according to the following paydate categorization to calculate "Actual pay": Women's World Cup (6/15/2015, 7/15/2015, 6/14/2019, 8/15/2019); Women's World Cup qualifiers (10/31/2014, 10/31/2018).
[3] "Game Play Bonus" (code F1) and "Tournament Bonus" (code F2) from Appendix E were added according to the following paydate categorization to calculate "Actual pay": Olympic games (07/29/2016); Olympic qualifiers (2/29/2016); Friendly tournaments (12/31/2014, 3/13/2015, 3/31/2015, 3/15/2016, 3/15/2017, 8/15/2017, 3/15/2018, 8/15/2018, 3/15/2019).
[4] "Actual pay" is the remainder "Game Play Bonus" (code F1) from Appendix E. Includes payments from the World Cup victory tour, which correspond to the following paydates in Dr. Cook's Appendix E: 10/30/2015, 12/31/2015, 8/30/2019, 9/13/2019, and 10/15/2019.
[5] "Actual pay" includes "All Forms of Actual Wages Exclusive of Bonuses" (codes E1, … , E9) from Appendix E plus "All forms of Benefits not included in Wages" (code J) from Appendix E plus "Appearances + CBA Signing Bonus" from Schedule 7 . The amount of "Actual pay" attributable to "All forms of Benefits not included in Wages" is $155,554.

14. Dr. Cook's finding that the WNT CBAs pay *more* than the MNT CBA across friendly bonuses, salary, and benefits is notable because it confirms the findings in my first report. As Exhibit 1 shows, the friendly game bonuses paid to the WNT would have been about $8 million higher according to the MNT CBA. However, the salary and other benefits of the WNT CBAs *more than offset* the lower friendly bonuses.[10] The WNT was paid nearly $12 million in salary and benefits, compared to $0 for the men. In other words, Dr. Cook's own calculations demonstrate that the combination of fixed payments (salary, benefits) and lower bonuses for friendly games in the WNT CBAs pay the WNT *more* than they would have been paid for non-tournament games under the

---

[10] Dr. Cook does not include salaries that the USSF pays to WNT players allocated to National Women's Soccer League teams in actual pay. Dr. Cook also does not include payments to the WNT Players Association ("WNTPA") other than Victory Tour payments. Inclusion of these payments would reduce damages further. 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 81, 83; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 629–632, 642.

MNT CBA structure of higher friendly bonuses and no fixed payments. [11]

15. An implication of the pattern in Exhibit 1 is that *all* of Dr. Cook's damages come from differences in bonus payments from the World Cup and non-World Cup tournaments. As I detail in Section 3, the damages that Dr. Cook finds on those dimensions can be explained by the differences in the incremental revenue (i.e., prize money) that the USSF receives for MNT tournaments versus WNT tournaments. Dr. Cook ignores this factor in her analysis.

---

[11] Exhibit 1 focuses on Dr. Cook's calculations of the Title VII damages period. I have also analyzed the Dr. Cook's damages for the EPA collective periods. For the Willful EPA class period, Dr. Cook calculates $33 million in damages from tournament pay, as well as $4.2 million from friendly games, which is more than offset by the $7.8 million paid in wages and benefits to the WNT. For the Non-Willful EPA class period, Dr. Cook calculates $32 million in damages from tournament pay, as well as $2.5 million from friendly games, which is more than offset by the $6.5 million paid in wages and benefits to the WNT. See workpaper 1.

### 3. DIFFERENCES IN WNT AND MNT CBA PROVISIONS ARE DUE TO REVENUE

16. In this section, I show that differences in prize money paid to USSF (i.e., revenue generation) across different tournaments are an important, non-discriminatory, economic factor that Dr. Cook ignores that can explain differences in the size of performance bonuses across the WNT and MNT CBAs. As I detail in Section 4, the differences in prize money are not the only differences between the two CBAs at issue in this case. However, as I show in this section, accounting for just differences in prize money between the relevant MNT and WNT tournaments can explain all of Dr. Cook's alleged "damages."

17. I begin my analysis in Section 3.1, where I show that tournaments that generate larger prize revenue for the USSF tend to have larger bonus payments for the players in the CBA. This is true even if one focuses just on the MNT's CBA—i.e., men receive higher bonus payments for success in tournaments that generate larger prize revenue for the USSF. This is consistent with standard economic principles of performance contracts, which predict that performance bonuses should be tied to revenue generation. This also demonstrates that differences in tournament prize money provide an alternative explanation for differences in tournament performance bonuses.

18. In Section 3.2, I then show that the differences in the size of the performance bonuses *between* the MNT and WNT CBAs that drive all of Dr. Cook's damages can also be explained by differences in prize money across the MNT's and WNT's tournaments. As noted above, Dr. Cook does not in any way account for this factor in her damages calculation. She simply assumes that *any difference* between what the WNT and MNT CBAs pay in performance bonuses is caused by the alleged discrimination.[12] As I show below, revenue generation is an alternative explanation that Dr. Cook has not considered or analyzed.

---

[12] Cook Report, ¶ 7 ("In the event that claimed violations of the Equal Pay Act ('EPA') and Title VII are found by the jury, I have determined the backpay damages suffered by the classes by comparing what each class member would have earned if she had been compensated at the same rate as the male professional soccer player under the U.S. Men's National Team's ('USMNT') collective bargaining agreement ('CBA').").

### 3.1. Performance bonuses and revenue generation

19. A fundamental idea in labor economics is that compensation is tied to the incremental revenue that a worker's performance generates for her employer, particularly in high skill occupations where performance can have a large impact on revenues. Indeed, this economic principle is central to the economics of performance contracts that I detailed in my initial report.

20. As I explained in that report, one of the fundamental reasons firms use performance contracts is to create incentives for workers to engage in activities that generate more revenue for the firm.[13] In other words, the goal of performance contracts is to link the compensation of workers to the revenue and/or profits of the firm. For example, one textbook I cited to in my first report notes the following about performance contracts:

> Examples of performance-based incentives are everywhere. Salespeople at department stores like Nordstrom and Bergdorf Goodman are paid using sales commissions, where they receive a fixed percentage of the revenue their sales generate for the firm. Brand managers at consumer packaged-goods firms like Kraft or Procter & Gamble typically receive year-end bonuses that are linked to the profit generated by their brands. Firms typically grant stock and stock options to chief executive officers; this links CEO wealth to the return that shareholders earn.[14]

21. These economic principles are relevant to the CBA terms at issue in this case. Specifically, a review of the two teams' CBAs shows that the size of performance bonuses for key tournaments correspond to the incremental revenue generation (i.e., prize money) for USSF.

22. Exhibit 2 demonstrates this point by comparing different men's events per the MNT CBA. Specifically, I compare (a) the total prize revenue generated for the USSF (blue bars) to (b) the performance bonus that USSF pays to the MNT (orange bars) for winning five different men's tournaments. As is clear, the magnitude of the performance bonuses differs substantially and corresponds with the differences in total prize money for winning the tournaments. For example, the Gold Cup generates approximately $1 million for USSF if the MNT wins, while the most recent World Cup would have generated $38 million for

---

[13] McCrary Report, § 2.1.
[14] Besanko, D., et al., *Economics of Strategy*, 5th Edition, John Wiley & Sons, Inc., Hoboken, NJ, 2010, at p. 82.

USSF if the MNT had won.

23. These large differences in bonus payments cannot be attributed to discrimination because they occur within the MNT CBA. Revenue generation is one legitimate economic factor that helps explain differences in performance bonuses in the CBAs in a manner unrelated to gender.[15]

---

**EXHIBIT 2**
*Performance bonuses are higher for tournaments with higher prize money*



Source: 2011–2018 MNT CBA, USSF_Morgan_000530 – 78; USSF_Morgan_007836 – 9; USSF_Morgan_042341 – 2; USSF_Morgan_042343 – 4; USSF_Morgan_042345 – 6; USSF_Morgan_081431 – 5
Note: Maximum total payment includes qualification, roster, first round points, second round, quarterfinal, and semifinal bonuses when applicable. The calculation assumes a roster size of 23 players.
[1] The prize revenue is $1,016,667, the average of the 1st place prize for the 2015, 2017, and 2019 edition. Gold Cup per game fee assumes five matches against teams not in the FIFA ranking top 25 and not Mexico, and one match against a team in the FIFA ranking top 25 or Mexico.

---

24. One can also compare prize revenue and bonus payments across time for the same women's tournament. In 2015, FIFA set the prize for winning the Women's World Cup at $2 million, and the MOU that covered the 2015 Women's World Cup provided a maximum of $2.4 million for winning (including qualification, roster, and victory bonuses, excluding player pay for the victory tour).[16] FIFA then raised the prize for winning the Women's World Cup to $4 million for the 2019 tournament, and the CBA that took effect in 2017

---

[15] This is not to say that revenue is the sole determinate of pay or the only factor that drives differences across the CBAs at issue. In Section 4, I discuss other differences between the CBAs at issue.
[16] USSF_Morgan_007840; 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 83.

increased the World Cup bonus payments to players to a maximum of $4.1 million (including qualification, roster, and victory bonuses, excluding player pay for the victory tour).[17] In other words, for both men and women, there is evidence that bonus payments are higher when revenue generation is higher.

25. Documents from the CBA negotiations also show that revenue generation was a factor in the negotiations over CBA terms. For example, at a June 27, 2016 WNT CBA meeting, a USSF representative stated, "Revenue, attendance and TV have to be taken into account. Bonuses are directly related to market realities."[18] At that same meeting, the WNTPA representative responded, "Women brought in $20m more than the men."[19] In a later meeting, a WNTPA representative stated, "We want a CBA where the compensation changes with the times. Compensation should be based on a revenue share."[20]

26. Indeed, the current WNT CBA contains parameters explicitly linking revenue to pay. For example, a provision in the current WNT CBA states that if the WNT participates in any "new International tournaments" where there is an opportunity for the USSF to generate revenue, the parties will discuss the bonus structure.[21] Other examples from the current WNT contract include increased compensation to WNT players or the WNTPA in the event that that "SUM gross revenue exceeds certain targets," or FIFA increases the World Cup prize money.[22]

27. These types of features of the CBAs and negotiations indicate that both sides understand the importance of pay relative to revenue generated, and that revenue generated affects performance bonuses independent of gender.

---

[17] USSF_Morgan_007841 – 2; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

[18] USSF_Morgan_005638 – 777 at 654.

[19] USSF_Morgan_005638 – 777 at 655.

[20] USSF_Morgan_005638 – 777 at 676.

[21] 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 611 ("New tournament bonuses. If the WNT begins participating in any new International tournaments during the term of this Agreement in which there is an **opportunity for the Federation to generate revenue**, the Parties shall meet in good faith to discuss a bonus structure for those tournament(s).") (emphasis added).

[22] 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 629 (describing that if SUM gross revenue exceeds certain targets for 2017–2018 and 2019–2021, USSF would pay the WNTPA 10% of the gross revenue in excess of the targets); 632 ("FIFA Prize Money. If the prize money paid by FIFA for 1st, 2nd, or 3rd place in the FIFA Women's World Cup is increased during the term of this Agreement, the Federation shall pay to the Players 10% of the incremental increase for such prize money the Federation receives from FIFA provided that such prize money received by the Federation exceeds the bonus the Federation has already agreed to pay. In no event shall the sum of the World Cup bonus payable to the Players for placing in the World Cup and the incremental share of prize money paid pursuant to this section fall below 60% of the FIFA prize money paid to the Federation.").

### 3.2. Dr. Cook ignores differences in revenue generation in her damages calculation

28. Dr. Cook's analysis does not attempt to account for differences in prize money across different tournaments in any way. Below, I examine the damages that Dr. Cook finds broken out by the three types of games she analyzes—World Cup games, non-World Cup tournament games, and friendly games. As I show below, the differences in payment terms that underlie Dr. Cook's "damages" come entirely from World Cup and non-World Cup tournament games and can be explained by differences in potential revenue (i.e., prize money) generated across MNT and WNT tournaments.

#### 3.2.1. Differences in World Cup bonuses reflect differences in prize revenue generated

29. I start with an analysis of the World Cup payments. Dr. Cook calculates that $58 million of the $64 million of alleged damages are due to discrepancies in the potential payments to the WNT and the MNT according to each team's CBA, should they win their respective World Cup.[23]

30. A critical economic factor to account for when analyzing differences in World Cup bonuses is that the prize money the USSF receives when the WNT or the MNT performs well differs greatly between the Men's and Women's World Cups. For example, the 2018 Men's World Cup prize money totaled $400 million across all participating teams, with the winning federation collecting $38 million from FIFA.[24] The total prize money pool associated with the 2019 Women's World Cup was $30 million, with the winning federation collecting $4 million from FIFA.[25]

31. Exhibit 3 compares the prize money paid by FIFA to the USSF if the WNT or the MNT win the World Cup to the performance bonuses paid by USSF to the WNT and the MNT according to their CBAs for winning the World Cup. As is clear, the difference in World Cup bonus payments are affected by differences in the prize money paid by FIFA. In fact, if we compare the fraction of the prize money received by the USSF from FIFA that is paid out to the WNT and the MNT, we see that the WNT receives a higher percentage of the prize for winning

---

[23] See Exhibit 1.

[24] FIFA Council confirms contributions for FIFA World Cup participants, accessible at https://www.fifa.com/about-fifa/who-we-are/news/fifa-council-confirms-contributions-for-fifa-world-cup-participants-2917806.

[25] USSF_Morgan_007841 – 42 at 42.

the World Cup relative to the MNT. Specifically, the WNT CBAs paid the WNT 119% of the FIFA prize for winning the Women's World Cup in 2015 and 104% in 2019.[26] The MNT CBA would have paid the MNT a maximum of 72% of the FIFA prize for winning the Men's World Cup in 2014 and 83% in 2018.[27]

---

**EXHIBIT 3**
***Revenue and payments associated with World Cup victories***



Source: 2011–2018 MNT CBA, USSF_Morgan_000530 – 78; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642; 2013–2016 WNT MOU, WNTPA_00004575 – 83; USSF_Morgan_007836 – 39; USSF_Morgan_007840; USSF_Morgan_007841 – 42; FIFA Council confirms contributions for FIFA World Cup participants, accessible at https://www.fifa.com/about-fifa/who-we-are/news/fifa-council-confirms-contributions-for-fifa-world-cup-participants-2917806
Note: Maximum total payment from competition includes qualification, roster, first round points, second round, quarterfinal, and semifinal bonuses when applicable. Women's World Cup does not include Victory Tours. The calculation assumes a roster size of 23 players for the Men's World Cup.

---

32. In her damages calculation, Dr. Cook does not even consider the difference in prize money between the Men's and Women's World Cup shown in Exhibit 3. She calculates that USSF should have paid the WNT players approximately $31.7 million for the 2019 Women's World Cup, more than seven times the prize money FIFA paid the USSF for the WNT winning the 2019 Women's World Cup.[28] For the 2015 Women's World Cup, Dr. Cook calculates that the

---

[26] The WNT CBAs pay a maximum of $2,370,000 for the 2015 Women's World Cup and $4,142,500 for 2019 Women's World Cup, excluding Victory Tour payments. See backup to Exhibit 3; 2013–2016 WNT MOU, WNTPA_00004575 – 83 at 83; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

[27] The MNT CBA pays a maximum of $25,325,500 for the 2014 men's World Cup and $31,656,875 for the 2018 men's World Cup. See backup to Exhibit 3; 2011–2018 MNT CBA, USSF_Morgan_000530 – 78 at 72–73.

[28] Dr. Cook reports $30,550,000 in alleged but-for wages associated with the 2019 Women's World Cup not including per game fees paid to players. See Cook Report, ¶¶ 43–44. Per game fees are $6,875 per game for 23

WNT should have been paid approximately $30.7 million, over 15 times the prize money FIFA paid the USSF. Dr. Cook assumes this difference is due to discrimination.

33. Exhibit 4 presents a different way to see the flaw in Dr. Cook's World Cup analysis. Exhibit 4 compares the prize money and bonus payments from the 2017 Confederations Cup to the Women's World Cup side by side. As shown, winning these two tournaments generates comparable amounts of revenue for USSF. Specifically, winning the 2017 Confederations Cup generates $4.1 million in prize revenue and winning the Women's World Cup generates $4 million in prize revenue.

**EXHIBIT 4**
***The WNT receives more compensation than the MNT for tournaments that generate similar revenue***



Source: 2011–2018 MNT CBA, USSF_Morgan_000530 − 78; 2017–2021 WNT CBA, USSF_Morgan_000587 − 642; USSF_Morgan_007841 − 42; USD 20 million in prize money for FIFA Confederations Cup, accessible at https://www.fifa.com/confederationscup/news/y=2016/m=11/news=usd-20-million-in-prize-money-for-fifa-confederations-cup-teams-2855001.html
Note: Maximum total payment includes qualification, roster, first round points, second round, quarterfinal, and semifinal bonuses when applicable. Women's World Cup does not include Victory Tours. The calculation assumes a roster size of 23 players for the Confederations Cup.

---

players over seven games, totaling $1,106,875. Adding the per game fees to the $30,550,000 results in the same $31.7 million. 2011–2018 MNT CBA, USSF_Morgan_000530 − 78 at 72–73.

34. However, the CBA sets a performance bonus that is 25% higher for the women ($3.2 million to $4 million). In other words, if we compare bonus payments for the 2019 Women's World Cup to bonuses from a MNT tournament that generates comparable revenue, the WNT World Cup bonus is higher. This pattern helps show that the differences in performance bonuses between the Men's and Women's World Cup that Dr. Cook attributes to the alleged discrimination are actually driven by differences in prize revenue generation.

### 3.2.2. Non-World Cup tournament performance bonuses also reflect differences in prize money

35. Dr. Cook's main analysis of non-World Cup tournaments has the same flaw. As with the World Cup, the prize money for non-World Cup tournaments played by the WNT and the MNT differ. Dr. Cook ignores this fact and treats differences in the size of performance bonuses between the MNT and WNT CBAs for winning non-World Cup tournaments as discrimination.[29] Specifically, for the three types of non-World Cup tournaments that Dr. Cook says the WNT plays in—friendly tournaments (e.g., the She Believes Cup), the Olympic Qualifying tournament, and the Olympics—Dr. Cook assumes that women should be paid performance bonuses that align with the average of MNT bonuses for the Gold Cup, Confederations Cup, and Copa America.

36. However, these two sets of tournaments are not comparable. For example, the average prize money for winning the three relevant men's tournaments is $3.9 million and the average performance bonus paid to the men if they win those tournaments is $2.6 million.[30] For the relevant women's tournaments, there is no prize revenue for the USSF and the average performance bonus for winning is $858,000.[31] Yet, in her main damages calculation, Dr. Cook assumes

---

[29] In an alternative calculation, Dr. Cook acknowledges that FIFA does not recognize friendly tournaments that the WNT participates in as official tournaments. Her alternative calculation treats these as friendly matches. Cook Report, ¶ 41 ("Counsel has informed me that USSF has taken the position in this litigation that there is a difference between the tournaments in which the USMNT plays and the tournaments in which the USWNT plays because FIFA has not recognized them as official tournaments. Therefore, as a test of reasonableness of my damage analysis assumptions, I have prepared an alternative calculation that assigns compensation for all USWNT tournaments, except for the World Cup, based on the compensation rate for friendly games as outlined in the USMNT CBA.").

[30] The tournaments included in the average calculation are the Gold Cup, 2016 Copa America, and 2017 Confederations Cup. See workpaper 2 for calculations. 2011–2018 MNT CBA, USSF_Morgan_000530 – 78; USSF_Morgan_070834; USSF_Morgan_042341 – 2; USSF_Morgan_042343 – 4; USSF_Morgan_042345 – 6; USSF_Morgan_081431 – 5; USD 20 million in prize money for FIFA Confederations Cup, accessible at https://www.fifa.com/confederationscup/news/.

[31] The tournaments included in the average calculation are the 2017 She Believes Cup, 2016 Olympic qualifying tournament, and 2016 Olympic Games. See workpaper 2 for calculations. 2017–2021 WNT CBA, USSF_Morgan_000587 – 642; USSF_Morgan_070835.

that the WNT would have been paid the average bonus of the MNT tournaments instead of the WNT bonuses. At a minimum, Dr. Cook should have considered the large differences in prize money when assuming the differences in performance bonuses reflect "damages."[32]

37. If we look at the bonus payment per dollar of prize money from these tournaments (as we did with the World Cup), we again see that the WNT again receives higher pay than the MNT. The men receive just 67% of the prize revenue generated ($2.6 million out of $3.9 million) if they win, while the women receive performance bonuses for winning despite zero dollars in prize revenue.

### 3.2.3. Compensation for friendly matches, salary, and other benefits

38. Other than the World Cup and non-World Cup tournament performance bonuses, the other remaining sources of pay that Dr. Cook analyzes are (1) performance payments for friendly games, (2) the fixed payments for salary and benefits, and (3) several other smaller payments detailed in the CBAs.[33] As shown above in Exhibit 1, Dr. Cook finds *no damages* on these dimensions of pay. In fact, she finds that the actual pay to the WNT across these dimensions is *higher* than the pay they would have received under the MNT. Specifically, Exhibit 1 above shows that, according to Dr. Cook, the WNT team players were actually paid $18.8 million under the terms of the WNT across these dimensions of pay. Dr. Cook then finds that those same players would have earned only $14.8 million had they been compensated according to the MNT CBA.[34]

39. This finding from Dr. Cook demonstrates the tradeoff between salary and

---

[32] These tournaments also differ on other dimensions that make them not comparable. For example, the MNT CBA does not provide for any payments to male players who compete in the men's Olympic Qualifying tournament and the Olympics regardless of their performance. 2011–2018 MNT CBA, USSF_Morgan_000530 – 78. The WNT friendly tournaments are smaller than MNT tournaments, typically consisting of four teams who play three games each that are compensated as friendly matches under the WNT CBAs, with the exception that some friendly tournaments pay a $5,000 tournament victory bonus per player. 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642.

[33] Dr. Cook also considers the signing bonus in the 2017–2021 WNT CBA as a source of player pay. Dr. Cook does not consider the signing bonus contained in the MNT CBA because it was paid to the MNT Players Association, not directly to the players. Dr. Cook nets the WNT signing bonus out of her damages calculation. Cook Report, ¶¶ 61–65. I do not conduct any further analysis with respect to signing bonuses.

[34] These figures include payments related to the Women's World Cup victory tour friendly matches because Dr. Cook treats them as friendly games in the but-for world. Dr. Cook's analysis finds small negative damages on just the victory tour friendly matches because the WNT CBA bonuses for these games are actually higher than MNT CBA bonuses for friendlies. See backup to Exhibit 1.

higher bonuses I detailed in my first report. While the MNT CBA offers higher bonuses for friendly games, it includes no salary and no benefits. As a result, the combined pay of friendly bonuses, salary, and benefits can actually lead to higher pay per game for the WNT than the combination of higher bonuses with no salary under the MNT CBA for a given level of performance.[35]

### 3.3. Actual pay per unit of revenue is also higher for the WNT

40. In this section, I present another way to assess whether the differences in the CBA terms that Dr. Cook assumes represent "damages" can be explained by differences in revenue. Specifically, I assess whether *actual* pay for the WNT was higher as a fraction of *actual* revenue generated than for the MNT. I find that it is. This is unsurprising, given my analysis in Section 3.2. If the WNT CBAs pay more per unit of revenue generated than the MNT CBA does *for the same performance*, then one would expect to see the same pattern in actual pay (which is based on different levels of performance). As I show below, it does.

#### 3.3.1. Actual pay as a fraction of revenue

41. Exhibit 5 presents a comparison of actual pay and actual revenue between the MNT and WNT team over the class period. The analysis focuses on revenues that can be directly allocated to each team's events—e.g., prize monies, ticket sales, and other direct revenues from the games. As Exhibit 5 shows, the WNT players received a total of $25,382,761 for their performance across all 102 tournament and friendly matches ($248,851 per game) during the Title VII class period, while the MNT players received $17,607,740 over 82 games ($214,729 per game) during the same period.[36] Over the same period, the WNT matches generated $93,603,518 in direct revenue over 102 games ($917,682 per game) while the MNT matches generated $72,443,690 in direct revenue over 82 games ($883,460 per game).[37]

42. The revenue and pay numbers, thus, indicate that the WNT received 27% of the revenue their matches generated, while the MNT received 24% of the

---

[35] As I showed in my first report, the pay advantage of the WNT CBA terms is larger when the WNT plays fewer friendly games in a given year because the value of the salary per game increases in that circumstance. Given that Dr. Cook categorizes approximately 12 games a year on average as friendlies in her damages analysis, she finds that the WNT friendly bonuses plus the WNT salary pay more than the MNT friendly bonuses. See, for example, Exhibits 1 and 2 from my first report, which compare sixteen games to eight games; Cook Report, Appendix A.

[36] Supplemental Expert Report of Carlyn Irwin, March 6, 2020, ("Irwin Supplemental Report"), Exhibit 9.A.

[37] Irwin Supplemental Report, Exhibit 4.A.

revenue their matches generated.[38] For comparison's sake, in her report, Dr. Cook estimates that but-for the alleged gender discrimination, the WNT would have been paid $91.8 million since April 6, 2014.[39] These wages would have accounted for 88% of the $104.5 million total revenues generated by WNT matches from January 1, 2014 through December 31, 2019,[40] which is more than 3.5 times the fraction MNT receive.

---

**EXHIBIT 5**
**Total payments to and revenue generated by MNT and WNT: June 11, 2015 – December 31, 2019**

| Team | Total number of matches played | Total revenue generated | Revenue per match | Total payments to players | Payments per match | Pay per game as fraction of revenue per match |
|------|------|------|------|------|------|------|
| 1. WNT | 102 | $ 93,603,518 | $917,682 | $ 25,382,761 | $248,851 | 27.12% |
| 2. MNT | 82 | $ 72,443,690 | $883,460 | $ 17,607,740 | $214,729 | 24.31% |

Source: Irwin Supplemental Report, Exhibit 4.A; Irwin Supplemental Report, Exhibit 9.A
Note: Includes matches and revenue generated between May 29, 2015 and December 31, 2019, and payments to players between June 11, 2015 and December 31, 2019. Total payments to players exclude per diem, monies paid to the respective players associations other than the payment made to the WNT Players Association for the 2015 Victory Tour, and payments to WNT members associated with their play for clubs in the NWSL.

---

43. It is notable in Exhibit 5 that the actual revenue generated by the WNT for USSF is higher than the actual revenue generated by the MNT during the class period. This pattern reflects the comparative performance of the MNT and the WNT during this period. That is, even though the MNT generates more revenue per game *for a given level of performance*, once we account for differences in performance, the WNT generates more revenue (e.g., the WNT won the World Cup in 2015 and 2019 and the MNT did not qualify in 2018). Importantly, however, Exhibit 5 still shows that *the share* of revenue that is paid out to each team is *higher* for the WNT than for the MNT. This captures the fact (discussed in Section 3 above) that the bonus terms in the WNT CBAs are, on average, more favorable than the bonus terms in the MNT CBA *per unit of revenue* generated.

---

[38] I conservatively do not include revenues associated with the men's 2016 Copa America tournament in this analysis. Including these revenues would increase revenue generated by MNT events, and reduce pay per game to the MNT as a fraction of revenue generated by their events.

[39] Cook Report, ¶ 38.

[40] Expert Report of Carlyn Irwin, February 4, 2020 ("Irwin Report"), Exhibit 6; Irwin Supplemental Report, Exhibit 4.A. See workpaper 3.

*3.3.2. Other sources of revenue for the USSF generated by national teams*

44. The foregoing analysis focuses on incremental revenues generated for USSF that can be directly tied to each team's games. As explained above, this includes prize money paid to USSF, as well as other revenue generated from games (e.g., ticket revenue, payments received from other federations for playing away games). The CBA negotiation documents indicate that there have also been negotiations between the USSF and the WNTPA regarding compensation related to revenues from Soccer United Marketing ("SUM") and Nike.[41] A relevant question is whether any differences in CBA terms might be explained by revenues from these sources.

45. In order to assess that question, one would need a method to attribute the SUM and Nike revenues to each of the WNT and MNT reliably. I consider two ways to attribute this revenue below based on available evidence.

- First, evidence in the record from collective bargaining negotiations shows that in 2017 the WNTPA proposed that the WNT players receive compensation as a fraction of certain revenues, including revenue from Nike and SUM, at which point the WNTPA proposed that 27% of this revenue be attributed to the WNT, explaining that this was based on a 3:1 ratio in favor of the MNT, based on the MNT's higher television ratings.[42] If 27% of these revenues were attributed to the WNT and 73% to the MNT, the WNT compensation would have been 17.14% of their revenue and the MNT compensation would have been just 8.01% of their revenue. [43]

- Even if I were to conservatively attribute these additional revenues evenly between the WNT and the MNT (50% to each), the compensation that the WNT received per unit of revenue generated is still higher (13.05% of their revenue) than the MNT (10.16% of their revenue).[44]

---

[41] The USSF earned a total of $201,817,097 in revenue stemming from sponsorship, television, licensing, and royalties between April 1, 2015, and March 31, 2019. Of this total, approximately $107,250,000 was from SUM and approximately $93,528,000 was from Nike. USSF_Morgan_000321 – 46 at 29–30, 37–39; USSF_Morgan_042076 – 96 at 81–82, 87–88.

[42] The WNTPA proposed that they would receive compensation equal to the greater of a fixed salary and bonus structure similar to the WNT's current compensation structure and 35% of WNT Sharable Revenue ("WSR"), of which a component was 27% of all SUM and Nike marketing revenue. WNTPA_00000456 – 64 at 56–59. The 27% ratio was based on the ratio of MNT to WNT television ratings, which was roughly 3:1 in favor of the MNT at the time. USSF_Morgan_005638 – 777 at 676, 702.

[43] See workpaper 4.

[44] See workpaper 4.

## 4. DR. COOK ALSO IGNORES DIFFERENT TRADEOFFS OF RISK VERSUS REWARD BETWEEN THE TWO TEAMS' CBAS

46. Another important difference between the two teams' CBAs that Dr. Cook does not account for in her analysis is differences in the risk versus reward profile. In my initial report, I conducted a review of the terms of the relevant CBAs and concluded that (a) the CBAs include many components of pay, including fixed pay and variable performance pay, (b) those components differ between the WNT CBAs and the MNT CBA, and (c) the WNT CBAs have more fixed payments and the MNT CBA has more bonus payments. These features of the two teams' contracts imply that the CBAs have different levels of risk and, thus, different levels of potential value to different players depending on performance outcomes.

47. To illustrate these concepts, in my initial report I presented several specific scenarios of performance where the WNT generated higher pay per game than the MNT. For example, I showed that the total compensation per game for friendly matches for the WNT under the current WNT CBA (including salary) can sometimes be higher than under the MNT CBA.[45] Additionally, I highlighted the fact that the fixed payments in the WNT CBAs provide insurance for players who do not appear in matches due to injury, coach's decision, or otherwise.

48. As detailed above, Dr. Cook's own calculations confirm the findings of my first report. Dr. Cook finds that the combination of lower bonuses for friendly games and a fixed salary in the WNT CBAs actually paid the WNT *more* than the combination of higher bonuses and no salaries in the MNT CBA. Dr. Cook also finds that players who were not on the roster for games due to injury or performance were better off under the WNT CBAs.[46]

49. Dr. Cook's damages framework provides an additional way to highlight the insurance value of the WNT salaries. In particular, in Exhibit 6, I analyze how the MNT would have been paid under the current WNT CBA since its inception in 2017, using Dr. Cook's own methodology. This exercise helps highlight the insurance value of the WNT CBAs because the MNT performance level during this period was lower than it had been in previous World Cup cycles—i.e., they

---

[45] See McCrary Report, Exhibit 2.

[46] Dr. Cook's analysis of individual players also finds that some WNT players who played in fewer games during the class periods due to injury or performance would have been better off under the WNT CBAs than the MNT CBA because of the insurance value that the WNT salary provides. Cook Report, ¶ 72.ii.

did not qualify for the World Cup, and thus lost out on all bonuses for World Cup play.

50. Exhibit 6 displays the results of this analysis. The first column displays what a MNT player would have made had he participated in *all* of the MNT matches from 2017–2019. This represents *the maximum total* pay an MNT player could have earned from matches during this period under the MNT CBA. Specifically, he would have earned $446,688 from the 48 friendly, World Cup qualifier, and other tournament matches ($9,306 per game).[47] Had this player been paid according to the current WNT CBA as a contracted player, he would have been paid $491,082 for those same 48 ($10,231 per game). Thus, the pay under the WNT CBA for MNT players during this period is *more* than the maximum pay an MNT player could have earned under the MNT CBA.

**EXHIBIT 6**
**A MNT player would have earned more under the current WNT CBA: 2017–2019**

|  | All MNT games | | Christian Pulisic | |
|---|---|---|---|---|
|  | MNT CBA | WNT CBA | MNT CBA[1] | WNT CBA |
| 1. Salary |  | $ 300,000 |  | $ 300,000 |
| 2. Friendly games | $ 178,875 | $ 49,500 | $ 48,125 | $ 10,500 |
| 3. World Cup | - | - | - | - |
| 4. World Cup qualifiers | $ 94,375 | $ 10,500 | $ 94,375 | $ 10,500 |
| 5. Other tournaments | $ 173,438 | $ 131,082 | $ 77,500 | $ 59,999 |
| **Total** | **$ 446,688** | **$ 491,082** | **$ 220,000** | **$ 380,999** |
| 6. Number of games | 48 | 48 | 23 | 23 |
| **Per game total** | **$9,306** | **$10,231** | **$9,565** | **$16,565** |

Source: Irwin Supplemental Report, Exhibit 12.B; 2011–2018 MNT CBA, USSF_Morgan_000530 – 78; 2017–2021 WNT CBA, USSF_Morgan_000587 – 642 at 642; USSF_Morgan_070834; USSF_Morgan_055431; USSF_Morgan_055446; USMNT Results: 2015-2019, accessible at https://www.ussoccerhistory.org/usnt-results/usmnt-results/usmnt-results-2015/; 2017 USMNT Lineups, accessible at https://www.ussoccer.com/usmnt-lineups/2017

Notes: Other tournaments include CONCACAF Cup, Gold Cup, Copa America, and Nations League. Following Dr. Cook's methodology, I assign the averge WNT non-World Cup tournament pay to the MNT non-World Cup tournament pay. The non-World Cup pay is an average of SheBelieves Cup, the Olympic qualifying tournament, and the Olympic games. See backup for details on these calculations.

[1] Mr. Pulisic was paid $2,802 less than the CBA terms dictated. See Irwin Supplemental Report, Exhibit 12.B. It is my understanding that the payment of certain games, such as those played in October of 2019, were compensated differently from the CBA terms because the team decided to split the payments evenly between the players in the roster and the players who attended camp but were not in the roster. USSF_Morgan_055446.

51. The pay advantage of the WNT CBA widens when we consider actual players who did not in fact play in *all* games during this period. For example, the final two columns repeat the same exercise for Christian Pulisic who has played in 23

---

[47] To calculate what a MNT player would have earned in a non-World Cup tournament, I follow Dr. Cook and apply the average payments for WNT non-World Cup tournaments, including a friendly tournament (such as the She Believes Cup or the Four Nations Tournament), Olympic qualifiers, and the Olympics.

MNT games since 2017.[48] The results are similar for Christian Pulisic; according to the MNT CBA, he earned a total of $220,000, or $9,565 per game.[49] Had he been paid according to the WNT CBA as a contracted player, he would have earned $380,999, or $16,565 per game.

52. In addition to highlighting the insurance value of the WNT contract, the analysis in Exhibit 6 also highlights a broader methodological flaw in Dr. Cook's approach to damages. In her analysis, Dr. Cook assumes that any difference in pay between the MNT and WNT for a given level of performance is *caused* by discrimination. If one applies Dr. Cook's approach to Exhibit 6, the appropriate conclusion would be that the MNT CBA discriminates against men because it pays the MNT less than the WNT for its performance over the past three years. In other words, USSF is somehow discriminating against men and women at the same time. A more reasonable interpretation of the result is that the two teams' CBAs present different tradeoffs and, depending on the performance of any given player, either can lead to higher pay.

---

[48] Mr. Pulisic is a prominent MNT player, having won USSF's Male Player of the Year award in both 2017 and 2019, becoming the youngest player to win multiple Male Player of the Year awards. Pulisic voted as 2019 U.S. Soccer Male Player of the Year, accessible at https://www.ussoccer.com/stories/2019/12/pulisic-voted-as-2019-us-soccer-male-player-of-the-year.

[49] Mr. Pulisic was paid $2,802 less than the CBA terms dictated. See Irwin Supplemental Report, Exhibit 12.B. It is my understanding that the payment of certain games, such as those played in October of 2019, were compensated differently from the CBA terms because the team decided to split the payments evenly between the players in the roster and the players who attended camp but were not in the roster. USSF_Morgan_055446.

## 5. CONCLUSION

53. The analyses presented above demonstrate that Dr. Cook's damages analysis is fundamentally flawed. As detailed in my first report, the WNT and MNT CBAs differ on a variety of dimensions that present different economic tradeoffs. These differences between the CBAs need to be accounted for when determining if the WNT CBAs pay players systematically less than the MNT for a given level of performance. Dr. Cook does not attempt to account for *any* of these differences.

54. As shown in Section 3 above, the differences in performance bonuses between the WNT and MNT CBAs that Dr. Cook treats as "damages" can be explained by differences in prize money paid to USSF across World Cup and non-World Cup tournaments. Once prize money is accounted for, I have shown that the terms of the WNT CBAs pay the WNT a higher fraction of the prize money for a given level of performance than the terms of the MNT CBA. Additionally, I highlight the fact that Dr. Cook's own analysis shows that, on all other payment terms outside of the bonuses for World Cup and non-World Cup tournaments, the WNT CBAs actually pays the women *more* than the MNT CBA would. This result reinforces the analysis in my first report. While the MNT has higher bonuses for non-tournament games (i.e., friendlies), the salary paid to WNT more than offsets this bonus.

55. Furthermore, I showed that the WNT CBAs have an additional benefit of limiting risk. The WNT CBAs have fixed payments, which ensures that players will be paid even if their performance is not as expected. For example, I show that MNT players would have in fact been paid more under the WNT CBA than their own CBA since the current WNT CBA took effect.

56. For these reasons, I find that the available evidence does not support Plaintiffs' claim that differences in the WNT CBAs and MNT CBA reflect gender discrimination, rather than legitimate economic factors.

## 6. RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE PORTIONS OF MY INITIAL REPORT

57. I understand that Plaintiffs filed a motion to exclude certain opinions in my first report. In this section, I respond to Plaintiffs' claims in that motion. As I show below, Plaintiffs have misrepresented both the content of my opinions and the relevance of my analysis for the issues in the case. As detailed throughout my initial report and in this report, in order to assess Plaintiffs' claim that the MNT CBA pays more than the WNT CBAs, it is necessary to analyze the different economic tradeoffs and benefits across the different clauses in the men's and women's CBAs. Below I explain how Plaintiffs' claims in their motion to exclude misrepresent my opinions on these topics.

58. In Plaintiffs' motion to exclude they assert the following with regard to my opinion:

> McCrary offers the unsupported opinion that when one group of employees has one mix of base compensation and bonus compensation, and another group of employees has a different mix of base compensation and bonuses compensation, there is no way to determine if the compensation schemes are discriminatory because of the different 'risks' presented.[50]

59. This assertion is incorrect and baseless. I did not express any such opinion in my first report, nor do I believe such an opinion to be true. In fact, as I explain below, my view is that it *is* possible to determine if a compensation scheme is discriminatory, on the basis of gender or otherwise, even if compensation for risk is present.

60. However, in this matter, and as I have explained throughout both of my reports, the WNT and MNT CBAs include very complex compensation arrangements, with varying levels of base compensation and bonuses across and between the teams. This means that to determine whether the two CBAs are consistent with discrimination in pay, one needs a methodology that puts the varying components of compensation in the contracts on the same scale. In my first report, I conveyed this opinion as follows:

---

[50] Plaintiffs' Notice of Motion and Motion to Exclude Defendant's Expert Testimony; Memorandum of Points & Authorities in Support, *Alex Morgan, et al. v. United States Soccer Federation, Inc.*, February 20, 2020 ("Motion to Exclude"), p. 14.

> Assessing whether the total compensation is higher for any given player over a given set of games under a given CBA relative to another requires (a) accounting for the tradeoffs of all relevant components of pay and (b) accounting for the risk (or uncertainty) in compensation that arises from performance clauses.[51]

61. In my initial report, I also expanded upon those general principles and provided concrete examples. My initial report demonstrated that, for specific examples of performance, the CBAs for the WNT compensate players at a higher rate than for the MNT, and for other examples of performance, the opposite was true.[52] Based on these facts and analyses, the opinion I offered in my first report (which I further corroborate in this report) is that the MNT CBA is not systematically better than the WNT CBAs for a given level of performance. The fundamental reason why gender differences in compensation can switch from positive to negative is that the CBAs present different tradeoffs over fixed payments and bonuses.

62. Indeed, as I have discussed above, the analysis of Dr. Cook (Plaintiffs' own expert) confirms my opinion. Dr. Cook finds no damages for friendly games because the salary and other fixed payments in the WNT CBAs more than offset the fact that the WNT receives lower bonuses on friendly games than the MNT. This result highlights the fact that the fixed payments in the WNT CBAs can make it a more favorable contract than the MNT CBA, depending on circumstances that cannot be known when the contracts are negotiated.

63. Importantly, counter to Plaintiffs' claims, my opinion in no way implies that discrimination cannot occur when two groups of people are paid using different contracts. Indeed, in their motion to exclude, Plaintiffs present an example where I agree discrimination may have occurred. Specifically, they consider an example of a firm that pays men 25% commission and a $5,000 base salary and pays women 5% commission and a $10,000 base salary. They then point out that if a woman generates $4 million in sales she would receive $210,000, while a male who sold $4 million would earn $1 million total. The motion to exclude concludes, "Dr. McCrary would opine you cannot determine if discrimination exists in this scenario because the woman had a larger base salary and thus

---

[51] McCrary Report, ¶ 12.

[52] McCrary Report, ¶ 12 ("In a variety of scenarios that occurred under each CBA during the class periods, the value of the fixed payments that the WNT players receives would more than offset the larger variable performance pay that the MNT players may receive.").

incurred less 'risk.'"[53] This statement again misrepresents my views. There could well be scenarios where I believed the broader context warranted a conclusion that there was discrimination. For example, if it were known at the time of contracting that sales for both men and women were going to be $4 million and there were no other relevant factors affecting pay, then it is obvious that the contract would entail women being compensated less than men.

64. There could also be scenarios where I believed the broader context meant a conclusion of discrimination was not supportable. That is the conclusion I have reached regarding this matter. What I show in both this report and my prior report—and what Dr. Cook's own analysis confirms—is that (1) the MNT and WNT generate different levels of revenue for a given level of performance, (2) there is uncertainty in performance at the time CBAs are negotiated, (3) the CBAs expose the MNT and WNT to different levels of risk, and (4) different players play in different amounts of games, such that salary becomes a more important component of pay. These factors are precisely why it is important to analyze the different tradeoffs between salary and bonus in the WNT and MNT CBAs.[54]

65. Finally, it is notable that, in calling my analysis "junk science," Plaintiffs do not cite to any scientific treatise, article, or textbook that challenges the economic principles I rely on. I have cited to both textbooks and scholarly research that lay out the basic economic principles that underlie the use of performance contracts and the tradeoffs that different performance contracts present to different employees. These are basic and widely accepted principles in economics.

_Justin McCrary_

—————————————————
**Justin McCrary**
**March 6, 2020**

---

[53] Motion to Exclude, p. 16.

[54] Plaintiffs also assert the following in their motion to exclude: "There is no case that has ever accepted Dr. McCrary's view that it is impossible to determine if there was discrimination when different combinations of compensation terms are employed." Motion to Exclude, p. 15. This claim, again, is a red herring because, as explained above, I did not express an opinion in my report that it is impossible to determine if there was discrimination when different combinations of compensation terms are employed. In fact, I disagree with that opinion.

## 7. APPENDIX A – CURRICULUM VITAE

# Justin McCrary

Columbia University
School of Law
521 Jerome Greene Hall
New York, NY 10027

| | |
|---|---|
| Cell Phone: | (510) 409-6418 |
| Email: | justin.mccrary@gmail.com |
| Homepage: | https://www.law.columbia.edu/faculty/justin-mccrary |

## Current Appointments

Columbia University
2018–   Paul J. Evanson Professor of Law

National Bureau of Economic Research
2012–   Faculty Research Associate

## Past Appointments

Columbia University
Fall 2017   Samuel Rubin Visiting Professor of Law

University of California, Berkeley
2014–17   Director, Social Sciences Data Laboratory (D-Lab)
2010–19   Professor of Law
2008–10   Assistant Professor of Law

European Central Bank (Banco de España)
2013–14   Economist

University of Michigan
2003–07   Assistant Professor, Gerald R. Ford School of Public Policy
2003–07   Assistant Professor, Department of Economics (courtesy)

National Bureau of Economic Research
2006–12   Faculty Research Fellow
2008–19   Co-director, Crime Working Group

Federal Reserve Bank of New York
1996–98   Assistant Economist

## Education

Ph.D. Economics, University of California, Berkeley, 2003

A.B. Public Policy, Princeton University, 1996

## Testimony Experience

*County of Suffolk v. Purdue Pharma LP, et al.; County of Nassau v. Purdue Pharma LP, et al.; and The People of the State of New York v. Purdue Pharma LP, et al.*
Supreme Court of the State of New York, County of Suffolk

Prescription opioid medication litigation

Testimony regarding causation, economics of crime, regression methodology

Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

Deposed on February 25, 2020

Report filed on February 3, 2020

*Government of the United States Virgin Islands v. Toyota Motor Corporation, et al.*
Superior Court of the Virgin Islands, Division of St. Thomas and St. John

    Consumer products liability case

    Testimony regarding the car market and damages methodologies

    Retained by Ford Motor Company

    Deposed on February 14, 2020

    Report filed on January 31, 2020

*Alex Morgan, et al. v. United States Soccer Federation, Inc.*
U.S. District Court for the Central District of California

    Putative class action alleging discrimination in pay

    Testimony regarding law and economics

    Retained by United States Soccer Federation

    Report filed on February 4, 2020

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
U.S. District Court for the Eastern District of New York

    Antitrust case

    Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

    Retained by Mastercard, Bank of America, Barclays, Capital One, Citibank, Fifth Third, First National Bank of Omaha, HSBC, JPMorgan Chase, PNC, SunTrust, Texas Independent Bancshares, and Wells Fargo

    Deposed on January 14, 2020

    Report filed on June 10, 2019

*Olson, Perez, Postmates, and Uber v. State of California*
U.S. District Court for the Central District of California

    U.S. constitutional objection to California adoption of Assembly Bill 5

    Testimony regarding two-sided markets and flexible work arrangements

    Retained by Postmates and Uber

    Report filed on January 8, 2020

*Rescap Liquidating Trust v. Primary Residential Mortgage, Inc.*
U.S. District Court for the District of Minnesota

    Mortgage-backed securities case (bankruptcy)

    Testimony regarding sampling, damages, and statistical concepts

    Retained by Primary Residential Mortgage, Inc.

    Deposed on October 23, 2019

    Supplemental report filed on August 23, 2019

    Report filed on August 9, 2019

*Phoenix Light SF Limited, et al. vs. Wells Fargo Bank*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case (servicing)

    Testimony regarding matching and other statistical methodologies

    Retained by Wells Fargo Bank

    Deposed on October 4, 2019

    Report filed on July 25, 2019

*Jacob Beaty and Jessica Beaty vs. Ford Motor Company*
U.S. District Court for the Western District of Washington

   Consumer products liability case

   Testimony regarding conjoint analysis and heterogeneity

   Retained by Ford Motor Company

   Deposed on June 25, 2019

   Class certification report filed on May 24, 2019

*Shamrell v. Apple Inc.*
Superior Court of the State of California, County of San Diego

   Putative class action regarding products liability, Unfair Competition Law and Consumers Legal Remedies Act

   Testimony regarding heterogeneity across putative class members, failure rate methodologies, econometrics, and data science

   Retained by Apple, Inc.

   Deposed on June 6, 2019

   Supplemental class certification report filed on October 17, 2018

   Class certification report filed on March 29, 2017

   Report filed on February 1, 2017

*Cuyahoga County v. Purdue Pharma LP, et al., and Summit County v. Purdue Pharma LP, et al.,*
U.S. District Court of the Northern District of Ohio

   Prescription opioid medication litigation

   Testimony regarding causation, drug use, economics of crime, regression methodology

   Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

   Deposed on May 31, 2019

   Report filed on May 10, 2019

*Lerman v. Apple Inc.*
U.S. District Court for the Eastern District of New York

   Putative class action regarding products liability

   Testimony regarding heterogeneity across putative class members, the nature of products, and conjoint analysis

   Retained by Apple, Inc.

   Deposed on May 29, 2019

   Report filed on April 3, 2019

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc.*
Supreme Court of the State of New York, County of New York

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Morgan Stanley

   Deposed on May 15, 2019

   Report filed on October 19, 2018

*Rebuttal Testimony of Powerex Corp re: BPA Southern Intertie Hourly Rate*
U.S. Department of Energy, Bonneville Power Administration

Administrative proceeding concerning the rates for transmission of electricity

Testimony regarding regression methodology

Retained by Powerex Corp.

Testimony before the Hearing Officer on April 23, 2019

Report filed on March 28, 2019

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*
U.S. District Court for the Southern District of New York

Antitrust price fixing case (Sherman Act §§ 1, 3 and Commodity Exchange Act)

Testimony regarding trader communications and sampling methodologies

Retained by Credit Suisse

Deposed on January 17, 2019

Report filed on October 25, 2018

*Financial Guaranty Insurance Company v.  Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley & Co.  LLC, as successor to Morgan Stanley & Co.  Inc., Morgan Stanley, and Saxon Mortgage Services, Inc.*
Supreme Court of the State of New York, County of New York

Mortgage-backed securities case

Testimony regarding sampling and statistical methods

Retained by Morgan Stanley

Deposed on January 8, 2019

Report filed on August 7, 2018

*Trinidad Lopez v. Liberty Mutual Insurance Company*
U.S. District Court for the Central District of California

Wage and hour case after class certification

Testimony regarding damages and statistics

Retained by Liberty Mutual

Report filed on December 21, 2018

*Samsung Electronics Co., Ltd., v. Kuroda Electric Co., Ltd., Sakai Display Products Corporation and Sharp Corporation*
International Chamber of Commerce

Contractual dispute regarding supply of television panels

Testimony regarding economic theory, data science, statistics

Retained by Samsung Electronics Co.

Testified at arbitration hearing on December 20, 2018

Report filed on September 28, 2018

*In re: Part 60 RMBS Put-Back Litigation*
Supreme Court of the State of New York, County of New York

Mortgage-backed securities case

Testimony regarding sampling and statistical methods

Retained by Morgan Stanley Mortgage Capital Holdings LLC

Deposed on November 27, 2018

Report filed on June 22, 2018

*In Re: RFC and ResCap Liquidating Trust Litigation*
U.S. District Court for the District of Minnesota and
U.S. Bankruptcy Court for the Southern District of New York

Mortgage-backed securities case (bankruptcy)

Testimony regarding sampling, damages, and statistical concepts

Retained by Advanced Financial Services, BMO Harris Bank, Cadence Bank, Colonial Savings, CTX Mortgage, Decision One, First Guaranty, Freedom Mortgage, Home Loan Center, HSBC Mortgage, Impac Funding, PNC, Provident, Standard Pacific, Synovus, and Universal American

Testified at jury trial on November 1, 2018 (Minnesota; Home Loan Center)

Final rebuttal report filed on June 14, 2018

Deposed on April 24, 2018

Rebuttal to supplemental disclosure filed on February 26, 2018

Report filed on October 27, 2017


*Residential Funding Company v. Universal American Mortgage Co.*
U.S. District Court for the District of Minnesota

Mortgage-backed securities case (bankruptcy)

Testimony regarding sampling and statistical methods

Retained by Universal American Mortgage Co.

Report filed on August 30, 2018

*In re Gateway Plaza Residents Litigation*
Supreme Court of the State of New York, County of New York

Putative class action regarding warranty of habitability

Testimony regarding electricity usage, individual preferences and choices, and heterogeneity across putative class members; large scale data analysis

Retained by Gateway Plaza

Supplemental class certification and rebuttal report filed on August 8, 2018

Class certification report filed on September 18, 2017

*United States of America v. SavaSeniorCare*
U.S. District Court for the Middle District of Tennessee

False Claims Act case

Testimony regarding sampling and statistical methods

Retained by SavaSeniorCare

Report filed on August 6, 2018

*Latoya Brown et al. v. Madison County, Mississippi*
U.S. District Court for the Southern District of Mississippi

Putative class action alleging violations of Section 1983 and the Fourth and Fourteenth Amendments

Testimony regarding regression methodologies, measurement error, and data science

Retained by Latoya Brown et al.

Report filed on July 2, 2018

*Martin Dulberg et al. v. Uber Technologies, Inc. and Rasier, LLC*
U.S. District Court for the Northern District of California

   Putative class action alleging breach of contract

   Testimony regarding heterogeneity in damages across putative class members

   Retained by Uber Technologies, Inc.

   Supplemental report filed on June 28, 2018

   Affirmative report filed on January 11, 2018

*Tri-City, LLC; Endor Car and Driver, LLC; Zehn-NY, LLC; Zwei-NY, LLC; Abatar, LLC; and Flatiron Transit, LLC v. New York Taxi and Limousine Commission and Meera Joshi*
Supreme Court of the State of New York, County of New York

   Article 78 proceeding challenging an administrative ruling

   Testimony regarding mismatch between accessibility regulation and accessibility demand

   Retained by plaintiffs

   Supplemental report filed on May 18, 2018

   Affirmative report filed on April 13, 2018

*Federal Home Loan Bank of Boston, v. Ally Financial, Inc., et al.*
Superior Court of the State of Massachusetts, Business Litigation Session, Suffolk County

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Morgan Stanley

   Report filed on May 17, 2018

*Cheryl Phipps and Shawn Gibbons v. Wal-Mart Stores, Inc.*
U.S. District Court for the Middle District of Tennessee

   Putative class action alleging discrimination in employment

   Testimony regarding the decentralized nature of Walmart's internal labor market and concomitant heterogeneity across proposed class members in pay and promotion outcomes

   Retained by Walmart

   Deposed on April 30, 2018

   Report filed on April 20, 2018

*People of the State of California v. Morgan Stanley & Co.*
Superior Court of the State of California, County of San Francisco

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Morgan Stanley & Co.

   Deposed on February 9, 2018

   Report filed on January 25, 2018

*Tony Dickey and Paul Parmer et al. v. Advanced Micro Devices, Inc.*
U.S. District Court for the Northern District of California

   Putative class action alleging false advertising

   Testimony regarding availability of information regarding and market for computer chips and heterogeneity across putative class members

   Retained by Advanced Micro Devices

   Report filed on January 26, 2018

*Federal Home Loan Bank of Chicago v. Banc of America Funding Corporation, et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

   Mortgage-backed securities case

   Testimony regarding sampling, regression, and statistical methods

   Retained by Morgan Stanley

   Deposed on December 14, 2017

   Report filed on August 21, 2017

*In re Lehman Brothers Holdings, Inc., et al., Debtors*
U.S. Bankruptcy Court for the Southern District of New York

   Mortgage-backed securities case

   Testimony regarding sampling, resampling methods for inference, and statistical methods

   Retained by Lehman Brothers Holdings, Inc.

   Deposed on October 9, 2017

   Report filed on August 28, 2017

*Deutsche Bank National Trust Company v. Morgan Stanley Mortgage Capital Holdings LLC*
U.S. District Court for the Southern District of New York

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Morgan Stanley Mortgage Capital Holdings LLC

   Deposed on March 27, 2017

   Report filed on December 16, 2016

*Rosen v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

   Putative class action regarding false advertising

   Testimony regarding economics of safety

   Retained by Uber Technologies, Inc.

   Deposed on February 3, 2017

   Report filed on January 13, 2017

   Affirmative report filed on December 2, 2016

*Blackrock Allocation Target Shares: Series S Portfolio, et al., v. Wells Fargo Bank, N.A.; Royal Park Investments SA/NV v. Wells Fargo Bank, N.A., as Trustee; National Credit Union Administration Board, et al., v. Wells Fargo Bank, N.A.; Phoenix Light SF Limited, et al., v. Wells Fargo Bank, N.A.; and Commerzbank AG v. Wells Fargo Bank, N.A.*
U.S. District Court for the Southern District of New York

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Wells Fargo Bank

   Report filed on January 18, 2017

*LA Taxi Cooperative, Inc. et al. v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

 False advertising case

 Testimony regarding economics of safety

 Retained by Uber Technologies, Inc.

 Report filed on January 13, 2017

 Affirmative report filed on November 18, 2016


*State of Illinois v. Hitachi Ltd., et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

 Antitrust price-fixing case

 Testimony regarding liability and damages

 Retained by Hitachi Ltd.

 Report filed on November 11, 2016


*In re: City of San Bernardino, California, Debtor*
U.S. Bankruptcy Court, Central District of California, Riverside Division

 Municipal bankruptcy case

 Testimony regarding economics, econometrics, rare risks and the value of a statistical life

 Retained by the City of San Bernardino

 Report filed on October 3, 2016


*U.S. Bank National Association v. Morgan Stanley Mortgage Capital Holdings LLC*
Supreme Court of the State of New York, County of New York

 Mortgage-backed securities case

 Testimony regarding sampling and statistical methods

 Retained by Morgan Stanley Mortgage Capital Holdings LLC

 Deposed on September 10, 2016

 Report filed on June 17, 2016


*National Credit Union Administration Board v. RBS Securities, Inc.*
U.S. District Court for the Central District of California &
U.S. District Court for the District of Kansas

 Mortgage-backed securities case

 Testimony regarding sampling and statistical methods

 Retained by RBS Securities

 Deposed on January 28, 2016

 Report filed on October 16, 2015


*Temple-Inland, Inc., v. Thomas Cook, et al.*
U.S. District Court for the District of Delaware

 Escheat law case

 Testimony regarding sampling, statistical methods, and economic theory

 Retained by the State of Delaware

 Deposed on November 24, 2015

 Report filed on October 23, 2015

*National Consumer Protection Service v. Farmacias Cruz Verde S.A. et al.*
Honorable Civil Court of Santiago (Chile)

    Antitrust putative class action

    Testimony regarding appropriate methods for estimating damages

    Retained by Salcobrand

    Report filed on November 14, 2015

*Douglas O'Connor, et al., v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

    Putative class action regarding independent contractor versus employee

    Testimony regarding heterogeneity in alleged damages across putative class members, potential for class conflict

    Retained by Uber Technologies, Inc.

    Report filed on October 27, 2015

    Report filed on July 7, 2015

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*
U.S. District Court for the District of Massachusetts

    Discovery dispute in affirmative action case

    Testimony regarding necessary inputs into statistical methodologies

    Retained by Harvard College

    Report filed on July 30, 2015

*Securities and Exchange Commission v. James V. Mazzo and David L. Parker*
U.S. District Court for the Central District of California

    Civil insider trading suit

    Testimony regarding probability theory and statistics

    Retained by James V. Mazzo and David L. Parker

    Deposed on May 13, 2015

    Report filed on March 13, 2015

*In re: City of Stockton, California, Debtor*
U.S. Bankruptcy Court, Eastern District of California

    Municipal bankruptcy suit

    Testimony regarding economic theory, labor economics, and econometrics

    Retained by the City of Stockton

    Deposed on March 13, 2013

    Report filed on February 15, 2013

*In the Matter of Act 111 Interest Arbitration Between Commonwealth of Pennsylvania and Pennsylvania State Troopers Association*

    Hearings on wage setting

    Testimony regarding rare risks and the value of a statistical life

    Retained by the Pennsylvania State Troopers Association

    Testified at arbitration hearing on December 4, 2012

    Report filed on December 4, 2012

## Scholarship on Sampling, Statistics, and Econometrics

Conservative Tests Under Satisficing Models of Publication Bias (with Garret Christensen and Daniele Fanelli)
*PLOS One*, Volume 11, Number 2, February 22, 2016

New Evidence on the Finite Sample Properties of Propensity Score Matching and Reweighting Estimators (with Matias Busso and John DiNardo)
*Review of Economics and Statistics*, Volume 96, Number 5, December 2014

Incomes in South Africa Since the Fall of Apartheid (with Murray Leibbrandt and James Levinsohn)
*Journal of Globalization and Development*, Volume 1, Issue 1, January 2010

Manipulation of the Running Variable in the Regression Discontinuity Design: A Density Test
*Journal of Econometrics*, Volume 142 , Issue 2, February 2008

## Scholarship on Competition

Measuring Benchmark Damages in Antitrust Litigation (with Daniel L. Rubinfeld)
*Journal of Econometric Methods*, Volume 3, January 2014

## Scholarship on Finance

Dark Trading at the Midpoint: Pricing Rules, Order Flow, and Price Discovery (with Robert Bartlett)
Accepted, *Journal of Law, Finance, and Accounting*

How Rigged Are Stock Markets?: Evidence from Microsecond Timestamps (with Robert Bartlett)
Conditionally Accepted, *Journal of Financial Markets*

Subsidizing Liquidity with Wider Ticks: Evidence from the Tick Size Pilot Study Timestamps (with Robert Bartlett)
Conditionally Accepted, *Journal of Empirical Legal Studies*

Shall We Haggle in Pennies at the Speed of Light or in Nickels in the Dark?: How Minimum Price Variation Regulates High Frequency Trading and Dark Liquidity (working paper, 2015, with Robert Bartlett)

## Scholarship on Risk and Crime

Why We Need Police (with Deepak Premkumar)
Chapter 3 in *The Cambridge Handbook of Policing in the United States*, Tamara Rice Lave and Eric Jr. Miller, eds., Cambridge University Press, June 2019

Are U.S. Cities Underpoliced? Theory and Evidence (with Aaron Chalfin)
*Review of Economics and Statistics*, Volume 100, Issue 1, March 2018, 167–186

Criminal Deterrence: A Review of the Literature (with Aaron Chalfin)
*Journal of Economic Literature*, Volume 55, Number 1, March 2017, 5–48 (lead article)

The Deterrence Effect of Prison: Dynamic Theory and Evidence (with David S. Lee)
*Advances in Econometrics*, Volume 38, 2017, editors Matias D. Cattaneo and Juan Carlos Escanciano
2018 Emerald Literati Award, Outstanding Author Contribution

Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process: An Empirical Inquiry (with Tamara Lave)
*Brooklyn Law Review*, Volume 78, Summer 2013, Number 4, 1391–1439

General Equilibrium Effects of Prison on Crime: Evidence From International Comparisons (with Sarath Sanga)
*Cato Papers on Public Policy*, Volume 2, 2012

*Controlling Crime: Strategies and Tradeoffs* (co-edited with Phil Cook and Jens Ludwig), Chicago: University of Chicago Press, 2011.

## Scholarship on Labor Economics

Unmarked?  Criminal Record Clearing and Employment Outcomes (with Jeffrey Selbin (lead author) and Joshua Epstein)
  *Journal of Criminal Law and Criminology*, Volume 108, Number 1, 2017 (lead article)

The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Laws Using Exact Date of Birth (with Heather Royer)
  *American Economic Review*, Volume 101, Number 1, February 2011

Comment on "Free to Punish? The American Dream and the Harsh Treatment of Criminals", by Rafael di Tella and Juan Dubra
  *Cato Papers on Public Policy*, Volume 1, 2011

Dynamic Perspectives on Crime
  in *Handbook of the Economics of Crime*, Chapter 4, Edward Elgar, 2010

The Effect of Court-Ordered Hiring Quotas on the Composition and Quality of Police
  *American Economic Review*, Volume 97, Number 1, March 2007

Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment
  *American Economic Review*, Volume 92, Number 4, September 2002

## Scholarship on Intellectual Property

A Reconsideration of Copyright's Term (with Kristelia A. Garcia)
  forthcoming, *Alabama Law Review*

## Scholarship on Monetary Policy

Following Germany's Lead: Using International Monetary Linkages to Estimate the Effect of Monetary Policy on the Economy (with Julian di Giovanni and Till von Wachter)
  *Review of Economics and Statistics*, Volume 91, Number 2, May 2009

## Other Scholarship

The Ph.D. Rises in American Law Schools, 1960-2011:  What Does It Mean for Legal Education?  (with Joy Milligan and James Phillips)
  *Journal of Legal Education*, Volume 65, Number 543, Spring 2016

## Referee

*Econometrica*

*American Economic Review*

*Quarterly Journal of Economics*

*Journal of Political Economy*

*Review of Economic Studies*

*Journal of Econometrics*

*Journal of Economic Literature*

*Review of Economics and Statistics*

*Journal of the American Statistical Assocation*

*American Economic Journal*

*Advances in Econometrics*

*American Law and Economics Review*

*International Law and Economics Review*

*Journal of Labor Economics*

*Journal of Econometric Methods*

*Industrial and Labor Relations Review*

*Journal of Law and Economics*

*Journal of Empirical Legal Studies*

*Journal of Urban Economics*

*Journal of Quantitative Criminology*

*American Political Science Review*

*American Sociological Review*

*Stanford Law Review*

*Yale Law Journal*

*Columbia Law Review*

## Other Activities

2019–   Member, Board of Directors, Plectica, LLC

2017–   Member, Board of Directors, American Law and Economics Association

2007–19  Co-Director (with Phil Cook and Jens Ludwig), *Crime Working Group*, National Bureau of Economic Research

2009–14  Co-Director, *Law and Economics Program*, University of California, Berkeley

## Courses Taught

### Columbia

2020-21  (upcoming) L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2019-20  L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall)

2018-19  L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2017-18  L6231: Corporations (Fall)

### Berkeley

2016-17   Law 244.4: Litigation and Statistics (Fall); Law 216: Law and Economics Workshop (Fall); Law 218.6: Law and Economics of Discrimination (Fall)

2015-16   Law 250: Business Associations (Fall); Law 244.4: Litigation and Statistics (Fall); Letters and Science 39D: Race, Policing, and Data Science (Fall)

2014-15   Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer)

2013-14   Law 250S: Business Associations (Summer)

2012-13   Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall)

2011-12   Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall); Law 251.31: Introduction to Law, Economics, and Business (Spring); Legal Studies 145: Law and Economics I (undergraduate)

2010-11   Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 216: Law and Economics Workshop (Fall and Spring); Legal Studies 145: Law and Economics I (undergraduate); Law 209.6: Topic in Quantitative Methods (JSP); Econ 250C: Labor Economics (graduate, shared course with 209.6)

2009–10   Law 216: Law and Economics Workshop (Fall and Spring); Law 209.32: Quantitative Methods II (JSP)

2008–09   Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP); Law 209.32: Quantitative Methods II (JSP)

2007–08   Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP)

### Michigan

Introduction to Quantitative Methods (policy), First Econometrics Field Course (economics), Advanced Economic Theory (policy)

## Grants and Fellowships

2007–2010   NIH, Constructive Proposals for Dealing With Attrition (with John DiNardo)

2009   Committee on Research, Junior Faculty Research Grant, UC Berkeley

2006–2009   NIH, The Effect of Female Education on Fertility and Infant Health (with Heather Royer, Grant # R03 HD051713)

2006–2011   NSF, New Instrumental Variables Estimates of the Effects of Schooling and Military Service: Empirical Strategies Using Non-Public-Use Data (with Josh Angrist and Stacey Chen)

2005   RWJ Foundation Health and Society Scholars Program, Small Grant Program

2004   Rackham Interdisciplinary Grant, University of Michigan

2004   CLOSUP Grant, University of Michigan

2004   National Poverty Center Grant, University of Michigan

2002–2003   Chancellor's Dissertation Year Fellowship, UC Berkeley

## Presentations

2018–2019  Columbia University, School of Law; Conference on Empirical Legal Studies, University of Michigan

2017–2018  Columbia University, School of Law; Georgetown University, School of Law

2016–2017  George Mason University, School of Law; University of Michigan, Economics Department (Summer, Fall); Equities Leaders Summit; University of Zürich, Department of Economics; ETH (Swiss Federal Institute of Technology) Zürich, Law and Economics; Northwestern University, School of Law; Duke University, School of Law; Duke University, Information Initiative

2015–2016  Goldman Sachs; University of California, Berkeley, School of Law; University of Virginia, School of Law; University of California, Irvine; Equal Employment Opportunity Commission; National Bureau of Economic Research, Summer Institute

2014–2015  Duke University; Federal Reserve Bank of New York; Equal Employment Opportunity Commission (EEO-DataNet); American Law and Economics Association (discussant); New York University (NYU / Penn Law and Finance Conference); National Bureau of Economic Research, Summer Institute (discussant)

2013–2014  University of Southern California, School of Law; London School of Economics; Bank of Spain; CEMFI; Carlos III; University of Zaragoza; University of Rotterdam; University of Maastricht; University of Götenborg

2012–2013  University of California, Los Angeles, School of Law

2011–2012  University of Oregon, Department of Economics; University of British Columbia, Department of Economics; Brown University, Department of Economics; University of Rochester, Department of Economics; Cato Institute; National Bureau of Economic Research, Summer Institute; Harvard Law School

2010–2011  Northwestern, School of Law; University of Wisconsin, Department of Economics; Brookings Institution; Cato Institute

2009–2010  University of Chicago, School of Law; Cornell University, School of Law and Department of Economics; University of Michigan, School of Law and Department of Economics; University of Virginia, School of Law, Olin Conference

2008–2009  University of California, Los Angeles, School of Law; University of Arizona, School of Law and Department of Economics; Stanford University, School of Law and Department of Economics; University of Miami, Department of Economics

2007–2008  Northwestern University, School of Law; University of Michigan, Department of Economics; National Bureau of Economic Research, Summer Institute; Florida State University

*Prior to 2007–2008, presentations are at departments of economics, unless otherwise noted*

2006–2007  University of Michigan, Program in Survey Methodology; Public Policy Institute of California; Brown University

2005–2006  University of Michigan; University of California, Irvine; University of California, Santa Barbara; University of California, Santa Cruz; California State University, Long Beach; University of Western Ontario; University of Toronto; University of Illinois, Chicago; University of Chicago, Graduate School of Business; APPAM; University of Florida; University of California, Berkeley, School of Law; Princeton University; RAND; Hebrew University (conference in honor of Reuben Gronau); Stanford University, University of Wisconsin, Madison; Northwestern University; Crime and Economics Summer Workshop, University of Maryland

2004–2005  Federal Reserve Bank of Chicago; University of Illinois, Urbana-Champaign; University of Michigan, William Davidson Institute; University of Maryland; Urban Institute; American Economics Association Meetings; City University of New York Health Economics Seminar; University of Wisconsin, Madison; Stanford University; University of California, Davis; University of California, Berkeley, Labor Lunch; NBER Summer Institute, Education/Labor Studies

2003–2004  University of Michigan; APPAM; NBER Labor Studies Meeting (Fall); Massachusetts Institute of Technology; Harvard University, Kennedy School; University of California, Los Angeles; University of California, San Diego; Columbia University; University of California, Berkeley; NBER Summer Institute, Monetary Policy; NBER Summer Institute, Labor Studies

2002–2003   University of California, San Diego; University of California, Los Angeles; RAND Institute; University of Chicago, Graduate School of Business; University of Chicago, Harris School of Public Policy; University of Michigan, Ford School of Public Policy; Columbia University; Dartmouth College; Federal Reserve Bank of New York; Boston University

Last updated: February 27, 2020

## 8. APPENDIX B – DOCUMENTS RELIED UPON

| Document Title | Document Date |
| --- | --- |
| **Record Documents** | |
| USSF_Morgan_000530 – 78 | 2011 – 2018 |
| USSF_Morgan_000321 – 46 | March 31, 2017 and 2016 |
| USSF_Morgan_000587 – 642 | 2017 – 2021 |
| USSF_Morgan_005638 – 777 | November 30, 2015 – April 2, 2017 |
| USSF_Morgan_007836 – 9 | December 17, 2013 |
| USSF_Morgan_007840 | January 7, 2015 |
| USSF_Morgan_007841 – 2 | January 25, 2019 |
| USSF_Morgan_042076 – 96 | March 31, 2019 and 2018 |
| USSF_Morgan_042341 – 2 | May 13, 2016 |
| USSF_Morgan_042343 – 4 | July 6, 2015 |
| USSF_Morgan_042345 – 6 | September 27, 2017 |
| USSF_Morgan_055446 | October 20, 2019 |
| USSF_Morgan_070834 | |
| USSF_Morgan_070835 | |
| USSF_Morgan_081431 – 5 | May 9, 2019 |
| WNTPA_00000456 – 64 | February 8, 2017 |
| WNTPA_00004575 – 83 | 2013 – 2016 |
| | |
| **Expert Reports** | |
| Expert Report of Carlyn Irwin, MBA, CPA/CFF/ABV/CEIV, CFE | February 4, 2020 |
| Expert Report of Finnie B. Cook, Ph.D. | February 4, 2020 |
| Expert Report of Justin McCrary, Ph.D. | February 4, 2020 |
| Supplemental Expert Report of Carlyn Irwin, MBA, CPA/CFF/ABV/CEIV, CFE | March 6, 2020 |
| | |
| **Legal Pleadings** | |
| Plaintiffs' Notice of Motion and Motion to Exclude Defendant's Expert Testimony; Memorandum of Points & Authorities in Support, *Alex Morgan, et al. v. United States Soccer Federation, Inc.* | February 20, 2020 |
| | |
| **Academic Articles** | |
| Black, Dan A., Amelia M. Haviland, Seth G. Sanders, and Lowell J. Taylor. "Gender Wage Disparities among the Highly Educated." *The Journal of Human Resources* 43, no. 3: 630–659 | Summer 2008 |

| Document Title | Document Date |
|---|---|
| **Books** | |
| Allen, M. A., Hall, R. E., and Lazear, V. A. "Reference Guide on Estimation of Economic Damages." In *Reference Manual on Scientific Evidence*, 3rd Edition. The National Academies Press, Washington, DC: 425–502 | 2011 |
| Besanko, D., Dranove, D., Shanley, M., and Schaefer, S. *Economics of Strategy*, 5th Edition. John Wiley & Sons, Hoboken, NJ | 2010 |
| Borjas, G. *Labor Economics*, 7th Edition. McGraw-Hill Education, New York, NY | 2016 |
| Rubinfeld, D. L. "Reference Guide on Multiple Regression." In *Reference Manual on Scientific Evidence*, 3rd Edition. The National Academies Press, Washington, DC: 303–357 | 2011 |
| **News Articles** | |
| FIFA Council confirms contributions for FIFA World Cup participants, accessible at https://www.fifa.com/about-fifa/who-we-are/news/fifa-council-confirms-contributions-for-fifa-world-cup-participants-2917806 | October 27, 2017 |
| Pulisic voted as 2019 U.S. Soccer Male Player of the Year, accessible at https://www.ussoccer.com/stories/2019/12/pulisic-voted-as-2019-us-soccer-male-player-of-the-year | December 12, 2019 |
| USD 20 million in prize money for FIFA Confederations Cup, accessible at https://www.fifa.com/confederationscup/news/y=2016/m=11/news=usd-20-million-in-prize-money-for-fifa-confederations-cup-teams-2855001.html | November 25, 2016 |
| **Other Sources** | |
| 2017 USMNT Lineups, accessible at https://www.ussoccer.com/usmnt-lineups/2017 | 2017 |
| USMNT Results: 2015-2019, available at https://www.ussoccerhistory.org/usnt-results/usmnt-results/usmnt-results-2015/ | 2015 – 2019 |

**Note: In addition to the documents on this list, I relied upon all documents cited in my report and my exhibits, as well as those cited in my Initial Report and exhibits to my Initial Report, to form my opinions.**