# EXHIBIT 1

## EXPERT REPORT OF CAREN GOLDBERG, PH.D.

*In the matter of*

*Alex Morgan, et al. v. United States Soccer Federation, Inc.*

February 4, 2020

## I.   INTRODUCTION

My name is Caren Goldberg and I have been retained as an expert witness by Plaintiffs to provide expert testimony in the matter of *Alex Morgan, et al. v. United States Soccer Federation, Inc.* My overall expert opinion is that the United States Soccer Federation, Inc. ("USSF" or "Federation") operated well below the range of acceptable and standard Human Resource ("HR") practice on the issue of gender discrimination with respect to its treatment of players on the United States Senior Women's National Soccer Team ("WNT"). This opinion is based on my broad knowledge of the field of Human Resource Management ("HRM") and Organizational Behavior ("OB"), my knowledge of the scholarly research on HRM and OB, and my review of the record evidence as described in this report. I reserve the right to modify my opinion, as additional information becomes available at subsequent points in time or in response to a request by counsel to opine on additional issues that have not been addressed in this report. Throughout this report, I make reference to the academic literature on discrimination. In so doing, I am not making assertions as to whether or not the events in this case constitute discrimination; rather, I refer to this research to identify the existence of the many red flags present that indicated a material possibility of gender discrimination against the members of the WNT that were visible to USSF management and its Board, and to note that all of those warning signs, contrary to acceptable standards of HR practice, were ignored.

## II.   <u>SUMMARY OF EXPERT QUALIFICATIONS AND EXPERIENCE</u>

I have spent the last four years as an Associate Professor of Management at Bowie State University. Prior to that, I spent seventeen years in the Management Departments at American University and George Washington University and one year in the Industrial-Organizational Psychology Department at George Mason University. For three years, I served as the Program Director for Human Resources at George Washington University. For the past two decades, I have taught undergraduate, master's, and doctoral level courses in Human Resource Management, Industrial Psychology, Organizational Behavior, and Research Design. I have covered diversity and inclusion in my undergraduate and master's level Introduction to Human Resource courses, my undergraduate Cases and Exercises in Human Resource Management courses, my master's level Human Resources/Organizational Behavior survey courses, and my Ph.D. seminars in Industrial Psychology and Human Resource Management. In addition, I have covered these topics in several off-campus Accelerated MBA and Executive MBA courses that I have taught, as well as in training modules that I have designed and delivered for the Center for Excellence in Public Leadership and the Council of Governments.

I have written more than 50 articles for peer-reviewed journals and conferences. I have also authored nine invited book chapters. My peer-reviewed research has been published in *Journal of Applied Psychology*, *Journal of Business and Psychology*, *Human Resource Management*, *Human Resource Development Quarterly*, *Human Relations*, *Human Resource Development Quarterly*, *Group and Organization Management*, *Journal of Organizational Behavior*, *Psychology of Women Quarterly*, *European Journal of Work and Organizational Psychology*, *Industrial and Organizational Psychology*, *Academy of Management Best Paper Proceedings*, *Sex Roles*, *Assessment*, *Journal of Business Research*, *Review of Global Management*, *Representative*

*Research in Social Psychology*, *Journal of Career Planning and Employment*, *Business Journal of Hispanic Research*, and *Journal of Managerial Psychology*. I have also conducted numerous media interviews and have been featured in several television, radio, and print news pieces (*Forbes, AOL*, *NPR*, *Dateline NBC*, *HRMagazine*, *USNews &World Report*, *Washington Post*, *Yahoo! Finance*, *FastCompany*, and *BBC News*) relating to my research.

I have engaged in a variety of leadership roles in my profession, including serving as an Associate Editor of *Group and Organization Management*, as an editorial board member of *Group and Organization Management*, *Human Resource Management*, *Journal of Business and Psychology*, and *Journal of Management*, and as a Track Chair for the Human Resource Division of the Southern Management Association. I also served on a joint taskforce created by the Society for Human Resource Management ("SHRM") and the American National Standards Institute, charged with creating national workplace standards for Diversity and Inclusion. In addition, I recently completed a three-year term as Treasurer of the Academy of Management's Gender and Diversity in Organizations Division, where I previously served a three-year term as an Executive Committee Member.

I received my B.A. degree in Psychology from the State University of New York at Stony Brook in 1987, my M.B.A. degree from the State University of New York at Binghamton in 1990, and my Ph.D. degree in Human Resource Management from Georgia State University in 1997. From 1988 to 1989, I worked in the compensation department at United Health Services.

During the last four years, I have testified as an expert at trial or by deposition as follows: In *Nielson v. Care Options* (Virginia Circuit Court for the City of Fairfax, Case No. CL14-10271), I was deposed in June 2016. In *Williams v. G&K Services, Inc.* (United States District Court for the District of Arizona, Case No. 15-cv-01744), I was deposed in August 2016. In the matters of

*Anderson, et al. v. Verizon New Jersey Inc., et al.* (United States District Court for the District of New Jersey, Case No. 13-cv-4777) and *Gardrie, et al. v. Verizon New Jersey Inc., et al.* (Case No. 15-cv-03538), I was deposed in September 2017 and October 2017. In October 2017, I was deposed in the matter of *Kassman, et al. v. KPMG, LLC* (United States District Court for the Southern District of New York, Case No. 11-cv-03743). In March 2018, I was deposed in *Ravina v. Columbia University and Geert Bekaert* (Civil Action No. 1:16-cv-02137(RA)). In June, 2018, I was deposed in *Maness v. City of High Point* (Civil Action No. 1:17-cv-384). In September, 2018, I was deposed in the matter of *Soto, et al. v. Microsoft Corporation*, 16-2-31049-4 SEA. In August 2019, I was deposed in *Fowler v. AT&T, Inc., et al.*, Civil Action No. 18-CV-00667. I was deposed in *Hightower v. Ingerman Management Company* and *McDonald v. Ingerman Management Company*, Civil Action Nos. 17-8025 (RMB-JS) and 17-12787 (NLH-JS) in October 2019. In December 2019, I was deposed in *Szaloki v. Wal-Mart Stores, Inc., et al.*, Case No. 50-2016-CA-007193-MB-AG. My testimony has been cited favorably in judges' decisions in *Seguin v. Northrop Grumman Corporation*, 2012-SOX-00037 and in *Moussouris, et al. v. Microsoft Corporation*, C15-1483JLR.

Appended to this report is a current copy of my *curriculum vitae*, which contains a more detailed description of my professional background, including a list of all publications authored in the previous ten years (Appendix 1).

## III.  <u>COMPENSATION</u>

I am being compensated at $500 per hour for my work in this case. My compensation does not depend on the outcome of this litigation.

## IV.    <u>MATERIALS CONSIDERED IN FORMING OPINIONS</u>

Appendix 2 lists the case materials that I considered in formulating my opinions.   In addition, throughout my report, I reference a number of scholarly resources, a list of which I provide as Appendix 3.

## V.    <u>BASES OF OPINIONS FORMED</u>

I have been asked to consider whether the Human Resource practices of USSF were consistent with standard and acceptable Human Resource practices with regard to its treatment of players on the WNT in connection with various aspects of their employment with USSF, including their working conditions and complaints of unequal and/or discriminatory treatment.   I identified several key questions to be answered as follows:

A.  Working Conditions:

1.   What are standard and acceptable HR policies and/or practices regarding equal employment opportunities with respect to working conditions for U.S.-based employees?

2.   What are the specific policies and/or practices of USSF that are relevant to working conditions applicable to players on the WNT as compared to players on the U.S. Senior Men's National Soccer Team ("MNT")?

3.   Did USSF operate within standard and acceptable HR policy and/or practice in its treatment of players on the WNT in connection with their working conditions?

B.  Complaints of Unequal Treatment:

1.  What are standard HR policies and/or practices for preventing discrimination and responding to complaints of unequal and/or discriminatory treatment toward U.S.-based employees?

2.  What are the specific policies and/or practices of USSF that are relevant to responding to complaints of unequal and/or discriminatory treatment?

3.  Did USSF operate within standard and acceptable HR policy and/or practice with respect to its response to complaints by the WNT union or the players of unequal and/or discriminatory treatment?

## VI.  <u>METHODOLOGY</u>

In formulating my opinions, I relied on both quantitative and qualitative methodologies. The quantitative analyses involved an in-depth examination of the data with respect to working conditions of the two teams.  In addition, I conducted an independent analysis of the materials in this case, using the case study method, a widely accepted qualitative method for conducting social science research. Case studies involve in-depth analyses of single or multiple cases using rich and varied sources of data. It is well-suited to the current matter, as I was able to consider the sworn testimony of Federation representatives and WNT players, USSF policy statements, the policies set forth in the collective bargaining agreements between the Federation and the MNT's and WNT's Players Associations, and documents produced in discovery. Numerous methodology-focused articles discussing the advantages of the case study method have been published in some of the most highly-regarded, peer-reviewed management journals (*e.g.*, Eisenhardt & Graebner, 2007; Eisenhardt, Graebner, & Sonnenshein, 2016; and Gioia, Corely, & Hamilton, 2013). In conducting a case study, I relied on established research or theory to evaluate the data presented. Gioia, et al. (2013, 26) note that "consult[ing] with existing literature, with suspension of judgment

about its conclusions," is a feature that enhances the ability of an inductive researcher to generate sound conclusions. Thus, with respect to the opinions presented below, I present the standards and findings of extant research in HR and Organization Behavior as a framework, against which I evaluate the working conditions of the WNT and MNT as well as USSF's responses to complaints of unequal and/or discriminatory treatment by players on the WNT.

## VII.   OPINIONS FORMED

### A.   Summary

It is my expert opinion that USSF operated well below the range of acceptable and standard HR practice for a U.S.-based employer of U.S.-based employees regarding (1) its treatment of players on the WNT in connection with their working conditions when compared to USSF's treatment of players on the MNT, and (2) its response to the complaints of players on the WNT or their union regarding unequal and/or discriminatory treatment.

In particular, it is my opinion that USSF operated not only below standard and acceptable HR standards, but also, in some cases, outside of its own stated policies by requiring WNT players to play more games on artificial surfaces, providing them with fewer charter flights, spending less on their hotel accommodations and airfare despite the fact that they played more games and spent more time traveling than players on the MNT, having high level USSF staff responsible for both teams (such as the Chief Medical Officer) travel more frequently with the MNT, providing fewer medical and sports conditioning personnel, including doctors, therapists, and trainers for the WNT, and paying the head coach of the WNT significantly less than the head coach of the MNT, thus raising red flags about the possibility of gender discrimination which were clearly visible to both USSF senior management and its Board.

In addition, it is my opinion that USSF operated well below standard and acceptable HR practices by failing to investigate complaints of unequal and/or discriminatory treatment that have been lodged by members of the WNT or its union representatives since at least 2004 by failing to investigate and eliminate any unequal treatment, and by threatening to take action against the WNT players after their union complained about such treatment.

My opinion is based on evidence that the WNT union complained to the United States Olympic Committee (which, in turn, informed USSF) in October 2004 about discriminatory compensation, discriminatory support with respect to equipment managers, trainers, massage therapists, meals, hotel accommodations and transportation, and other working condition issues. Yet USSF's former President Sunil Gulati testified that he could not identify any actions that USSF took in response to address any of these complaints. My opinion is further based on: (1) evidence that WNT players and their union representatives have lodged similar complaints since 2004, including in collective bargaining negotiations in 2016, but were met with such responses by USSF representatives as, "the women do not deserve to be paid equal pay;" (2) testimony by current USSF President Carlos Cordeiro, that he and other USSF Board members knew about the unequal support for female players for many years and that the topic of such inequality was a, "common theme over years" at Board meetings; (3) the fact that Mr. Cordeiro "laughed" when he read an article discussing how candidates running against him for USSF President in 2017, including the former head of Soccer United Marketing, were calling for immediate equal pay for the WNT; (4) evidence that USSF never took any actions to address these and other complaints of unequal treatment; and (5) evidence that USSF suggested that it would not schedule as many games for the WNT or that its financial support for the National Women's Soccer League ("NWSL") could be curtailed if the WNT continued pressing for equal treatment vis-a-vis the male players on the MNT.

I also base this opinion on the fact that, to this day, the evidence indicates that USSF has never implemented any compliance program or training with respect to the legal requirements of the Equal Pay Act or Title VII's anti-discrimination provisions, even since the time that an Equal Employment Opportunity Commission ("EEOC') complaint about claimed discriminatory practices was filed by several members of the WNT in 2016.[1]

### B.   Opinion on USSF's Treatment of Players on the WNT regarding Working Conditions When Compared to USSF's Treatment of Players on the MNT

In formulating my opinion on whether USSF's treatment of players on the WNT compared to its treatment of players on the MNT fell below acceptable and standard HR practices, I examined what the standard HR policies and practices regarding equal employment opportunities with respect to working conditions are for U.S.-based employees of a U.S.-based employer, as well as the specific policies and/or practices at USSF relevant to the working conditions applicable to players on the WNT versus players on the MNT.  My opinions and conclusions are below.

#### 1.   *What are standard and acceptable Human Resource policies and/or practices regarding equal employment opportunities with respect to working conditions for U.S.-based employees of U.S.-based employers?*

Cascio and Aguinis (2011) note that discrimination refers to the, "giving of an unfair advantage (or disadvantage) to the members of a particular group in comparison to the members of other groups." One of the sub-theories of discrimination reflects, "pure bias based on an open expression of hatred, disrespect, or inequality, knowingly directed against members of a particular group." Scholars, practitioners, and the Equal Employment Opportunity Commission have a common understanding of equal employment opportunity that applies to all components of the employment relationship including employment terms, working conditions, and various other

---

[1] *See* Carlos Cordeiro Deposition Transcript, at 43; Sunil Gulati Individual Deposition Transcript, Vol. 1, at 25-26; Tom King Individual Deposition Transcript, at 57-59.

privileges of employment. Further, laws that prohibit discrimination also prohibit retaliation (punishment) for opposing or reporting discrimination. DeNisi & Griffin, 2005; EEOC, 2020; Gomez-Mejia, Balkin, & Cardy, 2010; SHRM, 2008; SHRM 2009; SHRM 2018.

Employers have a responsibility to ensure that employment decisions are not based on protected characteristics (such as sex) and that workplace policies and practices do not exclude people of a particular sex (EEOC, 2020).  The Society for Human Resource Management and the Equal Employment Opportunity Commission provide multiple guidance resources that articulate minimum standards for providing employees with equal employment opportunity.  For example, SHRM (2018) notes that equal employment violations can be prevented through systemic efforts; these include the following:

- Adopting an organizational philosophy that treats employees as individuals entitled to respect and fair treatment, not as commodities.

- Establishing clear written policies and practices that genuinely reflect the employer's equal employment opportunity ("EEO") values, and then sticking to them and creating thorough documentation of human resource decisions.

- Emphasizing the employer's EEO values, policies, and procedures in new-employee onboarding and training.

- Providing ongoing training at all levels about the employer's EEO values, policies, and procedures.

- Creating an EEO conflict resolution process that is truly open-door.

- Designating and empowering a responsible individual to address EEO issues: an ethics officer, EEO officer, affirmative action officer, diversity officer, ombudsman, or director of human resources.

- Investigating employee complaints thoroughly and consistently.

SHRM (2008) further elaborates that the characteristics of an effective HR policy with respect to discrimination are that it defines discrimination and harassment and states clearly that such behavior is not tolerated, ensures that all complaints will be investigated, and warns that wrongdoers will be disciplined or discharged.  In the event of an occurrence, HR must conduct an investigation and take remedial action.  Further, to encourage employees to feel safe in reporting their concerns, the policy on reporting should allow for multiple avenues of complaint.  Training should stress to employees, "that they have a right to a workplace free of discrimination" and should encourage employees, "to use the reporting procedure when necessary."  Further, SHRM warns employers to, "make sure that supervisors and managers receive training separate from employees.  Besides general discrimination issues, their sessions should also include information about how to handle complaints."

2. ***What are the specific policies and/or practices of USSF that are relevant to working conditions applicable to players on the WNT as compared to players on the MNT?***

USSF has issued general statements that express the notion of gender equality and equal employment opportunity with respect to its employees.  USSF's mission statement found in its Form 990 states that the Federation's mission is to, "promote and govern soccer in the United States in order to make it the preeminent sport recognized for excellence in participation, spectator appeal, international competitions and gender equality."[2]  The evidence I reviewed shows that USSF has broad discretion to set policies as they relate to the following:  (1) the field surface on which the teams play; (2) amount of money allocated for airfare and room and board; mode of travel (charter flights, commercial flights, train, bus); and (3) personnel resources and support

---

[2] *See, e.g.*, Jay Berhalter Deposition Exhibit 30 (USSF Form 990), at 2-3.

service dedicated to each team, including, for example, how much USSF compensates the MNT and WNT head coaches and the number of medical and support staff for each team.  My review of the record shows that the result of such discretion is that significant disparities exist in USSF's treatment of WNT players compared to its treatment of MNT players with respect to all of these working conditions. Further, the evidence that I reviewed indicates that USSF had not adopted or implemented any HR policy, consistent with standard and acceptable HR practices, for responding to union or player complaints of gender discrimination or for achieving compliance with the Equal Pay Act or Title VII with respect to issues of gender discrimination.

### i. Surface of Fields

During the period at issue, USSF has required the WNT to play games on artificial turf at a much higher rate than the MNT. The record shows that WNT players and USSF officials agree that grass is a more desirable playing surface than turf. Indeed, the WNT players testified that playing on turf impacts their health negatively and changes the dynamics of the game. For example, Carli Lloyd testified that playing on turf hurts her joints and body and that she "feel[s] tremendously different after a game while playing on turf versus grass. Grass I feel a hundred percent better."[3] Ms. Lloyd also testified that playing on turf, "affects the style of play on the field with the ball" because, "[t]he ball bounces differently" and players, "[d]on't have that grass to hold up the ball."[4]

Christen Press agreed: "I think there are a ton of differences. So just to point out a few, the way the ball moves is different. The impact on the body is different. The way your body feels moving on the field is different. Running is different. Falling is different."[5] Not only does the game

---

[3] Carli Lloyd Deposition Transcript, at 23.
[4] Carli Lloyd Deposition Transcript, at 23-24.
[5] Christen Press Deposition Transcript, at 17-18.

dynamic change, but, "the most negative impact is just risk of injury."[6] Players can experience "things like skin abrasions to muscle tightness that is a result specifically of the surface."[7] Ultimately, Ms. Press, "prefer[s] to play on grass."[8] Alex Morgan further highlighted the cons of playing on turf: "It affects the game directly by the bounce of the ball[,] at the rate at which I could cut, and the agility in [sic] that affects my rate of recovery in lengthening it. Because of the fatigue of the muscles and the fatigue from the muscles and joints on turf, so it not only affects our physical bodies, but affects the way we play a game because of the bounce of the ball and the way that we cut."[9]

USSF agreed with the WNT players: "Grass surfaces tend to be better for the game, the ball tends to move a little bit faster. … I think we've stated here we prefer to play games on grass."[10] As did Jill Ellis, the former WNT head coach who led the team to two World Cup championships: "I prefer playing on grass. … it's much easier to control the surface" and "for wear and tear on the player, it's much better."[11] The 2017-2021 WNT CBA also expressly states that the "Federation prefers to play games on natural grass."[12]  Together, the record shows a clear preference by USSF and players on the WNT for playing on grass instead of turf.

That said, for domestic soccer matches, where the turf selection is made by USSF, the WNT has played on artificial turf far more often than the MNT has and at a higher rate, over the last six years. The following chart shows the number of U.S.-based games that the WNT and the MNT have played on turf and natural grass or grass over turf, respectively, from calendar years

---

[6] Christen Press Deposition Transcript, at 19.
[7] Christen Press Deposition Transcript, at 19.
[8] Christen Press Deposition Transcript, at 18.
[9] Alex Morgan Deposition Transcript, at 50.
[10] Jay Berhalter 30(b)(6) Deposition Transcript, at 233-34.
[11] Jill Ellis Deposition Transcript, at 154.
[12] Jay Berhalter Deposition Exhibit 31, USSF_Morgan_000587 (2017-2021 WNT CBA), at 000593.

2014 through 2019. I limited my analysis to games on U.S. soil because I understand that USSF controls the field surfaces for these matches.[13]

| WNT & MNT Domestic Field Surface Summary[14] | | |
|---|---|---|
| | **WNT (2014-2019)** | **MNT (2014-2019)** |
| **Number of Domestic Games Played** | 95 | 72 |
| **Number of Games on Grass/Grass Overlay** | 83 | 71 |
| **% of Games on Grass/Grass Overlay** | 87.37% | 98.61% |
| **Number of Games on Turf** | 12 | 1 |
| **% of Games on Turf** | 12.63% | 1.39% |

As shown above, from 2014 through 2019, the WNT played 12 games, or about 13% of the team's USSF-controlled matches, on artificial turf. But over the same six-year period, the MNT played just one match, or about 1% of the team's matches, on turf. Even more, the MNT played about 99% of the team's matches on grass or grass overlay, while the WNT played 87% of the team's matches on grass or grass overlay.

The record also shows at least one instance in which USSF entered into similar contracts for the WNT and the MNT to play at a turf stadium in Cincinnati, Ohio, except that USSF's

---

[13] *See* Jay Berhalter 30(b)(6) Deposition Testimony, at 261; Jill Ellis Deposition Transcript, at 157.

[14] The data in this chart was compiled from USSF_Morgan_055538 and USSF_Morgan_055539. This chart and others below (*e.g.*, those discussing mode of transportation and team win/loss/draw records) analyze data based on games played during *calendar* years 2014 through 2019. However, as seen below, I also analyzed the number of games played during fiscal years 2015 through 2020. I made this distinction because the USSF financial data that I considered contained data based on fiscal year, not calendar year. So to align my analyzes of game statistics when discussing fiscal year data, I considered the number of games played during those particular fiscal years. And elsewhere, I considered the number of games played during calendar years.

stadium contract for the MNT added a provision installing grass over turf—a benefit not afforded to the WNT when they played at that exact Cincinnati stadium two years before.[15]

The testimony of Jay Berhalter, USSF's Chief Commercial Officer, shows that one of the main considerations in determining whether or not to install grass over turf was not player safety or equal treatment, but cost considerations and revenue projections for an event.[16] Sunil Gulati, who was the President of USSF from 2006-2018, however, testified that he did not realize USSF was giving so much weight to the cost criterion in determining whether to install grass fields and that he would have hoped it would have been less important.[17] Because player health is at issue in the decision to select grass or artificial turf, consideration of cost differences, as former President Gulati testified, should not have been a controlling factor.[18]

There was also at least one match for the WNT where artificial turf field conditions were so poor that USSF was ultimately forced to cancel the game. Mr. Gulati testified that, in 2015 USSF was forced to cancel a WNT match in Hawaii due to poor artificial turf field conditions and severe concerns from both WNT players and their head coach.[19] Ms. Lloyd testified that, "the game playing surface was deemed not able to be played on" because the players, "could lift the turf with [their] hands and there were gaps and seams in it. And it was risky to play a game on there."[20] To Ms. Morgan, the 2015 Hawaii artificial turf was, "unacceptable due to the possibility of injury."[21] And to Jill Ellis, the WNT head coach, it "was a poor quality turf. .. The actual quality of the turf was almost like AstroTurf. So it was – yeah, it was not a good quality turf. So can you

---

[15] Jay Berhalter 30(b)(6) Deposition Transcript, at 275-76.
[16] Jay Berhalter 30(b)(6) Deposition Transcript, at 277-279.
[17] Sunil Gulati Individual Deposition Transcript, Vol 2, at 212-214.
[18] *See* Sunil Gulati Individual Deposition Transcript, Vol. 2, at 212-215.
[19] Sunil Gulati Individual Deposition Transcript, Vol. 1, at 115-117.
[20] Carli Lloyd Deposition Transcript, at 81-82.
[21] Alex Morgan Deposition Transcript, at 55-57.

fix that, no."[22] The evidence I reviewed shows that the WNT has played more matches (both in absolute terms and as a percentage of games played) on less desirable artificial turf field surfaces than the MNT has and that USSF was responsible for this unequal treatment in working conditions.[23]

### ii.   Airfare (including Charter Flights) and Room and Board

USSF's financial records show that for fiscal years 2015 through 2020, USSF spent millions more on air travel and room and board for the MNT than it did for the WNT, even though the <u>WNT played about 30% more matches</u> than the MNT over this time.  The data also show that USSF used charter flights for the MNT more frequently than for the WNT, which WNT players testified are more desirable and are a less physically taxing form of transportation for the team. Indeed, the record indicates that this difference in travel arrangements impacts physical recovery time for the players.[24]

---

[22] Jill Ellis Deposition Transcript, at 203; Ellis Exhibit 97 (Picture of Hawaii Turf).

[23] *See* Jay Berhalter 30(b)(6) Deposition Testimony, at 261; Jill Ellis Deposition Transcript, at 157.

[24] Alex Morgan testified that taking commercial flights has affected her negatively and that sitting in economy or economy comfort on a commercial flight can be, "extremely taxing on the body." Alex Morgan Deposition Transcript, at 66-67. Christen Press also testified that, "I believe that … the way you travel can be seen as … a recovery tool or not. And so if you have the space, the nutrition, and access to water that you need, it could significantly impact your performance the next day." Christen Press Deposition Transcript, at 72-73.

| Matches Per Fiscal Year 2015 Through 2019[25] | | |
|---|---|---|
| | **MNT** | **WNT** |
| **FY 2015 Matches** | 17 | 23 |
| **FY 2016 Matches** | 20 | 29 |
| **FY 2017 Matches** | 19 | 19 |
| **FY 2018 Matches** | 17 | 17 |
| **FY 2019 Matches** | 13 | 21 |
| **FY 2020 Matches** | 15 | 22 |
| **Total** | **101** | **131** |

Specifically, although the WNT played about 30% more matches than the MNT during these fiscal years, USSF spent over $4 million more on airfare for the MNT than it did for the WNT. The chart below summarizes USSF's expenditures on airfare for these fiscal years up through December 10, 2019.

| | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Total | % of Total |
|---|---|---|---|---|---|---|---|---|
| **USSF Spend on MNT and WNT Airfare[26]** | | | | | | | | |
| **MNT** | $1,887,515 | $1,685,113 | $1,919,140 | $1,671,373 | $1,639,814 | $363,465 | **$9,166,420** | **65.17%** |
| **WNT** | $761,725 | $519,172 | $975,560 | $731,642 | $1,365,431 | $546,108 | **$4,899,638** | **34.83%** |

---

[25] The data in this chart were compiled from USSF_Morgan_055538 and USSF_Morgan_055539. Note that these two spreadsheets are only as current through the date of production and do not detail matches played by either the WNT or the MNT during calendar year 2020. This is important because USSF's fiscal year 2020, which covers April 1, 2019 through March 31, 2020, is not over and therefore this chart excludes WNT and MNT matches that have yet to be played. Specifically, I have included matches played by each team from January 1, 2020 through February 4, 2020 (1 match for the MNT and 3 matches for the WNT), but have excluded any matches scheduled to be played from February 5, 2020 through March 31, 2020 as such data does not yet exist.

[26] These data were compiled from USSF_Morgan_042075 (USSF Expense Spreadsheet), specifically by adding together USSF's team expense line items for "60607 AIR TRAVEL" and "60608 AIR TRAVEL-CHARTER" for each team. USSF_Morgan_042075 indicates that USSF's data were exported on December 10, 2019. Therefore, fiscal year 2020, which covers the period of April 1, 2019 through March 31, 2020, only includes data up through that date.

As shown above, for each fiscal year from 2015 through 2019, USSF spent hundreds of thousands of dollars, and often over a million dollars, more on MNT airfare than on WNT airfare. And although fiscal year 2020 is the sole exception, (with the WNT having played 7 more matches, as shown above, including World Cup matches in France), when considering the entire six-year period, USSF spent over $4 million more on the MNT on airfare. Even more telling, when one considers the total airfare expenditures across the two national teams, USSF spent about 65% of its senior national team airfare budget on the MNT and only 35% on the WNT. Again, this is true despite the WNT playing about 30% more matches during these fiscal years.

That USSF has spent and budgeted millions more on airfare for the MNT than it has for the WNT is unsurprising, given that the men's team travelled on charter flights nearly three times more often than the women's team during calendar years 2014 through 2019. The chart below summarizes the MNT's and WNT's mode of transportation (charter flight, commercial flight, train, or bus) for each team's respective calendar year 2014 through 2019 match schedules.

| WNT & MNT Mode of Transportation Summary[27] | | |
|---|---|---|
| | WNT (2014-2019) | MNT (2014-2019) |
| Number of Games | 135 | 102 |
| Number of Charter Flights | 23 | 57 |
| % of Travel on Charter Flights | 17.04% | 55.88% |
| Number of Commercial Flights | 79 | 42 |
| % of Travel on Commercial Flights | 58.52% | 41.18% |
| Number of Buses/Trains Taken | 18 | 3 |
| % of Travel on Bus/Train | 13.33% | 2.94% |
| Number of Matches For Which Information Is Unavailable | 15 | 0 |
| % Information Unavailable | 11.11% | 0.00% |

---

[27] The data in this chart were compiled from USSF_Morgan_055538 and USSF_Morgan_055539.

USSF's data show that despite the WNT playing 33 more games than the MNT from 2014 through 2019, or about 32% more matches, USSF chartered nearly triple the number of flights for the MNT. Over this six-year period, the MNT took charter flights for 57 of 102 matches, while the WNT took charter flights for just 23 of 135 matches. That means that USSF provided charter flights for about 56% of the MNT's matches, but only about 17% of the WNT's matches.  During this six-year period, the women's team flew commercial for 79 of 135 matches, or about 59% of the team's matches, while the men's team flew commercial for just 42 of 102 matches, or about 41% of the team's matches.

The number of international matches played by each team does not change this conclusion. USSF's data show that during this same six-calendar-year period, the WNT played in 40 international matches out of a total of 135 matches (or about 29.6%), while the MNT played in 30 international matches out of a total of 102 matches (or about 29.4%).  According to USSF's data, the WNT played more total international matches than the MNT did over this time period, and also played international matches at about the same rate. In short, the number of charter flights taken by each team is another metric showing how USSF has treated its female soccer players unequally and worse than its male soccer players.

The same disparities exist for USSF's room and board expenses. As shown below, USSF spent over $2 million more on hotel expenses for the MNT than it did for the WNT over the period spanning USSF fiscal years from 2015 through 2020 (through December 10, 2019).

| USSF Spend on MNT and WNT Hotels[28] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **FY 2015** | **FY 2016** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **Total** | **% of Total** |
| **MNT** | $1,172,720 | $1,249,213 | $1,453,072 | $1,787,799 | $1,376,050 | $551,923 | **$7,590,777** | **58.41%** |
| **WNT** | $882,884 | $815,914 | $869,424 | $988,114 | $1,615,720 | $233,839 | **$5,405,895** | **41.59%** |

Again, for almost every fiscal year from 2015 through 2020, USSF spent hundreds of thousands of dollars more on hotels for the MNT than for the WNT. And, if the percentage of total hotel expenditures is considered, USSF spent about 58% of its national team hotel budget on the MNT and only 42% on the WNT, even though the WNT played considerably more matches during these fiscal years.

And, even counting in the cost of team meals, the record, as captured below, still shows that USSF spent more on its male soccer players than it did on its female soccer players for these categories of combined hotel and meal expenses, despite the fact that the women's team played about 30% more games during these fiscal years.

| USSF Spend on MNT and WNT Hotel and Meals[29] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **FY 2015** | **FY 2016** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **Total** | **% of Total** |
| **MNT** | $1,862,973 | $1,987,301 | $2,221,537 | $2,591,039 | $2,080,932 | $1,266,305 | **$12,010,087** | **56.10%** |
| **WNT** | $1,530,585 | $1,579,439 | $1,739,130 | $1,617,025 | $2,447,473 | $485,716 | **$9,399,368** | **43.90%** |

---

[28] These data were compiled from USSF_Morgan_042075, specifically by looking at USSF's team expense line items for "60540 HOTELS" for each team. As noted above, USSF_Morgan_042075 indicates that USSF's data were exported on December 10, 2019. Therefore, fiscal year 2020, which covers the period of April 1, 2019 through March 31, 2020, only includes data up through that date.

[29] These data were compiled from USSF_Morgan_042075, specifically by looking at USSF's team expense line items for "60540 HOTELS," "60541 MEALS-HOTEL," and "60542 MEALS-NON HOTEL" for each team.

Not only are USSF's actual expenditures greater for the MNT, but its yearly budgeting for each team is too—showing that USSF planned to spend less on the WNT. Indeed, as shown below, USSF has budgeted millions of dollars more on airfare, hotels, and meals for the MNT than it does for the WNT.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **USSF Budget for MNT and WNT Airfare, Hotels, and Meals[30]** | | | | | | | | |
| | **FY 2015** | **FY 2016** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **Total** | **% of Total** |
| **MNT** | $1,863,100 | $2,803,658.33 | $2,500,635 | $3,133,350 | $2,535,475 | $5,376,133.75 | **$18,212,352.08** | **57.26%** |
| **WNT** | $1,194,928 | $1,315,276 | $1,317,716 | $1,176,236 | $4,240,636 | $4,348,716 | **$13,593,508** | **42.74%** |

In fact, for every fiscal year from 2015 through 2020 except one, USSF budgeted several hundreds of thousands of dollars, and sometimes over $1 million, more for MNT than for the WNT. And, even accounting for the sole exception of fiscal year 2019, USSF's data show that of its total budget for senior national team airfare, hotel, and meals, 57% of that amount was devoted to the MNT, while only 43% was devoted to the WNT.

The same financial documents also reveal that USSF often budgeted more for the MNT for smaller line items like meal expenses and laundry.[31]  The record also shows that USSF's budgeting was based on historical numbers from prior years,[32] despite John Langel's (former WNT union

---

[30] These data were compiled from USSF's team budget documents: USSF_Morgan_047611 (National Team 2015 Budgets); USSF_Morgan_057320 (MNT FY 2016 Budget); USSF_Morgan_057328 (WNT FY 2016 Budget); USSF_Morgan_057336 (MNT FY 2017 Budget); USSF_Morgan_057343 (WNT FY 2017 Budget); USSF_Morgan_057362 (MNT FY 2018 Budget); USSF_Morgan_057368 (WNT FY 2018 Budget); USSF_Morgan_063159 (MNT FY 2019 Budget); USSF_Morgan_057402 (WNT FY 2019 Budget); USSF Morgan_057386 (MNT FY 2020 Budget); and USSF Morgan_057403 (WNT FY 2020 Budget).

[31] USSF_Morgan_057336 (MNT FY 2017 Budget); USSF_Morgan_057343 (WNT FY 2017 Budget); USSF_Morgan_057362 (MNT FY 2018 Budget); USSF_Morgan_057368 (WNT FY 2018 Budget); USSF_Morgan_063159 (MNT FY 2019 Budget); USSF_Morgan_057402 (WNT FY 2019 Budget); USSF Morgan_057386 (MNT FY 2020 Budget); and USSF Morgan_057403 (WNT FY 2020 Budget).

[32] Pinky Raina Deposition Transcript, at 81, 87-88.

counsel) 2004 letter to the USOC complaining that this approach discriminates against women, and the WNT players' 2016 EEOC complaint. Mr. King testified that he prepared team budgets, "after looking at historicals."[33] This means that to the extent that unequal treatment occurred in the past, it would be perpetuated by using historical unequal treatment as a basis for setting future budgets. And, when preparing these budgets, USSF never did any analysis of whether the WNT and MNT budgets were determined in a non-discriminatory manner as the numbers were not compared.[34] Taken together, USSF's own records show that from fiscal years 2015 to 2020, it budgeted and spent millions of dollars more on airfare and room and board for the MNT than the WNT, despite the MNT playing considerably fewer games during these fiscal years.

### iii.   Personnel Resources and Support Services

As detailed below, the documents produced by USSF indicate that the organization has compensated the male MNT head coaches many times more than the female head coaches of the WNT, despite the women's team outperforming the men's team and the testimony of USSF executives that the WNT head coaches have worked just as hard and just as many hours as the head coaches of the MNT, who have not been as successful. Furthermore, the record shows wide disparities in the type and number of medical and support staff available to each team, with an unequal advantage for the MNT. These results echo the concerns about unequal treatment raised by Mr. Langel on behalf of the WNT players in his 2004 letter to the USOC.  In that letter, he identified,  "unequal support with respect to items such as equipment managers, trainers, massage therapists" as one example of unequal treatment.[35] While the WNT players were able to secure

---

[33] Tom King Individual Deposition Transcript, at 15-17.
[34] *See* Pinky Raina Deposition Transcript, at 209-214; Carlos Cordeiro Deposition Transcript, at 35-37 ("The budget was a collection of 22 national team budgets that were presented to us. … We did not go into every single budget.").
[35] John Langel Deposition Exhibit 40, WNTPA_0010895 (Langel letter to USOC), at 0010898.

some additional support through bargaining—and "[o]nly after extensive negotiations" and threats not to participate in the World Cup[36]—the record shows that USSF continued its unequal treatment and supported the MNT more than the WNT in these areas, a situation that was also complained of in the WNT players' 2016 EEOC complaint.[37]

1. Disparity in Salary for WNT and MNT Head Coaches

USSF's commitment to the MNT over the WNT is further shown through its dramatically unequal compensation of the MNT and WNT head coaches. Despite the fact that Jill Ellis, the WNT's head coach from 2014-2019, was "incredibly successful" and won two World Cups, she was compensated at a small fraction of the compensation for her male counterpart, who a senior USSF executive admitted had led a "[p]retty big failure" when the MNT failed to qualify for the last World Cup.[38]

The record shows that the MNT and WNT head coaching positions are comparable because both coaches are responsible for, among other things, identifying and scouting talent, training players, being a role model within the sport, and creating an environment conducive to winning games.[39] The record also shows that Ms. Ellis had responsibilities that her male counterpart did not, including making decisions on player contracts, in part because the WNT did not have a General Manager, while the MNT did.[40] In addition, Ms. Ellis earned less than the General Manager for the MNT.[41]  Mr. Cordeiro, the current President of USSF and its past Vice President

---

[36] John Langel Deposition Exhibit 40, WNTPA_0010895 (Langel letter to USOC), at 0010898.
[37] Alex Morgan Deposition Exhibit 9, USSF_Morgan_003373 (2016 EEOC Charge), at 003374-003375.
[38] Jay Berhalter 30(b)(6) Deposition Transcript, at 219.
[39] Jill Ellis Deposition Transcript, at 49-52.
[40] Jill Ellis Deposition Transcript, at 50-51, 71.
[41] Jill Ellis Deposition Transcript, at 73.

and Treasurer, admitted that the MNT head coach does not work harder or more hours than the WNT head coach, even though the male MNT head coach is paid considerably more.[42]

Specifically, USSF testified that for the tax year beginning April 1, 2017, USSF paid the MNT head coach, Bruce Arena, $1,249,348 while paying the WNT head coach about four times less, or $291,029.[43] Based on the same tax records, USSF testified that the former MNT head coach, Jurgen Klinsmann, was paid $3,354,167 during this time frame, or about <u>eleven times</u> Ms. Ellis's compensation.[44] The same is true for 2014. USSF testified that, based on 2014 audited financials, MNT head coach Mr. Klinsmann had a base compensation of $2,500,000 per year escalating over the term of the agreement.[45] At the same time, the WNT head coach had a base compensation of $185,000-$215,000 per year[46] and actually earned $185,000.[47] After back and forth negotiations, in which her representative pushed for higher compensation, Ms. Ellis was offered and accepted a salary of $500,000 in October 2018,[48] which was still less than half of the MNT head coach's salary for the prior year, $1,249,348—an amount offered to a person new to the position and with no track record of success.[49]

And USSF's head coaching salary discrepancy has not improved since Vlatko Andonovski replaced Jill Ellis as the WNT coach at the end of 2019. As Mr. Cordeiro testified, Mr. Andonovski's current salary is about $350,000 while the MNT head coach earns approximately

---

[42] Carlos Cordeiro Deposition Transcript, at 101.
[43] Jay Berhalter 30(b)(6) Deposition Transcript, at 217-218; Berhalter Exhibit 30 (USSF Form 990), at 9.
[44] Jay Berhalter 30(b)(6) Deposition Transcript, at 215-218; Berhalter Exhibit 30 (USSF Form 990), at 9. This figure purportedly includes Mr. Klinsmann's severance package.
[45] Jay Berhalter 30(b)(6) Deposition Transcript, at 113; Berhalter Exhibit 16 (USSF Financial Statements Year End 2013 and 2014).
[46] Jay Berhalter 30(b)(6) Deposition Transcript, at 114; Berhalter Exhibit 16 (USSF Financial Statements Year End 2013 and 2014).
[47] Jill Ellis Deposition Transcript, at 58.
[48] Jill Ellis Deposition Transcript, at 66; Ellis Exhibit 90 (emails between Ms. Ellis's agent and USSF).
[49] Jay Berhalter 30(b)(6) Deposition Transcript, at 217-218; Berhalter Exhibit 30 (USSF Form 990), at 9.

$1,000,000.[50] Again, this is true even though Mr. Cordeiro admitted that the WNT head coach works just as hard and just as many hours as the MNT head coach.[51]

### 2.   Disparity in Staffing Resources Available

In addition to these salary disparities for the head coaches of the WNT and the MNT, USSF has also provided fewer staffing resources for the WNT than for the MNT. According to Mr. Gulati, considerations on how to allocate resources should be the same for both the MNT and WNT,[52] however, a review of USSF's delegation lists show that, in practice, USSF provides far more staffing resources for the MNT.

For example, USSF's Chief Medical Officer attended 83 out of 85 MNT games, but never once travelled with the WNT players to their games or tournaments with respect to the games for which USSF provided data.[53] The men's team also travelled with an average of two doctors per game, while the women's team travelled with an average of one doctor per game based on this

---

[50] Carlos Cordeiro Deposition Transcript, at 100-101.
[51] Carlos Cordeiro Deposition Transcript, at 101.
[52] Sunil Gulati Individual Deposition Transcript, at 80.
[53]  USSF_Morgan_016979; USSF_Morgan_016975; USSF_Morgan_016970;   USSF_Morgan_016965; USSF_Morgan_016958;   USSF_Morgan_016929;   USSF_Morgan_016925;   USSF_Morgan_016920; USSF_Morgan_016918;   USSF_Morgan_016912;   USSF_Morgan_016856;   USSF_Morgan_016945; USSF_Morgan_016786;   USSF_Morgan_016779;   USSF_Morgan_016768;   USSF_Morgan_016745; USSF_Morgan_016740;   USSF_Morgan_017132;   USSF_Morgan_017115;   USSF_Morgan_017112; USSF_Morgan_017110;   USSF_Morgan_017117;   USSF_Morgan_017108;   USSF_Morgan_017106; USSF_Morgan_017104;   USSF_Morgan_017101;   USSF_Morgan_017096;   USSF_Morgan_017092; USSF_Morgan_017125;   USSF_Morgan_017059;   USSF_Morgan_017057;   USSF_Morgan_017055; USSF_Morgan_017053;   USSF_Morgan_017062;   USSF_Morgan_017050;   USFF_Morgan_017031; USSF_Morgan_017017; USSF_Morgan_017000; USSF_Morgan_016998, defined within report as "WNT Delegation Lists"; USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List). For all future references to WNT Delegation Lists, the following note applies: USSF produced delegation lists during the discovery process. The delegation lists were incomplete and, accordingly, the compiled data being referenced throughout this report is based on information made available to Plaintiffs. Notably, the delegation lists were missing or incomplete for all of the WNT and MNT games in 2014, most of the WNT games in 2019 including the She Believes Cup and the World Cup, the She Believes Cup in 2017, and a few other non-tournament games.

same USSF data.[54] Even more telling, the MNT has never once been without either a doctor or the Chief Medical Officer attending a game (according to the data produced), while the WNT played in at least 20 games with no doctor present, at all.[55] With respect to physical therapists, which include athletic trainers, sports medicine personnel, and physiologists (but not chiropractors or massage therapists), the MNT traveled with an average of five physical therapists, whereas the WNT travelled with an average of only three physical therapists for the games for which USSF produced data.[56]

The MNT also had a team chef for 39 out of 85 matches, while the WNT had a chef for just 11 out of 92 matches for the games for which USSF has produced data.[57] Even more telling, the WNT was only afforded a chef for World Cup and Olympic matches, while the MNT received this benefit for friendlies and other tournaments.[58] The WNT players' testimony echoes these findings. For example, Alex Morgan testified that the WNT receive less quality treatment in terms of medical staff, food quality, and not being provided a chef, among other things.[59] Christen Press expressed similar sentiments, stating that the MNT has access to more medical staff and athletic trainers.[60]

In addition to these disparities in the attendance of various staff members at MNT and WNT matches, USSF's delegation lists further reveal a general disinterest in/disdain for the WNT

---

[54] WNT Delegation Lists; USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List).
[55] WNT Delegation Lists; USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List).
[56] WNT Delegation Lists; USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List).
[57] WNT Delegation Lists; USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List).
[58] WNT Delegation Lists; USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List).
[59] Alex Morgan Deposition Transcript, at 179.
[60] Christen Press Deposition Transcript, at 99-100.

among the USSF executive team.  While USSF leaders supported the MNT by appearing at many of their games, they have appeared at a much smaller number of the WNT matches included in the data produced by USSF. For example, Mr. Gulati attended 41 out of 85 MNT games listed in USSF documents, Mr. Flynn (USSF's former CEO) attended 45 out of 85 MNT games listed, Mr. Cordeiro attended 22 out of 85 MNT games listed, and Mr. King attended all 85 of the MNT games listed.[61] All four men also attended the MNT World Cup Qualifying games in 2016 and 2017 and the 2017 Gold Cup.[62] In comparison, the delegation lists show that the same four USSF leaders did not attend a single WNT game or tournament for the time period during which USSF provided data.[63] While I understand that some senior USSF officials have attended some WNT games in the years for which USSF did not provide delegation list data (such as the 2019 World Cup), the pattern revealed by the delegation lists produced show less leadership attendance for WNT games than for MNT games, which is indicative of the unequal public support shown by USSF for the MNT and the WNT.

### iv.   Performance of the Respective Teams

The WNT is the top ranked women's national team in the world after having won back-to-back World Cups in 2015 and 2019.[64] The MNT, however, failed to qualify for the 2018 World Cup. A comparison of the two teams' win, loss, and draw records confirms that during calendar years 2014 through 2019, the WNT has outperformed the MNT by a considerable margin on the field.

---

[61] USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List).
[62] USSF_Morgan_057305 (MNT Master Delegation List); USSF_Morgan_055556 (MNT Staff List).
[63] WNT Delegation Lists.
[64] Tom King Individual Deposition Transcript, at 62.

| WNT & MNT Games Won, Lost, Tied Summary[65] | | |
|---|---|---|
| | **WNT (2014-2019)** | **MNT (2014-2019)** |
| **Number of Games Played** | 135 | 102 |
| **Number of Wins** | 108 | 52 |
| **% of Wins** | 80.00% | 50.98% |
| **Number of Losses** | 9 | 29 |
| **% of Losses** | 6.67% | 28.43% |
| **Number of Draws** | 18 | 21 |
| **% of Draws** | 13.33% | 20.59% |

From 2014 through 2019, the WNT won 108 of 135 matches for an 80%-win rate, while the MNT won only 52 of 102 matches for a 51%-win rate. And, despite playing over 33 more games than the MNT, the WNT lost just 9 matches, a 7%-loss rate, while the MNT lost 29 matches, a 28%-loss rate.

As Mr. Gulati and Mr. Cordeiro both testified, the WNT has been the most successful women's soccer team in the world.[66] It is currently ranked number one in the world by FIFA while the MNT is only ranked 28.[67] It is thus all the more concerning, from an HR standpoint, that the WNT has received much less support in its operations and working terms and conditions. President Cordeiro, himself, testified that he believes that it is not right that the women on the WNT have less support and fewer opportunities than the men on the MNT and that numerous Board members have expressed this view over the years at Board meetings.[68] Yet, as discussed below, USSF has not taken any standard, acceptable HR steps, such as issuing a gender discrimination compliance

---

[65] USSF_Morgan_055538 (MNT match spreadsheet); USSF_Morgan_055539 (WNT match spreadsheet).
[66] Sunil Gulati Deposition Transcript, at 120; Carlos Cordeiro Deposition Transcript, at 163-164.
[67] Tom King Deposition Transcript, at 62-63.
[68] Carlos Cordeiro Deposition Transcript, at 78-79.

policy or performing any analysis to correct the disparities between the two teams in response to these many visible red flags and Board member awareness of these long-standing conditions of unequal treatment, opportunity, and support.

### 3. Did USSF operate within standard and acceptable HR policy and/or practice in its treatment of players on the WNT in connection with their working conditions?

Based on the above, in my expert opinion, USSF operated well below the range of standard and acceptable HR practice in its treatment of players on the WNT with regard to their working conditions.  Standard and acceptable HR practice dictates that similarly-situated employees be provided equal opportunities in the terms and conditions of their employment, regardless of any protected characteristic such as gender.  The testimony and documents I reviewed revealed that USSF did not provide the WNT players with equal opportunities or treatment compared to MNT players with respect to a number of working conditions over which USSF had complete control.

USSF—specifically Jay Berhalter and Dan Flynn—decided the surfaces on which the WNT and MNT games were played in the United States[69] and decided to have the WNT play on the less-desirable artificial turf surfaces 12 times, while having the men play on such surfaces only once from 2014 through 2019 for domestic matches. USSF decided how much to spend on the two teams for airfare and decided to spend over $4 million more on airfare for the MNT from fiscal year 2015 through fiscal year 2020, even though the WNT played about 30% more matches than the MNT during those fiscal years.  USSF decided how much to spend on the two teams for hotel accommodations and meals and decided to spend over $2.5 million more for the MNT from fiscal year 2015 to fiscal year 2020, again, even though the WNT played more matches and, therefore, traveled more during this period.  The delegation lists show that the Chief Medical Officer, who

---

[69] Jay Berhalter 30(b)(6) Deposition Transcript, at 260-261.

had responsibility for both teams, attended all MNT games and no WNT games during the period for which I have been provided data. The players on the WNT played twenty games without a single doctor on the sidelines according to data produced by USSF.  Likewise, USSF had control over the allocation of other staff resources and chose to provide fewer physical therapists and chefs to WNT than to MNT.  In fact, with few exceptions, USSF senior officials didn't even both to attend any of the WNT games and decided mostly to attend MNT games—a symbol of how management values the two teams.  USSF decided how much to pay the respective teams' head coaches and decided to pay the head coach of the very successful WNT a fraction of the salary it decided to pay the head coach of the less successful MNT.

With respect to all of these working conditions, USSF and its Board members knew players on the WNT were not afforded equal opportunities to the players on the MNT, but did not apply its stated "mission" policy of providing for gender equality as expressed in its Form 990.[70] According to Mr. Berhalter, who was responsible for the Human Resource function at USSF, USSF did not conduct any training on gender discrimination issues or have any compliance program on this issue that he was aware of.[71] Mr. Cordeiro agreed that such training and compliance programs had not occurred to his knowledge.[72] The record further shows that USSF did not investigate or address many of the disparities in treatment between the WNT and the MNT players that have been complained about since 2004. And, while Board members frequently complained about the lack of equal support for the two teams, according to Mr. Cordeiro,[73] little

---

[70] *See, e.g.*, Jay Berhalter Deposition Exhibit 30 (USSF Form 990), at 2.
[71] Jay Berhalter Individual Deposition Transcript, at 47, 136; *see also* Sunil Gulati 30(b)(6) Deposition Transcript, at 183.
[72] Carlos Cordeiro Deposition Transcript, at 43.
[73] Carlos Cordeiro Deposition Transcript, at 75-79.

was done to investigate or comply with the mission statement's gender equality objective.[74] For these and all of the reasons set forth in this report, it is my expert opinion that USSF operated below standard and acceptable HR practice with regard to its treatment of WNT players' working conditions.

### C. Opinion on USSF's Response to Players' Complaints of Unequal Treatment and/or Discrimination

Senior USSF officials have testified that USSF has, to their knowledge, never, in response to all of the red flags of possible discriminatory treatment described in the record and the views that such discrimination existed as expressed by not only the WNT players' union but numerous Board members, taken even the most basic step of putting into place a gender equality compliance policy or training for issues of gender discrimination.[75] Such a compliance program and training is a standard part of responsible and acceptable HR practice for employers in the United States. Indeed, because receiving a complaint of discriminatory conduct, by definition, engenders a potential concern regarding retaliation, researchers and practitioners agree that acting on a complaint should prompt efforts aimed at decreasing and/or monitoring for retaliation (Babcock, 2012; Cooper, 2012; Goldberg, et al, 2019; SHRM 2009).  Thus, in addition to investigating the complaint of discrimination, the EEOC's Retaliation Guidance (2016) urges employers to take the following actions upon learning of such a complaint:

- Develop a clearly-written non-retaliation policy that provides examples of retaliation; provide practical guidance on interactions between managers and

---

[74] *See* Carlos Cordeiro Deposition Transcript, at 43; Jay Berhalter Individual Deposition Transcript, at 47, 136; Sunil Gulati 30(b)(6) Deposition Transcript, at 183.

[75] Carlos Cordeiro Deposition Transcript, at 43; Sunil Gulati 30(b)(6) Deposition Transcript, at 183; Sunil Gulati Individual Deposition Transcript, at 25; Jay Berhalter Individual Deposition Transcript, at 47, 136-137.

employees who have lodged complaints of discrimination; provide a reporting mechanism to address employee concerns about retaliation; and provide a clear explanation that retaliation can result in discipline up to and including termination.

- Train managers and employees on the employer's anti-retaliation policy, tailor the training to address specific deficits in EEO knowledge and behavioral standards that have arisen in that particular workplace, provide examples on how to avoid problematic situations that have already manifested (or likely to manifest); offer EEO-compliant alternatives on how the situation could have been avoided; emphasize that those accused of EEO violations should not act on revenge, while acknowledging that these emotions may occur; include training for managers and HR staff on how to be responsive and proactive when employees raise complaints about EEO concerns; and consider overall efforts to encourage a respectful workplace, which social scientists suggest may curb retaliatory behavior.

- Provide follow-up by checking in with employees who have complained.

- Have HR, an EEO specialist, or in-house counsel review actions to ensure that they have a non-discriminatory and non-retaliatory motives.

The testimony of senior USSF executives and Board members is that, to their knowledge, USSF never even conducted any comparisons of working conditions of the men's and women's national teams to determine if there was unequal treatment that required redress, despite the complaints they received from the women's union of unequal treatment, and even after an EEOC complaint was filed on this subject.[76]  In my opinion, this behavior by senior USSF management

---

[76]Carlos Cordeiro Deposition Transcript, at 43; Sunil Gulati Individual Deposition Transcript, at 25; Jay Berhalter 30(b)(1) Deposition Transcript, at 136-137.

and Board members displays a disregard for standard and acceptable HR policies in this area. And, until Mr. Cordeiro became the President in 2018, there was not even a senior HR official charged with responsibility for diversity issues,[77] suggesting a lack of the most basic procedures for ensuring compliance with standard HR legal requirements.

In formulating my opinion on whether USSF's response to WNT players' complaints of unequal treatment and/or discrimination fell below acceptable standard HR practices, I examined the standard HR policies and practices regarding investigating and otherwise responding to such complaints by U.S.-based employees of a U.S.-based employer as well as the specific policies and/or practices of USSF relevant to this issue. My opinions and conclusions are below.

> ### 1. What are standard HR policies and/or practices for preventing discrimination and responding to complaints of unequal and/or discriminatory treatment toward US-based employees?

The Society for Human Resource Management urges employers to proactively exercise reasonable care in preventing and responding to complaints of discriminatory treatment. SHRM, for example, emphasizes the importance of having in place anti-discrimination policies, a complaint procedure, and a process to investigate and manage a complaint when it occurs (SHRM 2008; SHRM 2009). In particular, SHRM (2008) advises organizations to have:

> a "**clear anti-discrimination and sexual harassment policy** and that your employees are trained in that policy. Your policy must define harassment, state clearly that it is not tolerated, that all complaints will be investigated, and that you will discipline or fire any wrongdoers. In the event of an occurrence, HR must conduct an investigation and take remedial action" (emphasis from original).

Further, to encourage employees to feel safe in reporting their concerns, the policy on reporting should allow for multiple avenues of complaint. Training should stress to employees, "that they have a right to a workplace free of discrimination" and should encourage employees,

---

[77]Carlos Cordeiro Deposition Transcript, at 104-107.

"to use the reporting procedure when necessary."  SHRM also warns employers to, "make sure that supervisors and managers receive training separate from employees.  Besides general discrimination issues, their sessions should also include information about how to handle complaints."

There is strong agreement among scholars (Goldberg, Rawski, & Perry, 2019), practitioners (Association of Workplace Investigators, 2012; Babcock, 2012; Cooper, 2012; Fischel, Wilson, & Young, 2003), and the Equal Employment Opportunity Commission (1999) that upon learning of a complaint of unfair or discriminatory treatment, an employer should immediately perform a prompt and thorough investigation of the complaint and, if founded, remedy the situation.

The following practices on conducting investigations have been recommended by multiple sources such as the Association of Workplace Investigators (2012), Babcock (2012), Cooper (2012), Fischel, et al. (2003), and the Equal Employment Opportunity Commission (1999):

- Have competent and experienced investigators lead the investigation.

- Prepare questions in advance to ask of the accuser, the accused, and witness.

- Gather relevant evidence including testimonial evidence as well as rules, policies, procedures; memoranda or notes about incident; time cards; expense reports; logs or diaries; communications; prior complaints; personnel files; managers' files; work samples; and security videos.

- Make credibility assessments that examine the inherent plausibility of each party's version, motives to falsify, corroborating physical or testimonial evidence, and the harasser's past record.

- Create a written report that documents the complaint, identifies relevant policies and laws, resolves (if possible) conflicting reports, and assess the credibility of interviewees and the validity of the evidence.

- Recommend and implement actions including training or discipline, up to and including termination.

- Monitor the workplace for potential retaliation.

### 2. What are the specific policies and/or practices of USSF that are relevant to responding to complaints of unequal and/or discriminatory treatment?

In reviewing the 2017-2021 WNT CBA, Mr. Cordeiro testified that USSF's Board never ensured that it was complying with Title VII or the Equal Pay Act.[78] Nor could Mr. Cordeiro recall whether, after being presented with the 2017-2021 WNT CBA for approval, the USSF Board ever compared the WNT's compensation terms to those in the MNT CBA.[79] Mr. Gulati's and Mr. King's testimony also show that no such analyses or comparisons ever took place to their knowledge, including with respect to the prior 2013-2016 Memorandum of Understanding that governed working conditions for the WNT.[80]

Mr. Cordeiro further testified that at USSF Board meetings, he and "several others over many years" raised the fact that female players have not been treated equally and thus did not have the same opportunities.[81] This was a, "common theme over years" at Board meetings, breakfasts, and dinners.[82] In fact, to this day, Mr. Cordeiro testified that that USSF's "female players have not been treated equally"—a view he repeatedly emphasized over two years ago when running for

---

[78] *See* Carlos Cordeiro Deposition Transcript, at 43.
[79] *Id.* at 421-43.
[80] Sunil Gulati Individual Deposition Transcript, at 25-26; Tom King Individual Deposition Transcript, at 57-59.
[81] Carlos Cordeiro Deposition Transcript, at 76-77.
[82] *Id.* at 79.

USSF President.[83] Despite the fact that the WNT players have been raising complaints of unequal treatment since as early as 2004, there is no evidence that USSF or its Board has undertaken any gender equality compliance programs to address the existence of unequal working conditions, opportunity, and support.[84]

### 3. Did USSF operate within standard and acceptable HR policy and/or practice with respect to its response to complaints by the WNT union or the players of unequal and/or discriminatory treatment?

In my expert opinion, USSF operated well below the range of acceptable and standard HR practices in responding to WNT players' complaints of unequal and/or discriminatory treatment. The Federation was put on notice at least as early as 2004 that the WNT players believed they were being discriminated against relative to the MNT players.  In October 2004, USSF informed John Langel, the WNT union's counsel at the time, that ,"U.S. Soccer is going to go dark for the women this year," meaning that USSF would be playing the WNT in only a few international events and in the W-League, a now defunct women's soccer league, despite the WNT having just won Gold at the Olympics.[85] USSF's decision meant that 2005 would be, "a year of scouting" for the WNT, not a, "year of developing players through training and playing."[86]

In response to this perceived threat of retaliation for the players' bargaining positions demanding equal treatment, Mr. Langel wrote to the United States Olympic Committee ("USOC") to show how this was, "just one additional illustration of USSF's discrimination against women and its refusal to fulfill its obligation to treat women equitably," as evidenced by the fact that this

---

[83]Carlos Cordeiro Deposition Transcript, at 47-55; Cordeiro Exhibit 124, USSF_Morgan_044331 (12/20/17 Email).

[84]John Langel Deposition Exhibit 40, WNTPA_00010895 (Langel letter to USOC).

[85]John Langel Deposition Transcript, at 259; Langel Exhibit 40, WNTPA_0010895 (Langel letter to USOC), at 00010896-00010897.

[86]John Langel Deposition Exhibit 40, WNTPA_00010895 (Langel letter to USOC), at 00010897.

decision was made against the WNT Coach/Technical Director's beliefs at the time, despite USSF telling the WNT players that this was in fact the coach's "recommendation."[87]  The WNT players soon learned that USSF chose to "go dark" because it, "did not want to spend the money it would take to have [the WNT] train and compete in the protected competitions"—despite having a "$30 million dollars surplus" and having recently earned, "$3 million dollars . . . during the Women's World Cup in 2003."[88]

Mr. Langel's 2004 letter also listed the following, "illustrations of discrimination," some of which dated back to the 1990s:

- "USSF's statements in the 1990's to the effect that they would not have a women's national team if they were not required to do so";

- "USSF has attempted to persuade the Men's National Team Players' Association to structure its contracts in a way that would not result in any payments to the women under the same matrix";

- "USSF's unwillingness to pay the women anywhere near equal compensation for successes comparable to the men's (indeed USSF is committed to paying the women less than the men even though the women have been far more successful on the playing field)";

- "Unequal support with respect to items such as equipment managers, trainers, massage therapists, meals, hotel accommodations, and transportation";[89]

---

[87] *Id*.
[88] *Id*. at 00010898.
[89] Noting in a footnote that, "[o]nly after extensive negotiations and a threat to not participate in the 99 World Cup were the women able to secure USSF's commitment to provide support for these listed items at the same level as the support provided to the Men's National Team."

- "The commitment of funds to pay for 14 year-old boys and not girls to live and train in Bradenton, Florida while attending a private soccer academy";

- "The commitment of $10 million to build soccer stadiums for a for-profit professional league for men, Major League Soccer ('MLS')";

- "The commitment to loan or give millions to assist in the start-up of MLS. Correspondingly, when repeatedly asked by the Women's United Soccer Association ('WUSA') for start-up funding to help relaunch a league, US Soccer has repeatedly claimed 'it is not in the business of building leagues'";

- "The commitment of funds to pay Major League Soccer reserve players, again using not-for-profit funds to support a for profit league that is at no current risk of failure";

- "The recent decision to avoid scheduling events at or near certain MLS cities so as not to adversely affect the MLS while conducting the Women's Post Olympic Victory Tour";

- "The decision to assign the USSF's marketing rights to the marketing arm of Major League Soccer, thereby benefiting the MLS and ending any attempt to appeal to sponsors of women's sports";

- "The recent and repeated refusal to even provide dates to meet with the women to negotiate a new Uniform Player Agreement even though the current agreement requires the parties to meet to negotiate in good faith at least sixty days before the expiration date of December 31, 2004"; and

- "The refusal to even discuss a plan for the Team for the next four years, knowing the women stop getting paid on December 8, 2004."[90]

In addition, USSF received a report from Consensus Management Group ("CMG"), which conducted USSF employee interviews around the time of the 2004 complaint from Mr. Langel. These interviews indicated that USSF's commitment to equal treatment of female employees was disputed by a number of employees. For example, one quote from an interviewed employee was that the, "Federation is still an old boys club … women are the biggest minority around."[91] CMG also noted that, "gender issues surfaced in a variety of ways, from "'allowing' the demise of the WUSA [a prior women's professional soccer league], to the paucity of women in major leadership positions," and recommended that the Federation have a well-worded diversity policy.[92] Fast-forward to today and there still are no diversity, compliance, or other polices in place to address these issues. Despite the fact that the consulting firm that the Federation retained recommended adopting a diversity task force as early as 2004,[93] in the 1.5 decades since, that has yet to happen.[94] The lack of resources committed to diversity and inclusion was so glaringly apparent, that creating a Diversity and Inclusion Director position became a major platform issue for Mr. Cordeiro's candidacy for the USSF presidency in 2018—14 years after the WNT union's 2004 complaint and two years after the EEOC complaint about USSF's treatment of the WNT players was filed.[95] And, the number of women USSF Board members is only 4 out of 15 today.[96]

---

[90] John Langel Deposition Exhibit 40, WNTPA_00010895 (Langel letter to USOC), at 00010898-00010899.
[91] *Id.* at 00010902.
[92] *Id.* at 00010901.
[93] *Id.*
[94] Jay Berhalter Individual Deposition Transcript, at 136.
[95] USSF_Morgan_044356 (Carlos Cordeiro, USSF Presidential Candidate, Answers ESPN's Questions), at 044357; USSF_Morgan_042187 (Aim Higher A New Vision For U.S. Soccer), at 042188.
[96] Carlos Cordeiro Deposition Transcript, at 140-41.

In the *fifteen years* since Mr. Langel's 2004 letter[97] and the CMG report,[98] the record shows no attempt by USSF to investigate any of the complaints of gender discrimination or take any new gender equality compliance initiatives to address them.  Despite the fact that Mr. Langel's 2004 letter cites several gender-based complaints and provides a list of consultants' recommendations to address such,[99] Mr. Berhalter, who was in the HR function for USSF at the time, admitted that he does not recall any steps being taken to address the issues raised in the report nor any investigation into the gender discrimination issues referenced therein.[100]  In fact, shortly after being made aware of complaints of gender discrimination, the Federation sought to have the WNT "go dark" for a year, limiting players' opportunities to develop and be competitive at the international level.[101]  In 2016, without any redress, five players on the WNT filed a complaint with the EEOC detailing many of the same continued issues of discrimination.[102] And still, no new gender equality compliance programs have been instituted since that date.[103]

Further, while President Cordeiro described the numerous complaints and awareness by USSF Board members for many years about the members of the WNT not receiving equal opportunities, he admitted such lack of equal opportunity still exists.[104]  In fact, to this day, Mr. Cordeiro testified that USSF's, "female players have not been treated equally"—a view he repeatedly emphasized over two years ago when running for USSF president.[105]  President

---

[97] Fishel, et al. (2003) state that, "investigations should normally be completed in a matter of weeks and not months."  USSF did not even achieve the outside parameter they cited.
[98] John Langel Deposition Exhibit 40, WNTPA_00010895 (Langel letter to USOC), at 00010901.
[99] *Id.*
[100] Jay Berhalter Individual Deposition Transcript, at 136.
[101] John Langel Deposition Transcript, at 259; Langel Exhibit 40, WNTPA_00010895 (Langel letter to USOC), at 00010897.
[102] *E.g.*, Alex Morgan Deposition Exhibit 9, USSF_Morgan_003373 (2016 EEOC Charge).
[103] Jay Berhalter Individual Deposition Transcript, at 136.
[104] Carlos Cordeiro Deposition Transcript, at 54-55.
[105] *Id.* at 47-55.

Cordeiro tried to justify this lack of review or action on various equal treatment issues for the WNT by stating, "I can't do everything… 24 hours is limited hours in a day" and saying that he trusts USSF senior staff.[106] But, under standard and acceptable HR policies, that is not a proper excuse for lack of Board action when the Board is aware of unequal and/or discriminatory treatment.

Other examples of inadequate HR policies by USSF in the area of gender discrimination abound. President Cordeiro testified that Board members complained repeatedly of insufficient support and opportunity for the women's team,[107] but he and his predecessor, Sunil Gulati, were not aware of any compliance policies or efforts in this area.[108] Although Mr. Berhalter is directly involved in the decision on playing surfaces for WNT and MNT games and testified that Mr. Flynn is responsible for making the ultimate decision on playing surfaces in case of disagreement,[109] he testified that he never assessed which of the women's games that were played on turf would have been profitable enough to make a grass cover prudent, despite having testified that projected revenue for the events was the key driver in his decision to lay grass over the turf in friendlies—a policy that former President Gulati testified he did not agree with.[110]

The record also contains other examples of the Federation failing to investigate in accordance with standard and acceptable HR standards, if at all, the complaints made by the women's team of discriminatory treatment. I cite the following as examples:

- Mr. Berhalter admitted that he does not know why it would be that the Federation spent over twice on men's air travel than on women's air travel, despite the fact that

---

[106] *Id*. at 146.
[107] Carlos Cordeiro Deposition Transcript, at 78-79.
[108] *Id*. at 43.
[109] Jay Berhalter 30(b)(6) Deposition Transcript, at 261.
[110] Jay Berhalter Deposition Transcript, at 270-71; Sunil Gulati Individual Deposition Transcript, at 213-214.

women played 27 more games in the same period of 2012 through 2015.[111]  Mr. Gulati likewise admitted to being aware that the MNT had more charter flights but he was not aware of any investigation to justify or determine why this was done.[112]

- Mr. Berhalter admitted that he does not know why the Federation spent $3 million more on men's hotels than on women's hotels, even though the MNT played fewer games.[113]

- Mr. Berhalter does not recall any steps being taken in response to the gender issues raised in the report from Consensus Management Group in 2004.[114] Further, although he was in the HR function at the time, he does not recall USSF ever investigating gender discrimination issues.[115]

- In the time period since the 2016 EEOC complaint, Mr. Cordeiro was not aware of any efforts to institute a gender discrimination compliance policy or training.[116]

The record also shows that when the WNT union pressed for equal pay and treatment with the MNT in 2016, USSF responded by, among other things, threatening to reduce financial support for the NWSL.[117] This was a similar threat of retaliation to that which USSF made in 2004, when the union complained of unequal treatment.

The record further contains evidence of disregard and/or disdain for the WNT by USSF representatives. For example, during collective bargaining negotiations in 2016, there is evidence

---

[111] Jay Berhalter 30(b)(6) Deposition Transcript, at 294.
[112] Sunil Gulati Individual Deposition Transcript, at 101.
[113] Jay Berhalter 30(b)(6) Deposition Transcript, at 301-02.
[114] Jay Berhalter Individual Deposition Transcript, at 136.
[115] *Id*. at 137.
[116] Carlos Cordeiro Deposition Transcript, at 43.
[117] Rich Nichols Deposition Transcript, at 104-05; *See* USSF_Morgan_005638 (11/30/15 CBA Meeting Notes), at 005648-005653.

that Russell Sauer, USSF's lead outside counsel for CBA negotiations at that time, said "market realities [are] such that the women do not deserve to be paid equal pay."[118] Further, Mr. Cordeiro laughed when he read an article discussing how other candidates running for USSF President in 2018 advocated for equal pay for the WNT, but refused to explain why he laughed.[119] And Jay Berhalter testified that one of the reasons why the women on the WNT did not receive equal pay was that the men on the MNT were, "stronger and faster."[120] The former head coach of the WNT, however, and a number of players, testified that they were actually as skilled or more skilled, in total, than their male counterparts.[121]

In short, USSF's disregard for WNT's repeated complaints of discrimination and its responses of threatening to have the team "go dark" for a year and to eliminate financial support for the NWSL in response to complaints of lack of equal treatment fail to comport with standard and acceptable HR practices. Rather, standard and acceptable HR practices require prompt and thorough investigations in response to complaints of discrimination and an assurance that employees can complain of discrimination without fear of reprisal. USSF's actions were not consistent with these HR standards and, in my opinion, show a disregard for standard and acceptable HR policies in the gender discrimination area.

---

[118] Rich Nichols Deposition Transcript, at 128; Megan Rapinoe Deposition Transcript, at 108-109.
[119] Carlos Cordeiro Deposition Transcript, at 247-255.
[120] Jay Berhalter Individual Deposition Transcript, at 75-76.
[121] Jill Ellis Deposition Transcript, at 242-243; Carli Lloyd Deposition Transcript, at 105, 108, 131; Alex Morgan Deposition Transcript, at 212-213.

## VIII.  <u>CONCLUSION</u>

For the reasons described above, it is my professional opinion that USSF senior management and Board members were aware of numerous red flags indicating that USSF was not treating the members of the men's and women's national teams equally, equitably, or fairly in terms and conditions of employment from an HR perspective; that the differences in men's and women's treatment and support without investigation or redress by USSF was not consistent with accepted HR standards; that USSF's investigation into complaints of gender discrimination have been neither timely nor sufficient from standard HR practice; and that USSF's HR response to the numerous red flags indicating significant gender discrimination issues between the members of the WNT and the MNT has been wholly inadequate from the standpoint of standard and acceptable HR policies and procedures. I further note that such acceptable HR standards apply whether or not a particular workforce is unionized.

*Caren Goldberg, Ph.D.*

Caren Goldberg, Ph.D.
Signed on this 4th day of February, 2020

# **Appendix 1**
# **to the Expert Report of Dr. Caren Goldberg**

Exhibit 1 - Page 46

# Caren Goldberg, Ph.D.

9949 Corsica Street
Vienna, VA  22181
571-426-8325
caren@carengoldberg.com

## EDUCATION

**Doctor of Philosophy -** W.T. Beebe Institute of Personnel & Employment Relations, Georgia State University.  1997.

**Master of Business Administration** - School of Management, State University of New York at Binghamton.  1990.

**Bachelor of Arts -** Psychology, State University of New York at Stony Brook.  1987.

**Study Abroad** -Instituto Internacional de Madrid.  Fall, 1985

## WORK EXPERIENCE

**Faculty Member –** Department of Management, Marketing, and Public Administration, Bowie State University.  August, 2015 – May, 2019.
　　　Program Coordinator, Management – 2015 – 2017.

**Visiting Faculty Member -** Department of Psychology, George Mason University, Fairfax, VA. August, 2014 – May, 2015.

**International Visiting Scholar** – Universidad Peruana de Ciencias Aplicadas, Lima, Peru. November, 2014 – present.

**Faculty Member -** Department of Management, American University, Washington, DC. January, 2006 – May, 2014.

**Faculty Member -** Department of Management Science, George Washington University, Washington, DC.  Fall, 1996 – Fall, 2005.
　　　Promoted and Tenured - Fall, 2003.
　　　Program Director, HR – 2002 – 2005.
　　　Faculty Exchange – École des Sciences Politiques, Paris, France, 2003; 2004.

Page **1** of **28**

Exhibit 1 - Page 47

**Human Resources Specialist – Compensation -**United Health Services, Binghamton, NY.
May, 1988 - March, 1989.


EXPERT WITNESS ENGAGEMENTS

**Public Testimony in Employment Law Cases (Past Four Years)**

❖ *Andrea Szaloki v. Wal-Mart Stores, Inc., et al.,* Case No:  50-2016-CA-007193- MB-AG.
   Deposition – December, 2019.

❖ *Marshelle Hightower v. Ingerman Management Company* and *Andre'a McDonald v.
   Ingerman Management Company*, Civil Actions No. 17-8025 (RMB-JS) and 17-
   12787(NLH-JS).  Deposition – October, 2019.

❖ *Kathleen Fowler v. AT&T, Inc., et al.*, Civil Action No. 18-CV-00667.  Deposition –
   August, 2019.

❖ *Soto, et al v. Microsoft Corporation*, 16-2-31049-4 SEA.  Deposition – September, 2018.

❖ *Maness v. City of High Point.*  Civil Action No. 1:17-cv-384.  Deposition – June, 2018

❖ *Ravina v. Columbia University and Geert Bekaert.*  Civil Action No:  1:16-cv-02137(RA).
   Deposition – March, 2018.

❖ *Kassman, et al v. KPMG, LLC.*  Case No. 11-cv-03743.  Deposition – October, 2017.

❖ *Anderson, et al. v. Verizon New Jersey Inc., et al.* Civil Action No. 13-cv-4777 and *Gardrie,
   et al. v. Verizon New Jersey Inc., et al.* Civil Action No. 15-cv-3577.  Deposition –
   September, 2017.

❖ *Williams v. G&K Services, Inc.*  15-cv-01744-PHX-DDD.  Deposition – August, 2016.

❖ *Nielsen v. CareOptions*.  CL14-10271.  Deposition – June, 2016.


**Citations in Judges' Decisions**

❖ *Moussouris, et al. v. Microsoft Corporation*.  C15-1483JLR.  Order on Motions to Exclude.
   Judge James Robart, United States District Judge.  Issue Date:  April 25, 2018.

❖ *Seguin v. Northrup Grumman Corporation.*  2012-S0X-00037.  Decision and Order.  Judge
   Daniel Solomon, Administrative Law Judge.  Issue Date:  February 27, 2015.

Exhibit 1 - Page 48

<u>TRAINING AND SPEAKING ENGAGEMENTS</u>

❖ Presenter – "Practical Ways to Foster Effective Group Dynamics."  Invited lecture, University of Malta Masters in Conflict Resolution Program.

❖ Keynote Speaker – Interdisciplinary Conference on Sexual Harassment, University of Notre Dame.  2018

❖ Presenter – "Political affiliation and employment screening: The role of similarity and disidentification.  Industrial/Organizational Psychology Brown Bag Series, George Mason University.  2017.

❖ Presenter – "How political affiliation affects employment screening: The role of similarity and disidentification." College of Business Brown Bag Series, Bowie State University.  2017.

❖ Presenter – "Pygmalion in the Pipeline:  How Managers' Perceptions Influence Racial Differences in Turnover."  College of Business Brown Bag Series, Bowie State University.  2016.

❖ Keynote Presenter - "Attracting and Retaining a Diverse Pool of Talent."  3rd International Conference on Global Management.  Lima, Peru.  2016.

❖ Keynote Presenter – "Leading in Times of Crisis."  1st International Conference on Global Management.  Lima, Peru.  2014.

❖ Presenter – "Antecedents and Consequences of LMX Agreement."  Industrial/Organizational Psychology Brown Bag Series, George Mason University.  2015.

❖ Presenter – "It's Not Just Who You Know, But Who You Are: Newcomer Race-Ethnicity on Leader-Member Exchange Development."  Industrial/Organizational Psychology Brown Bag Series, George Mason University.  2011.

❖ Presenter – "Black and White and Read All Over:  Race Differences in Reactions to Recruitment Websites."  Industrial/Organizational Psychology Brown Bag Speaker Series, George Mason University.  2009.

❖ Session Organizer and Presenter – Diversity and Inclusiveness in the Classroom.  Ann Ferren Teaching Conference, American University.  Spring, 2009.

❖ Session Organizer and Presenter – Conference on Teaching and Training Workplace Diversity:  Addressing the Research-Practice Gap.  George Mason University.  2008.

❖ Center for Excellence in Public Leadership – Designed and delivered a senior executive development workshop for upper-level public managers in DC government.  2005.

❖ Council of Governments – Designed and delivered training workshop for mid- to upper-level

Exhibit 1 - Page 49

government managers in VA, MD, and DC.  2005.

❖ Center for Excellence in Public Leadership – Designed and delivered training workshop for mid- to upper-level public managers in DC government.  2005.

❖ JOBS (Junior Options for Business Success).  Designed and delivered workshop for job-seeking undergraduates.  George Washington University.  Spring, 2001.

❖ "The Use of Personality Tests in Employment" luncheon speaker.  Society of Consumer Affairs Professionals.  Spring, 2000.

❖ Group Dynamics and Teambuilding.  Designed and delivered workshop for incoming MBA students.  George Washington University.  Fall, 1999, Spring, 2000, Fall, 2000, Spring, 2001, Fall, 2002.

❖ "Dancing in the Minefields: Managing Employee Performance and Compensation."  Designed and delivered training for MBA residency.  George Washington University.  Spring, 1999.

❖ Center for Excellence in Municipal Management.  Designed and delivered HRM training module for mid- to upper-level DC government managers.  Spring, 1998.

❖ Tri-Way Enterprise.  Designed and delivered Human Resources and Employee Motivation Workshop to Chinese delegation of accounting and finance professionals.  Fall, 1998.

❖ "Generation X Views on Business and Work Issues" panel discussion.  Washington Human Resource Forum.  Fall, 1998.


PUBLICATIONS – IN PROGRESS

**Refereed Publications**

Sabat, I., Goldberg, C., King, E. Dawson, J., Zhang, L., & McKay, P.  Leaks in the pipeline: How leaders' perceptions of new hires influence minority turnover.  Under third review at *Journal of Applied Psychology.*

Goldberg, C. B., McKay, P., & Zhang, L.  The Influence of Newcomer Race-Ethnicity on the Leader-Member Exchange Unfolding Process.  Under second review at *Journal of Occupational and Organizational Psychology*.

Exhibit 1 - Page 50

Goldberg, C., Konrad, A., Lindsey, A., Yang, Y., & Cheung, H.  A Meta-Analytic Review of the Role of Gender Context on Men's and Women's Human Resource Development Outcomes: Implications for the Gender Gap in Leadership.  Invited to resubmit to *Human Resource Development International.*

Goldberg, C., Roth, P., Thatcher, J., Matthews, K., & Ahmad, A.  The effects of religion on the evaluation of social media profiles in hiring.  Preparing for submission to *Journal of Applied Psychology.*

Scandura, T., Goldberg, C., Zhang, L., & McKay, P.  Leader-Member Exchange and Turnover Intentions:  The Mediating Roles of Person-Organization Fit and Perceived Organizational Support.  Preparing for submission to *Personnel Psychology.*

## PUBLICATIONS - COMPLETED

### Refereed Publications

Roth, P., Bobko, P., Goldberg, C., Matthews, K., Ellingson, J., & Thatcher, J. (in press). Political affiliation and employment screening decisions: The role of similarity and disidentification processes.  *Journal of Applied Psychology.*

Goldberg, C., & Ahmad, A.  (2019).  Improving the measurement of sexual harassment climate.  *Industrial and Organizational Psychology: Perspectives on Science & Practice, 12,* 64-67.

Goldberg, C., Rawski, S., & Perry, E. (2019).  Training managers to handle sexual harassment complaints:  A longitudinal examination.  *Human Resource Development Quarterly, 30,* 81-100.

Roth, P., Goldberg, C., & Thatcher, J.  (2017).  The role of political affiliation on employment decisions:  A model and research agenda.  *Journal of Applied Psychology, 102,* 1286-1304.

Cheung, H.K., Goldberg, C., King, E., & Magley, V.  (2017).  Are They True to The Cause? Beliefs about Organizational and Unit's Commitment in Sexual Harassment Training.  Online First at *Group and Organization Management.*

Holtom, B., Goldberg, C., Allen, D., & Clark, M. (2016). Exploring the antecedents and consequences of shocks: A prospective perspective. *Journal of Business and Psychology, 31*: 1-13.

Burton, L.., Gilson, L., Goldberg, C. & K. B. Lowe (2016).  Does being an athlete help a woman? Examining how subtle bias in perceptions of leadership potential differentially impact male and female athletes.  *Review of Global Management*, 2(1), 66-72.

Exhibit 1 - Page 51

Zhang, L., & Goldberg, C. B.  (2014).  Sensitivity-to-diversity: A moderator of diversity - affective outcomes relationships.  *Equality, Diversity, and Inclusion, 33,* 494-509.

Goldberg, C., Perry, E. L., Finkelstein, L. M., & Shull, A.  (2013).  Antecedents and outcomes of targeting older applicants in recruitment.  *European Journal of Work and Organizational Psychology, 22.* 1-14.

Goldberg, C. B., Clark, M. A., & Henley, A.  (2011).  Speaking up: A conceptual model of voice responses following the unfair treatment of others in non-union settings.  *Human Resource Management, 50*, 75-94.

Konrad, A.M., Cannings, K., & Goldberg, C.B.  (2010).  Asymmetrical demography effects on psychological climate for gender diversity:  Differential effects of leader gender and work unit gender composition among Swedish doctors.  *Human Relations, 63*, 1661-1685.

Goldberg, C. B., Riordan, C., & Schaffer, B.  (2010).  Does social identity theory underlie relational demography?  A test of the moderating effects of self-continuity and status-enhancement on similarity effects.  *Human Relations, 63*, 903-926.

Goldberg, C. B., & Allen, D.  (2008).  Black and White and read all over:  Race differences in reactions to recruitment Web sites.  *Human Resource Management, 47,* 217-236.

Goldberg, C., Riordan, C., & Zhang, L.  (2008).  Employees' perceptions of their leaders:  Is similar always better?  *Group and Organization Management, 33,* 330-355.

Taylor, M. A., Goldberg, C., Shore, L., & Lipka, P.  (2008).  The dynamic effects of retirement expectations and social support on post-retirement adjustment: A longitudinal analysis.  *Journal of Managerial Psychology, 24,* 1-8.  **\*(Winner of the Emerald Literati Award for Excellence).**

Goldberg, C.  (2007).  The impact of training and conflict avoidance on responses to sexual harassment.  *Psychology of Women Quarterly, 31*, 62-72.

Goldberg, C. B.  (2007).  Cross-cultural perceptions of coworker- and supervisor-initiated social-sexual behaviors.  *Business Journal of Hispanic Research, 1*, 1-10.

Goldberg, C.  (2005).  Relational demography and similarity-attraction in interview assessments and subsequent offer decisions:  Are we missing something?  *Group and Organization Management, 30,* 597-624.

Konrad, A.M., Yang, Y., Goldberg, C., & Sullivan, S.  (2005).  Preferences for job attributes associated with work and family:  A longitudinal study of career outcomes.  *Sex Roles, 53,* 303-316.

Exhibit 1 - Page 52

Goldberg, C., Finkelstein, L., Perry, E., & Konrad, A.  (2004) Job and industry fit:  The effects of age and gender matches on career progress outcomes.  *Journal of Organizational Behavior, 25,* 807-829.

Goldberg, C., & Zhang, L.  (2004).  Simple and joint effects of gender and self-esteem on responses to same-sex sexual harassment.  *Sex Roles, 50,* 823-833.

Goldberg, C., & Cohen, D.  (2004).  Walking the walk and talking the talk:  Gender differences in the impact of interviewing skills on applicant assessments.  *Group and Organization Management, 29,* 369-384.

Goldberg, C., Riordan, C., & Schaffer, B.  (2003).  Missing pieces in social identity theory: Continuity and status as moderators of similarity.  *Academy of Management Best Paper Proceedings.*

Shore, L. M., Cleveland, J. N., & Goldberg, C.  (2003).  Work attitudes and decisions as a function of manager age and employee age.  *Journal of Applied Psychology, 88,* 529–537.

Goldberg, C.  (2003).  Applicant reactions to the employment interview:  A look at demographic similarity and social identity theory.  *Journal of Business Research, 56,* 561-571.

Goldberg, C., & Shore, L. M.  (2003).  The impact of age of applicants and of referent others on recruiters' assessments:  a study of young and middle-aged job seekers.  *Representative Research in Social Psychology, 27,* 11-22.

Goldberg, C.  (2003).  Who responds to surveys?  Assessing the effects of non-response in cross-sectional dyadic research.  *Assessment, 10,* 41-48.

Goldberg, C.  (2002).  The impact of the proportion of women in one's workgroup, profession, and friendship circle on males' and females' responses to sexual harassment.  *Sex Roles, 45,* 359-374.

Goldberg, C., & Waldman, D. A.  (2000).  Modeling employee absenteeism: Testing alternative measures and mediated effects based on job satisfaction.  *Journal of Organizational Behavior, 21,* 665-676.

Houghton, S. M., Simon, M., Aquino, K., & Goldberg, C.  (2000).  No safety in numbers: Persistence of biases and their effects on team risk perception and team decision making.  *Group and Organization Management, 25,* 325-353.

Perry, A., & Goldberg, C. (1998).  Who gets hired: Interviewing skills are a prehire variable. *Journal of Career Planning and Employment, 58 (2),* 47-50.

**Invited Publications**

Page **7** of **28**

Exhibit 1 - Page 53

Roth, P., Goldberg, C., Matthews, K.., Thatcher, J., Ellingson, J., & Goldberg, C. (2019).  Social
media cues about your political leanings might influence whether you're hired or not.  Invited
blog, London School of Economics.
https://blogs.lse.ac.uk/businessreview/2019/10/17/social-media-cues-about-your-political-
leanings-might-influence-whether-youre-hired-or-not/

Goldberg, C., & McDermott, E.P.  (2018).  Legal Issues Relating to an Aging Workforce.  In G.
Adams and K. Schultz (Eds.)  *Aging and Work in the 21st Century*, pp. 102-122.

Roth, P., Goldberg, C., & Thatcher, J.  (2017).  I vote left, you vote right: How can we work
together?  Invited blog, London School of Economics.
http://blogs.lse.ac.uk/usappblog/2017/10/28/i-vote-left-you-vote-right-how-can-we-work-
together/

Goldberg, C. (in press).  Global and Cultural Competencies.  Contribution to Guidance
Document of SHRM's Competency Model.

Goldberg, C., Gilson, L., & Nesci, S. (2017).  Leading women: Unique challenges and
suggestions for moving forward.  In T. Scandura & E. Mouriño (Eds.), *Leading Diversity in the
21st Century.* Information Age Publishing.

Goldberg, C., & Gilson, L.  (2016).  Editors' Comment:  What Makes the GOM Special Issue
Special?

Goldberg, C.  (2016).  Recruiting and Retaining a Diverse Workforce.  SHRM White Paper.

Gilson, L., & Goldberg, C.  (2015).  Editors' Comment:  So, what is a conceptual paper?  *Group
and Organization Management, 40*, 127-130.

Goldberg, C., & McKay, P.  (2016).  Diversity and LMX development.  Invited chapter in T.
Bauer and B. Erdogan (Eds.).  *The Oxford Handbook of Leader-Member Exchange.*  Oxford
University Press. 381-396.

Goldberg, C., Perry, E. L., Finkelstein, L. M., & Shull, A.  (2014).  Antecedents and outcomes of
targeting older applicants in recruitment.  In D. Truxillo and F. Fraccaroli (Eds.).  *Age in the
Workplace:  Challenges and Opportunities.*  Routledge/Taylor and Francis.

Goldberg, C.  (2010).  What do we really know about sexual harassment training effectiveness?
Invited chapter in M. Paludi (Ed.).  *Praeger Handbook on Understanding and Preventing
Workplace Discrimination.  Volume 2:  Best Practices for Preventing and Dealing with
Workplace Discrimination.*  Westport, CT:  Praeger.

Goldberg, C.  (2007).  Social identity theory.  Invited chapter in S. Clegg & J. Bailey (Eds.),
*International Encyclopedia of Organization Studies*, Sage Publications.

Goldberg, C.  (2007).  Diversity issues for an aging workforce.  Invited chapter in Kenneth A.

Exhibit 1 - Page 54

Schultz and Gary S. Adams (Eds.), *Aging and Work in the 21st Century*, Lawrence Erlbaum.

Goldberg, C. (2007). Make the most of interviewing. *Independent Agent*. April, 2007, p. 42.

Goldberg, C. (2006). Look to your Web site to increase the quality and diversity of your applicant pool. *HR Watch*. Appeared December 6, 2006.

Shore, L. M., & Goldberg, C. B. (2004). Age discrimination in organizations. In R. L. Dipboye and A. Colella (Eds.). *Psychological and Organizational Bases of Discrimination at Work*. Lawrence Erlbaum – SIOP Frontiers Series.
Swiercz, P., McHugh, P., & Goldberg, C. (1997). *Human Resource Systems for Competitive Advantage*. Needham Heights, MA: Simon & Schuster.

Goldberg Sharak, C. (1995). Managing diversity at Cox Communications. *H.R. Atlanta*.


## CONFERENCE PRESENTATIONS

De Janasz, S., Kaplan, D., Goldberg, C., & Schneer, J. (2019). Conflict ahead: A workshop on conflict and negotiations pedagogy. Eastern Academy of Management International Conference, Dubrovnik, Croatia.

Goldberg, C., Roth, P., Thatcher, J., Matthews, K., & Ahmad, A. (2018). The effects of religion on the evaluation of social media profiles in hiring. Southern Management Association Conference, Lexington, KY.

De Janasz, S., & Goldberg, C. (2018). Innovative and Experiential Approaches to Teaching HR. Annual Academy of Management Meeting, Chicago, IL.

Goldberg, C., Scandura, T., Zhang, L., & McKay, P. (2018). Current Developments in Leader-Member Exchange: A Research Incubator. Annual Academy of Management Meeting, Chicago, IL.

Roth, P. L., Bobko, P., Thatcher, J. B, Matthews, K. D., Ellingson, J. E., & Goldberg, C. (2017). Political Affiliation and employment screening: The role of similarity and disidentification. Paper presented at the Annual Academy of Management Meeting in Atlanta, GA.

Zhang, L., Goldberg, C., & Hong, W. (2017). Diversity, Social Network Density, and Team Performance: The Moderating Role of Team Climate for Inclusion. Paper presented at the Annual Academy of Management Meeting in Atlanta, GA.

De Janasz, S., & Goldberg, C. (2017). Innovative and Experiential Approaches to Teaching HRM. Presented at the Academy of Management Conference, Atlanta, GA.

Cohen, D., Goldberg, C., Brown, K., Fisher, S., & Gittelman, S. (2017). At the interface: Online learning versus classroom learning. Presented at the Academy of Management

Exhibit 1 - Page 55

Conference, Atlanta, GA.

Cheung, H.K., Goldberg, C., King, E., & Magley, V.  (2017).  Beliefs about Organizational and Unit's Commitment in Sexual Harassment Training.  Paper presented at the Society for Industrial/Organizational Psychologists Conference, Orlando, FL.

De Janasz, S., & Goldberg, C.  (2016).  Innovative and Experiential Approaches to Teaching HRM II.  Presented at the Academy of Management Conference, Anaheim, CA.

Goldberg, C., Konrad, A., Lindsey, A., & Yang, Y.  (2016).  Gender Context and Work Outcomes: A Meta-Analysis.  Paper presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Sabat, I., Goldberg, C., & King, E.  (2016).  Pygmalion in the Pipeline: How Managers' Perceptions Influence Minority Turnover.  Paper presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Medvin, E., Zacarro, S., & Goldberg, C.  (2016).  Relational, Situational, and Individual Factors Influencing Managers' Telework Allowance Decisions.  Paper presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Stockdale, P., Goldberg, C., Ross, D., Gutman, A., Dunleavy, E., & Banks, C.  (2016).  Competencies and Content Expertise for I/O Psychology Expert Witnesses.  Panel session presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Roth, P., Goldberg, C., & Thatcher, J.  (2015).  The role of political affiliation on employment decisions: A model and research agenda.  Presented at the Academy of Management Conference, Vancouver, BC.

De Janasz, S., & Goldberg, C.  (2015).  More Experiential HR: A Potluck for reviving and expanding your repertoire.  Presented at the Academy of Management Conference, Vancouver, BC.

Bowes-Sperry, L., Goldberg, C., Blockson, L., and Kermond, C.  (2015). Facilitating Faculty Responses to Diversity Dilemmas: Toward Creating Classroom Inclusiveness.  Presented at the Academy of Management Conference, Vancouver, BC.

De Janasz, S., Goldberg, C., Bowes-Sperry, L., Kaplan, D., Forret, M., Van Emerick, H., Peiperl, M., Marx, R., Schneer, J.  (2015).  Teaching OB Experientially: Reviving and Expanding your Repertoire.  Presented at the Eastern Academy of Management International Conference, Lima, Peru.

Burton, L., Gilson, L., Goldberg, C., & Lowe, K.  (2015).  The impact of biased perceptions of leadership potential on job prospects for male and female athletes.  Presented at the Eastern Academy of Management International Conference, Lima, Peru.

Page **10** of **28**

Exhibit 1 - Page 56

Goldberg, C. (2015).  Doing meaningful research – IGNITE presentation at the Society for Industrial/Organizational Psychologists Conference.  Philadelphia, PA.

Sharif, M. Goldberg, C., Huang, J., Liu, H., & Cogliser, C. (2014).  New avenues in LMX agreement research. Presented at the Southern Management Association Conference, St. Pete's Beach, FL.

Zhang, L., & Goldberg, C.  (2014).  The Antecedents and Consequences of Leader-Member Exchange (LMX) Agreement.  Presented at the Academy of Management Conference, Philadelphia, PA.

Barclay, L., Markel, K., Caldwell, K., Dwerman, D., Goldberg, C., Honig, B., Martin, B., Simon, M., Harris, S., Renko, M.  (2014).  Persons with disabilities and entrepreneurship:  Barriers and opportunities.  Presented at the Academy of Management Conference, Philadelphia, PA.

DeJanasz, S., & Goldberg, C.  (2014).  Experiential HR: A Potluck for reviving and expanding your repertoire.  Presented at the Academy of Management Conference, Philadelphia, PA.

Gourmanis, G., Ramsey, T., Milad, M., Goldberg, C., Crowder, D., Winberg, Y., Behnke, S., Crowder, D., El-Ghoroury, N., Lowman, R., & Tippins, N. (2014).  Competing coaches and coachees: Mock licensing board hearing.  Presented at the Society for Industrial/Organizational Psychologists Conference, Honolulu, HI.

Lowe, K., Gilson, L., Burton, L., & Goldberg, C. (2013). Pilot testing in organizational behavior research: A methodological overview and example from a study on the effects of gender and sport participation on perceptions of leadership.  Presented at the Eastern Academy of Management International Conference, Seville, Spain.  (**Winner - Best Paper Award, Research Methods Division).**

Gilson, L., Burton, L., Goldberg, C., & Lowe, K. (2012). Gender, sports, and leadership. Presented at the Southern Management Association Conference, Fort Lauderdale, FL.

Holtom, B., Weller, I., Goldberg, C., Allen, D., & Clark, M. (2011). Predicting the consequences of shocks: A prospective perspective.  Presented at the Southern Management Association Conference, Savannah, GA.

Payton, F., Stafford, T., Goldberg, C., Nelson, T., Suarez-Brown, T.  (2010).  Expanding minority representation in management education.  Presented at the Academy of Management Conference, Montreal, Canada.

Goldberg, C. B., & Zhang, L.  (2009).  A second chance to make a first impression?  A longitudinal examination of changes in Black and White newcomers' leader-member exchange and career future.  Presented at the Academy of Management Conference, Chicago, IL.

Exhibit 1 - Page 57

Goldberg, C., & Perry, E. (2009). Training managers to handle sexual harassment complaints: Context matters. Presented at the Society of Industrial/ Organizational Psychologists Conference, New Orleans, LA.

Goldberg, C. B., Clark, M., & Henley, A. (2008). You, me, and we: Identity and unfair treatment in groups. Presented at the Society of Industrial/ Organizational Psychologists Conference, San Francisco, CA.

Goldberg, C. B. (2007). Work and organizational issues in the retention of older employees. Symposium at the Society of Industrial/ Organizational Psychologists Conference, New York, NY.

Goldberg, C. B., & Zhang, L. (2006). The positive and negative effects of racism and sexism on perceptions of group cohesiveness and performance. Presented at the Southern Management Association Conference, Clearwater, FL.

Goldberg, C. B. (2006). The impact of organizational practices on recruiting a diverse workforce. Coordinator of symposium presented at the Academy of Management Conference, Atlanta, GA.

Goldberg, C., Perry, E. L., & Finkelstein, L. M. (2006). Targeting older applicants in recruitment: An organizational perspective. Presented the Academy of Management Conference, Atlanta, GA.

Goldberg, C. B., & O'Leary, B. (2006). Theoretical bases for diversity and fairness effects: Linking the two together. Presented at the Academy of Management Conference, Atlanta, GA.

Goldberg, C. & Allen, D. (2005). Web-based recruiting: When women and minorities need not apply. Presented at the Academy of Management Conference, Honolulu, HI.

Goldberg, C., Kaplan, D.M., Marchese, M.M., & Mumford, T.V. (2005). Using popular film and television as pedagogical tools in HR/IR. Presented at the Innovative Teaching in HR/IR Conference. Park City, UT

Goldberg, C., Riordan, C., & Zhang, L. (2004). Relational demography and leadership perceptions: Is similar always better? Presented at the Academy of Management Conference, New Orleans, LA.

Zhang, L., & Goldberg, C. (2004). The effects of sensitivity to surface-level and deep-level diversity on work group performance and attitudes. Presented at the Academy of Management Conference, New Orleans, LA.

Page **12** of **28**

Exhibit 1 - Page 58

Konrad, A.M., Goldberg, C., Sullivan, S., & Yang, Y.  (2004).  Preferences for job attributes associated with work and family: A longitudinal study.  Presented at the Academy of Management Conference, New Orleans, LA **(Nominated for Best Symposium – Careers Division).**

Goldberg, C., Riordan, C., & Schaffer, B.  (2003).  Missing pieces in social identity theory: Continuity and status as moderators of similarity.  Presented at the Academy of Management Conference.  Seattle, WA.

Zhang, L., & Goldberg, C.  (2003).  The effects of sensitivity to surface-level and deep-level diversity on work group performance and cohesion.  Presented at the Eastern Academy of Management International Conference, Porto, Portugal.

Konrad, A., & Goldberg, C.  (2002).  An examination of the impact of gender context on individuals and organizations.  Coordinator of symposium presented at the Academy of Management Conference, Denver, CO.

Goldberg, C., & Konrad, A.  (2002).  The effects of gender context: A meta-analysis.  Presented at the Academy of Management Conference.  Denver, CO.

Goldberg, C., & Stone, D.  (2001).  Older workers and disabled workers:  A look at two underutilized groups.  Coordinator of symposium presented at the Academy of Management Conference, Washington, DC.

Goldberg, C., Finkelstein, L., Perry, E., & Konrad, A.  (2001).  Age and career progress:  Tests of simple and moderated effects.  Presented at the Academy of Management Conference, Washington, DC.

Goldberg, C.  (2001).  Gender, gender context, and same-sex harassment: re-evaluating our theoretical understanding of social-sexual behavior. Presented at the Society of Industrial/ Organizational Psychologists conference, San Diego, CA.

Goldberg, C.  (2000).  The impact of different gender contexts on responses to sexual harassment.  Southern Management Association conference.  Orlando, FL.

Goldberg, C., & Cohen, D. (2000). Walking the walk and talking the talk:  Gender differences in the impact of interviewing skills on applicant assessments.  Eastern Academy of Management Conference.  Danvers, MA.

Case, J., Goldberg, C., McHugh, P., & Moreno-Tello, V.  (2000).  Cross-cultural perceptions of coworker- and supervisor-initiated social-sexual behaviors.  Presented at the Society of Industrial/Organizational Psychologists conference, New Orleans, LA.

Exhibit 1 - Page 59

Cleveland, J. N., Shore, L. M., & Goldberg, C.  (2000).  Work attitudes and performance as a function of manager age, employee age, and their interaction. Presented at the Society of Industrial/Organizational Psychologists conference, New Orleans, LA.

Goldberg, C.  (1999).  Multiple perspectives of sexual harassment.  Coordinator of symposium presented at the Academy of Management conference, Chicago, IL.

Goldberg, C., & McHugh, P.  (1999).  The impact of training on perceptions of and reactions to sexual harassment.  Presented at the Academy of Management conference, Chicago, IL.

Taylor, M., Goldberg, C., & Shore, L.  (1999).  Retirement expectations and retirement satisfaction.  Presented at the Society for Industrial/Organizational Psychologists conference, Atlanta, GA.

Goldberg, C. & McHugh, P.  (1999).  Cultural differences in perceptions of sexual harassment. Presented at the George Washington University Scholars Showcase, Washington, DC.

Goldberg, C. & McHugh, P.  (1998).  Is it sexual harassment?  An East-West comparison. Presented at the Management of Human Resources Conference, Honolulu, HI.

Goldberg, C.  (1998).  Who responds to surveys?  An application of Goodman and Blum's procedure to cross-sectional dyadic research.  Presented at the Southern Management Association Conference, New Orleans, LA.

Goldberg, C. & Shore, L.M.  (1998).  The impact of applicant age and the ages of referents on recruiters' decisions.  Presented at the Society for Industrial/Organizational Psychologists Conference, Dallas, TX.

Goldberg, C.  (1997).  Relational demography: A tale of two theories.  Presented at the Academy of Management Conference, Boston, MA.

Goldberg, C.  (1997).  The impact of job qualifications and interviewing skills on selection decisions.  Presented at the George Washington University Scholars Showcase, Washington, DC.

Goldberg, C., & Perry, A. (1996).  The relative importance of background and interviewing skills in campus interviews.  Presented at the Southern Association of Colleges and Employers Conference, Atlanta, GA.

Goldberg, C., & Shore, L. M. (1995).  Age stereotypes and new hire performance ratings. Presented at the Southern Management Association Conference, Orlando, FL.

Goldberg, C.  (1995).  The proposed Employment Nondiscrimination Act:  Implications for organizations.  Presented at the Academy of Management Conference, Vancouver, BC.

Goldberg, C., & Shore, L. M. (1994).  Measuring age context:  A comparison of two approaches. Presented at the Academy of Management Conference, Dallas, TX.

Exhibit 1 - Page 60

Goldberg, C., & Waldman, D. A. (1994).  Modeling the determinants of employee absenteeism. Presented at the Society for Industrial/Organizational Psychology Conference, Nashville, TN.

GRANTS, SCHOLARSHIPS, AWARDS, AND HONORS

**Title III Faculty Professional Development Award** - $1,949.  University-wide grant for teaching and pedagogy.  Bowie State University.  2018.

**Academy of Management, Gender and Diversity in Organizations Division** – Elected to Treasurer, 2015 – 2018.

**Best Paper Award** ($500).  Pilot testing in organizational behavior research: A methodological overview and example from a study on the effects of gender and sport participation on perceptions of leadership.  Eastern Academy of Management International Conference, Research Methods Division.  2013.
**Academy of Management, Gender and Diversity in Organizations Division** – Elected to Executive Committee, 2012-2015 term.

**Society for Human Resource Management/American National Standards Institute** – Appointed to taskforce, charged with creating national standards in the area of Diversity and Inclusion.  2010 - present.

**Society for Human Resource Management** – Honored as one of 100 thought leaders at the Leadership Summit on Diversity and Inclusion.  April 7-8, 2008.

**Kogod Research Grant** ($6,935).  A Multi-source, Multi-wave Investigation of New Hire Fit. Kogod School of Business, American University.  2007.

**Crain Summer Research Fellowship** - $12,500.  Relational demography and leadership perceptions:  Is similar always better?  George Washington University.  2005.

**Academy of Management Award for Outstanding Service** – Award from Human Resources Division for service as Secretary of the Executive Committee.  2001.

**Southern Management Association Award for Outstanding Service** – Plaque awarded for service as track chair for the Southern Management Association meeting.  2000.

**George Washington University Release Time for Research Award** - $2,000.  Employee perceptions of and reactions to sexual harassment: A field study (with Patrick McHugh). George Washington University.  1999.

**Junior Faculty Consortium Invitee -** Academy of Management Conference Human Resources Division, Boston, MA.  1997.

Exhibit 1 - Page 61

**Award for Outstanding Teaching Performance -** Department of Management, Georgia State University.  Winter, 1996.

**Award for Outstanding Teaching Performance -** Department of Management, Georgia State University.  Fall, 1995.

**Doctoral Consortium Invitee -** Academy of Management Conference Human Resources Division, Vancouver, BC.  1995.

**Georgia State University Dissertation Proposal Grant -** $1,000.  Georgia State University. 1995.

**Exemplar Research Award -** $2,000.  College of Business Administration, Georgia State University.  1995.

**William T. Rutherford Award -** $500.  W. T. Beebe Institute of Personnel and Employment Relations, Georgia State University.  1993.

**New York State Regents Scholarship -** $500/year.  New York State Board of Regents. 1984, 1985, 1986, 1987.


TEACHING EXPERIENCE

**Undergraduate Teaching Experience**

- ❖ Introduction to Business (Online)

- ❖ Introduction to Business (Traditional)

- ❖ Principles of Management (Online)

- ❖ Principles of Management (Traditional)

- ❖ Psychology of Working Groups and Teams

- ❖ Leading High Performance Teams

- ❖ Principles of Organizational Theory, Behavior, and Management

- ❖ GWU Paris Program – Introduction to Human Resource Management

- ❖ Introduction to Human Resource Management

- ❖ Introduction to Organizational Behavior

Exhibit 1 - Page 62

❖ Principles of Management

❖ Advanced Topics:  Cases and Exercises in Human Resource Management

**Graduate Teaching Experience**

❖ Seminar in Personnel Selection and Testing

❖ Seminar in Industrial Psychology

❖ Seminar in Small Group Behavior

❖ High Performing Teams

❖ MBA – Organizational Behavior and Human Resource Management

❖ Doctoral Seminar – Research Design

❖ Performance Management and Development

❖ Accelerated AMBA – Human Dynamics in Organizations

❖ Doctoral Seminar – Current Research in Human Resource Management

❖ Executive MBA – Human Resource Management

❖ Pre-MBA Group Dynamics 1-Day Workshop

❖ Accelerated MBA (Off-Campus Mini-Residency) – Dancing in the Minefields:  Managing Employee Performance and Compensation

❖ MBA Organizations, Management, and Leadership

❖ MBA Organizations, Management, and Leadership I

❖ MBA Organizations, Management, and Leadership II

❖ Accelerated MBA (Off-Campus Residency) Organizations, Management, and Leadership II

**Dissertation and Thesis Committee Service**

David Arena (Psychology – George Mason University), 2015.  The impact of racial microaggressions on subsequent creativity and cognitive task performance.

Page **17** of **28**

Exhibit 1 - Page 63

Emily Medvin (Psychology – George Mason University), 2015.  The impact of telework on leader-member exchange quality.

Elaine Brenner (Psychology- George Washington University), 2006.  Telework and retention.

Beverly Nyberg (Human Resource Development – George Washington University), 2004.  A study of Jaques' requisite organization theory as it relates to the impact of person to role and person to supervisor degree of fit on employee satisfaction in a non-profit service agency.

Haven Battles (Psychology – George Washington University), 2000. Professional self-efficacy and burnout in pediatric HIV nurses.

M. Martha Neal (Logistics and Operations Management – George Washington University), 1999. Leadership in a change environment: A case study in the United States Navy Logistics.


**Student Evaluations**

❖ On two occasions, I received a perfect 5.0 for overall teaching effectiveness.

❖ Throughout my nine years at GWU, averages for all of my overall and item scores for every semester except one, ranged from 4.0 to 5.0 on a five-point scale.

❖ I have also had students in my workshops evaluate my performance.  The scores have consistently been in the 4.5 range.

❖ I received two departmental awards for my teaching performance.


## PROFESSIONAL LEADERSHIP ACTIVITIES

**Treasurer**

Academy of Management, Gender and Diversity in Organizations Division.  2015-2018.

**Coordinator – Online Paper Development Workshop**

Academy of Management, Gender and Diversity in Organizations Division. 2017; 2018.


**Keynote Speaker – Multidisciplinary Conference on Sexual Harassment**

University of Notre Dame, South Bend, IN.  2018.

Exhibit 1 - Page 64

**Chair – Dorothy Harlow Best Paper Award Committee**

   Academy of Management, Gender and Diversity in Organizations Division.  2016.

**Editor – Special Conceptual Issue**

   *Group and Organization Management.*  2015; 2016.

**Chair – Academy of Management Doctoral Consortium**

   Gender and Diversity in Organizations Division. 2013; 2014; 2015.

**Panelist – Academy of Management Junior Faculty Consortium**

   Human Resources Division. 2014.

**Executive Committee - Academy of Management**

   Gender and Diversity in Organizations Division.  2012-2015.

**Mentor – Academy of Management**

   Gender and Diversity in Organizations Division.  2012 Conference.

**Associate Editor**

   *Group and Organization Management.*  2004 – 2007.

**Editorial Board Member**

   *Journal of Business and Psychology.*  2015 – present.
   *Group and Organization Management.*  2003 – 2004; 2007-present.
   *Human Resource Management.*  2003 – present.
   *Journal of Management.*  2003 – 2009.

**Mentor – Paper Development Workshop**

   Southern Management Association - Human Resources Division.  2011.

**Doctoral Consortium Committee**

   Academy of Management - Human Resources Division.  2004-2005.

**Roundtable Discussion Leader**

   Academy of Management Doctoral Consortium - Human Resources Division.  2004, 2007.

Exhibit 1 - Page 65

**Teaching Panel Presenter**

Academy of Management Doctoral Consortium - Human Resources Division.  2005, 2006.

**Editors' Roundtable Presenter**

Academy of Management Doctoral Consortium - Gender and Diversity in Organizations Division.  2005.

**Coordinator – Teaching Workshop**

Academy of Management - Human Resources Division.  2001.

**Secretary – Executive Committee**

Academy of Management - Human Resources Division.  2000 – 2002.

**Track Chair**

Southern Management Association - Human Resources Division.  2000.

***Ad-Hoc* Journal Reviewer**

*Academy of Management Journal*

*American Economic Review*

*Assessment*

*European Journal of Work and Organizational Psychology*

*Group and Organization Management*

*Human Performance*

*Human Resource Management Journal*

*Human Resource Management Review*

*Journal of Applied Social Psychology*

*Journal of Business Research*

*Journal of Human Resource Planning*

*Journal of Management*

*Journal of Organizational Behavior*

Exhibit 1 - Page 66

*Organizational Behavior and Human Decision Processes*

*Personnel Psychology*

*Sex Roles*

## Text Book Reviewer

Dessler, G.  *Fundamentals of Human Resource Management, 4rd Ed.*  Prentice Hall.  2006.

Dessler, G.  *Fundamentals of Human Resource Management, 3rd Ed.*  Prentice Hall.  2005.

Dessler, G.  *Fundamentals of Human Resource Management, 2nd Ed.*  Prentice Hall.  2003.

## Conference Reviewer

Innovative Teaching in HR/IR Conference.  2005.

Society for Industrial/Organizational Psychologists.  1999, 2000, 2012 – 2014.

Academy of Management Conference
- Human Resources Division.  1994, 1999-2007, 2009.
- Gender and Diversity in Organizations Division.  2000-2001, 2006, 2009 – 2014.
- Careers Division.  1996.

Southern Management Association Conference
- Human Resources/Careers Division.  1994-1999, 2002-2005.
- Organizational Behavior Division.  1996.
- Women in Management Division.  1992-1994.
- Research Methods Division.  1998.

## Conference Session Chair

Academy of Management
- Human Resources Division.  2000, 2008.
- Gender and Diversity in Organizations Division.  2010.
- Organizational Behavior & Technology and Innovation Division.  2005.

Southern Management Association - Human Resources Division.  2002.

## Conference Discussant/Facilitator

Southern Management Association
- Human Resources Division.  1997, 1999, 2001, 2002, 2009.
- Organizational Behavior Division.  1996.

Page **21** of **28**

Exhibit 1 - Page 67

- ▪ Careers Division.  1996.
- ▪ Women in Management Division.  1993, 1994.

Academy of Management - Human Resources Division.  2001.

## PROFESSIONAL COMMITTEE SERVICE

❖ Award Committee – Sage Scholarly Contributions to Management - Academy of Management, Gender and Diversity in Organizations Division.  2018.

❖ Committee on Ethnic and Minority Affairs Mentoring Program - Society for Industrial-Organizational Psychology.  2015 – present.

❖ Master Collaboration Committee - Society for Industrial and Organizational Psychology. 2012

❖ Dorothy Harlow Award Committee - Academy of Management Gender and Diversity Division.  2010.

❖ Best Paper Committee – Academy of Management Gender and Diversity Division.  2004.

❖ Best Student Paper Committee - Southern Management Association Conference.  1997.

❖ Member Relations Committee- Academy of Management Human Resources Division.  1993.

## UNIVERSITY SERVICE ACTIVITIES

**Ongoing Activities**

❖ Bowie State University – Salary Equity Committee.  2017 – 2019.
❖ Bowie State University – Faculty Mentor, MMPA Department.  2015 – 2019.
❖ Bowie State University – Program Coordinator, Management Program.  2016 – 2018.
❖ Bowie State University – Faculty Advisor, Delta Mu Delta.  2016 – 2019.
❖ Bowie State University – MMPA Curriculum Committee.  2016 – 2019.
❖ Bowie State University – Academic Advisement.  2016 – 2019.
❖ Bowie State University – Computerized Classroom Committee.  2015 – 2019.
❖ Bowie State University – Study Abroad Capacity Building Initiative 2015-2016.
❖ AU Faculty Retreat Planning Committee.  2011 – 2013.
❖ AU Faculty Advisor – Student SHRM Chapter.  2008 – 2014.

❖ AU Academic Integrity Code Review Committee.  2006 – 2014.

❖ AU University Policy Committee for Maternity & Family Obligations.  2007 – 2011.

❖ AU Management Department Faculty Search Committee.  2006 – 2007.

❖ AU Mgmt 353 Consistent Experiences across Sections (Teams Packet).  2006 – 2014.

❖ AU Faculty Advisory Board, Women's and Gender Studies.  2006 - 2014.

❖ GWU Doctoral Program Curriculum Committee.  2004 – 2005.

❖ GWU Undergraduate Program Committee.  2004 – 2005.

❖ GWU Liaison, Council on Education in Management.  2003 - 2005.

❖ GWU Conflicts of Interest and Commitment Committee.  2003 – 2005.

❖ GWU Study Abroad Committee.  2003 – 2005.

❖ GWU University Women's Committee.  2003 – 2005.

❖ GWU Program Director – HRM.  2003 – 2005.

❖ GWU Faculty Advisor – Student SHRM Chapter.  2000 – 2002.

❖ GWU University Women's Committee (alternate).  2000 – 2003.

❖ GWU Faculty Senate Committee on Research.  1998-2005.

❖ GWU Full-time MBA Curriculum Committee.  1999 – 2000.

❖ GWU Cohort MBA Curriculum Redesign Committee.  1997-1999.

❖ GWU Department of Management Science Annual Retreat Planning Committee.  1998.

❖ GWU MBA Core Faculty Meetings.  1997-2000.

❖ GWU Faculty Advisor - School of Business and Public Management Leadership Retreat.  1997-1998.

❖ GWU BBA Core Faculty Meetings.  1996-2005.

**One-Time or Periodic Activities**

❖ Chair, Search Committee – Public Administration Faculty.  Sp, 2018.

❖ Search Committee – Marketing Faculty.  Sp, 2018.

❖ Search Committee – Marketing Faculty.  Sp, 2017.

❖ Search Committee – Public Administration/Organizational Behavior Faculty.  Sp, 2017.

❖ Presenter – Research Brown Bag, "Pygmalion in the Pipeline," Fa, 2016.

❖ Presenter – Greenberg Seminar Series, "An Overview of Sexual Harassment," Fa, 2012.

❖ Moderator – KSB Alumni Event, "Redefining Having It All," Summer, 2012.

Exhibit 1 - Page 69

❖ Session Organizer and Presenter – Diversity and Inclusion in the Classroom.  Ann Ferren Teaching Conference, American University.  Sp, 2009.

❖ Faculty Presenter – MBA Orientation.  Fa, 2006.

❖ Faculty Presenter – GMU, GWU, UMD I/O-HR Brown Bag Series.  Sp, 2004.

❖ Faculty Presenter – First Year Development Program.  Sp, 2001, 2002, 2003.

❖ Presenter – Management Science Department-wide Doctoral Seminar.  Fa, 2003.

❖ Faculty Facilitator/Assessor – Graduate Teaching Assistantship Practicum.  Fa, 2003.

❖ Faculty Advocate – SBPM Distinguished Scholar Award (Jessica Toplin, nominee).  2003.

❖ Search Committee for Center for Excellence in Municipal Management Director.  2002.

❖ Faculty Judge – Undergraduate capstone assessment.  Sp, 2002.

❖ PMBA – "Customize Your MBA" program – Representative for HR group.  Fa, 1998, Fa, 2001, Sp, 2002.

❖ Designed and presented JOBS (Junior Options for Business Success) Workshop.  Sp, 2001.

❖ Undergraduate Programs Field Day – Presented information about HR field.  Sp, 2001, 2002.

❖ Search Committee for Graduate Career Center Assistant Director.  Sum, 2000.

❖ MBA Specialization Discussion and Reception – Representative for HR group.  Sp, 1999.

❖ KPMG National Case Competition – Faculty Host.  Sp, 1999.

❖ Cohort Team Assessments - Coaching and counseling session.  Fa, 1998.

❖ Speaker at Washington Human Resource Forum - Generation X Views on Business and Work Issues.  Fa, 1998.

❖ Moderator/Facilitator, EDS Consulting Week - Performance Management.  Sp, 1998.

❖ Faculty representative for Open House for newly-admitted MBA students.  Sp, 1997.

❖ Faculty representative for Family weekend for prospective undergraduate students.  Fa, 1996.


**Media Coverage**

❖ *WBAL Radio.*  Live radio interview regarding my research on political affiliation discrimination.  Aired December 4, 2019.

❖ *The Hill.*  "Is political affiliation the new discrimination? Our research suggests 'yes'."  Article summarizing my research on political affiliation discrimination.  Published 11/27/19.

❖ *New York Times.*  Interviewed for an article, "How to disclose a disability to an employer

Page **24** of 28

Exhibit 1 - Page 70

(and whether you should)."  Published July 10, 2019.

❖ *Vanity Fair.* Interviewed for an article, "'You will lose everything':  Inside the media's #metoo blacklist."  Published April 16, 2019.

❖ *CGTN America (Chinese National News Channel)* - Live television interview for a piece on the one-year anniversary of #metoo.  Aired October 14, 2018.

❖ *Anniston Star Daily.*  Interviewed for an article, "Experts: For Star, sexual harassment policy may not go far enough."  Published January 3, 2018.

❖ *The Parallax: Your Eye on Security News.*  Interviewed for an article, "At Chaos, a chaotic response to assault allegations."  Published January 4, 2018.

❖ *CGTN America (Chinese National News Channel)* - Live television interview for a piece on sexual harassment.  Aired December 7, 2017.

❖ *Anniston Star Daily*.  Interviewed for an article, "Alabama lawmaker at forefront of effort to change sexual harassment rules in Congress."  Published December 2, 2017.

❖ *CGTN America (Chinese National News Channel)* – Television interview for a piece on sexual harassment.  Aired November, 2017.

❖ *Elite Daily* – Interviewed for an article, "What can you do about sexual harassment in the workplace?  An expert breaks down the myths and truths."  Published November, 2017.

❖ *CGTN America (Chinese National News Channel)* – Live television interview for a piece on sexual harassment.  Aired October, 2017.

❖ *Bustle* – Interviewed for an article, "The statistics on reporting harassment will sadly validate your fears."  Published, October, 2017.

❖ *BBC* – Interviewed for an article, "How Metaphors Shape Women's Lives."  Published July, 2017.

❖ *New York Daily News* – Interviewed for an article, "Georgia college student says group of men threatened to 'grab her by the p---y' at Waffle House."  Published November, 2016.

❖ *El Comercio (Perú)* – Interviewed for an article, "Empresas líderes usan neurociencia para mejorar productividad."  Published September, 2016.

❖ *Fast Company* – Interviewed for an article, "The Other Wage Gap: Why Men In Female-Dominated Industries Still Earn More."  Published April, 2015.

❖ *Voice of America* – Interviewed for a televised segment on sexual harassment.  Aired on numerous worldwide affiliates, April, 2014.

Exhibit 1 - Page 71

❖ *Monster.com* – Interviewed for an article, "5 Items You Should Never Put in Your Cubicle." Published, December 3, 2013.

❖ *Entrepreneur Magazine* – Interviewed for an article, "4 steps to creating a successful job-swapping program." Published November 20, 2013.

❖ *Kiplinger* – Interviewed for an article, "Eight jobs that pay women more than men." Published 4/11/13.

❖ *Yahoo! Finance* – Interviewed for an article, "Male nurses becoming more commonplace – and higher paid." Published 2/26/13.

❖ *Forbes* – Interviewed for an article, "The 20 Best-Paying Jobs for Women in 2012." Published 7/18/12.

❖ *US News & World Report* – Interviewed for an article, "Experts mixed on whether quotas boost women in business." Published 6/26/12.

❖ *NPR, Kojo Show* – Hour-long, live call-in radio show on "The Nontraditional Workplace." Aired 6/5/12.

❖ *Forbes* – Interviewed for an article, "A new obstacle for women: The glass escalator." Published 5/21/12.

❖ *AOL* – Interviewed for an article, "Jobs where women make more than men." Published 3/1/12.

❖ *Washington Post* – Interviewed for an article, "African American women see their own challenges mirrored in Michelle Obama's." Published 1/23/12.

❖ *Forbes* – Interviewed for an article, "Five Ways to Spot a Bad Boss in an Interview." Published 12/11/11.

❖ *InsuranceQuotes.Com* – Interviewed for an article on sexual harassment. Published 11/12/11.

❖ *Wisconsin Public Radio* – Hour-long, live call-in radio show on sexual harassment. Aired 11/17/11.

❖ *WOR Radio* – Radio interview on Herman Cain's sexual harassment controversy. Aired 11/11/11.

❖ *USA Today/Detroit Free Press* - Interviewed for an article on Herman Cain's sexual harassment controversy. Published 11/9/11.

Page **26** of **28**

Exhibit 1 - Page 72

❖ *Fox 5 News* – Televised interview for a story on Herman Cain's sexual harassment controversy.  Aired 11/3/11.

❖ *CNN* – Interviewed for an article on Herman Cain's sexual harassment controversy.  Published 11/1/11.

❖ *The Daily* – Interviewed for an article on Herman Cain's sexual harassment controversy.  Published 11/1/11.

❖ *Voice of Russia* – Radio interview for, "The Walmart Case."  Aired 6/29/11.

❖ *Forbes* – Interviewed for an article entitled, "The 15 jobs where women earn more than men."  Published 3/14/11.

❖ *Forbes* – Interviewed for an article entitled, "20 surprising jobs women are taking over."  Published 3/7/11.

❖ *Detroit Free Press* – Interviewed for an article on sexual harassment entitled, "Waterford settles sexual harassment lawsuit for $95,000."  Published 12/12/10.

❖ *Crain's New York Business* – Interviewed for an article on discrimination entitled, "J.Crew Fashion Week event to get dressed down."  Published 9/10/10.

❖ *Times-Standard* – Interviewed for an article on sexual harassment entitled, "Muddied waters: Eureka officials' testimony conveys role of personal relationships in EPD investigation."  Published 9/3/10.

❖ *HRMagazine* – Interviewed for an article on building an HR consulting practice online.  Published 6/09.

❖ *US News & World Report* – Interviewed for an article entitled, "Recruiting 2.0."  Published 2/09.

❖ *HRMagazine* – Interviewed for an article regarding my 2008 study on race and recruitment.  Published 7/08.

❖ *Firstline* – Interviewed for an article on sexual harassment in the workplace.  Published 5/08.

❖ *California Executive* – Interviewed for an article on obesity in the workplace.  Appeared 9/07.

❖ *American Banker* – Interviewed for an article on diversity of bank Boards of Directors.

❖ *The Washington Examiner* – Interviewed for an article on absenteeism.  Appeared 8/4/06.

❖ *Entrepreneur Magazine* – Interviewed for an article on hiring former dot-com employees.  Appeared 9/01.

Page **27** of **28**

Exhibit 1 - Page 73

❖ *The Wall Street Journal* – Interviewed for an article on underemployment.  10/00.

❖ *Dateline, NBC* – Interviewed for a network television news piece on age discrimination. Aired 7/99 and 9/99.

❖ *KONA-TV* - Interviewed for local affiliate television news piece on sexual harassment.  8/98.

❖ *The Federal Times* - Interviewed for an article on employee absenteeism.  10/97.

Page **28** of **28**

Exhibit 1 - Page 74

# Appendix 2
# to the Expert Report of Dr. Caren Goldberg

Exhibit 1 - Page 75

**Appendix 2 to Expert Report of Dr. Caren Goldberg**

| Description | Bates Range(s) |
|---|---|
| Transcript of John Langel Deposition taken November 21, 2019 | None |
| John Langel Deposition Exhibit 4 (Ballard Spahr Memo to US WNTPA re WNT 2012 Negotiations with U.S. Soccer, dated November 1, 2012) | USSF_Solo_000545-USSF_Solo_000548 |
| John Langel Deposition Exhibit 14 (Email from John Langel to Sunil Gulati and Lisa Levine re attached 12.6.12 WNTPA Memo to US Soccer, dated December 6, 2012) | WNTPA_00009371-WNTPA_00009375 |
| John Langel Deposition Exhibit 27 (Email from John Langel to Sunil Gulati re Status of Discussions, dated March 12, 2013) | WNTPA_00009592 |
| John Langel Deposition Exhibit 34 (Email from Sunil Gulati to John Langel re Germany USWNT trip, dated March 14, 2013) | WNTPA_00004227-WNTPA_00004228 |
| John Langel Deposition Exhibit 40 (Ballard Spahr Letter to US Olympic Committee, dated November 15, 2004) | WNTPA_00010895-WNTPA_00010903 |
| John Langel Deposition Exhibit 41 (US Olympic Committee Letter to Dan Flynn, dated November 16, 2004) | WNTPA_00010904-WNTPA_00010906 |
| John Langel Deposition Exhibit 42 (USSF Letter to US Olympic Committee, dated November 29, 2004) | WNTPA_00010909-WNTPA_00010910 |
| Transcript of Rich Nichols Deposition taken December 4, 2019 | None |
| Transcript of Rebecca Sauerbrunn Deposition taken December 10, 2019 | None |

Exhibit 1 - Page 76

| Description | Bates Range(s) |
|---|---|
| Transcript of Christen Press Deposition taken December 12, 2019 | None |
| Transcript of Jay Berhalter 30(b)(6) Deposition taken December 12, 2019 | None |
| Jay Berhalter Deposition Exhibit 16 (USSF Financial Statements for Years Ended March 31, 2014 and 2013) | USSF_Morgan_000426-USSF_Morgan_000449 |
| Jay Berhalter Deposition Exhibit 30 (USSF Form 990 for 2017) | None |
| Jay Berhalter Deposition Exhibit 31 (2017-2021 Women's National Team CBA) | USSF_Morgan_000587-USSF_Morgan_000642 |
| Jay Berhalter Deposition Exhibit 32 (2011-2018 Men's National Team CBA) | USSF_Morgan_000530-USSF_Morgan_000578 |
| Jay Berhalter Deposition Exhibit 38 (USSF's Answers to Plaintiffs' First Set of Interrogatories, dated November 22, 2019) | None |
| Jay Berhalter Deposition Exhibit 39 (Email from Paul Marstaller to Mike Leuzzi, Dennis Carroll, Dan McNally and Abbas Soltani re Nippert Stadium, dated February 25, 2019) | USSF_Morgan_039546-USSF_Morgan_039550 |
| Jay Berhalter Deposition Exhibit 40 (Email from Lydia Wahlke to Jay Berhalter re USSF/WNTPA-playing surfaces, dated September 22, 2017) | USSF_Morgan_018898-USSF_Morgan_018907 |
| Jay Berhalter Deposition Exhibit 41 (Sydney Leroux Dwyer Tweet, dated April 14, 2013) | None |
| Jay Berhalter Deposition Exhibit 42 (Spreadsheet of Men's National Team Match Details) | USSF_Morgan_023627 |

Exhibit 1 - Page 77

| Description | Bates Range(s) |
|---|---|
| Jay Berhalter Deposition Exhibit 43 (Spreadsheet of Women's National Team Match Details) | USSF_Morgan_023628 |
| Jay Berhalter Deposition Exhibit 44 (FRE 1006 chart of USSF Transportation (Charter, Commercial, Bus/Train) for Men's and Women's National Teams) | None |
| Jay Berhalter Deposition Exhibit 45 (U.S. Soccer Men's & Women's National Team Activity: Game, Compensation, Revenue, Expense & Advertising Overview) | USSF_Morgan_013038-USSF_Morgan_013042 |
| Jay Berhalter Deposition Exhibit 46 (Women's and Men's National Teams Hotel/Flight/Advertising Expenses spreadsheet) | USSF_Morgan_042075 |
| Jay Berhalter Deposition Exhibit 47 (Men's and Women's National Team-Non-Game Operating Expense Budgets FY 2019) | USSF_Morgan_023161-USSF_Morgan_023162 |
| Transcript of Jay Berhalter Deposition taken December 13, 2019 | None |
| Jay Berhalter Deposition Exhibit 57 (New York Times article, "Far From World Cup, Hints of Rebellion Inside U.S. Soccer," dated June 25, 2019) | None |
| Jay Berhalter Deposition Exhibit 58 (Email from Sunil Gulati to Jay Berhalter re U.S. WNT will Face Thailand and the Netherlands in First Two Post-Olympic Friendlies, dated August 3, 2016) | USSF_Morgan_017865-USSF_Morgan_017866 |
| Jay Berhalter Deposition Exhibit 59 (Email from Paul Marstaller to Jay Berhalter re Follow-up-U.S. Soccer field-Atlanta, September 18, dated August 4, 2016) | USSF_Morgan_017895 |

Exhibit 1 - Page 78

| Description | Bates Range(s) |
|---|---|
| Jay Berhalter Deposition Exhibit 60 (Email from Jay Berhalter to Paul Marstaller re Possible U.S. Women's Soccer event 9/18, dated July 30, 2016) | USSF_Morgan_017791-USSF_Morgan_017798 |
| Jay Berhalter Deposition Exhibit 61 (Text messages between Jay Berhalter and Gary Stevenson, Amy Hopfinger, and Eric Conrad) | USSF_Morgan_040960 |
| Transcript of Sunil Gulati 30(b)(6) Deposition taken December 17, 2019 | None |
| Transcript of Sunil Gulati Deposition taken December 17, 2019 | None |
| Transcript of Sunil Gulati Deposition taken December 18, 2019 | None |
| Sunil Gulati Deposition Exhibit 86 (sports.yahoo.com article, "Reforms planned after internal criticism leads to 'wake-up call' for U.S. Soccer") | None |
| Transcript of Alex Morgan Deposition taken December 19, 2019 | None |
| Alex Morgan Deposition Exhibit 9 (Charge of Discrimination, dated April 20, 2016) | USSF_Morgan_003373-USSF_Morgan_003385 |
| Transcript of Carli Lloyd Deposition taken December 20, 2019 | None |
| Transcript of Jill Ellis Deposition taken January 15, 2020 | None |
| Jill Ellis Deposition Exhibit 90 (Email from Dan Flynn to Jay Berhalter re Follow Up, dated October 8, 2018) | USSF_Morgan_035612-USSF_Morgan_035615 |
| Jill Ellis Deposition Exhibit 97 (Email from Paul Marstaller to Tom King re Hawaii Game Field, dated December 6, 2015) | USSF_Morgan_037548-USSF_Morgan_037549 |

Exhibit 1 - Page 79

| Description | Bates Range(s) |
|---|---|
| Transcript of Megan Rapinoe Deposition taken January 16, 2020 | None |
| Transcript of Kelley O'Hara Deposition taken January 17, 2020 | None |
| Transcript of Pinky Raina Deposition taken January 21, 2020 | None |
| Transcript of Tom King 30(b)(6) Deposition taken January 23, 2020 | None |
| Tom King Deposition Exhibit 117 (2013-2016 Women's National Team Memorandum of Understanding) | WNTPA_00004575-WNTPA_00004583 |
| Transcript of Tom King Deposition taken January 23, 2020 | None |
| Transcript of Carlos Cordeiro Deposition taken January 29, 2020 | None |
| Carlos Cordeiro Deposition Exhibit 124 (Email from S. Gulati to D. Garber re Why I'm running for President of U.S. Soccer, dated December 21, 2017) | USSF_Morgan_044331-USSF_Morgan_044333 |
| Women's National Team Game Rosters and Logs | USSF_Morgan_028033-USSF_Morgan_028100 |
| Email from Lisa Levine to Rich Nichols attaching: Women's and Men's National Team Revenue, Expense and Compensation Comparison chart, dated November 23, 2016 | USSF_Morgan_013037-USSF_Morgan_013042 |
| Women's National Team Sponsorship Agreements | USSF_Morgan_000651-USSF_Morgan_001040; USSF_Morgan_001056-USSF_Morgan_001275; USSF_Morgan_001279-USSF_Morgan_001409; USSF_Morgan_001416-USSF_Morgan_002913; USSF_Morgan_002936-USSF_Morgan_002954; USSF_Morgan_002961-USSF_Morgan_003107 |

Exhibit 1 - Page 80

| Description | Bates Range(s) |
|---|---|
| Women's National Team Delegation Lists | USSF_Morgan_008482;  USSF_Morgan_016740;  USSF_Morgan_016939;  USSF_Morgan_016745;  USSF_Morgan_016940;  USSF_Morgan_016747;  USSF_Morgan_016998;  USSF_Morgan_016748;  USSF_Morgan_017000;  USSF_Morgan_016767;  USSF_Morgan_017017;  USSF_Morgan_016768;  USSF_Morgan_016770;  USSF_Morgan_017031;  USSF_Morgan_016779;  USSF_Morgan_017051;  USSF_Morgan_016785;  USSF_Morgan_017055;  USSF_Morgan_016786;  USSF_Morgan_017057;  USSF_Morgan_016795;  USSF_Morgan_017059;  USSF_Morgan_017101;  USSF_Morgan_016796;  USSF_Morgan_017106;  USSF_Morgan_016812;  USSF_Morgan_017110;  USSF_Morgan_016813;  USSF_Morgan_017112;  USSF_Morgan_016856;  USSF_Morgan_016912;  USSF_Morgan_017125;  USSF_Morgan_017128;  USSF_Morgan_016918;  USSF_Morgan_017132;  USSF_Morgan_016920;  USSF_Morgan_016925;  USSF_Morgan_017134;  USSF_Morgan_016929;  USSF_Morgan_016931;  USSF_Morgan_016936;  USSF_Morgan_016938;  USSF_Morgan_016945;  USSF_Morgan_016952;  USSF_Morgan_016958;  USSF_Morgan_016965;  USSF_Morgan_016970;  USSF_Morgan_016975;  USSF_Morgan_016979;  USSF_Morgan_016989;  USSF_Morgan_016997;  USSF_Morgan_017050;  USSF_Morgan_017053;  USSF_Morgan_017062;  USSF_Morgan_017086;  USSF_Morgan_017092;  USSF_Morgan_017096;  USSF_Morgan_017104;  USSF_Morgan_017108;  USSF_Morgan_017115;  USSF_Morgan_017117 |
| Letter from Bredhoff & Kaiser to USSF re Physical Therapist, dated November 9, 2017 | WNTPA_00004130-WNTPA_00004139 |
| Carlos Cordeiro for U.S. Soccer President: It's Time to Aim Higher campaign document | USSF_Morgan_042187-USSF_Morgan_042188 |
| Email from Dan Flynn to Jay Berhalter re Why I'm running for President of U.S. Soccer, dated December 20, 2017 | USSF_Morgan_044306-USSF_Morgan_044308 |
| Carlos Cordeiro for U.S. Soccer President: Athlete Council Questionnaire | USSF_Morgan_044335-USSF_Morgan_044345 |

Exhibit 1 - Page 81

| Description | Bates Range(s) |
|---|---|
| ESPN article, "Carlos Cordeiro, USSF presidential candidate, answers ESPN's questions," dated January 12, 2018 | USSF_Morgan_044356-USSF_Morgan_044360 |
| Men's National Team Match Details 2014-2019 spreadsheet | USSF_Morgan_055538 |
| Women's National Team Match Details 2014-2019 spreadsheet | USSF_Morgan_055539 |
| Ticket Sales Information spreadsheet | USSF_Morgan_016085 |
| Men's National Team Staff List spreadsheet | USSF_Morgan_055556 |
| Men's National Team Master Delegation List spreadsheet | USSF_Morgan_053705 |
| Consensus Management Group Report to the Board of Directors of USSF on Structure, Governance and Ethics, dated July 2004 | USSF_Morgan_063245-USSF_Morgan_063280 |
| USSF Government Task Force Recommendations to USSF Board of Directors, dated August 10, 2004 | USSF_Morgan_063281-USSF_Morgan_063289 |
| CBA Bargaining Notes, dated November 30, 2015-April 2, 2017 | USSF_Morgan_005638-USSF_Morgan_005777 |
| National Teams FY 2015 Budget spreadsheet | USSF_Morgan_047611 |
| Men's National Team FY 2016 Budget spreadsheet | USSF_Morgan_057320 |
| Women's National Team FY 2016 Budget spreadsheet | USSF_Morgan_057328 |
| Men's National Team FY 2017 Budget spreadsheet | USSF_Morgan_057336 |
| Women's National Team FY 2017 Budget spreadsheet | USSF_Morgan_057343 |
| Men's National Team FY 2018 Budget spreadsheet | USSF_Morgan_057362 |

Exhibit 1 - Page 82

| Description | Bates Range(s) |
|---|---|
| Women's National Team FY 2018 Budget spreadsheet | USSF_Morgan_057368 |
| Men's National Team FY 2019 Budget spreadsheet | USSF_Morgan_063159 |
| Women's National Team FY 2019 Budget spreadsheet | USSF_Morgan_057402 |
| Men's National Team FY 2020 Budget spreadsheet | USSF_Morgan_057386 |
| Women's National Team FY 2020 Budget spreadsheet | USSF_Morgan_057403 |
| USSF's Supplemental Answers to Plaintiffs' Interrogatory Nos. 1, 2, 5, 6 and 11, dated January 31, 2020 | None |

Exhibit 1 - Page 83

# **Appendix 3**
# **to the Expert Report of Dr. Caren Goldberg**

Exhibit 1 - Page 84

## Appendix 3 – List of References

Aguinis, H. & Solarino, A. (2019).  Transparency and replicability in qualitative research:  The case of interviews with elite informants.  *Strategic Management Journal, 40,* 1291-1315.

Association of Workplace Investigators (2014). *Guiding Principles for Conducting Workplace Investigations.* Association of Workplace Investigators, Inc.

Babcock, P.  (2012).  How to Avoid Botched Investigations.  Society for Human Resource Management.

Cascio, W. & Aguinis, W.  (2011).  Applied Psychology in Human Resource Management, 7th Ed.  Pearson/Prentice-Hall Publishing.

Cooper, L. M. (2012).  Top Ten Tip for Conducting a Sexual Harassment Investigation.  *California Employment Law Letter,* 1-4.  July 31, 2012.

DeCenzo, D. & Robbins, S.  (2010).  Fundamentals of Human Resource Management, 10th Ed.  John Wiley & Sons.

DeNisi, A. & Griffin, R. (2005).  Human Resource Management, 2nd Ed.  Houghton Mifflin Company.

Dessler, G.  (2013).  A Framework for Human Resource Management, 7th Ed.  Pearson/Prentice-Hall Publishing.

Eisenhardt, K., & Graebner, M.  (2007). Theory building from cases: Opportunities and challenges.  *Academy of Management Journal, 50*, 25-32.

Eisenhardt, K. M., Graebner, M., & Sonnenshein, S. (2016).  Grand challenges and inductive methods:  Rigor without rigor mortis.  *Academy of Management Journal, 59*, 1113-1123.

Equal Employment Opportunity Commission.  *Small Business Fact Sheet.*  https://www.eeoc.gov/eeoc/publications/upload/small_business_english.pdf.  Retrieved 2/1/20.

Equal Employment Opportunity Commission (2016).  *EEOC Enforcement Guidance on Retaliation and Related Issues.*  https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm.

Equal Employment Opportunity Commission (1999).  *Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors.*  https://www.eeoc.gov/policy/docs/harassment.html.

Gioia, D. A., Corley, K. G., & Hamilton, A. L. 2013. Seeking qualitative rigor in inductive research: Notes on the Gioia methodology. *Organizational Research Methods, 16,* 15-31.

Exhibit 1 - Page 85

Fischel, C., Willson, A.J., & Young, R. (2003). Is there a standard of care to define a reasonable harassment investigation? *SHRM-SIOP White Paper Series.* Society for Human Resource Management:  Alexandria, VA.

Goldberg, C., Rawski, S., & Perry, E. (2019).  Training managers to sexual harassment complaints:  A longitudinal examination.  *Human Resource Development Quarterly, 30,* 81-100*.*

Gomez-Mejia, L. R., Balkin, D. B., & Cardy, R. L.  (2010).  Managing Human Resources, 6th Ed.  Pearson/Prentice-Hall Publishing.

Society for Human Resource Management (2008).  SHRM Resources for Educators:  Liability protection best practices.

Society for Human Resource Management (2009).  SHRM Resources for Educators:  Adverse impact and disparate treatment – two types of discrimination.

Society for Human Resource Management (2018).  SHRM Toolkit:  Managing equal employment opportunity.

Robbins, S.  & Judge, T.  (2010).  Essentials of Organizational Behavior, 10th Ed. Pearson/Prentice-Hall Publishing.

Uniform Guidelines on Employee Selection Procedures (1978); 43 FR __, (August 25, 1978); 29 CFR part 1607.

Exhibit 1 - Page 86