UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

| Proceedings: | **(IN CHAMBERS) Order Re: Plaintiffs' Motion for Partial Summary Judgment [DE 170]; Defendant's Motion for Summary Judgment [DE 171]** |
|---|---|

## I.     **INTRODUCTION**

On March 8, 2019, Plaintiffs, who are female professional soccer players on the United States Senior Women's National Soccer Team ("WNT"), filed a putative collective action and class action against the United States Soccer Federation, Inc. ("Defendant" or "USSF"). Plaintiffs assert two claims against Defendant: (1) violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206; and (2) violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e.

On November 8, 2019, the Court certified a Federal Rule of Civil Procedure 23(b)(2) class consisting of "all WNT players on the team at the date of final judgment, or the date of the resolution of any appeals therefrom, whichever is later," as well as a Rule 23(b)(3) class consisting of "all WNT players who were members of the WNT at any time from February 4, 2015 through the date of class certification." (Class Cert. Order at 14–15, ECF No. 98.) The Court also conditionally certified a Fair Labor Standards Act ("FLSA") collective action of "all WNT players who were members of the WNT at any time from March 8, 2016 through the present." (*Id.* at 15.) The Rule 23(b) classes seek relief under Title VII, while the FLSA collective action seeks relief under the EPA.

Presently before the Court are (1) Plaintiffs' Motion for Partial Summary Judgment, and (2) Defendant's Motion for Summary Judgment. For the following reasons, the Court **DENIES** Plaintiffs' Motion and **GRANTS in part** Defendant's Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | ***Alex Morgan et al. v. United States Soccer Federation, Inc.*** | | |

## II.    FACTUAL BACKGROUND

The following facts are undisputed unless otherwise indicated.

### A.    The United States Soccer Federation

USSF is the national governing body for the sport of soccer in the United States. USSF selects, funds, trains, and manages the various United States national soccer teams, including the WNT and its male counterpart, the United States Senior Men's National Soccer Team ("MNT"). The MNT and the WNT are each represented by a separate union and compensated under the terms of a separate collective bargaining agreement ("CBA").

### B.    The Men's National Team

The MNT competes in a variety of events throughout the world. Since 2015, the MNT has competed for USSF in (1) friendly matches ("friendlies"); (2) FIFA World Cup qualifying matches; and (3) a variety of other tournaments such as the Gold Cup, Concacaf Cup, Copa America Centenario, and the Concacaf Nations League. In addition to playing for USSF, members of the MNT also play with professional soccer clubs. Indeed, since 2013, almost all MNT players have played for a club team in a professional soccer league, such as Major League Soccer (in the United States), LigaMX (in Mexico), the Eredivisie (in the Netherlands), the Premier League (in England), and the Bundesliga (in Germany). USSF does not compensate MNT players for playing with professional soccer clubs.

USSF recognizes the United States National Soccer Team Players Association ("USNSTPA") as the exclusive representative of all MNT players for collective bargaining. The most recent CBA between the USNSTPA and USSF was executed on November 20, 2011 and remained in effect through December 31, 2018. USSF has continued to compensate the MNT according to the terms of the 2011–2018 CBA since it expired, with some exceptions.

The MNT CBA is structured as a "pay-to-play" agreement, meaning that players are not compensated unless they participate in a training camp or make a particular roster. Under the CBA, USSF has "no obligation to hold any matches, tournaments, or events or to field a team for any match, tournament, or event." (MNT CBA, Ex. A at 1, ECF No. 171-22.) MNT players also do not receive an annual salary. Instead, they receive bonuses based on the team's performance in different matches. For example, from 2011 through 2014, if a player made the roster for a friendly against a team with a FIFA ranking of 1–10 and the team won, that player would receive a $14,100 bonus. If there was a tie, the same player would receive a $6,500 bonus, and if the team lost (regardless of the opponent's FIFA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

ranking), the player would receive a $4,000 bonus. These bonuses increased to $17,625 for a win, $8,125 for a tie, and $5,000 for a loss during the period from 2015 through 2018.

The highest bonuses available to MNT players under their CBA are bonuses related to the FIFA World Cup, which takes place every four years. For example, under the MNT CBA, if the team qualified for the 2018 World Cup (which it did not), USSF would have paid $2.5 million to the MNT player pool. Each player on the roster for the World Cup would have received an additional bonus of $68,750. If the team advanced to the semi-finals, USSF would have paid the player pool $5.625 million. If the team won first place, USSF would have paid the player pool $9.375 million.

**C.    The Women's National Team**

Like the MNT, the WNT participates in competitions around the world. Unlike the MNT, the WNT has achieved largely unrivaled success, winning four FIFA Women's World Cup titles and four Olympic gold medals. Since 2015, the WNT has competed for USSF in (1) friendlies; (2) the Olympics and associated qualifying matches;[1] (3) the FIFA Women's World Cup and associated qualifying matches; and (4) a variety of other tournaments such as the She Believes Tournament, the Tournament of Nations, and the Algarve Cup. Since 2013, most WNT players have not only played for USSF, but also for a club team in a professional soccer league. Many WNT players participate in the National Women's Soccer League ("NWSL")—the top-tier professional women's soccer league in the United States.

USSF recognizes the United States Women's National Soccer Team Players Association ("WNTPA") as the exclusive representative of WNT players for purposes of collective bargaining. The first CBA between the WNTPA and USSF expired at the end of 2004. The second CBA covered the period from 2005 through 2012.

---

[1] The MNT does not compete in the Olympics. For the men's Olympic qualifying tournament, USSF is required to field its Under 23 Men's National Team ("U-23 MNT"), which does not include any players over the age of 23. USSF must also use its U-23 MNT for matches in the Olympic Games if it qualifies, with the exception that the rules permit the teams that qualify for the Olympic Games to add three players over the age of 23 to their Olympic Games rosters.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

1. <u>*In 2012, USSF and the WNTPA Begin Negotiating a Successor CBA*</u>

In 2012, USSF and the WNTPA began negotiating a successor agreement to the 2005–2012 WNT CBA. On November 1, 2012, the WNTPA gave USSF a memorandum entitled "WNT 2012 Negotiations with U.S. Soccer," which contained a proposal for a new CBA. (Gulati Decl., Ex. 14, ECF No. 171-17.) Among other things, the memorandum included the following demands, none of which were provided in the MNT's CBA: (1) at all times, there must be at least 27 players under contract; (2) injury protection that protects the player for the shorter of the length of the injury or one year from the date of the injury; (3) severance for all players; (4) dental insurance; (5) an agreed upon number of games; (6) a set amount of break time for salaried players, and; (7) day care for matches. The memorandum also stated that per diem payments "should at least be equal to [the] Men's current contract." (*Id.*) Although the memorandum requested improvements in compensation tied to the FIFA Women's World Cup and friendlies, it did not request that this compensation be the same as that paid to the MNT.

The November 1st memorandum also contained a section bearing the heading "League," which posed a number of questions about the NWSL and requested "[h]ealth insurance and injury protection for all players in the League" and "housing expenses for all WNT Players while playing in the League." (*Id.*) At that time, there was no top-tier women's professional soccer league in the United States. The previous two attempts at such a league had failed, with the most recent iteration ending after three seasons in 2011. Sunil Gulati ("Gulati"), the USSF President at the time and lead negotiator for USSF in the 2012–2013 negotiations, had previously informed John Langel ("Langel"), the Executive Director and General Counsel for the WNTPA, that USSF wanted to assist in starting a new top-tier women's professional soccer league in 2013.

On December 4, 2012, USSF Chief Financial Officer, Eric Gleason ("Gleason"), emailed Langel a summary of USSF's initial proposal for a new CBA. Among other things, the document proposed (1) that there be 24 players under contract receiving an annual salary (three less than initially proposed by the WNTPA); (2) per diems equal to the MNT; (3) a $1.8 million payment to the players for Victory Tours after both the 2015 FIFA Women's World Cup and the 2016 Olympic Games, and; (4) various bonuses for success in the Olympics. The proposal also included annual housing allowances for players in the NWSL. Other than the per diems, the MNT CBA did not include any of these items. Gulati also orally offered an additional $200,000 to be applied to bonuses associated with the Women's World Cup or the Olympics or some combination, as determined by the WNTPA.

Two days later, Langel emailed a memorandum to Gulati and USSF's General Counsel, Lisa Levine ("Levine"), summarizing where he believed the parties stood in negotiations. Langel wrote: "I

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

have spoken with the Players and the financial proposal…will be acceptable…depending upon our resolution of the following outstanding items we have to address." (Langel Ex. 14, ECF No. 171-70.) Langel proceeded to list 25 outstanding items, the first of which was a proposal by the WNTPA that if the WNT did not win gold at the Olympics or win first place in the Women's World Cup, USSF would either (1) distribute $400,000 among the players, (2) give the players a ranking bonus, or (3) give the players a ticket bonus based on the number of tickets sold. USSF initially declined to "put more money" into the agreement, but it ultimately agreed to the last of those options: "Payment of $1.20 per/ticket [sic] sold to US Soccer-promoted home friendlies—under the same terms as the agreement with the men." (Def.'s Reply to Pls.' Statement of Genuine Disputes ("SGD") ¶ 103, ECF No. 198-1.) The fifth outstanding item was a proposal by the WNTPA for three months of severance benefits should USSF terminate the contract of any salaried player. USSF initially rejected this proposal, but it ultimately agreed to it. The fifteenth outstanding item was a proposal by the WNTPA for one year of salary continuation during periods of injury and three months of salary continuation upon return from injury, the latter also applying to return from maternity leave. Again, USSF initially rejected this proposal but ultimately agreed to it.

> 2.  *In 2013, USSF and the WNTPA Continue Negotiations and Ultimately Agree to the Terms of a Memorandum of Understanding*

On February 20, 2013, USSF emailed a counterproposal to the WNTPA. The proposal categorized the outstanding issues in negotiations as (1) financial; (2) lifestyle; (3) league (referring to the NWSL); and (4) marketing. In the email, Levine wrote "we have revised our financial proposal to reflect the priorities as expressed by the [WNTPA], namely to increase the guaranteed compensation at the expense of the non-guaranteed compensation (the bonus payments)." (Langel Ex. 20, ECF No. 171-73.) The proposal increased the base compensation for contracted players by 15% and proposed ticket revenue of $1.20 per ticket for all USSF-promoted home games. The proposal also stated that USSF "has agreed to include an additional $200,000 in order to help 'close the deal,' to be allocated to non-guaranteed compensation." (*Id.*) In addition, USSF agreed to increase the minimum number of contracted players to 24, and to three months' severance for contracted players. The proposal noted that "as discussed, the Federation has many reservations about the [WNTPA]'s proposal of one contract (with the Federation) encompassing both the players' National Team and league commitments. However, we are working to see if this can be accomplished." (*Id.*) Finally, USSF countered the WNTPA on other items, including injury protection, daycare/nanny service, and travel.

On February 28, 2013, the WNTPA responded with their own proposal. In the proposal, the WNTPA emphasized the importance of NWSL salaries, stating "we need to reach agreement on the WNT compensation if at any time under the contract there is no League," and "the WNT players need to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

have only one contract (covering both the WNT and the NWSL) with U.S. Soccer." (Langel Ex. 21, ECF No. 171-74.)

The following month, on March 5, 2013, USSF sent WNTPA an updated proposal, stating "our proposals have increased the minimum number of players under contract from 20 to 24. That is a significant and expensive change. If the players want to accept a minimum number of 20 players under contract then we would be willing to look at some other issues in a different light. We cannot, however, advance the process without some understanding that the increase of the minimum to 24 costs the Federation significant dollars per year[.]" (Langel Ex. 23, ECF No. 171-75.)

Ultimately, on March 19, 2013, the WNTPA and USSF executed a Memorandum of Understanding ("MOU") setting forth their agreement on a 2013–2016 CBA. (*See* Gulati Decl., Ex. 13, ECF No. 171-16.) The CBA consisted of the 2005–2012 CBA, as modified by the MOU. Under the MOU, USSF agreed to provide the WNT with several items that were not in the MNT CBA, including (1) a minimum number of players on contract; (2) annual salaries for participation in the WNT; (3) annual salaries for participation in the NWSL; (4) the guarantee of a 15% increase in WNT salary if there is no professional league or if USSF pulls support from the league; (5) severance benefits; (6) salary continuation during periods of injury; (7) medical, dental, and vision insurance, and; (8) childcare assistance, including pay for the individual providing childcare, as well as airfare and hotel accommodations for the childcare providers. The MOU was unanimously approved by the WNT.

       3.     <u>In 2016, the WNTPA Proposes a New CBA</u>

On December 24, 2015, Rich Nichols ("Nichols"), the new Executive Director and General Counsel of the WNTPA and successor to Langel, sent a letter to USSF stating that the WNTPA was giving notice of its intent to terminate the 2013–2016 CBA. The following month, on January 4, 2016, Nichols emailed Levine a proposal for a new CBA. The proposal asked, among other things, for USSF to pay $4.2 million for the exclusive rights to market the WNT and asked for a minimum of 30 players on contract, with each player receiving a $150,000 WNT salary and a $100,000 NWSL salary.[2] The proposal also requested: (1) 401(k) retirement contributions; (2) lifetime long-term disability insurance and a postretirement healthcare fund; (3) a $3 million payment for a three-game Victory Tour following the FIFA Women's World Cup and the Olympics, and; (4) an individual childcare professional for each

---

[2] Under the 2013–2016 CBA, there were three tiers of WNT salaries: $72,000 for tier 1, $51,000 for tier 2, and $36,000 for tier 3. (Gulati Decl., Ex. 13.) NWSL salaries differed depending on the year and the status of a player but ranged from $46,000 to $56,000 in 2016. (*Id.*)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

player with a child, with USSF responsible for an annual salary, benefits, travel expenses, and accommodation expenses for the childcare provider. In addition, the proposal asked for "[t]he comprehensive bonus compensation structure and bonus compensation to-be-paid to the USMNT as currently exists in the USMNT's CBA[,]" such that "the various bonus payments to-be-paid to the WNT Players shall EQUAL the bonuses to-be-paid the USMNT as provided in the current CBA/UPA between USSF and the USMNT." (Nichols Ex. 19 at 3, ECF No. 171-63.)

On March 15, 2016, the parties met to discuss the WNTPA's proposal. During the meeting, Levine asked Nichols to clarify the WNTPA's proposal on bonuses. Nichols responded that the WNTPA wanted the same bonuses for participating in the Women's World Cup that the MNT received for participating in the Men's World Cup. Levine stated that if FIFA would increase the amount it pays to soccer federations in connection with the Women's World Cup, then USSF could look at increasing the amount paid to the WNT for participating in it.

On May 9, 2016, the parties met again and USSF orally presented its proposal on compensation matters.[3] On May 13, 2016, Levine emailed Nichols a written summary of USSF's proposal. The proposal was structured as a pay-to-play agreement. It included the same per diem, camp fee (which represents payment to a player who is called into camp but who does not make the roster of a game associated with the camp), ticket-revenue-share payment, and friendly-appearance fee as the MNT CBA. It also included bonuses for winning or tying friendlies (which varied based on the FIFA ranking of the opponent), and bonuses associated with the FIFA Women's World Cup—all of which were lower than those provided in the MNT CBA. The proposal also included bonuses for winning the She Believes Tournament and various bonuses associated with the Olympics.

Several days later, on May 16, the parties met to discuss USSF's pay-to-play proposal. Nichols stated that the proposal was a great start and that the players liked the structure, but that the WNTPA needed a minimum guaranteed payment of $100,000 per player per year. Levine responded that there are no guarantees with pay-to-play. David Feher ("Feher"), counsel for the WNTPA, replied that MNT players work in a different environment than WNT players, which makes pay-to-play more difficult for the latter. The parties continued to discuss whether and how the concept of a minimum guarantee would work in the context of a pay-to-play agreement.

---

[3] In the time between the parties' March 15 and May 9 meetings, WNT players Carli Lloyd, Alex Morgan, Megan Rapinoe, and Becky Sauerbrunn filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC").

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

On June 1, 2016, Nichols emailed Levine a memorandum providing the details of a Minimum Annual Guaranteed Compensation ("MAG") system. The memorandum stated that "like the MNT, the WNT want minimum compensation of $5,000 per game.[4] However, in the event that a minimum of twenty (20) games are not scheduled...the players on the WNT propose that they shall each be paid a [MAG] of $100,000 [sic]." (King Decl., Ex. 8 at 1, ECF No. 186-37.) The memorandum also reiterated the WNTPA's position that "the WNT players want the same 'pay per play' compensation and bonus system currently deployed by the USSF to, and functioning with the MNT." (*Id.*) The memorandum went on to state:

> Importantly, to be clear, the MAG amount of $100,000 per Player is based upon the presumption that the USSF continues to provide the WNT Players compensation to play in the NWSL. In the event that the USSF (a) discontinues payment of WNT Players NWSL compensation, and or (b) reduces the USSF financial contribution to WNT Players NWSL compensation, and or (c) reduces the USSF financial support of the NWSL, said USSF discontinued payment of WNT Player NWSL compensation, and or financial reductions in the NWSL, may impact the amount of the WNT Contract Player Minimum Annual Guarantee Compensation to be paid to each WNT Contract Player.

(*Id.* at 1–2.) Like the WNTPA's January 4th proposal, the memorandum also proposed a minimum of 30 contracted WNT players per year. In addition, the memorandum proposed a guarantee that the MAG would continue during injuries, three months' severance upon contract termination, and post-termination health insurance for one year.

On June 16, 2016, Levine emailed Nichols about the WNTPA's MAG proposal, stating:

> [W]hile we certainly support the concepts of equitable and fair pay, your proposal goes well beyond this. In addition to demanding higher pay-outs—the "same compensation and bonus system currently deployed by the USSF to, and functioning with the MNT," you are demanding, among other items: (1) guarantees regarding minimum annual compensation and minimum number of games per year (which the MNT does not have); (2) automatic increases in the WNT comp if the MNT comp increases (which the MNT does not have); (3) a guaranteed number of players contracted each calendar year (which

---

[4] Under the MNT CBA, players are compensated for wins, draws, and losses. Thus, a player who makes the roster for a match and plays will receive at least $5,000 even if the team loses because the "loss bonus" is $5,000.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

the MNT does not have); (4) injury guarantees (which the MNT does not have); (5) pregnancy guarantees (which the MNT does not have); (6) severance (which the MNT does not have); (7) post-termination health insurance (which the MNT does not have); (8) retirement benefits (which the MNT does not have); and (9) significant financial support of a professional league (which the MNT does not have).

(Nichols Transcript Excerpts, Ex. 31, ECF No. 186-91.) Levine stated that the WNTPA's proposal was not acceptable to USSF, explaining that it was "not consistent with" what the parties had discussed. (*Id.*) Levine explained that "[t]he inconsistency arises in part because we understand the players want the benefit of higher per-game pay-outs, like the MNT – the PTP [pay-to-play] model. However, the MNT/PTP model contains down-side risks. In the model you proposed, instead of these risks, you want guarantees. ***Your proposal is basically for all of the upside plus the elimination of risk.***" (*Id.* (emphasis added).)

The parties met again on June 27. During the meeting, Levine described the WNTPA's proposal as being the MNT CBA, "plus, plus, plus," and she reviewed the nine categories of items the WNTPA had proposed that the MNT players do not receive. (Def.'s Reply to Pls.' SGD ¶ 138.) She stated that USSF could add a guarantee of 70 games per quad[5] to its pay-to-play proposal, as well as a guaranteed minimum of 18 players in each training camp, but that the guarantees would not be player-specific. Levine also observed that the expiring WNT CBA contained a provision concerning a compensation-to-revenue ratio, and she said that USSF would work to create a ratio with FIFA prize money as well.[6]

---

[5] International soccer is organized around four-year cycles known as "quads." The men's cycle runs from January 1 in the year after the FIFA World Cup through December 31 of the year of the next FIFA World Cup. The women's cycle runs from the January 1 after the Olympics through December 31 of the year of the next Olympics. The last two quads for the men were 2011–2015 and 2015–2018. The current quad runs from 2019–2022. The last two quads for the women were 2009–2012 and 2013–2016. The current quad runs from 2017–2020.

[6] Specifically, the 2005–2012 WNT CBA provided that "[i]f in any calendar year, the ratio of aggregate compensation of women's national team players to the aggregate revenue from all women's national team games…is less than the ratio of the aggregate compensation of the men's national team players compensation to the aggregate revenue from all men's national team games…then U.S. Soccer will make a lump sum payment to the women's national team player pool to make the ratios equal." (2005 WNT CBA, Ex. A at 9, ECF No. 171-24.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

On July 6, 2016, Levine sent Nichols written confirmation of USSF's proposal to guarantee a minimum number of games per quad and players per camp. She also reiterated USSF's willingness to look into a prize-money equity ratio.

On July 22, 2016, Nichols emailed Levine in response to USSF's counterproposal. Among other things, Nichols wrote: "First, to be clear, we want the SAME PAY PER GAME compensation as the MNT. This is a legal requirement and we should not even have to bargain for the USSF to comply with the law. However, this does not mean we want every other aspect of the MNT system or agreement, which is independent of the equal pay for equal work requirement." (Nichols Transcript Excerpts, Ex. 33, ECF No. 186-92.) Nichols went on: "[O]ur demand for 'equal pay' is literal; *we want at least the same per game WNT Player compensation enjoyed by the MNT*. Specifically, top line per-game-played compensation to the WNT should be paid as follows to satisfy the USSF's legal equal pay obligation:

| Rank | Appearance | Win Bonus | Total |
|---|---|---|---|
| 1-4 | $5,000 | $12,625 | $17,625 |
| 5-8 | $5,000 | $7,500 | $12,500 |
| 9+ | $5,000 | $4,375 | $9,375 |

Please refer to the MNT pay-per-game matrix to review the remainder of the pay structure." (*Id.* (emphasis added).) Nichols also wrote "We demand an annual minimum guarantee of 20 friendly games per year or, if the USSF decides to have fewer than 20 games per year, it may do so by paying the players an equivalence payment equal to $5,000 per game per player for the number of games less than 20 that the USSF chooses to conduct." (*Id.*) Nichols also repeated the WNTPA's demand for 30 contracted players.

The parties met on October 25, 2016. During the meeting, Levine reiterated USSF's view that the WNTPA was demanding nine categories of items that the MNT did not receive. In addition, Gulati said something to the effect that there was one item in the WNTPA's proposal that would "break" USSF, and that was the WNTPA's proposal related to World Cup bonuses. (King Decl. ¶ 30, ECF No. 186-29.) He explained that the amount of prize money received from FIFA for the Men's World Cup was vastly different from the prize money received from FIFA for the Women's World Cup. He also noted that the WNT players were paid more than $2 million for winning the 2015 Women's World Cup even though the total prize money USSF received was $2 million. After further discussion about the 2015 World Cup bonus payments, Nichols said "this is a negotiation" and suggested negotiating an additional amount above $2 million. (*Id.*)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

4.      <u>*Negotiations Continue Throughout 2017 and Culminate in a New CBA*</u>

At the beginning of 2017, USSF had just finished a WNT quad (2013–2016) during which it had generated $55 million from all WNT games, including the 2015 FIFA Women's World Cup. During that same period, USSF had generated almost $80 million from MNT games. On February 4, 2017, the parties met for negotiations. The WNTPA did not present a written proposal at the meeting. However, Christen Press, a WNT player and WNTPA player representative, communicated that the WNTPA was focused on three guiding principles in the negotiations: (1) guaranteed compensation for being a contracted player with USSF, (2) a fair share of the financial upside that USSF gains from the WNT's success, and (3) respect for the players' lifestyle and working conditions.

On February 8, 2017, the parties met again for negotiations and the WNTPA presented a revenue-sharing proposal. The proposal would have required USSF to pay the WNT players at least 35% of the combined total of certain revenue streams defined in the WNTPA's proposal. USSF rejected the proposal.[7]

The next day, USSF presented its first proposal since July 2016. The proposal included a commitment to have 15 players on contract, with annual WNT salaries ranging from $70,000 to $90,000, and annual NWSL salaries ranging from $56,000 to $66,000. The proposal also provided for (1) win and tie bonuses for friendlies (including $9,000 per win and $2,000 per tie for teams ranked 1–4); (2) a first-place bonus for the She Believes Cup; (3) Women's World Cup qualifying and match bonuses; (4) Olympic qualifying and Olympic Games bonuses; and, (5) a ticket-revenue share of $1.50 per ticket sold at USSF-controlled matches. Two days later, USSF presented its proposal for new "partnership" bonuses. The proposed bonuses would be paid to the WNTPA based on achieving certain targets in television ratings for WNT matches, revenue received from Soccer United Marketing ("SUM"),[8] and attendance at WNT matches. None of these "partnership" bonuses are in the MNT CBA.

On February 14, 2017, the WNTPA made a counterproposal. The proposal provided for 24 players on contract, with annual WNT salaries of $125,000 and annual NWSL salaries of $70,000, with the latter increasing $2,000 per year. The proposal contained win and tie bonuses for friendlies that were *lower* than USSF's previous proposal (including $5,000 per win and $1,000 per tie against teams ranked

---

[7] The USNSTPA presented a similar proposal to USSF, centered on a guarantee that the MNT would receive at least a certain percentage of defined revenue streams. USSF rejected that proposal as well.
[8] Broadly speaking, USSF has agreements with SUM under which SUM pays USSF for certain television broadcasting rights and SUM pays USSF for different bundles of intellectual property rights.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

1–4). Otherwise, it contained the same bonuses proposed by USSF for the She Believes Cup, the
Women's World Cup, and the Olympics. The proposal included the same ticket-revenue share proposed
by USSF, but indicated that this amount should be paid regardless of whether the match is controlled by
USSF. Finally, the proposal also added a post-World Cup tour bonus, a post-Olympic tour bonus, and a
first-place bonus for the Four Nations Tournament.

The next day, the WNTPA made another counterproposal on compensation. The proposal
contemplated a reduced number of players on contract (18 instead of 24) at guaranteed WNT salaries of
$100,000, as well as NWSL salaries for 20 players ranging from $60,000 to $70,000. The proposal
increased the proposed bonuses for friendlies from its previous proposal to $6,500 per win and $1,000
per tie for teams ranked 1–4. The proposal included the same bonuses for the She Believes Cup and the
Four Nations Tournament as the WNTPA's February 14th proposal, and higher bonuses for the post-
World Cup tour and the post-Olympic tour.

On March 9, 2017, the WNTPA made yet another counterproposal. This time, the proposal
contemplated 20 players with a WNT salary of $105,000, and 24 players with a NWSL salary of
$75,000. The proposal increased friendly bonuses to $12,625 per win and $3,125 per tie for teams
ranked 1–6. It included the same Women's World Cup and Olympic qualifying bonuses as the prior
proposal. The proposal eliminated the post-World Cup and post-Olympic tour bonuses but added a
signing bonus of $550,000 to be paid to the WNTPA. The proposal also increased the ticket-revenue
share to $1.75 per ticket sold.

On March 16, 2017, USSF responded with a counterproposal. The counterproposal included 20
players with a WNT salary of $100,000, and 24 players with NWSL salaries ranging from $60,000 to
$70,000. The proposal included friendly bonuses of $8,500 per win and $2,000 per tie for teams ranked
1–4. It included the same bonuses for the Women's World Cup and the Olympics that the WNTPA
requested. It also proposed post-Women's World Cup tour bonuses ranging from $250,000 to $375,000
per game, and post-Olympic tour bonuses ranging from $200,000 to $325,000 per game. The proposal
included a signing bonus of $200,000 and an annual payment of $350,000 for group likeness rights to be
paid to the WNTPA.

On March 29, 2017, the WNTPA responded with another proposal. The proposal included the
same number of contracted players and the same base salaries proposed by USSF. For friendlies, the
WNTPA proposed bonuses of $10,000 per win and $2,500 per tie against teams ranked 1–4. The
proposal provided that all friendly bonuses would increase by 20% in 2021. The proposal also included

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

significantly higher bonuses for the post-Women's World Cup and the post-Olympic tour. The proposed signing bonus was $300,000.

The parties' final in-person bargaining session took place on April 2, 2017. During that meeting, Gulati informed the WNTPA representatives that their proposal would cost USSF $1.6 million more than USSF's proposal and said that the WNTPA would have to reduce the total cost of its proposal by $500,000 to reach a deal. Two days later, the WNT voted unanimously to ratify a new CBA, which covered the period from January 1, 2017 through December 31, 2021. The WNTPA has never asked USSF to reopen the 2017 CBA to renegotiate its terms.

>    5.    *The 2017 CBA*

Ultimately, the 2017 WNT CBA provided that, in 2017, there would be 20 contracted players, each of whom would receive a base salary of $100,000. (2017 WNT CBA at 53, ECF No. 171-26.) There would also be two tiers of NWSL salaries, each containing 11 players. Tier 1 players would receive a base salary of $67,500, while Tier 2 players would receive a base salary of $62,500. This was essentially what the WNTPA proposed on March 29, 2017.

As for friendlies, the CBA provided that WNT players would receive a $8,500 bonus for wins and a $1,750 bonus for ties against teams ranked 1–4. These bonuses would decrease to $6,500 and $1,250, respectively, against teams ranked 5–8. The bonuses would decrease again to $5,250 for a win against a team ranked 9+. WNT players would not be compensated for ties against teams ranked 9+, nor would they be given bonuses for losses. All of these bonuses were lower than what the WNTPA proposed on March 29, but higher than what the WNTPA proposed on February 14.

For the World Cup, the 2017 CBA provided WNT players would receive qualifying bonuses of $3,000 per win and $500 per tie. Players would also receive a qualification bonus of $37,500 and a roster bonus of $37,500. Players would receive a $110,000 bonus for placing first, $50,000 for second, and $25,000 for third. All of these bonuses were the same as those requested by the WNTPA on March 29. For the post-Women's World Cup tour, the CBA provided payments ranging from $250,000 to $350,000—lower than those requested by the WNTPA on March 29.

The 2017 CBA provides bonuses for Olympic qualifying and Olympics games which are consistent with what WNTPA asked for during collective bargaining. The CBA provides an Olympic-qualifying bonus of $3,000 per win and $500 per tie. The CBA also provides a bonus of $100,000 for gold, $55,500 for silver, and $25,000 for bronze. Finally, it includes post-Olympic tour bonuses ranging from $200,000 to $300,000.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

Additionally, the CBA provides a one-time signing bonus of $230,000, a ticket-revenue share of $1.50 per ticket,[9] and $5,000 bonuses for first place at the She Believes Tournament and the Four Nations Tournament. The CBA also provides, among other things, severance benefits; injury protection; health, dental, and vision insurance; pregnancy pay; guaranteed rest time; child care assistance; partnership bonuses for exceeding SUM gross revenue targets; partnership bonuses tied to increased viewership; an annual payment in exchange for USSF's commercial use of player likeness, and; a clause that USSF shall use good faith efforts to schedule a minimum number of WNT games—none of which are in the MNT CBA.

## III.    **JUDICIAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a court may grant summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" only if dispute about them may affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.*

To prevail on a summary judgment motion, the movant must show that there are no genuine issues of material fact as to matters on which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Such a showing "must establish beyond controversy every essential element" of the movant's claim or affirmative defense. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks omitted). On issues where the moving party does not have the burden of proof at trial, the moving party is required only to show that there is an absence of evidence to support the non-moving party's case. *See Celotex*, 477 U.S. at 325.

To defeat a summary judgment motion, the non-moving party may not merely rely on its pleadings or on conclusory statements. *See Celotex*, 477 U.S. at 324. Nor may the non-moving party merely attack or discredit the moving party's evidence. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*,

---

[9] The CBA further provides that if "[i]f the Men's National Team base per-paid ticket rate increases before the end of 2021, the WNT base per-paid ticket rate shall increase to the same amount for the then-remaining term of th[e] Agreement." (*Id.* at 42.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

701 F.2d 95, 97 (9th Cir. 1983). Rather, the non-moving party must affirmatively present specific evidence sufficient to create a genuine issue of material fact for trial. *See Celotex Corp.*, 477 U.S. at 324.

## IV.   DISCUSSION

Plaintiffs allege that USSF discriminates against its female players by paying them less than male players on the MNT and subjecting them to unequal working conditions. Plaintiffs move for summary judgment that USSF has violated both the EPA and Title VII. Defendant, on the other hand, asks that the Court grant summary judgment in its favor.

### A.   The Equal Pay Act

The Court begins with Plaintiffs' EPA claim. The EPA provides, in relevant part:

No employer...shall discriminate...between employees on the basis of sex by paying wages to employees...at a rate less than the rate at which he pays wages to employees of the opposite sex...for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). "The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve." *Corning Glass Works v. Brennan*, 417 U.S. 188, 208 (1974). "It embodies the deceptively simple principle that employees doing equal work should be paid equal wages, regardless of sex." *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 913 (9th Cir. 1983) (internal quotation marks omitted).

As the Supreme Court has explained, the EPA's structure is straightforward. *See Corning Glass*, 417 U.S. at 195. First, the plaintiff bears the burden to establish a prima facie case of wage discrimination. *Id.* If the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that the wage differential is justified by one of the EPA's four exceptions. *Id.* at 196.

Here, Plaintiffs have the initial burden to establish a prima facie case of wage discrimination under the EPA. To do this, Plaintiffs must show that (1) they performed substantially equal work as MNT players, (2) under similar working conditions, and (3) MNT players were paid more. *See* 29

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

U.S.C. § 206(d)(1); *Riser v. QEP Energy*, 776 F.3d 1191, 1196 (10th Cir. 2015). The Court begins with the third element—whether MNT players were paid more than WNT players.

To establish a prima facie case of wage discrimination, Plaintiffs must show that Defendant pays wages to WNT players "at a rate less than the rate at which [it] pays wages to employees of the opposite sex." 29 U.S.C. § 206(d). "The term wage 'rate,' as used in the EPA, refers to the standard or measure by which an employee's wage is determined[.]" 29 C.F.R. § 1620.12(a). Meanwhile, "the term 'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment." 29 C.F.R. § 1620.10 (bracketing in original). Wages include "*all forms of compensation* irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name." *Id.* (emphasis added). Wages also include fringe benefits, which include "medical, hospital, accident, life insurance and retirement benefits; profit sharing and bonus plans; leave; and other such concepts." *Id.*; 29 C.F.R. § 1620.11(a).

Plaintiffs contend that "the written terms of the relevant CBAs establish as a matter of undisputed fact that USSF has paid WNT players at a rate less than MNT players throughout the class period." (Pls.' Mot. at 6, ECF No. 170.) In support, Plaintiffs make two primary arguments. First, Plaintiffs focus on the CBAs' bonus provisions, arguing that the WNT CBA provides for lower bonuses than the MNT CBA for friendlies, World Cup-related matches, and other tournaments. Second, Plaintiffs point to what WNT players *would have received* had they been compensated under the terms of the MNT CBA. Plaintiffs' expert opines that had WNT players been compensated under the MNT CBA, they would have received more money over the class period than they did under the WNT CBA, even when all fringe benefits are considered. (*See* Cook Expert Report at 9, 14–15, ECF No. 167-7.)

Defendant disputes that USSF pays WNT players at a rate less than the rate it pays MNT players. Unlike Plaintiffs, Defendant focuses on the total compensation paid to the players under the terms of the respective CBAs. Defendant contends that when total compensation is considered, it is apparent that WNT players received *more* money than MNT players on both a cumulative and an average per-game basis. Indeed, Defendant's expert opines that from 2015 to 2019, payments to the WNT totaled approximately $24 million and averaged $220,747 per game, whereas payments to the MNT totaled approximately $18 million and averaged $212,639 per game.[10] (Irwin Expert Report at 17, ECF No.

---

[10] These amounts exclude per diems, amounts paid to the respective players associations, and payments to WNT players associated with their participation in the NWSL.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

171-4.) Defendant's expert also opines that the average per-game compensation received by the four class representatives exceeds the average per-game compensation received by the four highest-paid MNT players. (*Id.* at 18–19 (finding that the four WNT class representatives made an average of $11,356 to $17,416 per game, while the four highest-paid MNT players made an average of $10,360 to $13,964 per game).) Defendant argues that total compensation is the appropriate method for comparison where, as here, plaintiffs receive more than one category of wages and "higher pay in one category can offset lower pay in another category for purposes of the Equal Pay Act[.]" (Def.'s Reply at 5, ECF No. 198 (quoting *Huebner v. ESEC, Inc.*, No. CV 01-0157-PHX-PGR, 2003 WL 21039345, at *2 n.8 (D. Ariz. Mar. 26, 2003).) Defendant also avers that this method of comparison is appropriate where men and women "do not have a parallel standard or measure of pay…that can be directly compared for the purpose of the anti-discrimination laws." (Def.'s Mot. at 8, ECF No. 171.)

Plaintiffs offer two responses to Defendant's "total compensation" argument. First, Plaintiffs accuse Defendant of attempting to "re-litigate" the Court's Certification Order by advocating for a total compensation method of comparison. (Pls.' Opp. at 6, ECF No. 187.) Second, Plaintiffs attempt to distinguish Defendant's cited cases, arguing that they "have nothing to do with the governing rate of pay discrimination standard" and "merely stand for the undisputed proposition…that all compensation, including bonuses and benefits, should be considered in determining whether a rate of pay differential exists[.]" (*Id.*)

As an initial matter, the Court disagrees that Defendant is attempting to "re-litigate" the Court's Certification Order by advocating for a total compensation method of comparison. In its Opposition to Plaintiffs' Motion for Class Certification, Defendant argued that Plaintiffs lacked standing to pursue their equal-pay claims because each of the proposed class representatives made more money than the highest-paid MNT player during the class period. The Court rejected this argument, explaining that it presupposed that there could be no discrimination under Title VII or the EPA where a female employee's total compensation exceeded that of similarly situated males, *regardless* of whether the female received a lower rate of pay than her male comparators. (Class Cert. Order at 5.) The Court did not, however, rule that consideration of all of the wages paid to Plaintiffs was improper as a matter of law. Instead, the Court ruled only that it could not conclude (at the class certification stage) that no discrimination had occurred based solely on the fact that WNT players received greater total compensation than the MNT because to do so could lead to an "absurd result" wherein "an employer who pays a woman $10 per hour and a man $20 per hour would not violate the EPA…as long as the woman negated the obvious disparity by working twice as many hours." (*Id.* at 7 (quoting *Ebbert v. Nassau Cty.*, No. 05-CV-5445(FB)(AKT), 2009 WL 935812, at *3 (E.D.N.Y. Mar. 31, 2009).)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

Since the Court's class certification ruling, "Plaintiffs have had ample time and opportunity to develop evidence showing that the fact that the WNT was paid more than the MNT was due solely, or in material part, to the WNT working more than the MNT." (Def.'s Reply at 7.) Now, at the summary judgment stage, Plaintiffs have the burden to "show what evidence" they have on this issue. *Mendelson v. Country Coach, Inc.*, No. EDCV 06-00572-SGL (OPx), 2007 WL 4811927, at *2 n.1 (C.D. Cal. Nov. 19, 2007) (summary judgment is the "moment in a lawsuit, when the nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of events."). Plaintiffs have not satisfied this burden. It is undisputed that, during the class period, the WNT played 111 total games and made $24.5 million overall, averaging $220,747 per game. By contrast, the MNT played 87 total games and made $18.5 million overall, averaging $212,639 per game. Based on this evidence, it appears that the WNT did not make more money than the MNT solely because they played more games. Rather, the WNT both played more games and made more money than the MNT per game.[11] Under these circumstances, it is not "absurd" to consider the total compensation received by the players. *Ebbert*, 2009 WL 935812, at *3.

Consider, for example, Plaintiffs' reliance on the bonuses received by WNT players for friendlies, World-Cup-related games, and other tournaments. Plaintiffs ask the Court to find an EPA violation because the WNT CBA provides for lower bonuses in these categories of compensation than the MNT CBA. But this approach ignores other benefits received by WNT players, such as guaranteed annual salaries and severance pay—benefits that MNT players do not receive. To consider these bonus provisions in isolation would run afoul of the EPA, which expressly defines "wages" to include all forms of compensation, including fringe benefits. 29 C.F.R. § 1620.12(a); 29 C.F.R. § 1620.11(a); *see Diamond v. T. Rowe Price Assocs., Inc.*, 852 F. Supp. 372, 395 (D. Md. 1994) (granting summary judgment to employer on plaintiff's EPA claim where although plaintiff did not receive stock options and larger annual bonuses, plaintiff received more total compensation than her alleged comparators). The Court therefore finds that Plaintiffs cannot establish that they were paid less than MNT players solely by reference to these bonus provisions.

Plaintiffs also ask the Court to conclude that WNT players are paid less than MNT players because had they been paid under the MNT CBA, they would have made more than they did under their own CBA. But Defendant has submitted evidence showing that had MNT players been paid under the terms of the WNT's 2017 CBA, they too would have made more than they did under their own CBA.

---

[11] Plaintiffs have not argued that these figures are skewed by the number of players on each team. If, for example, the WNT had double the players as the MNT throughout the class period, this would alter the Court's analysis.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

(McCrary Decl., Ex. 2 at 27, ECF No. 186-56.) Is this sufficient to demonstrate that Defendant compensates MNT players at a rate less than the rate it pays wages to WNT players? The Court thinks not. This approach—merely comparing what each team would have made under the other team's CBA—is untenable in this case because it ignores the reality that the MNT and WNT bargained for different agreements which reflect different preferences, and that the WNT explicitly rejected the terms they now seek to retroactively impose on themselves. The first time the WNT requested bonuses equivalent to those received by the MNT was in January 2016. USSF rejected that proposal, however, because the WNT was not asking for a pay-to-play arrangement similar to the MNT CBA; instead, it was asking for all of the upsides of the MNT CBA (namely, higher bonuses) without any of the drawbacks (e.g., no base salary). (*See* Nichols Transcript Excerpts, Ex. 31.) In May 2016, USSF offered the WNT a pay-to-play proposal similar to the MNT CBA but the WNT rejected it, preferring an agreement that involved some element of guaranteed compensation. The parties attempted to work out such an agreement and, in February 2017, USSF made a proposal which included, (1) a commitment to have 15 contracted players, (2) annual WNT salaries ranging from $70,000 to $90,000, and (3) bonuses for friendlies of $9,000 per win and $2,000 per tie for teams ranked 1–4. In response, the WNT offered a counterproposal which included *lower* bonuses for friendlies, but a higher number of contracted players with higher base salaries. Ultimately, the parties agreed to a compromise whereby there would be 20 contracted players in 2017, each of whom would receive a base salary of $100,000, with friendly bonuses of $8,500 per win and $1,750 per tie against teams ranked 1–4. (2017 WNT CBA at 53.)

This history of negotiations between the parties demonstrates that the WNT rejected an offer to be paid under the same pay-to-play structure as the MNT, and that the WNT was willing to forgo higher bonuses for other benefits, such as greater base compensation and the guarantee of a higher number of contracted players. Accordingly, Plaintiffs cannot now retroactively deem their CBA worse than the MNT CBA by reference to what they *would have made* had they been paid under the MNT's pay-to-play structure when they themselves rejected such a structure. This method of comparison not only fails to account for the choices made during collective bargaining, it also ignores the economic value of the "insurance" that WNT players receive under their CBA. One of the defining features of the WNT CBA is its guarantee that players will be compensated regardless of whether they play a match or not. This stands in stark contrast to the MNT CBA, under which players are only compensated if they are called into camp to play and then participate in a match. It is difficult to attach a dollar value to this "insurance" benefit, and neither party attempts to do so here.[12] However, there is indisputably economic

---

[12] The Court does not suggest that the economic value of this "insurance" benefit should be considered a form of "wages" under the EPA. 29 C.F.R. § 1620.12(a).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

value to this type of "fixed pay" contract, as compared to a "performance pay" contract.[13] (*See generally*
McCrary Decl., Ex. 2.) Indeed, the WNT clearly attached significant economic value to this contractual
arrangement because it was willing to agree to lower bonuses in exchange for higher fixed payments in
its 2017 CBA. Merely comparing what WNT players received under their own CBA with what they
would have received under the MNT CBA discounts the value that the team placed on the guaranteed
benefits they receive under their agreement, which they opted for at the expense of higher performance-
based bonuses.

Finally, to establish that WNT players are paid less than MNT players, Plaintiffs also offer the
statements of various individuals associated with USSF. For example, Plaintiffs point to the statements
of former USSF President Carlos Cordeiro ("Cordeiro") who, while campaigning for the USSF
presidency in December 2017, said that "[o]ur women's teams should be respected and valued as much
as our men's teams, but our female players have not been treated equally." (Def.'s SGD ¶ 20, ECF No.
186-1.) Cordeiro also stated: "I'm a strong supporter of greater equality, diversity and inclusion
throughout U.S. Soccer, and we clearly need to work toward equal pay for the national teams. . .To
ensure equal pay going forward, we need to be open to new paradigms while recognizing the specific
needs and desires of the WNT and MNT[.]" (*Id.* ¶ 21.) Plaintiffs also offer the statement of USSF's
outside counsel, Russell Sauer ("Sauer"), who allegedly stated during collective bargaining negotiations
that "market realities are such that the women do not deserve equal pay." (*Id.* ¶ 67.)

The statements offered by Plaintiffs are insufficient to establish a genuine dispute that WNT
players are paid at a rate less than the rate paid to MNT players. That USSF agents said WNT players
are paid less does not make it true where, as here, Defendant has presented evidence that the WNT was
paid more on both a cumulative and an average per-game basis than the MNT. *See Hein*, 718 F.2d at 916
("We believe that the proper test for establishing a prima facie case in a professional setting...is whether
the plaintiff is receiving lower wages than the *average* of wages paid to all employees of the opposite
sex[.]" (emphasis added)). Additionally, Cordeiro testified during his deposition that when he referenced
working toward "equal pay," he meant "creating more opportunity for our women so they can play more
competitive events that would drive more revenue and compensation" because "there was a lack of
opportunity for the women where the men play four/five times as many competitive [i.e., non-friendly]
matches as our women do . . . and [that] is at the heart of the issue" (Cordeiro Dep. 58:2–61:8, ECF No.

---

[13] The WNT CBA is not a pure "fixed pay" contract, nor is the MNT CBA a pure "performance pay"
contract. WNT players, for instance, are compensated based on a combination of fixed payments (e.g.,
WNT base salary, NWSL annual salary, severance, injury protection) and performance-based bonuses
(e.g., friendly bonuses, tournament-related bonuses).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|----------|----------------------|------|-------------|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

186-63.) It is also disputed whether Sauer made the alleged "market realities" comment. (Def.'s SGD ¶ 67; Sauer Decl. ¶¶ 3–4, ECF No. 186-61.)

In sum, Defendant has offered evidence in support of its Motion for Summary Judgment that the WNT has been paid more on both a cumulative and an average per-game basis than the MNT over the class period. In response, Plaintiffs have offered evidence that (1) WNT players are paid lower bonuses for friendlies, World Cup-related games, and other tournaments; (2) WNT players would have made more under the MNT CBA than they did under their own CBA, and; (3) USSF agents made statements to the effect that WNT players are paid less than MNT players. As set forth above, this evidence is insufficient to create a genuine issue of material fact for trial. Accordingly, the Court grants summary judgment to Defendant on Plaintiffs' EPA claim. The Court need not address the remaining elements of Plaintiffs' prima facie case.

**B.** <u>**Title VII**</u>

The Court next turns to Plaintiffs' remaining claim for discrimination in violation of Title VII. Plaintiffs bring their Title VII claim on two theories of disparate treatment. First, Plaintiffs allege that Defendant intentionally discriminated against them by paying them less than similarly situated MNT players. Second, Plaintiffs allege that Defendant intentionally discriminated against them by subjecting them to unequal working conditions. The Court addresses each theory in turn.

*1.* <u>*Discriminatory Compensation*</u>

Plaintiffs first contend that Defendant discriminated against them by paying them less than similarly situated players on the MNT. However, the Court has already held that Plaintiffs have not demonstrated a triable issue that WNT players are paid less than MNT players. Accordingly, the Court grants summary judgment to Defendant on this claim. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) ("To establish a prima facie case under Title VII, a plaintiff must offer proof…that the plaintiff suffered an adverse employment action[.]")

*2.* <u>*Discriminatory Working Conditions*</u>

Plaintiffs also allege that Defendant subjected WNT players to discriminatory working conditions. Before turning to the merits of this claim, the Court begins by considering its scope, and whether it was properly exhausted.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|----------|------------------------|--|------|-------------|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

a.     *The Scope of Plaintiffs' Working-Conditions Claim*

The parties dispute the scope of Plaintiffs' claim. In its Motion for Summary Judgment, Defendant argued that "[a]side from allegations surrounding compensation, the only concrete allegations of employment discrimination found in Plaintiffs' Complaint are allegations about playing on artificial turf instead of grass and flying commercial airplanes instead of charter aircraft." (Def.'s Mot. at 22.) Accordingly, Defendant moved for summary judgment on these two theories of liability. In their Opposition to Defendant's Motion, Plaintiffs countered that their claim applies not only to field surfaces and charter flights, but also to the amount of money allocated and spent on each team's travel (including room and board and charter flights); personnel resources and support service, including medical and training support; and differences in head coach compensation. (Pls.' Opp. at 24–25.) In its Reply, Defendant asks the Court to confine Plaintiffs' claim to field surfaces and charter flights. (*See* Def.'s Reply at 14.)

Upon review, the Court finds that Plaintiffs' Complaint fairly encompasses a claim for discriminatory working conditions with respect to (1) field surfaces; (2) travel conditions (specifically, charter flights and hotels), and; (3) support services (specifically, medical and training support). To satisfy Rule 8(a), a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Williams v. Boeing Co.*, 517 F.3d 1120, 1130 (9th Cir. 2008) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)). "Specific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief." *Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001). Here, Plaintiffs' Complaint alleges that Defendant's "policies and practices of intentional gender discrimination extend beyond pay and into nearly every aspect of Plaintiffs and similarly situated WNT players' work conditions. This includes playing, training and travel conditions; promotion of their games; support and development for their games and other terms and conditions of their employment that are less favorable than provided to MNT players." (Compl. ¶ 67, ECF No. 1.) The Complaint goes on to list examples of this unequal treatment. Specifically, the Complaint discusses field surfaces, (*id.* ¶¶ 68–71), charter flights, (*id.* ¶¶ 72–73), resources spent marketing WNT games, (*id.* ¶¶ 74–77), and ticket prices, (*id.* ¶ 77). Although the Complaint does not specifically refer to "room and board" or "medical and training support," Plaintiffs have put Defendant on notice of these allegations through subsequent filings. (*See, e.g.*, Lloyd Decl. ISO Mot. for Class. Cert. ¶¶ 12–19, ECF No. 64-18; Mot. for Class Cert. at 16, ECF No. 64.) Moreover, these theories of liability can properly be construed as falling under the Complaint's broad references to "travel conditions" and "support and development." In contrast, the Complaint does not fairly encompass a claim regarding differences in head coach compensation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

### b. Exhaustion

Having clarified the scope of Plaintiffs' working-conditions claim, the Court considers whether this claim has been properly exhausted. Before bringing suit under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge with the EEOC. *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002). "Whether a plaintiff in a Title VII action has timely exhausted her administrative remedies is an affirmative defense, [so] the defendant bears the burden of pleading and proving it." *Kraus v. Presidio Tr. Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1046 n.7 (9th Cir. 2009) (internal quotation marks omitted) (bracketing in original). Title VII's charge-filing requirement is not jurisdictional. *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1850 (2019). However, the failure to observe Title VII's exhaustion requirement still "renders a suit subject to dismissal in the absence of any equitable consideration to the contrary." *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988). The dual purposes behind the charge-filing requirement are to give the charged party notice of the claim and to narrow the issues for prompt adjudication. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002).

Generally, a court may not consider allegations of discrimination not included in the plaintiff's EEOC charge unless the new claims are "like or reasonably related to the allegations contained in the EEOC charge." *Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 729 (9th Cir. 1984). The court considers a claim to be like or reasonably related to the allegations in the charge when the allegations of discrimination either "fell within the scope of the EEOC's *actual* investigation or an EEOC investigation *which can reasonably be expected* to grow out of the charge of discrimination." *B.K.B.*, 276 F.3d at 1100 (emphasis in original). The court construes EEOC charges "with utmost liberality[.]" *Id.* (quoting another source).

Here, Defendant has not met its burden to demonstrate that Plaintiffs failed to exhaust their working conditions claim. In response to an EEOC Request for Information, Plaintiffs' counsel wrote a letter to the EEOC which stated, among other things:

> *[T]he EEOC asked the Players to provide information with respect to other differences in their working conditions as compared to the working conditions of the MNT*. Some of the issues the WNT has already discussed with the EEOC include differences unfavorable to the WNT with respect to the surface of fields on which each team plays, their access to trainers and exercise equipment, access to practice fields and locker rooms during training camps, access to medical personnel and massage and physical therapists, coaching resources, and the development academy.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

(Spangler Decl., Ex. 1 at 11–12, ECF No. 187-4 (emphasis added).) This letter supports Plaintiffs'
position that the EEOC investigated Plaintiffs' working-conditions claim. *See B.K.B.*, 276 F.3d at 1100.
Alternatively, it demonstrates that Plaintiffs' claim "fell within the scope of…an EEOC investigation
*which can reasonably be expected* to grow out of the charge[.]" *Id.*

        *c.*    *The Merits*

Finally, the Court turns to the merits of Plaintiffs' working-conditions claim. Title VII prohibits
covered employers from discriminating against any employee with respect to her "compensation, terms,
conditions, or privileges of employment, *because of* such individual's…sex[.]" 42 U.S.C. § 2000e-
2(a)(1) (emphasis added). Title VII disparate-treatment claims are typically assessed through the burden-
shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this
framework, the plaintiff has the initial burden to establish a prima facie case of disparate treatment. *Id.* at
802. The "elements and contours of a prima facie case" may "differ according to the facts at hand."
*Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). However, a prima facie case
generally requires the plaintiff to show that (1) she belongs to a protected class; (2) she was performing
her job adequately; (3) she suffered an adverse employment action; and (4) similarly situated individuals
outside of her protected class were treated more favorably, or other circumstances surrounding the
adverse employment action give rise to an inference of discrimination. *Fonseca v. Sysco Food Servs. of
Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). "Establishment of the prima facie case in effect creates
a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Cmty.
Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

When the plaintiff establishes a prima facie case, "the burden of production, but not
persuasion…shifts to the employer to articulate some legitimate, nondiscriminatory reason for the
challenged action." *Chuang v. Univ. of California Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir.
2000). "The defendant need not persuade the court that it was actually motivated by the proffered
reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it
discriminated against the plaintiff." *Burdine*, 450 U.S. at 255. (internal citation omitted).

Once the employer has articulated a legitimate, nondiscriminatory reason for its actions, the
presumption of discrimination "simply drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509
U.S. 502, 510 (1993). The plaintiff may still prevail, however, if she can show "that the legitimate
reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."
*Burdine*, 450 U.S. at 253. "A plaintiff may meet the burden to show pretext using either direct or
circumstantial evidence." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094–95 (9th Cir. 2005).
Direct evidence is "evidence which, if believed, proves the fact of discriminatory animus *without*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

*inference or presumption.*" *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 662 (9th Cir.
2002) (internal quotation marks and bracketing omitted). "Circumstantial evidence, in contrast, is
evidence that requires an additional inferential step to demonstrate discrimination." *Coghlan*, 413 F.3d
at 1095. Circumstantial evidence can take two forms: (1) the plaintiff can make an affirmative case that
her employer is biased, or (2) she "can make h[er] case negatively, by showing that the employer's
proffered explanation for the adverse action is unworthy of credence." *Id.* (internal quotation marks
omitted). "The distinction between direct and circumstantial evidence is crucial, because [in Title VII
cases] it controls the amount of evidence that the plaintiff must present in order to defeat the employer's
motion for summary judgment." *Id.*; *but see France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015)
(explaining that there is some question whether the distinction between direct and circumstantial
evidence is valid after the Supreme Court's decision in *Costa*, 539 U.S. at 100). "Because direct
evidence is so probative, the plaintiff need offer 'very little' direct evidence to raise a genuine issue of
material fact." *Coghlan*, 413 F.3d at 1095. "But when the plaintiff relies on circumstantial evidence, that
evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Id.*
(quoting *Godwin*, 150 F.3d at 1222).

### i.    *Field Surfaces*

Plaintiffs contend that USSF made the WNT play on inferior surfaces such as artificial turf more
frequently than the MNT. Essentially, Plaintiffs contend that USSF made two decisions about field
surfaces, either one or both of which must have been plagued by discriminatory animus. First, when
deciding the venue for matches, USSF chose turf venues more frequently for WNT matches than for
MNT matches. Second, if either team was scheduled to play at a turf venue, USSF chose to install
temporary grass over the turf more frequently for the MNT than for the WNT. According to Plaintiffs,
playing on artificial turf can lead to significant injuries and can also affect fundamentals of the game,
including the way the ball bounces and how the ball can be struck.

Plaintiffs have the initial burden to demonstrate a prima facie case of discrimination based on
field surfaces. Defendant does not appear to dispute that Plaintiffs belong to a protected class, were
performing their jobs adequately, and were subject to an adverse employment action.[14] There is some

---

[14] "[A]n adverse employment action is one that materially affects the compensation, terms, conditions,
or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.2d 1080, 1089 (9th Cir. 2008) (cleaned
up). The Ninth Circuit defines "adverse employment action" broadly but its scope is not unlimited. *See
Fonseca*, 374 F.3d at 847. Although Defendant does not appear to dispute that this element of Plaintiffs'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

dispute, however, as to whether WNT players and MNT are similarly situated. Accordingly, the Court proceeds with the second step of the *McDonnell-Douglas* framework, assuming but not deciding that Plaintiffs have established a prima facie case.

Once a plaintiff has established a prima facie case of discrimination, "the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). Here, Defendant has satisfied this burden. It is undisputed that, during the relevant time period, the MNT and WNT played the vast majority of their matches on grass rather than turf. Defendant has submitted evidence that there were only two time periods when Defendant subjected the WNT to games on artificial turf more frequently than the MNT. First, after the 2015 Women's World Cup, the WNT played on artificial turf seven times during their 10-game Victory Tour. It should be noted that the MNT did not play in any corresponding Victory Tour. Second, the WNT played three friendlies on artificial turf during the period between July 27 and October 19, 2017. With respect to the Victory Tour, Defendant submits evidence that USSF's desire "to spread its Senior National Team games across various cities in various regions of the country, the relatively large number of games required to be played in a relatively short period of time during fall and winter, and the desire to prioritize venues with grass fields for 2016 in preparation for the Olympic Games[15] all played a role in the number and concentration of games on artificial turf [during the Victory Tour]" (Def.'s Reply to Pls.' SGD ¶ 195.) As for why it did not install temporary grass over the turf at these venues, Defendant submits evidence that it did not anticipate generating enough revenue from those matches to make it financially prudent to install temporary grass over the turf at these venues, nor did USSF believe doing so would be necessary to attract opponents.[16] (*Id.*) With respect to the three friendlies between July 27 and October 19, 2017, again Defendant submits evidence that it did not anticipate generating enough revenue from these matches to justify the cost of installing temporary grass. (*Id.* ¶ 196.)

---

prima facie case is satisfied, the Court does not conclusively hold that Plaintiffs have established this element of their prima facie case.

[15] Stated differently, one of the reasons USSF chose turf venues for the Victory Tour was because it wanted to "save" the more desirable grass venues for the following year, when the WNT would be preparing for the Olympics.

[16] In contrast, Defendant contends that when it chose to install temporary grass for MNT matches, it did so because it anticipated the revenue from those matches would justify the cost. (*See* Def.'s Supp. Int. Ans. 2, ECF No. 171-77.) Also, with respect to three such matches, USSF did not believe that the opposing teams would be willing to play on turf. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

Because Defendant has satisfied its burden to offer a legitimate, nondiscriminatory explanation for subjecting the WNT to turf more frequently than the MNT during these two time periods, the inference of discrimination created by Plaintiffs' prima facie "simply drops out of the picture" and the burden shifts back to Plaintiffs to demonstrate pretext. *St. Mary's*, 509 U.S. at 510. In their Opposition to Defendant's Motion, Plaintiffs point to three pieces of circumstantial evidence to show pretext: (1) the expert report of Dr. Caren Goldberg ("Dr. Goldberg"), an expert in human resources ("HR") standards; (2) the deposition testimony of USSF Chief Commercial Officer Jay Berhalter ("Berhalter"); and (3) the deposition testimony of Cordeiro. In her expert report, Dr. Goldberg opines that by subjecting WNT players to games on turf more frequently than MNT players, Defendant operated below standard and acceptable HR standards and violated its own policy, which is to focus on the health and safety of players. (Goldberg Expert Report at 7, 14, 29, ECF No. 187-10). As for Berhalter's testimony, Plaintiffs argue that Berhalter "testified that decisions on playing surfaces were not made with equal treatment or player safety in mind." (Pls.' Opp. at 24 n.3.) However, even viewing this testimony in the light most favorable to Plaintiffs, this is not an accurate characterization of Berhalter's testimony. (*See* Berhalter Dep. 277–79, ECF No. 185-11.) Finally, according to Plaintiffs, Cordeiro testified that he "told members of USSF's Board of Directors that female soccer players were not treated equally on more than one occasion during his eleven years on the Board…and further testified that discussions regarding unequal opportunity for the WNT players were 'cumulative conversations' during Cordeiro's years on [the Board] that w[ere] expressed by numerous Directors in addition to Cordeiro." (Pls.' Statement of Undisputed Facts ¶ 23, ECF No. 170-1.)

Even viewing the evidence cumulatively and in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have failed to raise a triable issue as to pretext. Plaintiffs offer Dr. Goldberg's expert report and Berhalter's deposition testimony primarily to show that Defendant's proffered explanation for the turf disparity is unworthy of credence. *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) (a plaintiff can prove pretext indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable[.]") The crux of Plaintiffs' argument is that Defendant had an internal policy of focusing only on player health and safety when making decisions about field surfaces and that Defendant acted inconsistently with this policy by focusing on the cost of installing temporary grass for WNT matches. However, the record does not reveal any such inconsistency. There is no evidence that Defendant had a policy of focusing only on player health and safety when making field-surface decisions.[17] To the

---

[17] Indeed, the only USSF policy Dr. Goldberg identifies in her report is "its stated 'mission' policy of providing for gender equality as expressed in its Form 990.70." (Goldberg Expert Report at 30.) To the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

contrary, the record reveals that cost was at least one factor that Defendant considered when making field-surface decisions. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) (holding that employer's "shifting explanations" for plaintiff's layoff were insufficient to raise a genuine dispute as to employer's discriminatory motive because the explanations were "not incompatible, and therefore not properly described as shifting reasons.")

Plaintiffs' remaining evidence is similarly insufficient. Dr. Goldberg's opinion that USSF operated below standard and acceptable HR standards is irrelevant because the issue to be decided in this case is not whether USSF employed good management practices but whether it discriminated against Plaintiffs. *See Malone v. Potter*, No. CV0705530MMMFFMX, 2009 WL 10672523, at *6 (C.D. Cal. Feb. 25, 2009) ("The only issue to be decided in this case is whether defendant acted in a discriminatory…fashion. The question is not whether defendant employed good management or labor relations practices. Whether defendant followed a standard it was neither required to follow nor claimed that it followed is of little probative value.") And even if this evidence passed muster under Federal Rules of Evidence 401 or 403, it fails to satisfy the requirements Rule 702. For one, Dr. Goldberg has no specialized knowledge regarding field surfaces or soccer conditions more generally. She is therefore not qualified to opine on whether Defendant's decisions about field surfaces fell below acceptable standards. *See* Fed. R. Evid. 702.

Finally, Cordeiro's statement is insufficient to create a triable issue of pretext. This statement was not made in the context of any discussion about field surfaces, nor does it directly betray any discriminatory animus by Cordeiro. *See France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015) ("stray remarks not directly tied to the decisionmaking process are not direct evidence capable of defeating summary judgment."). In short, it does not raise a genuine dispute as to pretext.

In sum, the Court finds that Plaintiffs have failed to submit sufficient evidence that Defendant's proffered explanation for the turf disparity is pretext for unlawful discrimination. Based on the evidence submitted by Plaintiffs, a reasonable trier of fact could not conclude by a preponderance of the evidence that Defendant intentionally discriminated against the WNT by subjecting them to turf surfaces more frequently than the MNT. The Court therefore grants summary judgment to Defendant on this claim.

---

extent this can be considered a company policy, it is not inconsistent with Defendant's proffered explanation for the turf disparity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | ***Alex Morgan et al. v. United States Soccer Federation, Inc.*** | | | |

ii.     *Charter Flights*

Defendant also moves for summary judgment on Plaintiffs' charter-flights claim, which is one aspect of Plaintiffs' broader theory that Defendant discriminated against the WNT by subjecting them to inferior travel conditions relative to the MNT. Indeed, not only do Plaintiffs allege that Defendant provided the MNT with charter flights more frequently than the WNT, Plaintiffs also allege that Defendant budgeted and spent more money on airfare and hotels for the MNT than the WNT. For example, Plaintiff allege that from 2015 to 2020, USSF spent approximately $9 million on airfare for the MNT, while spending approximately $5 million on airfare for the WNT, even though the WNT played more games during this period.

The Court first considers whether Plaintiffs have established a prima facie case of discrimination with respect to the charter-flight disparity. Again, Defendant does not appear to dispute that Plaintiffs belong to a protected class, were performing their jobs adequately, and were subjected to an adverse employment action. Further, the Court concludes that "circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Fonseca*, 374 F.3d at 847. Accordingly, the Court proceeds with the second step of the *McDonnell-Douglas* framework.

In its Motion, Defendant points out that the MNT and the WNT have flown charter flights for all team travel (including travel to friendly matches) since October 2018. During the period from 2015 through 2018, the WNT flew charter flights for all team travel during the 2015 FIFA Women's World Cup, during Olympic qualifying in 2016, and during the 2016 Olympic Games. USSF did *not* reserve a charter flight for the WNT for its initial trip to Brazil for the 2016 Olympic Games. Tom King ("King"), the Managing Director of Administration for USSF, declares that no charter flight was reserved because "[he] did not believe the significant additional cost to take a charter flight…rather than flying business class (which is how the team traveled there) would have been a prudent expenditure of money in light of [his] view that business class travel would not cost the team any competitive advantage, given that international business class travel from the United States to South America is often at least as comfortable as a charter airplane, if not more so." (King Decl. ¶ 47 ECF No. 171-21.) King also points out that "WNT Head Coach Jill Ellis did not request a charter flight to Brazil" but "[i]f she had, [he] would have considered the request[.]" (*Id.*) The MNT did not compete in the Olympics in 2016. However, from 2015 through 2018, USSF provided the MNT with charter flights for all team travel to non-friendly matches.

Between June 11, 2015, and September 2018, the WNT did not use charter flights for any team travel to friendly matches. In contrast, the MNT flew a total of six charter flights for team travel to friendly matches over the same period. Two such flights were to and from Cuba in October 2016 for two

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

matches four days apart in between World Cup qualifiers. Defendant contends that the MNT flew on
charter airplanes because there were limited commercial flight options to and from Cuba at the time. (*Id.*
¶ 50.) The third flight was to a friendly in Utah, five days before a World Cup qualifier in Colorado.
Defendant asserts that the charter flight was provided because the MNT was struggling to qualify for the
2018 World Cup, and USSF agreed with the MNT head coach's request for a charter flight in an effort
to provide the team with every competitive advantage as it attempted to qualify for the World Cup. (*Id.* ¶
51.) The fourth charter flight was from Nashville to East Hartford for a friendly just days before the
team's Gold Cup opener back in Nashville. Again, USSF claims that it reserved the charter flight in an
effort to provide the team with every competitive advantage heading into the Gold Cup, which was
viewed by USSF as a significant opportunity to win a meaningful tournament, and to help provide the
program with momentum and a boost for its fans. (*Id.* ¶ 52.)

The fifth charter flight was from Ireland to a friendly in France. King declares that, by this time,
the MNT had failed to qualify for the 2018 World Cup, and USSF viewed the friendly against France as
a meaningful opportunity for the team to compete against one of the World Cup favorites. (*Id.* ¶ 53.)
King also declares that he "wanted the team to have every competitive advantage for that match because
[he] believed a good result in that match (which the team achieved) could give the players and the
program a significant boost, compared to most friendlies." (*Id.*) Finally, the last flight at issue was a
flight to a friendly against Mexico in Nashville. King declares that "[t]he match was only four days after
the team played a friendly match against Brazil in the New York area, and Mexico is the team's main
rival. Even a friendly match against Mexico is seen by U.S. Soccer as an important measuring stick for
the program. Accordingly, we reserved a charter flight to try to ensure every competitive advantage for
the team." (*Id.* ¶ 54.)

Defendant has articulated legitimate, nondiscriminatory reasons for providing the MNT with
charter flights more frequently than the WNT. For example, it appears that USSF provided the MNT
with charter flights on multiple occasions because the MNT was struggling relative to its competitors
and thus needed a competitive edge going into important matches. This explanation is not rooted in sex-
based discriminatory animus, but rather in competitive need. It is thus sufficient to satisfy Defendant's
burden under the *McDonnell-Douglas* burden-shifting framework. *See Burdine*, 450 U.S. at 248 ("The
defendant need not persuade the court that it was actually motivated by the proffered reasons, but it is
sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against
the plaintiff.") Accordingly, the burden shifts back to Plaintiffs to demonstrate pretext. Plaintiffs'
evidence of pretext consists primarily of Dr. Goldberg's expert report, the previously-discussed
statement made by Cordeiro, as well as the additional fact that although the WNT played more matches

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | | Date | May 1, 2020 |
|---|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | | |

than the MNT during the class period, USSF spent more money on both airfare and hotels for the MNT than it did for the WNT.

Upon review, the Court finds that Plaintiffs' evidence is sufficient to raise a genuine dispute as to pretext. The most common explanation provided by Defendant for the charter-flight disparity is rooted in the MNT's "competitive need." To be sure, this is a legitimate nondiscriminatory explanation for the disparity. However, this explanation is "so weak" and "implausible" "that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination." *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). For one, this rationale does not fully explain the gross disparity in money spent on airfare and hotels for the teams. Additionally, it compels the implausible conclusion that the WNT never faced a similar situation during the relevant time period when it too would have benefited from the "competitive advantage" that comes from charter flights. A rational fact finder could infer that the disparity in charter flights, coupled with the disparity in funds allocated for travel more broadly and Defendant's weak explanations for these discrepancies, gives rise to an inference of discriminatory motive. *See St. Mary's*, 509 U.S. at 511 ("the factfinder's disbelief of the reasons put forward by the defendant…may, together with the elements of the prima facie case, suffice to show intentional discrimination.") Accordingly, the Court denies summary judgment to Defendant on Plaintiffs' claim regarding charter flights.

*iii.*     *Travel Conditions and Support Services*

The Court does not specifically address the merits of Plaintiffs' remaining claims regarding travel conditions more broadly and support services. In its Motion for Summary Judgment, Defendant asked the Court to enter summary judgment only on Plaintiffs' claims related to artificial turf and charter flights. Defendant did not address Plaintiffs' allegations about money spent on airfare and hotel accommodations or Plaintiffs' allegations about support services until its Reply. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")

## V.     EVIDENTIARY OBJECTIONS

To the extent the parties object to any evidence that the Court relies on in this Order, those objections are overruled.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:19-cv-01717-RGK-AGR | Date | May 1, 2020 |
|---|---|---|---|
| Title | *Alex Morgan et al. v. United States Soccer Federation, Inc.* | | |

## VI.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion and **GRANTS in part** Defendant's Motion. Plaintiffs' Title VII claim for discriminatory working conditions survives only insofar as it is based on (1) travel conditions (specifically, charter flights and hotel accommodations), and (2) personnel and support services (specifically, medical and training support).

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    sw