1   Jeffrey L. Kessler (*pro hac vice*)
    jkessler@winston.com
2   David G. Feher (*pro hac vice*)
    dfeher@winston.com
3   **WINSTON & STRAWN LLP**
    200 Park Avenue, New York, NY 10166
4   Tel.:   (212) 294-6700
    Fax:   (212) 294-4700
5
    Cardelle B. Spangler (*pro hac vice*)
6   cspangler@winston.com
    **WINSTON & STRAWN LLP**
7   35 West Wacker Drive, Chicago, IL 60601
    Tel.:   (312) 558-5600
8   Fax:   (312) 558-5700
9   Diana Hughes Leiden (SBN: 267606)
    dhleiden@winston.com
10  Lev Tsukerman (SBN: 319184)
    ltsukerman@winston.com
11  **WINSTON & STRAWN LLP**
    333 South Grand Avenue, Los Angeles, CA 90071
12  Tel.:   (213) 615-1700
    Fax:   (213) 615-1750
13
    Jeanifer E. Parsigian (SBN: 289001)
14  jparsigian@winston.com
    **WINSTON & STRAWN LLP**
15  101 California St., 35th Floor, San Francisco, CA 94111
    Tel.:   (491) 591-1000
16  Fax:   (491) 591-1400
17  *Attorneys for Plaintiffs*

18              **UNITED STATES DISTRICT COURT**

19              **CENTRAL DISTRICT OF CALIFORNIA**

20  ALEX MORGAN, et al.,                | **Case No. 2:19-CV-01717-RGK-AGR**
21                      Plaintiffs,     | Assigned to: Judge R. Gary Klausner
22          v.                          | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
23  UNITED STATES SOCCER
24  FEDERATION, INC.,                   | Date:  December 12, 2022
25                      Defendant.      | Time: 9:00 a.m.
                                        | Courtroom: 850
26
27
28

**TO THE COURT, ALL PARTIES, AND ALL ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 12, 2022 at 9:00 a.m., or as soon thereafter as the matter may be heard, in courtroom 850 of the above-titled court, located at 255 East Temple Street, Los Angeles, California 90012, plaintiffs Alex Morgan, et al. (collectively, "Plaintiffs") will and hereby do move the Court, under Federal Rule of Civil Procedure 23 and the Equal Pay Act, for an order:

1. Granting final approval of the proposed Class Action Settlement and Release of Pay Claims, attached as Exhibit A to the accompanying Declaration of Jeffrey L. Kessler; and

2. Retaining jurisdiction to oversee administration and enforcement of the settlement agreement.

This motion is based upon this notice of motion, the accompanying memorandum of points and authorities, the accompanying declaration of Jeffrey L. Kessler, the accompanying proposed order, the records and files in this action, and any other written or oral submissions that may be presented at or before the hearing on this motion.

Pursuant to Local Rule 7-3, Defendant consents to this motion.

Dated: November 1, 2022        WINSTON & STRAWN LLP

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler
David G. Feher
Cardelle B. Spangler
Diana Hughes Leiden
Jeanifer E. Parsigian
Lev Tsukerman

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

                                                                                            **Page**
I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND .................................................................. 2

      A.    Plaintiffs' EEOC charges led to this lawsuit. ............................ 2

      B.    The parties engaged in thorough, extensive fact and expert discovery .......... 3

      C.    The parties engaged in extensive motion practice. ...................... 3

            1.    Plaintiffs' JPML motion and USSF's motion to transfer. ........ 3

            2.    The Court certified three classes ....................................... 3

            3.    The parties moved for summary judgment. ...................... 4

      D.    The Court approves the parties' working-conditions settlement. ............... 5

      E.    Plaintiffs appeal the Court's summary judgment ruling. ............ 5

III.  PROPOSED SETTLEMENT ................................................................. 5

      A.    The parties engaged in extensive settlement negotiations. ............ 5

      B.    The settlement terms ................................................................. 6

      C.    The scope of the release. ........................................................... 8

      D.    USSF provided notice under the Class Action Fairness Act
            ("CAFA"). ................................................................................. 9

      E.    The Court preliminarily approved the settlement. ..................... 9

      F.    Class counsel provided notice of the settlement. ....................... 10

IV.   LEGAL STANDARD ........................................................................... 11

      A.    Final approval for Rule 23 class settlements. ............................ 11

      B.    Approval of collective action settlements. ................................ 11

V.    ARGUMENT ...................................................................................... 12

      A.    USSF provided notice under the Class Action Fairness Act. ..... 12

      B.    Class members received adequate notice. .................................. 12

      C.    The proposed settlement should be approved under Rule 23 ...... 13

            1.    The settlement provides immediate and significant benefits
                  and avoids the inherent risk and expense of continued
                  litigation. ................................................................. 13

            2.    The settlement also avoids any risk of losing class status. ........ 15

            3.    The settlement amount and terms are fair and reasonable ......... 15

            4.    The extensive discovery record and this action's procedural
                  posture both favor settlement ..................................... 16

            5.    Skilled class counsel views the settlement favorably. ........... 17

            6.    The government received notice under CAFA; it did not
                  object. ....................................................................... 17

            7.    The class members reacted favorably to the settlement. ....... 18

      D.    The collective action settlement also passes muster under the FLSA .......... 20

VI.   CONCLUSION ................................................................................... 20

i

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5  *Alikhan v. Goodrich Corp.*,
    2020 WL 4919382 (C.D. Cal. June 25, 2020)..................................................*passim*
6
7  *Contreras v. Worldwide Flight Servs., Inc.*,
    2020 WL 2083017 (C.D. Cal. Apr. 1, 2020)........................................................14
8
9  *Dawson v. Hitco Carbon Composites, Inc.*,
    2019 WL 7842550 (C.D. Cal. Nov. 25, 2019) ................................................14, 17
10
11  *del Toro Lopez v. Uber Techs., Inc.*,
    2018 WL 5982506 (N.D. Cal. Nov. 14, 2018) ........................................................9
12
13  *Ernst v. ZogSports Holdings, LLC*,
    No. 2:18-CV-09043-RGK-MRW (C.D. Cal.)....................................................9, 19
14
15  *Herrera v. Fed. Express Corp.*,
    2020 WL 2951122 (C.D. Cal. Mar. 31, 2020) ....................................14, 16, 17, 20
16
17  *Jordan v. Michael Page Int'l, Inc.*,
    2020 WL 4919732 (C.D. Cal. July 2, 2020) ..................................................15, 16
18
19  *Khanna v. Inter-Con Sec. Sys., Inc.*,
    2013 WL 1193485 (E.D. Cal. Mar. 22, 2013)........................................................11
20
21  *In re Linkedin User Privacy Litig.*,
    309 F.R.D. 573 (N.D. Cal. 2015) ........................................14, 15, 17, 18
22
23  *Pan v. Qualcomm Inc.*,
    2017 WL 3252212 (S.D. Cal. July 31, 2017)............................................11, 12, 20
24
25  *Patton v. Church & Dwight Co.*,
    2019 WL 6357266 (C.D. Cal. Aug. 6, 2019) ..................................................*passim*
26
27  *Smith v. Experian Info. Sols., Inc.*,
    2020 WL 6689209 (C.D. Cal. Nov. 9, 2020) ..................................................15, 16
28
   *Spann v. J.C. Penney Corp.*,
    211 F. Supp. 3d 1244 (C.D. Cal. 2016)............................................................*passim*

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Vasquez v. Packaging Corp. of Am.*,
    2020 WL 6785650 (C.D. Cal. Aug. 17, 2020) .........................................................11

**Statutes**

28 U.S.C. § 1715(b) .........................................................................................................12

**Other Authorities**

Fed. R. Civ. P. 23 ...........................................................................................................11

# I.    INTRODUCTION

Plaintiffs seek final approval of a class action settlement with defendant United States Soccer Federation ("USSF") for their pay-discrimination claims under Title VII and the Equal Pay Act.[1]  This pay-claims settlement will fully resolve this case.[2]  On August 11, 2022, this Court preliminarily approved the parties' settlement, finding that it "appears to be fair, adequate, and reasonable" because, among other things, "the unopposed settlement agreement accomplishes Plaintiffs' goal for litigation: equal pay." Dkt. 320 at 4, 5.  In doing so, the Court recognized that the settlement was the result of "an extensive negotiation process" led by "renowned law firms" after the parties "spent significant time in discovery." *Id.* at 2, 4.  The Court should now finally approve the parties' settlement.  First, the settlement represents a fair and reasonable deal that avoids the inherent risk, expense, and delay of further litigation.  Second, the agreement is the product of arm's-length negotiations led by experienced counsel after substantial discovery and litigation.  Third, class members have reacted favorably to the agreement, which has been hailed worldwide as a historic breakthrough in equal pay.

Since preliminary approval, class counsel served the approved class notice and settlement agreement on all class members.  Only one member (who has been pursuing her own individual equal pay action against USSF in another jurisdiction) objected and did so on grounds that lack any merit.  Specifically, the objector has complained that the notice was inadequate, but this Court has already approved the form and substance of the notice, finding that it "sufficiently inform[ed] the class members" of the terms of the settlement and the opportunity to object.  *Id.* at 5.  The objector also complained that she did not yet know the specific amount of money she would receive from the settlement fund, but that information was always going to be provided and she has been informed that her expected pro rata allocation of the settlement fund is $339,999 after

---

[1] The class and collective action members are the members of the Title VII injunctive relief class, the Title VII damages class, and the FLSA collective action, as these groups are defined by the Court's November 8, 2019 class certification order. *See* Dkt. 98.

[2] The Court previously approved the parties' working-conditions settlement. Dkt. 305.

attorneys' fees and costs.[3]  In addition, because the objector has separately asserted an EPA claim against USSF, her FLSA EPA claim has been carved out of the release so that she is not releasing that claim here.  She thus has no injury or standing to object to USSF paying the claims from a single settlement fund, as allocating some settlement amounts solely to the FLSA claimants would result in a lower recovery to the objector because she is not a member of the FLSA collective action.  In any event, Plaintiffs' proposed pro rata allocation of damages from a single fund is the fairest and most reasonable distribution here because the EPA and Title VII damages compensate class members for the same conduct by USSF and the EPA damages period is entirely subsumed within the Title VII damages period.

Finally, the objector's criticism of the proposed attorneys' fees award is not well-taken.  Class counsel here invested more than $12 million in time and out-of-pocket expenses, on a complete contingency, and entered into agreements with all of the plaintiffs who appeared to receive 30% of any damages settlement, after the reimbursement of expenses.  This percentage, however, will compensate class counsel for less than 60% of their lodestar and class counsel will not seek any additional compensation at all either for the $2 million benefit fund created for class members by the settlement or for the historic injunctive relief that has enabled the class members to achieve their long-sought goal of equal pay going forward.  In these circumstances, the proposed attorneys' fee and expenses award is clearly reasonable and appropriate under the standards that govern fee awards in this Circuit.

## II.    FACTUAL BACKGROUND[4]

### A.    Plaintiffs' EEOC charges led to this lawsuit.

Plaintiffs are professional soccer players and members of the WNT.  In April 2016, the four class representatives here (plus the objector) each filed a charge of

---

[3] Each class member's expected pro rata allocation is listed in the accompanying Declaration of Jeffrey L. Kessler.

[4] Plaintiffs' preliminary approval motion recites many of the facts relevant to this motion.  *See* Dkt. 317 at 2–6.  Plaintiffs restate those facts relevant to final approval.

discrimination against their employer, USSF, with the Equal Employment Opportunity Commission ("EEOC") alleging sex-based discrimination. *See* Dkt. 2. The EEOC issued four right to sue letters in February 2019. *Id.* In March 2019, Plaintiffs sued USSF under the Equal Pay Act and Title VII for discrimination in pay and working conditions. Dkt. 1. USSF answered, denying liability. Dkt. 42.[5]

**B.    The parties engaged in thorough, extensive fact and expert discovery.**

The class representatives vigorously pursued their claims through extensive discovery. Plaintiffs served 67 document requests and 16 interrogatories. Dkt. 317-1 ¶ 11. The parties produced tens of thousands of documents. *Id.* The two sides also deposed nearly 20 fact witnesses. *Id.* ¶ 12. Plaintiffs deposed seven USSF current or former employees, including former USSF Presidents Carlos Cordeiro and Sunil Gulati, and key third-party sponsors Visa and Coke. *Id.* USSF similarly deposed 10 witnesses, including all four class representatives and Becca Roux, the WNT union's Executive Director. *Id.* Each side also retained highly credentialed experts. Plaintiffs retained (and class counsel paid for) three experts: Dr. Finnie Cook, Dr. Caren Goldberg, and Dr. Roger Noll. *Id.* ¶ 14. USSF also retained three experts: Phillip Miscimarra, Carlyn Irwin, and Dr. Justin McCrary. *Id.* ¶ 15. In the end, thousands of hours were spent on discovery as the parties developed the record on their claims and defenses. *Id.* ¶ 10.

**C.    The parties engaged in extensive motion practice.**

**1.    Plaintiffs' JPML motion and USSF's motion to transfer.**

When Plaintiffs sued, they also moved before the Judicial Panel on Multidistrict Litigation to transfer *Solo v. United States Soccer Federation* to this Court from Northern California. *See* Dkt. 9. That motion was ultimately denied. Dkt. 23. USSF then sought transfer, but this Court denied USSF's motion and retained the case. *See* Dkt. 56.

**2.    The Court certified three classes.**

In September 2019, Plaintiffs moved to certify two classes under Rule 23 and one

---

[5] The objector chose to file her own EPA action separately in another court even though she was offered the opportunity to be a named plaintiff in this action.

collective class under the EPA. *See* Dkt. 64. This Court granted that motion and certified a Rule 23(b)(2) injunctive relief class and a Rule 23(b)(3) damages class:

> **Injunctive Relief Class:** All WNT players on the team at the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later.

> **Damages Class:** All WNT players who were members of the WNT at any time from [June 11, 2015] through the date of class certification.

Dkt. 98 at 14–15; Dkt. 123. The Court also conditionally certified a collective class under 29 U.S.C. § 216(b) for "[a]ll WNT players who were members of the WNT at any time from March 8, 2016 through the present." Dkt. 98 at 15. Players who decided to opt into the EPA collective action filed written consent. *See* Dkts. 6, 10, 16, 33, 72, 129, 130, 131, 132, 147, 150, 153, 155, 159. The injunctive relief class sought equal working conditions going forward, while the Title VII damages class sought back pay for pay discrimination. The collective class too sought back pay for the same pay discrimination, but for a shorter period under the applicable statute of limitations. The Court appointed Alex Morgan, Megan Rapinoe, Carli Lloyd, and Becky Sauerbrunn as class representatives and Winston & Strawn LLP as class counsel. Dkt. 98 at 15.

### 3. The parties moved for summary judgment.

The parties filed competing summary judgment motions in early 2020. *See* Dkts. 170, 171. Plaintiffs moved for summary judgment on their pay-discrimination claims under both the EPA and Title VII, while USSF moved for summary judgment on all of Plaintiffs' claims. *See id.* In May 2020, the Court denied Plaintiffs' motion and granted in part USSF's motion. Dkt. 250. The Court ruled for USSF on Plaintiffs' Title VII and EPA pay-discrimination claims and on Plaintiffs' claim of unequal treatment for field surfaces. *Id.* at 21, 28. The Court denied summary judgment on Plaintiffs' claims relating to unequal treatment in hotel accommodations, charter flights, and support personnel. *Id.* at 31. Although the trial on these remaining claims was ultimately postponed multiple times due to the global COVID-19 pandemic, the parties

negotiated, drafted, and exchanged various pretrial filings, including witness lists, exhibit lists, and jury instructions. *See* Dkt. 317-1 ¶ 16.

### D.    The Court approves the parties' working-conditions settlement.

The parties previously settled Plaintiffs' separate Title VII working-conditions claims in December 2020. The crux of the agreement was that USSF would implement revised charter flight, venue selection, professional support, and hotel accommodation policies intended to create equality with the MNT moving forward in exchange for a release of liability on Plaintiffs' working-conditions claims. The Court granted final approval of that settlement in April 2021 and entered final judgment in the case, including on Plaintiffs' Title VII and EPA pay-discrimination claims. Dkts. 297, 305.

### E.    Plaintiffs appeal the Court's summary judgment ruling.

Plaintiffs then appealed the Court's summary judgment ruling on their overlapping Title VII and EPA pay-discrimination claims. Dkt. 308. The parties fully briefed the appeal and were set to argue in the Ninth Circuit in March 2022. *See* Dkt. 317-1 ¶ 6. Shortly before oral argument, the parties jointly moved to take oral argument off calendar and place the appeal in abeyance because they agreed to a settlement in principle on the Title VII and EPA pay-discrimination claims. *Id.* ¶ 8. The Ninth Circuit granted the joint motion, removed the oral argument from its calendar, and stayed further proceedings pending finalization of the parties' settlement. Dkt. 314.

## III.    PROPOSED SETTLEMENT

### A.    The parties engaged in extensive settlement negotiations.

Plaintiffs and USSF have discussed settlement dating as far back as the EEOC's investigation of Plaintiffs' charges in 2016. Dkt. 317-1 ¶ 17. After this lawsuit was filed, they continued to engage in settlement negotiations, formally and informally, including in a formal two-day mediation in August 2019 with both class representatives and senior USSF officials present. *Id.* The parties engaged in further informal settlement communications through the close of discovery and pretrial preparation. *Id.*

These negotiations intensified after the Court's summary judgment ruling and

multiple delays of the trial date due to COVID-19. *Id.* ¶ 18. After approval of the working-conditions settlement and Plaintiffs' Ninth Circuit appeal, the parties continued to engage in extensive discussions to try to resolve Plaintiffs' pay-discrimination claims. *Id.* ¶ 19. This included a full-day mediation in May 2021 focused solely on potential settlement of Plaintiffs' pay-discrimination claims. *Id.* ¶ 20. While the parties did not settle at the mediation, they continued to discuss a potential settlement of the pay-discrimination claims, with the class representatives again playing an important role during negotiations. *Id.* The parties engaged in extensive informal negotiation through regular calls and correspondence, involving the class representatives, key USSF officials, and counsel. *Id.* ¶ 21. The WNT union and its counsel also took part, particularly with respect to the settlement discussions related to future pay conditions, which was also the subject of collective bargaining negotiations with USSF. *Id.* The parties exchanged multiple drafts of a proposed term sheet before agreeing to a settlement in principle, and then negotiated a full settlement agreement. *Id.* ¶ 22. Class counsel with decades of collective experience with sports class action and employment matters led these negotiations. *See* Dkt. 64-1 ¶¶ 5–15. USSF too has been led by two prominent national law firms during negotiations. Dkt. 317-1 ¶ 22.

Plaintiffs have consistently sought a rate of pay equal to that afforded to the MNT. *See id.* ¶ 23. As the parties discussed settlement of Plaintiffs' pay claims, they spent significant time and effort negotiating and finalizing an agreement that would provide for equal pay going forward in all competitions, including the World Cup. *See id.* And in reaching their settlement, Plaintiffs and their counsel recognized the immediate benefit to settling the pay claims while avoiding the inherent uncertainty, delay, expense, and risk of the appeal and continued litigation. *Id.*

## B. The settlement terms.

Under the pay-claims settlement (Kessler Decl., Ex. A), USSF will provide $22 million to the class and collective action members in a fund to be distributed to class members after the award of attorneys' fees and expenses, $2 million in an escrow

account to benefit the class members' post-playing career goals and charitable efforts, and an agreement providing for equal pay going forward in exchange for a release of liability on the classes' pay-discrimination claims. Kessler Decl., Ex. A ¶¶ 29–30.

Settlement Amount. USSF will provide $22 million in a settlement fund for the Title VII class and collective action members, paid in four equal ($5.5 million) interest-free installments to be divided among the members, after subtracting Plaintiffs' attorneys' fees and costs. Kessler Decl., Ex. A ¶ 29(a). USSF paid the first $5.5 million installment into an escrow account established by class counsel on June 1, 2022. *See id.* USSF also deposited $2 million into an escrow account on June 1, 2022 to be used for the members' post-playing career goals and charitable efforts related to women's and girls' soccer. *See* Kessler Decl., Ex. A ¶ 29(b). The benefit fund Board will establish procedures for class and collective action members to apply for maximum financial awards of up to $50,000 for each member from the $2 million fund, which may be used for school tuition, job training, coach training, referee licenses, training in high performance and sporting analytics, internships, investments in soccer-related charitable programs with which the members are involved, or other women's or girls' soccer-related activities after the member has completed her playing career. *Id.*

Allocation of the $22 Million. The $22 million settlement will be divided among the class and collective action members after subtracting any awarded attorneys' fees and expenses. Dkt. 317-3 at 5 (class notice explaining distribution method). Each member will receive a pro rata share of the damages fund based on her pro rata share of the total damages sought based on Plaintiffs' expert's damages calculations. *Id.* This analysis accounts for the types of games played and the win/loss rate for each player's tenure with the team. Each class member will thus receive the percentage of the damages fund equal to the percentage that was attributable to her lost earnings. *Id.* The estimated damages fund, if the Court awards the requested fees and costs, is $14,030,873 and will be allocated as detailed in paragraph 11 of the accompanying Kessler Declaration. Class counsel seeks no fee award as to the $2 million benefit fund.

**Future Pay**.  The settlement agreement was conditioned on USSF and the WNT union entering into a new collective bargaining agreement ("New CBA") that would provide for future equal pay in all categories of competition by the WNT, including the World Cup.  Such a New CBA, required by the settlement agreement, was entered into and then approved by USSF's Board and ratified by the members of the WNT union.  The New CBA, as required by the settlement agreement, provides for an equal rate of pay, as set forth in the agreement, for members of the WNT and members of the MNT for players' responsibilities in connection with friendlies, all other games and tournaments, and in the Men's and Women's World Cups.  *See* Kessler Decl., Ex. A ¶ 30.  The New CBA details these rates of pay.  *See* Kessler Decl., Ex. A ¶ 30(b).

## C.    The scope of the release.

Plaintiffs agreed that the class and collective action members would release their pay-discrimination claims against USSF.  Kessler Decl., Ex. A ¶ 31.  The class members agreed to release USSF from "any and all claims, known or unknown, arising through the date of Final Approval, (i) that were asserted in the Complaint and/or that could have been asserted in the Complaint based on the facts and/or allegations alleged in the Complaint or (ii) that, based on the terms of the New CBA, USSF discriminated against Plaintiffs on the basis of their sex by paying them a lower rate of pay than the players on the USMNT."  Kessler Decl., Ex. A ¶ 18.  The settlement release specifically excluded objector Hope Solo's EPA claims in her lawsuit against USSF as she was the only class member who had filed a separate EPA claim against USSF: "[T]his provision will not constitute or affect a release of the plaintiff's claim under the Equal Pay Act asserted in *Solo v. United States Soccer Federation*, Case No. 3:18-cv-5215-JD."  *Id.*

Because there are some members of the Title VII class that did not opt in to the collective action, the settlement notice advised and the settlement checks will advise class members that "[i]f you have not previously opted-in to the collective action, by signing or cashing this check, you are consenting to join the collective action and affirm your release of the claims under the Fair Labor Standards Act."  Kessler Decl., Ex. A

¶ 32; *see also* Dkt. 317-3 at 5.  The notice makes clear that they may choose not to opt into the collective action and thereby not release any FLSA claims by choosing not to sign or cash the check.  Courts have approved similar cash-checking procedures to allow FLSA members to opt in.  *See, e.g.*, *Ernst v. ZogSports Holdings, LLC*, No. 2:18-CV-09043-RGK-MRW, Dkt. No. 64-3 at 3 (C.D. Cal.) (settlement providing that "[b]y signing or cashing this check, you are consenting to join the collective action and affirm your release of claims under the Fair Labor Standards Act against Releasees").[6]

By an order granting final approval, Plaintiffs and all class members accepting their checks (except for the objector, who has a separate EPA action) will be deemed to have agreed not to sue or make a claim against USSF for any released claims arising or accruing at any time before final approval.  Kessler Decl., Ex. A ¶ 31.  The release does not affect any claims *other* than pay-discrimination claims accruing at any time.  *Id.*

USSF also agreed to release class and collective action members from any and all counterclaims, known or unknown, that could have been asserted in response to the Complaint, through the date of final approval.  Kessler Decl., Ex. A ¶ 33.

**D.    USSF provided notice under the Class Action Fairness Act ("CAFA").**

The settlement requires that USSF provide appropriate notice under CAFA.  Kessler Decl., Ex. A ¶ 35(b).  USSF counsel represented that it provided notice to the appropriate state and federal officials under CAFA on September 9, 2022.  Kessler Decl. ¶ 5.  No state or federal officials have expressed any objection to the settlement.

**E.    The Court preliminarily approved the settlement.**

The Court preliminarily approved the pay-claims settlement, finding that it "appears to be fair, adequate, and reasonable for purposes of preliminary approval under Rule 23(e)" and a "fair and reasonable resolution of a bona fide dispute."  Dkt. 320 at

---

[6] *See also del Toro Lopez v. Uber Techs., Inc.*, 2018 WL 5982506, at *6 (N.D. Cal. Nov. 14, 2018) (utilizing similar cash-checking opt-in method for collective members); *Alikhan v. Goodrich Corp.*, 2020 WL 4919382, at *4 (C.D. Cal. June 25, 2020) ("Only Collective Members who timely cash their checks … will be deemed to have 'opted in' to the Settlement for purposes of the release under the FLSA.").

5. The Court noted that the settlement funds would be distributed "based on individual play time, without any incentives for class representatives." *Id.* at 4. The class representatives thus "have not received preferential treatment," and "there is no evidence of collusion." *Id.* "Most significantly," however, was that the "settlement agreement accomplishes Plaintiffs' goal for litigation: equal pay." *Id.* The Court also found the settlement's attorneys' fee provision "sufficiently fair" and that the release "is not overly broad because it is limited to the pay-discrimination claims." *Id.* at 4–5.

The Court also approved the class notice and its delivery method, finding that it "sufficiently informs the class members of: (1) the terms of the Settlement Agreement; (2) the nature of the litigation and the settlement classes; (3) the benefits that the Settlement Agreement will confer to members; (4) how objections to the Settlement Agreement could be made; and (5) the expected attorneys' fees and costs." *Id.* at 5. The approved notice described how the $22 million fund would be allocated, explaining that: "Each Class Member or FLSA Collective Action Member will receive a pro rata share of the Damages Fund based on their pro rata share of the total damages Plaintiffs sought in this lawsuit based on their expert's damages calculations. … Each Class Member of the Damages Class or FLSA Collective Action Member will receive the percentage of the Damages Fund equal to the percentage of the total damages that was attributable to her lost earnings. Individual awards will be determined after the Court approves the Settlement and the distribution method described above." Dkt. 317-3 at 5.

**F. Class counsel provided notice of the settlement.**

On August 24, 2022, USSF provided the class list containing the full name, last known home address, and last known email address of 74 class and collective action members. Kessler Decl. ¶ 6.[7] On September 9, 2022, class counsel provided notice to each class and collective action member by first-class mail. *Id.* ¶ 7. Each mailing contained the approved class notice and the settlement agreement. *Id.* That same day,

---

[7] The class list did not include Kristen Edmonds, a former WNT player whom Plaintiffs' damages expert, Dr. Finnie Cook, initially identified as a Title VII class member but for whom Dr. Cook calculated no damages.

class counsel also emailed the class notice and agreement to all 74 class and collective action members. *Id.* ¶ 8. While electronic notice to two members was initially returned as undeliverable, class counsel obtained alternate emails for those class members and successfully re-sent electronic notice on September 10. *Id.* All class members thus received electronic notice. *Id.* Only four mailings were returned as undeliverable, but there were no delivery issues with the service of emails to these four members. *Id.* ¶ 9. Notice was thus provided by email and/or by mail to all 74 members.

The class members' deadline to object to the settlement was October 11. Kessler Decl., Ex. A ¶ 21. Just one class member objected. Kessler Decl. ¶ 10; Dkt. 325.

## IV.   LEGAL STANDARD

### A.   Final approval for Rule 23 class settlements.

Courts engage in a three-step inquiry in approving class action settlements. *Alikhan*, 2020 WL 4919382, at *4. First, they assess "whether the parties have met notice requirements under the Class Action Fairness Act." *Id.* Second, they determine "whether the notice requirements of Federal Rule 23(c)(2)(B) have been satisfied." *Id.* And third, they decide whether the proposed class action settlements are fair, reasonable, and adequate. *Id.*; Fed. R. Civ. P. 23(e)(2). "In determining whether a proposed settlement should be approved, the Ninth Circuit has a 'strong judicial policy that favors settlement, particularly where complex class action litigation is concerned.'" *Vasquez v. Packaging Corp. of Am.*, 2020 WL 6785650, at *3 (C.D. Cal. Aug. 17, 2020).

### B.   Approval of collective action settlements.

While this Circuit has not yet provided "explicit direction for assessing the fairness of a proposed EPA settlement," "[m]ost district courts in the Ninth Circuit assess whether the settlement reflects a reasonable compromise over issues that are actually in dispute." *Pan v. Qualcomm Inc.*, 2017 WL 3252212, at *11 (S.D. Cal. July 31, 2017). Courts "must [e]nsure that 'the settlement is a fair and reasonable resolution of a bona fide dispute.'" *Khanna v. Inter-Con Sec. Sys., Inc.*, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22, 2013). Courts will "often apply the Rule 23 factors in evaluating the

fairness of an FLSA settlement, while recognizing that some do not apply 'because of the inherent differences between class actions and FLSA actions.'" *Id.*; Dkt. 320 at 3. "[T]he FLSA standard sets a lower threshold than the corresponding Rule 23 requirements." *Pan*, 2017 WL 3252212, at *11; Courts have found that settlements that meet Rule 23 also satisfy the FLSA standard. *See id.*

## V.    ARGUMENT

### A.    USSF provided notice under the Class Action Fairness Act.

CAFA requires that "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official." 28 U.S.C. § 1715(b).  A final approval order may issue 90 days after the appropriate officials are served with this notice.  *See Alikhan*, 2020 WL 4919382, at *5 (citing 28 U.S.C. § 1715(d)).    USSF represented that it provided notice of the proposed settlement to the appropriate state and federal officials on September 9.  *See* Kessler Decl. ¶ 5.  The Court can thus grant final approval on or after December 8, 2022 (i.e., 90 days from service of notice).  This requirement is thus met.  *See, e.g.*, *Alikhan*, 2020 WL 4919382, at *5 (CAFA requirements met where defense counsel represented that it "served notices in accordance with CAFA to the Attorney General of the United Sates and the Office of the Attorney General in all States where class members reside").

### B.    Class members received adequate notice.

"Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2), and upon settlement of a certified class, '[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal.'" *Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1254–55 (C.D. Cal. 2016). This Court approved the parties' agreed-upon class notice and delivery method. Dkt. 320 at 5.

Class counsel successfully delivered the notice and settlement agreement to all 74 class and collective action members by first-class mail and/or by email.  As set forth

above, all class members received fair and adequate class notice of the settlement. *See, e.g.*, *Alikhan*, 2020 WL 4919382, at *6 (notice adequate where administrator "completed notice in accordance with the procedures approved by the Court"); *Spann*, 211 F. Supp. 3d at 1255 (finding that "the class notice and the notice process fairly and adequately informed class members of the nature of the action, the terms of the proposed settlement," and the class members' right to object or exclude themselves).

While the one objector complained that the notice did not specify her precise settlement payment, the allocation method for distributing the fund was set forth in the notice and the precise payment amounts cannot be known until after the Court makes a fees and expenses award and administration costs are finally determined. The objector and all class members have been informed of a specific estimate of their awards if the fees and costs motion is granted. This is more detailed information than is ordinarily available in a class action settlement in which final calculations often cannot be made until the funds are ready for distribution.

### C.    The proposed settlement should be approved under Rule 23.

Courts consider several factors in deciding whether a settlement is fair, reasonable, and adequate, including "(1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Patton v. Church & Dwight Co.*, 2019 WL 6357266, at *3 (C.D. Cal. Aug. 6, 2019). Courts balance and weigh these factors depending on the facts of each case. *Alikhan*, 2020 WL 4919382, at *6. "[T]he involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair." *Patton*, 2019 WL 6357266, at *3.

### 1.    The settlement provides immediate and significant benefits and

1    **avoids the inherent risk and expense of continued litigation.**

2    In evaluating the strength of the case, courts assess "objectively the strengths and

3    weaknesses inherent in the litigation and the impact of those considerations on the

4    parties' decisions to reach [a settlement]." *Spann*, 211 F. Supp. 3d at 1255. "An

5    important consideration in judging the reasonableness of a settlement is the strength of

6    plaintiffs' case on the merits balanced against the amount offered in the settlement."

7    *Contreras v. Worldwide Flight Servs., Inc.*, 2020 WL 2083017, at *3 (C.D. Cal. Apr. 1,

8    2020). "This factor is generally satisfied when plaintiffs must overcome barriers to

9    make their case." *Dawson v. Hitco Carbon Composites, Inc.*, 2019 WL 7842550, at *3

10   (C.D. Cal. Nov. 25, 2019). And in assessing risk and expense, courts consider the time

11   and cost required by continued litigation. *Alikhan*, 2020 WL 4919382, at *6.

12   These related factors strongly favor approval of the settlement. While Plaintiffs

13   are confident in their case—and that they would win at the Ninth Circuit—there was no

14   guarantee that they would win on appeal. Despite this substantial hurdle, the settlement

15   achieves the exact and historic equal pay goal that Plaintiffs have sought from the start

16   in addition to an eight-figure damages payout for class members. The settlement thus

17   eliminates the risk of an adverse appellate decision or an unfavorable jury verdict, while

18   obtaining substantial and historic relief that has been hailed as a global breakthrough in

19   the achievement of equal pay. Continued litigation would thus add only uncertainty to

20   what will now be certain and immediate relief achieving the precise equal pay objective

21   that Plaintiffs sought when they first sued. *See Herrera v. Fed. Express Corp.*, 2020

22   WL 2951122, at *4 (C.D. Cal. Mar. 31, 2020) ("substantial recovery now" coupled with

23   the uncertainties of litigation made both factors favor final approval); *In re LinkedIn*

24   *User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Generally, unless the

25   settlement is clearly inadequate, its acceptance and approval are preferable to lengthy

26   and expensive litigation with uncertain results."). Indeed, that this historic settlement

27   has been achieved before Plaintiffs prevailed on appeal is a particularly strong factor

28   favoring approval. *See Patton*, 2019 WL 6357266, at *4 (continued litigation risks

favored final approval despite plaintiff's belief in the strength of her case).

Settlement also saves the Court and the parties the time and expense of arguing a Ninth Circuit appeal and then holding a multi-week jury trial—another factor favoring final approval. *See In re LinkedIn*, 309 F.R.D. at 587 ("Because continued litigation would be risky, costly, complex, and long, this factor favors settlement."). Simply put, this settlement agreement clearly "presents a fair compromise in light of the risks and expense of continued litigation" and should thus be approved. *Smith v. Experian Info. Sols., Inc.*, 2020 WL 6689209, at *3 (C.D. Cal. Nov. 9, 2020).

### 2. The settlement also avoids any risk of losing class status.

While Plaintiffs believe the risk of decertification is minimal, that risk also supports final approval and a resolution of Plaintiffs' pay-discrimination claims. *See Spann*, 211 F. Supp. 3d at 1256 (despite court's certification before settlement, "risk that the court could de-certify the class … weigh[ed] in favor of granting final approval").

### 3. The settlement amount and terms are fair and reasonable.

When assessing this factor, courts consider "the complete package taken as a whole, rather than the individual component parts." *Patton*, 2019 WL 6357266, at *4. They consider the settlement terms "in conjunction with 'factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).'" *Jordan v. Michael Page Int'l, Inc.*, 2020 WL 4919732, at *6 (C.D. Cal. July 2, 2020). The settlement package here is clearly fair and reasonable.

First, as mentioned above, the settlement achieves Plaintiffs' long sought and historic goal of equal pay: through a new, ratified CBA and as a condition of settlement, USSF has agreed to equal pay for its senior national teams (including for the World Cup), providing an immediate and substantial benefit to both current and future WNT players. Second, on top of equal pay going forward, the settlement also provides a $22 million damages payout that will be distributed fairly based on each class and collective member's damages claims and play time with the WNT. This $22 million payout is a substantial portion (about one-third) of the claimed back pay damages. USSF will also

provide an additional $2 million for a board-administered fund to benefit class and collective action members in their post-playing career goals and charitable efforts related to women's and girls' soccer. And all these benefits avoid the inherent risks, costs, and uncertainties that come with continued litigation. Because the settlement confers "immediate and tangible benefit[s]" and "eliminates the risk that [Plaintiffs] could receive less … or nothing at all, if the litigation continued," this factor strongly supports final approval. *Smith*, 2020 WL 6689209, at *4 ("The Court also finds that the amount offered is fair and reasonable, especially in light of the preceding discussion regarding the risks, obstacles, and costs of further litigation."); *see also Jordan*, 2020 WL 4919732, at *6 (factor favored final approval because "Plaintiffs could risk losing on the merits and recovering less than this amount should litigation continue").

### 4. The extensive discovery record and this action's procedural posture both favor settlement.

Courts are "more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case. The more discovery completed, the more likely it is that the parties have 'a clear view of the strengths and weaknesses of their cases.'" *Jordan*, 2020 WL 4919732, at *6. This factor thus considers whether "the parties have sufficient information to make an informed decision about settlement." *Patton*, 2019 WL 6357266, at *4. The amount of motion practice and briefing, too, can support this factor. *See Herrera*, 2020 WL 2951122, at *5.

The well-developed discovery record here led to informed settlement decisions. The parties extensively negotiated the scope and substance of discovery—with several disputes landing before the Court. These efforts led to five-figure document productions between the parties and nearly 20 fact depositions. Both sides were thus equipped with "ample information with which to make informed settlement decisions." *Patton*, 2019 WL 6357266, at *4. And where, as here, "discovery was sufficiently advanced to allow the parties to make an informed decision about settlement," this

factor favors final approval. *Alikhan*, 2020 WL 4919382, at *7 (extensive document review, multiple sets of written discovery, and retention of an expert favored approval).

The parties also engaged in extensive motion practice. They briefed, among others, class certification, competing summary judgment motions, and many motions *in limine*. *See* Dkts. 64, 170, 171, 202–16. This substantial motion practice—coupled with a robust discovery record—further supports final approval. *See, e.g.*, *Herrera*, 2020 WL 2951122, at *5 (factor favored final approval because "[t]he parties conducted substantial discovery … and filed and opposed numerous dispositive and class related motions"); *In re LinkedIn*, 309 F.R.D. at 588 (approval favored where nearly three years of litigation included document exchanges, dispositive motion briefing, mediation efforts, and months of settlement negotiations). Taken together, the parties here used a well-developed discovery and litigation record to make informed settlement decisions.

### 5.    Skilled class counsel views the settlement favorably.

Courts are "entitled to, and should, rely upon the judgment of experienced counsel for the parties." *Alikhan*, 2020 WL 4919382, at *7. "Great weight is accorded to the recommendation of counsel … because the parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *Spann*, 211 F. Supp. 3d at 1257. Class counsel negotiated this settlement after significant motion practice (including a pending appeal) and with the benefit of months of discovery. And as the Court recognized, "world-renowned law firms [that] have experience in class-action litigation" are guiding each side. Dkt. 293 at 4; Dkt. 320 at 4. Counsel's experience and views thus favor final approval. *See, e.g.*, *Dawson*, 2019 WL 7842550, at *5; *Spann*, 211 F. Supp. 3d at 1257 (factor supported final approval because it was recommended by "experienced class action attorneys who prosecuted th[e] action vigorously").

### 6.    The government received notice under CAFA; it did not object.

"CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement

procedures." *In re LinkedIn*, 309 F.R.D. at 588–89.  USSF provided notice of the proposed settlement under CAFA.  Kessler Decl. ¶ 5.  Because "[n]one of these officials have raised any objections or concern regarding the settlement[,] … this factor favors the settlement." *In re LinkedIn*, 309 F.R.D. at 589.

### 7.    The class members reacted favorably to the settlement.

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Spann*, 211 F. Supp. 3d at 1257 (minimal objections and their lack of merit to supported final approval).  That presumption is true here because just one class member, who has been pursuing her own separate EPA action, objected to the settlement. *See, e.g.*, *In re Linkedin*, 309 F.R.D. at 589 (N.D. Cal. 2015) ("A low number of opt-outs and objections in comparison to the class size is typically a factor that supports settlement approval.").

Moreover, Solo's objections are each meritless.  Her complaints about the class notice are unfounded and, in any event, moot, given that this Court approved the notice. Solo argues that the class notice is ambiguous because it states that the settlement payments will be made in four installments but does not specify that those payments will be made annually.[8]  But this ignores the fact that notice to the members included a copy of the settlement agreement that specifies that the $22 million fund will be received and distributed in annual installments. *See* Kessler Decl., Ex. A ¶ 29(a).

Second, the notice does describe the plan of allocation for the settlement funds: "[each class member] will receive a pro rata share of the Damages Fund based on their pro rata share of the total damages" calculated by Plaintiffs' experts. *See* Dkt. 317-3 at 5.  This provides sufficient specificity for class members to evaluate the settlement, and indeed, this Court has approved a similar allocation disclosure as sufficiently specific

---

[8] Solo also argues the settlement agreement and the notice differ on whether the first payment will be 10 business days or 15 business days after approval of the new CBA. This is a meaningless quibble as the first payment was made months ago and there is no prejudice to any class member from this tiny administrative detail.

in *Ernst v. ZogSports Holding, LLC*. *See* 2019 WL 13143664, at *3–4 (C.D. Cal. Sept. 6, 2019); *Ernst*, Dkt. No. 64-4 (Class Notice) (the "Net Settlement Amount shall be distributed to Participating Class Members pro-rata, based upon their number of football seasons registered relative to the total number of football seasons of all Settlement Class Members"). And, in any event, Solo and all other class members have been informed of their specific recovery estimates, if the full attorneys' fee and expenses award is approved and if administration costs hit their $50,000 estimate. The projected pro rata share for each class member, based on the above assumptions, is included in the accompanying Kessler Declaration and is a more specific allocation than is often available in a class action settlement in which final distribution amounts cannot be determined until all steps have been completed.

Nor should Solo's contention, based on out of district, non-binding cases, that there have to be separate funds for Rule 23 claims and FLSA claims, impact approval; none of those cases (*Millan*, *Kaiser*, and *Hudson*) involved Title VII or EPA pay-discrimination claims like those here and are otherwise distinguishable.[9] Again, in *Ernst*, this Court approved a joint Rule 23 and FLSA settlement that used a single settlement fund for all settling members. *See Ernst*, Dkt. No. 64-3 (Agreement) & Dkt. 78 (Final Approval Order). This is the most reasonable and efficient means of settling such claims where, as here, the equal pay claims are for the same conduct and substantially overlap (indeed, the EPA damages period here is subsumed in the Title VII damages period). EPA claimants did not suffer different back pay damages compared

---

[9] The court in *Millan v. Cascade Water Service* faulted the adequacy of the class notice, deemed the release overbroad, and "[could not] determine whether the proposed settlement amount fairly compensates the putative class members for their injuries." 310 F.R.D. 593, 602, 608, 612–613 (E.D. Cal. 2015) (identifying various deficiencies). The court in *Smith v. Kaiser Foundation* likewise identified several issues that precluded preliminary approval, including class notice inadequacies, excessive service awards, and fee award discrepancies. 2019 WL 5864170, at *10–13 (S.D. Cal. Nov. 7, 2019). And in *Hudson v. Libre Technology*, the court faulted the lack of an opt-in procedure for the collective action while the parties here have already allowed members to opt in. 2019 WL 5963648, at *10 (S.D. Cal. Nov. 13, 2019).

with Title VII claimants, nor did they have a different theory of recovery for which the settlement should account. Rather, it is simply a difference in the time period that each individual played on the team. A pro rata distribution already accounts for the different time periods and games in which each class member played and is the fairest means by which to settle this action. Solo also has no standing to object on this basis as separating the damages into two funds (for EPA and Title VII claims) would only decrease her recovery, as she would receive a pro rata amount only of the portion designated for the Rule 23 claims. Indeed, because Solo is the only class member who has a separate EPA action filed, the class release exempts her EPA claims, so she is free to accept her almost $350,000 settlement payment here and continue pursuing her separate EPA action. Having suffered no injury, she has no standing to even raise this meritless objection.

And as detailed in Plaintiffs' preliminary approval motion (Dkt. 317 at 6–7), and previously recognized by this Court (Dkt. 320 at 2), the parties' settlement results from extensive negotiations. The parties first discussed a global settlement over six years ago when the dispute was before the EEOC. The parties have steadily engaged in several formal and informal settlement talks, including two mediations (one in August 2019 and the second in May 2021). These discussions involved the WNT players, key USSF leaders, counsel, and the WNT union. There is simply no "evidence to suggest that the settlement is not otherwise the product of an arm's-length negotiation." *Patton*, 2019 WL 6357266, at *3; *see also* Dkt. 320 at 4. Indeed, the parties' documented history of negotiations after significant discovery and extensive motion practice further supports final approval. *Herrera*, 2020 WL 2951122, at *4.

**D.      The collective action settlement also passes muster under the FLSA.**

Settlements that meet Rule 23 likewise satisfy the FLSA standard. *See Pan*, 2017 WL 3252212, at *11. The settlement terms are fair, reasonable, and resulted from arm's-length negotiations. The Court should thus approve the collective action settlement.

## VI.      CONCLUSION

For all of these reasons, the Court should grant final approval of the settlement.

Dated: November 1, 2022            WINSTON & STRAWN LLP

                                   By: */s/ Jeffrey L. Kessler*
                                   Jeffrey L. Kessler
                                   David G. Feher
                                   Cardelle B. Spangler
                                   Diana Hughes Leiden
                                   Jeanifer E. Parsigian
                                   Lev Tsukerman

                                   *Attorneys for Plaintiffs*

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO: 2:19-CV-01717-RGK-AGR