1   Jeffrey L. Kessler (*pro hac vice*)
    jkessler@winston.com
2   David G. Feher (*pro hac vice*)
    dfeher@winston.com
3   **WINSTON & STRAWN LLP**
    200 Park Avenue, New York, NY 10166
4   Tel:   (212) 294-6700
    Fax:   (212) 294-4700
5
    Cardelle B. Spangler (*pro hac vice*)
6   cspangler@winston.com
    **WINSTON & STRAWN LLP**
7   35 West Wacker Drive, Chicago, IL 60601
    Tel:   (312) 558-5600
8   Fax:   (312) 558-5700

9   Diana Hughes Leiden (SBN: 267606)
    dhleiden@winston.com
10  Lev Tsukerman (SBN: 319184)
    ltsukerman@winston.com
11  **WINSTON & STRAWN LLP**
    333 South Grand Avenue, Los Angeles, CA 90071
12  Tel:   (213) 615-1700
    Fax:   (213) 615-1750
13
    Jeanifer E. Parsigian (SBN: 289001)
14  jparsigian@winston.com
    **WINSTON & STRAWN LLP**
15  101 California St., 35th Floor, San Francisco, CA 94111
    Tel:   (491) 591-1000
16  Fax:   (491) 591-1400

17  *Attorneys for Plaintiffs*

18              **UNITED STATES DISTRICT COURT**

19             **CENTRAL DISTRICT OF CALIFORNIA**

20  ALEX MORGAN, et al.,                    **Case No. 2:19-CV-01717-RGK-AGR**

21                   Plaintiffs,            Assigned to: Judge R. Gary Klausner

22  v.                                      **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES**
23
    UNITED STATES SOCCER
24  FEDERATION, INC.,                       Date:  December 12, 2022
                                            Time: 9:00 a.m.
25                   Defendant.             Place: Courtroom: 850
26
27
28

---

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 12, 2022 at 9:00 a.m., or as soon thereafter as the matter may be heard, in courtroom 850 of the above-titled court, located at 255 East Temple Street, Los Angeles, California 90012, plaintiffs Alex Morgan, et al. (collectively, "Plaintiffs") will and hereby do move the Court for an order:

1. Awarding class counsel $6.6 million in attorneys' fees; and

2. Approving reimbursement of $1,319,127 in expenses incurred by class counsel, plus $50,000 in anticipated settlement administration costs.

This motion is based upon this notice of motion, the accompanying memorandum of points and authorities, the accompanying declaration of Jeffrey L. Kessler and exhibits thereto, the proposed order filed concurrently herewith, the records and files in this action, and any other written or oral submissions that may be presented at or before the hearing on this motion.

Pursuant to Local Rule 7-3, Defendant takes no position on this motion.

Dated: November 1, 2022          WINSTON & STRAWN LLP

By: */s/ Jeffrey L. Kessler*
    Jeffrey L. Kessler

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND AND COUNSEL'S WORK ................................. 2

    A.    Class counsel devoted significant time and effort to pre-lawsuit investigation, research, and work. ................................................................. 2

    B.    Counsel defeats a transfer motion and obtains class certification. ............ 3

    C.    Counsel devoted significant time to fact and expert discovery. ................ 3

    D.    Class counsel moves for summary judgment and prepares for trial. ......... 5

    E.    Counsel delivers a strong settlement on Plaintiffs' non-pay claims. ......... 5

    F.    Class counsel appeals the Court's summary judgment ruling and then delivers a strong settlement on Plaintiffs' pay-discrimination claims. ....... 6

III.    LEGAL STANDARD ........................................................................................ 7

IV.    ARGUMENT ..................................................................................................... 9

    A.    Class counsel achieved landmark settlements that will provide both immediate and future benefits to WNT players. ..................................... 11

    B.    Counsel's experience, effort, and skill favor a 30% fee award. .............. 13

    C.    This case's factual and legal complexity favors a 30% fee award. ......... 14

    D.    Counsel's contingency arrangement supports a 30% fee award .............. 15

    E.    The classes have reacted favorably to the fee request, with just one objection. ................................................................................................. 16

    F.    The lodestar method strongly confirms that a 30% fee request is reasonable. .............................................................................................. 18

    G.    Class counsel should be reimbursed for reasonably incurred costs ........ 19

V.    CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aichele v. City of Los Angeles*,
    No. 12-CV-10863-DMG-FFMx, 2015 WL 5286028 (C.D. Cal. Sept.
    9, 2015) ........................................................................................................ 8

*Alikhan v. Goodrich Corp.*,
    No. 17-CV-6756-JGB-RAOx, 2020 WL 4919382 (C.D. Cal. June 25,
    2020) ........................................................................................................... 9

*Alvarez v. XPO Logistics Cartage, LLC*,
    No. 18-CV-03736-RGK-E, 2022 WL 644168 (C.D. Cal. Feb. 8, 2022)
    .................................................................................. 9, 13, 15, 17

*In re Anthem, Inc. Data Breach Litig.*,
    No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 8, 2018)
    .................................................................................. 10, 12, 19, 20

*Barbosa v. Cargill Meat Sols. Corp.*,
    297 F.R.D. 431 (E.D. Cal. 2013) ........................................................ 9, 15

*Burden v. SelectQuote Ins. Servs.*,
    No. 10-CV-5966-LB, 2013 WL 3988771 (N.D. Cal. Aug. 2, 2013) ....... 8

*Carlin v. DairyAmerica, Inc.*,
    380 F. Supp. 3d 998 (E.D. Cal. 2019) ......................................... *passim*

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 1917, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ....................... 10

*Cheryl Gaston v. FabFitFun, Inc.*,
    No. 20-CV-09534-RGK-E, 2021 WL 6496734 (C.D. Cal. Dec. 9,
    2021) ......................................................................................................... 12

*Fernandez v. Victoria Secret Stores, LLC*,
    No. 06-CV-04149-MMM-SHx, 2008 WL 8150856 (C.D. Cal. July 21,
    2008) .................................................................................... *passim*

*Harrison v. Bank of Am. Corp.*,
    No. 19-CV-00316-LB, 2021 WL 5507175 (N.D. Cal. Nov. 24, 2021) ......... 9

ii

*In re Heritage Bond Litig.*,
  No. 02-ML-1475-DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ............. *passim*

*Keller v. Elec. Arts, Inc.*,
  No. 09-CV-1967-CW, 2015 WL 5005057 (N.D. Cal. Aug. 18, 2015) ....... 14, 18, 19

*Moreyra v. Fresenius Med. Care Holdings, Inc.*,
  No. 10-CV-517-JVS-RZx, 2013 WL 12248139 (C.D. Cal. Aug. 7,
  2013) .................................................................................................. 8, 15, 17, 18

*Pan v. Qualcomm Inc.*,
  No. 16-CV-01885-JLS-DHB, 2017 WL 3252212 (S.D. Cal. July 31,
  2017) ........................................................................................................ *passim*

*Saldivar v. Priority One Med. Transp., Inc.*,
  No. 09-CV-04789-MMM-Ex, 2011 WL 13213889 (C.D. Cal. Mar.
  22, 2011) ................................................................................................ 9, 16, 17

*Singer v. Becton Dickinson & Co.*,
  No. 08-CV-821-IEG-BLM, 2010 WL 2196104 (S.D. Cal. June 1,
  2010) ............................................................................................................... 15

*Vedachalam v. Tata Consultancy Servs., Ltd*,
  No. 06-CV-0963-CW, 2013 WL 3941319 (N.D. Cal. July 18, 2013) ............... 9, 19

*Vizcaino v. Microsoft Corp.*,
  142 F. Supp. 2d 1299 (W.D. Wash. 2001), *aff'd*, 290 F.3d 1043 (9th
  Cir. 2002) ....................................................................................................... 10

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ........................................................................ 8

## I.    INTRODUCTION

After more than three years of litigation, Plaintiffs and the U.S. Soccer Federation ("USSF") have resolved this multi-faceted class action lawsuit with two landmark agreements: one providing for equal working conditions between the U.S. Senior Women's National Soccer Team ("WNT") and the U.S. Senior Men's National Soccer Team ("MNT"); and the other providing $22 million in damages to the Equal Pay Act and Title VII class members, a $2 million fund supporting post-career initiatives, and most importantly, an agreement to provide equal pay going forward for current and future WNT players for all WNT competitions, including the World Cup. Having favorably settled all claims, class counsel now seeks $6.6 million (or 30% of the $22 million common fund) in attorneys' fees. This amount represents less than 60% of class counsel's lodestar. *See* Kessler Decl. ¶¶ 25–27.[1] And no additional attorneys' fees are being sought in connection with the $2 million benefit fund for class members that is part of the settlement package.

Not only have courts in this Circuit regularly granted similar fee awards from class action settlement funds, but all relevant factors strongly favor such an award here. **First**, both settlements achieved Plaintiffs' most important and historic goal: equality in pay and in working conditions between the WNT and MNT. And the more recent pay-claims settlement also adds an eight-figure payout *plus* an additional $2 million fund that will benefit WNT players in their post-career endeavors and support charitable efforts related to women's and girls' soccer. **Second**, class counsel's expertise in employment and sports law paired with the nearly 16,000 hours and more than $12 million in attorney time and out-of-pocket expenses devoted to this case favor the proposed fee award. This landmark settlement did not come easily: the parties exchanged tens of thousands of documents, took nearly twenty depositions, retained multiple experts each, litigated a number of discovery disputes, briefed class

---

[1] Unless otherwise noted, all citations to "Kessler Decl." are to the concurrently filed Declaration of Jeffrey L. Kessler.

certification and cross-motions for summary judgment, fully briefed a Ninth Circuit appeal, participated in two formal mediations, and negotiated two hard-fought settlements. **Third**, class counsel accomplished all this with uniquely complicated facts and novel complexities involving multiple interested parties and nearly a decade of collective bargaining history and agreements with both the WNT and the MNT. **Fourth**, class counsel fought for Plaintiffs entirely on contingency—recognizing that there might never be payment for the thousands of hours worked or millions of dollars invested in the case. **Fifth**, the fee request has near universal support from the classes, with just one member objecting. **Sixth**, as noted above, the lodestar method (yielding about $11.49 million in fees) confirms the reasonableness of a percentage-based approach yielding a much smaller $6.6 million figure. **Finally**, class counsel entered into engagement letters with each of the class members who appeared in the case and collective action in which those class members agreed to a 30% contingency fee after expenses. Kessler Decl. ¶ 23. The proposed award is thus entirely consistent with the agreement and expectation of the class members.

Considering all of these factors, the Court should approve the requested 30% fee award here. The Court should also approve reimbursement of $1,319,127 in reasonably and necessarily incurred costs (a significant portion of which were essential expert fees) plus $50,000 in anticipated costs for administering the parties' pay-claims settlement.

## II.    FACTUAL BACKGROUND AND COUNSEL'S WORK

### A.    Class counsel devoted significant time and effort to pre-lawsuit investigation, research, and work.

Before filing suit, class counsel thoroughly investigated Plaintiffs' gender-discrimination claims. Counsel specifically: (1) conducted informational interviews with current and former WNT players; (2) scrutinized the terms of USSF's collective bargaining agreements with WNT and MNT players; (3) compared the complicated pay structures in USSF's CBAs with the MNT and WNT; (4) assessed USSF's historical treatment of its senior national teams in their working conditions; (5) familiarized

themselves with the market for and interest in both men's and women's international soccer; (6) developed legal theories grounded in provable facts; and (7) corresponded with USSF's counsel on the merits of Plaintiffs' discrimination claims. Class Counsel also represented the four named plaintiffs in their complaint to the EEOC, which was a requisite to filing the claims in this case. Kessler Decl. ¶ 6.

These efforts eventually led to a strong collective and class action complaint that USSF never challenged with a motion to dismiss. *See* Dkt. 1.

**B.    Counsel defeats a transfer motion and obtains class certification.**

Early on, class counsel successfully opposed USSF's motion to transfer venue to the Northern District of California. *See* Dkt. 56. This was a critical win because it avoided the possibility that the Northern District of California would then transfer the case to the Northern District of Illinois, where USSF is based and a circuit with less favorable precedent for class members. *See* Dkt. 50 at 1.

Shortly after that victory, class counsel spent significant time investigating, researching, and briefing class and collective action certification. *See* Dkts. 64 & 70. And while USSF opposed certification, the Court sided with Plaintiffs and certified all three requested classes of WNT players (a Title VII damages class, a Title VII injunctive relief class, and a FLSA collective action). *See* Dkt. 98 at 14–15.

**C.    Counsel devoted significant time to fact and expert discovery.**

Class counsel vigorously pursued Plaintiffs' claims through extensive, time-consuming fact discovery. From August 2019 through February 2020, Plaintiffs served 67 document requests and 16 interrogatories. Kessler Decl. ¶ 7. Plaintiffs responded to USSF's interrogatories and document requests, many of which required class counsel to gather information and documents from the 28 individual Plaintiffs. *See id.* All told, the parties collectively produced tens of thousands of documents. *Id.* ¶ 8. Class counsel spent substantial time collecting, reviewing, and making privilege, confidentiality, and responsiveness calls for thousands of documents. *Id.* These efforts led to a 121-page, 1,000-document-plus privilege log for Plaintiffs' productions. *Id.* And that was only

half the picture.  Class counsel then had to review USSF's documents to prove Plaintiffs' case.  *Id.* ¶ 9.  This was all while counsel extensively negotiated the scope and substance of discovery through numerous meet and confers and adjudicated many discovery disputes with the Court.  *Id.* ¶ 10.

Class counsel took and defended nearly twenty fact depositions in this case.  *Id.* ¶ 11.   Winston & Strawn attorneys deposed seven USSF current or former employees: former USSF Presidents Carlos Cordeiro and Sunil Gulati; the former Chief Commercial Officer, Jay Berhalter; the Managing Director of Administration, Tom King; the former Head Coach of the WNT, Jill Ellis; the Chief Financial Officer, Pinky Raina; and Senior Counsel Greg Fike.  *Id.*  They also deposed Visa and Coke, two key third-party sponsors.  *Id.*  Class counsel also defended ten depositions taken by USSF, including those for all four class representatives and Becca Roux, the WNT union's Executive Director.  *Id.*

Expert discovery was just as rigorous.  Plaintiffs retained and class counsel paid for three experts: Dr. Finnie Cook, an economist who opined on the amount of Plaintiffs' back pay damages; Dr. Caren Goldberg, a human resource expert and consultant who opined on the differences in working conditions between the WNT and MNT; and Dr. Roger Noll, a well-published sports economist and economics professor at Stanford University who rebutted USSF's economic analyses on identifying and measuring a gender wage pay gap.  *Id.* ¶ 12.  Winston & Strawn attorneys worked closely with all three experts as they prepared a combined six expert reports (covering opening, rebuttal, and supplemental reports) and were deposed by USSF.  *Id.*  Class counsel also analyzed reports from USSF's three experts: Phillip Miscimarra, a partner at the national law firm Morgan, Lewis & Bockius LLP; Carlyn Irwin, a senior advisor with the economics consulting firm Cornerstone Research; and Dr. Justin McCrary, an economist and professor at Columbia University.  *Id.* ¶ 13.  Class counsel deposed each USSF expert.  *Id.*

1      All told, class counsel devoted thousands of hours to fact and expert discovery to
2   carefully develop a strong record on the parties' claims and defenses. *Id.* ¶ 14.

3          **D.    Class counsel moves for summary judgment and prepares for trial.**

4      In February 2020, the parties fully briefed competing summary judgment
5   motions—ones that would decide case-dispositive issues. *See* Dkts. 170, 171. In the
6   first half of 2020, class counsel spent significant time and resources preparing for trial
7   on both Plaintiffs' pay and working conditions claims, which was initially scheduled
8   for May 5, 2020.[2] Kessler Decl. ¶ 16. This included briefing motions in limine (with
9   class counsel drafting 11 such motions and preparing oppositions for 5 such motions
10  from USSF) and drafting and exchanging pretrial submissions, including witness lists,
11  exhibit lists, deposition designations, and jury instructions. *Id.* Class counsel continued
12  trial preparation on the surviving working-conditions claims after the Court's summary
13  judgment decision. *Id.* ¶ 17.

14         **E.    Counsel delivers a strong settlement on Plaintiffs' non-pay claims.**

15     The parties (with class counsel at the helm for Plaintiffs) have discussed
16  settlement on the pay and non-pay claims dating as far back as the EEOC's investigation
17  of Plaintiffs' charges in 2016. *Id.* ¶ 18; *see* Dkt. 1 ¶ 87. After this lawsuit was filed in
18  2019, those settlement negotiations continued, formally and informally, including in a
19  formal two-day mediation in August 2019 with class counsel, class representatives, and
20  senior USSF officials and counsel present. Kessler Decl. ¶ 18. The parties also engaged
21  in informal settlement communications through the close of discovery and pretrial
22  preparation. *Id.*

23     These settlement negotiations intensified after the Court's summary judgment
24  ruling. Class counsel, with decades of collective experience in sports class action and
25  employment matters, led such efforts for Plaintiffs. *See* Dkt. 64-1 ¶¶ 5–15 (describing

26  _____

27  [2] On May 1, 2020, the Court granted summary judgment to USSF on Plaintiffs' pay-
    discrimination claims. It denied in part USSF's summary judgment motion on
28  Plaintiffs' claims for unequal working conditions and set those claims for trial. *See* Dkt. 250.

class counsel's experience in similar matters); *see also* Kessler Decl., Exs. 1 (attorney biographies) & 2 (firm practice area materials). From July through November 2020, the parties continually discussed a potential settlement of Plaintiffs' working-conditions claims. Kessler Decl. ¶ 19. This included several formal virtual meetings plus extensive informal negotiation through regular calls and correspondence. *Id.* During this time, the parties exchanged multiple drafts of a proposed settlement agreement and policy documents. *Id.* Class counsel spent significant time negotiating and finalizing an agreement that would provide for equality in the players' working conditions. *Id.*

Class counsel achieved a working-conditions settlement providing for equal treatment in late 2020. The parties negotiated a settlement under which USSF would implement revised charter flight, venue selection, professional support, and hotel accommodation policies intended to ensure equality with the MNT moving forward.[3] *See* Dkt. 293 at 2. Those policies will remain in effect for four years and apply to all current and future WNT players. *Id.* The Court approved the working-conditions settlement in April 2021 with no class member objections. Dkt. 304 at 1; Dkt. 305 at 1.

**F.     Class counsel appeals the Court's summary judgment ruling and then delivers a strong settlement on Plaintiffs' pay-discrimination claims.**

The parties' working-conditions settlement paved the way for Plaintiffs' appeal of the final judgment on the pay-discrimination claims. *See* Dkt. 305 at 1; Dkt. 308. Class counsel worked closely with appellate specialists at co-counsel firm Mayer Brown in briefing that appeal and preparing for the oral argument. Kessler Decl. ¶ 20.

Throughout this period, the parties continued to engage in extensive settlement discussions to resolve Plaintiffs' pay-discrimination claims—with such efforts again led by class counsel. *Id.* ¶ 21. This included a full-day mediation in May 2021 that, while unsuccessful in resolving the pay-discrimination claims, led to continued dialogue. *Id.*

---

[3] Plaintiffs' motions for preliminary approval and final approval of that settlement, along with the Court's order approving the settlement, provide a more detailed explanation of the working-conditions settlement's terms. *See* Dkts. 276, 293, 297, 304, 305.

These informal calls and correspondence led to repeated back-and-forth exchanges of proposed term sheets and further negotiations via calls and correspondence. *Id.*

The parties eventually settled Plaintiffs' pay-discrimination claims in late February 2022—just weeks before, and as they simultaneously prepared for, their Ninth Circuit oral argument. *Id.* ¶ 22. These months of negotiations again demanded substantial time and effort to reach a settlement of Plaintiffs' pay-discrimination claims. *Id.* ¶¶ 21–22.

This settlement has three components. First, USSF will pay Plaintiffs $22 million into a damages fund in four equal installments over a four-year period ($5.5 million per year) as a back pay award. Dkt. 317 at 8. Second, USSF will deposit $2 million in an escrow account to further Plaintiffs' post-playing career goals and charitable efforts related to women's and girls' soccer. *Id.* Class members will be able to apply for grants from this $2 million fund for school tuition, job training, coach training, referee licenses, training in high performance and sporting analytics, internships, investments in soccer-related charitable programs, and/or other women's or girls' soccer-related activities. *Id.* Third, and most importantly, USSF will provide an equal rate of pay to WNT and MNT players alike for friendlies, all other games and tournaments, and in the Men's and Women's World Cups on a going forward basis. *Id.* at 8–9. The WNT players' union has now finalized a new CBA with USSF with these terms, which were a condition of the settlement agreement. *See id.* at 9.[4]

The Court preliminarily approved the parties' pay-claims settlement on August 11, 2022. Just one class member, Hope Solo, objected to the settlement. Kessler Decl. ¶ 39.

### III.  LEGAL STANDARD

"A lawyer who recovers 'a common fund for the benefit of persons other than himself or his client' is entitled to reasonable attorney fees from the fund as a whole.'"

---

[4] Plaintiffs' motion for preliminary approval provides a fuller explanation of the pay settlement's terms. *See* Dkt. 317 at 7–10.

*Moreyra v. Fresenius Med. Care Holdings, Inc.*, No. 10-CV-517-JVS-RZx, 2013 WL 12248139, at *1 (C.D. Cal. Aug. 7, 2013).  Courts have discretion to use either a percentage or lodestar method to decide appropriate attorneys' fees. *Pan v. Qualcomm Inc.*, No. 16-CV-01885-JLS-DHB, 2017 WL 3252212, at *11 (S.D. Cal. July 31, 2017). The percentage approach "requires the court to simply determine what percentage of the fund would provide class counsel with a reasonable fee under all the circumstances." *Moreyra*, 2013 WL 12248139, at *1.  "Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests …." *Aichele v. City of Los Angeles*, No. 12-CV-10863-DMG-FFMx, 2015 WL 5286028, at *5 (C.D. Cal. Sept. 9, 2015).

Courts consider several factors in assessing fee awards: "(1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's l[ode]star." *Fernandez v. Victoria Secret Stores, LLC*, No. 06-CV-04149-MMM-SHx, 2008 WL 8150856, at *11 (C.D. Cal. July 21, 2008); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–52 (9th Cir. 2002) (outlining relevant factors).  Courts use the lodestar approach to "cross-check" the reasonableness of a percentage-based award. *Vizcaino*, 290 F.3d at 1050.

Courts also reimburse counsel for reasonable expenses. *Burden v. SelectQuote Ins. Servs.*, No. 10-CV-5966-LB, 2013 WL 3988771, at *5 (N.D. Cal. Aug. 2, 2013). "Such expense awards comport with the notion that the district court may 'spread the costs of the litigation among the recipients of the common benefit.'" *Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1023 (E.D. Cal. 2019).

## IV.   ARGUMENT

Class counsel seeks $6.6 million (30% of the $22 million common damages fund) in attorneys' fees.[5]  This request is consistent with attorneys' fees awards of 30% or more in complex class action cases that have frequently been granted in this Circuit. *See, e.g.*, *In re Heritage Bond Litig.*, No. 02-ML-1475-DT, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) ("[T]he Court notes that courts in this circuit, as well as other circuits, have awarded attorneys' fees of 30% or more in complex class actions."). Indeed, "many cases in this circuit … have granted fee awards of approximately 30% or more." *Vedachalam v. Tata Consultancy Servs., Ltd*, No. 06-CV-0963-CW, 2013 WL 3941319, at *2 (N.D. Cal. July 18, 2013) (fee award of 30% (about $8.9 million) of $29,750,000 settlement fund); *see, e.g.*, *Alvarez v. XPO Logistics Cartage, LLC*, No. 18-CV-03736-RGK-E, 2022 WL 644168, at *4 (C.D. Cal. Feb. 8, 2022) (fee award of 33.33% (about $6.7 million) of $20 million fund in case alleging California Labor Code and Business and Professions Code violations); *Pan*, 2017 WL 3252212, at *11–13 (fee award of 29.6% (about $5.8 million) of $19.5 million fund in case bringing Title VII and EPA gender-discrimination claims); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *23 (fee award of 33.33% (about $9.3 million) of the $27.8 million fund in securities case).[6]

---

[5] The Ninth Circuit has deemed a 25% fee award a benchmark to consider in evaluating reasonableness, with awards in common fund cases, like this one, typically "exceed[ing]" the benchmark percentage.  *See, e.g.*, *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013) ("'[I]n most common fund cases, the award exceeds that benchmark' percentage."); *Saldivar v. Priority One Med. Transp., Inc.*, No. 09-CV-04789-MMM-Ex, 2011 WL 13213889, at *13 (C.D. Cal. Mar. 22, 2011) ("Awards in the rage of 33.33% of a settlement fund are not atypical in common fund cases." (citing Ninth Circuit survey of settlements of $50 million to $200 million)).

[6] Courts have awarded similar fees in cases with even smaller common funds. *See, e.g.*, *Harrison v. Bank of Am. Corp.*, No. 19-CV-00316-LB, 2021 WL 5507175, at *7 (N.D. Cal. Nov. 24, 2021) (fee award for 30% (about $3.5 million) of the $11.5 million fund in wage and hour matter); *Fernandez*, 2008 WL 8150856, at *11 (fee award for 34% (about $2.9 million) of the $8.5 million fund in wage and hour matter); *Alikhan v. Goodrich Corp.*, No. 17-CV-6756-JGB-RAOx, 2020 WL 4919382, at *1, *9 (C.D. Cal.

Each relevant factor supports 30% as a reasonable attorneys' fee award here. This is especially true as class counsel is not seeking any additional fee award with respect to the $2 million benefit fund for class members.  Plus, counsel's fee award would be paid out over time as USSF makes its yearly $5.5 million installments over a four-year period; class counsel would not take all of its fees from USSF's first two payments and would instead collect incrementally each year as the class itself is paid out.  Kessler Decl. ¶ 38.  This structure allows Plaintiffs to realize millions of dollars faster at the expense of class counsel taking all of its fees off the top of the first two payments.

Counsel also seeks reimbursement of $1,319,127 in reasonably incurred costs and $50,000 in anticipated costs to administer the fund.  These incurred costs, among other things, covered significant expert witness fees that were essential to the case, in addition to the other normal complex litigation hotel and transportation costs associated with attending depositions and court hearings; copying; postage; depositions and court reporters; and mediation—all of which were necessary to effectively pursue the litigation on behalf of class members.  And the conservatively estimated $50,000 in anticipated administration costs will cover all costs for administering the parties' settlement, including those for assistance from Plaintiffs' expert Dr. Cook in allocating the $22 million common fund.

For the reasons detailed below, the Court should approve a $6.6 million fee award (30%) and reimbursement of $1,369,127 ($1,319,127 plus $50,000) in costs.

---

June 25, 2020) ($497,182.50 fee award which was "just shy of 30% of the Gross Settlement Amount" in wage and hour class action).  The same is true for cases with larger settlement funds. *See, e.g.*, *Carlin*, 380 F. Supp. 3d at 1006 (fee award of 33% (about $13.3 million) of $40 million fund in case about misreporting of milk prices); *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1301, 1306 (W.D. Wash. 2001), *aff'd*, 290 F.3d 1043 (9th Cir. 2002) (fee and expense award of 28% (about $27 million) of $97 million fund); *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *9, *34 (N.D. Cal. Aug. 8, 2018) (fee award of 27% (about $31 million) of $115 million settlement fund); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *1 (N.D. Cal. Aug. 3, 2016) (fee award of 27.5% of $576,750,000 common fund).

**A.      Class counsel achieved landmark settlements that will provide both immediate and future benefits to WNT players.**

The result obtained "is a significant factor" in making a fee award. *In re Heritage Bond Litig.*, 2005 WL 1594403, at *19; *Carlin*, 380 F. Supp. 3d at 1019 (discussing that the "'degree of success obtained' is 'the most critical factor'").  The two settlements here represent major, hard-fought and historic victories strongly favoring a 30% fee award.

First, Plaintiffs sued to equalize working conditions between the United States' senior national soccer teams.  They sought equality with the MNT in hotel accommodations, charter flights, game venues, and professional support.  Class counsel negotiated a settlement achieving that exact goal—and not just for current WNT players but for future ones too.  The agreed-to policies will greatly improve the day-to-day life of WNT players by enhancing multiple aspects of the job—from travel, to support, to match-day playing surfaces.  And if USSF and the MNT ever agree to a more favorable policy in any of the four covered areas during the settlement's effective period, the WNT players will be able to take advantage of the more favorable MNT policy.

The pay-claims settlement is even more powerful.  Plaintiffs brought their pay-discrimination claims to equalize the rates of pay afforded to WNT and MNT players alike in all types of competitions, including the World Cup, and to recover millions of dollars in back pay. USSF repeatedly stated that it would never agree to provide equal pay in all of these competitions and fought as hard as it could to resist doing so. Despite this fierce opposition, class counsel again achieved the fundamental equality goals of the litigation.

First, counsel negotiated for a $22 million damages payout, representing about one-third of the $64 million in back pay losses estimated by Plaintiffs' damages expert, Dr. Finnie Cook, as of March 2020.  *See* Dkt. 212-1 at 31 (calculating back pay losses

of $63,822,242 before interest).[7]  This substantial recovery itself—more than 34%—favors an increase from the Ninth Circuit's 25% benchmark.  Indeed, this District has previously found that a $27.8 million settlement fund representing "36% of the class's total net loss" was an "exceptional result" supporting a 33.3% fee award.  *See In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 (collecting cases of 30-percent-plus fee awards where settlement fund recovered 10 to 17 percent of damages); *Carlin*, 380 F. Supp. 3d at 1021–22 (collecting cases awarding 30-plus-percent in fees when the common fund represented 32 to 36 percent of the damages).  And this payout analysis ***excludes*** the additional $2 million fund that will further the WNT players' goals and charitable efforts once they hang up their cleats, and for which no attorneys' fee award is being sought.

Most importantly, USSF agreed to provide an equal rate of pay to WNT and MNT players alike for friendlies, tournaments, and in the Men's and Women's World Cups—the very crux of this lawsuit and the single-most important relief sought here.  While this is not immediately quantifiable, it is certainly a "relevant circumstance" in assessing a fee award.  *See In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *8.  And, in fact, this equal pay treatment has led to substantial increases in WNT compensation in the new CBA.  Given the substantial and historic benefit afforded to both current and future WNT players through the equal pay agreement now embodied in the new CBA, the pay-claims settlement strongly favors a fee award here.  *See Cheryl Gaston v. FabFitFun, Inc.*, No. 20-CV-09534-RGK-E, 2021 WL 6496734, at *3 (C.D. Cal. Dec. 9, 2021); *see Pan*, 2017 WL 3252212, at *12 (finding that programmatic, non-monetary relief that was "specifically tailored to address the lasting discrimination" supported increase from benchmark).

---

[7] Dr. Cook submitted a supplemental expert report on April 10, 2020 with updated damages calculations.  Her updated calculations found $65,128,464 in back pay losses for the Title VII class.

1  And Plaintiffs achieved these incredible results relief despite an adverse summary

2  judgment ruling which had not yet been reviewed on appeal.  In sum, the substantial

3  and historic results achieved strongly support a 30% fee award.

4  **B.    Counsel's experience, effort, and skill favor a 30% fee award.**

5  The "prosecution and management of a complex national class action requires

6  unique legal skills and abilities." *In re Heritage Bond Litig.*, 2005 WL 1594403, at *19.

7  "[I]f Counsel has represented 'intimate knowledge of the case,' and applied their unique

8  skills to obtain favorable results, this factor should weigh in favor of an increase in the

9  benchmark rate." *Carlin*, 380 F. Supp. 3d at 1021.  The Winston & Strawn attorneys

10  here are "qualified, experienced, and skilled" and "prosecuted this action effectively."

11  *Fernandez*, 2008 WL 8150856, at *12 (factor favored "a generous fee award").  Indeed,

12  in appointing Winston & Strawn as class counsel, this Court found that the team here

13  "ha[s] significant employment law and class action experience," Dkt. 98 at 12, and also

14  deemed Winston & Strawn a "world-renowned law firm[]" in preliminarily approving

15  the parties' working-conditions settlement, Dkt. 293 at 4.

16  For over three years, class counsel fought against two highly respected law firms

17  in Latham & Watkins LLP and Seyfarth Shaw LLP.  *See In re Heritage Bond Litig.*,

18  2005 WL 1594403, at *19–20 (fee award where counsel obtained "exceptional result"

19  while being "opposed by highly skilled and respected counsel with well-deserved local

20  and nationwide reputations for vigorous advocacy").  This entailed a mountain of work:

21  exchanging and reviewing tens of thousands of documents, taking and defending nearly

22  twenty fact depositions, retaining and working with multiple experts, obtaining class

23  certification, briefing summary judgment, and fully briefing a federal appeal.  All told,

24  class counsel devoted nearly 16,000 hours to this case (Kessler Decl. ¶ 26) and

25  "shoulder[ed] the burden on discovery, motion practice, and trial preparation." *Alvarez*,

26  2022 WL 644168, at *4 (factor favored 33.33% fee award where counsel worked about

27  15,000 hours).

28  This substantial effort thus also favors a 30% fee award.

### C.    This case's factual and legal complexity favors a 30% fee award.

"[T]he novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award." *In re Heritage Bond Litig.*, 2005 WL 1594403, at *20.  These considerations apply here.  To start, this case is not an ordinary class action lawsuit involving a single class.  It involves three discrete, yet overlapping, classes: a Title VII damages class, a Title VII injunctive relief class, and an EPA collective action—all of which the Court certified.  *See* Dkt. No. 98.  It demanded a deep dive into the collective bargaining history between USSF and both team unions—the WNT's union and the MNT's union—going back nearly a decade.  Kessler Decl. ¶ 15.  And those negotiations yielded multiple CBAs that required a thorough, side-by-side analysis to identify historical pay and treatment disparities.  *Id.*  This also entailed a multi-year comparison of MNT and WNT players' compensation; their modes of transportation and hotel accommodations; their venue surface conditions; USSF's spend on player airfare, hotels, and meals; and overall team performance.  *Id.*  And unlike many other class action lawsuits, this case was not just about money; a single damages number would not resolve Plaintiffs' claims.  Injunctive relief—both on working conditions and establishing an equal rate of pay going forward—was a critical, non-monetary aspect that Plaintiffs pursued relentlessly.

The legal side too presented novel complexities, particularly on how to understand and apply an equal "rate of pay" when presented with competing collective bargaining agreements involved differing and complicated pay structures.  Navigating this key issue, especially with the intricate facts here, demanded "a high level of skill and high-quality work to overcome." *Keller v. Elec. Arts, Inc.*, No. 09-CV-1967-CW, 2015 WL 5005057, at *3 (N.D. Cal. Aug. 18, 2015).  Indeed, this very issue decided summary judgment and became the focus of Plaintiffs' Ninth Circuit appeal.  And as other courts have noted, "successfully proving legally cognizable employment discrimination can often be difficult." *Pan*, 2017 WL 3252212, at *12 (complexity

supported a 29.6% fee award); *see also Fernandez*, 2008 WL 8150856, at *13 (factor supported 34% award where "the case was both legally novel and factually complex").

All told, this case "concerned relatively uncharted territory," was "factually complex," and "was marked by extensive motion practice"—all of which support a 30% fee award.  *In re Heritage Bond Litig.*, 2005 WL 1594403, at *20.

### D.    Counsel's contingency arrangement supports a 30% fee award.

"Courts consistently recognize that the risk of non-payment or reimbursement of expenses is a factor in determining the appropriateness of counsel's fee award."  *Id.* at *21.  And courts will increase the 25% benchmark "to reward counsel for investing 'substantial time, effort, and money, especially in light of the risks of recovering nothing.'"  *Carlin*, 380 F. Supp. 3d at 1021.  Class counsel fits this mold exactly.  As discussed above and below, counsel invested thousands of hours, and more than $12 million in attorney fee time and expenses, into a uniquely complicated case for over three years.  Kessler Decl. ¶¶ 26, 34.  And counsel did so "entirely on contingency, facing the risk that they would dedicate years of time to this litigation and not be compensated."  *Alvarez*, 2022 WL 644168, at *4 (factor favored 33.33% fee award); *Carlin*, 380 F. Supp. 3d at 1021 (factor supported fee award given "the financial risk Counsel undertook, given the risks of litigation, the substantial amount of time they needed to invest in moving this suit close to trial, and possibility of non-payment").

After the Court granted summary judgment on Plaintiffs' pay-discrimination claims, Plaintiffs appealed to the Ninth Circuit.  While Plaintiffs were confident in their case, success was far from certain.  And "where recovery is uncertain, an award of one-third of the common fund as attorneys' fees has been found to be appropriate."  *Barbosa*, 297 F.R.D. at 449.  Courts have routinely found so.  *See, e.g.*, *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG-BLM, 2010 WL 2196104, at *8 (S.D. Cal. June 1, 2010) (contingency arrangement supported 33% fee award in wage and hour class action); *Moreyra*, 2013 WL 12248139, at *3 (33% fee award where "there always was a likelihood that Plaintiffs would recover nothing subject to appeals"); *In re Heritage*

*Bond Litig.*, 2005 WL 1594403, at *21 (33.33% fee award where "counsel proceeded entirely on contingency basis, while paying for all expenses incurred," and where "[t]here was no guarantee of any recovery").

The specific contingency agreements here also support class counsel's request. The 28 individual Plaintiffs who appeared in the case and class counsel agreed that counsel would be awarded 30% of the total proceeds recovered on behalf of the players, after the payment of expenses, subject to court approval, with the remaining 70% paid to the players.  Kessler Decl. ¶ 23.

This factor thus also favors a 30% fee award.

### E.   The classes have reacted favorably to the fee request, with just one objection.

"The existence or absence of objectors to the requested attorneys' fee is a factor i[n] determining the appropriate fee award."  *In re Heritage Bond Litig.*, 2005 WL 1594403, at *21.  The "lack of objection weighs in favor" of a fee award. *See Saldivar*, 2011 WL 13213889, at *14.

The class notice here advised class members that they could object to the settlement terms and to counsel's expected fee request.  *See* Dkt. 317-3 at 6.  The notice advised that class counsel would seek $6.6 million in attorneys' fees (or 30% of the $22 million fund), plus up to $1,319,127 in costs incurred and $50,000 in anticipated settlement administration costs.  *Id.* at 5.  Just one class member, Hope Solo, objected to the fee request.  *See* Kessler Decl. ¶ 39; Dkt. 325 at 9–10.  That objection is meritless.

Solo argues that the fee request here is "improper as neither reasonable nor necessary."  But she gives no explanation for her objection to the fees other than the fact that 30% is higher than the starting 25% benchmark discussed in the cases.  In advancing this objection, Solo fails to address any of the relevant facts or law.  She first ignores the tremendous amount of work spent by class counsel to achieve an eight-figure settlement, equal pay, and equal working conditions—all after an adverse summary judgment ruling.  She then erroneously combines counsel's fees and expenses

request to argue that counsel "seek[s] nearly 36% of the Settlement Fund"—11% more than the Ninth Circuit benchmark. Dkt. 325 at 9. This is a complete distortion, as the Court will immediately recognize. The Ninth Circuit has a 25% benchmark, but that is a benchmark against a fees request; litigation expenses are not included in the percentage-based approach and are separately awarded. *See, e.g.*, *Moreyra*, 2013 WL 12248139, at *2, *5 (33% fee award *plus* an additional six-figure expense reimbursement); *Saldivar*, 2011 WL 13213889, at *2, *14 (awarding one-third of the settlement fund in fees *plus* reasonably incurred expenses); *Alvarez*, 2022 WL 644168, at *7 (awarding one-third of the settlement fund in fees *plus* almost $400,000 in expenses). Further, Solo ignores all of the case law, discussed above, which indicates that the 25% benchmark is routinely exceeded in a complex case, with a substantial recovery like this, and that 30% fee awards have repeatedly been granted by courts in this Circuit for cases like that presented here.

The fact that no other class member objected to the fee request further favors a 30% award. *See, e.g.*, *Saldivar*, 2011 WL 13213889, at *14 ("No member of the class, moreover, has objected to the requested fee award. This lack of objection weighs in favor of awarding the amount sought."); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *21 (factor supported fee award where "no class member has objected to the attorneys' fee request and only one person opted-out of the class"); *Moreyra*, 2013 WL 12248139, at *4 (33% fee award where no class member objected). The Solo fee objection is both an outlier and without merit.

It is also supportive of the fee award that no class member objected to the working-conditions settlement, which provided significant additional benefits to the class members (and for which no separate fee award is being sought). *See* Dkt. 304. This near universal support by class members of both settlements is another factor in support of counsel's fee request. *See Pan*, 2017 WL 3252212, at *13 ("[A]lthough thirteen class members have requested exclusion, and four filed objections, this only constitutes approximately 0.49% of the overall class. ... This near-unanimous class

approval and absence of fee-specific objections also weighs in favor of [a fee award].”); *Fernandez*, 2008 WL 8150856, at *13 (“[T]he reaction of the class has been positive. Only three class members objected and only twenty-nine opted out.  This indicates that counsel achieved a favorable result for the class, which in turn suggests that they are entitled to a generous fee.”).

**F.     The lodestar method strongly confirms that a 30% fee request is reasonable.**

The lodestar method multiplies the number of hours counsel reasonably spent on the lawsuit by the reasonable hourly rate in the legal community for similar work.  *See Moreyra*, 2013 WL 12248139, at *2.  When counsel is seeking a percentage of a settlement amount, the alternative lodestar calculation “serves as a point of comparison” to “assess the reasonableness of [the] percentage award.”  *Fernandez*, 2008 WL 8150856, at *14.  As a result, this “‘cross-check’ need not be as exhaustive as a pure lodestar calculation.”  *Id.* (cross-check “can be approximate and still serve its purpose”). Courts can instead “do a rough calculation ‘with a less exhaustive cataloging and review of counsel’s hours.’”  *Carlin*, 380 F. Supp. 3d at 1022.

The 30% fee request here is a *fraction*—less than 60%—of the lodestar calculation.  The requested 30% fee yields a $6.6 million award while counsel’s lodestar totals about $11.49 million—with approximately 16,000 hours worked over three-plus years.  *See* Kessler Decl. ¶¶ 5–22, 25–33 (summarizing work performed and fees incurred).  This case required such extensive work because of its scope, duration, and factual and legal complexity, as discussed above. *See Keller*, 2015 WL 5005057, at *3 (finding over 20,000 hours worked “reasonable given the complexity of the legal issues involved … as well as the extensiveness of both discovery and settlement negotiations”).

And because the fee request is only a modest percentage of the total lodestar, class counsel’s fee request represents a “negative multiplier”—the lodestar must be *reduced* to match the fee sought.  Unlike many other class action settlements,

18

particularly those involving "megafunds," where a fee request is generally multiples of the lodestar, the "negative multiplier" here strongly supports the reasonableness of the 30% fee request.  *See Carlin*, 380 F. Supp. 3d at 1022–23 (collecting cases); *Keller*, 2015 WL 5005057, at *2–3 (awarding 29% of settlement fund where percentage-based approach yielded a *lesser* amount than the lodestar).

**G.    Class counsel should be reimbursed for reasonably incurred costs.**

Courts approve reimbursement for: "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees."  *Carlin*, 380 F. Supp. 3d at 1023–24.

Winston & Strawn seeks reimbursement for $1,319,127 in expenses reasonably incurred over the past three-plus years—with a significant portion representing costs associated with Plaintiffs' retention of three highly qualified experts (who drafted a total of six reports and each of whom was deposed) and the rest falling into permissible categories.  *See* Kessler Decl. ¶¶ 34–35 (detailing various costs incurred by category). Class counsel advanced this entire amount, interest-free, with no assurances that it would recover a dime.  *Id.* ¶ 34.  And all such expenses were not only necessarily incurred to achieve the milestone settlements here but are also routinely billed in the legal marketplace.  *See, e.g.*, *Vedachalam*, 2013 WL 3941319, at *3 (reimbursing costs for copying, mailing, and service; deposition transcripts; travel; mediators; providing class notice; computer research; and expert consultants because "[t]hese litigation expenses were necessary to secure the resolution"); *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *29 (approving expenses that "were necessary to the prosecution of this litigation, were the sort of expenses normally billed to paying clients, and were made for the benefit of the Class").

Counsel's expense reimbursement is thus reasonable.  *See, e.g.*, *Carlin*, 380 F. Supp. 3d at 1023–24 (approving reimbursement of over $800,000 in costs for copying,

depositions, travel, experts, transcripts, and mediator fees); *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *28–29 (reimbursing about $2 million in costs for expert fees, travel, transcripts, document management, copying, and mediator fees).

Class counsel also seeks reimbursement for $50,000 that it expects to incur in administering the settlement. This conservative estimate will pay for, among others, fees incurred in connection with Plaintiffs' expert Dr. Cook's work in calculating payouts of the $22 million fund to each class member.

## V.    CONCLUSION

For all of the reasons stated above, the Court should award Plaintiffs' counsel $6.6 million in attorneys' fees and approve reimbursement of $1,369,127 ($1,319,127 plus $50,000) in expenses.

Dated:  November 1, 2022              WINSTON & STRAWN LLP


By:  */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
David G. Feher
Cardelle B. Spangler
Diana Hughes Leiden
Jeanifer E. Parsigian
Lev Tsukerman

*Attorneys for Plaintiffs*